UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

MARY VAN BRUNT-PIEHLER,

                                        Plaintiff,

                 v.

ABSOLUTE SOFTWARE, INC., ABSOLUTE
SOFTWARE CORPORATION, GEOFF HAYDON,
THOMAS KENNY and TODD AWTRY,

                                        Defendants.

Index No. 16-cv-6313(EAW) (MWP)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**DORSEY & WHITNEY LLP**
51 West 52nd Street
New York, New York 10019
(212) 415-9200

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................. iv

STATEMENT OF FACTS ................................................................................................ 1

ARGUMENT ................................................................................................................... 14

I.      SUMMARY JUDGMENT STANDARD ............................................................... 14

II.     PIEHLER'S SEX AND AGE DISCRIMINATION CLAIMS UNDER TITLE
VII, ADEA AND NYSHRL SHOULD BE DISMISSED ................................... 16

       A.     Piehler Cannot State a *Prima Facie* Case of Discrimination ................................ 16

              1.     Piehler's Complaints and Criticisms of Awtry Raise no Inference
of Discrimination ............................................................................. 16

              2.     The stray remarks on which Piehler relies are insufficient to state a
prima facie case ............................................................................... 21

       B.     Piehler was Terminated for a Legitimate, Non-Discriminatory Reason ............... 24

       C.     There is No Evidence That the Legitimate, Nondiscriminatory Reasons for
Piehler's Termination Were Pretext for Discrimination ......................................... 25

III.    PIEHLER'S INDIVIDUAL LIABILTY CLAIMS AGAINST HAYDON AND
KENNY FAIL BECAUSE THERE IS NO EVIDENCE THEY ACTUALLY
PARTICIPATED IN DISCRIMINATION AGAINST HER ............................... 26

IV.    PIEHLER HAS NOT ESTABLISHED AIDING AND ABETTING UNDER THE
NYSHRL ................................................................................................................ 28

V.     PIEHLER'S RETALIATION CLAIMS UNDER THE NYSHRL AND THE EPA
SHOULD BE DISMISSED .................................................................................... 29

       A.     Piehler Cannot State a Prima Facie Case of Retaliation ......................................... 30

              1.     Plaintiff Did Not Engage in Protected Activity During her
Employment. ...................................................................................... 30

              2.     Absolute Was Not Aware of any Protected Activity by Piehler
During her Employment ................................................................... 31

- i -

3.    Piehler has not Identified Adverse Action taken During her Employment .................................................................. 32

4.    There is no Evidence of Adverse Action Based on Piehler's EEOC Charge ........................................................................ 33

5.    Piehler Has Not Established a Causal Connection Between the Protected Activity and the Adverse Employment Action. ......................... 33

6.    Defendants Had Legitimate Non-Discriminatory Reasons for Piehler's Termination that were not Pretextual ........................... 34

VI.   PIEHLER'S EQUAL PAY CLAIMS FAIL AS A MATTER OF LAW ........................ 34

A.    Plaintiff's Unequal Pay Claims Fail as a Matter of Law ......................................... 34

B.    Piehler Cannot Establish a *Prima* Facie Case Under the Federal Equal Pay Act ................................................................................. 35

1.    Piehler Improperly Compares Herself to Male Employees Whose Jobs Were Not Substantially Equal to Hers ..................... 35

a.    Luporini, Dye and Morini are not Similarly Situated ....... 36

b.    Art Robinson and Dave Armstrong Are the Only Appropriate Male Comparators ......................................... 38

2.    Absolute did not Pay Lower Wages to Piehler ........................... 39

a.    Piehler was Assigned a Higher OTE than the Average Male Comparator ................................................. 39

b.    Piehler was Assigned a Higher OTE Than Armstrong and Amy Rathbun was Assigned a Higher OTE Than Robinson, Armstrong, and Piehler ........................................................................... 41

C.    Absolute Made Salary Decisions Based on Factors Other Than Sex ................... 41

1.    Art Robinson was More Highly Compensated than Piehler Based on Superior Performance ................................................... 42

2.    Luporini, Dye and Morini were Assigned Higher OTE than Piehler Because (1) Their Positions Were More Difficult and Carried More Risk and (2) they had Recent Cybersecurity Experience; and (3) Absolute Had to Offer a Competitive Salary to Recruit Them ........................................... 44

       D.      Plaintiff Cannot Establish a Case Under the New York EPA Because None of the "Comparators" Work in the Same Establishment ............................ 45

VII.    PIEHLER'S CLAIM FOR DEFAMATION AND/OR SLANDER PER SE AGAINST ABSOLUTE AND AWTRY MUST BE DISMISSED ................................ 46

       A.      The claim should be dismissed as against Awtry ................................... 46

       B.      Piehler's claim fails as a matter of law for inadequate pleading .......................... 46

       C.      Plaintiff lacks admissible evidence that defamatory statements were made ......... 47

       D.      The alleged statements are non-actionable opinion and qualifiedly privileged ................................................................................. 48

VIII.   PIEHLER'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS AGAINST ALL DEFENDANTS MUST BE DISMISSED ................................................................. 49

CONCLUSION ................................................................................................. 50

4820-6786-3985\5

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams v. Delta Airlines, Inc.*,
  No. 16 CV 1986 (KAM) (LB), 2017 U.S. Dist. LEXIS 208639 (E.D.N.Y.
  Dec. 18, 2017)..........................................................................................................28

*Aldrich v. Randolph Cent. Sch. Dist.*,
  963 F.2d 520 (2d Cir. 1992)....................................................................................35

*Allen v. Chanel, Inc.*,
  No. 12-cv-6758, 2015 WL 3938096 (S.D.N.Y. June 26, 2015) ..............................16

*Alvarez v. Royal Atl. Developers, Inc.*,
  610 F.3d 1253 (11th Cir. 2010) ..............................................................................23

*Ambrose v. Summit Polymers, Inc.*,
  172 F. App'x 103 (6th Cir. 2006) ............................................................................38

*Anderson v. Young & Rubicam*,
  68 A.D.3d 430 (1st Dep't 2009) ..............................................................................16

*Ashby v. ALM Media, LLC*,
  110 A.D.3d 459 (1st Dep't 2013) ............................................................................49

*Biro v. Condé Nast*,
  883 F. Supp. 2d 441 (S.D.N.Y. 2012)......................................................................48

*Brattis v. Rainbow Adver. Holdings, L.L.C.*,
  99 Civ. 10144, 2000 U.S. Dist. LEXIS 7345 (S.D.N.Y. May 30, 2000)...........48, 49

*Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*,
  302 F.3d 83 (2d Cir. 2002)......................................................................................14

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
  243 F.3d 93 (2d Cir. 2001)......................................................................................25

*Castro v. N.Y.C. Board of Educ.*,
  No. 96 CIV. 6314 (MBM), 1998 WL 108004 (S.D.N.Y. Mar. 12, 1998)..............30

*Chen v. City Univ. of N.Y.*,
  805 F.3d 59 (2d Cir. 2015)......................................................................................15

*Chiaramonte v. Animal Med. Ctr.*,
  677 F. App'x 689 (2d Cir. 2017) ............................................................................35

4820-6786-3985\5

*Chukwueze v. NYCERS*,
   10-Civ-8133, 2014 U.S. Dist. LEXIS 101908 (S.D.N.Y. July 25, 2014), *aff'd*,
   643 F. App'x 64 (2d Cir. 2016) ........................................................................................30

*Couloute v. Ryncarz*,
   No. 11 CV 5986, 2012 U.S. Dist. LEXIS 20534 (S.D.N.Y. Feb. 15, 2012) .........................50

*Crain v. Judson Indep. Sch. Dist.*,
   Civil Action No. SA-16-CV-832-XR, 2018 U.S. Dist. LEXIS 183777 (W.D.
   Tex. Oct. 26, 2018) ........................................................................................................33

*Delaney v. Bank of Am. Corp.*,
   766 F.3d 163 (2d Cir. 2014)............................................................................................16

*Delgado v. Puerto Rican Family Inst., Inc.*,
   97 Civ. 7122 (DAB), 2001 U.S. Dist. LEXIS 12699 (S.D.N.Y. Aug. 22, 2001) .............35, 42

*Deutsche Asset Mgmt. v. Callaghan*,
   2004 U.S. Dist. LEXIS 5945 (S.D.N.Y. Apr. 7, 2004)........................................................47

*Dinolfo v. Rochester Tel. Corp.*,
   972 F. Supp. 718 (W.D.N.Y. 1997) ..............................................................................38, 45

*Doria v. Cramer Rosenthal McGlynn, Inc.*,
   942 F. Supp. 937 (S.D.N.Y. 1996) ...................................................................................38

*Downey v. Adloox Inc.*,
   2018 WL 5266875 (S.D.N.Y 2018)...................................................................................19

*Drury v. Waterfront Media, Inc.*,
   2007 U.S. Dist. LEXIS 18435 (S.D.N.Y. Mar. 7, 2007) .....................................................45

*EEOC v. Straubinger*,
   No. CIV-75-372, 1981 U.S. Dist. LEXIS 13423 (W.D.N.Y. June 8, 1981).........................40

*Evert v. Wyoming Cnty. Health Sys.*,
   2017 U.S. Dist. Lexis 69681 (W.D.N.Y. 2017)..............................................................17, 32

*Fears v. Heritage Ctrs.*,
   No. 02-CV-639S, 2004 U.S. Dist. LEXIS 16455 (W.D.N.Y. Aug. 15, 2004) .....................23

*Feingold v. New York*,
   366 F.3d 138 (2d Cir. 2004).............................................................................................27

*Figueroa v. RSquared NY, Inc.*,
   89 F. Supp. 3d 484 (E.D.N.Y. 2015) .................................................................................27

*Fisher v. Vassar College*,
    70 F.3d 1420 (2d. Cir. 1995)................................................................35

*Fleming v. MaxMara USA, Inc.*,
    644 F. Supp. 2d 247 (E.D.N.Y. 2009), *aff'd*, 371 F. App'x 115 (2d Cir. 2010)....................25

*Fontecchio v. ABC Corp.*,
    No. 12-cv-6998 (CS), 2015 WL 327838 (S.D.N.Y. Jan. 23, 2015)........................................25

*Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*,
    136 F.3d 276 (2d Cir.1998)................................................................32

*Garcia v. Barclays Capital, Inc.*,
    281 F.Supp 3d 365 (S.D.N.Y. 2017)................................................................15, 42

*Glenwright v. Xerox Corp.*,
    832 F. Supp. 2d 268 (W.D.N.Y. 2011)................................................................16

*Gorzynski v. JetBlue Airways Corp.*,
    596 F.3d 93 (2d Cir. 2010)................................................................15, 16

*Greathouse v. JHS Sec. Inc.*,
    784 F.3d 105 (2d Cir. 2015)................................................................31

*Greenbelt Coop. Pub. Ass'n v. Bresler*,
    398 U.S. 6 (1970)................................................................49

*Grosjean v. First Energy Corp.*,
    349 F.3d 332 (6th Cir. 2003)................................................................26

*Heatherly v. Univ. of Alabama Bd. of Trustees*,
    2018 WL 3439341 (N.D. Ala. July 17, 2018)................................................................36

*Heymann v. Tetra Plastics Corp.*,
    640 F.2d 115 (8th Cir. 1981)................................................................40

*Huntemann*,
    1997 U.S. Dist. LEXIS 12714................................................................49

*Inguanzo v. Hous. & Servs., Inc.*,
    No. 12–cv–8212, 2014 WL 4678254 (S.D.N.Y. Sept. 19, 2014), *aff'd*, 621 F.
    App'x 91 (2d Cir. 2015)................................................................26

*Kassman v. KPMG LLP*,
    2018 U.S. Dist. LEXIS 203561 (S.D.N.Y. Nov. 30, 2018)................................................................39

*Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*,
    716 F.3d 10 (2d Cir. 2013)................................................................32

*Khwaja v. Jobs to Move Am.*,
　　No. 1:19-cv-07070 (GBD) (SDA), 2019 U.S. Dist. LEXIS 197982 (S.D.N.Y.
　　Nov. 13, 2019) ........................................................................................................30

*Kobos v. Target*,
　　2018 U.S. Dist. Lexis 98554 (S.D.N.Y. 2018) ........................................................29

*Lam v. Sephora USA, Inc.*,
　　488 F. App'x 487 (2d Cir. 2012) ..........................................................................15

*Leong v. SAP Am., Inc.*,
　　67 F. Supp. 3d 972 (N.D. Ill. 2014) .......................................................................31

*Loughry v. Lincoln First Bank*,
　　67 N.Y.2d 369 (1986) ............................................................................................46

*Mattera v. JPMorgan Chase Corp.*,
　　740 F. Supp. 2d 561 (S.D.N.Y. 2010).............................................................15, 16

*Mauze v. CBS Corp.*,
　　340 F. Supp. 3d 186 (E.D.N.Y. 2018) ...................................................................45

*McCall v. Bright House Networks, LLC*,
　　No. 6:18-cv-1670-Orl-22DCI, 2020 U.S. Dist. LEXIS 2123 (M.D. Fla. Jan. 7,
　　2020) ......................................................................................................................23

*McCollum v. Bolger*,
　　794 F.2d 602 (11th Cir. 1986), *cert den.* 479 U.S. 1034 ...................................24, 25

*Meiri v. Dacon*,
　　759 F.2d 989 (2d Cir. 1985)...................................................................................24

*Mikinberg v. Bemis Co.*,
　　555 F. App'x 34 (2d Cir. 2014) ..............................................................................16

*Milligan v. Citibank, N.A.*,
　　00 Civ. 2793 (AGS), 2001 U.S. Dist. LEXIS 16105 (S.D.N.Y. Sep. 25, 2001) ....................37

*Mullins v. City of N.Y.*,
　　626 F.3d 47 (2d Cir. 2010)......................................................................................30

*Neratko v. Frank*,
　　31 F. Supp. 2d 270 (W.D.N.Y. 1998) .....................................................................25

