**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

MARY VAN BRUNT-PIEHLER,

*Plaintiff,*

*v.*

ABSOLUTE SOFTWARE, INC., ABSOLUTE
SOFTWARE CORPORATION, GEOFF HAYDON,
THOMAS KENNY, and TODD AWTRY,

*Defendants.*

Civil Action No.
**16-CV-6313-EAW-MWP**

**PLAINTIFF'S RESPONSE TO DEFEDANTS' RULE 56 STATEMENT OF FACTS**

**THOMAS & SOLOMON LLP**
*Attorneys for Plaintiffs*
693 East Avenue
Rochester, NY 14607
Telephone: (585) 272-0540

Of Counsel:    J. Nelson Thomas, Esq.
                Jonathan W. Ferris, Esq.

## ABSOLUTES BUSINESS

1.     Absolute Software Corporation is a Canadian company headquartered in Vancouver, British Columbia. Olsen Decl. ¶¶ 2-3, 6.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

2.     Absolute Software, Inc. was formed in 1998 as a wholly owned subsidiary of Absolute Software Corporation. Olsen Decl. ¶¶ 2-3, 6.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

3.     Absolute Software, Inc. maintains an office in Austin, Texas. Olsen Decl. ¶¶ 2-3, 6.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

4.     Absolute Software, Inc. acts as a sales company responsible for the sale and distribution of Absolute's products in the United States. Olsen Decl. ¶¶ 2-3, 6.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

5.     Absolute Software Corporation and Absolute Software, Inc. ("collectively "Absolute") are in the computer software business. Olsen Decl. ¶4.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

6.    Absolute provides endpoint security and data risk management solutions for devices such as computers, laptops, tablets and smartphones. Haydon Decl. ¶2; Olsen Decl. ¶4.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

7.    Historically, Absolute's core business had been in the education and government sphere, sometimes referred to as "SLED" (state, local and education), to which Absolute sold anti-theft software to locate and retrieve laptops and other devices. Olsen Decl. ¶4.

Response: Deny. *See* Haydon Tr. 58:6-59:12; Awtry Tr. 320:5-321:25.

8.    Although Absolute had grown significantly since its founding in 1993, in some respects it still operated with the informality of a start-up company with a charismatic CEO who practiced an informal management style. Olsen Decl. ¶6.

Response: Deny. *See* Olsen Tr. 43:6-13; 46:12-25.

9.    Absolute hired Thomas Kenny ("Kenny") in December 2012 as Executive Vice President and General Manager of Worldwide Sales. Olsen Decl.¶7; Lestrade Decl., Exh. A (Berardo Tr. 19:11-20:13).

Response: Admit.

10.     Absolute hired Todd Awtry ("Awtry") in January 2013 as Vice President of Sales North
        America. Olsen Decl.¶ 7; Lestrade Decl., Exh. A (Berardo Tr. 19:24-20:13).

Response: Admit.


11.     Piehler commenced employment with Absolute Software, Inc. in November 2010 as the
        Regional Director of outside sales for the Northeast region of the United States. Lestrade
        Decl., Exh. D (Piehler Tr.44:18-23). Olsen Decl. ¶5.

Response: Admit.


12.     Upon joining Absolute Software, Inc., Piehler reported to John Sarantakes, then Senior
        Vice President of North American and EMEA Sales. Olsen Decl. ¶5.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no
response is needed.


13.     Sarantakes was subsequently removed from that position and Piehler began reporting to
        Awtry in January 2013. Olsen Decl. ¶ 5;

Response: Admit.


14.     Absolute hired Kenny and Awtry to bring more professionalism to the sales force. Olsen
        Decl.¶ 7; Lestrade Decl., Exh. B (Berardo Tr. 19:24-20:13}.

Response: Deny. *See* Kenny Tr. 105:7-24; 106:7-14; 107:2-10; Awtry Tr. 165:21.

15.    Awtry's duties included the introduction of more formal processes and structure to Absolute's sales organization. Awtry Decl. ¶6.

Response: Deny. *See* Awtry Tr. 50:2-51:6, 211:11-19, 216:16-25; **Exhibit AB**, DEFS07234.

16.    Awtry had previously worked in sales management at Hewlett Packard. Awtry Decl. ¶6.

Response: Deny on the grounds basis that defendant has failed to proffer admissible evidence and relies only on a self-serving statement that does not sufficiently establish the fact asserted.

17.    Awtry sought to implement some of the processes and procedures at Absolute that he had learned at Hewlett Packard, and to effect other changes designed to improve the operations and effectiveness of Absolute's sales force. Awtry Decl. ¶6.

Response: Deny. *See* Awtry Tr. 50:2-51:6, 211:11-19, 216:16-25; **Exhibit AB**, DEFS07234; Rathbun Tr. 146:4-22.

18.    John Livingston was CEO of Absolute Software Corporation for twenty years, until he stepped down in December 2013. Olsen Decl. ¶¶ 6, 8.

Response: Plaintiff states that this statement is not material to the outcome of this motion, so no response in needed.

19.    Geoff Haydon assumed the CEO role on July 1, 2014. Olsen Decl. ¶8.

Response: Admit.

20.     Errol Olson served as the Chief Financial Officer of Absolute from July 2010 until

December 31, 2019. He also served as the interim Chief Executive Officer from December

2013 to July 2014. Olsen Decl. ¶¶ 1, 8.

Response: Admit.


21.     Haydon served as the Chief Executive Officer of Absolute Software, Inc. and Absolute

Software Corporation ("Absolute") from July 1, 2014 until he resigned in February 2018.

Haydon Decl. ¶¶2, 8.

Response: Admit.


22.     During Haydon's tenure, Absolute and its wholly owned subsidiaries employed more than

400 employees and maintained offices in Canada, the United States, Europe and Asia.

Haydon Decl. ¶2.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no

response is needed.


23.     Mary Piehler was an employee of Absolute Software, Inc. for approximately one year of

the time that Haydon served as Absolute's CEO. Haydon Decl. ¶ 6.

Response: Admit.


24.     Haydon had limited contact with Ms. Piehler. Haydon Decl. ¶ 6.

Response: Deny. Haydon Tr. 55:13-18.

25.  As CEO, Haydon's focus was on the business goals of the company and keeping it profitable. Haydon made and approved decisions to manage business units with a view towards Absolute's financial performance. Haydon Decl. ¶ 7.

Response: Deny. *See* Kenny Tr. 105:7-24; 106:7-14; 107:2-10; Rathbun Tr. 18:18-22.


26.  Managers at Absolute responsible for business segments made decisions regarding the specific management of their segments, including personnel issues such as hirings, terminations and promotions. Haydon Decl. ¶ 7.

Response: Deny. Haydon Tr. 51:23-52:2; 61:4-7; 64:18-20; 66:7-9; 68:21-25; 69:20-70:15; Kenny Tr. 94:24-95:2; 96:16-97:6; 105:19-22. 148:23-149:25; 150:5-20; 152:3-153:23; Awtry Tr. 45:9-12; Awtry Tr. 252:2-13; **Exhibit N**, Defendants' Revised Privilege Log; **Exhibit AL**, DEF07377; **Exhibit AM**, DEFS07585.


