UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARY VAN BRUNT-PIEHLER,

                Plaintiff,

      v.

ABSOLUTE SOFTWARE, INC.,
ABSOLUTE SOFTWARE CORPORATION,
GEOFF HAYDON, THOMAS KENNY,
AND TODD AWTRY,

                Defendants.

_____

**DECISION AND ORDER**

6:16-CV-06313 EAW

## <u>INTRODUCTION</u>

Plaintiff Mary Van Brunt-Piehler ("Plaintiff") commenced this action against Absolute Software, Inc., Absolute Software Corporation, Geoff Haydon, Thomas Kenny, and Todd Awtry (collectively "Defendants") on May 18, 2016, asserting violations of Title VII of the 1964 Civil Rights Act ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621, *et seq.*; the Equal Pay Act ("EPA"), 29 U.S.C. § 206, *et seq.*; the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 290, *et seq.*; and state law claims of tortious interference with prospective business relations, defamation and slander.  (Dkt. 1; Dkt. 34).  Presently before the Court is Defendants' Motion for Summary Judgment.  (Dkt. 143).  Because genuine issues of material fact prevent judgment as a matter of law on many of Plaintiff's claims, Defendants' motion is denied except with respect to the following claims which are dismissed: Plaintiff's post-

employment retaliation claims; Plaintiff's age-based and EPA retaliation claims; Plaintiff's New York EPA claim; and Plaintiff's common-law claims for defamation, slander and tortious interference with prospective business relations.

## BACKGROUND

### I.   Procedural Background

Prior to commencing the instant action, Plaintiff, a female employee of her joint employers Absolute Software, Inc. and Absolute Software Corporation (hereinafter collectively "Absolute"), filed a charge with the Equal Employment Opportunity Commission ("EEOC") on September 4, 2015, alleging discrimination on the basis of her gender and age. (Dkt. 34 at ¶¶ 8, 31). Plaintiff subsequently filed a second charge of discrimination with the EEOC, alleging that she was retaliated against after complaining to Absolute's Human Resources Department in July 2014, and for comments made by Absolute in retaliation for Plaintiff's first EEOC charge, including that Plaintiff had "defrauded" Absolute and engaged in "criminal" activity. (*Id*. at ¶ 33).

On May 18, 2016, Plaintiff commenced the instant action. (Dkt. 1). Defendants filed their Answer on July 15, 2016. (Dkt. 7). The parties stipulated to the filing of an Amended Complaint (Dkt. 37), which was filed on July 24, 2017 (Dkt. 34). Defendants filed an Answer, and then an Amended Answer, to the Amended Complaint. (Dkt. 40; Dkt. 42).

The Amended Complaint contains ten causes of action, including: (1) gender discrimination in violation of Title VII, against Absolute; (2) age discrimination in violation of the ADEA, against Absolute; (3) unequal pay in violation of the EPA, against

Absolute; (4) retaliation in violation of the EPA, against Absolute; (5) violation of the New York EPA, New York Labor Law § 194 against Absolute; (6) age and gender discrimination in violation of the NYSHRL, against all Defendants; (7) retaliation in violation of the NYSHRL, against all Defendants; (8) aiding and abetting discrimination and retaliation in violation of the NYSHRL, against all Defendants; (9) tortious interference with prospective business relations, against all Defendants; and (10) defamation and/or slander *per se*, against Absolute and defendant Awtry. (Dkt. 34 at 11-21).

On January 15, 2020, Defendants moved for summary judgment. (Dkt. 143; *see also* Dkts. 144-150). Plaintiff filed response papers on April 30, 2020 (Dkts. 155-159, 163-166), and Defendants replied on July 15, 2020 (Dkts. 169-173, 175).

Oral argument on Defendants' motion for summary judgment was held before the undersigned on November 9, 2020, at which time the Court reserved decision. (Dkt. 178). At oral argument, Plaintiff's counsel confirmed that Plaintiff did not oppose summary judgment on her claims for tortious interference with prospective business relations and defamation and/or slander *per se*. Counsel further advised that Plaintiff would not pursue her New York EPA claim. Following oral argument, on November 13, 2020, counsel submitted a letter to the Court, advising that Plaintiff did not oppose dismissal of Plaintiff's post-employment retaliation claims.

## II.   Factual Background

The following facts are taken from Defendants' Statement of Material Facts (Dkt. 150), Plaintiff's response thereto (Dkt. 158), and the Exhibits submitted in support of and in opposition to Defendants' Motion for Summary Judgment.

### A.   Reorganization of Absolute

Absolute Software Corporation is a Canadian company headquartered in Vancouver, British Columbia.  (Dkt. 150 at ¶ 1).  Absolute Software, Inc. was formed in 1998 as a wholly owned subsidiary of Absolute Software Corporation and is responsible for the sale and distribution of products in the United States.  (*Id*. at ¶¶ 2, 4).  Absolute is in the computer software business and provides endpoint security and data risk management solutions for devices such as computers, laptops, tablets, and smartphones.  (*Id*. at ¶¶ 5, 6).

Plaintiff commenced employment with Absolute in November 2010, as the Regional Director of outside sales for the Northeast region of the United States.  (Dkt. 150 at ¶ 11; Dkt. 158 at ¶ 11).  When Plaintiff first began working at Absolute, she reported to John Sarantakes, the then-Senior Vice President of North American and EMEA Sales.  (Dkt. 150 at ¶ 12).

Defendant Thomas Kenny began work at Absolute in December 2012, as Executive Vice President and General Manager of Worldwide Sales.  (Dkt. 150 at ¶ 9; Dkt. 158 at ¶ 9).  Defendant Todd Awtry began work at Absolute in January 2013, as Vice President of Sales North America.  (Dkt. 150 at ¶ 10; Dkt. 158 at ¶ 10).  Following

Sarantakes' removal, Plaintiff began reporting to Awtry in January 2013.  (Dkt. 150 at ¶ 13; Dkt. 158 at ¶ 13).

According to Defendants, Awtry, who previously worked at Hewlett Packard, was hired to introduce a more formal process and structure to Absolute's sales organization. (Dkt. 150 at ¶¶ 15-17; *see also* Dkt. 147 at ¶ 6 (Declaration of Todd Awtry ("Awtry Decl."))).   While some members of the sales force were accepting of the changes implemented by Awtry, others were not.  (Dkt. 147 at ¶ 6).  On July 1, 2014, defendant Geoff Haydon assumed the role of CEO at Absolute, replacing John Livingston, who had held the position for 20 years.  (Dkt. 150 at ¶¶ 18, 19; Dkt. 158 at ¶ 19).  Absolute's board of directors tasked Haydon with expanding Absolute's business, to further focus on information security solutions for private sector clients.  (Dkt. 146 at ¶ 3 (Declaration of Geoff Haydon ("Haydon Decl."))).  Haydon ultimately resigned in February 2018.  (Dkt. 150 at ¶ 21; Dkt. 158 at ¶ 21).

Defendants contend that when Haydon became CEO, Absolute's board of directors tasked him with expanding Absolute's business to private enterprise clients in the healthcare, financial services and general private sectors, that would use Absolute's products for data security purposes.  (Dkt. 150 at ¶ 36; *see also* Haydon Decl., at ¶ 3). Part of this involved reorganizing Absolute's sales force.  (Dkt. 150 at ¶ 37; Haydon Decl., at ¶ 3).  Prior to the reorganization, Absolute divided its North American sales operations into five geographic regions, with each region having an outside sales team of Account Executives ("AEs"), managed by either a Regional Director ("RD") or an Area Vice President ("AVP").  (Dkt. 150 at ¶ 38; *see also* Haydon Decl., at ¶ 3).  The

managers for these five regions were Warren Young (West AVP), Dave Armstrong (North Central RD), Amy Rathbun (Southwest RD), Art Robinson (Southeast AVP), and Plaintiff (Northeast RD).  (Dkt. 150 at ¶ 40).  During the relevant period, Plaintiff, along with Young, Armstrong, Rathbun, and Robinson, reported to Awtry.  (Dkt. 150 at ¶ 27; Dkt. 158 at ¶ 27).  Awtry reported to Kenny, and Kenny reported to Haydon.  (Dkt. 150 at ¶¶ 28, 29; Dkt. 158 at ¶¶ 28, 29).  Kenny was terminated by Absolute in January 2016, and Awtry was demoted and subsequently resigned from Absolute in 2017.  (Dkt. 150 at ¶¶ 32, 33; Dkt. 158 at ¶¶ 32, 33).