*Neubecker v. N.Y. State, State of Univ. of N.Y., Erie Cmty. Coll.*,
　　2018 U.S. Dist. LEXIS 158422 ..............................................................................14

4820-6786-3985\5

*Opals On Ice Lingerie v. Bodylines Inc.*,
   320 F.3d 362 (2d Cir. 2003)....................................................................15

*Pollis v. New Sch. for Soc. Research*,
   132 F.3d 115 (2d Cir. 1997)...............................................................17, 40

*Price v. N. States Power Co.*,
   664 F.3d 1186 (8th Cir. 2011) ............................................................39

*Raco v. GE*,
   1996 U.S. Dist. LEXIS 22611 (S.D.N.Y. Oct. 7, 1996) ....................35, 41

*Scott v. Sulzer Carbomedics, Inc.*,
   141 F. Supp. 2d 154 (D. Mass. 2001) ....................................................42

*Sharma v. Airport Mgmt. Servs., LLC*,
   No. 16-CV-9109 (LAP), 2018 U.S. Dist. LEXIS 48593 (S.D.N.Y. Mar. 22,
   2018) ..................................................................................................34

*Siani v. State Univ. of N.Y.*,
   7 F. Supp. 3d 304 (E.D.N.Y. 2014) ......................................................16

*Sitar v. Ind. Dep't of Transp.*,
   344 F.3d 720 (7th Cir. 2003) ................................................................31

*Sowell v. Alumina Ceramics, Inc.*,
   251 F.3d 678 (8th Cir. 2001) ................................................................41

*Spencer v. Virginia State Univ.*,
   2018 U.S. Dist. LEXIS 15773 (E.D. Va. Jan. 30, 2018) ........................42

*Stewart v. Florence Nightingale Health Ctr.*,
   No. 97 Civ. 6977, 1999 U.S. Dist. LEXIS 3985 (S.D.N.Y. Mar. 31, 1999)...........49

*Talwar v. Staten Island Univ. Hosp.*,
   610 F. App'x 28 (2d Cir. 2015) ............................................................41

*Townsend v. Exch. Ins. Co.*,
   247 F. Supp. 2d 325 (W.D.N.Y. 2003) ..................................................26

*Velazquez v. Yoh Servs., LLC*,
   2019 U.S. Dist. LEXIS 46746 (S.D.N.Y. Mar. 15, 2019) ......................31

*Waters v. Turner, Wood & Smith Ins. Agency, Inc.*,
   874 F.2d 797 (11th Cir. 1989) ..............................................................36

*Weinstock v. Columbia Univ.*,
   224 F.3d 33 (2d Cir. 2000)....................................................................30

*Zhengfang Liang v. Café Spice SB, Inc.*,
    911 F. Supp. 2d 184 (E.D.N.Y. 2012) ....................................................................................40

**Statutes**

29 U.S.C. § 206(d)(1) ...................................................................................................35, 39, 42

N.Y. Exec. Law §§ 296(1), 296(6) ........................................................................................27

New York Labor Law § 194 ...............................................................................................45, 46

**Other Authorities**

29 C.F.R. § 1620.9(a)..............................................................................................................39

Fed. R. Civ. P. 8 ......................................................................................................................47

Fed. R. Evid. 802 ....................................................................................................................48

Federal Rule of Civil Procedure 56 .........................................................................................1

Defendants Absolute Software, Inc. and Absolute Software Corporation ("collectively "Absolute"), Geoff Haydon, Thomas Kenny and Todd Awtry submit this memorandum of law in support of their motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## STATEMENT OF FACTS

**Absolute's Business**

Founded in 1993, Absolute Software Corporation is a Canadian company headquartered in Vancouver, British Columbia.  Absolute Software, Inc. was formed in 1998 as a wholly owned subsidiary of Absolute Software Corporation.  It maintains offices in Austin, Texas and principally acts as a sales company, responsible for the sale and distribution of Absolute's products in the United States.  Olsen Decl., ¶¶ 2-3

Absolute Software Corporation and Absolute Software, Inc. are in the computer software business.  Historically, Absolute's core business had been in the "SLED" (state, local and education) sphere, to which Absolute sold anti-theft software to locate and retrieve laptops and other devices. *Id.* ¶ 4.

Although Absolute had grown significantly since its founding, in some respects it still operated with the informality of a start-up company.  *Id.* ¶ 6.  In order to bring more professionalism to the sales force, Absolute hired Thomas Kenny in December 2012 as Executive Vice President and General Manager of Worldwide Sales, and Todd Awtry in January 2013 as Vice President of Sales North America.  *Id.* at ¶ 7; Lestrade Decl., Exh. A (Berardo Dep. Tr.) at 19:11-20:13.

Awtry's duties included the introduction of more formal processes and structure to Absolute's sales organization.  Awtry had previously worked in sales management at Hewlett Packard and sought to implement some of the processes and procedures that he had learned there, and to effect other changes designed to improve the operations and effectiveness of

Absolute's sales force.  Some members of the sales force were accepting of the changes that he

implemented, while others resisted change.  Awtry Decl. ¶ 6.

Absolute's initial CEO, John Livingston, stepped down in December 2013 and Geoff

Haydon assumed the role on July 1, 2014.  Olsen Decl. ¶ 8.  Absolute's board of directors tasked

him with expanding Absolute's business beyond SLED and he sought to transform the company

by focusing on information security solutions for private enterprise clients.  Haydon Decl. ¶ 3;

Olsen Decl. ¶¶ 8-9; Lestrade Decl., Exh. B (Kenny Tr.) at 68:5-69:8; C (Awtry Tr.) at 25:7-14.

**The Reorganization of the Sales Force**

In order to achieve this transformation, Haydon made the decision to reorganize

Absolute's sales force.  Absolute had previously divided its North American sales operations into

five geographic regions, with each region having an outside sales team of Account Executives

("AEs") managed by either a Regional Director ("RD") or an Area Vice President ("AVP").[1]

The managers for these five regions were Warren Young (West AVP); Dave Armstrong (North

Central RD); Amy Rathbun (Southwest RD); Art Robinson (Southeast AVP) and the Plaintiff,

Mary Piehler (Northeast RD).  They reported to Awtry; Awtry reported to Thomas Kenny and

Kenny reported to Haydon.  Haydon Decl. ¶ 3.

Beginning July 1, 2015, the date on which Piehler's employment was terminated,

Absolute eliminated the prior regions and created three significantly larger territories—East,

Central and West.  Under the old structure, the five RDs/AVPs - Piehler, Rathbun, Robinson,

Warren and Armstrong—had managed AEs responsible for both acquiring new business and

---

[1] The title of AVP was a higher and more prestigious position than RD and generally awarded to those with more tenure at the company.  For example, the two AVPs at that time—Warren Young and Art Robinson—had been employed since 1995 and 1998 respectively, whereas Dave Armstrong, Amy Rathbun and Mary Piehler were more recent hires.  Awtry Decl. ¶ 4.

retaining existing business within their regions.  The three new territories each had separate

teams focused specifically on "Acquisition" and "Retention."  Therefore, as of July 1, 2015, the

positions previously held by Piehler, Rathbun, Robinson, Warren and Armstrong no longer

existed.  The regions covered by each of them prior to July 1, 2015 were replaced by the larger

territories. Awtry Decl.¶¶ 8-9; Lestrade Decl., Exh. D (Piehler Tr.) at 286:13-287:7.

The purpose of the Acquisition teams was to focus on acquiring new business from

private sector enterprises.  Haydon Decl. ¶ 4.  Haydon identified the criteria for the Acquisition

teams, including the RDs or AVPs for these teams, as people having recent cybersecurity

backgrounds and experience selling to Fortune 500 enterprises.  *Id*. ¶ 5.

Awtry made the ultimate decision on who should manage the new teams.  On July 1,

2015, Art Robinson assumed the role of AVP for East/Retention, Amy Rathbun became the AVP

for Central/Retention and Warren Young the AVP for West/Retention.[2]   Piehler had been

tentatively slotted into the East/Acquisition role, but because her employment was terminated as

of July 1, 2015, she never served in that role. Awtry Decl. ¶ 12.

Absolute hired Kurt Luporini (age 43) (Central), Randy Dye (age 50) (West) and Joe

Morini (age 51) (East) to serve as RDs for these teams: Olsen Decl. ¶ 14.  Luporini and Dye had

been hired in the Spring of 2015.  Morini commenced employment on or about July 14, 2015.

All three came from outside of Absolute and had recent cybersecurity backgrounds and

enterprise sales experience.  Awtry Decl. ¶¶ 40-43.

**Piehler's Relationship with Awtry**

Piehler commenced employment with Absolute Software, Inc. in November 2010.

Lestrade Decl., Exh. D (Piehler Tr.) at 44:18-23.  John Livingston was still running the company

---

[2] Warren Young was demoted to Account Executive in October 2015.  Awtry Decl. ¶ p. 4, n.1.

and Piehler reported to John Sarantakes, then Senior Vice President of North American and

EMEA Sales.  Sarantakes was subsequently removed from that position and Piehler began

reporting to Awtry in January 2013.  Olsen Decl. ¶¶ 5, 7. Almost immediately, she voiced her

disapproval of the changes that Awtry and Kenny sought to implement.  She openly criticized

Awtry and Kenny to other employees and predicted their failure.  This behavior caused the

relationship between Awtry and Piehler to be strained from the start.  Awtry perceived Piehler's

actions and attitude as disrespectful and disparaging of him.  Awtry Decl ¶¶ 16, 28; Lestrade

Decl., Exh. C (Awtry Tr.) at 137:18-22; 143:20-144:5; 252:16-257:24.

In March 2013, Piehler had email correspondence with a co-worker, Jermaine

Maldonado, in which she shared gossip about Kenny and Awtry, criticized their leadership as

"chaos not structure," portrayed Awtry as incompetent and uninformed.  Piehler ended the email

chain with the prediction: "I think these guys will be gone from [Absolute] in less than a year."[3]

Awtry Decl. ¶ 17, Ex. B; Lestrade Decl., Exh. D (Piehler Tr.) at 145:14-146:10.  This attitude

colored her dealings with Awtry.  He learned of this email in the Spring of 2013, and considered

Piehler's comments about him to be offensive.  Awtry Decl. ¶ 18.  Piehler testified at her

deposition that her reference to "chaos not structure" referred to "a great example of a business

assumption" that in her view Awtry and Kenny got wrong.  Lestrade Decl., Exh. D (Piehler Tr.)

at 133:14-134:21.  She also testified about Awtry and Kenny that she "didn't see any

leadership."  *Id*. at 142:3-143:22.  She thought they would be gone from Absolute in less than a

year "[b]ecause their behavior was not something that was going to lead to Absolute increasing

business and it was not a culture that the founder of the company had insisted upon and built the

---

[3] Piehler gloated in her deposition that her prediction was not far offer, as Kenny was terminated in January 2016 and Awtry was demoted and subsequently resigned in 2017.  Lestrade Decl. Exh. D (Piehler Tr.) 146:3-6.

company on." *Id*. at 146:17-23.  She also explained her prediction that they would soon be gone by testifying that "I think it's fair to say I knew more about the culture of the company at that time than two people that were just hired." *Id*. at 146:7-16.

Piehler's direct dealings with Awtry were no less abrasive.  On April 5, 2013, Piehler sent Awtry, a highly critical email (DEFS00774) in which she stated to him that it was "not a good practice" for him to have emailed two sales representatives, Charles Springgay and Mark Kelly, requesting a telephone call the next day without telling them what the call would be about. Piehler also lectured Awtry "[r]ight now at Absolute we can't play mind games."  Awtry Decl. ¶ 19, Exh. C.  Piehler testified about this email at her deposition, stating that she believed Awtry "was playing a mind game with [Springgay and Kelly] hoping that they would think they were getting fired."  "Because those were the two he was targeting that were travelling in from Vancouver to the northeast and he didn't like it."  Lestrade Decl., Exh. D (Piehler Tr.) at 159:22-160:6.  Piehler further testified that she told Awtry "look it, you laid off people today in the company . . .  you are creating a level of angst, and they're coming to me as the manager and I don't know what you are doing."  *Id*. at 106:7-108:15.

Piehler's actions also challenged Awtry's authority.  In the summer of 2014, Awtry requested that each sales manager assign an AE to attend a monthly marketing meeting.  As of September 15, 2014, Piehler had not assigned an AE from her team.  When Awtry asked Piehler why, she responded that she "opted not to assign a rep in Q4 as we continued to sell and focus on our business." Awtry Decl., Exh. G (DEFS00780); Lestrade Decl., Exh. D (Piehler Tr.) at 164:17-167:21. Awtry took that as Ms. Piehler's deliberately disobeying his directive because she did not agree with it, suggesting that Awtry was not focused on the business of selling, but that she was.  Every other outside sales team assigned an AE to the marketing meeting.  Awtry

Decl. ¶ 23.

In April 2015, Piehler put forth a candidate for an open position on her team. When Awtry questioned whether he had a security background required by Mr. Haydon, Piehler challenged that directive and argued that "[s]elling this market is not about a 'security background'. . . ." Awtry Decl. ¶ 24, Ex. H (DEFS02815).

On May 22, 2015, Piehler and Awtry participated in a three-way telephone conference with Art Robinson to discuss the division of the Acquisition and Retention teams for the East region in the upcoming sales reorganization. During the call, Piehler resisted Awtry's recommendations concerning how the teams would be divided and was insistent that her AEs should be able to choose which team they would be on, even though it had been explained to her that it was no longer possible to allow the AEs to choose. *Id.* ¶ 26. Piehler testified about the call at her deposition, stating about Awtry and Robinson "[i]t was just ridiculous. It was two people who didn't have any understanding of what these sales people do for a living, trying to slide them into new spots," (Lestrade Decl., Exh. D [Piehler Tr.] at 288:14-23) and that Awtry "was not happy that I said if he went to this, these reps would leave, that **this was not what he should be doing**." *Id.* at 289:11-14 (emphasis added).