27.  Warren Young, Dave Armstrong, Amy Rathbun, Art Robinson and Mary Piehler, reported to Awtry. Haydon Decl. ¶3.

Response: Admit.


28.  Awtry reported to Kenny. Haydon Decl. ¶3.

Response: Admit


29.  Kenny reported to Haydon. Haydon Decl. ¶3.

Response: Admit.

30.     Warren Young, one of the longest tenured employees at Absolute, was a Canadian citizen, residing in Vancouver, British Columbia, and worked for Absolute Software Corporation. Olsen Decl. ¶13; Awtry Decl. ¶5.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed

31.     Warren Young's compensation was paid in Canadian dollars. Olsen Decl. ¶13; Awtry Decl. ¶5. All of the other RDs and AVPs were American citizens who worked for Absolute Software, Inc. and were paid in U.S. dollars. Olsen Decl. ¶13.

Response: Admit.

32.     Kenny was terminated by Absolute in January 2016. Lestrade Decl., Exh. D (Piehler Tr. 146:3-6).

Response: Admit.

33.     Awtry was demoted and subsequently resigned from Absolute in 2017. Lestrade Decl., Exh. D (Piehler Tr.) 146:3-6.

Response: Admit.

34.     Leigh Ramsden is the Vice President of Finance for Absolute Software Corporation and Treasurer and Controller for Absolute Software, Inc. He has served in this role since August 2014. Ramsden Decl. ¶ 1.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

35.     From November 2009 until August 2014, Ramsden served as Senior Director of Finance. Ramsden Decl. ¶ 1.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

## THE REORGANIZATION OF THE SALES FORCE

36.     Absolute's board of directors tasked Haydon with expanding Absolute's business beyond SLED clients to private enterprise clients in the healthcare, financial services and general private sectors, that would use Absolute's products for data security purposes. Haydon sought to transform the company by focusing on information security solutions for private enterprise clients. Haydon Decl. ¶¶ 3; Olsen Decl. ¶¶ 8-9; Lestrade Decl., Exh. B (Kenny Tr.) at 68:5–69:8; Lestrade Decl., Exh. C (Awtry Tr.25:7-14).

Response: Deny. *See* Kenny Tr. 105:7-24; 106:7-14; 107:2-10; Rathbun Tr. 18:18-22.

37.     In order to achieve this transformation, Haydon decided to reorganize Absolute's sales force. Haydon Decl. ¶3; Olsen Decl. ¶¶ 8-9.

Response: Deny. *See* Rathbun Tr. 149:9-25; Haydon Tr. 40:25-41:5; 41:25-42:6, 48:15-24; Piehler Decl. ¶ 90.

38.     Absolute had previously divided its North American sales operations into five geographic regions, with each region having an outside sales team of Account Executives ("AEs") managed by either a Regional Director ("RD") or an Area Vice President ("AVP"). Haydon Decl. ¶3.

Response:  Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

39.     The title of AVP was a higher and more prestigious position than RD and was generally awarded to those with more tenure at the company. For example, the two AVPs at that time—Warren Young and Art Robinson—had been employed since 1995 and 1998 respectively, whereas Dave Armstrong, Amy Rathbun and Mary Piehler were more recent hires. Awtry Decl. ¶4.

Response: Deny.

40.     The managers for these five regions were Warren Young (West AVP); Dave Armstrong (North Central RD); Amy Rathbun (Southwest RD); Art Robinson (Southeast AVP) and Mary Piehler (Northeast RD). Haydon Decl. ¶3.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

41.    Beginning July 1, 2015, Absolute reorganized its outside sales force in North America by eliminating the prior regions and creating three significantly larger territories—East, Central and West. Awtry Decl.¶¶8-9.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

42.    Prior to the reorganization that began on July 1, 2015, the five RDs/AVPs—Piehler, Rathbun, Robinson, Warren and Armstrong—had managed AEs responsible for both acquiring new business and retaining existing business within their regions. Awtry Decl.¶8.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

43.    After the reorganization that began on July 1, 2015, each of the three territories, East, Central and West, had their own Acquisition teams, focused exclusively on acquiring new business from private sector enterprises, and their own Retention teams, focused on retaining existing business. These six teams were each headed by a Regional Director or Area Vice President who reported to Mr. Awtry. Haydon Decl.¶4; Awtry Decl.¶8; Olsen Decl. ¶9.

Response: Deny. Defendants rely on self-serving affidavit that state inadmissible facts.

44.    As of July 1, 2015, the positions previously held by Piehler, Rathbun, Robinson, Warren and Armstrong no longer existed because the regions covered by each of them prior to the July 1, 2015 reorganization were replaced by the larger territories. Awtry Decl. ¶9.

Response: Deny. *See* Rathbun Tr. 29:4-17; 27:22-28:11.

45.    The Acquisition teams had no legacy customers on which they could rely for commissions. Haydon Decl.¶ 4; Olsen Decl.¶ 9; Lestrade Decl., Exh. B (Kenny Tr. 228:15-24)

Response: Deny. Defendants rely on self-serving affidavit that state inadmissible facts.

46.    At the time of the reorganization, Absolute was a relatively unknown player in the cyber-security business. Haydon Decl.¶39; Ramsden Decl. ¶12; Lestrade Decl., Exh. B (Kenny Tr. 191:23-192:8).

Response: Deny.

47.    Haydon identified the criteria for the Acquisition teams, including the RDs or AVPs for these teams, as people having recent cyber security backgrounds and experience selling to Fortune 500 enterprises. Haydon Decl. ¶ 5; Olsen Decl.¶ 9.

Response: Deny. *See* Piehler Tr. 292:25-293:5, 310:9-19.

48.     Awtry and Kenny determined the composition of the retention and acquisition teams, including the RDs/AVPs, with Awtry making the ultimate decision on who should manage the new teams. Haydon Decl. ¶ 5; Awtry Decl. ¶ 12.

Response: Deny. *See* Haydon Tr. 60:25-61:3.


49.     On July 1, 2015, Art Robinson assumed the role of AVP for East/Retention. Awtry Decl. ¶12.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


50.     On July 1, 2015, Amy Rathbun became the AVP for Central/Retention. Awtry Decl. ¶12.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


51.     On July 1, 2015, Warren Young became the AVP for West/Retention. Awtry Decl. ¶12.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


52.     Piehler had been tentatively slotted into the East/Acquisition role, but because her employment was terminated as of July 1, 2015, she never served in that role. Awtry Decl. ¶11.

Response: Deny. **Exhibit S3**; **Exhibit C**, 221:24-224:9; **Exhibit E**, 266:13-267:11; **Exhibit BD; Exhibit AI**; **Exhibit L**.