Beginning July 1, 2015 (the date Plaintiff was terminated), Absolute reorganized its outside sales force in North America by eliminating the prior regions and creating three larger territories of East, Central and West.  (Dkt. 150 at ¶ 41; *see also* Awtry Decl., at ¶¶ 8-9).  The new territories each had separate teams focused specifically on "Acquisition" and "Retention."  (Dkt. 150 at ¶ 43; Awtry Decl., at ¶ 8).  Accordingly, as of July 1, 2015, the positions previously held by Plaintiff, Rathbun, Robinson, Warren, and Armstrong no longer existed because the regions covered by each of them prior to the reorganization were replaced by the larger territories.  (Dkt. 150 at ¶ 44; *see also* Awtry Decl., at ¶¶ 8-9).

Awtry, in consultation with Kenny, made the decisions regarding who would manage each of the new teams.  (Awtry Decl., at ¶ 12).  Robinson, Rathbun, and Young ultimately became the AVPs for each of the new, larger regions.  (*Id.*).  Plaintiff was tentatively slotted into the East/Acquisition role, but because her employment was terminated as of July 1, 2015, she never served in that role.  (*Id.*).  Absolute hired three

individuals to serve as RDs for these teams: Kurt Luporini (age 43) (Central), Randy Dye (age 50) (West) and Joe Morini (age 51) (East).  (Dkt. 150 at ¶ 53; *see also* Awtry Decl., at ¶ 13).  Luporini, Dye and Morini all came from outside of Absolute and had recent cyber-security backgrounds and enterprise sales experience.  (Awtry Decl., at ¶¶ 13, 40-43).

**B.      Absolute's Culture of Discrimination**

Plaintiff described her experience at Absolute as "one where women were not treated with respect, were treated differently, could not climb the corporate ladder, and were continually terminated or otherwise forced out of the company."  (Dkt. 156 at ¶ 28 (Affirmation of Mary Van Brunt-Piehler ("Piehler Aff."))).  She described one specific example, when during a corporate event in Rancho Mirage, the CEO, COO, and CFO swam nude in front of employees at the hotel pool, and encouraged other employees, particularly female employees, to join them swimming naked in the pool.  (*Id*. at ¶ 29).  During his deposition, Errol Olsen, Absolute's CFO, confirmed that he, the CEO, and the COO swam in the hotel pool, in various stages of undress.  (*See* Dkt. 157-2 at 108-11 (relating that when he was attending a sales meeting where there was a pool, he jumped into the pool wearing his underwear, that the CEO and COO also jumped into the pool, shed their boxers, and swam naked)).

Plaintiff asserts that other female employees were either terminated or forced out of the company and excluded from events and meetings.  (Piehler Aff., at ¶¶ 32-35).  Amy Rathbun similarly testified that women were treated differently than men at Absolute.  (*See* Dkt. 157-1 at 33 (women were "just left out," and were not "looked in the

eye" by Awtry and Kenny, were excluded from meetings, and had to "really mak[e] a strategy" for communicating with the men)).  Rathbun further testified that once Kenny and Awtry came to the company, "it became very different . . . women were excluded and not brought in—not really welcome to the table.  We nudged our way in many times because that's what good sales leaders do, but it was not very welcoming."  (*Id*. at 32-33). Rathbun testified that another Absolute employee, Art Robinson, made references to "make-up sex" and "rape" during conversations about clients.  (*Id*. at 114-15; *see also* Dkt. 157-4 at 2, 4 (Rathbun emails documenting Robinson's comments relating to "make-up sex" and "rape")).  Rathbun recounted one occasion on which Robinson told her before a meeting with a large client that he "didn't feel comfortable with two women being in the meeting," and during the prep lunch, told her, "Amy, I don't want you to speak."  (Dkt. 157-1 at 61-62; *see also* Dkt. 157-4 at 6 (Rathbun email to Robinson, referencing comment about having two women in the meeting, and asking "[h]ow about I just dial in to the meeting so I can hear the conversation and understand the go forward plan for HISD?")).

Both Plaintiff and Rathbun identified Abigail Maines, a former VP at Absolute, who was "forced out of the company" after Kenny and Awtry arrived at Absolute. (Piehler Aff., at ¶ 32; *see also* Dkt. 157-1 at 39-40 (Rathbun's testimony that Maines' departure was "very hush-hush," that she was "one of the best . . . people that worked at Absolute," and that she was "pretty sure [Maines] was fired.")).  Rathbun also identified Myra Moy-Gregory, who was "pushed down out of her role into operations" and removed from her job responsibilities as the Channel manager for Dell and replaced by

- 8 -

"Mike Kenny and others."  (*See* Dkt. 157-1 at 41-42).  Rathbun also testified that she believed she was paid less than her male counterparts and, when she brought this to the attention of Awtry, he told her she had to "stop talking about it," because it "wasn't part of the code of conduct[.]"  (*Id*. at 54-55).

### C.    Plaintiff's Relationship with Awtry

According to Defendants, starting in April 2013, Plaintiff disapproved of the changes both Awtry and Kenny sought to implement.  For example, Plaintiff criticized Awtry and predicted his failure to other employees.  (Awtry Decl., at ¶¶ 16, 17, 28).  Plaintiff also sent emails to Awtry, criticizing his dealings with other sales representatives.  (*Id*. at ¶ 19).  Further, after Awtry requested that each sales manager assign an AE to attend a monthly marketing meeting, Plaintiff declined to do so, which Awtry took as Plaintiff deliberately disobeying his directive.  (*Id*. at ¶ 23; Dkt. 147-7).  Additionally, on May 22, 2015, Plaintiff and Awtry participated in a telephone call with Robinson to address the division on the Acquisition and Retention teams for the East region in the upcoming sales reorganization; during the call, Plaintiff resisted Awtry's recommendations pertaining to how the teams would be divided.  (Awtry Decl., at ¶ 26).  Following the phone call, Plaintiff and Awtry exchanged emails, in which Plaintiff criticized Awtry.  (*Id*. at ¶ 27).  Although he consulted with Kenny, Haydon, and Human Resources, Awtry was the individual who fired Plaintiff.  (*Id*. at ¶ 28).

**D.      Plaintiff's Allegations of Discrimination at the April 2015 Manager's Meeting**

Plaintiff contends that at a meeting at the Westin Hotel in New York City on April 30, 2015, Kenny told Absolute's sales leaders that Haydon wanted Absolute to get rid of sales employees that were "at the end of their rainbow," and "hire guys that are athletes, that will talk trash in each other's face."  (Dkt. 157-1 at 24-26; *see also* Piehler Aff., at ¶ 38).   Rathbun also testified regarding defendant Kenny's April 2015 announcement relating to Absolute's new hiring criteria:

> He said he wanted to hire ex-jocks, guys that had been playing basketball or baseball or football who can come in and have a great work ethic and be very aggressive.  That's my interpretation of what he said.

(Dkt. 157-1 at 89).  Rathbun also confirmed that Kenny mentioned "not wanting to hire people at the end of their rainbow."  (*Id.*).

**E.      Plaintiff's Performance and Termination**

According to Defendants, Plaintiff's performance at Absolute was inconsistent; there were quarters in which Plaintiff's team met its sales quota, but her team did not meet its overall sales quota in any fiscal year in which Awtry supervised her.  (Awtry Decl., at ¶ 29).   During the 2014 fiscal year, Plaintiff's team sold "significantly less" Absolute Manage and Absolute Service Products, which were two software products, than the next closest region.  (*Id.* at ¶ 30).  Plaintiff acknowledged her performance with respect to those software programs, and in September 2014, she agreed to provide Awtry with a plan "about [her team's] lack of absolute service business."  (*Id.*).