After the telephone conference, Awtry sent Piehler an email concerning his frustration with her. Two hours later, Piehler sent Awtry a multi-page, point-by-point rebuttal in which she lectured Awtry about how he should do his job—"Criticizing me and my 'leadership' in front of one of my peers in not really the right thing to do" and "Maybe you should have showed the RDs first before you showed their direct reports." She accused him of "inconsistent messaging" and "waffling" and not acting "professionally." She continued to place more emphasis on what her AEs wanted, instead of what was best for Absolute. She ended her email by saying "[t]hank you

for the recap email and I am glad I had the opportunity to respond.  Have a good weekend!"
Awtry Decl. ¶ 27, Ex. J (P000712-14).

**Piehler's Job Performance**

Piehler's job performance at Absolute was inconsistent.  There were quarters in which
Piehler's team met its sales quota.  However, her team did not meet its overall sales quota in any
fiscal year in which Awtry supervised her.  In the two quarters immediately preceding Piehler's
termination combined, her team's quota attainment was only 69.8%.  Awtry Decl. ¶ 29, Ex. K.

Piehler also struggled with her team's sales of two software products:  Absolute Manage
and Absolute Service.  In FY 2014, Piehler's team sold significantly less than the next closest
region.  On September 16, 2014, Piehler acknowledged her poor performance with respect to
Manage and Service, stating that her results on those two products were "painful."    Awtry Decl.
¶ 30, Ex. L (DEFS00786).  On September 23, 2014, Piehler agreed to provide Awtry with a plan
"about [her team's] lack of absolute service business."  *Id.* ¶ 30, Ex. M (DEFS00790).

**DOE Investigation**

The New York City Department of Education (DOE) had been one of Absolute's largest
customers for many years.  In or about July 2013, Absolute changed the way it credited
commissionable revenue in order to reward the acquisition of new business.  Going forward,
revenue on sales to existing customers would be credited at 80%, while revenue on sales to new
customers would be credited at 130%.  *Id.* ¶ 3.

In or about June 2014, it came to light that even though the DOE had long been a
customer, all of Absolute's sales to the DOE were being booked as new business at the 130%
quota attainment rate.   Matt Meanchoff, then VP of Account Management and Service brought
the issue to the attention of Absolute's Finance Department.  Ramsden Decl. ¶ 7.

Piehler, Charles Springgay (male under 40) and Justin Peacock (male over 40) (*see* Olsen Decl. ¶ 14) were identified as the main individuals involved in booking the business in that manner and their commissions were withheld until it could be determined whether the orders should receive the accelerated commission attainment credit.  Ramsden Decl. ¶ 9.

Ramsden involved Awtry in the investigation to interview Piehler, Springgay and Peacock.  Piehler argued that she had previously informed Awtry how the DOE business was being booked and that it was appropriate to treat new DOE schools as new business.  Ultimately, Awtry implemented a new protocol concerning DOE orders which resulted in Piehler being credited at 130% for most of the DOE sales.  Ramsden Decl. ¶ 11.  As discussed below, Piehler took great offense at the DOE investigation, calling it a "witch hunt," and went on the offensive, principally against Awtry, writing emails questioning Awtry's competence and professionalism. Lestrade Decl., Exh. E (DEFS02585).

**Piehler's Termination**

Tasked with implementing a major restructuring of the sales force, and under increasing pressure from Haydon to do so quickly, Awtry determined that he needed managers to work with him and not oppose his leadership.  Awtry made the decision to terminate Piehler's employment because her actions and attitude made her difficult to work with.  He felt that she was disparaging of him, said negative and disrespectful things to him and about him to others, suggested to him and to others that he was incompetent,  did not support him as a manager, was difficult and at times combative, resistant to his directives and suggestions, and her performance was mediocre.  Awtry Decl. ¶¶ 16, 28-29; Lestrade Decl., Exh. C (Awtry Tr.) at 137:18-22; 143:20-144:5; 252:16-257:24.  Mr. Awtry felt that Ms. Piehler aligned herself more with the AEs who reported to her than she did with company management, that she would often say "my job is

to represent my team and what my team wants," that she had an "us (sales representatives) versus them (management)" attitude. *Id*. at 256:16-257:7.

### Piehler's Claims Concerning Comments Allegedly Made By Thomas Kenny

Piehler alleges in her complaint that in April 2015, Kenny stated that Haydon wanted to get rid of older, female employees. Amended Complaint ("AC") (Dkt. 34) ¶16. Piehler makes reference to Kenny's comments elsewhere in the Amended Complaint but with different wording. *See id*, ¶¶ 21, 25 and 46. Piehler made no mention of these comments during her employment. Lestrade Decl., Exh. A (Berardo Tr.) at 124:4-23; 129:23-130:9.

Piehler testified at her deposition that the words appearing in quotation marks in paragraph 25 of the Amended Complaint (i.e., "end of rainbow" and "just hire guys who are athletes, who talk sports and trash and get in each other's faces") are what she remembers Kenny saying. The rest is paraphrasing. Lestrade Decl., Exh. D (Piehler Tr.) at 312:2-23.

Piehler testified that other than Kenny's comments about what Haydon wanted, she never heard Haydon express these views. *Id*. at 314:12-20. Piehler also testified that other than at the April 30, 2015 meeting, she never heard Kenny make those or similar comments. *Id*. at 315:5-23. She never heard other Absolute employees say that Absolute wanted to get rid of older female employees. *Id*. at 315:24-316:5.

Kenny testified that Haydon never expressed to him anything about getting rid of older or female employees or hiring young males. Lestrade Decl., Exh. B (Kenny Tr.) at 104:12-17; 109:13-24. Haydon testified that he never expressed anything of the sort and that the alleged comments did not align with his thinking in any way. *Id*., Exh. F (Haydon Tr.) at 35:23-26; 40:6-24.

### Absolute's Actual Hiring Practices

The percentage of women and employees over the age of 40 at Absolute did not change in any significant way from July 1, 2013 (one year before Haydon commenced employment at Absolute) and July 1, 2016 (two years after Haydon commenced employment at Absolute and one year after Piehler's termination.  In fact, the percentage of women and older employees employed in Absolute Software, Inc.'s sales team increased slightly over that period:

| SALES EMPLOYEES ABS INC. | | | | |
|---|---|---|---|---|
| | July 1, 2013 | July 1, 2014 | July 1, 2015 | July 1, 2016 |
| Total Employees | 75 | 83 | 88 | 68 |
| Females | 19% (14) | 23% (19) | 22% (19) | 22% (15) |
| Over 40 | 82% (61) | 82% (68) | 82% (73) | 85% (58) |
| Women Over 40 | 15% (11) | 14% (12) | 16% (14) | 18% (12) |

Olsen Decl. ¶ 11.

Absolute did not refrain from interviewing or hiring older or female candidates.  In or about December 2014, Thomas Kenny, at the request of Geoff Haydon, interviewed a female candidate, Holly Whalen, for an Acquisition RD role.  Ms. Whalen was Haydon's first choice to fill one of those open positions at the time, but she declined.  Haydon Decl. ¶ 10; Lestrade Decl., Exh. B (Kenny Tr.) at 172:14-173:9; Lestrade Decl., Exh. C (Awtry Tr.) at 335:12-14, 21-23; 336:25-337:7.

In or about May 2015, Awtry interviewed a female candidate, Susan Lutz, for the Acquisition East role.  Her resume refers to her thirty years of experience.  Both Awtry and Kenny thought Ms. Lutz would be a good candidate to interview.  Awtry was favorably impressed by Ms. Lutz but she ultimately did not join Absolute.  Awtry Decl. ¶ 14, Exh. A.

In July 2015, just days after Piehler's employment was terminated, Absolute hired Diane

Moran into a position on the US sales team.  Ms. Moran is a female who is older than Piehler.
Awtry Decl. ¶ 52; Olsen Decl. ¶ 14.

**The Compensation Process for RDs/AVPs**

Compensation for RDs and AVPs consisted of a combination of base pay and
commissions earned on sales within their region.  Every RD and AVP was assigned an On
Target Earnings ("OTE") amount.  The OTE commission component was the annual commission
earnings if the employee attained 100% of their annual commission quota.  In addition,
RDs/AVPs could earn commission enhancements, bonuses and other awards for meeting certain
benchmarks ("Sales Bonuses"), which applied evenly to all RDs/AVPs.  Awtry Decl. ¶ 31.

Every October, Absolute reviewed the performance of the RDs/AVPs over the past fiscal
year and sometimes awarded increases in OTE.  For example, compensation decisions that went
into effect in October 2014 were based on performance during FY 2014 (July 1, 2013-June 30,
2014).  *Id.* ¶ 33.

During most of Awtry's tenure supervising Piehler, the RD/AVP with the highest OTE
was Amy Rathbun, a woman over the age of 40. At the time that Awtry performed his first
compensation review at Absolute (*i.e.*, October 2013), Amy Rathbun was the highest performer
and received the highest percentage raise in OTE (8%), double that of Art Robinson, who was
the next highest performer.  *Id.* ¶ 35.  Rathbun was 48 years of age at the time.  Olsen Decl. ¶ 14.
Piehler had the lowest quota attainment of the group and did not receive a compensation increase
on that basis.  Awtry Decl. ¶ 35.  Amy Rathbun and Art Robinson were the only two RDs/AVPs
to meet their quota in FY 2014 and were the only ones to receive an increase in OTE in October
of that year.  Piehler, Young and Armstrong did not receive an OTE increase at that time.  *Id.*

Ms. Rathbun continued to be the highest performer in terms of quota attainment, and had

the highest OTE compensation of this group until October 2015.[4]  *Id.* ¶ 37.  In March 2015, Awtry recommended Rathbun for a promotion to AVP.  His recommendation was approved and Rathbun assumed the AVP title on July 1, 2015, the start of FY 2016.  Rathbun received a compensation increase for FY 2016.  *Id.*

**Piehler Admits She Did Not Complain About Age or Sex Discrimination**

Immediately after Absolute started its inquiry into the DOE account, Piehler made complaints to Daniel Berardo, Absolute's then-head of Human Resources, and to Absolute's CFO, Errol Olsen.  She did not say to either of them that she felt she was being discriminated against on the basis of sex or age, or on any other impermissible basis.  She testified at her deposition that she does not believe that she told Berardo that she was discriminated against  on the basis of age (Lestrade Decl., Exh. D [Piehler Tr.] at 239:18-24) and does not know if she said she was being discriminated against based on sex.  *Id.* at 240:19-241:14 ("I don't recall making **any** particular statements to Mr. Berardo") (emphasis added).  At first she claimed that she discussed it with Errol Olsen:  "I had that discussion, but it was not Mr. Berardo-–Mr. Berardo was not there.  It was a one-on-one, but with Errol."  *Id.* at 242:15-243:6.  However, later she admitted that she did not tell Mr. Olsen that she was being discriminated on any particular basis:  "It just—honestly was not part of the conversation at that point."  *Id.* at 247:24-248:9

**Piehler's Conversations with Berardo**

Piehler testified that she had three telephone conversations with Berardo on or about June 30, 2014, all of them concerning the DOE investigation. Lestrade Decl., Exh. D (Piehler Tr.) at 228:22-229:21.  In those conversations she "also talked about how once Mr. Awtry and Mr.

---

[4] In April 2015, Kurt Luporini and Randy Dye were hired as RDs focused only on acquiring new business. Although they were both assigned OTEs that were higher than Rathbun's, Rathbun received a raise in October 2016 to the same OTE as Randy Dye.  Awtry Decl. ¶¶ 37, 42.

Kenny arrived at the company, I never received a pay raise; any stock options; my numbers were getting presented incorrectly." *Id*. at 260:11-24.  She also said "I had a discussion with him that I was being discriminated against based on how I was being treated, versus my peers, including the people who were paid full commissions and were not investigated." *Id*. at 240:6-11.

**Piehler's Conversation with Errol Olsen**

Piehler testified that she had a conversation with Errol Olsen on or about July 8, 2014 in which she discussed her frustration with Awtry's leadership style, including how upset she was about the DOE investigation and the withholding of commissions, not receiving a performance review from him, the fact that he included performance ratings for sales personnel in an email and his not going on sales calls with her.  *Id.* at 245:21-248:9.

**Piehler's Email Correspondence with Berardo**

Piehler exchanged several emails with Daniel Berardo after speaking with him on June 30, 2014.  On July 1, 2014, she sent Berardo emails in which she portrayed Awtry as incompetent and an unfit manager, stating "I wondering [sic] if something is wrong with Todd and I don't mean that sarcastically at all" and "He can't remember anything relative to the business."  In the same email thread, she complained about how sales numbers were reported. *Id.*, Exh. E (DEFS 02584-86), G (P000811-18), H (DEFS02549-50).  Nothing in Piehler's email correspondence with Daniel Berardo raised any inference of sex or age discrimination or any protected activity.

On July 6, 2014, in response to Berardo's request for details concerning the sales numbers, Piehler forwarded to Berardo pages of emails that she had with Daniel Miller, Absolute's Sales Operations Manager, requesting changes to mistakes made in data summaries called "warbooks," which are interim sales reports.  In the emails, Miller walks Piehler through

the reasons why the interim numbers are sometimes off.  Nowhere in Piehler's emails with Miller is there any suggestion that Piehler is complaining about sex or age discrimination in the way the numbers are being reported on the warbooks.   Indeed, in her emails to Miller, Piehler stated "I know it's a system issue . . . ." Lestrade Decl., Exh. G (P000811).

Piehler mentions several other issues in her July 6, 2014 response to Berardo, none of which suggest discrimination: not getting a performance review, the distribution of sales personnel performance ratings, Absolute not investigating an employee who had a part-time job and slides presented at a meeting that did not remove non-repeat business for her region.  *Id.* (P000811-17).

On August 11, 2014, Piehler emailed Berardo stating "In my current performance review, Todd was upset that you told him I said I did not get a review in a prior time.  Todd felt that was untrue."  And further in the email:  "He now understands which review I was talking about."  *Id.* Exh. H (DEFS02550).  Piehler also informed Berardo of issues that she raised with Errol Olsen, none of which included a claim of discrimination.  Nowhere in this email, or in any email, does she suggest that she was complaining of discrimination of any sort.