53.     Pursuant to Geoff Haydon's criteria for the new Acquisition teams, Absolute hired three individuals to serve as RDs for these teams: Kurt Luporini (age 43) (Central), Randy Dye (age 50) (West) and Joe Morini (age 51) (East). Awtry Decl. ¶13.

Response: Deny. *See* Kenny 221:24-224:9; DEFS00006; Piehler Decl. ¶¶ 5-9,

54.     Luporini and Dye had were hired in the Spring of 2015. Awtry Decl. ¶13.

Response: Plaintiff states that this statement is not material to the outcome of this motion so no response is needed.

55.     Joe Morini commenced employment on or about July 14, 2015. Awtry Decl. ¶13.

Response: Deny. **Exhibit S3.**

56.     Luporini, Dye and Morini all came from outside of Absolute and had recent cyber-security backgrounds and enterprise sales experience. Awtry Decl. ¶13.

Response: Deny. Defendants rely on a self-serving affidavit that state inadmissible facts. For the purposes of this motion, plaintiff agrees that they purport to have cybersecurity experience.

57.     Kurt Luporini had extensive experience in enterprise security software sales specific to the central region of the United States. He had 21 years of experience, most recently as the US

Director of Security and Software Quality Sales at SQS Group, and both lived and worked in Illinois. *See* Awtry Decl. ¶ 41, Ex. N.

Response: This statement is not material to the outcome of this motion, so no response is needed. For the purposes of this motion, plaintiff agrees that Mr. Luporini's resume purports the above.

58.    As reflected in Luporini's offer letter, his OTE was $300,000, with a base salary of $150,000 and on target commissions of $150,000. During salary negotiations, Luporini requested an OTE of $320,000 and told me that had received other offers in this range. Awtry Decl. ¶ 41, Ex O. (DEFS00046).

Response: Deny. Defendants rely on self-serving affidavit that state inadmissible facts. The document speaks for itself and no denial or admission is needed.

59.    Randy Dye had more than twenty-years of experience, the last several years of which were in enterprise security for Hewlett Packard. He lived and worked in Arizona, so his contacts were specific to the western region that he was hired to manage. Awtry Decl. ¶ 42, Ex. P (DEFS08692).

Response: Deny. Defendants rely on self-serving affidavit that state inadmissible facts. The document speaks for itself and no denial or admission is needed.

60.    Dye's starting OTE at Absolute was $280,000, with a base of $140,000 and on target commissions of $140,000. Awtry Decl. 42 Ex. Q (DEFS00042-43).

Response: The document speaks for itself and no denial or admission is needed.

61. Joe Morini had been an Executive VP of Sales and Marketing for IDF, a global leader in security and privacy software and had 25 years of experience. He lived and worked in the New York City metropolitan area. Awtry Decl. ¶ 43, Exhibit R (DEFS09139-41).

Response: Deny. Defendants rely on self-serving affidavit that state inadmissible facts.


## RELATIONSHIP BETWEEN PIEHLER AND AWTRY

62. In March 2013, only two months into Awtry's tenure at Absolute, Piehler sent several emails to Absolute employee Jermaine Maldonado. In these emails, Ms. Piehler:

- Shared gossip that she allegedly heard about Awtry and Thomas Kenny from "HP field reps" who said that we "just never helped." Lestrade Decl. Exh. B at DEFS00751.

- Said that a form spreadsheet that Awtry wanted the team leaders to fill out "[m]ade no sense." *Id*. at DEFS00750.

- Mocked Awtry's outgoing voicemail message. *Id.* at DEFS00749-50.

- Said that Thomas Kenny and Awtry were "running around saying" that they were ending the practice of having sales reps who live outside their territory that need to fly to the territory to visit customers and this was distressing two of her representatives who Thomas and Awtry "don't even know." *Id.* at DEFS00748.

- Said that Awtry was "**shell shocked**" when Piehler told him how much revenue those sales reps brought in and that "before [Awtry] brooms them [he] better ask" where the revenue from two of her fly-in reps would come from. She also said that Awtry was "**mortified**" and had "**no idea**" how much revenue they brought in. *Id*.

- Said that she saw the changes that Thomas and Awtry were implementing at Absolute "as **chaos** not 'structure'" and that she was "very disappointed" and "wondering if this is the right direction" because "**I see [ ] 2 guys who don't seem interested in what ABT does, but would rather make this look like their HP org, which failed miserably**." *Id.* at DEFS00749.

- Said that Awtry had "no idea what to do" and "admitted it was a bad plan" to offer more money to employees who wanted to quit Absolute. *Id.*

- Said "something just doesn't feel right to me, and I am disappointed by [Awtry's and. Kenny's] actions, not just by rumors." *Id.*

- Accused Awtry and Kenny of "disrespect[ing]" and "trashing" her "reps." *Id.* at DEFS00747.

- Ended the thread by saying "**I think these guys will be gone from ABT in a year, maybe less**" and "**[t]here is no point in building a new ship and ignoring the crew . . . it can't sail alone.**" *Id.*

Awtry Decl. ¶17, Ex. B; Lestrade Decl., Exh. D (Piehler Tr. 145:-146:10).

Response: Deny. Awtry Tr. 104:19-106:12, 155:17-156:3; **Exhibit AH**, DEFS00132; Piehler Decl. ¶¶ 108-113.


63.     Awtry learned of Piehler's March 2013 email to Maldonado in the Spring of 2013, and considered Piehler's comments about him to be offensive. Awtry Decl. ¶18.

Response: Deny. Defendants rely on self-serving affidavit that state inadmissible facts.

64.    Piehler's reference to "chaos not structure" in her March 2013 email to Jermaine
       Maldonado referred to "a great example of a business assumption" that in her view Awtry
       and Kenny got wrong. Lestrade Decl., Exh. D (Piehler Tr. 134:19-21).

Response: Deny. Awtry Tr. 104:19-106:12, 155:17-156:3; **Exhibit AH**, DEFS00132.


65.    Piehler testified that she thought Awtry and Kenny would be gone from Absolute in less than
       a year "[b]ecause their behavior was not something that was going to lead to Absolute
       increasing business and it was not a culture that the founder of the company had insisted
       upon and built the company on." Lestrade Decl., Exh.D (Piehler Tr. 146: 17-23).

Response: Deny. Piehler Decl. ¶¶ 108-113.


66.    Maldonado was not a confidant of Piehler. Lestrade Decl., Exh. D (Piehler Tr. 131:5-20).

Response: Plaintiff states that this statement is not material to the outcome of this motion so no
response is needed.


67.    On April 5, 2013, Piehler sent Awtry an email (DEFS00774) in which she stated to him
       that it was a "not a good practice" for him to have emailed two sales representatives,
       Charles Springgay and Mark Kelly, requesting a telephone call the next day without telling
       them what the call would be about. Piehler also told Awtry, "[r]ight now at Absolute we
       can't play mind games." Awtry Decl. ¶19, Ex. C.

Response: Deny. Awtry Tr. 104:19-106:12, 155:17-156:3.