Plaintiff contends that her performance review for the first half of the fiscal year 2015, which she received in February 2015, was "excellent," with "115% attainment in the first quarter of FY 15" and "105% attainment in the second quarter of FY 15." (Piehler Aff., at ¶ 21). Plaintiff received an overall score of 3.59 out of 5 and, as part of the self-assessment she scored herself lower than Awtry did (3.47 vs. 3.59). (*Id*. at ¶ 22). Out of the approximately seventeen performance areas pertinent to the review, Plaintiff met or exceeded expectations on all but two and, in the reviewer overall comments, Awtry wrote "you had a GREAT 1H FY 15." (*Id*. at ¶ 23). The only areas in which Plaintiff received below expectation marks were related to two of Absolute's products, Absolute Manage and Absolute Service; however, in the prior months, Absolute's strategy in selling those products had shifted and they became "secondary products." (*Id*. at ¶¶ 24, 25).

In June 2014, Plaintiff was part of an investigation concerning the New York City Department of Education (hereinafter "DOE"), which was one of Absolute's largest clients. In or about July 2013, Absolute changed the way it credited commissionable revenue in order to reward the acquisition of new business; specifically, revenue on sales to existing customers would be credited at 80 percent, while revenue on sales to new customers would be credited at 130 percent. (Dkt. 144 at ¶ 3 (Declaration of Leigh Ramsden ("Ramsden Decl."))). Despite the fact that the DOE had been a longtime client, all of Absolute's sales to it were being booked as new business at the 130 percent attainment rate. (*Id*. at ¶ 8). Plaintiff and two other individuals were identified as booking business in that fashion, and their commissions were withheld until it could be

determined whether the orders should receive the additional commission credit. (*Id.* at ¶¶ 9, 10). Ramsden, Absolute's Vice President of Finance, involved defendant Awtry in the investigation to interview Plaintiff. (*Id.* at ¶ 9).

Plaintiff contends that she had previously, on several occasions, informed Awtry how DOE business was booked and that it was appropriate to treat new DOE schools as new business. (Piehler Aff., at ¶ 53; *see also* 157-5 at 10 (March 17, 2014 email from Plaintiff to Awtry informing him that DOE business is posted at 130 percent for new schools)). Prior to approximately the last week of June 2014, neither Awtry nor anyone else at Absolute expressed any concerns to Plaintiff regarding how DOE business was booked. (*Id.* at ¶ 54). Plaintiff contends that during a call with Awtry on June 30, 2014, he accused her of "lying" and "stealing" from Absolute. (*Id.* at ¶ 57). In approximately September 2014, Absolute concluded its DOE investigation, with Awtry acknowledging that the DOE orders should be paid at the 130 percent rate. (*Id.* at ¶ 65; *see also* Ramsden Decl., at ¶ 11 (after Plaintiff's team provided a recalculation of accounts that met the new protocol, Awtry requested the Finance Department recalculate the commissions for those sales at the 130 percent rate)). Plaintiff contends that while she ultimately had part of her commissions reimbursed for some of the DOE accounts, she was never fully repaid and the investigation resulted in her not meeting her sales quota for the 2014 fiscal year. (Piehler Aff., at ¶¶ 61, 66). Plaintiff further contends that the DOE investigation appeared targeted towards her, as two other sales leaders, Scott Barker and Mike Kenny, also received commissions related to the same type of DOE sales, but they were not subject to the investigation or loss of compensation. (*Id.* at ¶ 64).

- 12 -

Awtry ultimately terminated Plaintiff's employment on July 1, 2015. (*Id.* at ¶ 105). He felt that she was difficult to work with, said negative things about him, did not support him as a manager, and was resistant to his directives and suggestions. (Awtry Decl., at ¶¶ 16, 28). Plaintiff maintains that in the weeks following the April 2015 hiring directive, she "remained hopeful" that due to her performance "Absolute would look past the fact that I was the oldest female and that [she] would remain employed." (Piehler Aff., at ¶ 104). At the termination meeting, Awtry did not provide Plaintiff with a reason for her termination, and Plaintiff was not provided with any verbal or written warnings regarding any performance issues, including issues with her attitude, prior to her termination. (*Id.* at ¶¶ 106, 107).

**F.      Pay Structure and Employment at Absolute**

Defendants contend that the percentage of women employees in Absolute's sales team over the age of 40 did not change in any significant way from July 1, 2013 (one year before Haydon became CEO) and July 1, 2016 (two years after Haydon became CEO). (*See* Dkt. 145 at ¶ 11 (Declaration of Errol Olsen ("Olsen Decl."))). During this time, Defendants interviewed and/or hired older and female candidates. (Haydon Decl., at ¶ 10; Awtry Decl., at ¶¶ 14, 52). Defendants further contend that compensation for RDs and AVPs consisted of a combination of base pay and commissions earned on sales within their region. (Awtry Decl., at ¶ 31). Every RD and AVP was assigned an "On Target Earnings" (OTE) amount, and the OTE commission component was the annual commission earnings if the employee attained 100 percent of their annual commission quota. (*Id.*). Rathbun and Robinson were the only two RDs/AVPs to meet their quota in

FY 2014 and therefore were the only individuals to receive an increase in OTE in October of that year; Plaintiff, Young and Armstrong did not receive an OTE increase at that time.  (*Id*. at ¶ 35).

Plaintiff contends that her OTE at Absolute was $240,000.  (Piehler Aff., at ¶ 114).  Her replacement, who was a younger male, was paid more than she was, despite the fact that he performed the same role.  (*Id*. at ¶¶ 115-20).  Further, other RDs who were male had significant components of their sales guaranteed, which dramatically increased the value of their commissions.  (*Id*. at ¶ 121).  During the time Awtry and Kenny were at Absolute, Plaintiff was never given a pay raise, stock, or stock options.  (*Id*. at ¶ 123).  Rathbun also complained that she was paid less than men at Absolute (*see* Dkt. 157-1 at 55), pointing specifically to Luporini, who was paid more than her, received stock options, and had guaranteed commissions, when she received none of those benefits, despite the fact that Luporini had a lower title and had no experience with the company (*id*. at 103-05).

## **DISCUSSION**

## I.    **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).   Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87).   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   "In the context of employment discrimination lawsuits, courts must be 'especially cautious' in granting summary judgment 'because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination.'" *Anderson v. N.Y.C. Health & Hosps. Corp.*, No. 16-CV-1051(GBD)(KFP), 2020 WL 2866960, at *10 (S.D.N.Y. Mar. 2, 2020) (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)), *adopted*, 2020 WL 1528101 (S.D.N.Y. Mar. 31, 2020).

## II.  Gender and Age Discrimination Claims Under Title VII, ADEA, and NYSHRL

### A.  Legal Standard

On a motion for summary judgment, discrimination claims under Title VII, the ADEA, and the NYSHRL are typically evaluated under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Plaintiff must initially establish a *prima facie* case of discrimination by establishing that: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an

adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 253 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).

If a plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate "some legitimate nondiscriminatory reason" for the disparate treatment. *McDonnell Douglas*, 411 U.S. at 802. If the employer articulates a sufficient reason, the burden shifts back to the plaintiff to prove that the employer's reason "was in fact pretext" for discrimination. *Id.* at 804; *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). For her gender-based claims, Plaintiff is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors for the decision." *Smith v. New York and Presbyterian Hosp.*, 440 F. Supp. 3d 303, 328 (S.D.N.Y. 2020) (internal quotations and citation omitted). By contrast, for her age-based claims, Plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 180 (2009)).[1]

---

[1]     With respect to age discrimination claims under the NYSHRL, the Second Circuit has "assumed without deciding that 'but for' causation is also required," noting that the issue has not been definitively resolved by New York courts. *Boonmalert v. City of New*

Defendants do not contest that Plaintiff meets the first three elements of a *prima facie* case of discrimination—namely, that as a woman over 40 years old,[2] she falls within protected classes; that she was qualified for her position; and, by virtue of her termination on July 1, 2015, that she was subject to an adverse employment action. Rather, Defendants contend that the evidence does not give rise to an inference of gender or age discrimination, and instead Plaintiff complains about business decisions having nothing to do with age or gender.  (Dkt. 149 at 26-27).