## **ARGUMENT**

## I.    **SUMMARY JUDGMENT STANDARD**

The Court is well acquainted with the standard for summary judgment, *see Neubecker v. N.Y. State, State of Univ. of N.Y., Erie Cmty. Coll.*, ., No. 15-CV-00614 EAW, 2018 U.S. Dist. LEXIS 158422, at *12-13; 2018 WL 4442266 (W.D.N.Y., September 17, 2018), so Defendants will not repeat it except to emphasize that to defeat summary judgment, a plaintiff must come forward with admissible affirmative proof from which a jury could return a verdict in their favor. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).  The facts

"must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." *Opals On Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 370 n.3 (2d Cir. 2003).

### The Burden-Shifting Analysis Under Title VII, ADEA and NYSHRL

Plaintiff's discrimination claims under Title VII, the ADEA and the NYSHRL are assessed under the *McDonnell Douglas* burden-shifting formula, with the ultimate burden of proof on the plaintiff.  This requires Plaintiff first to establish a *prima facie* case by showing that (i) she belongs to a protected class; (ii) she was qualified for the position at issue; (iii) she suffered an adverse employment action, and (iv) such action occurred under circumstances giving rise to an inference of employment discrimination.  *Garcia v. Barclays Capital, Inc.*, 281 F.Supp. 3d 365, 375 (S.D.N.Y. 2017); *Chen*, 805 F.3d at 70; *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 570–71 n.7 (S.D.N.Y. 2010) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106–07 (2d Cir. 2010)).[5]

If Plaintiff is able to establish a *prima facie* case, then Defendants must articulate, but need not prove, "some legitimate, nondiscriminatory reason" for the adverse employment action—here, the termination of Plaintiff's employment.  *Lam v. Sephora USA, Inc.,* 488 F. App'x 487, 489 (2d Cir. 2012) (citations omitted).  "Defendant's burden at this stage is 'light.'  It 'is one of production, not persuasion; it can involve no credibility assessment.'"  *Garcia*, 281 F. Supp. 3d at, 375 (citations omitted).

Assuming Defendants satisfy this requirement, the burden then shifts back to Plaintiff to show that Defendants' proffered reason for discharging her was a pretext for discrimination.  The

---

[5] This applies to Plaintiff's claims under the federal Age Discrimination in Employment Act ("ADEA") as well as her age claims under the New York State Human Rights Law ("NYSHRL").  *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75–76 (2d Cir. 2015).

ultimate burden of proof lies with the Plaintiff. Here, there is a divergence between Plaintiff's burden with respect to sex discrimination versus age discrimination. In order to prove sex discrimination under Title VII and NYSHRL, Plaintiff must prove, by a preponderance of material and admissible evidence, that sex was a motivating factor in the decision to terminate her employment. In order to prove her age discrimination claim, Plaintiff must present admissible evidence, which, if taken in her favor, would suffice to show a triable issue as to whether her employment termination would not have occurred absent consideration of age. *See Ehrbar v. Forest Hills Hospital*, 131 F. Supp. 3d 5, 28–29 (E.D.N.Y. 2015) (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168–69 (2d Cir. 2014)). Plaintiff's burden of proving age discrimination is the but-for standard. [6]

## II.   PIEHLER'S SEX AND AGE DISCRIMINATION CLAIMS UNDER TITLE VII, ADEA AND NYSHRL SHOULD BE DISMISSED

### A.   Piehler Cannot State a *Prima Facie* Case of Discrimination

Piehler has failed to establish a prima facie case of sex or age discrimination because the evidence does not give rise to an inference of sex or age discrimination.

#### 1.   *Piehler's Complaints and Criticisms of Awtry Raise no Inference of Discrimination*

Although Piehler's sex and age discrimination claims are based solely on the termination of her employment, at her deposition she raised a litany of perceived slights and business

---

[6] New York State courts have not held definitively whether the "but for" standard applies to age discrimination claims under the NYSHRL but have held that "case law endorses the 'but for' language." *Anderson v. Young & Rubicam*, 68 A.D.3d 430, 431 (1st Dep't 2009) (citing *Gross v. FBL Fin. Servs.*, Inc., 557 U.S. 167, 176 (2009)). The Second Circuit has "assumed, without deciding, that the ADEA's 'but for' standard of causation also applies to age discrimination claims brought under the NYSHRL." *Mikinberg v. Bemis Co.*, 555 F. App'x 34, 35 (2d Cir. 2014); *see also Gorzynski*, 596 F.3d at 106 n.6. District courts in the Second Circuit, on that basis, have applied the "but for" standard to NYSHRL age discrimination claims. *See, e.g., Allen v. Chanel, Inc.*, No. 12-cv-6758, 2015 WL 3938096, at *4 (S.D.N.Y. June 26, 2015); *Siani v. State Univ. of N.Y.*, 7 F. Supp. 3d 304, 321 (E.D.N.Y. 2014); *Glenwright v. Xerox Corp.*, 832 F. Supp. 2d 268, 279 (W.D.N.Y. 2011); *Mattera*, 740 F. Supp. 2d at 574. It is proper to do so here as well.

disputes, none of which is sufficient to raise an inference of discrimination.[7]  Even if Piehler's

many criticisms of Awtry's behavior are considered as background information, the record is

devoid of any evidence that Awtry was motivated by a discriminatory intent.

Piehler's allegations mainly surround business decisions that she disagreed with.  She

was unhappy that Awtry and Kenny wanted to end the practice that existed at Absolute in which

AEs who lived in Vancouver were covering territories in the Northeast United States.  Lestrade

Decl., Exh. D (Piehler Tr.) at 107:25-108:3.  She thought this made Kenny and Awtry

"dismissive" of people.  *Id*. at 107:3-8.  The two AEs that Piehler was referring to, Charles

Springgay and Mark Kelly, were both male.  Mr.  Kelly was over 40.  Olsen Decl. ¶ 14.

Piehler also alleges there was "a general lack of respect for the northeast."  Lestrade

Decl., Exh. D (Piehler Tr.) at 116:11–18 ("And I think that perhaps it is because I was a female

manager [or] [p]erhaps it was because my team was more newly hired as we were expanding and

growing our business . . . .")  Piehler has not come forward with any evidence to support a lack

of respect for the "northeast" or any discriminatory treatment of herself.  "A plaintiff's

speculations, generalities, and gut feelings, however genuine, when they are not supported by

specific facts, do not allow for an inference of discrimination to be drawn."  *Evert v. Wyoming*

*Cnty. Health Sys.*, No. 14-CV-912S, 2017 U.S. Dist. Lexis 69681, at *14 (W.D.N.Y. May 8,

2017) (quoting *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 379 (E.D.N.Y.

2013)).  "Absent some evidence that it was motivated by discriminatory intent, however, bad

treatment does not establish a violation of Title VII."  *Pollis v. New Sch. for Soc. Research,* 132

F.3d 115, 124 (2d Cir. 1997).

---

[7] Many of these issues arose more than 300 days prior to Piehler's first EEOC charge and therefore, while they may
be considered as background information, they are not actionable under Title VII and ADEA.  *AMTRAK v. Morgan*,
536 U.S. 101, 113, 122 S.Ct. 2061 (2002).

Piehler testified that in the first several months of Awtry's employment, he terminated an employee on her team because he "need[ed] his head count to hire [his] friend from HP." Lestrade Decl., Exh. D (Piehler Tr.) at 120:16-121:13. Piehler herself has identified a business reason for the decision to terminate the employee, *i.e.*, to use the headcount elsewhere. However, even construed in the light most favorable to Piehler, this allegation suggests favoritism toward Awtry's friend, not race or sex discrimination against Piehler.

Piehler testified that she believes that Awtry and Kenny felt that a woman should not be in her position. *Id.* Lestrade Decl., Exh. D (Piehler Tr.) at 126:24-127:9. She reached that conclusion partly because she was excluded from "sales contests that was offered to other regions." *Id.* at 127:10-15. However, the sales contest that she was referring to was a trip to Pebble Beach (*id.* at 129:5-11) that was offered as an incentive to Amy Rathbun's team if they closed certain business. Amy Rathbun is a female who was over 40 at the time. Olsen Decl. ¶ 14. Piehler's team was not offered that particular incentive, but neither were the teams who reported to Art Robinson, Warren Young and David Armstrong. Awtry Decl. ¶ 38.

Piehler testified that another reason she concluded that Awtry and Kenny felt that a woman should not be in Piehler's position is that she was "excluded from internal task forces that were put together to discuss things, you know such as maybe changes in the compensation plan, or changes in a business strategy. I was never included in any of those, it was always the male peers that were included." Lestrade Decl., Exh. D (Piehler Tr.) at 127:10-21. Although Piehler alleges that males were included in such discussions, there is no evidence from which to draw any inference that, even if Piehler was excluded, it was because of her age or sex. She also testified that she was disappointed "in their treatment of me and incorrect assumptions about my business acumen and experience and ability to manage the team." *Id.* at 128:14-19. "I think they

didn't understand the obstacles, and I think they were dismissive, and treated me different by not asking me as a field manager to help them with those obstacles." *Id*. at 142:21-143:4. There is no evidence to connect any of this to Piehler's sex or her age. "[A]n employer is allowed to 'make bad business judgments and misjudge the work of employees as long as its evaluations and decisions are not made for prohibited discriminatory reasons' such as age." *Downey v. Adloox Inc.*, No. 16-CV-1689(JMF), 2018 WL 5266875 at *6 (S.D.N.Y Oct. 23, 2018). Moreover, exclusion from meetings does not qualify as an adverse employment action. *See Rivera v. Orange Cty.*, 2013 U.S. Dist. LEXIS 30847, at *4 (S.D.N.Y. Mar. 5, 2013).

Piehler testified that Awtry accused her of "stealing" in connection with the DOE investigation. Lestrade Decl., Exh. D (Piehler Tr.) at 199:23-200:8. Even if this allegation were true, Piehler has come forth with no evidence that the accusation was rooted in her age or sex, or that it was the product of anything other than a dispute over whether it was appropriate to treat all orders for the DOE as new business for purposes of the quota attainment accelerators. Moreover, she also testified that Awtry accused Charles Springgay and Justin Peacock of stealing as well. *Id*. at 204:16-25.

Piehler testified that she never got a raise from Awtry and Kenny. *Id.* (Piehler Tr.) at 129:19-20. Here again, there is no evidence from which to draw any inference of discrimination. Compensation decisions for RDs were made based on their performance in the prior Fiscal Year. Piehler's performance was either the lowest, or within the group of low performers, in the years that she was not granted an increase in OTE. The highest raises in OTE were given to Amy Rathbun (female over 40) and the second highest raises were given to Art Robinson (male over 40). In addition, compensation increases were not automatic and there were years in which younger males did not receive compensation increases as well. In October 2014, only the top

two performers, Amy Rathbun and Art Robinson, got raises.  In October 2013, Piehler was the lowest performer and did not receive an increase on that basis.  Awtry Decl. ¶¶ 33-35.

Piehler complained that Awtry sent out everyone's performance ratings to all RDs/AVPs. Awtry inadvertently included the performance rating for sales personnel in an email that he sent to encourage the completion of evaluations.  *See* Olsen Decl. ¶ 15; Lestrade Decl., Exh. C (Awtry Tr.) at 107:24-108:8.

Piehler alleges that Awtry "refused to provide feedback during [her] job performance reviews."  AC (Dkt. 34) ¶ 41.  At her deposition, she testified that she was referring to her performance review for FY 2013 (July 1, 2012 through June 30, 2013) in which for each item, Awtry wrote the same comment:  "I only had six months visibility to observe the competency." Lestrade Decl., Exh. D (Piehler Tr.) at 170:17-172:23.  Piehler also alleges that Awtry did not discuss the review with her.  *Id*. at 175:5-12.  Piehler presents no evidence suggesting that her review, or lack thereof, was based in any way on her age or her sex.  She admits to having no information concerning Awtry's performance reviews of others.  *Id*. at 172:24-173:5.  In fact, Awtry wrote the same comment for all RDs/AVPs for FY 2013.  Awtry Decl. ¶ 21.

Piehler testified that her FY 2014 performance review contained "false data" and she had to file an addendum with the correct data.  Lestrade Decl., Exh. D (Piehler Tr.) at 176:21-177:5. However, a side-by-side review of the 2014 performance evaluation and the addendum authored by Piehler show that there was no disagreement as to the facts stated in the review, rather a disagreement with the rating in some of the categories. Awtry Decl. ¶ 22.

At her deposition, Piehler testified about three occasions on which she claims Awtry yelled at her.  First, in July 2014 at Absolute's General Sales Meeting ("GSM") (Lestrade Decl., Exh. D [Piehler Tr.] at 262:6-12, 20-25), which was during the inquiry over the booking of the

DOE accounts.   Second, in August 2014 concerning her claim that he had not given her a 2013 performance review, "which he felt was not true."  *Id*. at 254:13-20.  However, when she notified Berardo of this incident, she said that Awtry was "upset," not that he yelled at her.  Lestrade Decl., Exh. H (DEFS02550).  Third, that Awtry yelled at her during a disagreement over how to divide the Retention and Acquisition teams.  Lestrade Decl., Exh. D (Piehler Tr.) at 290:12-17.  Piehler further testified that during the call she told Awtry that "if he went to this, these reps would leave, that **this was not what he should be doing**." *Id*. at 289:10-14. (emphasis added).  There is no evidence that any of these events, even if they occurred, were due to Piehler's age or sex.  Rather, the natural inference is that they were the product of workplace disputes between Awtry and Piehler.

> ### 2. *The stray remarks on which Piehler relies are insufficient to state a prima facie case.*

Piehler's theory of Absolute's discriminatory intent largely rests on her hazy and changing account of comments allegedly made by Thomas Kenny.[8]  Piehler claims to relate what Thomas Kenny said at an April 2015 meeting.  Piehler has had four different versions of what she says was said, three in this litigation and one in another litigation.  Her conjecture that these comments had something to do with her termination is not borne out by the facts or her contrary allegations that her termination was due to retaliation.