68.    Piehler testified that Awtry "was playing a mind game with [Springgay and Kelly] hoping that they would think they were getting fired." "Because those were the two he was targeting that were travelling in from Vancouver to the northeast and he didn't like it." Lestrade Decl., Exh. D (Piehler Tr. 159:22-160:6).

Response: The statement speaks for itself and no denial or admission is needed

69.    Piehler testified that she said to Awtry, "look it, you laid off people today in the company . . . you are creating a level of angst, and they're coming to me as the manager and I don't know what you are doing." Lestrade Decl., Exh. D (Piehler Tr. 106:7-108:15).

Response:  The statement speaks for itself and no denial or admission is needed

70.    In the summer of 2014, Awtry requested that each sales manager assign an AE to attend a monthly marketing meeting. Awtry Decl. ¶2, Ex. G (DEFS00780).

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

71.    As of September 15, 2014, Piehler had not assigned an AE from her team to attend monthly marketing meetings. Awtry Decl. ¶23.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

72.    Every other outside sales team assigned an AE to the marketing meeting. Awtry Decl. ¶23.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no

response is needed.

73.    When Awtry asked Piehler why she had not yet assigned an AE, Piehler responded that she

       "opted not to assign a rep in Q4 as we continued to sell and focus on our business." Awtry

       Decl. ¶23, Ex G.

Response:  The document speaks for itself and no denial or admission is needed.

74.    In April 2015, Piehler put forth a candidate for an open position on her team. Awtry Decl.

       ¶24, Ex. H.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no

response is needed.

75.    When Awtry questioned whether the candidate Piehler put forth had a security background

       required by Mr. Haydon, Piehler stated that "[s]elling this market is not about a 'security

       background'. . . ." Awtry Decl. ¶24, Ex. H.

Response:  The document speaks for itself and no denial or admission is needed.

76.    On May 22, 2015, Piehler and Awtry participated in a three-way telephone conference with

       Art Robinson to discuss the division of the acquisition and retention teams for the East

       region in the upcoming sales reorganization. Awtry Decl. ¶26.

Response: Admit.

77.    Piehler testified about the May 22, 2015 call with Awtry and Robinson that, "[i]t was just ridiculous. It was two people who didn't have any understanding of what these sales people do for a living, trying to slide them into new spots," and that Awtry "was not happy that I said if he went to this, these reps would leave, that this was not what he should be doing," Lestrade Decl. Ex. D. (Piehler Tr. .288:14-23 and 289: 11-14).

Response: The statement speaks for itself and no denial or admission is needed.

78.    After the May 22, 2015 telephone conference, Awtry sent Piehler an email. Awtry Decl. ¶27, Ex. J (Dep Ex. 24) DEFS00760-763.

Response:  The document speaks for itself and no denial or admission is needed.

79.    Piehler replied to Awtry's email two hours later with a multi-page, point-by-point rebuttal in which she stated—"Criticizing me and my 'leadership' in front of one of my peers in not really the right thing to do" and "Maybe you should have showed the RDs first before you showed their direct reports." She also referenced "inconsistent messaging" and "waffling" and not acting "professionally." Awtry Decl. ¶27, Ex. J (Dep Ex. 24) DEFS00760-763. Piehler was terminated on July 1, 2015. Haydon Decl. ¶ 6.

Response: The statement speaks for itself and no denial or admission is needed.

80.    Todd Awtry, as Vice President of Sales North America, made the decision to terminate Mary Piehler. Haydon Decl. ¶ 8.

Response: Deny. Haydon Tr. 51:23-52:2, 60:25-61:3.; Awtry Tr. 252:2-13; Kenny Tr. 52:4-8.

## ALLEGED KENNY COMMENTS

81.    During her employment at Absolute, Piehler made no mention of the comments she alleges
       in the Amended Complaint were made by Thomas Kenny at a managers' meeting at the
       Westin Hotel in New York City on approximately April 30, 2015. Lestrade Decl. Ex. A
       (Berardo Tr. 124: 4-17; 129: 23-130:9).

Response: Deny. Piehler Tr. 239:4-240:11, 243:10-248:18.


82.    The words appearing in quotation marks in paragraph 25 of the Amended Complaint (i.e.,
       "end of rainbow" and "just hire guys who are athletes, who talk sports and trash and get in
       each other's faces") are what Piehler alleges Kenny said. The rest is paraphrasing. Lestrade
       Decl., Exh. D (Piehler Tr. 312:2-23).

Response: Deny. Olsen Tr. Olsen Tr. 58:24-60:3, 62:2-13, 62:24-25; 63:8-15; Rathbun Tr.
142:23-145:12; 149:9-25; **Exhibit K**, DEFS09805; **Exhibit J**, DEFS09807; **Exhibit I**,
DEFS09811.


83.    Other than Kenny's alleged comments about what Haydon wanted, Piehler never heard
       Haydon express these views. Lestrade Decl., Exh. D (Piehler Tr. 314:16-20).

Response: Admit.


84.    Other than at the April 30, 2015 meeting, Piehler never heard Kenny make those or similar
       comments. Lestrade Decl., Exh. D (Piehler Tr. 314:14-18).

Response: Deny. Piehler Tr. 315:10-13.

85.    Piehler never heard other Absolute employees say that Absolute wanted to get rid of older

female employees. Lestrade Decl., Exh. D (Piehler Tr. 315:24-316:5).

Response: Deny. Piehler Tr. 292:25-293:5, 310:9-19; 315:10-13.

86.    Haydon never expressed to Kenny anything about getting rid of older or female employees

or hiring young males. Lestrade Decl., Exh. B (Kenny Tr. 104:12-17; 109:13-24).

Response: Deny. Kenny Tr. 105:7-107:15, 122:4-11, 133:24-135:11.

87.    Haydon never stated that he "wanted to get rid of employees 'that are at the end of the

rainbow.'" Haydon Decl. ¶ 9.

Response: Deny. Kenny Tr. 105:7-107:15, 122:4-11, 133:24-135:11.

88.    Errol Olsen never heard Hayden say that he "wanted to 'just hire guys who are athletes,

who talk sports and trash and get in each other's faces.'" Olsen Decl. ¶ 11.

Response: Deny. Olsen Tr. 61:18-6213; 62:24-25, 63:8-15. Further deny because defendants rely

on a self-serving affidavit that states inadmissible facts.

89.    Errol Olsen never heard Haydon say that he wanted to get rid of employees that are at the

end of the rainbow. Olsen Decl. ¶ 11.

Response: Deny. Olsen Tr. 61:18-6213; 62:24-25, 63:8-15. Further deny because defendants rely

on a self-serving affidavit that states inadmissible facts.

## ABSOLUTE'S HIRING PRACTICES

90.    Haydon wanted highly competent employees with a commitment to excellence, and for Absolute's acquisition sales force, he wanted people with recent cyber-security experience and contacts at Fortune 500 companies so that Absolute's business could be expanded into offering software solutions to this sector. Haydon Decl. ¶ 9.