The Court disagrees.[3]  During a managers meeting at the Westin Hotel in New York City on April 30, 2015, Kenny stated that Haydon wanted to get rid of employees "that are at the end of their rainbow" and that he wanted to "just hire guys who are athletes, who talk sports and trash and get in each other's faces."  (Dkt. 159 at 9-10; *see also* Dkt. 34 at ¶ 46; Piehler Aff., at ¶ 38).  At the same meeting, Kenny asked Plaintiff if one of her older employees "still had any steam left."  (Piehler Aff., at ¶ 43).  Five business days following Kenny's comments at the Westin Hotel, Defendants contacted outside counsel to obtain advice on how to terminate Plaintiff.  (*See* Dkt. 157-3 at 17 (listing emails dated May 7, 2015 through May 15, 2015, seeking or conveying legal

---

*York*, 721 F. App'x 29, 32 (2d Cir. 2018) (citing *Gorzynski*, 596 F.3d at 105 n.6 and *DeKenipp v. State*, 97 A.D.3d 1068, 1070 (2012)).

[2]     Plaintiff was 57 years old at the time her employment was terminated.  (*See* Olsen Decl., at ¶ 14 (listing Plaintiff's date of birth as November 8, 1957)).

[3]     Plaintiff contends that because she has direct proof of discrimination, the burden-shifting framework of *McDonnell Douglas* is not applicable.  (Dkt. 159 at 9-14). Defendants disagree.  (Dkt. 175 at 9).  The Court need not resolve this issue since Plaintiff plainly satisfies the test under *McDonnell Douglas*.

advice "regarding negotiation with Mary Piehler.")).  Plaintiff was terminated on July 1, 2015.  (Piehler Aff., at ¶ 105).  She was replaced by a younger man (Joe Morini, aged 51), who was paid at a higher rate than she was paid, despite her years of experience at the company.  (Piehler Aff., at ¶ 115; Ramsden Decl., at ¶ 12).  This plainly raises an inference of discrimination.

Defendants contend that Kenny's comments were "stray remarks," that he was not a final decision maker, and that Absolute's demographics did not change after his comments were made.  (Dkt. 149 at 31-34).  The Court is unpersuaded.  Plaintiff's recounting of the April 2015 comments made by Kenny has been confirmed by others present.  (*See* Piehler Aff. at ¶¶ 36-40; Dkt. 157-1 at 26; Dkt. 157-1 at 89).  Indeed, even Kenny confirmed during his deposition that he "accurately" conveyed who Haydon wanted to hire at Absolute, and although he denied saying that he wanted to hire athletes and people who would talk trash, he admitted that "there was a conversation referring to the early formation of EMC and the cultural background that started at EMC as a start-up," which could be characterized as "[v]ery aggressive, a lot of former athletes, intense people," and that Haydon "used the term professional athlete," which was "a person who brought, you know, a rigor and focus and passion to the job to basically be successful." (Dkt. 157-1 at 148-51).  Kenny also confirmed that at Absolute, "the culture needed to accelerate," that Absolute needed "people who were competitive . . . [w]ho would excite performance achievement of their peers," and that Absolute "needed a boost of energy sourced from people with a very specific background in information security coming from verticals that we were trying to get into. . . ."  (*Id*. at 156-57).

Further, the evidence shows that Kenny was involved in decision making at Absolute. Kenny was Absolute's VP of Sales and, for example, at his deposition he testified to Absolute's hiring practices, communicated those criteria to members of the Sales Team, interviewed potential employees, helped to set compensation, signed-off on when people were hired, and was involved in the decision to fire Plaintiff. (Dkt. 157-1 at 140, 160-65).

The fact that Kenny stated that Absolute wanted to hire young males on only one occasion does not render his statement a "stray comment." "In determining whether a remark is probative, [district courts in this Circuit] have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Kenny was a decision maker at Absolute and he was apparently communicating the intent of Haydon (Absolute's CEO); the remark was made in close proximity to Plaintiff's firing; the content of the remark—a clear communication that Absolute favored hiring young males—and the context of the remark (*i.e.*, in a leadership setting, with few women present); all support the conclusion that Kenny's April 30, 2015 statements were not "stray remarks."

Not surprisingly, another court has previously rejected Absolute's attempts to characterize Kenny's comments as simply "stray remarks." *See Lubahn v. Absolute*

*Software, Inc*., No. 16-14425, 2018 WL 5634353, at *4-5 (E.D. Mich. Oct. 31, 2018) (where the plaintiff challenged his termination from Absolute based on his age, finding that the same comments by Kenny were not "stray remarks"). Moreover, Defendants' reliance on *Langlois v. Hartford Bd. of Educ*., No. 19-2503, ___ Fed. Appx. ___, 2020 WL 6278722 (2d Cir. Oct. 27, 2020), is misplaced, as that case involved two standalone comments made by a supervisor, with no other *indicia* of discrimination. Here, Plaintiff's evidence involves far more than just Kenny's remarks at the April 2015 meeting—and in any event, the content and context of Kenny's statements are vastly different than the remarks at issue in *Langlois*.

In an effort to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination, Defendants argue that Plaintiff's poor performance reviews and her relationship with Awtry precipitated her firing from Absolute—not her gender or age. (*See* Dkt. 149 at 34). These reasons are not entirely supported by the record. Although Defendants have offered evidence that Plaintiff and Awtry did not get along (*see, e.g.*, Awtry Decl. at ¶¶ 15-28), Plaintiff never received any verbal or written warnings prior to her termination, nor was she placed on a performance improvement plan. Further, Plaintiff contends that she consistently exceeded her assigned sales quotas and outperformed other RDs, and Plaintiff received a strong performance evaluation in Febraury 2015, not long before her termination. (Piehler Aff., at ¶¶ 16-23).

When all this evidence is viewed as a whole, and in the context of the evidence concerning the discriminatory culture at Absolute, the Court easily concludes that Plaintiff has established a *prima facie* case of age and gender discrimination, and she has

further raised genuine issues of material fact concerning whether Defendants' cited reasons for firing Plaintiff were pretextual.   Accordingly, Defendants' motion for summary judgment on Plaintiff's gender and age discrimination claims in violation of Title VII, the ADEA, and the NYSHRL, is denied.

## III.   <u>Plaintiff's Retaliation Claims</u>

Plaintiff asserts claims of retaliation under both the EPA and the NYSHRL.  These claims are analyzed under the same *McDonnell Douglas* test.  *See Xanthakos v. City Univ. of N.Y.*, No. 17-CV-9829, 2020 WL 5026930, at *8 (S.D.N.Y. Aug. 24, 2020) (retaliation claims under the ADA, RA, Title VII, Section 1983, EPA, and NYSHRL are all analyzed under the same standard) (citing *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 142 (2d Cir. 2002)).  To establish a *prima facie* case of retaliation, Plaintiff must show: "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir. 2013) (citation omitted).   Like age discrimination claims, retaliation claims are subject to a but-for causation test.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).[4]

---

[4]      Although the Second Circuit has not "conclusively resolved whether the but-for causation standard applies to [retaliation] claims under the NYSHRL," it has "implicitly applied the but-for standard to NYSHRL claims."  *Farmer v. Shake Shack Enterprises, LLC*, No. 19 CIV 9425 (PAE), 2020 WL 4194860, at *13 n.7 (S.D.N.Y. July 21, 2020) (citations omitted).  Neither party has addressed the causation standard for a retaliation claim under the EPA.  *Cf. Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1343 (11th Cir. 2000)

### A.    Plaintiff's Alleged Protected Activity[5]

Plaintiff's retaliation claims are based on informal complaints of discrimination she made to Berardo (Absolute's Director of Human Resources) and Olsen.[6]  Plaintiff

---

(in demonstrating causation for FLSA claim, "the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights.").  In any event, the causation standard for Plaintiff's EPA claims is not dispositive of the Court's resolution of the summary judgment motion directed to that claim.