The first version of the comments came from Piehler's counsel prior to the filing of this lawsuit.  Berardo testified that Piehler's counsel provided the quote that "the CEO does not want to hire people who are at the end of their rainbow.  He just wants to hire guys who are athletes, talk trash and are aggressive." Lestrade Decl., Exh. A (Berardo Tr.) at 124:4-12; 129:23-130:9.

---

[8] Piehler's Title VII and ADEA claims are limited to the facts sent forth in her EEOC charges, which only include the Kenny comments.  *Nweke v. Prudential Ins. Co. of Am.*, 25 F. Supp. 2d 203, 214 (S.D.N.Y. 1998).

These comments are about hiring, but paragraph 21 of the Amended Complaint refers to "getting rid" of employees. Piehler alleges Haydon's control of hiring policies "included stating in early 2015 that Absolute wanted to get rid it (sic) of its older, female workforce and replace those employees with young males." AC (Dkt. 34) ¶ 21. Then, in paragraph 46 of the Amended Complaint, Piehler alleges that "Kenny stated that Defendant Haydon wanted to get rid of employees 'that are at the end of the rainbow' and that he wanted to 'just hire guys who are athletes, who talk sports and trash and get in each other's faces.'" Id. at ¶ 46. However, when asked at her deposition what she recalls Kenny saying, she testified "I don't have an answer to that. What's in quotes, Mr. Kenny said. The rest is paraphrasing." Lestrade Decl., Exh. D (Piehler Tr.) at 312:18-23. Therefore, only the words that she quotes—"that are at the end of the rainbow" and "just hire guys who are athletes, who talk sports and trash and get in each other's faces." are what she recalls Kenny saying. She also clarified that Kenny never used the word older. Id. at 306:12-24. Finally, shortly after Piehler's deposition in this case, she testified in another case that Kenny said that the company should "hire athletes who would get in each other[s] faces and talk trash." Id., Exh. I (Lubahn Tr.) at 9:9-16. Piehler did not mention "guys" or reference gender in that other litigation, which only involved age discrimination claims.

Haydon denied making the statements and no witness has offered any evidence to refute this denial.[9] Id., Exh. F (Haydon Tr.) at 35:23-36:1; 40:6-24. Kenny testified that Haydon never stated those comments to him. Id., Exh. B (Kenny Tr.) at 104: 12-17; 109:13-24.

Putting aside the sparse and contradictory record of what was actually said, accepting any of Piehler's varying interpretations of the comments would fail to establish liability because the

---

[9] Plaintiff conceded that she has no personal knowledge of Haydon making these statements. Lestrade Decl., Exh. D (Piehler Tr.) at 312:2-316:5.

statements lack the necessary nexus to Piehler.  *McCall v. Bright House Networks, LLC*, No. 6:18-cv-1670-Orl-22DCI, 2020 U.S. Dist. LEXIS 2123, at *10 (M.D. Fla. Jan. 7, 2020) (granting summary judgment for employer because comments that "[w]e need to get their old [asses] out of here" and that "older employees are not keeping up" were "unrelated to the decision-making process itself" and did not "specifically relate" to the plaintiff).  The statements did not mention Piehler or the decision to terminate Piehler.  Other than the April 2015 meeting, Piehler never heard Kenny use the expression "end of the rainbow" or say "just hire guys who are athletes who talk sports and trash and get into each other's faces."  Lestrade Decl., Exh. D (Piehler Tr.) at 315:14-23.   A single stray remark cannot be the sole basis for a discrimination claim.  *Fears v. Heritage Ctrs.*, No. 02-CV-639S, 2004 U.S. Dist. LEXIS 16455, at *10-11 (W.D.N.Y. Aug. 15, 2004) ("Because this **single stray remark** is the only evidence of racial discrimination that Plaintiff has offered, her claim fails as a matter of law."); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1267 (11th Cir. 2010) (single stray remark by person who was not a decisionmaker was too weak to raise a genuine fact issue regarding discrimination).

Additionally, Kenny was not the final decision-maker.  Awtry made the decision to terminate Piehler.  Awtry Decl. ¶ 28; Lestrade Decl., Exh. B (Kenny Tr.) at 77:9-78:6; 86:18-25; 93:24-94:5.  The fact that Kenny was consulted  does not provide the necessary nexus between the termination and the alleged comments.  *McCall*, 2020 U.S. Dist. LEXIS 2123, at *21 (granting summary judgment for employer when numerous other decision makers aside from the manager "signed off on [p]laintiff's termination").  Awtry doesn't recall hearing Kenny making the comments and testified that the comments were not reflective of how he made hiring decisions.  Lestrade Decl., Exh. C (Awtry Tr.) at 241:21-25; 245:22-25.

Piehler alleges that the Kenny Comments "embodied Absolute's pattern and practice of

discriminating against older and female workers."  AC (Dkt. 34) ¶ 49.  This is belied by the undisputed facts of Absolute's demographics.  As set forth in the chart on page 10, *supra*, the percentage of women and employees over the age of 40 at Absolute did not change in any significant way from July 1, 2013 (one year before Haydon commenced employment at Absolute) to July 1, 2016 (two years after Haydon commenced employment at Absolute and one year after Piehler's termination.  In fact, the percentage of women and older employees employed in Absolute Software, Inc.'s sales team, of which Piehler was a member, increased slightly over that period.  Olsen Decl. ¶ 11.

Absolute did not refrain from interviewing or hiring older or female candidates.  As noted above, Absolute interviewed two women for RD roles—Holly Whalen and Susan Lutz and hired Diane Moran for a sales position shortly after Piehler's termination.

### B.    Piehler was Terminated for a Legitimate, Non-Discriminatory Reason

Awtry and Piehler did not get along.  He terminated her employment because he felt that she was disparaging of him, said negative and disrespectful things to him and about him to others, suggested to him and to others that he was incompetent,  did not support him as a manager, was difficult and at times combative, resistant to his directives and suggestions and her performance was mediocre.  Awtry Decl. ¶ 28.  The inability to get along with co-workers "represents a legitimate, nondiscriminatory reason for an employment decision.  *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985); *see also McCollum v. Bolger*, 794 F.2d 602, 609-10 (11th Cir. 1986), ("The record makes clear, however, that the reason for this disparate treatment was not sex discrimination. [Plaintiff] had a bad relationship with her supervisor [] and she also disagreed with her superiors as to how her job should be performed.").  "Personal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII."  *Id.*  There is ample evidence that any hostility towards Piehler was grounded in her poor treatment of Awtry and not

related to her age or sex.  *See Neratko v. Frank*, 31 F. Supp. 2d 270, 285 (W.D.N.Y. 1998)

(citing *McCollum,* 794 F.2d at 609-10 (holding that supervisor's personal animosity for

employee is a legitimate and non-discriminatory reason for adverse employment action).

### C.   There is No Evidence That the Legitimate, Nondiscriminatory Reasons for Piehler's Termination Were Pretext for Discrimination

Even if Piehler were able to state a *prima facie* case of age or sex, discrimination, she still

could not rebut and prove as pretextual the legitimate, nondiscriminatory and well-documented

reasons for Absolute's decision to end her employment.  Piehler may disagree with that decision,

but she "cannot merely rationalize, explain, or disagree with an employer's proffered non-

discriminatory reasons" to defeat summary judgment.  *Ehrbar*, 131 F. Supp. 3d at 29; *Fleming v.

MaxMara U.S., Inc.*, 644 F. Supp. 2d 247, 266 (E.D.N.Y.2009) ("[A] plaintiff's factual

disagreement with the validity of an employer's non-discriminatory reason for an adverse

employment decision does not, by itself, create a triable issue of fact.").

It has long been accepted that the Court's "role is to prevent unlawful hiring practices,

not to act as a 'super personnel department' that second guesses employers' business

judgments."  *Fontecchio v. ABC Corp.*, No. 12-cv-6998 (CS), 2015 WL 327838, at *10

(S.D.N.Y. Jan. 23, 2015) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104

(2d Cir. 2001)).  "Only where an employer's business decision is so implausible as to call into

question its genuineness should this Court conclude that a reasonable trier of fact could find that

it is pretextual."  *Id*. (quoting *Fleming v. MaxMara USA,Inc.*, 371 F. App'x 115, 118 (2d Cir.

2010)).

Piehler has not carried her burden of showing that the stated reasons for her termination

were a pretext and that her sex was at all a factor in the decision to terminate her.  There is

nothing "so implausible" about Absolute's decision to discharge Piehler.  Piehler's own words,

in emails and in her deposition testimony, demonstrate that she was disrespectful of Awtry, unsupportive of his leadership, criticized him to his face and behind his back, gossiped about him and was vocal to others concerning her belief that he was incompetent and uniformed.

Piehler has not carried her even heavier burden to show that age was the "but-for" cause of her termination.  The record is devoid of any evidence that Piehler was terminated because of her age and is replete with evidence that age was not a factor.  When Piehler was terminated at age 57, Art Robinson, who was also 57, assumed the East/Retention role, which included serving Absolute's existing clients in Piehler's prior Northeast region.  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 338 (6th Cir. 2003) ("The overwhelming body of cases in most circuits has held that age differences of less than ten years are not significant enough to make out the fourth part of the age discrimination prima facie case.") (collecting cases); *see* Awtry Decl. ¶ 12; *see* Olsen Decl. ¶ 14.   Likewise, Joseph Morini, who was hired for the East/Acquisition role, is only six years younger than Piehler.  Olsen Decl. ¶ 14.  *Townsend v. Exch. Ins. Co.*, 247 F. Supp. 2d 325, 332 (W.D.N.Y. 2003) (age difference of seven years between plaintiff and replacement employee did not give rise to an inference of age discrimination). No reasonable factfinder could discern a preference for younger or male employees from these facts.  *Inguanzo v. Hous. & Servs., Inc.*, No. 12–cv–8212, 2014 WL 4678254, at *19 (S.D.N.Y. Sept. 19, 2014), *aff'd*, 621 F. App'x 91 (2d Cir. 2015) ("Where a member of the plaintiff's protected class is contemporaneously hired as a replacement, the offering of proof of intentional discrimination appears extremely difficult, if not practically impossible.")

## III.   PIEHLER'S INDIVIDUAL LIABILTY CLAIMS AGAINST HAYDON AND KENNY FAIL BECAUSE THERE IS NO EVIDENCE THEY ACTUALLY PARTICIPATED IN DISCRIMINATION AGAINST HER

As set forth above, the NYSHRL claims should be dismissed against all Defendants.  The NYSHRL claims against Thomas Kenny and Geoff Haydon should be dismissed on the

additional ground that they did not actually participate in discrimination against Piehler.

Two separate provisions of NYSHRL, §§ 296(1) and 296(6), create potential liability for individuals. The Second Circuit has explained:

> [Section 296(1) of t]he NYSHRL makes it unlawful for an employer to discriminate on the basis of, *inter alia*, race, creed, color, or sexual orientation. A supervisor is an "employer" for purposes of establishing liability under the NYSHRL if that supervisor "actually participates in the conduct giving rise to [the] discrimination." In addition, the NYSHRL states that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." In *Tomka*, we found that this language allowed a co-worker who "actually participates in the conduct giving rise to a discrimination claim" to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff.

*Feingold v. New York*, 366 F.3d 138, 157-58 (2d Cir. 2004) (internal citations omitted).

Therefore, under binding Second Circuit precedent, an individual must "actually participate" in the conduct giving rise to the discrimination as a prerequisite to individual liability under both §§296(1) and 296(6). *Id.*; *Figueroa v. RSquared NY, Inc.*, 89 F. Supp. 3d 484, 493 (E.D.N.Y. 2015) ("[A]n individual cannot be held liable for discriminatory conduct under the NYSHRL unless that individual actually participate[d] in the conduct giving rise to a discrimination claim. That an individual occupies a high position of authority is an insufficient basis for the imposition of liability . . . .") (internal quotations and citations omitted).

Notwithstanding this binding precedent, even when courts have applied the "actually participate" standard only to claims under §296(6), they still require a showing of "some minimal culpability" or "connection [to] the underlying [claim]" before imposing individual liability under §296(1). *See Adams v. Delta Airlines, Inc.*, No. 16 CV 1986 (KAM) (LB), 2017 U.S. Dist. LEXIS 208639, at *19 (E.D.N.Y. Dec. 18, 2017) (Report & Recommendation), *adopted*, 2018 U.S. Dist. LEXIS 53534 (E.D.N.Y. Mar. 29, 2018) (dismissing individual liability claim under §296(1) against CEO for failure to show that, besides being the CEO, he had any

connection to the plaintiff's claims, and recognizing that while some courts have not required "active participation" for personal liability under §296(1), they have nevertheless required "some minimal culpability", or "connection [to] the underlying [claim]") (quotations and citations omitted).

Piehler alleges that Geoff Haydon, in his role as CEO, and Thomas Kenny, in his role as Vice President of Global Sales, are employers under the NYSHRL because they had the authority to hire and fire employees. Piehler also alleges that all Defendants, including Haydon and Kenny, aided and abetted discrimination in violation of the NYSHRL. Under either theory of liability, Piehler must show direct, purposeful participation by Haydon and Kenny in conduct giving rise to discrimination against her. She cannot make that showing because there is no evidence that either Haydon or Kenny actually participated in discriminatory conduct towards her or even exhibited the requisite minimum culpability and connection to the underlying claims.

## IV. PIEHLER HAS NOT ESTABLISHED AIDING AND ABETTING UNDER THE NYSHRL

Piehler's Eighth Cause of Action assets a claim against all Defendants under the NYSHRL for aiding and abetting. "Importantly, since it is the employer's participation in the discrimination practice which serves as the predicate for the imposition of liability on others for aiding and abetting, a plaintiff cannot prevail against an individual on her state claims unless she can first establish the liability of her employer." *Pelligrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 344, 356 (N.D.N.Y. 2010). For the reasons discussed above, Piehler has not established the liability of the employer.