Response: Deny. Rathbun Tr. 142:23-145:12, 147:4-18., 148:4-6, 149:9-25; Piehler Tr. 292:25-293:5, 310:9-19.


91.    At no time through Haydon's actions or words did he indicate that age or gender should be the basis for hiring or firing employees at Absolute. Haydon Decl. ¶ 9.

Response: Deny. Rathbun Tr. 142:23-145:12, 147:4-18., 148:4-6, 149:9-25; Kenny Tr. 105:7-24; 106:7-14; 107:2-10; Piehler Tr. 292:25-293:5, 310:9-19.


92.    Haydon hired a woman, Amanda Mallow, as a member of Absolute's Executive Leadership Team. He attended and spoke at the Women's Leadership Conference in Austin, Texas. Haydon Decl. ¶ 10.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


93.    Haydon expressed support for diversity and the inclusion of women on top performing teams in a January 2015 email to Regional Director Amy Rathbun. Haydon Decl. ¶ 10, Ex. A.

Response: Deny.

94.    In late 2014, Haydon identified a woman by the name of Holly Whalen as a candidate for a Regional Director position. Whalen had decades of relevant experience and a cyber-security background. Haydon Decl. ¶ 10.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

95.    Haydon met with Holly Whalen along with Absolute's CFO, Errol Olsen, and asked Thomas Kenny to meet with her as a candidate. Haydon Decl. ¶ 10.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

96.    Ms. Whalen was Haydon's first choice for a Regional Director position in the Western Region. However, Ms. Whalen elected to accept a position with another company. Haydon Decl. ¶ 10.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

97.    As reflected in the chart below, the actual demographics of Absolute Software, Inc.'s sales force, of which Ms. Piehler was a member, demonstrate that the percentage of women and employees over the age of 40 did not change in any significant way from July 1, 2013 (one year before Haydon commenced employment at Absolute) to July 1, 2016 (two years after Haydon commenced employment at Absolute and one year after Piehler's termination). The

percentage of women and older employees employed in Absolute Software, Inc.'s sales team

in fact increased over that period: (Olsen Decl. ¶ 11)

| Sales Employees ABS Inc. | | | | |
|---|---|---|---|---|
| | July 1, 2013 | July 1, 2014 | July 1, 2015 | July 1, 2016 |
| Total Employees | 75 | 83 | 88 | 68 |
| Females | 19% (14) | 23% (19) | 22% (19) | 22% (15) |
| Over 40 | 82% (61) | 82% (68) | 82% (73) | 85% (58) |
| Women Over 40 | 15% (11) | 14% (12) | 16% (14) | 18% (12)[1] |

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no

response is needed.

98.     The following chart sets forth the demographics of various Absolute employees referenced

in this lawsuit: (Olsen Decl. ¶ 14)

| Demographics of Relevant People | | |
|---|---|---|
| Name | Gender | DOB |
| Mary Piehler | Female | 11/8/57 |
| Amy Rathbun | Female | 10/6/65 |
| Art Robinson | Male | 4/11/58 |
| Warren Young | Male | 10/14/72 |

The data used to create this chart is from data provided by Absolute in response to interrogatories
propounded by Piehler in discovery. Olson Decl. ¶ 11, Ex. A.

| Demographics of Relevant People | | |
|---|---|---|
| Name | Gender | DOB |
| Dave Armstrong | Male | 3/24/72 |
| Charles Springgay | Male | 4/22/79 |
| Justin Peacock | Male | 3/7/69 |
| Kurt Luporini | Male | 5/23/72 |
| Randy Dye | Male | 11/1/64 |
| Joe Morini | Male | 9/24/63 |
| Todd Awtry | Male | 11/9/70 |
| Thomas Kenny | Male | 12/21/62 |
| Geoff Haydon | Male | 7/28/65 |
| Diane Moran | Female | 9/11/56 |
| Mark Kelly | Male | 11/14/72 |

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

99.    In July 2015, just days after Piehler's employment was terminated, Absolute hired Diane Moran into a position on the US sales team. Ms. Moran is a female who is older than Piehler. Awtry Decl. 52

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

100.    In or about May 2015, Awtry interviewed a female candidate, Susan Lutz for an Acquisition East role. Awtry Decl. 14

Response: Deny. Defendants rely on a self-serving affidavit that states inadmissible facts.

101.  On July 1, 2016, Art Robinson, who was 58 years old at the time, was promoted from Area

Vice President (retention) for the Eastern region of the United States to Vice

President of Sales, SLED, North America. This position had previously been held by Todd

Awtry. Olsen Decl. ¶ 12.

Response: Deny. Defendants rely on a self-serving affidavit that states inadmissible facts.

102.  Warren Young was demoted to Account Executive in October 2015. Awtry Decl ¶12

Response: Deny. Defendants rely on a self-serving affidavit that states inadmissible facts.

## COMPENSATION ISSUES

103.  During Awtry's tenure as VP Sales North America, he prepared performance evaluation

ratings for each of the RDs/AVPs based on a computerized form managed by the HR

department that required numerical scores and comments on a variety of criteria. Awtry

Decl. ¶ 33.

Response: Deny. Defendants rely on a self-serving affidavit that states inadmissible facts..

104.  When Awtry commenced employment at Absolute, the outside RDs/AVPs had been

assigned the following OTEs: Piehler, Rathbun, Robinson: $240,000; Warren Young:

$250,000 (CAD); Dave Armstrong $200,000. Awtry Decl. ¶ 35.

Response: Deny. Awtry Tr., at 173:10-174:2.

105.   When making recommendations for compensation, Awtry reviewed the performance from the prior fiscal year. For example, when he made recommendations for FY 2014, in October 2013, he reviewed FY 2013 performance. Awtry Decl. ¶ 35.

Response: Deny. Haydon Tr. 61:4-7; Awtry Tr. At 46:6-17; Kenny Tr. 149:7-13; 149:14-25; 150:5-20; 152:22-153:7; 153:5-23.

106.   At the time that Awtry performed his first compensation review at Absolute (i.e., October 2013), Amy Rathbun, a female who at the time was a 48 years old, was the highest performer with quota attainment of 90.58%. She received an increase in OTE from $240,000 to $260,000. Awtry Decl. ¶ 35.

Response: Deny. Awtry Tr. 173:21-175:8.

107.   Rathbun's 8% raise in OTE or Fiscal Year 2014 was double that of Art Robinson, who was the next highest performer. Awtry Decl. ¶ 35.

Response: Deny. Awtry Tr. 173:21-175:8.

108.   Piehler had the lowest quota attainment of the group and did not receive a compensation increase for FY 2014. Awtry Decl. ¶ 35.

Response: Deny. Piehler Aff., at ¶¶ 11, 12.

109.  Amy Rathbun and Art Robinson were the only two RDs/AVPs to meet their quota in Fiscal

Year 2014, and were the only ones to receive an increase in OTE in October of that year.

Awtry Decl. ¶ 35.