[5]    Defendants argue that Plaintiff improperly attempts to cite to instances of protected activity that were not "mentioned in her Amended Complaint or in her Second EEOC Charge."  (Dkt. 175 at 29).  The Court concludes that Plaintiff's EEOC Charge and Amended Complaint provided sufficient notice of the protected activity that she relies on in support of her claims of retaliation.  *See*, *e.g.*, *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001).  Defendants plainly were aware of additional protected activities taken by Plaintiff.  For example, Awtry's Declaration submitted in support of Defendants' motion for summary judgment specifically discusses Plaintiff's email following the May 22, 2015 phone call with Awtry, Plaintiff, and Robinson.  (Awtry Decl., at ¶ 27).  Attached to Awtry's Declaration as Exhibit J is the email Plaintiff sent him, including the portion of that email stating, "Todd, I am responding item by item," and "I am cc'ing Daniel Berardo as this may be an HR issue. . . ."  (*See* Dkt. 147-10 at 2).  The Exhibit sticker on the email indicates that it was discussed at Plaintiff's March 5, 2018 deposition.  *See Costa v. Sears Home Imp. Prods., Inc.*, 65 F. Supp. 3d 333, 344-45 (W.D.N.Y. 2014) (where defendants claimed that plaintiff was impermissibly attempting to amend her complaint through her opposition papers by relying on additional protected activities, explaining that "[t]he real issue in the present case is whether Plaintiff may now assert *factual allegations* that were not specifically referenced in her complaint as acts of retaliation," and concluding it would consider all the activities Plaintiff asserted, because they were "all sufficiently supported by the complaint, the record, or Plaintiff's prior testimony so as to have given Defendants proper notice to develop responses to the allegations through discovery."); *see also Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) ("[B]ecause most EEOC charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint.") (citing *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992)).

first complained on June 30, 2014, when she had "multiple phone calls" with Berardo regarding her belief that she was being discriminated against. (Piehler Aff., at ¶ 70). During this discussion, Plaintiff told Berardo that she "was being treated differently than [her] peers," and "also discussed . . . how once Mr. Awtry and VP Kenny arrived at the company, I never received a pay raise and never received stock options." (*Id*. at ¶¶ 70, 71; *see also* Dkt. 157-1 at 5 (Plaintiff testified at her deposition that she "spoke to Mr. Berardo regarding being treated differently than [her] peers. . . .")). Plaintiff further complained that Awtry was "discriminating against [her] by treating [her] different than [her] colleagues and attempting to make [her] look bad by saying things that were not true." (*Id*. at ¶ 72). Plaintiff gave the example that both Awtry and Kenny published incorrect sales numbers for her region. (*Id*.). Plaintiff also told Berardo that she "was being discriminated against as part of the DOE investigation, and that other male employees were being paid full commissions and were not being investigated." (*Id*. at ¶ 73). Plaintiff and Berardo followed up on this conversation by emails dated July 1, 2014, and July 6, 2014. (*See* Dkt. 157-7 at 6, 12). In the July 6, 2014 email, Plaintiff explained "I don't want to be known as a troublemaker, all I want is the data reflected correctly and to be paid fairly." (*Id*. at 12). Plaintiff also pointed to a male employee who, despite an infraction, was paid at full value:

---

[6]     Plaintiff also initially based her claims of protected activity on the September 4, 2015 EEOC charge, but following oral argument, Plaintiff's counsel submitted a letter to the Court, confirming that Plaintiff was withdrawing her post-employment retaliation claim.

I am very committed to Absolute, but I feel discouraged that 50% of the commission has been taken away from the DOE sales, given the effort we exerted. This struck me as a very odd thing to launch an "investigation" into, as opposed to just a conversation. *We did not launch a corporate investigation in my CER who I identified as having a part time job, during the day, when Absolute is paying him to be here hunting business for the Northeast. We continued to pay him at full value, and I got an email telling me to "lay off"? But I am under investigation for selling to the DOE?*

(*Id.* (emphasis added)).

Thereafter, in early July 2014, at a Global Sales Meeting in Vancouver at the Pacific Rim Hotel, Plaintiff spoke to Olsen. (Piehler Aff., at ¶ 76). Plaintiff contends that she and Olsen discussed many topics, "including the discrimination that [she] was experiencing at Absolute during this time," and she "mentioned how Mr. Awtry was paying [her] differently than [her] peers." (*Id.* at ¶ 77). Plaintiff complained that Awtry "had arbitrarily decided to stop paying [her] on the DOE commissions, while other employees, who were males, continued to receive their commissions." (*Id.*). Plaintiff also told Olsen that Awtry did not give her a performance review, he inappropriately shared performance reviews with all RDs, he failed to attend one-on-one phone calls he scheduled with her, and he "had never gone on a sales call with [her] during his entire tenure with Absolute." (*Id.* at ¶ 78). Olsen confirmed that this meeting occurred, including that Plaintiff told him she was frustrated by Awtry's leadership style and he had shared her performance review with others; however, Olsen maintained that Plaintiff "did not raise with [him] any complaint about being treated differently than men at Absolute, nor did she give [him] any reason to think then or at any time that she was being discriminated against in any way." (Olsen Decl., at ¶ 15). On July 17, 2014, after her

meeting with Olsen, Plaintiff received an email from Berardo, saying that he was glad she had a good conversation with Olsen and "[i]f Errol is aware of your concerns, no need to forward me additional information." (Piehler Aff., at ¶ 80; *see also* Dkt. 157-7 at 4). In August 2014, Berardo informed Plaintiff that Awtry was reprimanded as a result of her complaints. (Piehler Aff., at ¶ 81). Awtry told Plaintiff he was aware she had made the complaints against him. (*Id.* at ¶ 83).

At approximately the same time Berardo informed Plaintiff that Awtry had been reprimanded, Plaintiff received a negative performance review from Awtry. (*Id.* at ¶ 82). At Plaintiff's request, Awtry re-reviewed her performance and slightly increased her performance rating. (*Id.* at ¶ 84). Because she believed the negative performance review was in retaliation for the complaints she made, Plaintiff submitted an additional addendum to human resources disputing her score, noting her concerns that she was "not being judged fairly in several categories," and "a different standard was being used to judge regions." (*Id.* at ¶¶ 82, 85; *see also* Dkt. 157-7 at 22-23).

Plaintiff states that after Awtry became aware of the complaints she made against him, her relationship with him changed dramatically, including: Awtry would schedule one-on-one calls with her, but would then not show up at the scheduled times; Plaintiff was not included in the decisions Awtry was making about her region; she did not receive her DOE commissions until October 2014; she did not receive a pay increase that fall; and she continued not receiving commissions to which she was entitled. (Piehler Aff., at ¶¶ 86-89). On January 12, 2015, Plaintiff emailed Awtry, copying both Berardo and Caroline Nelson (Absolute's General Counsel), Ramsden, and Michael Kenny. (*See* Dkt.

157-7 at 27-29).   In the email, Plaintiff expressed her concern relating to the DOE investigation against her and that she had not received her commissions.  (*Id.*).  Plaintiff related that she was offended that Awtry had accused her of "stealing" from Absolute, as she felt he was questioning her integrity, rather than trying to understand what had occurred; he withheld her pay without notifying her (salary and commission), even for other territories that were not related to the DOE, while others were notified that their checks would be held; and that "as a Regional Director, [she] deserve[d] to be treated with respect, and at least get the same communication as . . . others who were impacted." (*Id.* at 28-29).