In addition, an employer cannot aid and abet itself. *See Patacca v. CSC Holdings, LLC*, No. 16-cv-0679 (SFJ) (ARL), 2019 U.S. Dist. LEXIS 65558, at *25-27 (E.D.N.Y. Apr. 17, 2019). The aider and abettor must "share the intent or purpose of the principal actor, and there

can be no partnership in an act where there is no community of purpose.  Consequently, to find

that a defendant actually participated in the discriminatory conduct requires a showing of direct,

purposeful participation."  *Id.*, at *25-26. (quotations omitted).  Here, because there has been no

showing of discriminatory conduct by any principal actor, it necessarily follows that no aiding

and abetting liability may be imposed on any Defendant.

## V.   PIEHLER'S RETALIATION CLAIMS UNDER THE NYSHRL AND THE EPA SHOULD BE DISMISSED

Piehler brings her retaliation claims under NYSHRL and the Federal EPA (Counts IV

and VII) based on two instances of allegedly protected activity:  (1) internal complaints made in

July 2014 to Daniel Berardo and Errol Olsen; and (2) the filing of an EEOC Charge in

September 2015.

Claims under both statutes are evaluated using a three-step burden-shifting analysis,

similar to the analysis for a discrimination claim. First, the plaintiff must establish a *prima facie*

case by showing: "(1) she participated in a protected activity; (2) the employer was aware of

plaintiff's participation in this activity; (3) the employer took an adverse action against the

employee; and (4) a causal connection exists between the protected activity and the adverse

action." *Kobos v. Target, No. 15-CV-5573(DRH)(SIL),*  2018 U.S. Dist. LEXIS 98554, at *18

(S.D.N.Y. June 12, 2018) (retaliation under NYSHRL is analyzed under same framework as

Title VII). See also, *Khwaja v. Jobs to Move Am.*, No. 1:19-cv-07070, 2019 U.S. Dist. LEXIS

197982, at *14-15 (S.D.N.Y. Nov. 13, 2019) (quoting *Mullins v. City of N.Y.*, 626 F.3d 47, 53

(2d Cir. 2010)).  Assuming the plaintiff establishes a prima facie claim, "the burden shifts to the

defendant to articulate a 'legitimate, non-discriminatory reason for the employment action.'"

*Mullins*, 626 F.3d at 53 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).

To succeed, a plaintiff must show the employer's reason is a pretext and that retaliation was the

but-for cause of the adverse action. *Chukwueze v. NYCERS*, 10-Civ-8133, 2014 U.S. Dist. LEXIS 101908, at *20 (S.D.N.Y. July 25, 2014), *aff'd*, 643 F. App'x 64 (2d Cir. 2016).

### A.    Piehler Cannot State a Prima Facie Case of Retaliation

#### 1.    *Plaintiff Did Not Engage in Protected Activity During her Employment.*

Piehler did not engage in protected activity when she complained in July 2014.  She complained about various things, but she did not complain that she was being treated differently on the basis of any protected trait. Grievances about a supervisor do not constitute protected activity if they do not include charges of discrimination on a protected basis.  In *Kobos*, *supra*, the court granted summary judgment because, although plaintiff alleged that she complained orally of being the only employee scheduled to work at night, she did not mention age or national origin in her conversation, and "[w]hen Target's counsel asked Plaintiff directly if she had brought up discrimination on the basis of age or national origin, she replied that she did not remember." *Kobos*, 2018 U.S. Dist. LEXIS 98554, at *20-21; *Chukwueze*, 2014 U.S. Dist. LEXIS 101908, at *19-20 (granting summary judgment where Plaintiff did not specifically reference any protected discriminatory action); *Castro v. N.Y.C. Board of Educ.*, No. 96 CIV. 6314 (MBM), 1998 WL 108004, at *8 (S.D.N.Y. Mar. 12, 1998) (lodging grievances without reference to discrimination was not protected activity).

Likewise, to engage in protected activity under the EPA, Piehler must claim unequal pay based on gender.  *Sitar v. Ind. Dep't of Transp.,* 344 F.3d 720, 727 (7th Cir. 2003) (holding that complaining about lower compensation compared to other employees is not protected activity unless complaint was specifically about gender discriminatory conduct); *Leong v. SAP Am., Inc.*, 67 F. Supp. 3d 972, 986 (N.D. Ill. 2014) ("A complaint about dissatisfaction with one's compensation in general does not trigger protection of the statute"); *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 116 (2d Cir. 2015) ("[t]o fall within the scope of the antiretaliation provision, a

complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.") (citation omitted); *Velazquez v. Yoh Servs., LLC,* No. 17 CIV 842 (CM), 2019 U.S. Dist. LEXIS 46746, at *32-35 (S.D.N.Y. Mar. 15, 2019) (complaints about "money" are too vague to relate to rights protected by a state or federal statute.)

The undisputed evidence demonstrates that Piehler did not complain of sex, age or any other protected class discrimination during her employment at Absolute. Piehler has admitted that she did not complain that she was being discriminated against based on any protected trait in her conversations with Berardo and Olsen. Lestrade Decl., Exh. D (Piehler Tr.) at 239:18-20; 240:19-241:14; 247:24-248:9. The emails that she exchanged with Berardo following her conversations with him, in which she refers to the DOE investigation as a "witch hunt," suggests that Awtry is incompetent because he cannot remember anything, complains that interim sales numbers are being reported incorrectly, etc., make no reference whatsoever to gender or age or discrimination. Lestrade Decl., Exh. E. With respect to pay equity issues, Piehler testified she told Berardo that after Awtry and Kenny arrived, she did not receive a pay increase or any stock options. Piehler testified that to the extent she was complaining about a disparity in compensation, she was complaining about the fact employees who were not investigated did not have their commissions withheld.[10] Lestrade Decl., Exh. D (Piehler Tr.) at 239:4-240:11. There was no complaint of unequal pay based on gender.

## 2. *Absolute Was Not Aware of any Protected Activity by Piehler During her Employment*

The undisputed facts demonstrate as well that Absolute was not aware of any protected

---

[10] As discussed above, Piehler's DOE commissions and those of two males were withheld pending a legitimate investigation.

activity on the part of Piehler. Both Berardo and Olsen testified unequivocally that they did not believe that Piehler was alleging discrimination.  Lestrade Decl., Exhs. A (Berardo Tr.) at 330:3-14, 261:21-262:5, 78:7-14, 93:7-94:20, 261:8-13; L (Olsen Tr.) at 71:25-72:5, 84:13-85:25, 88:3-17, 154:16-21.  "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."  *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10 (2d Cir. 2013) (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998)).  In *Galdieri – Ambrosini*, the Second Circuit affirmed the post-trial entry of judgment as a matter of law because "there was no semblance of gender-oriented motivation in the events or conversations to which [the plaintiff] testified and that plaintiff's complaints "did not state that [she] viewed [her supervisor's actions as based on her gender, and there was nothing in her protests that could reasonably have led [the company] to understand that that was the nature of her objections."  *Id.*

Nothing in the general complaints made by Piehler led Absolute to believe Pieher was complaining about discrimination.  "[I]t is objectively unreasonable to believe that complaining about poor treatment in the workplace that is unrelated to any trait, protected or otherwise, is a 'protected activity' under Title VII."  *Evert v. Wyo. Cnty. Cmty. Health Sys.,* No. 14-CV-912S, 2017 U.S. Dist. Lexis 69681 at *18 (W.D.N.Y. May 8, 2017).

### 3.  *Piehler has not Identified Adverse Action taken During her Employment*

While Piehler's EPA retaliation claim is based solely on the termination of her employment (AC [Dkt. 34] ¶ 96), her NYSHRL retaliation claim appears to be based also on the allegations contained in paragraph 43 of the Amended Complaint that Awtry: (1) retaliated against her by "stating the he was very angry that [she] had complained to Human Resources;" and (2) "subsequently wrote a job performance review that was factually incorrect . . ., requiring

- 32 -

Plaintiff to seek a corrected version of her performance review from human resources."

AC(Dkt. 34) ¶ 43. Neither of these alleged actions rise to the level of an adverse action. *See*

*Collymore v. New York*, 2019 U.S. App. LEXIS 10693, at *4-5 (2d Cir. Apr. 11, 2019) (being

yelled at and having your work more scrutinized than others are "insufficient to constitute an

actionable change in the terms and conditions of employment and are more in the nature of petty

slights.") Likewise, "the threat of disciplinary action, without more, does not constitute an

adverse employment action." *Whitt v. Buffalo Transp. Inc.*, 2018 U.S. Dist. LEXIS 74358 at *6

(S.D.N.Y. May 2, 2018).

### 4. *There is no Evidence of Adverse Action Based on Piehler's EEOC Charge*

There is no admissible evidence to support the allegation that disparaging statements

were made about Piehler after the filing of her EEOC Charge.

### 5. *Piehler Has Not Established a Causal Connection Between the Protected Activity and the Adverse Employment Action.*

Piehler cannot prevail on her retaliation claim because she cannot furnish any evidence

that the relevant decision-maker – Awtry  – was even aware of her protected activity. *Crain v.*

*Judson Indep. Sch. Dist.*, Civil Action No. SA-16-CV-832-XR, 2018 U.S. Dist. LEXIS 183777,

at *54 (W.D. Tex. Oct. 26, 2018) (granting summary judgment for employer when plaintiff

failed to show that the relevant decision-makers responsible for the adverse employment action

were aware of the protected activity).

Berardo and Olson were not aware of Piehler's alleged protected activity.  Lestrade Decl.,

Exhs. A (Berardo Tr.) at 330:3-14, 261:21–262:5, 78:7-14, 93:7–94:20, 261:8-13; L (Olsen Tr.)

at 71:25–72:5, 84:13–85:25, 88:3-17, 154:16-21.  Awtry was never told that Piehler complained

of discrimination and was never reprimanded for it.  Lestrade Decl., Exh. C (Awtry Tr.) at

106:25-107:15.  Piehler alleges that "Awtry was reprimanded for his behavior." AC (Dkt. 34) ¶

42.  However, she testified that she has no information as to what behavior Awtry was reprimanded for or what the reprimand consisted of.  Lestrade Decl., Exh. D (Piehler Tr.) at 268:23 – 269:8.

Moreover, the roughly one year lapse between her purported complaints to HR and Mr. Olsen and her termination are too attenuated for any causal linkage.  *Sharma v. Airport Mgmt. Servs., LLC*, No. 16-CV-9109 (LAP), 2018 U.S. Dist. LEXIS 48593, at *19-20 (S.D.N.Y. Mar. 22, 2018) (one year delay between complaint and termination was too attenuated to suggest a causal connection) (citation omitted).

### 6. *Defendants Had Legitimate Non-Discriminatory Reasons for Piehler's Termination that were not Pretextual*

The reasons for Piehler's termination are discussed above.  An employer's reason for an adverse action cannot be proven to be a pretext for retaliation unless it is shown to be false and that retaliation is the real reason.   Absolute has established that it had a legitimate, non-discriminatory reason for terminating Piehler's employment.  Piehler does not deny the statements that she made to or about Awtry.  In fact, she doubled down on them in her deposition testimony.

## VI.   PIEHLER'S EQUAL PAY CLAIMS FAIL AS A MATTER OF LAW

### A.   Plaintiff's Unequal Pay Claims Fail as a Matter of Law

To prove a violation of the Federal Equal Pay Act ("EPA"), a plaintiff must first establish a *prima facie* case.  This requires a plaintiff to "demonstrate that (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions.  Critical to an EPA claim is the equal work inquiry, which requires evidence that the jobs compared are 'substantially equal.'"  *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689,

690–91 (2d Cir. 2017) (internal citations and quotation marks omitted).  Central to the substantially equal inquiry is the "congruity and equality of actual job content between the plaintiff and comparator."  *Id.* at 691.  A plaintiff must also show "that any difference in pay is attributable to sex."  *Raco v. GE*, No. 95-CV-0062, 1996 U.S. Dist. LEXIS 22611 at *5-6 (S.D.N.Y. Oct. 7, 1996) (*quoting Fisher v. Vassar College*, 70 F.3d 1420, 1452 (2d. Cir. 1995).

If the plaintiff establishes a *prima facie* case, "the burden of persuasion shifts to the defendant to show that the wage disparity is justified by one of four affirmative defenses provided by the Act: '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'"  *Delgado v. Puerto Rican Family Inst., Inc.*, 97 Civ. 7122 (DAB), 2001 U.S. Dist. LEXIS 12699, at *7-8 (S.D.N.Y. Aug. 22, 2001) (quoting 29 U.S.C. § 206(d)(1)).  If the employer provides proof of an affirmative defense, the plaintiff must advance evidence that the affirmative defense is pretextual.  *Id.* at *8 (citing *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526 (2d Cir. 1992)).

Piehler cannot establish a *prima facie* case because (1) the male employees that she compares herself to were not performing substantially equal jobs and therefore are not appropriate comparators; and (2) Piehler's assigned OTE was higher than that of the average of the appropriate male comparators.  But even if this Court finds that Piehler established a *prima facie* case, summary judgment should be granted because Absolute compensated certain men more highly than Piehler based on factors other than sex.

**B.**    **Piehler Cannot Establish a *Prima* Facie Case Under the Federal Equal Pay Act**

**1.**    **Piehler Improperly Compares Herself to Male Employees Whose Jobs Were Not Substantially Equal to Hers**

The Amended Complaint identifies the alleged comparators as "Regional Directors, such

as Art Robinson (Southeast Regional Director), Kurt Luporini (Central Regional Director),

Randall Dye (West Regional Manager)" and Joseph Morini, who Piehler claims was her eventual

replacement.  AC (Dkt. 34) ¶ 53.  During her deposition, she identified Warren Young and Troy

Stultz as males who earned more than she did.  Lestrade Decl., Exh. D (Piehler Tr.) at 332:23-

333:4.  With the exception of Art Robinson, the evidence establishes that these employees are

not appropriate comparators.