Response: Deny. Piehler Aff., at ¶¶ 11, 12.


110.  Piehler, Young and Armstrong did not received OTE increases in October 2014. Awtry

Decl. ¶ 35.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no

response is needed.


111.  During most of Awtry's tenure supervising Piehler, the RD/AVP with the highest OTE was

Amy Rathbun, a woman over the age of 40. Awtry Dec ¶37.

Response: Deny. Ferris Aff., at ¶ 126-127.


112.  Ms. Rathbun continued to be the highest performer in terms of quota attainment, and had

the highest OTE compensation of this group until October 2015. Awtry Dec. ¶ 37.

Response: Deny. Ferris Aff., at ¶ 126-127.


113.  Set forth on the chart below are the compensation increases as well as quota attainment,

net sales and performance scores for Mary Piehler, Amy Rathbun, Art Robinson, Warren

Young and David Armstrong for Fiscal Years 2012-2015. The data on the chart was

obtained from their compensation letters, commission statements and performance reviews

produced in discovery in this action. With respect to Warren Young, who was paid in

Canadian dollars, the conversion to US dollars was calculated by using the annual Canada/US foreign exchange rate (AEXCAUS) published at http://fred.stlouisfed.org. Awtry Decl. ¶ 36

|  |  | Mary Piehler (Northeast) | Amy Rathbun (Southwest) | Art Robinson (Southeast) | Warren Young (West) | David Armstrong (North Central) |
|---|---|---|---|---|---|---|
| **FY 2012** | OTE | $240,000 | $240,000 | $240,000 | $248,201 (USD) $250,000 (CAD) | $200,000 |
|  | Net Sales | $14,092,760 | $15,129,166 | $16,831,229 | $19,306,946 | $8,019,923 |
|  | Quota Attainment (%) | 105.96 | 111.65 | 108.93 | 102.56 | 90.37 |
|  | Performance Rating | 4.0 | 4.12 | 4.1 | 4.34 | 3.56 |

| | | Mary Piehler (Northeast) | Amy Rathbun (Southwest) | Art Robinson (Southeast) | Warren Young (West) | David Armstrong (North Central) |
|---|---|---|---|---|---|---|
| **FY 2013** | OTE | $240,000 | $240,000 | $240,000 | $246,202 (USD) $250,000 (CAD) | $200,000 |
| | Net Sales | $13,451,686 | $14,870,900 | $16,046,730 | $12,245,752 | $12,967,199 |
| | Quota Attainment (%) | 83.85 | 90.58 | 89.90 | 86.15 | 108.90 |
| | Performance Rating | 3.0 | 3.44 | 3.0 | 3.33 | 3.0 |
| **FY 2014** | OTE | $240,000 | $260,000 | $250,000 | $238,189 (USD) $258,000 (CAD) | $210,000 |
| | Net Sales | $15,326,217 | $18,586,182 | $19,842,563 | $13,658,667 | $12,920,425 |
| | Quota Attainment (%) | 96.78 | 110.73 | 100.07 | 94.40 | 92.63 |
| | Performance Rating | 3.35/2.94 | 3.76/3.29 | 3.53/3.82 | 3.47/3.35 | 3.65/3.24 |
| **FY 2015** | OTE | $240,000 | $274,000 | $270,000 | $209,952 (USD) $258,000 (CAD) | $210,000 |
| | Net Sales | $11,881,977 | $16,737,799 | $21,184,086 | $9,314,991 | $4,221,810 |
| | Quota Attainment (%) | 86.11 | 110.67 | 124.64 | 81.28 | 42.90 (resigned 1/16/15) |
| | Performance Rating | 3.59/n/a | 4.24/3.76 | 4.35/4.59 | 3.59/3.41 | n/a |

Response: Deny. Ferris Aff., at ¶ 126-127.

114.   In March 2015, Awtry recommended Ms. Rathbun for a promotion to AVP. Awtry Dec. ¶ 37.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

115.   Awtry's recommendation was approved and Ms. Rathbun assumed the AVP title on July 1, 2015, the start of Fiscal Year 2016. Awtry Dec. ¶ 37.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

116.   Ms. Rathbun received a compensation increase for Fiscal year 2016. Awtry Dec. ¶ 37.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

117.   Leigh Ramsden, in his capacity as Senior Director Finance, and in connection with the reorganization of the sales force that went into effect on July 1, 2015, was asked by Awtry to approve compensation offers to Kurt Luporini, Randy Dye and Joe Morini. Ramsden Decl. ¶ 12.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

118. Ramsden approved the proposed OTEs for Luporini, Dye and Morini. Ramsden Decl. ¶ 12.

Response: Deny. Haydon Tr. 69:24-70:5.

119. Compensation for those hired from outside of Absolute took into consideration the individual's current salary structure and market conditions. Awtry Decl. ¶ 40.

Response: Deny. Kenny Tr. 149:7-13; 149:14-25; 150:5-20; 152:22-153:7; 153:5-23; Piehler Tr. 239:4-240:11; Rathbun Tr. 61:21-62:13.

120. Morini's OTE at IDF was $300,000, Absolute offered him an OTE of $300,000 with a 60/40 split of $180,000 base and $120,000 in on target commissions. Awtry Decl. ¶ 43, Ex. H (DEFS09142-43).

Response:  These documents speaks for themselves and no denial or admission is needed.

121. Troy Stultz was hired as the Director of Sales, Value Added Resellers ("VAR"), North America. Awtry Decl. ¶ 51.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

122. Stultz's territory was the entire United States. Stultz had a program management role in which he built a VAR program from scratch, including the creation of a website and other backend infrastructure, to recruit and build a community of resellers to partner with Absolute. His program did not deal with end-user customers. Awtry Decl. ¶ 51.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

## PIEHLER'S PERFORMANCE

123.   Ms. Piehler's job performance at Absolute was inconsistent. There were quarters in which Piehler's team met its sales quota, but her team did not meet its overall sales quota in any fiscal year in which Awtry supervised her. Awtry Decl. ¶29, Ex. K.

Response: Deny. Piehler Aff., at ¶¶ 15-18, 21-23; **Exhibit Y**; **Exhibit C**, Kenny Tr. 45:7-17; 50:5-10; **Exhibit E**, Awtry Tr. 132:6-136:11.


124.   In the two quarters immediately preceding Piehler's termination combined, her team's quota attainment was only 69.8%. Awtry Decl. ¶30.

Response: Deny. Piehler Aff., at ¶¶ 15-18, 20-22, 25-27; **Exhibit Y**; **Exhibit C**, Kenny Tr. 45:7-17; 50:5-10; **Exhibit E**, Awtry Tr. 132:6-136:11.


125.   In Fiscal Year 2014, Piehler's team sold significantly less Absolute Manage and Absolute Service Products than the next closest region. Awtry Decl. ¶30, Ex. L.

Response: Deny. Piehler Aff., ¶¶ 20-22, 25-27.