Plaintiff contends that she made a final complaint on May 22, 2015, following a telephone conversation with Awtry.  (Piehler Aff., at ¶¶ 97-103).  In May 2015, Absolute planned a reorganization to an "acquisition model," and Plaintiff was chosen to head the acquisition role for the East Regional Director.  (*Id.* at ¶¶ 90, 95).  Plaintiff had discussed the reorganization with Awtry prior to May 22, 2015, but during a phone call with Robinson, Plaintiff, and Awtry on that date, the reorganization that they discussed was "completely" different from what Plaintiff had previously discussed with Awtry, including the placement of members of her sales team.  (*Id.* at ¶¶ 97-99).  When Plaintiff raised these concerns "in a very professional and courteous way," Awtry became angry and raised his voice, said he was going to "get personal," and "used the opportunity to launch into a variety of criticisms about [her] attitude, cooperation, and leadership."  (*Id.* at ¶ 100).  Plaintiff maintains that Awtry's attacks "had nothing to do with [her] job performance, but instead were personal attacks stemming from his dislike that [she] had

complained to Mr. Olsen and Mr. Berardo in the months prior regarding the discrimination [she] was experiencing."  (*Id*. at ¶ 101).

Following the phone call, Awtry and Plaintiff exchanged emails.  (*Id*. at ¶¶ 102-03; *see also* Dkt. 157-7 at 35-38).  After Awtry emailed Plaintiff to communicate his frustration around Plaintiff's "lack of leadership," Plaintiff responded, and copied Berardo, flagging for him that it "may be an HR issue."  (Dkt. 157-7 at 35).  In the email, Plaintiff expressed that "[a]s a leader, [she] should be able to ask questions . . . and not be criticized for it."  (*Id*. at 36).  Plaintiff also asked that Awtry not chastise her in front of her peer during a phone call.  (*Id*. at 35, 37).

### B.     EPA Retaliation Claim

The Supreme Court has explained that to fall within the scope of the anti-retaliation provision for an EPA claim, "a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).  Thus, where an employee makes informal complaints to her employer's management, the complaints may not rise to the level of specificity required to state an EPA retaliation claim where there is no indication that the employee was "actually complaining of EPA . . . violations such that these complaints constituted 'an assertion of rights protected by the statute' and a 'call for their protection.'"  *Hernandez v. Premium Merch. Funding One*, LLC, No. 19CV1727, 2020 WL 3962108, at *15 (S.D.N.Y. July 13, 2020); *see Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 473 (S.D.N.Y. 2013) (general complaints of discrimination are

not sufficient).  The Court seriously questions whether Plaintiff's internal complaints were sufficiently specific to constitute protected activity under the EPA.  Although Plaintiff did make various references to being unfairly paid in comparison to her peers and not receiving commissions that were due, the Court is hard-pressed to conclude that a reasonable trier of fact could conclude that Absolute should have understood Plaintiff to be complaining of an EPA violation.[7]

However, even if Plaintiff's complaints could be understood as raising an EPA violation, her EPA retaliation claim suffers from a more fundamental failure in causation.  Plaintiff's EPA retaliation claim is based solely on the termination of her employment.  (Dkt. 34 at ¶ 96).  Defendants make this point in their moving papers, and Plaintiff does not dispute it.  (*See* Dkt. 149 at 42).  However, the best argument that Plaintiff has that any of her complaints claimed an EPA violation relates her communications with Berardo in June and July 2014, that she was being discriminated against as part of the DOE investigation and that male employees were being paid full commissions and not being investigated.  Given that Plaintiff's termination did not occur until one year later, the Court concludes that no reasonable trier of fact could find a causal connection between the alleged protected activity under the EPA and Plaintiff's termination.  As discussed below, Plaintiff did make further complaints that she relies on in support of her claims

---

[7]     Defendants did not raise another potential argument concerning the EPA retaliation claims—namely, there is authority for the notion that the EPA's anti-retaliation provisions only proscribe retaliation that occurs after an employee has complained of a potential violation to a government authority.  *Kassman*, 925 F. Supp. 2d at 473 n.6.  Here, the alleged adverse action occurred prior to any complaint by Plaintiff to a government authority.

that she engaged in protected activity—including a communication about an "HR issue" in May 2015—but under the standard set forth in *Kasten*, these further complaints do not rise to the level of protected activity under the EPA.  Accordingly, summary judgment is granted in favor of Defendants on the EPA retaliation claim.

### C.    NYSHRL Retaliation Claims

With respect to Plaintiff's NYSHRL retaliation claims, the Court concludes that there are genuine issues of material fact as to whether Plaintiff engaged in protected activity based on gender, but not based on age.   "Complaints about conduct clearly prohibited by the statute need not mention discrimination or use particular language." *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007); *see Lenzi v. Systemax, Inc.*, 944 F.3d 97, 113 (2d Cir. 2019) (reversing grant of summary judgment in favor of employer, finding that employee's complaint that she was not paid similar to her peers, in context, constituted protected activity because it could be understood to mean that she was complaining about being paid differently than her male counterparts).

As explained above, Plaintiff complained to Absolute's upper management and/or Human Resources Department in June 2014, July 2014, January 2015, and May 2015. While Plaintiff did not specifically use the term "gender discrimination," and the emails documenting these complaints similarly do not contain the specific words "gender discrimination," Plaintiff's complaints clearly communicate that she was being treated differently than her peers (most of whom were male), and that she was not being judged fairly.  (*See, e.g.,* Piehler Aff., at ¶ 70 (Plaintiff's June 30, 2014 complaint to Berardo that

she was being treated differently than her peers); Dkt. 157-7 at 12 (July 6, 2014 email, relating that "all [Plaintiff] want[ed] is the data reflected correctly and to be paid fairly," and while she was subject to an internal investigation, a male who had committed an infraction was not investigated and was paid at full value); Piehler Aff., at ¶ 77 (Plaintiff reported to Olsen that defendant Awtry was paying her differently than her peers and he had arbitrarily stopped paying her on the DOE commissions, while other employees, who were males, continued to receive their commissions)). Viewed in that context, Plaintiff need not have used the magic words "gender discrimination" to make clear that her complaints were based on her perception that she was being discriminated against based on her gender. Indeed, given the evidence of the culture at Absolute, an argument could be made that it is not surprising that Plaintiff did not use the specific words "gender discrimination." Plaintiff specifically told Berardo that she did not want to "start trouble" by complaining. Rathbun similarly testified that although she did not like to "throw around the word discrimination," she and other women felt excluded from meetings and strategy discussions, and "that's discrimination." (Dkt. 157-1 at 33-34).

Based on this evidence, the Court concludes that a rational tier of fact could conclude that Plaintiff complained that she was being discriminated against based on her gender. However, the Court reaches a different conclusion as to Plaintiff's age-based retaliation claims, because none of Plaintiff's complaints suggest that she believed she was being treated unfairly due to her age. *See Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 357 ("ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity," and an employer must be

on notice that discrimination is occurring).   Even reading Plaintiff's complaints generously, no rational trier of fact could find that Plaintiff was complaining of discrimination based on her age; rather, all the evidence pertaining to Plaintiff's complaints pertain to her being treated differently than her *male* peers.

Unlike Plaintiff's EPA retaliation claim, her NYSHRL retaliation claim is based on more than just the termination of her employment.   Actions are "materially adverse" for purposes of a retaliation claim if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010); *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").   While "petty slights and minor annoyances" are not materially adverse for purposes of a retaliation claim, *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24-25 (2d Cir. 2014), alleged acts of retaliation must be viewed in the aggregate, "as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."   *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 225 (E.D.N.Y. 2014) (quoting *Hicks*, 593 F.3d at 165); *see also Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006) ("[T]his ridicule was considered a part of a larger campaign of harassment which though trivial in detail may have been substantial in gross, and therefore was actionable." (internal quotation marks omitted)).

Plaintiff has offered evidence that, following her complaints of gender discrimination, Awtry failed to meet with her, withheld her pay, gave her a negative

performance evaluation, and excluded her from decision making. Ultimately, Plaintiff was fired. Taken together, these acts amount to adverse actions. *See, e.g., Collazo v. Cnty. of Suffolk*, 163 F. Supp. 3d 27, 53 (E.D.N.Y. 2016) ("Viewing Plaintiff's alleged adverse actions in the aggregate, the Court finds that Plaintiff has raised triable issues of fact as to whether the withholding of documents, stripping of responsibilities, hostility, assignment to an isolated cubicle, failure to receive a multiline telephone, and malfunctioning security badge constitute adverse actions. These incidents, to the extent they were intentional, would dissuade a reasonable employee from making a discrimination charge."); *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008) ("[F]or the purposes of a retaliation claim, bad performance reviews are an adverse employment action.").