### a.     Luporini, Dye and Morini are not Similarly Situated

The job that Piehler was doing before she was terminated is not substantially equal to the

jobs that Luporini, Dye and Morini were doing.  "The standard for determining whether jobs are

equal in terms of skill, effort, and responsibility is high."  *Heatherly v. Univ. of Alabama Bd. of*

*Trustees*, No. 16-CV-00275-RDP, 2018 WL 3439341, *12 (N.D. Ala. July 17, 2018) (*quoting*

*Waters v. Turner, Wood & Smith Ins. Agency, Inc*., 874 F.2d 797, 799 (11th Cir. 1989).

Beginning on July 1, 2015, Absolute reorganized its outside sales force by replacing the

five geographic regions with three significantly larger regions.  As reorganized, each region had

a Retention team that would focus on existing business and an Acquisition team that would

acquire new business from private sector enterprises.  Previously, the sales teams for each region

earned commissions from legacy accounts, which in some cases had been Absolute customers

for years, and from new business they generated.  As of July 1, 2015, the positions and territories

previously held by Piehler, Rathbun, Robinson, Young, and Armstrong no longer existed.

Awtry Decl.¶ 9; Lestrade Decl., Exh. D (Piehler Tr.) at 286:3-287:7.

Absolute hired Joseph Morini, Randall Dye, and Kurt Luporini for the new Acquisition

roles for the newly drawn East, West, and Central regions, respectively.  Awtry Decl. ¶ 13.

These positions were categorically different because Acquisition teams had no existing business

to rely upon and had to earn commissions entirely from new customers.  This made the new

Acquisition roles significantly more difficult and carried more risk than the former RD/AVP

roles.  They were required to start from scratch to create a new book of business entirely from

new clients in healthcare and other private sector companies.  Lestrade Decl., Exh. B (Kenny Tr.)

at 228:15-24 (explaining that Morini was compensated for "starting basically from zero").  Dye's

responsibilities included "creating an entirely new team of sales reps, accepting a quota with no

run rate business, and then -- so on-boarding new reps and then creating a pipeline that would

drive revenue that would lead to quota retirement inside of a completely new region."  *Id.* at

205:6-15.  Likewise, Morini's role was entirely different from Ms. Piehler's because the

"acquisition team, as it was designed at that time, had no customers.  Their job was to hunt for

brand new customers.  [Piehler's] team had existing clients that generated revenue.  So you're

kind of comparing two separate entities."  Lestrade Decl., Exh. C (Awtry Tr.) at 329:2-7. This

was particularly challenging because Absolute was a relatively unknown Canadian company

without name-recognition in the cybersecurity market.  Awtry Decl. ¶ 39; Ramsden Decl. ¶ 12;

Lestrade Decl., Exh. B (Kenny Tr.) at 191:23-192:8.  Signing new clients as opposed to servicing

legacy clients was a categorically different position.  *Milligan v. Citibank, N.A.*, 00 Civ. 2793

(AGS), 2001 U.S. Dist. LEXIS 16105, at *26 (S.D.N.Y. Sep. 25, 2001) (noting that plaintiff did

not have substantially equal responsibilities to purported comparator who opened accounts for

new customers, and plaintiff who encouraged business customers to use other banking products);

*Dinolfo v. Rochester Tel. Corp.*, 972 F. Supp. 718, 723 (W.D.N.Y. 1997) (holding that

comparators who were responsible for residential services market did not have substantially

similar roles to plaintiff who was responsible for healthcare market).

     Second, the new positions covered significantly larger territories.  Piehler covered only

the Northeast, whereas the new East Acquisition role covered the entire East Coast and a portion

of Eastern Canada.  Lestrade Decl., Exhs. B (Kenny Tr.) at 221:9-23; D (Piehler Tr.) at 285:25-287:7.  Third, the new acquisition leaders were expected to hire new teams of sales personnel to effectuate their regional strategies.  Lestrade Decl., Exh. C (Awtry Tr.) at 313:8–315:15.

Therefore, Piehler has not met her high burden to show that Luporini, Dye or Morini held positions that were "substantially equal" rather than "merely comparable."  *Dinolfo*, 972 F. Supp. at 722 (citations omitted); *Doria v. Cramer Rosenthal McGlynn, Inc.*, 942 F. Supp. 937, 942 (S.D.N.Y. 1996) (holding that even if plaintiff and her comparators overlapped with respect to fifty percent of *their* job responsibilities, that would not constitute equal work).

        **b.**        **Art Robinson and Dave Armstrong Are the Only Appropriate Male Comparators**

Prior to the reorganization, David Armstrong was the RD for the North Central Region and Art Robinson was the AVP for the Southeast region.  Awtry Decl. ¶ 4.  Piehler improperly omits Mr. Armstrong as a comparator, presumably because Absolute paid her more than Armstrong.  *Ambrose v. Summit Polymers, Inc.*, 172 F. App'x 103, 106 (6th Cir. 2006) ("a plaintiff may not ignore lower-earning employees of the opposite sex when seeking to show inequality in pay -- *i.e.,* a plaintiff cannot establish a prima facie case by showing only that the highest-earning employees of the opposite sex were paid more."); Awtry Decl. ¶ 36.

Piehler appropriately did not identify Warren Young as a comparator in her Amended Complaint.  *See* AC (Dkt. 34). ¶53.[11]   Warren Young is not an appropriate comparator because

---

[11] However, during her deposition, she testified that he was a male who earned more than she did.  Lestrade Decl., Exh. D (Piehler Tr.) at 332:23-333:4.  Piehler also attempted to add Troy Stultz as a comparator during her deposition.  Mr. Stultz was the Director of Sales, Value Added Resellers ("VAR"), North America.  His job was not substantially equal to Piehler's because his territory was the entire United States (whereas Piehler's was limited to the Northeast), and he and his team did not sell directly to customers.  Instead, Stultz had a program management role in which built a VAR program from scratch, including the creation of a website and other backend infrastructure, to recruit and build a community of resellers to partner with Absolute.  His program did not deal with end-user customers.  Awtry Decl. ¶ 51.

Piehler and Young did not work for a single establishment as required by the EPA. *See* 29

U.S.C. §206(d)(1). "The EPA requires equal pay for equal work for employees who work in a

single 'establishment.'" *Kassman v. KPMG LLP*, 11 Civ. 3743 (LGS), 2018 U.S. Dist. LEXIS

203561, at *79 (S.D.N.Y. Nov. 30, 2018) (quoting 29 U.S.C. § 206(d)(1)). "The term

'establishment' in the EPA 'refers to a distinct physical place of business rather than to an entire

business or 'enterprise' which may include several separate places of business.'" *Id.* (quoting 29

C.F.R. § 1620.9(a)).

Warren Young, one of the longest tenured employees at Absolute, was a Canadian

citizen, residing in Vancouver, British Columbia, and worked for a different entity (Absolute

Software Corporation). Mr. Young's compensation was paid in Canadian dollars. All of the

other RDs/AVPs were American citizens and worked for Absolute Software, Inc. Olsen Decl. ¶

13; Awtry Decl. ¶ 5; Lestrade Decl., Exh. C (Awtry Tr.) at 339:5-14.

Employees with far greater commonalities, e.g., working for the same entity and sharing

the same job title have been held to work in separate establishments. *See Price v. N. States*

*Power Co.*, 664 F.3d 1186, 1195 (8th Cir. 2011) (holding that service centers were separate

establishments when field representatives did not transfer between the two locations, served

different customers, and were approximately 75 miles apart).

### 2. Absolute did not Pay Lower Wages to Piehler

#### a. Piehler was Assigned a Higher OTE than the Average Male Comparator

The "average wage paid to male employees is a recognized standard for determining

whether a female employee has been underpaid" *See EEOC v. Straubinger*, No. CIV-75-372,

1981 U.S. Dist. LEXIS 13423, at *3 (W.D.N.Y. June 8, 1981) (citing *Heymann v. Tetra Plastics*

*Corp.*, 640 F.2d 115, 121 (8th Cir. 1981)).  During the relevant period[12], Piehler's OTE was either equivalent to or more than the average OTE of Robinson and Armstrong.  As stated above, Young is not a proper comparator, but even if his OTE were included, Piehler's OTE was still more than the average OTE for males.

| ON TARGET EARNINGS COMPARISON | | | | | |
|---|---|---|---|---|---|
| | **Mary Piehler** | **Art Robinson** | **David Armstrong** | **Warren Young (USD)** | **Average Male RD OTE** |
| **FY 2012** | $240,000 | $240,000 | $200,000 | $248,201 | $229,400.33 |
| **FY 2013** | $240,000 | $240,000 | $200,000 | $246,202 | $228,734.00 |
| **FY 2014** | $240,000 | $250,000 | $210,000 | $238,189 | $232,729.67 |
| **FY 2015** | $240,000 | $270,000 | $210,000 | $209,952 | $229,984.00 |
| **Total** | **$960,000** | $1,000,000 | $820,000 | $942,544 | **$920,847** |
| **Average** | **$240,000** | $250,000 | $205,000 | $235,636 | **$230,211** |

Awtry Decl. ¶ 36.

If the OTE of the other female RD, Amy Rathbun[13], who was also the highest-paid RD in terms of OTE, is averaged with Mary Piehler's OTE, it becomes abundantly clear that the average OTE of female RDs was higher than the average OTE of male RDs during Piehler's tenure.  *Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 (2d Cir. 2015) (affirming summary judgment for employer when female employees were paid more than male employees).

---

[12] An action to recover damages under the Federal Equal Pay Act "must be commenced within two years of its accrual, or three years if the violation is willful."  *Zhengfang Liang v. Café Spice SB, Inc.*, 911 F. Supp. 2d 184, 202 (E.D.N.Y. 2012) (quoting *Pollis v. New Sch. for Social Research*, 132 F.3d 115, 118 (2d Cir. 1997)).  Piehler alleges willfulness, but can muster no facts supporting such a contention.

[13] Amy Rathbun was the RD for the Southwest Region.  *See* Lestrade Decl., Exh. M (DEFS08190).  Based on her superior performance, Ms. Rathbun was promoted to the AVP position effective July 1, 2015.  *See* Lestrade Decl., Exh. N (DEFS08250-51).

| AVERAGE ON TARGET EARNINGS | | |
|---|---|---|
| | **Average Female RD OTE (including Amy Rathbun)** | **Average Male RD OTE** |
| **FY 2012** | **$240,000** | **$229,400** |
| **FY 2013** | **$240,000** | **$228,734** |
| **FY 2014** | **$250,000** | **$232,729** |
| **FY 2015** | **$257,000** | **$229,984** |

Awtry Decl. ¶ 36.

> **b.      Piehler was Assigned a Higher OTE Than Armstrong and Amy Rathbun was Assigned a Higher OTE Than Robinson, Armstrong, and Piehler**

The fact that Absolute assigned Piehler a higher OTE than Dave Armstrong defeats her prima facie case.  *See Sowell v. Alumina Ceramics, Inc*., 251 F.3d 678, 684 (8th Cir. 2001) (no prima facie case established by a woman tool maker who "was paid the same as, or more than, at least some male tool makers.").

Moreover, the fact that Amy Rathbun was assigned a higher OTE than Robinson and Armstrong, similarly undermines Piehler's *prima facie* case.  *Raco v. GE*, No. 95-CV-0062, 1996 U.S. Dist. LEXIS 22611, at *10 (N.D.N.Y. Oct. 7, 1996) (holding that the fact that other men were paid more than the plaintiff and a female employee belied a male plaintiff's contention that his pay was discriminatory based on his sex). *See also Spencer v. Virginia State Univ*., No 16CV989-HEH 2018 U.S. Dist. LEXIS 15773, at *28 (E.D. Va. Jan. 30, 2018) (plaintiff failed to establish prima facie case under EPA because her salary is the same as that of one male professor, higher than those of one male and one female, and lower than those of one male and one female).  The Court should dismiss Piehler's pay discrimination claims for this reason alone.

> **C.      Absolute Made Salary Decisions Based on Factors Other Than Sex**

Art Robinson was the only comparable male RD compensated more highly than Piehler. He was a much stronger performer.  Even if Piehler could establish a prima facie case, Defendants rebut this showing by providing proof that it based its decisions to compensate Mr. Robinson more highly on factors other than sex.  *Delgado*, 2001 U.S. Dist. LEXIS 12699, at *7-8 (quoting 29 U.S.C. § 206(d)(1)).

### 1.   Art Robinson was More Highly Compensated than Piehler Based on Superior Performance.

Piehler consistently underperformed Art Robinson including with respect to quota attainment, net sales revenue, and performance ratings.  On this basis, he was offered higher compensation.  Awtry Decl. ¶ 36.  Rewarding employees for outperforming their colleagues is perfectly acceptable.  *Scott v. Sulzer Carbomedics, Inc.*, 141 F. Supp. 2d 154, 176-77 (D. Mass. 2001) (granting summary judgment to employer because record established that male employees with higher compensation had "superior sales, market conditions, or prior employment experience"); *Garcia v. Barclays Capital, Inc.*, 281 F. Supp. 3d 365, 383 (S.D.N.Y. 2017) (granting summary judgment for employer when plaintiff consistently performed worse than comparators).

Piehler understood that her compensation was based on her ability to meet or exceed her assigned sales quota.  Lestrade Decl., Ex. D (Piehler Tr.) at 17:18-20 ("Q. And was your compensation based in part on quota attainment? A. Based in part on quota attainment.") During every fiscal year, Piehler underperformed Art Robinson on the quota attainment metric.  Although Piehler exceeded her assigned quota in 2012, Absolute did not increase any RD's/AVP's compensation the next fiscal year.  For the remaining years, Piehler never met her assigned sales quota.

| QUOTA ATTAINMENT | | |
|---|---|---|
| | **Mary Piehler** | **Art Robinson** |
| **FY 2012** | **105.96%** | **108.93%** |
| **FY 2013** | **83.85%** | **89.90%** |
| **FY 2014** | **96.78%** | **100.07%** |
| **FY 2015** | **86.11%** | **124.64%** |

Piehler also consistently booked lower overall sales revenue than Mr. Robinson.

| SALES REVENUE | | |
|---|---|---|
| | **Mary Piehler** | **Art Robinson** |
| **FY 2012** | **$14,092,760** | **$16,831,229** |
| **FY 2013** | **$13,451,686** | **$16,046,730** |
| **FY 2014** | **$15,326,217** | **$19,842,563** |
| **FY 2015** | **$11,881,977** | **$21,184,086** |

Regional Directors were also assigned performance ratings.  Awtry Decl. ¶ 32.