126.   On September 16, 2014, Piehler acknowledged her poor performance with respect to the software products Manage and Service, stating that her results on those two products were "painful." Awtry Decl. ¶30, Ex. M.

Response: Deny. Piehler Aff., at ¶¶ 25-27.

127.    On September 23, 2014, Piehler agreed to provide Awtry with a plan "about [her team's]

lack of absolute service business." Awtry Decl. ¶30, Ex. M.

Response:  The document speaks for itself and no denial or admission is needed.


128.    Some members of Absolute's sales force are paid commissions based on the sales of

Absolute's products and services. Ramsden Decl. ¶ 1.

Response: Admit.


129.    Account Executives ("AE"s) are paid commissions on the products and services that they

sell, and Regional Directors or Area Vice Presidents ("RD"s/"AVP"s) who manage them

are paid commissions on the combined sales of the AEs on their teams. Ramsden Decl. ¶

1.

Response: Admit.


130.    Absolute's Finance Department is responsible for calculating the amount of the

commissions. Ramsden Decl. ¶ 1.

Response: Admit.


131.    Compensation for RDs and AVPs consisted of a combination of base pay and commissions

earned on sales within their region. Awtry Decl. ¶ 31.

Response: Admit.

132.    Every RD and AVP was assigned an On Target Earnings ("OTE") amount. The on-target commission component was the annual commission earnings if the employee attained 100% of their annual commission quota. RDs/AVPs. Awtry Decl. ¶ 33.

Response: Admit.

133.    RDs/AVPs could earn commission enhancements, bonuses and other awards for meeting certain benchmarks ("Sales Bonuses"), which applied evenly to all RDs/AVPs. Awtry Decl. ¶ 31.

Response: Deny. Rathbun Tr. 61:21-62:13; Piehler Tr. 239:4-240:11.

134.    Every October, Absolute reviewed the performance of the RDs/AVPs over the past fiscal year and sometimes awarded increases in OTE. For example, compensation decisions that went into effect in October 2014 were based on performance during Fiscal Year 2014 (July 1, 2013-June 30, 2014). Awtry Decl. ¶ 33.

Response: Deny. Defendants rely on a self-serving affidavit that states inadmissible facts.

135.    Performance evaluation ratings were a component in base salary determinations. Awtry Decl. ¶ 33.

Response: Deny. Defendants rely on a self-serving affidavit that states inadmissible facts.

### THE DOE INVESTIGATION

136.    In Fiscal Year 2014 (beginning July 1, 2013), Absolute's management decided to change the sales compensation plan by providing an incentive to the sales force for sales to new accounts. Sales made to new accounts would be credited at 130% for quota attainment

purposes, whereas sales to existing accounts would be credited at 80%. Ramsden Decl. ¶ 3.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

137.    As part of the implementation of the revised sales compensation plan, Absolute created a "Frozen List" that identified the existing accounts. Sales to the accounts on the Frozen List would be credited at 80%. Ramsden Decl. ¶ 4.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

138.    Sales employees had the opportunity to lobby for accounts to be removed from the Frozen List and treated as new accounts for quota attainment purposes if special circumstances warranted. Ramsden Decl. ¶ 4.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

139.    The New York City Department of Education (the "DOE") has been an Absolute customer for many years, and for much of this period has been one of Absolute's largest accounts. Ramsden Decl. ¶ 5.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

140.  The DOE has various funding programs through which schools purchase devices. The largest of those programs is called Resolution A. Ramsden Decl. ¶ 5.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


141.  Absolute maintained an account for the DOE denominated ("Reso A"). Products purchased by the DOE through this program were credited to the DOE Reso A account. Ramsden Decl. ¶ 5.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


142.  The Frozen List included the Reso A account because it was considered an existing or legacy account. Ramsden Decl. ¶ 6.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


143.  On or about June 26, 2014, Matt Meanchoff, in his capacity as Vice President of Account Services and Management, brought to the attention of Ramsden and Absolute's Finance Department that an unprecedented number of new accounts were being opened for the DOE, and that it was impacting his team's ability to provide services for new devices. Exhibit A at DEFS01037; Ramsden Decl. ¶ 7.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

144.    Meanchoff specifically asked Ramsden about a new account entitled "Schools of the Upper East Side." This account raised concerns with Mr. Meanchoff because, to his knowledge, the account did not align with a funding source or a particular school or program. Ramsden Decl. ¶ 7.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

145.    In or about June 2014, it came to light that even though the DOE had been one of Absolute's largest customers for years, sales to the DOE were being booked as new business at the 130% quota attainment rate. Ramsden Decl. ¶ 8.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

146.    Absolute's Finance department reviewed 296 orders and calculated that the 130% rate represented a quota attainment credit of $1,833,595. If the 80% rate had been applied, the quota attainment credit would have been $1,128,356, for a difference of $705,229. Exhibit A at DEFS01038; Ramsden Decl. ¶ 8.

Response:  Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

147.    At that time, Charles Springgay was the AE assigned to the DOE account. He was a member of the Northeast region sales team and reported to Mary Piehler. Justin Peacock

was the Territory Manager who assisted Springgay and Piehler in booking sales to the DOE. Ramsden Decl. ¶ 9.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

148.  Piehler, Charles Springgay (male under 40) and Justin Peacock (male over 40) were identified as the main individuals involved in booking DOE sales as new business at the 130% quota attainment rate. Ramsden Decl. ¶¶ 9-10.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed..

149.  While this issue was being investigated, commission payments to Springgay, Piehler and Peacock on the DOE account were withheld. They would have been the recipients of the bulk of the commission payments on these sales. Ramsden instructed his staff to issue manual checks to those three individuals to reduce the DOE commissions to the 80% rate until the issue was resolved. Exhibit B at DEFS 07219; Ramsden Decl. ¶ 10.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

150.  Ramsden involved Awtry in the DOE investigation to interview Piehler, Springgay and Peacock. Ramsden Decl. ¶ 9.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

151.    Piehler stated that she had previously informed Awtry how the DOE business was being booked and that it was appropriate to treat new DOE schools as new business. Awtry Decl. ¶48.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


152.    Todd Awtry subsequently determined that sales to DOE schools that had not previously purchased from Absolute, and where the funding source did not require Computrace to be included, even if funded through Resolution A, would be credited at 130% for quota attainment purposes. Ramsden Decl. ¶ 11, Exhibit C at DEFS00135-36.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


153.    Ultimately, Awtry implemented a new protocol concerning DOE orders which resulted in Piehler being credited at 130% for most of the DOE sales. Ramsden Decl. ¶ 11.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.