Further, the change in treatment that Plaintiff experienced—which she identifies occurred beginning in August 2014—started close in time to Plaintiff's initial complaints to Berardo and Olsen in June and July 2014, and Berardo informing her that Awtry had been reprimanded for her complaints. For example, Plaintiff received a negative performance evaluation and was excluded from decisions that Awtry made about her region. Plaintiff was terminated on July 1, 2015, approximately five weeks following her May 22, 2015 email to Awtry and Berardo, highlighting her concerns that she was being treated unfairly. "[T]emporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation[.]." *Fraser v. MTA Long Island R.R.*, 307 F. Supp. 3d 105, 116 (E.D.N.Y. 2018) (internal quotation omitted).

Defendants argue that they had legitimate, non-discriminatory reasons for any adverse actions taken against Plaintiff, *i.e.*, that Plaintiff did not get along with Awtry, including statements that she made to or about Awtry.  (*See* Dkt. 149 at 44).  As with Plaintiff's discrimination claims, while there is evidence in the record that Plaintiff and Awtry did not work well together, the Court finds that Plaintiff has demonstrated, at the very least, that there are genuine issues of material fact as to whether the reasons for the adverse actions taken against her, including her termination, were in retaliation for her complaints.  For example, Plaintiff has offered evidence that, during the May 22, 2015 phone call, Awtry "got personal" in criticizing her, and that his attacks "had nothing to do with [her] job performance, but instead were personal attacks stemming from his dislike that [she] had complained to Mr. Olsen and Mr. Berardo in the months prior regarding the discrimination [she] was experiencing."  (*See* Piehler Aff., at ¶ 101).

Ultimately, a jury will need to decide whether Plaintiff can sustain her burden of proof in this regard—but on a motion for summary judgment, these issues are not ripe for resolution.  Thus, the Court denies Defendants' motion for summary judgment on the retaliation claims asserted under the NYSHRL to the extent they are based on complaints of gender discrimination.

## IV.    **Plaintiff's EPA Discrimination Claims**

The Court next evaluates Plaintiff's EPA claims of discrimination, pursuant to which she claims she was paid less than her similarly situated male colleagues.  (Dkt. 34 at ¶¶ 86-93, 99-104).  As explained above, at oral argument, Plaintiff stated that she

would not pursue her New York EPA claim. Accordingly, Plaintiff's New York EPA claim is dismissed, and the Court evaluates Plaintiff's federal EPA claim.

Congress passed the EPA "to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work." *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir. 1999). "[T]o prove a violation of the EPA, a plaintiff must demonstrate that '[ (1) ] the employer pays different wages to employees of the opposite sex; [ (2) ] the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and [ (3) ] the jobs are performed under similar working conditions.'" *EEOC v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 254-55 (2d Cir. 2014) (quoting *Belfi*, 191 F.3d at 135). Once this *prima facie* case is established the burden of persuasion switches to the defendants to prove "that the wage disparity is justified by one of the affirmative defenses provided under the Act: '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production or (iv) a differential based on any other factor than sex.'" *Belfi*, 191 F.3d at 136 (quoting 29 U.S.C. § 206(d)(1)).

Defendants contend that Plaintiff cannot establish a *prima facie* case because (1) the male employees to which she compares herself were not performing substantially equal jobs and therefore are not appropriate comparators, and (2) Plaintiff's assigned OTE was higher than that of the average of the appropriate male comparators. (Dkt. 149 at 45). Defendants further contend that, even if the Court finds that Plaintiff has established a *prima facie* case, summary judgment should be granted because Absolute

- 34 -

compensated certain men more highly than Plaintiff based on factors other than sex. (*Id.*).

According to Plaintiff, her male comparators include: Art Robinson, Kurt Luporini, Randy Dye, and Joe Morini. (Dkt. 159 at 43). In support of their contention that Plaintiff was not paid less than these individuals based on her gender, Defendants submit the Declaration of Leigh Ramsden, Absolute's VP of Finance, which addresses the pay disparity between Plaintiff and Luporini, Dye, and Morini. (*See* Ramsden Decl., at ¶ 1). Specifically, Ramsden stated that she was asked by defendant Awtry to approve compensation offers for Luporini, Dye, and Morini, as they were "new hires for the newly created positions of Regional Directors for the acquisition teams in the Central, West and East regions respectively." (*Id.* at ¶ 12). Ramsden "recognized that the proposed OTEs for these individuals were higher than the OTEs being paid to then-existing outside Regional Directors and Area Vice Presidents," but she approved them "*because the new hires possessed the experience that Geoff Haydon wanted*," and "[she] agreed that because of market factors, Absolute had to offer compensation packages to attract top performing sales people with cyber-security backgrounds," and also understood that "the acquisition role involved more risk because those teams targeted new business only and had no existing accounts to rely on for commissions." (*Id.* (emphasis added)).

The problem with this explanation as to why Luporini, Dye, and Morini were paid at a higher rate, *i.e.*, because they "possessed the experience that Geoff Haydon wanted" is that there are factual issues that Absolute's hiring criteria, as set by Haydon, was itself

discriminatory based on gender.  Accordingly, given the factual record, Defendants cannot rely on the fact that Luporini, Dye, and Morini better fulfilled Haydon's hiring criteria as justifying their higher pay.

In her response to Defendants' motion, Plaintiff offers evidence specifically disputing Defendants' characterization of her comparators.  Plaintiff disputes that the positions filled by Luporini, Dye, and Morini were "newly created" in the sense that they had different job responsibilities than she had in her position, as well as that Luporini, Dye, and Morini had no existing accounts on which to rely, and therefore their jobs involved more risk.  (Piehler Aff., at ¶¶ 115-18).  Plaintiff states that she examined the employment postings for each of these individuals, and "they describe exactly the job duties I performed."  (*Id*. at ¶ 120; *see also* Dkt. 157-8 at 2-10 (Absolute's employment posting and description for "Regional Sales Director – North Central Region")).

Defendants' arguments that other RDs were not accurate comparators are somewhat belied by the record.  For example, all RDs had the same job title and description, worked from home but traveled their regions to make sales, supervised sales teams of six to 10 people, and were evaluated by the same manager, who used the same evaluation forms to report on their performance.  (Piehler Aff., at ¶¶ 12-13).  The question of "[w]hether two positions are 'substantially equivalent' for Equal Pay Act purposes is a question for the jury."  *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001); *see also McCullough v. Xerox Corp.*, 224 F. Supp. 3d 193, 198 (W.D.N.Y. 2016) ("[T]o the extent that the record contains evidence concerning Xerox Human Resource Managers' duties and Xerox's expectations and assessment of their

performance of those duties, it narrowly suffices to raise a question of fact as to whether their jobs all involved the same 'common core' of tasks, and were therefore 'substantially equal' for purposes of the EPA.").

The Court finds that there are genuine issues of material fact as it relates to Plaintiff's EPA claim. Plaintiff's OTE at Absolute, after five years of employment, was $240,000 (Piehler Aff., at ¶ 114; *see* also Dkt. 163 at 2 (Plaintiff's base salary was $120,000 and her commissions were $120,000, for a total OTE of $240,000)). Plaintiff was paid lower than each of her comparators, including Luporini (whose OTE was $60,000 more a year than Plaintiff's); Dye (whose OTE was $40,000 more a year than Plaintiff's); and Robinson (whose OTE was $30,000 a year more than Plaintiff's). (*See* Dkt. 163 at 4-9). During the time that Awtry and Kenny were at Absolute, Plaintiff was never given a pay raise or any stock or stock options (Piehler Aff., at ¶ 123), while males in the company were given stock options (*see* Dkt. 157-1 at 103 (Rathbun testifying that Luporini was given 10,000 stock options, while she got "zero" that year and the year before, and she did not receive any stock options when she joined Absolute)). Plaintiff was replaced by Joe Morini, whose offer letter dated July 2, 2015 (one day after Plaintiff was terminated) included a base salary of $180,000, commissions of $120,000, for a total OTE of $300,000, as well as 5,000 stock options. (Dkt. 163 at 11-13).