Piehler consistently underperformed on this metric.

| PERFORMANCE RATINGS | | |
|---|---|---|
| | **Mary Piehler** | **Art Robinson** |
| **FY 2012** | **4.0** | **4.1** |
| **FY 2013** | **3.0** | **3.0** |
| **FY 2014[14]** | **3.35/2.94** | **3.53/3.82** |
| **FY 2015** | **3.59** | **4.35/4.59** |

Awtry Decl. ¶ 36.

---

[14] Two performance ratings were assigned in each half of fiscal years 2014 and 2015.  Awtry Decl. ¶ 36.

    **2.**    **Luporini, Dye and Morini were Assigned Higher OTE than Piehler Because (1) Their Positions Were More Difficult and Carried More Risk and (2) they had Recent Cybersecurity Experience; and (3) Absolute Had to Offer a Competitive Salary to Recruit Them**

Luporini, Dye and Morini were assigned higher OTE than Piehler because as leaders of the newly formed Acquisition teams, they could not rely on any legacy accounts to earn commissions. Lestrade Decl., Exh. B (Kenny Tr.) at 205:6-15. Absolute was a relatively unknown player in the cybersecurity business (*id.* at 191:23-192:8) and, therefore, accepting one of these positions involved a high risk of low commission attainment. Absolute was required to offer a compensation package that reflected the difficulty and risk involved in selling to all new customers on behalf of a relatively unknown Canadian company. Awtry Decl. ¶ 39.

Luporini, Dye and Morini also had credentials, including recent cybersecurity experience, that Absolute perceived to have great value. Dye's "résumé [was] aligned to the specific scope and role that was being created in the western U.S. to be focused on acquiring that new business as part of the acquisition team." Lestrade Decl., Exh. B (Kenny Tr. at 204:20–205:2). Luporini had a "fairly extensive background in enterprise security software sales, specific to the geography in the central region, specific to the vertical Fortune 1500 and healthcare, with a fairly substantial Rolodex of customers and of people that he could potentially resource as hires for this newly formed team. *Id.* at 188:8-18, 194:10–195:13. Likewise, Morini had been an Executive VP of Sales and Marketing for IDF, a global leader in security and privacy software and had 25 years of experience. Awtry Decl. ¶ 43. He was perceived to have the ability to "come in with a Rolodex of customer names[,] . . . [b]uild an acquisition base team[,] . . . hunt for new business[,] . . . and knew the security industry." Lestrade Decl., Exh. C (Awtry Tr.) at 313:8-28; 326:3-327:5. To woo qualified candidates, Absolute had to offer a competitive salary.

As discussed in the Awtry Declaration, the compensation offered to the newly hired

Acquisition RDs Luporini, Dye and Morini was the result of salary negotiations.  Awtry Decl. ¶¶
39-43. Piehler cannot establish that these considerations are pretextual as courts recognize that
offering a competitive salary to new hires is not unlawful.  *Drury v. Waterfront Media, Inc.*, No.
05 Civ. 10646 (JSQ), 2007 U.S. Dist. LEXIS 18435, at *13 (S.D.N.Y. Mar. 7, 2007) (collecting
cases and noting that salary matching to lure or retain employees is a reasonable, gender-neutral
business tactic that qualifies as a "factor other than sex").

The fact there were significant differences in the base salaries of Luporini, Dye and
Morini ($150,000, $140,000 and $180,000 respectively), also demonstrates that sex did not play
a role in their being paid more than Piehler.  Instead, this fact suggests that differences in pay
among these persons was due to their background and not their sex.  *See Dinolfo*, 972 F. Supp. at
724 (significant difference in salary between alleged same sex comparators was affirmative
indication that sex did not play a role in plaintiff receiving lower pay).

### D.      Plaintiff Cannot Establish a Case Under the New York EPA Because None of the "Comparators" Work in the Same Establishment

For the reasons elaborated above in connection with Plaintiff's federal EPA claims,
Plaintiffs has not established a case under her state EPA claims.  *Mauze v. CBS Corp.*, 340 F.
Supp. 3d 186, 206 (E.D.N.Y. 2018) ("Equal pay claims brought pursuant to the New York Labor
Law § 194 are 'analyzed under the same standards [as the Federal] Equal Pay Act'.

The state unequal pay claims must also be dismissed because the New York State Equal
Pay Act has an even more restrictive definition of "establishment" than the federal EPA.  Under
the New York statute, "establishment" is confined to a geographical region "no larger than a
county."  N.Y. Lab. Law § 194.  Piehler does not refer to a comparator from the same
establishment under state law. She worked out of Rochester, New York.  None of her preferred
comparators worked in the same county.  *See* Awtry Decl. at ¶ 5 (Robinson worked in Norcross,

Georgia); (Young worked for a separate entity in Vancouver, British Columbia); (Armstrong

worked in Troy, Michigan). For this reason alone, Piehler's claim under the State law fails as to

each of the alleged comparators.

## VII.   PIEHLER'S CLAIM FOR DEFAMATION AND/OR SLANDER PER SE AGAINST ABSOLUTE AND AWTRY MUST BE DISMISSED

Piehler's claim for defamation against Absolute and Awtry must be dismissed because, in

addition to failing to adequately plead a claim for defamation, Piehler lacks any admissible

evidence establishing that the alleged defamatory statements were ever made.  Even if there were

evidence that the statements were made, her claim still fails because the statements are opinion,

and are protected by a qualified privilege.

### A.   The claim should be dismissed as against Awtry

While Piehler asserted this claim against Awtry, she testified—through multiple levels of

hearsay—at her deposition that Gottlieb and Robinson, instead, made the defamatory statements.

Her claim as against Awtry should be dismissed on this additional ground. [15]

### B.   Piehler's claim fails as a matter of law for inadequate pleading

Piehler's defamation claim fails as a matter of law for failure to satisfy the pleading

requirements of Fed. R. Civ. P. 8, which in the case of defamation, requires the plaintiff to

"specify who made the statements, when they were made and in what context, whether they were

made to a third party, and whether they were written or oral."  *Deutsche Asset Mgmt. v.*

*Callaghan*, No. 01 Civ. 4426 (CBM) 2004 U.S. Dist. LEXIS 5945, at *40 (S.D.N.Y. Apr. 7,

2004).  Piehler alleges "upon information and belief" that "Defendants [Absolute] and [] Awtry

---

[15] Piehler's claim for punitive damages must be dismissed because Robinson and Gottlieb, the alleged speakers, are not superior officers of Absolute *See Loughry v. Lincoln First Bank*, 67 N.Y.2d 369, 378 (1986)

either published, or caused to be published, defamatory statements about Plaintiff," including

that she was terminated "because she had 'defrauded' the company and/or engaged in 'criminal'

activity."  AC (Dkt. 34) ¶¶ 127-28.  Here, as in *Callaghan*, Piehler failed to allege the specific

individuals responsible for the alleged statements, when they were made, and their context.  *See*

*id.*  ¶¶ 33, 64-68, 126-37.  Instead, she merely alleges that "Defendants, directly and through

their agents" or "Absolute" made the statements.  *Id*. ¶¶ 65-66, 68.  Such allegations are

insufficient as a matter of law.

> ### C.     Plaintiff lacks admissible evidence that defamatory statements were made

Summary judgment should be granted on the additional ground that Piehler lacks any

admissible evidence that the alleged defamatory statements were ever made.  In *Callaghan*, the

court refused to consider similar hearsay allegations at summary judgment:

> Callaghan's allegations of defamation are quintessential hearsay: he relies on
> statements conveyed to him by Olenskyj, Capezutto, and Jones that a third party
> made to prove the truth of the matter that the defamatory statements were [] made.

*Callaghan,* 2004 U.S. Dist. LEXIS 5945, at *42.

Piehler testified about two allegedly defamatory statements.  First, Absolute employee

Ted DeSalvo told her that another Absolute employee, Jeffrey Gottlieb, had told DeSalvo that

"the reason that I was either fired or terminated, I'm paraphrasing, was that my activities with the

Department of Education was criminal."  Lestrade Decl., Exh. D (Piehler Tr.) at 319:10-320:23.

Second, Absolute employee "[Michael] Opel told me that defamatory statements were being

made about me, and that my activities were criminal."  *Id*. at 321:23-322:9.  Piehler admitted that

she did not know who made this second statement, but surmised that it was made by "Absolute's

management."  *Id*. at 322:10-324:10.  This testimony is inadmissible hearsay.  *See* Fed. R. Evid.

802. Here, the only other evidence that concerns allegedly defamatory statements is a message

Piehler claims she received from Opel, in which Opel purportedly writes, "They are now telling

people that you were fired because you and Springgay defrauded the company." *See* Lestrade

Decl., Exh. P (P002093). This exhibit not only fails to identify who made the alleged statements

to whom, the date and relevant context, but is also inadmissible hearsay. *See* Fed. R. Evid. 802.

In the absence of admissible evidence that defamatory statements about the plaintiff were ever

made, including by Awtry, summary judgment should be granted on this claim.

      **D.**     **The alleged statements are non-actionable opinion and qualifiedly privileged**

      Summary judgment should be granted because even if the alleged defamatory statements

were made, they constitute non-actionable opinion. Under the New York Constitution,

statements of opinion receive absolute protection. *Brattis v. Rainbow Adver. Holdings, L.L.C.*,

99 Civ. 10144, 2000 U.S. Dist. LEXIS 7345, at *9 (S.D.N.Y. May 30, 2000).

      "Context is the key as assertions that a person is guilty of blackmail, fraud, corruption

and the like in certain contexts have been found to be understood by the reader or listener to be

rhetorical hyperbole or vigorous epithet." *Field v. Grant*, 920 N.Y.S.2d 240 (Sup. Ct., Suffolk

County) (holding statement that attorney "practices fraud" was non-actionable opinion).

Statements of rhetorical hyperbole, loose or imaginative expression, as well as hypothesis and

speculation, are not actionable because they are not capable of being proved true or false. *See*

*Biro v. Condé Nast*, 883 F. Supp. 2d 441, 460-63 (S.D.N.Y. 2012).

      Here, the little context available indicates that the alleged statements were opinion

expressed in the form of loose, hyperbolic language and speculation. Moreover, there is no

evidence that anyone who heard them actually thought Piehler had been charged with a crime.

*See Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (lack of evidence anyone

believed plaintiff had been charged with crime based on characterization of negotiating position

as "blackmail.").

      The alleged statements should also be dismissed because they are protected by a qualified

privilege based on a common or shared business interest.  *See Stewart v. Florence Nightingale Health Ctr.*, No. 97 Civ. 6977, 1999 U.S. Dist. LEXIS 3985, at *31 (S.D.N.Y. Mar. 31, 1999).  "New York courts have not been hesitant to invoke qualified privilege to protect an employer's statements made in an employment context."  *Brattis*, 2000 U.S. Dist. LEXIS 7345, at *14.  This privilege not only protects statements made within Absolute, but also any statements made by Absolute to prospective employers.  *See Huntemann v. City of Yonkers*, No. 95 Civ. 1276 (LAP), 1997 U.S. Dist. LEXIS 12714, at *23-24.  Whether or not a privilege exists under the circumstances is a question for the court.  *Id*.  In *Stewart*, the court held that a statement by an employee to staff members that the plaintiff had been terminated for "gross misconduct" was privileged because it "related to the mutual interests of the parties involved in the communication.  1999 U.S. Dist. LEXIS 3985, at *33-34.  The statements here were allegedly made to Absolute sales employees about an issue related to the recording of sales revenue, a subject in which they shared a common interest.  *See Ashby v. ALM Media, LLC*, 110 A.D.3d 459, 459 (1st Dep't 2013).

## VIII.   PIEHLER'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS AGAINST ALL DEFENDANTS MUST BE DISMISSED

Piehler's claim for tortious interference should be dismissed because it is based on the same alleged statements comprising her defamation claim, and there is no admissible evidence that such statements were ever made.  Equally important, Piehler admits that she is not aware of the statement having been made or repeated to any prospective employer or to anyone in the same industry.  Lestrade Decl., Exh. D (Piehler Tr.) at 319:13-327:14.  The tortious interference claim should be dismissed on this basis alone.

In addition, Piehler has failed to adequately plead this claim and lacks admissible evidence of each element.  Piehler has not: (1) identified a specific business relationship with a

third party that defendants were aware of and directed their conduct toward; or established that

defendants (2) used improper means or acted with the sole purpose of harming Plaintiff; (3)

preventing prospective employers from hiring her and (4) causing her damage.  *See Couloute v.*

*Ryncarz*, No. 11 CV 5986, 2012 U.S. Dist. LEXIS 20534, at *8, 11-12, 13-14 n.5 (S.D.N.Y. Feb.

15, 2012).  Also, because Plaintiff testified that Robinson and Gottlieb made the allegedly

defamatory statements, this claim should be dismissed as against Awtry, Haydon and Kenny.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant their

motion for summary judgment and dismiss Plaintiff's claims in their entirety, and award

Defendants any other relief the Court deems just and proper.

Dated: New York, New York
       January 15, 2020

**DORSEY & WHITNEY LLP**

By:     /s/ *Laura M. Lestrade*
       Laura M. Lestrade
       Mark S. Sullivan
       Joshua R. Kornfield
       Krista E. Bolles
       51 West 52nd Street
       New York, New York 10019
       (212) 415-9200
       *Attorneys for Defendants*