154.    After Piehler's team provided a recalculation of accounts that met the new protocol, Awtry requested that the Finance Department recalculate the commissions for those sales at the 130% rate. He provided this direction to Ramsden on or about September 24, 2014. Exhibit D at DEFS01363-65. Ramsden Decl. ¶ 11.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

155.   To Ramsden's knowledge, all of the commissions due to Ms. Piehler were paid to her. Ramsden Decl. ¶ 11.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

156.   Piehler referred to the DOE investigation as a "witch hunt," and wrote emails questioning Awtry's competence and professionalism. Lestrade Decl. Ex. 7. [DEFS02585 (Dep Ex. 17)]

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

## PIEHLER'S COMPLAINTS

157.   In 2013, Ms. Rathbun requested that Absolute offer her team a trip to Pebble Beach golf resort as an incentive if they closed a very important piece of business. Awtry Dec. ¶ 38.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

158.   None of the other teams, including those of Mary Piehler, Art Robinson, Warren Young or Dave Armstrong were eligible to qualify for the trip to Pebble Beach. Awtry Dec. ¶ 38.

Response: Plaintiff states that this paragraph is not material to the outcome of this motion, so no response is needed.

159.    On or about June 2014, Piehler communicated with Daniel Berardo, Absolute's then-head of Human Resources about Todd Awtry. Olsen Decl. ¶ 15.

Response: Admit as to the fact that she communicated with Mr. Berardo, but deny as to the fact that her conversations with Mr. Berardo were solely regarding Mr. Awtry.

160.    Piehler had three telephone conversations with Berardo on or about June 30, 2014, all of them concerning the DOE investigation. Lestrade Decl., Exh. D (Piehler Tr. 229:6-4).

Response: Admit as to the fact that she communicated with Mr. Berardo on that date, but deny as to the fact that her conversations with Mr. Berardo were solely regarding the DOE investigation.

161.    In Piehler's conversations with Berardo on or about June 30, 2014, Piehler discussed how once Awtry and Kenny arrived at the company, she never received a pay raise or stock options, and that her numbers were being presented incorrectly. Lestrade Decl., Exh. D (Piehler Tr. 260:11-24).

Response: Admit.

162.    Piehler did not state in her complaints to Berardo or Olsen that she was being discriminated against on the basis of sex or age, or on any other impermissible basis. Lestrade Decl. Ex. D (Piehler Tr. 247:24-248:9); Olsen Decl. ¶ 15.

Response: Deny. *See* Piehler Tr. 239:4-240:11, 243:8-20, 245:21-247:22; Piehler Aff., at ¶¶ 71-74.

163.    Piehler does not believe she told Berardo that she was being discriminated on the basis of age. Lestrade Decl., Exh. D (Piehler Tr. Tr. 239:18-20).

Response: Deny. Piehler Tr. 239:4-240:11; Piehler Aff., at ¶¶ 71-74.

164.    Piehler does not recall telling Berardo that she was discriminated against on the basis of sex, and doesn't recall making any particular statement to Berrardo. Lestrade Decl., Exh.D (Piehler Tr. 240:6-11; 241:14).

Response: Deny. Piehler Tr. 239:4-240:11; Piehler Aff., at ¶¶ 71-76.

165.    Piehler had a conversation with Errol Olsen on or about July 8, 2014 in which she discussed her frustration with Awtry's leadership style, including how upset she was about the DOE investigation and the withholding of commissions, not receiving a performance review from him, his inclusion of performance ratings for sales personnel in an email and his not going on sales calls with her. Lestrade Decl., Exh. D (Piehler Dep. Tr. 245:21-248:9).

Response: Deny. 245:21-247:22; Piehler Aff., at ¶¶ 77-79.

166.    Piehler did not tell Olsen that she felt she was being discriminated against on the basis of age or sex. Olsen Decl. ¶15; Lestrade Decl., Exh. D (Piehler Tr. 247:24-248:9).

Response: Deny. Piehler Tr. 245:23-247:16; Piehler Aff., at ¶¶ 77-79.

167. Piehler exchanged several emails with Daniel Berardo after speaking with him on June 30, 2014. Lestrade Decl., Exh. E (DEFS 02584-86).

Response: The documents speaks for themselves and no admission or denial is required.


168. On July 1, 2014, Piehler sent Berardo an email in which she raised issues about Awtry's competence and fitness as a manager. In the same email thread, she complained about how sales number were reported. Lestrade Decl., Exh. E (DEFS 02584-86).

Response: The documents speaks for themselves and no denial or admission is needed.


169. Nothing in Piehler's email correspondence with Daniel Berardo referred to sex or age discrimination or any protected activity. Lestrade Decl., Exh. E (DEFS 02584-86).

Response: Deny. Piehler Aff., at ¶ 75.


170. On July 6, 2014, in response to Berardo's request for details concerning Piehler's complaint about how the numbers were booked, Piehler forwarded to Berardo pages of emails that she had with Daniel Miller, Absolute's Sales Operations Manager, in October 2013 requesting changes to mistakes made in data summaries called "warbooks," which are interim sales reports. Lestrade Decl., Exh. G (P000811).

Response:  The document speaks for itself and no denial or admission is needed.


171. Nowhere in Piehler's emails with Mr. Miller does Piehler state there is sex or age discrimination in the way the numbers are being reported on the warbooks. In her emails to Miller, Piehler stated "I know it's a system issue . . . ." Lestrade Decl., Exh. G (P000811).

Response: Deny. Piehler Aff., at ¶¶ 75-76.

172.    Piehler mentions several other issues in her July 6, 2014 response to Berardo: not getting

a performance review, the distribution of sales personnel performance ratings, not

investigating an employee who had a part-time job and slides presented at a meeting that

did not remove non-repeat business for her region. Lestrade Decl., Exh. G P000811-17.

Response: The document speaks for itself and no denial or admission is needed.

173.    On August 11, 2014, Piehler emailed Berardo regarding the issues that she raised with

Errol Olsen. Nowhere in this email does she suggest that she was complaining of

discrimination of any sort Lestrade Decl., Exh. H (DEFS02550).

Response: The document speaks for itself and no denial or admission is needed.

## DEFAMATION/TORTIOUS INTERFERENCE

174.    Piehler is not aware of an allegedly defamatory statements having been made or repeated

to a prospective employer or to anyone in the same industry outside of Absolute. Lestrade

Decl., Exh. D (Piehler Tr. 319:13-16; 319:19-23; 319:25-320:16; 320:11-321:18; 321:16-

18; 322:10-324:10 325:8-326:9)

Response:

175.    No prospective employer ever asked Piehler about the DOE investigation or informed her

that they had heard she was involved in stealing from Absolute. Lestrade Decl., Exh. D

(Piehler Tr.326:19-329:2).

Response:


176.    No one in the same industry as Piehler has ever told her that they heard about Piehler in

connection with a DOE investigation. Lestrade Decl., Exh. D (Piehler Tr. 327:7-14).

Response:


Dated: April 30, 2020

                              **THOMAS & SOLOMON LLP**

                    By:    /s/ Jonathan W. Ferris
                           J. Nelson Thomas, Esq.
                           Jonathan W. Ferris, Esq.
                           *Attorneys for Plaintiffs*
                           693 East Avenue
                           Rochester, New York 14607
                           Telephone:  (585) 272-0540
                           nthomas@theemploymentattorneys.com
                           jferris@theemploymentattorneys.com