Rathbun also complained of pay inequality based on her gender. (*See* Dkt. 157-1 at 55 (explaining that when she questioned Awtry regarding the fact that men were receiving a better compensation package than she was, despite the fact that she had been at the company and helped to build the brand, he told her "you can't talk about that," and

"it's not part of the code of conduct.")).  Rathbun pointed specifically to Luporini, who was paid more than her, received stock options, and had guaranteed commissions (which ensured he would be paid, regardless of his sales performance), when Rathbun received none of those benefits, despite the fact that Luporini was "doing half the job" of Rathbun, had a lower title, and had no experience with the company.  (Dkt. 157-1 art 103-05; *see also* Piehler Aff., at ¶ 122 ("Other than my first four weeks of employment in 2010, Absolute never offered any sales guarantees on my pay above 50 [percent] of my OTE.")).

Defendants contend that Plaintiff's compensation was lower than her male comparators for reasons other than her gender.  (Dkt. 149 at 51-52).  Specifically, Defendants contend that Art Robinson was compensated more highly than Plaintiff based on his "superior performance," and Luporini, Dye, and Morini were assigned a higher OTE because their positions were more difficult, they had recent cybersecurity experience, and Absolute had to offer a competitive salary to recruit them.  (*Id.*).  With regard to the latter reasons offered by Defendants, as more fully explained above, Plaintiff has offered evidence that the positions assumed by Luporini, Dye, and Morini involved the same responsibilities as her position and did not involve any additional risk, as they simply assumed the existing pipeline of business in their regions.  In other words, contrary to what Defendants claim, Luporini, Dye, and Morini did not need to start their team "from scratch" or create a pipeline of new accounts, and therefore their positions were no more difficult than Plaintiff's.  Further, Plaintiff has explained that contrary to Defendants' position relating to her experience and as "apparently unknown to

Absolute's executives," she has "significant experience in cybersecurity," including that prior to working at Absolute, she spent eight years managing a field sales team focused on selling Security and Data Protraction applications,  and served on Symantec's Global Advisory Council.  (Piehler Aff., at ¶¶ 5-7).

As to Defendants' comparisons between Plaintiff's and Robinson's performance, the statistics offered by Defendants—which address the metrics of quota attainment, sales revenue, and performance ratings—show that Robinson did outperform Plaintiff in some instances, although in many of the metrics, their quota attainment, sales revenue, or ratings were close.  (*See* Dkt. 149 at 53).  Defendants apparently did not consistently rely on these criteria when assessing pay increases.  For example, in fiscal year 2013, Robinson missed his quota by ten percent but received an OTE pay increase of $10,000; however, the following year, Plaintiff missed her quota by only three percent, and received no pay increase.  (*Id.* at 50, 53).  Similarly, Morini's attainment quota for the 2016 fiscal year was only 43 percent (Dkt. 157 at ¶ 234); however, he received a merit-based raise (Dkt. 164 at 48).  Accordingly, a reasonable juror could find that Defendants' proffered reasons for why Plaintiff was paid less than her male counterparts are not supported by the evidence.

To the extent Defendants offer other explanations as to the discrepancies in pay between Plaintiff and her male counterparts, those are issues of fact for a jury.  Accordingly, Defendants' motion for summary judgment is denied as to Plaintiff's federal EPA discrimination claim.

**V.**     **Plaintiff's Individual Liability and Aiding and Abetting Claims**

Defendants also move to dismiss Plaintiff's individual liability claims, including her claims against Haydon and Kenny for age and gender discrimination and retaliation, in violation of the NYSHRL (Dkt. 34 at ¶¶ 105-16) and aiding and abetting in discrimination and retaliation (*id*. at ¶¶ 117-19). (*See* Dkt. 149 at 36-39).

"Section 296(6) states that it is unlawful discriminatory practice 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYSHRL], or attempt to do so.'" *Johnson v. Cnty. of Nassau*, 82 F. Supp. 3d 533, 536 (E.D.N.Y. 2015) (quoting N.Y. Exec. Law § 296(6)). "Furthermore, it is well-settled in the Second Circuit that where a defendant actually participates in the conduct giving rise to a discrimination claim, he can be held personally liable under the [NYSHRL]." *Id*.

Defendants apparently do not contest Plaintiff's individual liability claims as they pertain to Awtry and, as explained above, the evidence presented by Plaintiff shows that Awtry was the main perpetrator of the allegedly discriminatory treatment and retaliation against Plaintiff, and he ultimately fired her. Plaintiff's claims against Kenny and Haydon are a closer call, but considering the evidence, the Court finds that there is an issue of fact as to Kenny's and Haydon's involvement in the discriminatory treatment against Plaintiff. First, Kenny testified that he was involved in the decision to terminate Plaintiff (*see* Dkt. 157-1 at 140 (Kenny was "advised of the plan to terminate her . . . in the run up to our kickoff in July" which covered "60 days")), and Rathbun testified that once Kenny and Awtry came to the company, "it became very different . . . women were excluded and not brought in—not really welcome to the table. We nudged our way in

many times because that's what good sales leaders do, but it was not very welcoming."
(*Id*. at 32-33). It also appears from Defendants' privilege log that Haydon and Kenny were included on at least some of the emails relating to Plaintiff's termination (*see* Dkt. 157-3 at 17-40), although the parties dispute the volume of those emails. Additionally, and perhaps more importantly, the direct evidence of discrimination in this case—the April 30, 2015 statements at the Westin Hotel relating to Absolute's new hiring criteria—were made by Kenny, and apparently represented Haydon's hiring directives. Shortly after this announcement, Plaintiff was terminated from her position, without any warning and without any explanation. Although Haydon disputes that he made these hiring directives (*see* Haydon Decl., at ¶ 9 ("[A]t no time did I ever say that I 'wanted to get rid of employees that are at the end of the rainbow.' Nor did I ever say that I 'wanted to just hire guys who are athletes, who talk sports and trash and get in each other's faces.'")), other employees present on April 30, 2014 confirmed that Kenny made these statements, and Kenny has testified that he accurately conveyed the type of employee Haydon wanted at Absolute. These are factual issues for a jury to decide.

Defendants also contend that Plaintiff's aiding and abetting claims against Kenny and Haydon must be dismissed because a plaintiff cannot prevail against an individual unless she can first establish the liability of her employer, and "for the reasons discussed above, Piehler has not established the liability of the employer." (Dkt. 49 at 38). However, contrary to Defendants' argument on this point, the Court *has* found that there is an issue of material fact as to Plaintiff's discrimination and retaliation claims. Defendants further argue that Plaintiff has failed to show discriminatory conduct by any

principal actor, and therefore no aiding and abetting liability can be imposed on any defendant.   (*Id*. at 39).   As explained above, the Court disagrees.   Accordingly, Defendants' motion for summary judgment to dismiss the individual liability claims is denied.

## VI.   Plaintiff's Defamation and Slander Claims and Plaintiff's Claim for Tortious Interference with Prospective Business Relations

Defendants contend that summary judgement is appropriate on Plaintiff's defamation and slander claims, as well as her claim for tortious interference with prospective business relations.   (Dkt. 149 at 56-60).   In her response papers, Plaintiff asserts that she "is not contesting summary judgment on her defamation, slander *per se*, and tortious interference claims."   (Dkt. 159 at 8 n.2).   Accordingly, those claims are dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. 143) is granted in part and denied in part.   Defendants' motion is denied as to the following claims: Plaintiff's gender and age discrimination claims, in violation of Title VII, the ADEA, and the NYSHRL; her pre-termination, gender-based retaliation claim against Absolute, in violation of the NYSHRL; her federal EPA discrimination claim; and her individual liability claims under the NYSHRL against Awtry, Haydon and Kenny. Plaintiff's post-employment retaliation claims, age-based and EPA retaliation claims, New York EPA claim, defamation and slander claims, and her claim for tortious interference with prospective business relations, are dismissed.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

DATED:      November 30, 2020
            Rochester, New York