

March 6, 2023

**VIA CM/ECF**

Honorable Elizabeth A. Wolford
United States District Court
Western District of New York
100 State Street
Rochester, NY 14614

       **Re:**   **<u>Van Brunt-Piehler v. Absolute Software, Inc. et al.</u>**
              **Civil Action No. 16-cv-6313-EAW-MWP**

Dear Judge Wolford:

    Pursuant to the Court's ruling today regarding the admissibility of the employee survey (Plaintiff's Exhibit 67), plaintiff is submitting the attached as additional proposed designations to the deposition transcript of Daniel Berardo as **<u>Exhibit A</u>**.

                               Very truly yours,

                               **/s/ Jonathan W. Ferris**

                               Jonathan W. Ferris

cc:    All counsel of record (via email)

# Exhibit A

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                    WESTERN DISTRICT OF NEW YORK

4

5        MARY VAN BRUNT-PIEHLER,        )

6                        Plaintiff,     )

7                        v.             )  No. 16-cv-6313

8        ABSOLUTE SOFTWARE, INC.,       )   (EAW) (MWP)

9        ABSOLUTE SOFTWARE               )

10       CORPORATION, GEOFF HAYDON,     )

11       THOMAS KENNY, and TODD AWTRY)

12                        Defendants.    )

13       _____    )

14

15

16

17                    DEPOSITION OF DANIEL BERARDO

18                        Vancouver, BC

19                    Wednesday, May 8, 2019

20

21

22

23

24       Reported by:
         JESSICA D. ARCHIBALD
25       JOB NO. 160294

Page 2

```
 1
 2
 3
 4                  Wednesday, May 8, 2019
 5                  10:58 a.m.
 6
 7
 8          Deposition of DANIEL BERARDO, held at
 9   the offices of DORSEY & WHITNEY LLP, 1095 West
10   Pender Street, Suite 1070, Vancouver, BC,
11   before Jessica D. Archibald, Official Reporter,
12   authorized to administer oaths in the province
13   of British Columbia.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2      A P P E A R A N C E S:
 3
 4
 5      THOMAS & SOLOMON
 6      Attorneys for Plaintiff
 7          693 EAST AVENUE
 8          ROCHESTER, NY 14607
 9      BY:   NELSON THOMAS, ESQ.,
10          via teleconference;
11
12
13      DORSEY & WHITNEY
14      Attorneys for Defendants
15          51 WEST 52ND STREET
16          NEW YORK, NY 10019
17      BY:   MARK SULLIVAN, ESQ.,
18          LAURA LESTRADE, ESQ.
19
20
21
22   ALSO PRESENT:
23          Maninder Malli, Esq., Absolute Software
24          Mike Elderkin - videographer
25
```

Page 4

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED
 3   by and between the attorneys for the
 4   respective parties herein, that filing and
 5   sealing be and the same are hereby waived.
 6          IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10          IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn to
15   before the Court.
16
17
18
19          - oOo -
20
21
22
23
24
25
```

Page 5

```
 1          D. Berardo
 2          VIDEOGRAPHER:  This is the start of
 3   media number 1 in the video-recorded
 4   deposition of Daniel Berardo in the matter
 5   of Mary Van Brunt-Piehler versus Absolute
 6   Software Incorporated et al. in the United
 7   States District Court Western District of
 8   New York.  The case number is 16-cv-6313.
 9   This deposition is being held at 1985 West
10   Pender Street, Vancouver, British Columbia,
11   Canada, on May 8th, 2019, at approximately
12   10:59 a.m.
13          My name is Mike Elderkin.  I am the
14   legal video specialist from TSG Reporting
15   Incorporated headquartered at 747 3rd
16   Avenue, New York, New York.  The court
17   reporter is Jessica Archibald, in
18   association with TSG Reporting.
19          Will counsel please introduce
20   yourselves.
21          MR. SULLIVAN:  Mark Sullivan and
22   Laura Lestrade from Dorsey & Whitney on
23   behalf of the defendants.  Also present in
24   the room is Maninder Malli, in-house
25   counsel for Absolute.
```

2 (Pages 2 to 5)

Page 6

D. Berardo

1
2     MR. THOMAS:  Nelson Thomas at Thomas
3  & Solomon on behalf of the plaintiff, Mary
4  Piehler.
5     VIDEOGRAPHER:  Will the court --
6     MS. VAN BRUNT-PIEHLER:  Mary Piehler,
7  plaintiff.
8     VIDEOGRAPHER:  Will the court
9  reporter please swear in the witness.
10 D A N I E L  B E R A R D O,
11     called as a witness, having been duly
12  sworn by a Notary Public, was examined and
13  testified as follows:
14 EXAMINATION BY
15 MR. THOMAS:
16     Q. All right.  Now that we're on the
17  record, I just...
18     For the videographer, I just want to
19  confirm that the audio coming in through the
20  telephone is going in okay for the playback
21  for the video here.  Is that -- are we all --
22  are we all good with that?
23     VIDEOGRAPHER:  Yes.
24     MR. THOMAS:  Okay.  Perfect.  And
25  then also, Mark, I just -- I know the

Page 7

D. Berardo

1
2  deposition is occurring in Canada, but I --
3  we're under -- I assume we're all in
4  agreement that we're using FRCP rules and
5  American rules of procedure and all that
6  stuff?
7     MR. SULLIVAN:  Yes, we are.
8     MR. THOMAS:  Okay.  All right.
9 BY MR. THOMAS:
10     Q. Mr. Berardo, I'm Nelson Thomas, and I
11  am the attorney representing Mary Piehler in
12  this case.  Have you ever given a deposition
13  before?
14     A. I have not.
15     Q. Okay.  What did you do to prepare for
16  today's deposition?
17     A. We met with -- with Mark and Laura on
18  Monday, and then a couple of months back, just
19  when we weren't sure of when the deposition
20  date would be, we also met for a few hours.
21     Q. Okay.  And where was -- and I'm --
22  I'm having a little bit of trouble hearing
23  you.  Can you move the microphone closer to
24  your...
25     A. Oh, sure.

Page 8

D. Berardo

1
2     Q. Or whichever -- I don't know where
3  the...
4     MR. MALLI:  Maybe just speak up a
5  little bit.
6     THE WITNESS:  Sure, yeah, I can speak
7  up a little bit.
8 BY MR. THOMAS:
9     Q. Okay.
10     A. Okay.
11     Q. Great.  Thank you.  When you met with
12  Laura a few months ago, where was that?
13     A. That was -- that was here at -- at
14  their office.
15     Q. How long was the meeting on Monday?
16     A. It was three hours or just under.
17     Q. And the meeting back several months
18  ago, what was -- how long was that?
19     A. I don't recall specifically.
20  Probably in the same neighbourhood, three to
21  four hours.
22     Q. Did you review documents as part of
23  that process?
24     A. We did, yes.
25     Q. What documents did you review?

Page 9

D. Berardo

1
2     A. There were some emails and -- some
3  emails.  I think that's all I recall.  I --
4  there was the --
5     Q. How many --
6     A. There was the --
7     Q. -- in total did you get?
8     A. I was going to say there was the --
9  also the -- a bit of the Absolute policy, a
10  section of the Absolute policy.  How many
11  emails?  Maybe 10 to 20 threads.
12     Q. Besides the 10 to 20 emails and the
13  Absolute policies, did you review anything
14  else?
15     A. Not that I recall off the top of my
16  head right now.
17     Q. Tell me a little bit about your
18  employment history before coming to Absolute.
19     A. Sure.  Specific to HR?  Or, I mean,
20  how far do you want me to go back?
21     Q. Why don't -- let's just -- very
22  quickly, where did you graduate high school?
23     A. Sure.  I graduated high school in
24  Burnaby, British Columbia, at a high school
25  called "Alpha Secondary."

Page 10

D. Berardo

1   Q. What year was that?
2   A. 1997.
3   Q. Okay. And then did you attend
4   college after that?
5   A. Yeah, I attended university at -- I
6   graduated from Simon Fraser University, also
7   in Burnaby, British Columbia.
8   Q. And what year was that?
9   A. I graduated in 2002.
10  Q. And what was your first full-time
11  employment after graduation?
12  A. First full-time employment was an
13  office coordinator-type job at a company
14  called "Marsh" in Vancouver.
15  Q. And how long were you -- when did you
16  start that job, and when did you end it?
17  A. So I started that job in 2002, and
18  then I ended in two thousand and -- 2003.
19  Q. And what was your next position?
20  A. Then I went to Disney World, and I
21  worked at Disney World for a year. Yeah.
22  Q. What did -- what did you do at Disney
23  World?
24  A. I was a Canadian cultural

Page 11

D. Berardo

1   representative, but, essentially, I was
2   working at Epcot in the restaurant.
3   Q. Okay. Got it.
4   A. Yeah.
5   Q. Which -- what -- what country?
6   A. Canada.
7   Q. Okay.
8   A. Yeah.
9   Q. Okay. Very good. After -- after you
10  were at Disney World, where did you go next?
11  A. So I went to -- briefly, at a company
12  called "Willis." I was there just for a few
13  months until I went back to Marsh.
14  Q. What did you do at Willis?
15  A. Same -- same -- it was an office-type
16  job; filing, mailroom, reception.
17  Q. And then how long were you at Willis
18  for?
19  A. It was just a few months. Just a few
20  months before I went back to Marsh.
21  Q. And how long were you at Marsh?
22  A. I was at Marsh until 2006, so it was
23  -- it was probably early 2005 -- early 2005 to
24  September 2006.

Page 12

D. Berardo

1   Q. And what was your position there?
2   A. Same type of position; office
3   coordinator.
4   Q. All right. And then what was your
5   next position?
6   A. So -- but I should say during this
7   time, I was in -- I was also in school. I was
8   in -- part-time taking a management
9   certificate in human resources, so -- in 2005
10  through 2007. In 2006, I -- I moved to a
11  company called "Radical Entertainment" in
12  Vancouver.
13  Q. What do they do?
14  A. Video games.
15  Q. Okay. And what was your role there?
16  A. I was an HR -- HR coordinator. I
17  started off as an HR coordinator.
18  Q. And how long were you at Radical
19  Entertainment?
20  A. So I was there until the very end of
21  2010.
22  Q. And what was your next job after
23  that?
24  A. So my -- my next job was at a company

Page 13

D. Berardo

1   -- it was, again, only for a couple of months
2   before I joined Absolute. It was a mining
3   company. The -- the name escapes me for some
4   reason. It was a mining company in Vancouver.
5   I was there for two and a half years. It was
6   called "Wardrop Engineering." Did I -- sorry,
7   I -- I'm not sure I said -- I was there for
8   two and a half months.
9   Q. Oh, okay. That's what I was going to
10  ask. Okay.
11  A. I may have said years. It was
12  months.
13  Q. Okay. It felt like two and a half
14  years; right?
15  A. Yeah, it did.
16  Q. All right. Following that, you went
17  to Absolute, and when was that?
18  A. That was June of 2011.
19  Q. And what was your role at Absolute?
20  A. So I started off in June 2011 as a
21  senior HR generalist.
22  Q. And what was your next position?
23  A. So my next position -- so once the
24  head of -- the head of HR left -- I want to

4 (Pages 10 to 13)

Page 14

D. Berardo

1 say -- it was towards the end of 2012. So
2 when she left, I assumed the position of head
3 of HR. My technical -- or, sorry, my -- my
4 position was HR manager, and then subsequently
5 promoted to HR director at some point.
6 Q. And approximately when was that?
7 A. Promoted to HR director, probably
8 twenty -- 2014. Maybe mid-2014.
9 Q. And what was your next position?
10 A. So I just -- so I was an HR director
11 until I left Absolute Software.
12 Q. Let me just make sure that I have
13 this correct.
14 A. Sure.
15 Q. That you were a senior HR generalist
16 when you started in June of 2011; you became
17 an HR manager when the head of HR left in
18 2012; then you became head of HR; and then HR
19 director; and then you left in 2014?
20 A. Yeah, at the -- sorry, no, I left at
21 the very end of 2015. So December --
22 Q. 2015?
23 A. Yeah, the very end of 2015.
24 Q. Now, there was a complete turnover in

Page 15

D. Berardo

1 HR between 2015 and 2016 --
2 MR. SULLIVAN: Objection.
3 BY MR. THOMAS:
4 Q. -- at Absolute; right?
5 MR. SULLIVAN: Objection to form.
6 THE WITNESS: No, there was a -- I
7 would say there -- there was a turnover
8 once I had left in 2016. Not -- not
9 during --
10 BY MR. THOMAS:
11 Q. What -- what prompted --
12 A. -- 2015.
13 Q. -- that? What prompted that?
14 A. My departure.
15 Q. And what -- what about your departure
16 prompted the turnover?
17 A. I -- I don't -- I don't know. I --
18 I'm not sure, just because I wasn't at
19 Absolute at that time.
20 Q. Were you -- were you in touch with
21 people who were at Absolute --
22 MR. SULLIVAN: Objection to form.
23 BY MR. THOMAS:
24 Q. -- in the HR department?

Page 16

D. Berardo

1 A. I was, yeah. I had a few -- couple
2 people that I kept in touch with in the HR
3 department.
4 Q. What did they say to you about why --
5 what was happening?
6 MR. SULLIVAN: Objection to form.
7 THE WITNESS: I think they -- the new
8 head of HR, they -- you know, they just
9 weren't really getting along with her.
10 BY MR. THOMAS:
11 Q. Was that Amanda Mallow?
12 A. It was, yes.
13 Q. Why did you decide to leave Absolute?
14 A. I was head-hunted by a company in
15 Vancouver, and it was just a good next step in
16 my career.
17 Q. Now, when you were at Absolute, you
18 reported to the head of HR until -- and who
19 was the head of HR?
20 A. Oh, no, sorry, I -- oh, sorry, until
21 she left. Sorry. Her name was Leah Rubin.
22 Q. Okay.
23 A. Yes.
24 Q. And when you became HR manager, who

Page 17

D. Berardo

1 did you report to?
2 A. I reported in to Errol Olsen.
3 Q. Okay. Did you report in to Errol
4 Olsen the entire time until you left?
5 MR. SULLIVAN: Objection to form.
6 THE WITNESS: From -- from what I
7 recall, yes.
8 BY MR. THOMAS:
9 Q. And when did you officially get the
10 title "head of HR"?
11 A. So I -- I guess I -- essentially, I
12 never had, officially, the title of "head of
13 HR." I was the head of HR, but -- but, again,
14 I was -- I was -- the first title was "HR
15 manager," and then I was subsequently promoted
16 to HR director.
17 Q. Oh, okay.
18 A. Yeah.
19 Q. So when you were -- so is it your
20 testimony that when you were HR manager, that
21 was the equivalent of head of HR?
22 MR. SULLIVAN: Objection to form.
23 THE WITNESS: I was leading the
24 department.

Page 18

D. Berardo

1  BY MR. THOMAS:
2      Q. Okay. Did they conduct a search for
3  a replacement for Leah Rubin when she
4  departed?
5      A. Not that I recall.
6      Q. You just advanced into the position
7  upon her departure?
8      A. Correct. I mean, I was, yeah, asked
9  to -- to assume the role.
10     Q. How -- how did you feel about ABT --
11 how did you feel about Absolute sales culture
12 under Thomas Kenny and Todd Awtry during the
13 time that you were there?
14     MR. SULLIVAN: Objection to form.
15     THE WITNESS: Sorry, can you -- can
16 you clarify? What -- what do you mean by
17 how I felt about it? Like...
18 BY MR. THOMAS:
19     Q. What was your -- as an HR
20 professional, what was your --
21     A. Sure.
22     Q. -- observation about how they were
23 conducting themselves at the company?
24     A. Sure.

Page 19

D. Berardo

1      MR. SULLIVAN: Objection to form.
2      THE WITNESS: Okay.
3      MR. THOMAS: And, Mark, what is your
4  -- and just one second. I'm -- sorry to
5  cut you off, Dan -- or Mr. Berardo.
6      Mark, what is your objection?
7      MR. SULLIVAN: It's calling for an
8  opinion. It's also ambiguous.
9  BY MR. THOMAS:
10     Q. Well, let me make it clear,
11 Mr. Berardo. I'm asking for your observations
12 about what you saw in terms of Thomas Kenny
13 and Todd Awtry's conduct from an HR
14 perspective while they were at -- while you
15 were at Absolute with them.
16     MR. SULLIVAN: Objection so form.
17     THE WITNESS: Sorry, and specifically
18 when they first came in? Is that the time
19 frame you're asking me about.
20 BY MR. THOMAS:
21     Q. Why don't we start there and go all
22 the way through.
23     A. Sure. Okay. So -- so I -- so,
24 previously, I -- I don't think that we --

Page 20

D. Berardo

1  Absolute had -- or, to my knowledge, had a
2  sales organization that was led by people that
3  had come from a larger company, a larger
4  corporation. So I saw them coming in and
5  putting in some -- some more -- or some more
6  professional ways of -- professional ways of
7  conducting -- you know, running the sales
8  organization. Kind of that was my -- that was
9  my observation, is that they were -- is that
10 they were trying to advance the sales
11 organization to be a bit more of a
12 professionally run company. Or organization.
13     Q. What -- did your view of their -- the
14 cultures that they brought change over time?
15     MR. SULLIVAN: Objection to form.
16     THE WITNESS: Did it -- are you
17 asking did it change the culture of the
18 sales organization?
19 BY MR. THOMAS:
20     Q. No, did your view change?
21     A. Did my view --
22     Q. So they basically came in, and you
23 thought they brought a more professional --
24 tried to bring a more professional approach.

Page 21

D. Berardo

1      A. It did -- it did not --
2      Q. Was that the opinion you held the
3  entire time --
4      A. It --
5      Q. -- while you were there?
6      A. Yes, it was. Yeah.
7      Q. What -- what other observations did
8  you have about how they ran the sales culture
9  at Absolute while you were there?
10     MR. SULLIVAN: Objection to form.
11     THE WITNESS: I don't -- is there --
12 is there something specific -- I -- that
13 you're looking for? Just --
14 BY MR. THOMAS:
15     Q. Just -- just -- just your
16 observations, if -- if you saw them conduct
17 themselves in any way other than professionals
18 during the time that you were there.
19     MR. SULLIVAN: Objection to form.
20     THE WITNESS: You know, not that I --
21 not that I recall on the whole.
22 BY MR. THOMAS:
23     Q. What about not on the whole, more
24 specifically?

6 (Pages 18 to 21)

D. Berardo

1
2      MR. SULLIVAN:  Objection to form.
3      THE WITNESS:  I mean -- I mean, off
4  the top of my head, I -- I can't think of a
5  specific incident at -- at this time.
6  BY MR. THOMAS:
7      Q. Did you think that Mr. Awtry
8  conducted himself in a professional manner
9  when he was working at Absolute from a -- let
10 me strike that.
11     What was your observation about how
12 Mr. Awtry conducted himself from an HR point
13 of view during the time that he was employed
14 at Absolute and you were there?
15     MR. SULLIVAN:  Objection to form.
16     THE WITNESS:  It -- sorry, it's hard
17 for me to answer a question -- just an
18 observation question with -- without
19 knowing kind of specifically what you're --
20 what you're asking.  You know, I -- I
21 worked with him over the course of two and
22 a half years or so, maybe three years.  I
23 mean, again, I -- for the most part, from
24 what I recall, he -- he always conducted
25 himself professionally.

D. Berardo

1
2  BY MR. THOMAS:
3      Q. Do you recall times when you felt he
4  was not conducting himself professionally?
5      MR. SULLIVAN:  Objection to form.
6      THE WITNESS:  I mean, there's --
7  there's a -- there's a -- I don't remember
8  anything specifically, but -- I mean, I
9  would just be speculating without referring
10 back to emails.  It's just -- it was just a
11 really long time ago.
12 BY MR. THOMAS:
13     Q. Well, from the emails you took a look
14 at on Monday --
15     A. Sure.
16     Q. -- do you remember anything in there
17 that made you think that he conducted himself
18 in ways other than professionally, based on
19 your observations?
20     A. From the emails on Monday?  Not that
21 I recall, no.
22     Q. Okay.  What about Mary Piehler?  What
23 was your view of how she conducted herself
24 from an HR point of view -- strike that.
25     What were your observations about

D. Berardo

1
2  how Mary Piehler conducted herself, from an HR
3  point of view, when both you and her were
4  working at the company?
5      MR. SULLIVAN:  Objection to form.
6      THE WITNESS:  So, you know, Mary
7  was -- you know, she -- she was very -- my
8  observations were she was very passionate
9  about her -- her business.  And from --
10 from what I recall -- again, this is just a
11 broad generalization from what I
12 remember -- is that she was very -- she
13 objected to a lot of items that were coming
14 down, and that, you know, perhaps she
15 was -- she was difficult to work with.
16 BY MR. THOMAS:
17     Q. Did you find her difficult to work
18 with?
19     A. Not all the time.  At points, from
20 what I recall, yes.
21     Q. Tell me a time when you found her
22 difficult to work with.
23     A. Again, it's -- it's hard to remember
24 specifics.  I -- I remember just phone calls
25 where, a lot of times, our conversations would

D. Berardo

1
2  be going in a round -- going around in a lot
3  of circles.  Never really taking ownership of
4  situations.  So it was -- it was, you know,
5  generally, never her fault.
6      Again, I preface that with saying this is
7  just a general observation, so -- so for me to
8  give a specific time when that happened would
9  be difficult for me to recall right now.
10     Q. Yeah, in speculating about it, do you
11 remember anything?
12     A. Any specific incidences?
13     Q. Yes.
14     A. Nothing off the top of my head right
15 now.
16     Q. Tell me a little bit about your
17 employment since you have left Absolute.
18     A. Sure.  So I -- I went to a company
19 called "Hyperwallet" in Vancouver.  Assumed
20 the position of VP of people.  And so I -- I
21 have been there ever since.
22     Q. What is your role there?
23     A. So my role is the head of HR.  I will
24 preface that with saying that our company was
25 acquired by PayPal, and so my role has changed

Page 26

D. Berardo

1
2  since the acquisition, since January 1st, so
3  I'm, you know, not the VP of people.  So
4  I'm -- I'm head of people for specific -- the
5  Hyperwallet division within PayPal.
6      Q. Were you aware of surveys that were
7  done of employees in 2014 to get employee
8  feedback?
9      A. Yes.  Yeah.
10     Q. Did any of those -- did you get the
11  chance to see the results of those surveys?
12     A. In 2014, yes, I did.  Yeah.
13     Q. Did those results raise any concerns
14  with you?
15     A. Yeah, absolutely, they did.  Yeah.
16     Q. Why?
17     A. There was a -- there was a number of
18  areas the company had to work on, in terms of
19  culture -- I mean, there was -- there was
20  other areas.  I mean, we -- we came up with
21  a -- with a list of areas that the company
22  needed to work on, and we came up with a plan
23  to work on them.  Like, another example that
24  comes to mind is around compensation, coming
25  up with a professional compensation plan for

Page 27

D. Berardo

1
2  the company.  You know, there -- there was
3  definitely other areas too that we worked on.
4      Q. Do you remember the report showing
5  serious concerns about Todd -- Todd Awtry
6  and Thomas Kenny's professionalism?
7          MR. SULLIVAN:  Objection to form.
8          THE WITNESS:  So I -- I viewed -- I
9  did view some of those documents during the
10  review on Monday just very briefly, but I
11  do recall there being some comments in the
12  survey about Thomas and Todd.
13  BY MR. THOMAS:
14     Q. Did -- did those affect -- when you
15  saw them at the time in 2014, did you pay any
16  attention to them in terms of your view of
17  Thomas and Todd?
18         MR. SULLIVAN:  Objection to form.
19         THE WITNESS:  So, sorry, can you
20  clarify.  What do you mean by in terms of
21  my view?
22  BY MR. THOMAS:
23     Q. I had asked you what your view was of
24  Thomas --
25     A. Oh, right.

Page 28

D. Berardo

1
2      Q. -- Kenny and Todd Awtry when they
3  worked at Absolute and you worked there.  Do
4  you remember that a few minutes ago?
5      A. I do, yes.
6      Q. And I'm asking you, when you were
7  there and you saw these reports about the
8  professionalism of Thomas and Todd as reported
9  by people within the company, to what degree,
10  if any, did it affect your view of their
11  professionalism?
12         MR. SULLIVAN:  Objection to form.
13         THE WITNESS:  So from what I recall,
14  my view didn't change.  Absolute had come
15  from an environment where our founder CEO
16  was very heavily sales-focussed.  So it was
17  -- it was a bit of a family-type culture.
18  And so I think I knew when we were bringing
19  in Thomas and TK that -- sorry, "TK,"
20  Thomas and Todd -- that -- that there would
21  be a shift and some resistance to the --
22  the type of culture or the type of sales
23  environment that they -- they would be
24  bringing to -- into the company.
25  BY MR. THOMAS:

Page 29

D. Berardo

1
2      Q. You said the founder of the company
3  was very sales-focussed.  Did I hear you
4  correctly?
5      A. I mean, from what -- yeah, I mean, I
6  worked with him for -- until he left the
7  company for a year and a half.  And so, from
8  what I recall, he was very sales-focussed.
9      Q. And were Thomas Kenny and Todd Awtry
10  less sales-focussed than him?
11     A. No.  No.  I mean, just -- it was just
12  a different -- a different approach.
13     Q. And what -- how was that approach
14  different?
15     A. So I think John's -- who was the
16  founder CEO -- he was a bit -- again, a bit
17  more family -- to use the word -- the term
18  "family," but, you know, we're all in this --
19  you know, not all in this together, but we're
20  all part of the same family, for example.  A
21  bit difficult to describe.  Whereas they came
22  in as a bit more corporate and -- and
23  professional and buttoned-up.
24     Q. So you're saying Thomas Kenny and
25  Todd Awtry came in as more professional and

Page 30

D. Berardo

1  buttoned-up?
2      A. Correct, yes.
3      Q. Okay.  When you saw the comments
4  about Thomas and Todd's conduct at the company
5  in the 2014 survey, what steps did you take to
6  remedy the problems that were -- if any, that
7  were raised in the survey?
8      MR. SULLIVAN:  Objection to form.
9      THE WITNESS:  I don't -- I don't
10     recall specifically, but, you know, I --
11     yeah, I don't -- I don't recall
12     specifically.  I'm sorry.
13  BY MR. THOMAS:
14     Q. Do you recall generally?
15     A. Well, I don't think that we -- you
16  know, I would be -- I would just be
17  speculating on -- on kind of the conversations
18  that I -- may have had with my boss about
19  it, but -- but we --
20     Q. I'm not asking you about
21  conversations with your boss.  I'm asking
22  about steps that the company took in response
23  to the survey regarding the professionalism or
24  lack thereof of Thomas Kenny and Todd Awtry.

Page 31

D. Berardo

1      MR. SULLIVAN:  Objection to form.
2      THE WITNESS:  The company -- you
3  know, the company didn't find anything in
4  the survey that would have caused concern
5  that would have -- you know, that would
6  have made us take steps to change the -- or
7  -- or to rectify the situation.
8  BY MR. THOMAS:
9      Q. So, for instance, when there were
10  comments about the vision and strategy of
11  company, and the comments that came back were
12  things like:
13      Thomas Kenny has not told the team
14      what the company strategy is.  Poor
15      communicator and keeps information to
16      himself."
17  The company did not view that as -- well, you
18  didn't view that as a problem that needed to
19  be remedied; correct?
20     MR. SULLIVAN:  Objection to form.
21     THE WITNESS:  I can't say I didn't.
22  I just don't recall.  I mean, as I said
23  before, there may have been conversations,
24  and there may have been some type of -- you

Page 32

D. Berardo

1  know, I would be speculating.  You
2  know, the company listened to all the
3  comments, and there may or may not have
4  been conversations with them about
5  communicating better.
6  BY MR. THOMAS:
7      Q. But you don't -- you -- sitting here
8  today, you don't recall changing your
9  opinion -- well, let me read you some more.
10     A. Sure.
11     Q. Another comment:
12      Terrible communication from Thomas
13      Kenny and Todd Awtry.  Unclear strategy.
14      Poor decision-making.  Questioning
15      integrity of company."
16  That -- that was not something that made you
17  change your view of Thomas and Todd?
18     A. So --
19     MR. SULLIVAN:  Objection to form.
20     THE WITNESS:  There were -- there
21  were hundreds or maybe even thousands of
22  comments in the survey, and so -- we looked
23  at the survey as a whole, and so those
24  individual comments did not change my view.

Page 33

D. Berardo

1      MR. THOMAS:  If I could ask the court
2  reporter to give Mr. Berardo a copy of
3  Exhibit 67.  So that was Awtry 67.
4      THE COURT REPORTER:  Do you mind if
5  we go off the record so I can get it out of
6  the box?
7      MR. THOMAS:  Off the record, on the
8  record, however you would like.
9      THE COURT REPORTER:  Okay.  We should
10  go off.
11     MR. THOMAS:  If you want to go off,
12  I'm fine with that.  If you want to stay
13  on, we can.  Either way.
14     THE COURT REPORTER:  Okay.  Thanks.
15     VIDEOGRAPHER:  Going off record.  The
16  time is 11:31.
17     (PROCEEDINGS RECESSED AT 11:31?A.M.)
18     (PROCEEDINGS RECONVENED AT 11:32?A.M.)
19     VIDEOGRAPHER:  We're back on the
20  record.  The time is 11:32.
21  BY MR. THOMAS:
22     Q. Mr. Berardo, I'm showing you what has
23  previously been marked as Awtry Exhibit 67.
24  If you can take some time and look through

9 (Pages 30 to 33)

Page 34

D. Berardo

1
2  that.  And this is -- this is a document you
3  saw on Monday too; correct?
4      A. It may -- it may have been.  I
5  didn't -- we didn't review it in detail.  So
6  this is -- this looks similar, yes.
7      Q. Okay.  What I would like you to do is
8  read the document -- take your time -- and let
9  me know if there's any positive comments in
10 here about Thomas Kenny or Todd Awtry.
11     MR. SULLIVAN:  Objection to form.
12     THE WITNESS:  Okay.  So you want me
13 to read all 29 pages?
14 BY MR. THOMAS:
15     Q. If you would like, yes.
16     A. Okay.
17     Q. Oh, one thing before you do that,
18 Mr. Berardo, who -- ELT at Absolute refers to
19 the "executive leadership team"; right?
20     A. That's correct.
21     Q. Who was on the executive leadership
22 team in the end of -- or, let's say, in August
23 of 2014?
24     A. It -- I don't -- I -- I can't recall
25 names specifically.  It would be the head of

Page 35

D. Berardo

1
2  each department.  I'm sure someone could get
3  that information for you.
4      Q. But that was -- Thomas and Todd were
5  two of those people; correct?
6      A. Thomas for sure.  Todd, I would
7  assume.  But I don't know for certain.
8      Q. All right.  Go ahead and -- and you
9  can read the report, and let me know if
10 there's anything positive in there about
11 either -- either of them.
12     MR. SULLIVAN:  Objection to form.
13     THE WITNESS:  Can I use your -- do
14 you want me to highlight them -- do you
15 want me to highlight any positives, and
16 then read them to you after?  Or do you
17 want me to read them as I go?
18 BY MR. THOMAS:
19     Q. Yeah, you can read them to me -- you
20 can read them to me at the end.  Yeah.
21     A. At the end?  Okay.
22     Q. Or now.  Or now, if you would like
23 to.  If you've found any.
24     A. Sure.  I will just read them as I go,
25 then.  I -- it's going to be -- it depends on

Page 36

D. Berardo

1
2  who you ask if this is positive or not, but
3  this -- this says:
4      Transitional feel will start to
5  settle nicely as the necessary roles are
6  filled."
7  I'm not sure what that refers to.
8      Q. I -- right now, I'm asking about
9  positive comments about Thomas or Todd.  Is
10 that a positive comment about Thomas or Todd?
11     A. It -- it may have been.  It may not
12 have been.  I don't know.  It doesn't -- it
13 doesn't state the names.
14     Q. I'm not asking you to speculate.  I'm
15 only asking you to -- when you look at -- when
16 you look at something -- something that you
17 know is positive about the staff.
18     A. Sure.  With their names attached?
19     Q. I presume so, unless there's some
20 other way you can identify that they're being
21 referred to.
22     A. So -- yeah, so there was nothing --
23 nothing specific that I saw that called --
24 called out Thomas and TK -- sorry, I just keep
25 on saying "Thomas and TK" -- Thomas and Todd,

Page 37

D. Berardo

1
2  you know, complimenting them or -- or being
3  positive.
4      Q. Okay.  What was the purpose of this
5  survey?
6      A. It was to gather -- gather feedback
7  from employees on a wide range of topics and
8  to help guide kind of some key -- key
9  strategic initiatives over the course of the
10 next year or 18 months.
11     Q. And how was the information in the
12 surveys used to derive key strategic
13 decisions?
14     A. Well, we --
15     Q. Or what was the word you used?  Key
16 strategic?  What was it?
17     A. I don't recall what I said, sorry.
18 Strategic initiatives?
19     Q. Initiatives.
20     A. Yeah.
21     Q. So how -- how would the survey help
22 that?
23     A. We identified -- I mean, I'm --
24 I'm -- I can't remember everything that we
25 did.  One of the -- one of the -- one of the

Page 38

D. Berardo

2  things --
3        Q. And I'm -- I'm sorry.  I'm actually
4  asking a different -- different question.
5  At -- at a general level, why was this survey
6  helpful in deriving key strategic initiatives?
7        A. Yeah.
8        Q. How would it be used in that process?
9        A. Yeah, and I --
10       MR. SULLIVAN:  Objection to form.
11       THE WITNESS:  And I should say this
12  was kind of specific to the people,
13  culture, HR, not necessarily business --
14  business strategic decisions.  Why it would
15  be helpful is because it -- the feedback
16  comes directly from employees, and -- and
17  we want to ensure that we have an engaged
18  workforce.  And so figuring out what is --
19  what the main issues are in the company and
20  then trying to rectify them is something
21  that's important -- was important in this
22  company, but is important in any company, I
23  think.
24  BY MR. THOMAS:
25       Q. All right.  Well, we -- we talked

Page 39

D. Berardo

2  about the positive, or lack thereof, comments
3  about Thomas and Todd.  I would like to now
4  read you several sections from the report.  I
5  will start on page DEFS1387:
6        Thomas Kenny has not told the team
7     what the corporate strategy is.  Poor
8     communicator and keeps information to
9     himself."
10  Next comment, same page:
11     Terrible communication from Thomas
12     Kenny and Todd Awtry.  Unclear strategy.
13     Poor decision-making.  Questioning
14     integrity of company."
15  Turning to the next page, there's a comment:
16        Key leadership roles are leaving.
17     The wrong people.  Thomas Kenny and Todd
18     Awtry have pushed out the executives; i.e.,
19     Abigail Maines.  Upper management should
20     not have let this happen."
21  Turning to page DEFS01390:
22        No manager.  ELT has no integrity.
23     Thomas Kenny allows Todd Awtry to hire a
24     sibling; i.e., nepotism.  Trust is broken.
25     No one will trust him."

Page 40

D. Berardo

2  Next quote on that page:
3        No manager did more than one year.
4     Lack of communication and connection
5     between Thomas Kenny and Todd Awtry and
6     sales."
7  Next comment, same page:
8        The new RD hiring of Kenny affected
9     ELT integrity."
10  Turning to the next page of the survey,
11  DEFS1391 (as read):
12        Level of two-way communication from
13     the ELT has decreased greatly over the past
14     -- over the last nine months."
15  Next page, DEFS01392:
16        Strongly supported by media manager.
17     Great deal of respect for this person.
18     Communication in Abigail Maines departure
19     was not handled properly.  Felt inaccurate.
20     Thomas Kenny wanting to cover himself for
21     blame.  Very typical behaviour."
22  Turning to the next page, DEFS1393:
23        Disjointed organization.  Thomas
24     Kenny and Todd Awtry messed up sales
25     organization.  Ineffective multiple

Page 41

D. Berardo

2  reporting for different positions.
3     Demotivated employees equals low sales."
4  Turning to DEFS1395:
5        Current leadership of Todd Awtry and
6     Thomas Kenny not receptive to any kind of
7     feedback."
8  Turning to DEFS1397:
9        Had a good team leader.  Abigail
10     Maines let go, who was great.  What has
11     Thomas Kenny contributed?  Was it worth
12     it?"
13  Next quote:
14        Staff are afraid to speak about
15     management.  Not encouraged.  If you speak
16     up, you will lose your job."
17  Next page (as read):
18        Get Abigail Maines back.  Promote to
19     help and retain relationship with other
20     companies.  Move -- need to move Thomas
21     Kennedy [sic] and 'sidekick' Todd Awtry,
22     who does not belong, and ensure we retain
23     the talent we already have."
24  And turning to page DEFS1411 (as read):
25        Current leadership of Todd and Thomas

11 (Pages 38 to 41)

Page 42

D. Berardo

1
2  Kennedy -- Thomas Kenny grossly
3  under-qualified.  Becomes more and more
4  apparent with decisions being made and the
5  direction they are taking the company.  ELT
6  and the board not seriously concerned.  No
7  communication from leadership team,
8  prioritization of non-impactful decisions,
9  questions around the rapid build-up of the
10  CER team.  Don't currently have the
11  existing business to keep the people in a
12  position adequately occupied.  The VAR
13  program is designed to increase business.
14  It has gotten off to an incredibly slow
15  start.  Need to put some focus on
16  marketing.  There are major concerns about
17  lack of adversity throughout the company.
18  Only have one female member of the ELT.
19  Have no female representation on the
20  management team listed on our website, nor
21  on our board.  Women at Absolute are paid
22  less than their counterparts.  Difficult
23  for them to advance their careers and
24  increase their earnings.  Ethical question
25  regarding nepotism and the hiring of the

Page 43

D. Berardo

1
2  new sales manager.  Claim that a local
3  candidate could not be found is essentially
4  dishonest.  The sales team has serious
5  reservations about the ability to have an
6  open and honest relationship with the new
7  manager.  Seem to be no efforts to brand
8  Absolute as the leader in any area -- in
9  any arena.  Customers do not recognize our
10  name.  Aren't seen as a leader in any of
11  our competitive spaces."
12  Now, given those comments about the people,
13  culture, and HR, what did you do in terms of
14  working with Thomas and Todd to derive key
15  strategic initiatives based on you what saw in
16  the survey?
17       MR. SULLIVAN:  Objection to form.
18       THE WITNESS:  So -- so my role was
19  not to -- I -- I didn't have the capacity
20  to work with each individual department.
21  My role was to work on the HR initiatives
22  for the company as a whole.
23  BY MR. THOMAS:
24       Q. What did Absolute do to rectify the
25  issues that were raised in the survey in

Page 44

D. Berardo

1
2  regard to Thomas Kenny and Todd Awtry?
3       MR. SULLIVAN:  Objection to form.
4       THE WITNESS:  I don't recall, and --
5  I -- I don't recall.
6  BY MR. THOMAS:
7       Q. But the purpose of the survey was to
8  have these issues raised and then rectify
9  them; right?
10       MR. SULLIVAN:  Objection to form.
11       THE WITNESS:  In -- in general, yes.
12  As I mentioned before, there are thousands
13  of comments, so it would be unlikely that
14  we would be able to address every single
15  comment in the survey.
16  BY MR. THOMAS:
17       Q. I'm not asking about every single
18  comment in the survey.  I'm talking about the
19  multiple comments I just read to you.  That
20  was not something Absolute chose to address?
21       MR. SULLIVAN:  Objection to form.
22       THE WITNESS:  I don't have that
23  information.  It may have been.  I don't --
24  I -- I may have had conversations -- I -- I
25  would just be speculating.  I don't recall.

Page 45

D. Berardo

1
2  BY MR. THOMAS:
3       Q. Well, I don't want your speculation.
4       A. Sure.
5       Q. I want your direct knowledge of
6  anything that Absolute did to rectify the
7  issues that were raised in the survey, which
8  was one of the purposes of the survey.
9       A. I don't --
10       MS. LESTRADE:  Objection.
11       THE WITNESS:  I don't -- I don't
12  have -- I don't have the -- I don't recall.
13  I don't recall what the company did,
14  specifically.
15  BY MR. THOMAS:
16       Q. And you were head of HR at this time?
17       A. That's correct.
18       Q. And do you have any documents that
19  would refresh your recollection of anything
20  that occurred?
21       A. Maybe.  I mean, I don't have any
22  documents in front of me.  There may be
23  emails.  I don't recall the...
24       Q. And you are telling -- are you saying
25  under oath that after reading the comments in

Page 46

D. Berardo

1
2  these surveys, you continued to believe that
3  Thomas Kenny and Todd Awtry brought a level of
4  professionalism in terms of sales to Absolute?
5       MR. SULLIVAN:  Objection to form.
6       THE WITNESS:  Yes, I did, after the
7  survey.  Correct.
8  BY MR. THOMAS:
9       Q.  Okay.  What in the survey made you
10  think they brought in a level of
11  professionalism to the sales force at
12  Absolute?
13       MR. SULLIVAN:  Objection to form.
14       THE WITNESS:  So the surveys is one
15  point in --
16  BY MR. THOMAS:
17       Q.  Sorry, let me -- let me rephrase that
18  question.  What, if anything, in this survey
19  led you to believe that they brought a level
20  of professionalism to Absolute?
21       MR. SULLIVAN:  Objection to form.
22       THE WITNESS:  I mean, the surveys at
23  one point in time -- I -- I understood,
24  from a holistic point of view, that change
25  is hard for people, and it always is very

Page 47

D. Berardo

1
2  difficult for people.  And so any time --
3  any time there's -- any time there's change
4  in organization, there's going to be people
5  that are -- that are not happy with that
6  change.
7       So -- so my understanding, when I
8  read the survey, there obviously are
9  various comments on different things, but
10  when you -- when you look at it from a --
11  from a bigger picture, it didn't change my
12  view about Thomas and Todd coming in to
13  kind of button up the -- the sales
14  organization.
15  BY MR. THOMAS:
16       Q.  What comment in here made you think
17  they were -- they came in and buttoned up the
18  sales organization?
19       MR. SULLIVAN:  Objection to form.
20       THE WITNESS:  There were no comments
21  in here that -- that did that.
22  BY MR. THOMAS:
23       Q.  Okay.  And you did the survey to
24  understand how the people and culture in HR
25  roles were viewed within the company; right?

Page 48

D. Berardo

1
2       MR. SULLIVAN:  Objection to form.
3       THE WITNESS:  Sorry, can you repeat
4  that question.
5  BY MR. THOMAS:
6       Q.  Yes.
7       Can the court reporter read it back,
8  please.
9       (REPORTER READ BACK)
10       MR. SULLIVAN:  Objection to form.
11       THE WITNESS:  The people and culture
12  in HR roles.  Sorry, I still don't --
13  BY MR. THOMAS:
14       Q.  I believe you referred to the people,
15  culture, and HR roles earlier as being what
16  this survey was looking at.  Am I correct on
17  that?
18       A.  People, culture, and HR roles.  I
19  mean, the -- it wasn't looking at HR roles.
20  We were --
21       Q.  Was it looking at people and culture
22  of the company?
23       A.  Yeah, we were -- it -- it tries to
24  get the -- an understanding of the level of
25  engagement within the company.

Page 49

D. Berardo

1
2       Q.  Do you have any reason to believe the
3  survey was done inaccurately?
4       A.  We used a third-party vendor and --
5  who was -- who was a professional company that
6  did surveys and had scientific backings around
7  the questions that they asked.  So there's no
8  reason for me to believe that the way we
9  worded the survey or how we conducted the
10  survey was -- was incorrect.
11       Q.  Or the results are inaccurate?  Did
12  you think the results were inaccurate?
13       A.  No.
14       MR. SULLIVAN:  Objection to form.
15       THE WITNESS:  No, I did not.
16  BY MR. THOMAS:
17       Q.  Did you share the results of the
18  survey with Todd Awtry?
19       A.  Yes.  I mean, just from this email,
20  it looks like I did.  Wait.  Hold on.  Sorry.
21  The email was sent to Thomas Kenny.  So I
22  only -- it looks like I only sent it to -- to
23  Thomas.  I don't recall if I had shared this
24  with Todd.
25       Q.  Did -- to what degree, if any, did

13 (Pages 46 to 49)

D. Berardo

1
2   reading the sales raise concerns in your mind
3   about how Thomas Kenny and Todd Awtry were
4   running their sales team?
5       MR. SULLIVAN:  Objection to form.
6       THE WITNESS:  I can't -- I can't
7   recall -- I can't recall what I was
8   thinking at that time.
9   BY MR. THOMAS:
10      Q. Sitting here today, what does it make
11  you think about how Thomas and Todd were
12  running their sales team?
13      MR. SULLIVAN:  Objection to form.
14      THE WITNESS:  I mean, again, the -- I
15  look at -- I mean, I -- I look at -- when I
16  look at employee surveys, I look at -- you
17  know, there -- there's a lot more than the
18  comments as well.  There -- there are
19  the -- you know, there's the numerical
20  values that go with each question.
21  BY MR. THOMAS:
22      Q. Where's the numerical values?
23      A. I don't know.  I mean, they're part
24  of the survey, obviously.
25      Q. Do you think -- do you know if there

D. Berardo

1
2   are any numerical values?
3       A. Well, it wouldn't -- there would be
4   numerical values based on each question,
5   asking people to rate --
6       MR. THOMAS:  Okay.  Well, first of
7   all, let me request a production of those
8   numerical values.
9   BY MR. THOMAS:
10      Q. But I'm asking you, sitting here
11  today with that survey in front of you, how
12  does that make you feel about how Thomas and
13  Todd were conducting themselves in terms of
14  their employees in the sales organization?
15      MR. SULLIVAN:  Objection to form.
16      THE WITNESS:  Well, I -- I would -- I
17  would -- the feedback that I would give,
18  sitting here today, is that it seemed like
19  communication wasn't as good as it could
20  have been with the strategy.  And so I
21  would -- I would likely give the feedback
22  to improve communication.
23  BY MR. THOMAS:
24      Q. Let me ask you -- so from an HR
25  perspective, sitting here today, when you look

D. Berardo

1
2   at that report, what is your observation about
3   how Thomas and Todd were conducting themselves
4   in the sales organization?
5       MR. SULLIVAN:  Objection to form.
6       THE WITNESS:  I mean, I -- I don't --
7   you're asking me here today, but how they
8   were conducting themselves was five years
9   ago, so it's hard for me to sit here to
10  answer that question when I'm reading a
11  survey that's -- you know, I just don't
12  have --
13  BY MR. THOMAS:
14      Q. Well, this is -- let's go through
15  this.  This is a survey you commissioned;
16  correct?
17      A. That's correct, yeah.
18      Q. And you did the survey so that you
19  could get feedback from employees; correct?
20      A. Correct, yes.
21      Q. And you feel the feedback was
22  accurate?
23      A. I mean, the -- the feedback -- the
24  feedback were people's opinions, yes.
25      Q. Which is what you were soliciting?

D. Berardo

1
2       A. Correct, yes.
3       Q. And you have an extensive background
4   in human resources; correct?
5       A. Yeah, we went through my background,
6   so I'm not sure if you call it "extensive" at
7   this point, but it -- that would be -- if
8   that's your opinion, then, okay.
9       Q. Do you have a graduate degree in
10  human resources?
11      A. I have a -- I have a management
12  certificate from BCIT.
13      Q. In human resources?
14      A. That's correct, yes.
15      Q. And how long have you been doing
16  human resources?
17      A. Since 2006.
18      Q. Okay.  So with that as background and
19  the survey that you commissioned to find out
20  what -- how the sales organization was being
21  run and that you believe is accurate, what is
22  your view as to how Thomas Kenny and Todd
23  Awtry were performing in terms of the sales
24  organization?
25      MR. SULLIVAN:  Objection to form.



Page 54

D. Berardo

2    THE WITNESS:  So I need to say the
3  survey was not conducted to see how the
4  sales organization was running; it was
5  conducted for the entire company.  So
6  it's -- it's difficult for me to answer --
7  BY MR. THOMAS:
8    Q. Let's just focus on the sales --
9  let's just focus on the sales portion of it.
10    A. Sure.  I mean, my answer hasn't
11  changed from the last time you asked.
12    Q. Which was that communication was
13  lacking --
14    A. From reading --
15    Q. -- at least?
16    A. From reading this, it seemed like
17  there -- there could be improved
18  communication.  From reading the comments,
19  yes.
20    Q. And you remember no steps that you
21  took or that Absolute took when you were head
22  of HR to remedy that; correct?
23    MR. SULLIVAN:  Objection to form.
24    THE WITNESS:  Yeah, I mean, again, I
25  just can't remember the specifics.

Page 55

D. Berardo

2  BY MR. THOMAS:
3    Q. And you characterized their
4  performance as being buttoned-up and
5  professional; correct?
6    A. I -- that was my -- that was my
7  opinion or my overall view.
8    Q. Does -- does seeing this report
9  change that?
10    A. No.  I mean, I saw the report when it
11  came out.
12    Q. So did your view of Thomas and Todd's
13  performance remain just the same about them
14  being buttoned-up and professional before
15  reading this report as it was after?
16    A. I mean, in general, yes, from what I
17  recall.
18    Q. And you took no steps in regards to
19  the issues that were raised there?
20    A. No, I didn't say that.  I said that I
21  don't recall the steps that were taken.
22    Can I take a break?
23    MR. SULLIVAN:  Sure.
24    MR. THOMAS:  Yeah.
25    VIDEOGRAPHER:  Going off record.  The

Page 56

D. Berardo

2  time is 12:22.
3    (PROCEEDINGS RECESSED AT 12:22?P.M.)
4    (PROCEEDINGS RECONVENED AT 12:33 P.M.)
5    VIDEOGRAPHER:  Back on the record.
6  The time is 12:33.
7    MR. THOMAS:  Oh, I need to take a
8  call here.  Hang on.  I'll be -- I'll be
9  right back.
10    VIDEOGRAPHER:  Going off record.  The
11  time is 12:33.
12    (PROCEEDINGS RECESSED AT 12:33?P.M.)
13    (PROCEEDINGS RECONVENED AT 12:38 P.M.)
14    VIDEOGRAPHER:  Back on the record.
15  The time is 12:38.
16  BY MR. THOMAS:
17    Q. All right.  Mr. Berardo, what would
18  more, in your -- based on your personal
19  knowledge, what would more accurately reflect
20  the observations of the professionalism of
21  Thomas Kenny and Todd Awtry's interactions
22  with employees; what we see in the survey or
23  your -- or your recollection five years later?
24    MR. SULLIVAN:  Objection to form.
25    THE WITNESS:  Sorry, I don't -- I

Page 57

D. Berardo

2  don't know how to answer that question.  I
3  don't understand the question.
4  BY MR. THOMAS:
5    Q. What part of it don't you understand?
6    A. Can you repeat the question.
7    Q. Sure.
8    Can the court reporter read it back.
9    (REPORTER READ BACK)
10    MR. SULLIVAN:  Objection to form.
11    THE WITNESS:  Are we -- are you
12  asking for my opinion?
13  BY MR. THOMAS:
14    Q. Not for your opinion.  Based on --
15  based on your knowledge of how well you
16  recollect things and how well the survey was
17  done, which do you -- which, in your
18  understanding personally, would be more
19  accurate?
20    MR. SULLIVAN:  Objection to form.
21    THE WITNESS:  Well, so this -- again,
22  the survey was taken in -- at one point in
23  time over the course of two weeks, and my
24  observations was over the course of two or
25  three years, so I -- I would -- I -- you

15 (Pages 54 to 57)

Page 58

D. Berardo

know, I would say that my recollection
overall is probably more accurate than
the -- than the employee survey.
BY MR. THOMAS:
    Q. Do you have any reason to believe
employees felt any better about Thomas and
Todd in the weeks and years after the survey
while you were still employed there than they
did at the time the survey was taken?
    MR. SULLIVAN: Objection to form.
    THE WITNESS: Yes. I mean, I think,
    from what I recall, the communication did
    get better. And, you know, we didn't do
    any formal -- unfortunately, we didn't do
    any -- we didn't do a follow-up survey
    after this before I had left Absolute,
    but -- but my observations were that things
    were better.
BY MR. THOMAS:
    Q. Didn't you -- well, first of all,
didn't you do a survey -- a culture survey
June 1st, 2015?
    A. I -- it's -- I don't recall, but
it's -- it's -- it's possible. Do we -- I

Page 59

D. Berardo

don't know if we have a copy of it or...
    Q. Well, that -- by the guiding
coalitions, was it -- it was performed -- it
was done by the guiding coalition?
    A. Oh, there was -- we -- we did do a --
we -- we -- we did it -- it's possible we did
a -- I -- the guiding coalition was to
discover what our values were at Absolute. So
I -- I don't recall if that was a full survey.
    Q. Okay. Do you -- do you remember
referring to it as a "corporate cultural
assessment survey"?
    A. I -- I don't recall what it was
called.
    MR. THOMAS: Okay. We would request
    the production of that survey and the
    results of it.
BY MR. THOMAS:
    Q. Did you have any other -- were you
aware that Todd Awtry performed a survey,
monthly survey of his sales employees
regarding their views of his performance?
    A. I don't -- I don't recall. Not --
I'm not answering that it -- it didn't happen;

Page 60

D. Berardo

I just don't recall off the top of my head
right now.
    Q. Is there any other data points that
you can point to that would indicate employees
felt that Thomas and Todd did a better job
after the survey was performed --
    MR. SULLIVAN: Objection to form.
BY MR. THOMAS:
    Q. -- during the time that you were
there?
    A. Any -- any, like, surveys or any --
anything that was written down?
    Q. Any data points whatsoever.
    MR. SULLIVAN: Objection to form.
    THE WITNESS: I mean, just -- just, I
    guess, observations, from what I recall.
    And --
BY MR. THOMAS:
    Q. Did you observe at the time -- did
you observe -- at the time that Exhibit --
Awtry Exhibit 67 was being done, did you
observe that people didn't like working with
Thomas and Todd?
    MR. SULLIVAN: Objection to form.

Page 61

D. Berardo

    THE WITNESS: Sorry, can -- can you
    repeat the --
BY MR. THOMAS:
    Q. And felt they were unprofessional?
    A. Can you repeat the question?
    Q. Sure.
        When -- well, first of all, we will
request the production of the survey, monthly
survey by Todd Awtry.
        But, additionally, let's talk about
the survey. You were aware that Thomas and
Todd had problems in terms of communicating
with their employees, in terms of employees'
view of their professionalism, in terms of
employees' view of their trust in them.
Correct? You were aware of -- you were aware
of that; correct?
    MR. SULLIVAN: Objection to form.
    THE WITNESS: So I -- I read the
    employee survey, but I wouldn't
    characterize it like you characterized it.
BY MR. THOMAS:
    Q. What -- what -- what of my
characterization don't you agree with?

16 (Pages 58 to 61)

D. Berardo

1
2    A. There were -- well, in the survey,
3   there were people that did talk about the
4   communication.  Sorry, you also mentioned
5   their professionalism?
6    Q. Yes.  Did you -- did you read that
7   survey and felt the people thought they were
8   doing a professional job?
9    A. Sorry, when I read the survey, did I
10  think that they were doing a professional job?
11    Q. That people were -- didn't have any
12  concerns about their professionalism?
13    MR. SULLIVAN:  Objection to form.
14    THE WITNESS:  Just for -- reading it
15   now, there were a couple comments that I
16   read, but at -- at the time, there was
17   nothing overall that -- that caused me
18   great concern.
19  BY MR. THOMAS:
20    Q. That wasn't my question to you.  My
21  question to you was to be -- well, let me ask
22  you -- let me change it.  When you got this
23  survey in August of 2014, did the comments
24  about Todd and Thomas surprise you at all?
25    MR. SULLIVAN:  Objection to form.

D. Berardo

1
2    THE WITNESS:  I don't recall.  I
3   don't remember.
4  BY MR. THOMAS:
5    Q. You don't recall them surprising you?
6    A. No, I just don't recall what my
7   reaction was.
8    Q. Were you concerned at all about the
9   comment that was made about how women were
10  being treated by Absolute?
11    MR. SULLIVAN:  Objection to form.
12    THE WITNESS:  I don't -- I don't
13   recall that -- I don't recall my reaction
14   to that comment.
15  BY MR. THOMAS:
16    Q. So, now, you're -- let me just get
17  this straight.  You're head of HR when the
18  survey comes in; correct?
19    A. That's correct.
20    Q. How important is it for you, as an HR
21  head, to make sure that the company's not
22  discriminating against women?
23    A. That's --
24    MR. SULLIVAN:  Objection to form.
25    THE WITNESS:  It's very important.

D. Berardo

1
2  BY MR. THOMAS:
3    Q. One of your most important
4   requirements as head of HR?
5    MR. SULLIVAN:  Objection to form.
6    THE WITNESS:  It's one of the -- it's
7   one of the most important requirements.
8  BY MR. THOMAS:
9    Q. Okay.  And would you take action if
10  you heard people saying that women were not
11  being treated fairly at Absolute?
12    MR. SULLIVAN:  Objection to form.
13    THE WITNESS:  Absolutely.  If someone
14   came up to me and -- and they -- they --
15   they -- of course I would, yes.
16  BY MR. THOMAS:
17    Q. What happens if they put it in a
18  survey?
19    MR. SULLIVAN:  Objection to form.
20  BY MR. THOMAS:
21    Q. Would you take action then?
22    A. It would --
23    MR. SULLIVAN:  Objection to form.
24   Sorry.
25    THE WITNESS:  It would be very

D. Berardo

1
2   difficult to take action on an anonymous
3   survey without specifics.
4  BY MR. THOMAS:
5    Q. What about a complaint that women
6   weren't being treated fairly, and they were
7   being paid less?  Would you take any action if
8   that came to you in a survey, or would you
9   just ignore it?
10    MR. SULLIVAN:  Objection to form.
11    THE WITNESS:  So -- so being treated
12   fairly, there's -- there -- there's nothing
13   specific.  If there was -- if there's
14   something specific, I -- I definitely would
15   look into it.  Being paid fairly, again,
16   this is -- this -- you're asking me what I
17   would do now?
18  BY MR. THOMAS:
19    Q. No, I'm asking you, as head of HR at
20  Absolute, was it your policy or practice to
21  act on complaints of sex discrimination when
22  they came across your desk?
23    A. Well, absolutely.
24    Q. What would cause you not to act on a
25  complaint of discrimination that came across

17 (Pages 62 to 65)

Page 66

D. Berardo

2 your desk?
3     MR. SULLIVAN:  Objection to form.
4     THE WITNESS:  I don't know -- I'm
5 sorry.  I don't know how to answer that
6 question.
7 BY MR. THOMAS:
8     Q. Can you think of any circumstances
9 where you shouldn't act on it if it came
10 across your desk as head of HR, a complaint
11 about being discriminated against?
12     MR. SULLIVAN:  Objection to form.
13     THE WITNESS:  If -- if someone came
14 to me and...
15 BY MR. THOMAS:
16     Q. I'm not talking about coming to you.
17 I'm talking about a report in any way, shape,
18 or form coming across your desk.  Under what
19 circumstances would you ignore it?
20     MR. SULLIVAN:  Objection to form.
21     THE WITNESS:  I -- I mean, I don't --
22 I mean, I can't think of a million
23 different circumstances in my head right
24 now.  So, I mean, I can't say, absolutely
25 certain, that there wouldn't be a case

Page 67

D. Berardo

2 where I would give pause and think about
3 it.  I -- I mean, I -- that's why I said I
4 don't know how to answer this question.
5     If -- if there was -- if -- if there
6 was a -- if there was someone that -- that
7 raised some sort of discrimination claim, I
8 would take action on it, absolutely.
9 BY MR. THOMAS:
10     Q. Well, what happens if it -- well,
11 let's go to take a look at Exhibit 67,
12 DEFS1411.  Do you see in the second bullet
13 point where it says:
14     Women at Absolute are paid less than
15 their counterparts.  Difficult for them to
16 advance their careers and increase their
17 earnings"?
18 Do you see that?
19     A. Yes, I do.
20     Q. Did you or did you not read that
21 survey in August of 2014?
22     A. So I -- I did read the survey.  I
23 mean, again, there were likely hundreds or
24 thousands of comments.  But I did my best to
25 go through all the -- all the -- all the --

Page 68

D. Berardo

2 all the comments.
3     Q. What action did you take in regards
4 to the comment I just read you?
5     A. I don't recall.
6     Q. You don't recall examining the pay
7 practices of Absolute to see if women were
8 paid less?
9     A. No, I don't recall.
10     Q. Do you recall looking to see why it
11 was difficult for women to advance in their
12 careers and increase their earnings?
13     MR. SULLIVAN:  Objection to form.
14     THE WITNESS:  I don't recall.
15 BY MR. THOMAS:
16     Q. Is that something you would recall
17 doing?
18     MR. SULLIVAN:  Objection to form.
19     THE WITNESS:  I don't -- I don't
20 know.  I mean, I don't know if I would -- I
21 mean, it's a hard question to answer if I
22 would recall something, if I would know how
23 to -- or I would recall something that I
24 may have done in the past.  I mean, I don't
25 know how to answer that question.  I'm

Page 69

D. Berardo

2 sorry.
3 BY MR. THOMAS:
4     Q. Truthfully is how I would like you to
5 answer it.
6     MR. SULLIVAN:  Objection to form.
7     THE WITNESS:  Can you -- can you
8 please repeat the question?  Oh, so can you
9 please repeat the question?
10     MR. THOMAS:  Yeah, the court reporter
11 -- can the court reporter read it back,
12 please.
13     (REPORTER READ BACK)
14     THE WITNESS:  Correct.  And, as I
15 said, I don't recall.
16 BY MR. THOMAS:
17     Q. Are you aware of any documents
18 reflecting any action that you took whatsoever
19 regarding the complaint about discrimination
20 about pay disparities within Absolute?
21     MR. SULLIVAN:  Objection to form.
22     THE WITNESS:  I don't -- I don't
23 recall.
24 BY MR. THOMAS:
25     Q. It was one of the most important

18 (Pages 66 to 69)

D. Berardo

1  parts of your job. Is that what you had said?
2      MR. SULLIVAN:  Objection to form.
3      THE WITNESS:  Against discrimination,
4  yes, that's -- that is what I said.
5  BY MR. THOMAS:
6      Q. And the reason that you did the
7  survey, which you believe was done accurately,
8  was to find out what strategic initiatives
9  needed to be done in terms of people and
10  culture and HR at Absolute; correct?
11      MR. SULLIVAN:  Objection to form.
12      THE WITNESS:  For -- for the -- yes,
13  for HR and people and engagement, yes.
14  BY MR. THOMAS:
15      Q. And someone complained to you that
16  women are not being paid as much as their
17  counterparts and it's difficult for them to
18  advance in their careers, and you can remember
19  doing nothing about that?
20      MR. SULLIVAN:  Objection to form.
21      THE WITNESS:  I don't recall if I --
22  if we did or did not take any action on
23  this. I don't recall. I'm sorry.
24  BY MR. THOMAS:

D. Berardo

1      Q. Is this something you should have
2  taken action on?
3      MR. SULLIVAN:  Objection to form.
4      THE WITNESS:  Are you asking me --
5  BY MR. THOMAS:
6      Q. Or is it something you would have
7  ignored?
8      MR. SULLIVAN:  Objection to form.
9      THE WITNESS:  Are you asking me what
10  I would do right now?
11  BY MR. THOMAS:
12      Q. No, I'm asking you at the time, under
13  Absolute's policies, is this something that
14  you should have taken a look at?
15      MR. SULLIVAN:  Objection to form.
16      THE WITNESS:  Under Absolute --
17  BY MR. THOMAS:
18      Q. Or is it something that you should
19  have ignored?
20      MR. SULLIVAN:  Objection to form.
21      THE WITNESS:  No, I -- I don't know
22  the answer -- I don't know the answer to
23  that. I...
24  BY MR. THOMAS:

D. Berardo

1      Q. You don't know if you --
2      A. I --
3      Q. -- should have taken any action in
4  response to a complaint by an employee that
5  women are paid less than men?
6      A. So --
7      MR. SULLIVAN:  So objection to form.
8      THE WITNESS:  So this is an anonymous
9  survey, so -- so, again, if someone came to
10  me -- if someone came to me, obviously, I
11  would have taken action. You know, right
12  now, I mean, I -- I can't think of what I
13  would have --
14  BY MR. THOMAS:
15      Q. I'm not asking you right now.
16      A. So I -- I -- it's hard for my mind to
17  go back five years, so that's why I'm saying I
18  can't recall. So if you're asking me what I
19  would do now, I can tell you. I just -- I --
20  you know, I can't reverse my mind five years
21  ago.
22      Q. Why can't -- why aren't you sure
23  about what you were supposed to have done five
24  years ago?

D. Berardo

1      MR. SULLIVAN:  Objection to form.
2      THE WITNESS:  Well, because I
3  can't -- I can't recall what I did. So for
4  me to just speculate --
5  BY MR. THOMAS:
6      Q. I'm not asking you what you did. I'm
7  asking you what you should have done.
8      MR. SULLIVAN:  Objection to form.
9  BY MR. THOMAS:
10      Q. Should you have taken a look at the
11  claim that women across the board were being
12  paid less than their counterparts at Absolute?
13  Should you have looked at that?
14      MR. SULLIVAN:  Objection to form.
15      THE WITNESS:  So if I was to look at
16  this right now, I -- I -- and someone had,
17  you know, pointed this out specifically,
18  I -- I would have taken a look.
19      MR. THOMAS:  Okay. We would like any
20  documents that reflect any taking a look or
21  any investigation or anything that was done
22  by Mr. Berardo in regards to anything that
23  relates to the survey, but specifically
24  that section.

D. Berardo

1
2  BY MR. THOMAS:
3      Q. Do you remember giving the -- the
4  survey to Geoff Haydon, the new CEO?
5      A. I don't remember that, no.
6      Q. Do you remember him requesting that
7  he see the names of the employees who made the
8  comments?
9      A. I don't recall.
10      Q. Is it possible that he did?
11      MR. SULLIVAN: Objection to form.
12      THE WITNESS: I mean, anything is
13  possible. It's possible that he said that.
14  BY MR. THOMAS:
15      Q. Should -- was the survey told to
16  employees that it was going to be done
17  anonymously?
18      A. Yes, it was.
19      Q. Would there be any reason that
20  Mr. Haydon should have been able to see the
21  names of the employees that made the comments?
22      MR. SULLIVAN: Objection to form.
23      THE WITNESS: I mean, from my
24  perspective, no. That's my opinion.
25  BY MR. THOMAS:

D. Berardo

1
2      Q. But any perspective, that you're
3  aware of?
4      A. I mean, I can only give you my
5  opinion.
6      Q. Well, I'm not -- I'm not asking for
7  your opinion. But based on your role as HR
8  manager --
9      A. Sure.
10      Q. -- having conducted the survey and
11  working at Absolute, was it appropriate for
12  Mr. Haydon to see the names of the people who
13  made the comments?
14      A. Sure.
15      MR. SULLIVAN: Objection to form.
16  BY MR. THOMAS:
17      Q. From any perspective?
18      A. No. No, it would not -- it would not
19  have been appropriate.
20      Q. I would like to talk about Absolute's
21  policy when you worked there in regards to you
22  investigating complaints from employees.
23  Okay?
24      A. Sure.
25      Q. Okay. Did Absolute have a policy

D. Berardo

1
2  about investigating complaints coming from
3  employees?
4      A. You know, I don't have the policy
5  manual in -- in front of me, but I believe it
6  was in the handbook.
7      Q. What was -- what's your understanding
8  of what that policy is?
9      A. I don't -- I don't recall the
10  specific policy. I'm sorry.
11      Q. Okay. Well, let me ask you this: If
12  someone came to you and complained about how
13  they were being treated, was that -- did you
14  have a responsibility to investigate that
15  complaint?
16      A. Absolutely. If it was discrimination
17  or -- or harassment, absolutely, I had a
18  responsibility.
19      Q. Retaliation too?
20      A. Retaliation too, absolutely.
21      Q. Unfair treatment?
22      MR. SULLIVAN: Objection to form.
23      THE WITNESS: Unfair treatment of --
24  of -- of what?
25  BY MR. THOMAS:

D. Berardo

1
2      Q. That an employee comes and says
3  they're being treated unfairly by their
4  manager in the company. Do you have a duty
5  to -- did you have a duty to investigate that?
6      A. Based --
7      MR. SULLIVAN: Objection to form.
8      THE WITNESS: Based on their -- based
9  on their gender or based on their age or --
10  or based on protected grounds? Or -- or
11  just that they're not being treated fairly
12  in their opinion?
13  BY MR. THOMAS:
14      Q. Well, let's break it down into two --
15  two categories. Let's start with a complaint
16  on any basis. Just that "I'm being treated
17  unfairly." Did you have an obligation to
18  follow up to see what was going on?
19      A. Well, I would ask the employee on --
20  on what basis. You know, a lot of times,
21  there's -- oftentimes, there's always
22  disagreements between managers and employees,
23  so I wouldn't be following up --
24      Q. No, it wasn't -- sorry. Go ahead.
25      A. No, I wouldn't be following -- I was

D. Berardo

just going to say I wouldn't be following up
on every single -- every single, you know,
management/employee disagreement, unless it
was something that I had a duty to
investigate.

Q. And what did you consider those
duties to -- the duty to investigate covered
what?

A. Well, anything -- anything that -- if
there was someone who was being discriminated
on -- based on protected grounds, any -- any
sort of bullying or -- or sexual harassment.

Q. You said bullying, sexual harassment,
discriminated. Anything else?

A. I mean, if someone came to me --
any -- any sort of, like, crimes, anything --
fraud, embezzlement. I mean, anything of that
nature, anything illegal.

Q. Would there ever be a reason for --
you described the grounds that you thought you
had a duty to investigate. Would there ever
be a reason not to investigate those types of
complaints?

MR. SULLIVAN: Objection to form.

D. Berardo

THE WITNESS: Not that I'm -- not
that I'm aware of.
BY MR. THOMAS:

Q. And in addition to -- did you have
any obligation besides simply investigating
them? Did you have a duty to remedy the
problems?

MR. SULLIVAN: Objection to form.

THE WITNESS: The -- I mean, the --
the company to investigate and to -- and --
and to remedy the situation. Not just to
investigate, to substantiate the
allegation. If the allegation was
substantiated, then to ensure that -- that
it was corrected.
BY MR. THOMAS:

Q. What level of harassment by a manager
to their -- to their employee was okay at
Absolute?

MR. SULLIVAN: Objection to form.

THE WITNESS: What level of, like,
sexual harassment? Are you asking about
sexual harassment? Or what do you mean,
"harassment"?

D. Berardo

BY MR. THOMAS:

Q. Okay. Well, let's say sexual
harassment. What level of sexual harassment
was okay at Absolute?

A. There was no -- there was no level of
sexual harassment that was okay.

Q. What level of -- is it okay for a
manager at Absolute just simply to harass an
employee, even if it's not sexual?

MR. SULLIVAN: Objection to form.

THE WITNESS: I mean, I would -- I
would need to you clarify what you meant by
"harassment." If you --
BY MR. THOMAS:

Q. What do you mean by -- when you use
the word "harassment," what do you mean by
"harassment"?

A. Well, generally, harassment is sexual
harassment, if -- I mean, if a manager is
stalking someone outside of work. I mean...

Q. What happens if it's not sexual in
nature? Is it okay to be -- for a manager to
harass their employee at Absolute?

MR. SULLIVAN: Objection to form.

D. Berardo

THE WITNESS: Again, I -- I need to
understand specifically the example that
you're asking about.
BY MR. THOMAS:

Q. So there are some -- some forms of
harassment by a manager that might be okay?

MR. SULLIVAN: Objection to form.

THE WITNESS: I -- that's not what I
said.
BY MR. THOMAS:

Q. Well, what about -- why do you -- I
mean, what is confusing to you about the
question?

A. Well, harassment --

MR. SULLIVAN: Objection to form.

THE WITNESS: Harassment can be -- it
can -- it can be defined in many different
ways by many different people, so I --
BY MR. THOMAS:

Q. Give me a definition of harassment
that would be okay -- that someone could
define something as harassment that would be
okay at Absolute.

MR. SULLIVAN: Objection to form.

Page 82

D. Berardo

1
2       THE WITNESS:  I mean, the -- the way
3   I define harassment, I don't think anything
4   would be okay, if -- if --
5   BY MR. THOMAS:
6       Q. And you define it as...?
7       A. I -- I define it as kind of
8   nonbusiness -- nonbusiness-type behaviour of a
9   sexual or nonsexual nature that -- that, you
10  know, makes the other employee feel
11  uncomfortable.  I mean, again, this is just
12  off the top of my head, so it's hard for me to
13  come up with a full definition.
14      Q. We'll take that definition.  Was that
15  ever okay at Absolute?
16      MR. SULLIVAN:  Objection to form.
17      THE WITNESS:  If -- if someone was
18  harassing someone for nonbusiness reasons,
19  no, it was not okay.
20  BY MR. THOMAS:
21      Q. If they were harassing them for
22  business reasons, was it okay?
23      MR. SULLIVAN:  Objection to form.
24      THE WITNESS:  I guess I need to
25  understand -- I mean, you're asking me

Page 83

D. Berardo

1
2   the -- you're asking me harassment for
3   business reasons.  I don't -- I don't -- I
4   need to understand what your definition of
5   harassment is for me to answer that
6   question.
7   BY MR. THOMAS:
8       Q. I'm going off of your definition, and
9   you said for nonbusiness -- you -- you said
10  "for nonbusiness reasons."  So I'm asking --
11  I'm trying to understand what you're talking
12  about.  And so when you say nonbusiness
13  reasons versus business reasons, what is the
14  difference between those?
15      A. Well, there's a lot of times --
16      Q. In your -- in your -- in your view.
17      A. Sure.  There's a lot of times with a
18  manager and an employee when there are
19  uncomfortable conversations about performance;
20  correct -- changing your performance,
21  correcting performance.  And so, you know,
22  those -- those types of business conversations
23  happen in companies all the time.
24      Q. Is it okay if a manager yells at an
25  employee during a business conversation?

Page 84

D. Berardo

1
2       MR. SULLIVAN:  Objection to form.
3       THE WITNESS:  I mean, in -- my
4   view, it's not a best practice.
5       MR. THOMAS:
6       Q. Is it -- at Absolute, was that okay?
7       MR. SULLIVAN:  Objection to form.
8   BY MR. THOMAS:
9       Q. Like, was that okay for a manager to
10  do?
11      MR. SULLIVAN:  Objection to form.
12      THE WITNESS:  I mean, I -- I can't
13  speak on behalf of the company.  I mean,
14  for myself --
15  BY MR. THOMAS:
16      Q. Well, I'm asking on behalf of HR for
17  the company.
18      A. Well, I said --
19      Q. As an HR -- as an HR -- as head of
20  HR, was it okay for managers to yell at
21  employees about business things?
22      MR. SULLIVAN:  Objection to form.
23      THE WITNESS:  It's -- it's not
24  something that I would encourage.
25  Absolutely not.  Not a best practice.

Page 85

D. Berardo

1
2   BY MR. THOMAS:
3       Q. I'm not asking whether it's a best
4   practice.  I'm asking if -- was it okay at
5   Absolute for a manager to do that?
6       MR. SULLIVAN:  Objection to form.
7       THE WITNESS:  I would -- if I found
8   out the manager was doing that, I would
9   coach the manager on how to communicate a
10  bit more effectively.
11  BY MR. THOMAS:
12      Q. Which would mean not to do it?
13      A. Which would mean --
14      Q. Not to yell?
15      A. -- not to do it, yes.
16      Q. Okay.  What about falsely accusing
17  someone of stealing?  Is that something a
18  manager should do at Absolute?
19      MR. SULLIVAN:  Objection to form.
20      THE WITNESS:  Falsely accusing
21  someone of stealing.  I mean, if -- if it
22  was false, obviously, the manager shouldn't
23  be telling an employee that they're
24  stealing if they're not stealing.  I
25  mean...

Page 86

D. Berardo
1
2  BY MR. THOMAS:
3      Q. And that was not allowed at Absolute?
4      MR. SULLIVAN: Objection to form.
5  BY MR. THOMAS:
6      Q. Or was it allowed?
7      MR. SULLIVAN: Objection to form.
8      THE WITNESS: Was it allowed at
9  Absolute? I mean, are you --
10  BY MR. THOMAS:
11      Q. Was -- let me rephrase the question.
12  Was it or was it not allowed at Absolute for
13  managers to falsely accuse their employees of
14  stealing?
15      MR. SULLIVAN: Objection to form.
16      THE WITNESS: Again, I don't really
17  understand the question. You're asking me
18  if it was okay for a manager to tell an
19  employee that he or she is stealing when
20  they're not stealing. Is that what you're
21  asking me?
22  BY MR. THOMAS:
23      Q. Correct.
24      A. So I would say that --
25      Q. Yes.

Page 87

D. Berardo
1
2      A. -- that would not be okay for a
3  manager to tell an employee that they're
4  stealing when they're not stealing or when
5  there's no evidence of stealing.
6      Q. And you're saying that -- you said a
7  few things, but you're talking about under
8  Absolute policy; right? That wouldn't be
9  acceptable?
10      MR. SULLIVAN: Objection to form.
11      THE WITNESS: No, I'm not saying
12  under Absolute policy, just because I don't
13  have the policies in front of me. I -- I
14  don't recall the policies.
15  BY MR. THOMAS:
16      Q. Do you think it was -- was it your
17  understanding that it was okay for people --
18  for a manager to falsely accuse someone of
19  stealing at Absolute under Absolute's polices?
20      MR. SULLIVAN: Objection to form.
21      THE WITNESS: Again, I don't have the
22  policies in front of me, so I don't recall
23  specific policies about anything against
24  managers specifically or in the policy
25  for -- you know, anything in the policy

Page 88

D. Berardo
1
2  that would say that managers are not
3  allowed to tell employees that they are
4  stealing when they're not stealing. I
5  don't know if the policy covered that
6  specifically.
7  BY MR. THOMAS:
8      Q. It might have; it might not. Either
9  way, it could have -- Absolute -- it could
10  have been okay at Absolute for that to happen;
11  right?
12      A. I --
13      MR. SULLIVAN: Objection to form.
14      THE WITNESS: That's not what I said.
15  BY MR. THOMAS:
16      Q. Okay. Sitting here right now, is it
17  possible that under Absolute's policy, falsely
18  accusing an employee of stealing was okay?
19      MR. SULLIVAN: Objection to form.
20      THE WITNESS: I don't -- I can't
21  answer that question because I don't have
22  the policy in front of me, and I -- I don't
23  have intimate knowledge with the policy
24  right now.
25  BY MR. THOMAS:

Page 89

D. Berardo
1
2      Q. So it's possible --
3      MR. SULLIVAN: Objection to form.
4  BY MR. THOMAS:
5      Q. -- that that was okay?
6      A. I --
7      Q. Because if it's not possible, the
8  answer is, no, that wasn't allowed under
9  Absolute policy. If you say you're not sure,
10  it means maybe it's possible; maybe it isn't.
11  Right?
12      A. I mean, I'm just saying I just don't
13  recall. I don't recall --
14      Q. Okay.
15      A. -- the policy. I'm sorry.
16      Q. Maybe that sort of thing is what can
17  happen at Absolute?
18      MR. SULLIVAN: Is that a question?
19      MR. THOMAS: Yeah.
20      MR. SULLIVAN: Objection to the form
21  of that question.
22      THE WITNESS: Can you repeat the
23  question, please.
24  BY MR. THOMAS:
25      Q. So maybe it was okay at Absolute for

23 (Pages 86 to 89)

D. Berardo

1
2  managers to falsely accuse their employees of
3  stealing?  As you sit here today, that might
4  have been okay?
5         MR. SULLIVAN:  Objection to form.
6         THE WITNESS:  Well, I don't have the
7  information in front of me about the
8  policy, so I -- I can't answer whether it
9  would be okay or not okay.
10 BY MR. THOMAS:
11        Q. But maybe?
12        MR. SULLIVAN:  I'm sorry.  I didn't
13 hear that.  Can you --
14        THE COURT REPORTER:  But maybe.
15        MR. SULLIVAN:  Oh.  Objection to
16 form.
17        I'm sorry.  Was that a question again
18 or a statement?
19        MR. THOMAS:  A question.  Maybe,
20 question mark.
21        MR. SULLIVAN:  Objection to form.
22        MS. LESTRADE:  Asked and answered.
23        MR. SULLIVAN:  And asked and answered
24 multiple times.
25        THE WITNESS:  So as I have answered

D. Berardo

1
2  before, I don't have --
3  BY MR. THOMAS:
4         Q. So let me -- let me -- let me
5  rephrase the question.  As you sit here today,
6  you can't foreclose the possibility that
7  Absolute would allow managers to tell their
8  employees that they -- tell their employees
9  falsely that they were stealing stuff; right?
10        MR. SULLIVAN:  Objection to form.
11        THE WITNESS:  I mean, based on the
12 policy, I -- I just -- I don't have the
13 information to say yes or no to that.
14 BY MR. THOMAS:
15        Q. Based on what your knowledge is of
16 Absolute, do you have the ability to say yes
17 or no to that?
18        MR. SULLIVAN:  Objection to form.
19        THE WITNESS:  Based on my knowledge
20 of Absolute?  So not the policy?
21 BY MR. THOMAS:
22        Q. As serving -- as serving there in --
23 as head of HR for -- or the HR department for
24 four-plus years.
25        MR. SULLIVAN:  Objection to form.

D. Berardo

1
2         THE WITNESS:  So I think I have
3  answered the question before, that if -- do
4  I think it's okay for a manager to say to
5  an employee that he or she is stealing when
6  they're not stealing.  My opinion is
7  that -- my opinion is that that would not
8  be okay when I was the head of HR.
9  BY MR. THOMAS:
10        Q. And that would be -- and your
11 understanding is that would be against policy
12 when you were head of HR there; correct?
13        A. No.
14        MR. SULLIVAN:  Objection to form.
15        THE WITNESS:  That is -- that's not
16 my understanding.  Because I -- I have
17 already answered that I don't have
18 knowledge of the policy off the top of my
19 head, so I can't answer that question.
20 BY MR. THOMAS:
21        Q. What does -- what did Absolute policy
22 require you in HR to do to remedy harassment
23 of employees by their managers?
24        A. I don't -- I -- I don't recall the
25 specific policy.

D. Berardo

1
2         Q. In general.  Do they require you to
3  do anything or not?
4         A. In -- if someone was sexually -- if
5  someone has -- had accused someone of sexually
6  harassing?  Is that what you're asking?
7         Q. Or just harassment on any -- on any
8  basis -- on any basis, based on their
9  complaints of discrimination, based on gender.
10        A. Sure.
11        MR. SULLIVAN:  Objection to form.
12        THE WITNESS:  Sure.  If it -- if
13 there was harassment based on gender or
14 discrimination, we definitely would have to
15 investigate.
16 BY MR. THOMAS:
17        Q. When you worked at Absolute, did you
18 consider someone to be complaining about
19 discrimination only if they specifically said
20 they were being treated illegally under
21 discrimination laws?
22        MR. SULLIVAN:  Objection to form.
23        THE WITNESS:  Well, no.  I -- someone
24 could tell me -- you know, someone could
25 tell me -- you know, if someone told me --

Page 94

D. Berardo

1
2    I mean, someone doesn't have to say "I was
3    treated -- I was treated illegally based on
4    protected grounds." I mean, they would
5    likely tell me the circumstances, and then
6    we could determine if it was sexual
7    harassment or -- or bullying or -- or
8    something that they were being
9    discriminated based on protected grounds.
10   BY MR. THOMAS:
11       Q. And it wouldn't be just statements --
12   you wouldn't require them to make a statement
13   to you like "I'm being discriminated against
14   on the basis of sex" before you would you
15   consider it a --
16       A. No.
17       Q. -- complaint; correct?
18       A. No. Absolutely. Someone wouldn't
19   have to specifically say they were being
20   discriminated on the basis of sex.
21       Q. If somebody came to you and said --
22   let's say a woman came to you and said "all
23   I'm asking -- all I'm asking is to be treated
24   the same" in comparison with her male
25   employees, would you -- would that raise an

Page 95

D. Berardo

1
2    issue of discrimination with you?
3        MR. SULLIVAN: Objection to form.
4        THE WITNESS: I -- I would -- I would
5    talk to that employee to get a -- get some
6    specifics on -- on what she may be speaking
7    about.
8    BY MR. THOMAS:
9        Q. What happens if a female employee
10   came to you and said that she just wants to be
11   paid fairly? Would that -- would you consider
12   that to be something that you needed to follow
13   up on in terms of potential discrimination?
14       MR. SULLIVAN: Objection to form.
15       THE WITNESS: I would definitely talk
16   to her about specifics of -- of what she
17   would be referring to so I could -- I could
18   investigate further.
19   BY MR. THOMAS:
20       Q. What happens if a woman came to you
21   and said that she wanted to -- when she said
22   that a male employee was being paid full value
23   and that she wanted to be paid full value too
24   for her work?
25       MR. SULLIVAN: Objection to form.

Page 96

D. Berardo

1
2    BY MR. THOMAS:
3        Q. Would that have raised a concern in
4    your mind that you needed to look at potential
5    discrimination?
6        MR. SULLIVAN: Objection to form.
7        THE WITNESS: Again, I -- I would --
8    I would -- I -- I would talk to the
9    employee to get -- to gather more
10   information.
11   BY MR. THOMAS:
12       Q. Why?
13       A. Because I would understand -- want to
14   understand why the employee -- why the
15   employee is thinking that way, who is the --
16   who the employee is comparing themselves to.
17   We would need to look at, you know, probably a
18   whole bunch of different factors on, you know,
19   what job they're doing, what level they're
20   working at, what their experience, their
21   background, their education is.
22       Q. And you would follow up on -- on
23   comments like that?
24       MR. SULLIVAN: Objection to form.
25       THE WITNESS: Yeah, if someone -- if

Page 97

D. Berardo

1
2    someone came to me and -- I would
3    definitely be having that conversation with
4    that person to -- to gather more
5    information from that person.
6    BY MR. THOMAS:
7        Q. What happens if an employee came to
8    you and said that she's worried about being
9    retaliated -- it -- well, strike that.
10       What happens if an employee came to
11   you and said that she was worried that she
12   doesn't want to be known as a "troublemaker"?
13   Would that raise concerns with you?
14       MR. SULLIVAN: Objection to form.
15       THE WITNESS: Well, I mean, it
16   would -- it would definitely set off some
17   red flags in my -- in my mind. And I would
18   -- I would ask some probing questions on --
19   on why the employee felt that way.
20   BY MR. THOMAS:
21       Q. What happens if a female employee
22   came to you and said that she's being treated
23   differently than her male counterparts? What
24   would you do?
25       MR. SULLIVAN: Objection to form.

25 (Pages 94 to 97)

D. Berardo

THE WITNESS: I would ask -- I -- I would ask, again, specific questions and follow up and get -- get some more specifics from that employee.

BY MR. THOMAS:

Q. These -- is it fair to say all these types of questions that we went over would be the types of questions that would raise red flags in your mind from a discrimination point of view in HR?

MR. SULLIVAN: Objection to form.

THE WITNESS: It would cause me to ask some more questions to the employees for sure.

BY MR. THOMAS:

Q. Because, potentially, the complaints are about discrimination; right?

MR. SULLIVAN: Objection to form.

THE WITNESS: Potentially.

BY MR. THOMAS:

Q. There are other types of questions that employees would ask you that wouldn't raise any red flags, and you wouldn't need to follow up on; correct?  Because they wouldn't

D. Berardo

be suggesting discrimination; right?

MR. SULLIVAN: Objection to form.

THE WITNESS: I mean, there's -- yeah, employees could ask me a whole bunch of different questions that wouldn't raise red flags for me.

BY MR. THOMAS:

Q. Well, most -- and most of the time, when employees ask you questions, you don't feel the need to ask more probing questions to find out if they're talking about discrimination.  Is that fair to say?

MR. SULLIVAN: Objection to form.

BY MR. THOMAS:

Q. When you were at Absolute?

A. No, that's not fair to say.

Q. Do you say that most -- do you say that, most of the time employees ask you questions, you feel the need to probe more to see if there's discrimination going on?

MR. SULLIVAN: Objection to form.

THE WITNESS: It -- it depends what kind of questions they've asked -- they asked me.

D. Berardo

BY MR. THOMAS:

Q. Okay.  And, in fact, the questions we just went over would be the types of questions that would suggest potential discrimination to you; right?

MR. SULLIVAN: Objection to form.

THE WITNESS: They would cause me to ask more questions, yes.

BY MR. THOMAS:

Q. Because of discrimination; right?

A. Well, just because, in my head, I -- I would want to understand if -- yeah, if there was some sort of discrimination or -- or harassment.

Q. Now, you say that you would ask more probing questions.  How would you -- what do you mean by that?

MR. SULLIVAN: Objection to form.

THE WITNESS: I would ask some follow-up -- I mean, it depends on what they're telling me, but I would ask some follow-up questions, and I would ask for specifics so I -- so I could understand the situation.

D. Berardo

BY MR. THOMAS:

Q. Would you document what the employee told you?

MR. SULLIVAN: Objection to form.

THE WITNESS: I -- I --

BY MR. THOMAS:

Q. In response to -- in response to your questions?

MR. SULLIVAN: Objection to form.

THE WITNESS: Yeah, I -- I would -- I mean, yeah, if -- if they were coming to me for -- for -- for something that may be discriminatory, I would document it.

BY MR. THOMAS:

Q. And what sort of follow-up would you do after you documented their responses?

MR. SULLIVAN: Objection to form.

THE WITNESS: So if there was -- sorry, if there was discrimination, or if there was not discrimination?

BY MR. THOMAS:

Q. Well, once you asked the follow-up -- what would you -- let me ask you this --

A. Sure.

D. Berardo

1
2    Q. -- what would you do to further
3    investigate whether there was discrimination
4    based on what the employee said?
5        MR. SULLIVAN:  Objection to form.
6        THE WITNESS:  You know, it would --
7    it would depend on the -- it would depend
8    on the circumstances.  I mean, there could
9    be thousands of situations, so it really
10   would -- it really would depend.
11   Oftentimes, we have to look at was there
12   anyone else in the room, witnesses.  I
13   would -- you know, again, this is just
14   me -- this is what I would do -- I'm just
15   telling you what I would do right now.  Not
16   back then.
17   BY MR. THOMAS:
18       Q. I want -- I want to talk about what
19   you would do -- what you would do when you
20   were head of HR at Absolute.
21       A. Sure.  I mean, we would -- we would
22   have to investigate any sort of
23   discriminations, and we would, you know, do so
24   by -- I would do so by, you know, raising it
25   with our legal counsel to help guide us

D. Berardo

1
2    through that of -- of any -- with any sort of
3    investigations that we may have to -- we may
4    have to conduct.
5        Q. Would you raise the issues with the
6    people who were being accused of doing the
7    discrimination?
8        MR. SULLIVAN:  Objection to form.
9        THE WITNESS:  It's based on -- based
10   on the -- it's -- it's based on -- I mean,
11   it would be based on the circumstances,
12   but, oftentimes, you have to interview
13   the witnesses, and -- and those that are
14   being accused to come up with the -- with
15   the answer.
16   BY MR. THOMAS:
17       Q. Would you document those
18   interactions?
19       MR. SULLIVAN:  Objection to form.
20       THE WITNESS:  Yes, you would -- you
21   would document those interactions.
22   BY MR. THOMAS:
23       Q. Is there ever a time when, if an
24   employee raised the sorts of questions I
25   just -- well, let me -- let me go back through

D. Berardo

1
2    that.
3        Is there ever a time that an
4    employee said something to you like "all I ask
5    for is to be treated the same --" if a female
6    employee -- strike that.
7        If a female employee said something
8    like "all I ask is to be treated the same"
9    when comparing herself to male counterparts,
10   is there ever a situation where you wouldn't
11   follow up and ask questions of her about that?
12       MR. SULLIVAN:  Objection to form.
13       THE WITNESS:  So if -- I mean --
14       MR. THOMAS:  What is -- what is the
15   basis of the objection?
16       MR. SULLIVAN:  It's calling for a
17   hypothetical.
18       MR. THOMAS:  No, I'm -- okay.  Then
19   let me make it clear.
20   BY MR. THOMAS:
21       Q. Under Absolute's policy and
22   practices, as HR manager, would there ever be
23   a time that you wouldn't follow up and ask a
24   woman further questions when she says "all I
25   ask is to be treated the same" and comparing

D. Berardo

1
2    herself to male colleagues?
3        A. So, again, I can't speak to the
4    policy specifically, because I don't have it
5    in front of me right now.  I don't recall
6    specifically what it said.  But I will say
7    that if someone was in my office at Absolute
8    and she said what you just said, I would
9    always -- I would always ask a follow-up
10   question to her and -- and get more
11   information.
12       Q. Same for a female employee who says
13   that she just wants to be paid fairly?
14       A. I would ask her -- I would ask her
15   more information.
16       Q. Always?
17       MR. SULLIVAN:  Objection to form.
18       THE WITNESS:  Yeah, I would never
19   shoo that person out of my office.  I would
20   always ask some more questions.
21   BY MR. THOMAS:
22       Q. Would you always ask under -- as --
23   as 'H' -- as the head of HR, if a woman said
24   that she wants to be paid full value for her
25   work and says that male employees are being

D. Berardo

1  paid full value but she isn't, would you
2  always ask follow-up questions for that?
3         MR. SULLIVAN:  Objection to form.
4         THE WITNESS:  Yeah, I would ask
5  follow-up questions.
6         MR. THOMAS:  What is -- so what is
7  the basis of the objection, Mark?
8         MR. SULLIVAN:  Hypothetical.
9  BY MR. THOMAS:
10        Q. I'm talking about -- well, let me --
11  I'm not asking hypothetical.  I'm talking
12  about under your practices at -- as head of
13  HR, would you always follow up with a woman
14  who said -- that came to you and said "I want
15  to be paid full value for my work" and
16  compared herself to a male employee who she
17  said was being paid full value?
18        MR. SULLIVAN:  Objection to form.
19        THE WITNESS:  Yes, I would have.
20        MR. THOMAS:  What is the objection,
21  Mark?
22        MR. SULLIVAN:  Vague, ambiguous.
23        MR. THOMAS:  What is vague and
24  ambiguous about it?
25

D. Berardo

1         MR. SULLIVAN:  The circumstances
2  surrounding your -- what is, essentially, a
3  hypothetical.  I don't follow them.  I
4  think it's -- I think they're vague and
5  ambiguous.  I'm not directing --
6         MR. THOMAS:  Okay.
7  BY MR. THOMAS:
8         Q. Go ahead, Mr. Berardo.
9         MR. SULLIVAN:  -- him not to answer,
10  but I -- I have asserted objection based on
11  form.
12  BY MR. THOMAS:
13        Q. Go ahead, Mr. Berardo.  You would
14  always ask -- correct? -- under those
15  circumstances?
16        A. Yes, I would always ask follow-up
17  questions.
18        Q. If a female employee said she didn't
19  want to be known as a troublemaker when she
20  was complaining about her treatment by her
21  male manager, would you always ask follow-up
22  questions for that?
23        A. Yes, I --
24        MR. SULLIVAN:  Objection to form.
25

D. Berardo

1         THE WITNESS:  Yes, I would ask
2  follow-up questions.
3  BY MR. THOMAS:
4         Q. And you would always ask follow-up
5  questions if a female employee told you that
6  she was being treated differently than her
7  male counterparts; correct?
8         MR. SULLIVAN:  Objection to form.
9         THE WITNESS:  I would ask follow-up
10  questions, yes.
11  BY MR. THOMAS:
12        Q. And let me just ask you -- I have
13  more to go here.  Are you -- in terms of a
14  lunch -- I -- I mean, I'm in a different time
15  zone than you.  So I'm -- I don't need a lunch
16  break, but I don't know what you all are
17  thinking.  Do you want a -- do you need a
18  lunch break?  Do you want to take some time
19  now?  Or what is your thought?
20        MR. SULLIVAN:  How are you doing?
21        THE WITNESS:  I'm -- I'm good, if you
22  are.
23        MR. SULLIVAN:  Yeah, we -- we can
24  continue going.  What -- I -- is --
25

D. Berardo

1         MS. LESTRADE:  Yeah.
2         MR. SULLIVAN:  -- everyone else good
3  with that?
4         MS. LESTRADE:  Sure.  We've got our
5  lunches here.
6         MR. SULLIVAN:  Yeah.
7         MR. THOMAS:  Okay.  Fine.
8         MR. SULLIVAN:  Let's ask the court
9  reporter.  You will need a lunch break.
10  What -- can you go another half hour, or do
11  you want to stop now?
12        THE COURT REPORTER:  Yeah,
13  absolutely.  Another half hour is fine.
14        MR. SULLIVAN:  All right.  Why don't
15  we go another half hour and see where we
16  are then?
17        MR. THOMAS:  Okay.
18  BY MR. THOMAS:
19        Q. Mr. Berardo, let me also say that,
20  about today's deposition, if at any point you
21  need a break, of course just let us know.
22  We'll be glad to accommodate it.  If I've got
23  a question pending, I may just want to finish
24  off the question and answer before, but we can
25

Page 110

1          D. Berardo
2   take a break.
3       A. Sure.  Thank you.
4       MR. SULLIVAN:  Do you need a break
5   now, or are you --
6       THE WITNESS:  I'm good right now.
7   BY MR. THOMAS:
8       Q. And -- sorry, go ahead.  And then
9   also, too, if you're -- and I think we have
10  been doing this so far, but if you have any
11  problems understanding the question I'm asking
12  you, will you be sure to let me know before
13  you answer it?
14      A. Yes.  Yeah.
15      Q. And -- and you -- also, too, if I ask
16  you a question and it can be answered several
17  different ways and you're not sure which way
18  to answer it, just let me know that too before
19  you answer, if that's okay.
20      A. Sure, yeah.
21      Q. Were you aware about Errol Olsen
22  engaging in a nude swim when he was -- when he
23  was at -- working at Absolute?
24      MR. SULLIVAN:  Objection to form.
25      THE WITNESS:  So I -- I came on after

Page 111

1          D. Berardo
2   that incident, but -- but I -- I was made
3   -- made aware of that incident.
4   BY MR. THOMAS:
5       Q. Who made you aware of it?
6       A. I don't -- I don't recall
7   specifically.  I don't recall specifically who
8   made me aware.
9       Q. Was it told to you through official
10  channels, or was it sort of just gossip?
11      A. It was -- it was -- it was most
12  likely gossip.
13      Q. And what did you hear about what he
14  had done?
15      A. So from -- from what I recall, it
16  was -- it was -- there was the CEO, the CFO,
17  and the COO, and they went skinny-dipping in a
18  pool.
19      Q. Is that the most significant part of
20  it?
21      A. From -- from what I recall.
22      Q. It was not that significant that it
23  was in front of a whole bunch of employees?
24      A. No, so, sorry, it was -- so from --
25  from -- from what I recall, from what was told

Page 112

1          D. Berardo
2   to me, it was in front of -- I'm not sure if
3   it was a whole bunch of employees.  It was in
4   front of at least --
5       Q. Well, it was at least -- at least in
6   front of a number of employees; correct?
7       A. I -- I would say at least in front of
8   one employee.  There may have been more.
9       Q. So who -- who was that employee?
10      A. I don't know.  I -- I wasn't there,
11  and so I don't have specifics.
12      Q. Was it done at a company event?
13      A. I don't know.
14      Q. At the pool that the company -- or
15  the hotel the company was staying at?
16      A. I don't know.
17      Q. And Mr. Olsen was your -- was the
18  one -- the head of HR?  I mean, or who -- that
19  -- into who HR reported?
20      MR. SULLIVAN:  Objection to form.
21      THE WITNESS:  When I -- when I -- he
22  was -- he was the -- he -- I reported in to
23  him when I became the HR manager.  Previous to that, Leah had
24  reported in to the CEO.
25  BY MR. THOMAS:

Page 113

1          D. Berardo
2       Q. Okay.  So when you came onboard, they
3   shifted over your forwarding relationship to
4   the guy who had swum naked in front of at
5   least one employee, if not more, at a company
6   event previously; correct?
7       MR. SULLIVAN:  Objection to form.
8       THE WITNESS:  I -- I started
9   reporting to Errol when I became the HR
10  manager, correct.
11  BY MR. THOMAS:
12      Q. Did you think it was weird at all
13  that you were reporting to a person who --
14  well, first of all, what -- what do you think
15  of the CFO swimming naked in front of
16  employees at a company event --
17      MR. SULLIVAN:  Objection --
18  BY MR. THOMAS:
19      Q. -- from an HR perspective?
20      MR. SULLIVAN:  Objection to form.
21      THE WITNESS:  So you're asking for my
22  personal opinion?
23  BY MR. THOMAS:
24      Q. No, your opinion as an HR -- I mean,
25  as -- with your background in HR --

D. Berardo

1
2      A. Sure.
3      Q. -- and working at Absolute.
4         MR. SULLIVAN:  Objection to form.
5         THE WITNESS:  Sure.  Obviously, it's
6   inappropriate.  Absolutely inappropriate.
7   BY MR. THOMAS:
8      Q. And was there any discipline taken in
9   terms of Mr. Olsen?
10      A. I wasn't --
11         MR. SULLIVAN:  Objection to form.
12         THE WITNESS:  I wasn't at the company
13   at that time.  I -- I don't know.
14   BY MR. THOMAS:
15      Q. Did it concern you at all that you
16   were suddenly reporting in HR -- in to someone
17   who had engaged in absolutely inappropriate
18   behaviour?
19         MR. SULLIVAN:  Objection to form.
20         THE WITNESS:  I don't recall -- I
21   don't recall how I felt about it.
22   BY MR. THOMAS:
23      Q. How do you feel about it now?
24         MR. SULLIVAN:  Objection to form.
25         THE WITNESS:  How do I feel about it

D. Berardo

1
2   now?  You know -- so, again, if you're
3   asking for my personal opinion, I don't
4   know the --
5   BY MR. THOMAS:
6      Q. No, your -- your opinion as -- with
7   your background in HR.
8         MR. SULLIVAN:  Objection to form.
9   BY MR. THOMAS:
10      Q. Should HR be reporting in to the guy
11   who engaged in absolutely inappropriate
12   behaviour with other employees of a sexual
13   nature?
14         MR. SULLIVAN:  Objection to form.
15         THE WITNESS:  Well, there was --
16   there was no other -- there was no other
17   choice at that point on where to report in
18   to, so under the circumstances --
19   BY MR. THOMAS:
20      Q. So it was fine?
21         MR. SULLIVAN:  Objection to form.
22         THE WITNESS:  Under the
23   circumstances, that's who I reported in to.
24   BY MR. THOMAS:
25      Q. You could have reported in to the

D. Berardo

1
2   CEO.
3         MR. SULLIVAN:  Objection to form.
4   BY MR. THOMAS:
5      Q. As was done before; right?
6      A. The CEO was part of that incident.
7      Q. Oh, okay.  So, yeah, I guess we have
8   the CEO engaged in absolutely inappropriate
9   behaviour; right?
10         MR. SULLIVAN:  Objection to form.
11         THE WITNESS:  Those were -- that's --
12   that was the gossip that I heard.  Again, I
13   wasn't at the company at that time.
14   BY MR. THOMAS:
15      Q. But assuming it to be true, that they
16   were swimming naked in front of at least one
17   employee at a company event -- the CEO did
18   that; is that correct?
19         MR. SULLIVAN:  Objection to form.
20         THE WITNESS:  Again, this was -- it's
21   gossip.  So I wasn't there.  I -- I don't
22   know for certain.
23   BY MR. THOMAS:
24      Q. Who was it, to your understanding,
25   that engaged in a nude swim in front of

D. Berardo

1
2   employees?
3         MR. SULLIVAN:  Objection to form.
4         THE WITNESS:  I mean, the gossip that
5   I heard was the -- were -- was the -- were the CEO, the CFO, and
6   the COO.
7   BY MR. THOMAS:
8      Q. From an HR perspective, what -- what
9   does that make you feel about Absolute as the
10   company?
11         MR. SULLIVAN:  Objection.
12   BY MR. THOMAS:
13      Q. That the CEO, CFO, and COO are
14   swimming naked in front of employees at a
15   company event?
16         MR. SULLIVAN:  Objection to form.
17         THE WITNESS:  As I mentioned before,
18   it -- I -- I would feel that that's
19   completely inappropriate.
20   BY MR. THOMAS:
21      Q. And what did you feel about working
22   in the HR role for a company that had the top
23   level management engaging in that behaviour?
24         MR. SULLIVAN:  Objection to form.
25         THE WITNESS:  Well, so me and my

D. Berardo

previous manager felt that we could add
some professional capabilities and
professional HR support to the company, so
we -- we felt that we could make a positive
impact.
BY MR. THOMAS:
    Q. And so when you say there really
wasn't anyone -- there wasn't really any other
choice, the reason there wasn't any other
choice was because the entire top management
of the company, you understood, had engaged in
absolutely inappropriate behaviour, so you're
going to be stuck with one of them.  Right?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  So, I mean, from the
gossip that I heard -- again, I wasn't
there -- I mean, that was my opinion.  I
mean...
BY MR. THOMAS:
    Q. What does that symbolize to you about
the culture of Absolute?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  The culture of Absolute
when?

D. Berardo
BY MR. THOMAS:
    Q. When you started working at Absolute.
What did that symbolize for you about the
culture at Absolute?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  Well, I think the
culture at Absolute, when I started,
definitely needed some -- it definitely
needed some work.  And -- and -- and that's
why, you know, when our -- our founder CEO
resigned and we went on a search for a new
CEO, brought in some new sales
professionals, that's why I felt it was a
positive -- those were -- those were
positive developments.
BY MR. THOMAS:
    Q. Why did -- why did the culture need
changing, from your HR perspective?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  Typically, with founder
CEOs, you know, they -- they -- they hold
the company near and dear.  They don't like
a lot of change.  So I felt for the company
to take it to the next level, that it

D. Berardo
needed some outside help.
BY MR. THOMAS:
    Q. Because...?
    A. I mean, from a business perspective,
understanding the importance of HR.  That's
just from my perspective.  From a sales
perspective, from a product's perspective, I
think an outside person can provide a lot of
value.
    Q. And one of the -- one of the bad
things about the culture at Absolute was the
top three people in the company would swim
naked at a company event in front of other
employees.  That was the culture; correct?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  I wouldn't define
the --
BY MR. THOMAS:
    Q. That needed help?
    A. No, I -- I -- I wouldn't define the
culture as -- from that specific incident.
    Q. Isn't that typical of the way that --
it was -- it was acceptable for that to happen
at Absolute; right?

D. Berardo
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  I wasn't there at the
time, so I can't say if it was acceptable
or not acceptable.
BY MR. THOMAS:
    Q. Well, let's talk about Errol Olsen
who was one of the three people.  Where is he
today?
    A. My understanding is that he's still
at Absolute.
    Q. M'mm-hmm.  What -- what position had
he held when you were looking for a new CEO?
    A. He was interim CEO.
    Q. M'mm-hmm.  Was that a good -- a good
way to have the -- the culture of the company,
from your HR perspective?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  I mean, from my
perspective, Errol -- Errol was a very --
he was a highly engaged leader that really
cared about people.  That was my --
BY MR. THOMAS:
    Q. Are you referring to the nude swim as
being highly engaged and very caring about

D. Berardo

1
2  people?
3       MR. SULLIVAN:  Objection to form.
4  BY MR. THOMAS:
5       Q. Doing -- doing that in front of other
6  employees, that's very caring?
7       A. No, that's -- that's not what I
8  was --
9       Q. It's --
10      A. -- referring to.
11      Q. -- certainly very engaged.  I would
12  agree with you there.
13      MR. SULLIVAN:  Objection to form.
14      THE WITNESS:  That's not what I was
15  referring to.
16  BY MR. THOMAS:
17      Q. Okay.  Well, would that be an example
18  of him being highly engaged, jumping in a pool
19  naked in front of other employees?
20      MR. SULLIVAN:  Objection to form.
21      THE WITNESS:  That would not be an
22  example of that, no.
23  BY MR. THOMAS:
24      Q. Okay.  Would that be an example of
25  him -- well, why -- well, why don't you -- I

D. Berardo

1
2  mean, here is a guy who engaged in that
3  behaviour and managed to stay as CFO of the
4  company -- to come in from CEO and stay as
5  CFO.  How -- how were -- did your -- how were
6  you able to change that culture?
7       MR. SULLIVAN:  Objection to form.
8  BY MR. THOMAS:
9       Q. Where someone -- where someone can
10  engage in absolutely inappropriate behaviour
11  and have that sort of career in the company?
12      MR. SULLIVAN:  Objection to form.
13      THE WITNESS:  So I think that's --
14  that's more of a question for the board of
15  directors.  From -- from my -- all my
16  interactions with Errol, he was always
17  respectful in his communication to me, to
18  employees.  So, I mean -- and -- and he was
19  very supportive of us creating a very
20  engaged workforce.
21  BY MR. THOMAS:
22      Q. And he was the one chosen to have HR
23  report in to him as well; correct?
24      MR. SULLIVAN:  Objection to form.
25      THE WITNESS:  Yes.  I reported in to

D. Berardo

1
2  him when I became the HR manager.
3  BY MR. THOMAS:
4       Q. When did you become aware of Thomas
5  Kenny's comments about Absolute's hiring
6  criteria during the New York -- Westin
7  New York City meeting in April 2015?
8       MR. SULLIVAN:  Objection to form.
9       THE WITNESS:  I became aware of it
10  once Mary was terminated and we were in
11  discussions with her lawyer, and the lawyer
12  brought up the comment to us.
13  BY MR. THOMAS:
14      Q. Was it a failure on the part of HR
15  that you didn't become aware of that until
16  someone threatened to file a lawsuit?
17      MR. SULLIVAN:  Objection to form.
18      THE WITNESS:  I -- I would --
19  BY MR. THOMAS:
20      Q. Months later?
21      A. No.  I don't know how we would have
22  had this information unless the employee came
23  forward with the information.
24      Q. How many people were in the meeting?
25      A. I don't recall specifically.  I

D. Berardo

1
2  wasn't at the meeting.
3       MR. THOMAS:  Okay.  All right.  If
4  the court reporter can get Exhibit 38 for
5  the witness, Kenny 38.  We can go on or off
6  the record.  It does not matter to me.
7       THE COURT REPORTER:  It's fine.
8  BY MR. THOMAS:
9       Q. All right.  Once you have the
10  document, I would like you to return -- I
11  would like you to turn to response to
12  interrogatory 15, which is on page 17.
13      A. Number 15, sorry?
14      Q. Yeah.  Actually, I mean, before we
15  even go to that, I mean, would you -- would
16  you have expected in HR that you should have
17  been informed of the comments that Thomas
18  Kenny made?
19      MR. SULLIVAN:  Objection to form.
20      THE WITNESS:  If someone had taken
21  offence to them, I would -- I would have
22  appreciated someone coming to talk to me
23  about it.
24  BY MR. THOMAS:
25      Q. What about even if someone hadn't

D. Berardo

1  taken offence to them, just the fact that they
2  were being put out there as the hiring
3  criteria for Absolute.  Is it something you
4  would have liked to have been told about?
5      MR. SULLIVAN:  Objection to form.
6      THE WITNESS:  I don't think that it
7  was -- I mean, my opinion is that it was
8  not being put out as a hiring criteria.
9  BY MR. THOMAS:
10     Q.  Or, I mean, was it -- were there --
11  well, did -- well, let me ask you this:  Did
12  you understand that Mr. Kenny said that
13  this -- that he was referring to the type of
14  people that Geoff Haydon wanted to have hired
15  in the company?
16     MR. SULLIVAN:  Objection to form.
17     THE WITNESS:  Is there -- sorry, can
18  I -- can I look at the quote again?
19  Because -- is there --
20  BY MR. THOMAS:
21     Q.  All right.  We'll -- yeah, we'll --
22  we can go there.  Hang on here.
23     A.  Sure.
24     MR. THOMAS:  If the court reporter

D. Berardo

1  could get Exhibits 36 and 37, Kenny 36 and
2  Kenny 37 for the witness.
3  BY MR. THOMAS:
4      Q.  What I would ask you --
5      A.  This is 38.
6      Q.  -- to do, Mr. Berardo, is read over
7  Exhibit 36 and 37, and then I'm going to ask
8  you some questions about them.
9      A.  Sure.
10  This is 37.
11     THE COURT REPORTER:  Yeah, and then
12  what is the next one?
13     THE WITNESS:  This is 38.
14  BY MR. THOMAS:
15     Q.  And I believe if we go in
16  chronological order -- you can take a look --
17  but I think Exhibit 37 -- oh, I'm sorry.
18  Wait, no.  Actually, this is -- yeah, 36 takes
19  place chronologically before Exhibit 37,
20  but --
21     MR. SULLIVAN:  Nelson, the court
22  reporter has not yet located Exhibit 36.
23     MR. THOMAS:  Okay.  All right.
24  Thank you.

D. Berardo

1      THE COURT REPORTER:  Can we actually
2  go off the record?
3      VIDEOGRAPHER:  Going off record.  The
4  time is 1:45.
5      (PROCEEDINGS RECESSED AT 1:45 P.M.)
6      (PROCEEDINGS RECONVENED AT 2:44 P.M.)
7      VIDEOGRAPHER:  We're back on the
8  record.  The time is 2:44.
9  BY MR. THOMAS:
10     Q.  All right.  Hey.  Thank you very
11  much.
12     Mr. Berardo, we'll go over those
13  exhibits in just a second.
14     A.  Sure.
15     Q.  Before I do that, one follow-up
16  question I had for you was you -- when we were
17  talking about the nude swim that the COO, CEO,
18  and CFO participated in, you said you think
19  there was one other -- one other employee
20  present -- or at least one other employee that
21  you thought might be present.  Who was that?
22     MR. THOMAS:  Objection to form.
23     THE WITNESS:  So, sorry, I -- I don't
24  know.  I -- I wasn't there.  I didn't read

D. Berardo

1  any reports.  Just pure gossip and
2  speculation.
3  BY MR. THOMAS:
4      Q.  Yeah, sure.
5      A.  So I don't know.
6      Q.  I will take your gossip and
7  speculation.
8      A.  Oh, I don't -- I don't -- wouldn't
9  know who that employee was.  I was just
10  speculating that there would be at least one
11  employee there, if there was -- you know, it
12  turned out to be an issue.
13     Q.  Were you aware that an employee
14  posted a Facebook page about it?
15     A.  I was not, no.
16     Q.  Okay.  All right.  So have you had a
17  chance to look at Exhibits 36 and 37?
18     A.  I have not, no.
19     Q.  Okay.  Why don't you go ahead and
20  take a look.
21     A.  Sure.  Okay.
22     Q.  So I guess the first question I have
23  for you is, turning to Exhibit 36, page
24  DEF9807, did you understand that the comment

D. Berardo

1
2  at issue was "the CEO does not want to hire
3  people who are at the end of their rainbow; he
4  just wants to hire guys who are athletes, talk
5  trash, and are aggressive"?
6      A. Yeah, I believe that, just from my
7  recollection, that was the quote that you --
8  that you had provided to us that -- that
9  Thomas allegedly said.
10     Q. Do you consider that to be referring
11 to hiring criteria?
12     A. Absolutely not.
13     Q. When it says "the CEO does not want
14 to hire," you don't think that's hiring
15 criteria?
16     A. I -- I -- recruiting and hiring to me
17 meant at no time did -- did -- did this ever
18 get sent to us to hire, you know...
19     Q. I'm not asking that. I'm asking you,
20 though, the statement "the CEO does not want
21 to hire blank, blank, blank," that is a
22 reference, whether true or not, to hiring
23 criteria; correct?
24         MR. SULLIVAN: Objection to form.
25         THE WITNESS: So you're asking for my

D. Berardo

1
2  opinion?
3  BY MR. THOMAS:
4      Q. No, I'm asking for -- all my
5  questions today will be you with your HR
6  background.
7      A. So if someone -- yeah, so if -- if
8  someone said to me "the CEO does not want to
9  hire," that would refer to hiring some -- you
10 know, what he does -- who he does and doesn't
11 want to hire, sure.
12     Q. Okay. Now, I think you're also
13 saying that what was said was -- was not --
14 did not accurately reflect the company's
15 hiring criteria; right?
16     A. This -- this does not reflect the
17 company's hiring criteria, no.
18     Q. Would you have expected employees to
19 tell you about statements like this that were
20 made at company events?
21         MR. SULLIVAN: Objection to form.
22         THE WITNESS: Yeah, I mean, if
23 they -- if they -- if they took offence to
24 it or --
25 BY MR. THOMAS:

D. Berardo

1
2      Q. Even if -- even if they didn't take
3  offence.
4          MR. SULLIVAN: Objection to form.
5          THE WITNESS: "The CEO does not want
6  to hire people who are at the end of their
7  rainbow. He just wants to hire guys who
8  are athletes, talk trash, and are
9  aggressive." I mean, as the head of HR, I
10 would have liked if someone would have, you
11 know, brought this to my attention, if --
12 if -- if it was said.
13 BY MR. THOMAS:
14     Q. And no one brought it your
15 attention -- correct? -- until this lawsuit?
16     A. That's correct.
17     Q. Now, is it true that Thomas Kenny did
18 not deny that he made these statements?
19         MR. SULLIVAN: Objection to form.
20         THE WITNESS: So just referring back
21 to the email, so I said Thomas does not --
22 does not deny that he said these comments,
23 but he said that they were taken out of
24 context. So -- so that's -- you know,
25 that's a fact that is in the -- that is in

D. Berardo

1
2  the exhibit.
3  BY MR. THOMAS:
4      Q. And that's a fact that you recorded;
5  right?
6      A. That's correct.
7      Q. And that you accurately recorded?
8      A. I -- I would presume I accurately --
9  I accurately recorded this, yes.
10     Q. Did Thomas ever deny to you that he
11 made these comments?
12         MR. SULLIVAN: Objection to form.
13         THE WITNESS: From what I recall,
14 he -- I mean, when I had the conversation
15 with him, I don't think he ever admitted
16 that he said -- he said the -- you know, he
17 said it exactly as quoted. You know, so I
18 don't -- I don't recall if --
19 BY MR. THOMAS:
20     Q. What did he -- what did he say he
21 said?
22     A. I don't -- I don't recall -- what I
23 recall is kind of in the email and how he --
24 how he would have explained that, if he had
25 said -- if he had said "end of the rainbow,"

Page 134

D. Berardo

1  what he was referring to -- you know, says he
2  was referring to those that are "coasting in
3  their careers and just collecting a
4  paycheque."
5      Q. Was that him denying the comment was
6  made?
7      A. I don't think that was him denying
8  the comment was made, no.
9      Q. Did he ever deny to you that the
10  comment was made?
11      MR. SULLIVAN: Objection to form.
12      THE WITNESS: I don't -- I don't -- I
13  don't recall him ever admitting that the --
14  that the comment was made exactly how it
15  was laid out.
16  BY MR. THOMAS:
17      Q. My question to you is did he ever
18  deny making the comment?
19      A. I -- I don't remember. I don't
20  recall if he ever denied it or not.
21      Q. And, in fact, if you turn to
22  Exhibit 37, you asked him three main
23  questions. "Where does this statement come
24  from?"
25

Page 135

D. Berardo

1      A. Right.
2      Q. And he said to you he was referring
3  to the environment where Geoff came from, not
4  a specific quote from Geoff.
5      A. Okay.
6      Q. Right? Is that what he told you?
7      A. I would presume so, if it's -- if
8  it's on here. I would have recorded this
9  accurately.
10      Q. And you also would have recorded
11  accurately his statement to you Geoff never
12  said the statement to TK?
13      A. If that's what he said and I wrote
14  down, that would be accurate.
15      Q. Well, I'm asking you -- well, let's
16  go -- let's -- let's go through -- let's start
17  with Exhibit 36.
18      A. Sure.
19      Q. Anything that you have written in 36
20  that is not accurate?
21      A. Again, I -- I can only presume five
22  years ago or four years ago, whenever I wrote
23  this down, that I would -- I would only have
24  written down accurate -- accurate things. So
25

Page 136

D. Berardo

1  everything in here --
2      Q. I'm asking you -- so -- so is there
3  any -- do you have any reason to believe that
4  any statement of yours in Exhibit Kenny 36 is
5  inaccurate?
6      A. No, I have no reason to believe that.
7      Q. Turning to Exhibit 37, do you have
8  any reason to believe that any statement that
9  you wrote in Exhibit 37 is inaccurate?
10      A. No.
11      Q. Do you remember anything in
12  Exhibit 36 from those conversations that you
13  relate that you left out?
14      A. Not that I recall.
15      Q. Any --
16      A. I --
17      Q. -- statements that related to the
18  conversations you had in Exhibit 37 that you
19  left out?
20      A. No. I mean, I -- I can't recall the
21  actual conversation in my mind.
22      Q. So is there anything you can remember
23  leaving out in Exhibit 37?
24      A. No. I don't recall the conversation,
25

Page 137

D. Berardo

1  so --- I -- I don't recall the conversation.
2  So, therefore, you know, it's hard for me to
3  answer that question, if I left anything out,
4  because I don't recall the conversation.
5      Q. In Exhibit 38 and 37, you were
6  sending the information to your in-house
7  lawyer, Oliver de Geest, and your outside
8  lawyer, Aaron Goldstein. Correct?
9      A. Yes.
10      Q. Would you have had every incentive to
11  be accurate and complete in what you wrote up
12  to them?
13      MR. SULLIVAN: Objection to form.
14      THE WITNESS: Well, I would -- I
15  would have only told them -- I would have
16  only told them the truth. Absolutely.
17  BY MR. THOMAS:
18      Q. And would there be any reason that
19  you would have left out any important
20  information to them from these conversations?
21      MR. SULLIVAN: Objection to form.
22      THE WITNESS: Not -- not that I
23  recall. I don't recall the conversation,
24  so it's hard -- it's hard --
25

35 (Pages 134 to 137)

D. Berardo

BY MR. THOMAS:
Q. My question is -- my question to you
is different. My question to you is is there
any reason you would have not been complete in
describing the conversation that you occur --
that occurred with Mr. Kenny --
        MR. SULLIVAN: Objection to form.
BY MR. THOMAS:
Q. -- on any important point?
A. Nothing that I can think of.
Q. Now, on page 36, you said that you
spoke to seven people from the meeting. Do
you see that?
A. Oh, Exhibit 36?
Q. Yeah.
A. Yeah, I do.
Q. Who were those seven people?
A. I don't -- I don't recall their
names.
Q. Two women who were present recalled
the statement. Do you see that?
A. I do see that, yes.
Q. And brushed it off. They "know how
TK is." Do you see that?

D. Berardo

A. I do see that, yes.
Q. And they did interpret it in a
negative way; is that correct?
A. Yes, I do see that.
Q. Did it concern you, as head of HR,
that the two women you interviewed viewed the
comment in a negative way?
        MR. SULLIVAN: Objection to form.
        THE WITNESS: So, I mean, I can't
remember how I -- I felt when I spoke with
them. I will say, as the head of HR, yeah,
it would concern me.
BY MR. THOMAS:
Q. And did it concern you that they
thought that they -- they "know how TK is" --
        MR. SULLIVAN: Objection to form.
BY MR. THOMAS:
Q. -- in terms of him making comments
like that?
A. I can't say that was in reference to
him making comments like that. I'm not sure
what that -- what that was reference -- what
-- what that exactly was referencing.
Q. And, now, you said you would have

D. Berardo

expected someone at Absolute who was bothered
by the comment to -- that you would have
expected to have heard about it; correct?
        MR. SULLIVAN: Objection to form.
BY MR. THOMAS:
Q. At the time.
A. I would have -- I would have expected
it -- I would have -- I mean, I would -- I
would have liked someone to raise it, if -- if
they felt offended by it, yes.
Q. And these people did interpret it in
a negative way, didn't they?
        MR. SULLIVAN: Objection to form.
        THE WITNESS: Yeah. From that
statement, yes.
BY MR. THOMAS:
Q. And they didn't feel comfortable
raising it with you, did they?
        MR. SULLIVAN: Objection to form.
        THE WITNESS: So I -- I can't
interpret how they felt.
BY MR. THOMAS:
Q. No, my question to you is they did
not -- well, I -- they never raised it --

D. Berardo

strike that.
        They never raised it with you, did
they?
A. They did not raise it, correct.
Q. Let's go back to Exhibit 67.
A. 67?
Q. And if you would go to page
DEFS1411 -- and, actually, no, I'm sorry.
Well, let's look at that. On DEFS -- I'm
sorry. Yeah, let's look at DEFS1411, the
middle of that second bullet where it talks
about the lack of female representation,
diversity of the company, the fact that women
are paid less and can't advance their careers.
        And then go to the comment on page
DEFS1395 where the respondent said:
        The current leadership of Todd Awtry
and Thomas Kenny is not receptive to any
kind of feedback."
And DEFS1397, the second bullet below
"comments," which says:
        Staff are afraid to truly speak about
management. Not encouraged. If you speak
up, you will lose your job."

D. Berardo

So compare those comments from the survey back
in 2014 with the culture in 2015 that felt
uncomfortable when comments are made about
hiring criteria and raising them with HR.  How
much had changed?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  Well, I mean, you're --
    you're picking one comment out of, you
    know...
BY MR. THOMAS:
    Q. I picked three.
    A. Well, three comments.  It could be
the same person out of 300-plus people.  So I
don't think that one comment would --
    Q. So three comments.
    A. Sure -- those three comments is
representative of the culture of -- of
Absolute or the culture of speaking up.
    Q. Well, it's representative in 2015
that two women who thought these comments were
negative towards them and typical of Thomas
Kenny didn't feel comfortable mentioning that
to you.  Correct?  You had to find out through
a lawsuit?

D. Berardo

        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  So, you know, what I
    would say is that I don't know how they
    felt or why they didn't bring it up, but I
    think it would be speculation to say that
    they didn't bring it up because they felt
    uncomfortable.
BY MR. THOMAS:
    Q. Do you know any other reason why they
wouldn't bring it up to HR?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  It could be because
    they just brushed it off as -- as no big
    deal.
BY MR. THOMAS:
    Q. Typical Thomas Kenny, the way he is?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  I don't know.  I would
    -- I would be speculating.  It would be
    best to speak to these witnesses.
BY MR. THOMAS:
    Q. I don't think -- I don't think you
would be speculating about that, because they
told you they knew that's how -- they brushed

D. Berardo

it off because they knew that's how Thomas
Kenny was.
    A. But --
        MR. SULLIVAN:  Objection to form.  Is
    that a question?
        MR. THOMAS:  Yeah.
BY MR. THOMAS:
    Q. I don't think you're speculating, are
you?  Because that's what they told you?
    A. As I --
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  As I mentioned before,
    they "know how TK is," I -- I don't have
    any context or remember any context on why
    they said that or what they meant by that.
BY MR. THOMAS:
    Q. Did any red flags go off with you
when you found out that two female employees
felt that they were receiving negative
comments from their -- the executive vice
president of sales, and they didn't feel
comfortable coming to you?  And you knew there
was people in the past had said that they
weren't comfortable raising issues about

D. Berardo

Thomas Kenny?  Did any red flags go off in
your head at this --
        MS. LEWIS:  That's too vague.
        MR. THOMAS:
    Q. -- point?
    A. So --
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  So I don't know --
    you're saying that they didn't feel
    comfortable coming to me, and I think
    that's a misrepresentation of the facts.
    Unless they said that --
BY MR. THOMAS:
    Q. Well, they didn't come to you.  Did
it raise a red flag to you that they didn't
come to you and people had reported being
uncomfortable about raising issues about
Thomas Kenny?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  Well, I spoke with them
    about it, and they felt comfortable
    speaking with me when I spoke to them about
    it.
BY MR. THOMAS:



Page 146

D. Berardo

1
2      Q. So this didn't raise any red flags to
3   you, then?
4          MR. SULLIVAN: Objection to form.
5          THE WITNESS: I mean, it -- when
6      would it have raised red flags? After the
7      fact -- after when I spoke with them?
8   BY MR. THOMAS:
9      Q. I'm just asking you if it did or
10  didn't. During the conversation, after the
11  conversation, at any point --
12     A. It --
13     Q. -- did it raise any red flags with
14  you?
15     A. It didn't. Because from -- from --
16  what I recall of the conversation is that
17  they -- they didn't -- you know, again, they
18  -- they -- they brushed it off. They didn't
19  view it as discriminatory.
20     Q. Well, why did they brush it off
21  again? I -- we keep coming back to that. Why
22  did they brush it off?
23         MR. SULLIVAN: Objection to form.
24         THE WITNESS: I don't know. I don't
25  -- I don't recall.

Page 147

D. Berardo

1
2   BY MR. THOMAS:
3      Q. Why did they tell you they brushed it
4   off?
5      A. I don't recall.
6      Q. Why don't -- what did -- what did you
7   say in your email that -- of why they brushed
8   it off?
9      A. Well, it -- it says there they "know
10  how TK is."
11     Q. M'mm-hmm. What do you -- red flags
12  didn't go off in your head when two females
13  tell you that they brushed off negative sexual
14  discriminatory comments from their manager
15  because they knew that's how he is?
16         MR. SULLIVAN: Objection to form.
17         THE WITNESS: We were -- we were
18     investigating this comment, so it was a bit
19     too late for red flags to go off in my
20     head, because we were already investigating
21     the comment.
22  BY MR. THOMAS:
23     Q. Well, there -- well, what about -- do
24  you mean it's too -- it's too late to -- what
25  do you mean by it's too late?

Page 148

D. Berardo

1
2      A. Well, I was already speaking with
3   them, so when a red flag usually goes off in
4   my head is if -- is if we're just finding out
5   about something for the first time.
6      Q. Aren't you just finding out about
7   something for the first time here?
8      A. Well, we were finding out -- we -- we
9   knew that Thomas had allegedly said something,
10  and we were investigating the comment. We
11  talked to seven employees, according to the
12  email, and three of the employees remember the
13  comment. So --
14     Q. My question to you is, yes or no, red
15  flags went off in your head or didn't go off
16  in your head when these women reported this to
17  you?
18     A. I --
19         MR. SULLIVAN: Objection to form.
20         THE WITNESS: I don't recall if red
21     flags went off in my head.
22  BY MR. THOMAS:
23     Q. Did you do any follow-up
24  investigation on what they said?
25         MR. SULLIVAN: Objection to form.

Page 149

D. Berardo

1
2          THE WITNESS: So from what I recall,
3      this was -- this was the investigation, and
4      I don't recall -- I don't recall what was
5      done after this.
6   BY MR. THOMAS:
7      Q. Were Thomas Kenny's comments
8   acceptable --
9          MR. SULLIVAN: Objection --
10  BY MR. THOMAS:
11     Q. -- under Absolute's HR policy and
12  hiring criteria?
13         MR. SULLIVAN: Objection to form.
14         THE WITNESS: I don't have the policy
15     in front of me, so I can't speak to the
16     policy. I think --
17  BY MR. THOMAS:
18     Q. Does that help -- let me ask you
19  this: Did -- is what Thomas Kenny said
20  appropriate [lost connection] hiring criteria?
21         MR. SULLIVAN: Objection to form.
22         THE WITNESS: So if we're taking -- I
23     mean, if we're taking his quotes as what he
24     actually said, I -- you know, I would say
25     it's -- it's not -- and -- and if you're

Page 150

D. Berardo

1
2  interpreting it like you -- like you...
3  BY MR. THOMAS:
4      Q. I'm not interpreting it. I'm just
5  asking. I -- thank you for your answer.
6          What did you do to Thomas Kenny for
7  making these comments?
8          MR. SULLIVAN: Objection to form.
9          THE WITNESS: We -- we investigated
10     the comments. From what I recall, the
11     company determined that there was nothing
12     further to investigate.
13 BY MR. THOMAS:
14     Q. And what sort of disciplinary action
15 was taken against an executive vice president
16 who made inappropriate hiring comments which,
17 in turn, made women feel in a negative way?
18         MR. SULLIVAN: Objection to form.
19         THE WITNESS: I don't -- I don't
20     recall -- I don't recall what was done.
21 BY MR. THOMAS:
22     Q. You don't recall taking any action
23 against Thomas Kenny, do you?
24     A. Well, I -- I don't recall what action
25 was taken. I'm -- I'm sure --

Page 151

D. Berardo

1
2      Q. Was any action taken?
3      A. I don't recall.
4      Q. Okay. Do you have any documents that
5  indicate any action was taken?
6      A. I mean, I don't -- I don't work for
7  the company anymore, so...
8      Q. When you were there from -- well, you
9  were there at the time. Do you remember
10 taking any action?
11     A. What I'm saying is I don't recall --
12 I don't recall what was discussed; if it was a
13 verbal, or if there was something else that
14 was done. I -- I don't remember.
15     Q. Was there a verbal?
16     A. I don't remember. I don't recall.
17     Q. Should some action have been taken
18 against Thomas Kenny?
19         MR. SULLIVAN: Objection to form.
20         THE WITNESS: We investigated, and --
21 BY MR. THOMAS:
22     Q. My question is should any action have
23 been taken against him?
24     A. So we --
25         MR. SULLIVAN: Objection to form.

Page 152

D. Berardo

1
2          THE WITNESS: We investigated, and it
3      was determined --
4  BY MR. THOMAS:
5      Q. I'm not asking you whether you
6  investigated. I'm asking you should any
7  action have been taken against him?
8      A. So the --
9          MR. SULLIVAN: Objection to form.
10         THE WITNESS: The action was -- doing
11     an investigation was part of the action
12     against him. Because we're --
13 BY MR. THOMAS:
14     Q. Oh, so just investigating him is
15 action against him?
16     A. Well, if the investigation finds that
17 something was -- was inappropriate and against
18 company policy, then there would be action
19 against that employee.
20     Q. And just doing the investigation is
21 taking sort of a personnel action against
22 somebody in the company, isn't it?
23         MR. SULLIVAN: Objection to form.
24         THE WITNESS: Sorry, what do you mean
25     by that question?

Page 153

D. Berardo

1
2  BY MR. THOMAS:
3      Q. Well, I think you said just doing the
4  investigation was action enough.
5      A. No -- no, I --
6      Q. [Indiscernible] --
7      A. -- didn't -- I didn't say that. I
8  didn't say it's --
9      Q. Okay.
10     A. -- action enough.
11     Q. But doing an investigation was part
12 of the company's action against him; correct?
13     A. Well, it's -- it's part of -- I mean,
14 it's part of -- when someone makes a
15 complaint, an investigation is -- is -- is an
16 action you take towards finding out the facts
17 and the truth and coming up with a resolution.
18     Q. What were the facts and the truth
19 here?
20     A. What were the facts and the truth
21 here?
22         MR. SULLIVAN: Objection to form.
23         THE WITNESS: I mean, the -- the
24     facts were that Mary had alleged that this
25     comment was made, and -- and we -- we

Page 154

D. Berardo

1
2  investigated what he meant by each of these
3  comments -- or each of his comments, and it
4  was determined that -- it was determined
5  that -- that -- that the intent of the
6  comments were not -- were not based on any
7  sort of discrimination.
8  BY MR. THOMAS:
9     Q. Where was that determination
10 recorded?
11       MR. SULLIVAN: Objection to form.
12       THE WITNESS: I mean, I -- I don't
13 recall. I mean, part of it is here on --
14       MR. THOMAS: Okay. We request the
15 production of any documents reflecting any
16 determination, any action, anything
17 involving Tom Kenny and the company's
18 investigation.
19 BY MR. THOMAS:
20    Q. Let me ask you -- you said it was
21 determined. The truth -- the truth was that
22 he did make those comments; correct?
23       MR. SULLIVAN: Objection to form.
24       THE WITNESS: That's not what I said.
25 He was alleged --

Page 155

D. Berardo

1
2  BY MR. THOMAS:
3     Q. I'm asking you now.
4     A. So he was alleged to have made those
5  comments. He --
6     Q. Did he -- did he make -- did he make
7  them?
8        MR. SULLIVAN: Objection to form.
9        THE WITNESS: So he didn't deny the
10 comments. I don't -- I don't recall if
11 he -- I mean, I -- I don't recall what he
12 said.
13 BY MR. THOMAS:
14    Q. Well, you weren't there, but what --
15 you can look at your emails. What was he
16 alleged to have said?
17    A. Well, he was -- he was alleged to
18 have said what -- what Mary -- what you had
19 brought forward during our negotiations.
20    Q. And did you come to -- what
21 conclusion did you come to as to whether he
22 made those comments?
23    A. So I'm not sure if we ever came to a
24 conclusion if he or if he didn't make those
25 exact comments.

Page 156

D. Berardo

1
2     Q. Okay.
3     A. I don't recall.
4     Q. But, Mr. Berardo, you're telling me
5  under oath that as an HR official and -- and
6  you have an executive vice president for sales
7  who tells a room of sales employees "the CEO
8  does not want to hire people who are at the
9  end of their rainbow; he just wants to hire
10 guys who are athletes, talk trash, and are
11 aggressive." You're telling me that you never
12 came to a conclusion as to whether he said
13 that or not?
14       MR. SULLIVAN: Objection to form.
15       THE WITNESS: I -- I don't -- I don't
16 recall -- I don't recall the specific notes
17 from the -- with our conversations with the
18 witnesses there. I mean, I wasn't -- I
19 wasn't there.
20 BY MR. THOMAS:
21    Q. That's not my question. Do you
22 remember what my question was, Mr. Berardo?
23    A. No. Go ahead. Repeat it.
24    Q. Okay. My question to you is -- well,
25 actually, I will have the court reporter read

Page 157

D. Berardo

1
2  it back.
3     A. Sure.
4     (REPORTER READ BACK)
5        THE WITNESS: I -- I don't recall if
6  we came to a conclusion or not.
7  BY MR. THOMAS:
8     Q. You should have -- you should have,
9  though, one way or the other; right?
10       MR. SULLIVAN: Objection to form.
11       THE WITNESS: I don't know if we
12 should have or shouldn't have. I just know
13 that -- I don't recall -- I don't recall
14 the conversations around if it was
15 determined whether he said that or not.
16 BY MR. THOMAS:
17    Q. Well, if you're supposed to come to
18 the truth of an allegation, how can you do
19 that if you don't determine whether the person
20 said what was supposed -- what they said was
21 said?
22       MR. SULLIVAN: Objection to form.
23       THE WITNESS: Well, I think it came
24 down to -- I mean, his words could be
25 interpreted different ways by different

40 (Pages 154 to 157)

D. Berardo

1  people.  So it's -- sometimes it's very
2  difficult to come to the absolute truth.
3  BY MR. THOMAS:
4      Q. So you -- you found that -- you found
5  his statement here and his non-denial that he
6  made them difficult to decide what to do?
7          MR. SULLIVAN:  Objection to form.
8          THE WITNESS:  So from what I recall,
9      it -- it -- it wasn't -- it -- it wasn't
10     clear.  It wasn't black and white.  It
11     was -- you know, he explained what he meant
12     by -- by what he said.  And it was
13     interpreted differently -- it was
14     interpreted differently.
15 BY MR. THOMAS:
16     Q. Is this an example of Mr. Kenny's
17 professionalism -- professionalism that you
18 thought so highly of?
19         MR. SULLIVAN:  Objection to form.
20         THE WITNESS:  Is this an example of
21     his professionalism?  I mean, you're asking
22     for my opinion?
23 BY MR. THOMAS:
24     Q. As an HR person, yes.

D. Berardo

1          MR. SULLIVAN:  Objection to form.
2  BY MR. THOMAS:
3      Q. Is this a professional HR way to
4  approach hiring decisions and communications
5  with employees?
6      A. So --
7          MR. SULLIVAN:  Objection to form.
8          THE WITNESS:  So I don't think this
9      was a way to -- this was never -- he was
10     never directed to hire people.  I can
11     attest to that --
12 BY MR. THOMAS:
13     Q. Well, what were the first three --
14 what are the first three words of the comment?
15 Or the first five words?
16     A. So the first five --
17     Q. "The CEO does not want to hire."
18     A. So that's what --
19     Q. That's what you're saying doesn't
20 relate to hiring decisions?
21     A. So that's what alleged -- that's what
22 alleged -- yeah, that's the alleged quote.
23     Q. Alleged quote is the one that he does
24 not deny making; right?

D. Berardo

1      A. It says that Thomas did not deny he
2  -- that he said these comments, but they were
3  taken out of context, yes.
4      Q. Okay.  So he doesn't deny that he
5  said the CEO does not want to hire people who
6  are at the end of their rainbow; he just wants
7  to hire guys who are athletes, talk trash, and
8  are aggressive.  Is this an example of a
9  professional, buttoned-down comment by Thomas
10 Kenny?
11         MR. SULLIVAN:  Objection to form.
12         THE WITNESS:  I mean, no.
13 BY MR. THOMAS:
14     Q. Did it -- did it surprise you that he
15 would make such a comment?
16         MR. SULLIVAN:  Objection to form.
17         THE WITNESS:  So it -- did it
18     surprise -- yeah, I mean, from what I
19     recall, I was a bit surprised that he
20     said -- that it was alleged that he said
21     this.
22 BY MR. THOMAS:
23     Q. And that he didn't deny that he said
24 it?

D. Berardo

1          MR. SULLIVAN:  Objection to form.
2  BY MR. THOMAS:
3      Q. You keep saying "alleged."  He
4  "allegedly" said it.  Do you think we can drop
5  "allegedly" at this point because he doesn't
6  deny that he said it?
7          MS. LESTRADE:  No.
8          MR. SULLIVAN:  Objection to form.
9  BY MR. THOMAS:
10     Q. Or do you still want to say
11 "alleged"?
12     A. Well, from -- from what I recall, I
13 mean, the -- the quote is very specific, and
14 he wasn't sure -- he wasn't sure exactly what
15 he said.  So I would hate for it to be
16 the truth -- I would hate for it to be brought
17 forward as the absolute truth, because, from
18 what I recall, you know, he didn't -- he
19 didn't -- he didn't remember it exactly like
20 it was -- like it was said.  He just didn't
21 deny that --
22     Q. You don't --
23     A. -- something like --
24     Q. Yeah, you -- you don't --

Page 162

D. Berardo

1  
2    A. -- that was said.
3    Q. -- mention that in either Exhibit 36
4  or 37 that he doesn't remember it exactly, do
5  you?
6    A. Sorry?
7    Q. You don't mention anywhere in
8  Exhibit 36 or 37 that he doesn't remember it
9  exactly, do you?
10   A. I don't know.  A lot of this is
11 redacted, so --
12   Q. No, no, I'm asking you in -- anywhere
13 in 36 or 37 --
14   A. Oh, sure.
15   Q. -- did he -- did you say that he
16 didn't remember it exactly?
17   A. No, I don't think -- not -- not in --
18 not in what I'm looking at right now, I did
19 not say that.
20   Q. And -- and, in fact, the female
21 employees said they know how he is; right?
22     MR. SULLIVAN:  Objection to form.
23     THE WITNESS:  They know how TK is,
24   yes.  That's what's down here.
25 BY MR. THOMAS:

Page 163

D. Berardo

1  
2    Q. Okay.  And who were the two female
3  employees you talked to?
4    A. So I don't know for -- I don't know
5  for certain.  I -- I believe one was Myra.
6    Q. Myra Moy-Gregory?
7    A. Yes.
8    Q. And the second?  Amy Rathbun?
9    A. Amy Rathbun, yes.
10   Q. Do you think they were being honest
11 with you?
12     MR. SULLIVAN:  Objection to form.
13     THE WITNESS:  I -- I don't know -- I
14   don't -- I can't answer what -- what
15   they -- if they were being honest or if
16   they were not being honest.  I mean, I
17   would assume -- I would think that they
18   would be honest with me, yes.
19 BY MR. THOMAS:
20   Q. Now, is it indicative of Absolute
21 culture that the executive vice president for
22 sales can say "the CEO does not want to hire
23 people who are at the end of their rainbow; he
24 just wants to hire guys who are athletes, talk
25 trash, and are aggressive," and suffer no

Page 164

D. Berardo

1  
2  repercussions for doing so?
3      MR. SULLIVAN:  Objection to form.
4      THE WITNESS:  Again, I -- I don't
5    know if he suffered any repercussions --
6  BY MR. THOMAS:
7    Q. If he didn't suffer any, that -- it's
8  okay at Absolute?
9      MR. SULLIVAN:  Objection to form.
10     THE WITNESS:  If he -- if he
11   didn't -- sorry, if he didn't?
12 BY MR. THOMAS:
13   Q. Are you aware of any -- are you aware
14 of any negative consequences he suffered?
15   A. I mean, I -- I don't recall.  I mean,
16 Thomas was --
17   Q. Okay.  Is that -- is that --
18   A. Thomas was --
19   Q. -- acceptable, under Absolute
20 culture, to make comments like this and no one
21 have any record of any negative repercussion
22 to him whatsoever?
23     MR. SULLIVAN:  Wait a minute.
24   Will you -- will you finish your
25   prior answer.

Page 165

D. Berardo

1  
2      THE WITNESS:  Can you read back what
3    I was...
4      (REPORTER READ BACK)
5      THE WITNESS:  I mean, I was going to
6  say Thomas was eventually terminated from
7  Absolute.
8  BY MR. THOMAS:
9    Q. How long after this?
10   A. I -- I think it was after I left.
11   Q. So we're talking a year?
12   A. So, no, I left at the end of -- I
13 left at the end of 2016.  So this was six
14 months -- I don't remember if Thomas was
15 terminated before or after.  I'm sure we can
16 get that to you.
17   Q. Yeah, we -- we have that information.
18   A. Sure.
19   Q. But setting aside -- we have the
20 reason for his termination.  Leaving -- I will
21 just represent to you they're not because of
22 this.
23     Is there any -- is it indicative of
24 the culture at Absolute that a person can make
25 a comment like Thomas Kenny did and suffer no

Page 166

D. Berardo

1
2  repercussions?
3      MR. SULLIVAN:  Objection to form.
4      THE WITNESS:  If the -- if the
5  comment -- if the comment was found to be
6  discriminatory, I would say that it would
7  not be indicative of the culture.  But we
8  -- we investigated, and it was determined
9  that the -- his intentions were not to be
10  discriminatory.
11  BY MR. THOMAS:
12      Q. And because he didn't have that
13  intention, he suffered no repercussions for
14  what he said?
15      MR. SULLIVAN:  Objection to form.
16      THE WITNESS:  Again, I don't -- I
17  don't recall if there were any
18  repercussions or not.
19  BY MR. THOMAS:
20      Q. I'm asking you would it be indicative
21  of Absolute culture that a person could say
22  this, regardless of --
23      MS. LESTRADE:  Asked and --
24  BY MR. THOMAS:
25      Q. -- their intentions --

Page 167

D. Berardo

1
2      MS. LESTRADE:  -- answered.
3  BY MR. THOMAS:
4      Q. -- and suffer no negative
5  repercussions?  Would that be indicative of
6  how you all ran things?
7      A. I think --
8      MR. SULLIVAN:  Objection to form.
9      THE WITNESS:  -- I already answered
10  that question.
11  BY MR. THOMAS:
12      Q. Which is, yes, that it --
13      MR. SULLIVAN:  Objection to --
14  BY MR. THOMAS:
15      Q. -- could be indicative?
16      MR. SULLIVAN:  Objection to form.
17      THE WITNESS:  No, I don't think
18  that's what I said.
19  BY MR. THOMAS:
20      Q. I said regardless of his intentions.
21  Let's assume his intentions were fine.
22      A. His intentions were fine --
23      Q. It's fine for someone to say this if
24  they have good intentions, and nothing happens
25  to them at Absolute?  That's the kind of

Page 168

D. Berardo

1
2  culture you all have?
3      MR. SULLIVAN:  Objection to form.
4      THE WITNESS:  That's not the type of
5  culture we have.
6  BY MR. THOMAS:
7      Q. But that's what happened here.
8      MR. SULLIVAN:  Objection to form.
9      THE WITNESS:  I think that comments
10  can be interpreted in a number of different
11  ways to a number of different people.
12  BY MR. THOMAS:
13      Q. And some are acceptable?
14      MR. SULLIVAN:  Objection to form.
15      THE WITNESS:  I mean, that's --
16  that's -- that would be someone's opinion,
17  if they're acceptable or not.
18  BY MR. THOMAS:
19      Q. Well, let me ask you this:  As an HR
20  person, is this an acceptable comment for an
21  executive vice president of sales to make,
22  regardless of their intention?
23      MR. SULLIVAN:  Objection to form.
24      THE WITNESS:  I think that there
25  would -- there would be some coaching after

Page 169

D. Berardo

1
2  for sure.  If -- if it wasn't -- if it
3  was -- there is -- there's better ways to
4  say it, yes.
5  BY MR. THOMAS:
6      Q. So, no, it's not acceptable; correct?
7      MR. SULLIVAN:  Objection to form.
8      THE WITNESS:  It's not for me to
9  determine whether it's acceptable or not.
10  BY MR. THOMAS:
11      Q. You're -- but, I mean, you're head of
12  HR.
13      A. Well --
14      Q. What do you mean it's not up to you
15  to determine whether a discriminatory comment
16  is acceptable or not?
17      A. So --
18      MR. SULLIVAN:  Objection to form.
19      THE WITNESS:  So, again, we're --
20  -- we determined --
21  BY MR. THOMAS:
22      Q. Wait, wait, wait.  I want to get back
23  to that.  It's not your job?  It's not your
24  job to determine whether this -- a
25  discriminatory comment is acceptable or not?

D. Berardo

1
2   A. That --
3   Q. You really -- do you stand by that?
4   A. No, that's not what I said.  You're
5   --
6   Q. Well, let's read back your answer.
7   A. You're now --
8   MR. THOMAS:  Court reporter, can you
9   read back his answer --
10   THE WITNESS:  You're --
11   MR. THOMAS:  -- about what he said
12   about it being his job.
13   THE WITNESS:  Can you also read back
14   his question, though, so it's not taken out
15   of context.
16   MR. THOMAS:  Absolutely.  Please read
17   the question and answer back.
18   (REPORTER READ BACK)
19   THE WITNESS:  So what I meant --
20   BY MR. THOMAS:
21   Q. It's not -- it's not for you to
22   determine whether a comment like this is
23   acceptable or not?
24   A. So if I -- so --
25   MR. SULLIVAN:  Objection to form.

D. Berardo

1
2   THE WITNESS:  So when you speak like
3   that, it -- it just -- it confuses me a bit
4   on -- on what we -- we've just talked
5   about.
6   Can you just read back --
7   BY MR. THOMAS:
8   Q. All right.  Let's -- let's start
9   again.
10   A. Thank --
11   Q. Is it your job to determine whether a
12   comment about people -- that people make about
13   hiring criteria of the company are acceptable
14   or not?
15   A. Well, if they're -- yeah, if
16   they're -- if they're discriminatory or not,
17   that is -- that is part of my job.
18   Absolutely.
19   Q. Okay.  And do you find the comment
20   that Thomas -- when you -- when you were head
21   of HR for Absolute, did you find the comment
22   that Thomas Kenny made acceptable or not?
23   A. Through the investigation, we
24   determined that it -- there wasn't any sort of
25   discrimination.  His intent was not

D. Berardo

1
2   discriminatory.  As I said before, there are
3   better ways -- there were better -- there
4   would be better ways to -- to say what he was
5   trying to say.
6   Were they discriminatory?  We determined
7   that they weren't.  I don't know what -- what
8   more you want me to say about that.
9   Q. Just the truth.
10   A. That -- that's the truth.
11   Q. That it was acceptable?
12   MR. SULLIVAN:  Objection --
13   MS. LESTRADE:  Oh, my god.
14   MR. SULLIVAN:  Objection to form.
15   BY MR. THOMAS:
16   Q. I mean, it's not -- I mean,
17   Mr. Berardo, it's acceptable, or it's not.  I
18   will let you choose which -- I mean, I -- I
19   just need the -- I just want the truth.  Did
20   you find it acceptable or not acceptable, what
21   he said?
22   A. Well, I don't think it's --
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  I don't think it's --
25   it's -- it's black and white.  Again,

D. Berardo

1
2   there's -- there's different
3   interpretations of the way different people
4   say things.  Or different -- different --
5   people say things, and they can be
6   interpreted differently, right, by
7   different people.
8   So we found that the way -- his
9   intent was not discriminatory.  And so
10   could he have said it better?  I already
11   said yes.  I don't know how to answer if it
12   was acceptable or not and -- and in what
13   context.
14   BY MR. THOMAS:
15   Q. Why is it not -- why is it not
16   discriminatory to say that you want to hire
17   guys who are athletes, talk trash, and get in
18   each other's faces?  Why is that not
19   discriminatory?
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  Because we determined
22   that what he meant -- what he was referring
23   to were -- by "guys" -- I mean, it says
24   here by "guys," that's just the way he
25   referenced all people, "guys."  "Hey, you

D. Berardo

1
2  guys."  He says it in a generic term, like
3  many people do.  At no time did he ever
4  mean men.
5       So -- so when we looked -- when we
6  looked and we asked him -- you know, again,
7  we didn't find his intent to be
8  discriminatory.
9  BY MR. THOMAS:
10      Q. However, you did find two women who
11  the comment -- they interpreted it in a
12  negative way?
13      A. Sure, yes.
14      Q. Right?  So on one -- on one hand, you
15  have two women who interpreted it in a
16  negative way; on the other hand, you have an
17  inappropriate comment, but you take the man's
18  word that he didn't mean it in a
19  discriminatory way.  Is that how -- is that
20  how it shook out?
21      MR. SULLIVAN:  Objection to form.
22      THE WITNESS:  No, because there --
23  there -- there was context, and there was
24  discussions with these two women.  And
25  sitting here today, I can't remember -- you

D. Berardo

1
2  know, I can't remember what they meant by
3  -- when they said they interpreted it in a
4  negative way.  Negative doesn't --
5  BY MR. THOMAS:
6      Q. What weight did you -- what weight
7  did you give to their concerns?
8      MR. SULLIVAN:  Were you finished with
9  your answer?
10      THE WITNESS:  I was saying negative
11  --
12  BY MR. THOMAS:
13      Q. Were you -- yeah, were you finished?
14  Did you have anything else?
15      A. Yeah, I was going to say "negative"
16  doesn't necessarily mean "discriminatory."
17      Q. Okay.  What weight did you give to
18  their comments?
19      MR. SULLIVAN:  Objection to form.
20      THE WITNESS:  We -- we would have
21  given -- we would have given their -- their
22  comments equal weight.  Absolutely.
23  BY MR. THOMAS:
24      Q. Somehow, though, the man ends up not
25  getting punished; correct?

D. Berardo

1
2      MR. SULLIVAN:  Objection to form.
3      THE WITNESS:  Because it was
4  determined that his comments were not
5  discriminatory.
6  BY MR. THOMAS:
7      Q. And one of the people that made that
8  determination was Errol Olsen; correct?
9      MR. SULLIVAN:  Objection to form.
10      THE WITNESS:  I don't -- I don't
11  recall who -- who all was involved with the
12  determination.
13  BY MR. THOMAS:
14      Q. Well, why don't you turn to page
15  DEFS09807, where you say:
16      Hi, Aaron.  Our CFO spoke to Thomas
17  Kenny last week."
18  Who was your CFO?
19      A. Our CFO was Errol Olsen.
20      Q. So the guy who swam nude in front of
21  employees at the -- at the gathering to whom
22  HR reported is the one who is involved in this
23  investigation; correct?
24      MR. SULLIVAN:  Objection to form.
25  BY MR. THOMAS:

D. Berardo

1
2      Q. Just so I'm clear.
3      MR. SULLIVAN:  Objection to form.
4      THE WITNESS:  Errol was involved with
5  the investigation.
6  BY MR. THOMAS:
7      Q. Right?  And I -- just to be clear,
8  he's the one who swam nude in front of other
9  employees at an employee event; correct?
10      MR. SULLIVAN:  Objection to form.
11      THE WITNESS:  I wasn't there.  I
12  don't know.  Again, it was gossip.
13  BY MR. THOMAS:
14      Q. And then, somehow, the man's word
15  gets believed; right?
16      MR. SULLIVAN:  Objection to form.
17      THE WITNESS:  What -- what man's word
18  gets believed?
19  BY MR. THOMAS:
20      Q. That would be Mr. Kenny's.
21      MR. SULLIVAN:  Objection to form.
22      THE WITNESS:  It was -- yeah, it was
23  -- well, it was determined that -- that
24  his -- you know, that his statement was not
25  discriminatory.

D. Berardo

BY MR. THOMAS:

Q. What a shock.

MR. SULLIVAN: Is that a question?

MR. THOMAS: No, just a statement.

MR. SULLIVAN: Or a speech?

MR. THOMAS: Actually, I don't think it was long enough for a speech, but whatever you -- whatever you want to call it is fine with me.

MR. SULLIVAN: We'll call it a speech.

MR. THOMAS: It was a part -- maybe a part of the closing statement.

BY MR. THOMAS:

Q. Have you ever heard about -- did you ever hear about the movie "Mall Cops"?

A. "Mall Cops"?

Q. Yes.

A. I think so, yeah.

Q. Do you remember the -- the joke in there was that mall cops -- all that mall cops do is observe and report?

A. I -- I don't -- I don't recall that, no.

D. Berardo

Q. Okay. Do you feel that you were doing more in this situation than a mall cop, whose job was to observe and report?

MR. SULLIVAN: Don't answer that. That's an insulting question. Don't answer that question.

Move on.

BY MR. THOMAS:

Q. Did you do anything -- did you do anything more in this case besides observe and report?

A. Clearly. We investigated.

Q. You observed and you reported, but you didn't take any action, did you?

MR. SULLIVAN: Objection to form.

THE WITNESS: I don't recall which action we took. We had a -- we made a determination, which is action.

BY MR. THOMAS:

Q. And the action and determination was there was nothing -- there was nothing wrong here?

A. There was no discrimination that was -- that was intended here, correct.

D. Berardo

Q. Did you attend the 2015 executive managers' meeting in Whistler?

A. I -- I attended. I did attend an executive leadership team meeting in Whistler. I don't recall if it was 2015. It must have been.

Q. Sorry, what was that?

A. I said it must have been. I did attend an executive leadership team meeting in Whistler.

Q. Do you remember any women being present there?

A. I don't recall, no.

Q. What was discussed in that meeting?

A. It was a -- it was a lot of strategy. I mean, I --

Q. Discussions about who were going to be retained, who were going to be let go?

A. No. No. It was -- I -- from -- from -- from my recollection, it -- it wasn't that type of meeting. It was about the strategy of the company.

Q. Was it about the reorganization?

A. I don't remember if -- if we

D. Berardo

discussed any -- any reorganization. I don't recall.

Q. Let me ask you did Amy Rathbun ever complain to you about her treatment at the company?

A. Never.

Q. And you wouldn't consider her comments to you on Exhibit 36 an example of complaining about that; right?

A. I don't -- I don't remember our conversation specifically, so I can't even answer that question.

Q. But she was one of the ones you interviewed; right?

A. That's -- that -- from my recollection, yes.

Q. And she interpreted Tom Kenny's comments in a negative way; right?

A. That's what it says here, yes.

Q. And that she knows that's how Tom Kenny is; right?

A. They know how TK is. That's what it says, yes.

Q. And you -- and you don't consider

D. Berardo

that her complaining about being -- feeling
discriminated against?

A. I don't recall our conversation, our
specific conversation. I -- I know Amy and I
had a lot of conversations, and -- and never
once did it come up that she ever felt or
interpreted comments as discriminatory.

Q. Let's go now to Exhibit 38 and the
answer to interrogatory 15, which is on
page 17. If you go to the last sentence, it
talks about who was at the meeting when Thomas
Kenny made his comments. Do you see that?

A. What page are we looking at? Sorry.

Q. Page 17.

A. Oh, 15 here?

MS. LESTRADE: Yeah.

THE WITNESS: Number 15?

MR. SULLIVAN: Yes.

THE WITNESS: Okay.

MR. SULLIVAN: I think the question
is on the prior page.

THE WITNESS: Okay.

BY MR. THOMAS:

Q. All right. The culture that exists

D. Berardo

at Absolute resulted in none of those people
telling you what Thomas Kenny said about the
hiring criteria at Absolute; correct?

MR. SULLIVAN: Objection to form.

THE WITNESS: That's not correct.

BY MR. THOMAS:

Q. Did -- did any of them come to you
and tell you --

MR. SULLIVAN: Objection --

BY MR. THOMAS:

Q. -- without you asking them first?

MR. SULLIVAN: Objection to form.

THE WITNESS: No one told me about
those comments.

BY MR. THOMAS:

Q. Okay. And that's consistent with how
things happened at Absolute, isn't it?

MR. SULLIVAN: Objection to form.

THE WITNESS: That's incorrect.

BY MR. THOMAS:

Q. It's inconsistent?

A. No, I said your statement is
incorrect.

Q. Okay. Why is it incorrect?

D. Berardo

A. Because you're -- you're making the
assumption that no one would come or raise
issues at Absolute, and that was the culture.

Q. No one came or raised issues about
Thomas Kenny's comment, did they? None of
those people?

A. About his comment, no.

Q. That's the kind of culture that
existed at Absolute, isn't it?

MR. SULLIVAN: Objection to form.

THE WITNESS: It -- that is -- I -- I
don't agree with what you're saying.

BY MR. THOMAS:

Q. Why is -- why is -- why is that
not -- is it consistent with the culture at
Absolute or not consistent?

MR. SULLIVAN: Objection to form.

THE WITNESS: We have -- there --
there was numerous times where people have
come to raise concerns about various
different issues, so it's not indicative of
the culture.

BY MR. THOMAS:

Q. So this was a -- this was surprising,

D. Berardo

that people didn't come to you about this?

MR. SULLIVAN: Objection to form.

THE WITNESS: I don't -- I don't
remember my feelings.

BY MR. THOMAS:

Q. Sitting here today, are you surprised
that people did not come to you about it?

MR. SULLIVAN: Objection to form.

BY MR. THOMAS:

Q. Given the culture at Absolute at the
time?

MR. SULLIVAN: Objection to form.

THE WITNESS: Do I find it
surprising? I -- I think -- I think I
mentioned before I would have liked -- you
know, I would have appreciated if someone
would have raised it to me.

BY MR. THOMAS:

Q. My question to you is is it
consistent with Absolute culture that no one
came forward?

A. I think I --

MR. SULLIVAN: Objection to form.

THE WITNESS: I've already answered

D. Berardo

1  that question numerous times.
2  BY MR. THOMAS:
3      Q. And your answer is that it's
4  inconsistent; correct?
5          MR. SULLIVAN:  Objection to form.
6          THE WITNESS:  The -- no one -- no one
7  coming to me was inconsistent with what the
8  culture generally was at Absolute.
9  BY MR. THOMAS:
10     Q. Were you aware at that Whistler --
11  that Whistler meeting about employees that
12  Absolute wanted to retain and intend to stay
13  on?
14     A. I don't -- I don't recall the
15  conversation, off the top of my head.
16     Q. Do you remember a point in time where
17  Ms. Piehler was investigated regarding the
18  Department of Education, the DOE?
19     A. Yeah.
20     Q. Tell me what you remember about that.
21     A. That someone had raised concerns
22  that -- that
23     Q. Who was that -- who was that someone?
24     A. So I think, originally -- and -- and

D. Berardo

1  this is -- my -- my memory may be failing me,
2  so I -- I want to make sure I say that.  But I
3  think it was -- they didn't come directly to
4  me, but -- but they -- but it was -- it was
5  Matt Meanchoff.  He raised it to someone.  It
6  could have been -- it was someone in finance,
7  perhaps.  It could have been Errol; it could
8  have been Lee.  I'm not sure.  About Mary and
9  her team booking business in a certain way,
10  booking it as new business versus renewal
11  business.
12     Q. Did you participate in the
13  investigation of the DOE issue?
14     A. Limitedly.
15     Q. What -- tell -- describe your role.
16     A. So from -- from what I recall, I had
17  sat on -- I sat -- sat on an interview or two,
18  but it was largely a -- it was largely a
19  number.  So they were -- they were trying to
20  find out -- trying to find out how these
21  numbers got booked into where.  So it was
22  largely, I think, run by finance.  Perhaps
23  legal.  I don't recall specifically.
24     Q. Who -- who do -- what interviews do

D. Berardo

1  you remember sitting in on?
2     A. I don't -- I don't recall off the top
3  of my head.
4     Q. Were you aware that regional
5  directors are generally not responsible for
6  recording orders on sales in their region?
7     A. They would ultimately be responsible
8  because they would have people reporting in to them,
9  so they do have the ultimate responsibility.
10     Q. But they're -- but you understand
11  they're not the ones responsible for entering
12  the sales or the orders; correct?
13     A. Well, the -- the data entry?  They
14  wouldn't -- I -- to my knowledge, they
15  wouldn't be, actually, data-inputting the
16  numbers into the system.  That wouldn't be
17  their --
18     Q. Or deciding where they should go;
19  correct?
20     A. No, ultimately -- so -- ultimately, I
21  believe that's their responsibility.  That's
22  just my understanding of it.  I -- I -- I was
23  not in sales ops, and I didn't really have
24  visibility into how business was booked,

D. Berardo

1  specifically.  But -- but the regional --
2  regional directors would -- would ultimately
3  be responsible for the team that they have
4  under them.
5     Q. Did you know that Absolute
6  investigated Mary Piehler and her subordinate,
7  Charles Springgay, in relation to the issue of
8  the DOE?
9     A. Yes.
10     Q. And what is the race of Charles
11  Springgay?
12     A. I mean, I don't know the specific
13  race.  He is -- he --
14     Q. African American?
15     A. No.  Charles Springgay would be --
16  would be of Asian decent, perhaps.
17     Q. Do you know or not know?
18     A. I mean, I -- I'm -- I would only
19  visually -- be visually observing.  So I don't
20  know for certain what his background was.
21     Q. Fair to say that he's a racial
22  minority?
23     A. It depends how you define racial
24  minority.  In --

Page 190

D. Berardo

1
2    Q. As an HR person.
3    A. In Vancouver -- in Vancouver, he
4 would not be considered a racial minority.
5    Q. In the United States, would he be
6 considered a racial minority?
7      MR. SULLIVAN: Objection to form.
8      THE WITNESS: I believe so.
9 BY MR. THOMAS:
10    Q. Now, Mary Piehler and Charles
11 Springgay were investigated, but Mike Kenny -
12 Mike Kenny and his subordinate, Justin
13 Peacock, weren't investigated as part of this;
14 correct?
15    A. I don't --
16    Q. DOE.
17    A. I don't recall. I -- I don't know
18 the specifics. Or recall the specifics.
19    Q. Do you have any reason to believe
20 that Mike Kenny was investigated?
21    A. I don't even know if he was -- he was
22 employed at that time. I don't know. I don't
23 -- I don't recall.
24    Q. Do you have any reason to believe he
25 was investigated?

Page 191

D. Berardo

1
2    A. I don't recall.
3    Q. Why weren't Mike Kenny's commissions
4 held on his DOE orders?
5      MR. SULLIVAN: Objection to form.
6      THE WITNESS: I don't know.
7 BY MR. THOMAS:
8    Q. But Mary Piehler's were; correct?
9      MR. SULLIVAN: Objection to form.
10      THE WITNESS: I -- I don't recall the
11 specifics on -- on -- on that.
12 BY MR. THOMAS:
13    Q. Do you remember the time Mary
14 Piehler's commissions were withheld?
15    A. If you're asking me to answer with
16 certainty, I can't answer with certainty. I
17 don't remember.
18    Q. What is your recollection right now?
19    A. My recollection from -- from -- from
20 what I remember is that there was a number of
21 people who had their commission withheld
22 during the investigation. I --
23    Q. Who were -- who were they?
24    A. Well, so -- so under investigation, I
25 think it was Charles, Mary, and I think it was

Page 192

D. Berardo

1
2 Justin Peacock. Those were kind of --
3    Q. But not Ian Dunton, and not Mike
4 Kenny; correct?
5    A. I don't remember. Perhaps. I -- I
6 don't know.
7    Q. Did you approve of not paying Mary
8 her commissions for the DOE order -- for the
9 DOE orders, even though the investigation had
10 not been completed?
11      MR. SULLIVAN: Objection to form.
12      THE WITNESS: Did I approve us --
13 Hyperwallet not paying -- sorry, did I
14 approve Absolute not paying her
15 commissions?
16 BY MR. THOMAS:
17    Q. Yes.
18    A. That wouldn't have been my
19 determination.
20    Q. Were you involved in the
21 determination?
22    A. I don't recall.
23    Q. Why would someone's commission --
24 from an HR perspective, why would someone's
25 commissions be withheld when the investigation

Page 193

D. Berardo

1
2 had not even been completed?
3      MR. SULLIVAN: Objection to form.
4      THE WITNESS: So I -- I can only -- I
5 can only -- I can only speculate, like --
6 BY MR. THOMAS:
7    Q. No, I'm not asking you to speculate.
8 As an HR manager at Absolute --
9    A. Right.
10    Q. -- why would an employee's
11 commissions be held under your tenure when the
12 investigation into the issue had not been
13 completed?
14    A. So --
15      MR. SULLIVAN: Objection to form.
16      THE WITNESS: -- are we talking about
17 in general? Or are we talking about the
18 specific incident?
19 BY MR. THOMAS:
20    Q. We'll take -- we'll take DOE
21 specifically.
22    A. Because I don't recall -- I don't
23 recall why or why not for that --
24    Q. Would there ever -- would there ever
25 be a reason to withhold someone's commissions

D. Berardo

1  when an investigation hadn't been completed,
2  again, in your role as head of HR at Absolute?
3      MR. SULLIVAN: Objection to form.
4      THE WITNESS: During an
5  investigation, if we were investigating
6  something, I think it -- it would be
7  justified to withhold commissions.
8  BY MR. THOMAS:
9      Q. Would it be justified to withhold
10 some people's commissions but not others?
11     MR. SULLIVAN: Objection to form.
12     THE WITNESS: I mean -- I mean, it
13 would depend on the circumstances. I don't
14 know how to answer that.
15 BY MR. THOMAS:
16     Q. What about withholding them from the
17 minority female employees, but paying them to
18 the white male employees? Would that be
19 acceptable?
20     A. No, it wouldn't --
21     MR. SULLIVAN: Objection to form.
22     THE WITNESS: It would not be
23 acceptable to withhold or not withhold
24 based on race or gender.

D. Berardo

1  BY MR. THOMAS:
2      Q. Would that be consistent with
3  Absolute's culture, though?
4      A. Well --
5      MR. SULLIVAN: Objection to form.
6      THE WITNESS: -- absolutely not.
7  BY MR. THOMAS:
8      Q. Isn't it true that Mary Piehler was
9  totally exonerated on the issue of the DOE
10 orders?
11     MR. SULLIVAN: Objection to form.
12     THE WITNESS: I don't know if I would
13 use those terms. I -- from what I recall,
14 it was determined that -- that a definitive
15 determination couldn't be made, and so the
16 commissions were paid out as was booked.
17 BY MR. THOMAS:
18     Q. Isn't it true that Todd Awtry
19 acknowledged that he had been told that that's
20 how the commissions were paid?
21     MR. SULLIVAN: Objection to form.
22 BY MR. THOMAS:
23     Q. Were going to be paid?
24     A. I don't recall.

D. Berardo

1      Q. Well, then, how can -- how can you
2  not recall that and recall that there was not
3  complete exoneration for Mary Piehler?
4      MR. SULLIVAN: Objection to form.
5      THE WITNESS: Well, I -- I recall --
6  well, I don't recall that -- you're asking
7  me -- you're asking me a specific question
8  about Todd. I don't remember that
9  interaction with Todd.
10 BY MR. THOMAS:
11     Q. Do you remember there -- was there
12 any wrongdoing associated with Mary Piehler
13 coming out of the DOE investigation?
14     A. I mean, I...
15     Q. That you recall?
16     A. That I recall?
17     Q. Yeah.
18     A. Not that I recall.
19     Q. It's true that Todd Awtry tried to
20 get Mary Piehler fired over the DOE
21 commissions; correct?
22     MR. SULLIVAN: Objection to form.
23     THE WITNESS: Not that I recall, no.
24     MR. THOMAS: If the court reporter

D. Berardo

1  could show the witness Awtry Exhibit 73 as
2  well as Exhibit 74.
3      THE WITNESS: Just while we're doing
4  that, can I just take a quick break?
5      MR. SULLIVAN: Sure.
6      VIDEOGRAPHER: Going off the record.
7  The time is 3:49.
8      (PROCEEDINGS RECESSED AT 3:49?P.M.)
9      (PROCEEDINGS RECONVENED AT 3:57 P.M.)
10     VIDEOGRAPHER: Back on the record.
11 The time is 3:57.
12 BY MR. THOMAS:
13     Q. Okay. Let me show you what has been
14 marked as Exhibit 73 and 74. Once you've had
15 a chance to read them, let me know.
16     A. Sure. Okay.
17     Q. Does -- do these exhibits refresh
18 your recollection as to whether Todd Awtry was
19 trying to get Mary Piehler fired over the DOE
20 issue?
21     A. Does it -- does it -- I mean, I don't
22 know how to answer that question. I mean,
23 I -- I see here he asks -- he asks us:
24     Do we have enough grounds to -- for

Page 198

1           D. Berardo
2    termination for all three?"
3        Q. And what does he say immediately
4    after that?
5        A. So he says:
6            I believe we do, but I want others'
7    thoughts."
8        Q. So does that suggest to you that Todd
9    Awtry was trying to get Mary Piehler fired
10   over the DOE issue?
11       A. No, I would say that he was asking
12   for multiple people's opinions on if there was
13   enough grounds for termination.
14       Q. What was his opinion?
15       A. Well, he says:
16           I believe we do, but want others'
17   thoughts."
18       Q. Yeah, so what was his opinion?
19       A."I believe we do, but we want other's
20   thoughts."
21       Q. No, no, I didn't ask you -- what --
22   what was his opinion.  His opinion was "I
23   believe we do"; correct?
24       A. Oh.
25           MR. SULLIVAN:  Objection to form.

Page 199

1           D. Berardo
2           THE WITNESS:  Sure.  "I believe we
3    do."
4    BY MR. THOMAS:
5        Q. All right.  And then what did you --
6    do you remember responding to him at all?
7        A. I don't recall off the top -- I don't
8    -- I don't recall if I responded or -- or
9    didn't.  I don't know.
10       Q. Okay.  Was this the email you saw in
11   preparation for this deposition today?
12       A. I don't -- I mean, thinking back, I
13   think at one point, we did look at this email
14   on Exhibit 73, but not -- I don't recall
15   looking at 74.  I could be wrong.
16       Q. And on 74, he pushes again, doesn't
17   he, for an answer to his question as to
18   whether Mary Piehler can be fired, and he
19   thought that there were grounds to do so.
20   Right?
21           MR. SULLIVAN:  Objection to form.
22           THE WITNESS:  Response to my
23   question.  I don't know what he was
24   referring to.
25   BY MR. THOMAS:

Page 200

1           D. Berardo
2        Q. What question had he asked the day
3    before to the same recipients?
4        A. So this was June 27th, 2014, at 10:33
5    a.m.  And then June 26th at 5:03 to Lee,
6    Michael, Matt -- well, Matt's on this email,
7    but not on this email.  So it's not the same
8    recipients.  But on the --
9        Q. Almost -- almost -- almost identical
10   recipients.  Fair to say?
11       A. And here he includes Michael Kenny
12   and Thomas -- or, sorry, Michael Kenny was
13   involved -- or was in the June 26th email, but
14   Thomas --
15       Q. It's virtually the same -- it's
16   virtually the same recipients.  And the next
17   morning, he had [indiscernible] demanding an
18   answer to his question, didn't he?
19           MR. SULLIVAN:  Objection to form.
20           THE WITNESS:  So I can't answer that
21   because I don't know if this is related.
22   BY MR. THOMAS:
23       Q. And was...
24       A. Like, the --
25       Q. It's strange, isn't it --

Page 201

1           D. Berardo
2        A. Okay.
3        Q. -- that Todd Awtry is trying to get
4    Mary Piehler fired, which is several months
5    before Mary Piehler had told him about how the
6    commissions would be allocated, and he thanked
7    her for the heads-up.  Right?
8            MR. SULLIVAN:  Object --
9    BY MR. THOMAS:
10       Q. Isn't that weird?
11           MR. SULLIVAN:  Objection to form.
12           THE WITNESS:  I think he was
13   asking -- he was asking if there was enough
14   grounds for termination.
15   BY MR. THOMAS:
16       Q. But why should there be enough
17   grounds when three -- when, several months
18   before, he was told by Mary this is the way
19   things were going to be done, and he thanked
20   her for it?
21           MR. SULLIVAN:  Objection to form.
22           THE WITNESS:  I'm sorry.  What
23   exhibit was at that?  Just to --
24           MR. THOMAS:  If the court reporter
25   could show him Exhibit Awtry 71.

Page 202

D. Berardo

1
2  THE WITNESS:  Okay.
3  BY MR. THOMAS:
4     Q. So March 17th, Todd is told exactly
5  how this allocation is going to go.  He thanks
6  Mary Piehler for it.  And in June, he's trying
7  to get her fired over it.  Does that -- does
8  that concern you at all?
9     A. Well --
10    MR. SULLIVAN:  Objection to form.
11    THE WITNESS:  -- all I see is -- is
12  he -- him saying "thanks for the -- for
13  heads -- thanks for heads-up."
14  BY MR. THOMAS:
15    Q. Okay.
16    A. I don't see any --
17    Q. Does this concern you at all that he
18  knew this was how the DOE was going to be
19  allocated; he said "thanks for the heads-up";
20  and then, several months later, was trying to
21  fire Mary Piehler over it?
22    MR. SULLIVAN:  Objection to form.
23  BY MR. THOMAS:
24    Q. Does that concern you?
25    A. Well, I don't -- I don't know if he

Page 203

D. Berardo

1
2  was trying to fire Mary.  He asked, "Do we
3  have grounds enough for termination?"
4     Q. Does it concern you that he thought
5  there were grounds enough for termination
6  when, several months before, he had been told
7  how the allocation was going to go, and he
8  thanked Mary Piehler for the heads-up?
9     MR. SULLIVAN:  Objection to form.
10  BY MR. THOMAS:
11    Q. Does that concern you?
12    A. I -- I don't know if he -- I don't
13  know if he had agreed to this or he had forgot
14  about this.  You know...
15    Q. My question to you is does it concern
16  you?
17    MR. SULLIVAN:  Objection to form.
18    THE WITNESS:  I don't remember if it
19  concerned me or not.
20  BY MR. THOMAS:
21    Q. Does it concern you sitting here
22  today?
23    MR. SULLIVAN:  Objection to form.
24    THE WITNESS:  Well, knowing the
25  facts, it doesn't concern me.

Page 204

D. Berardo

1
2  BY MR. THOMAS:
3     Q. Why?
4     A. Just because this email seems pretty
5  ambiguous.
6     Q. How is it ambiguous when it precisely
7  describes the issue that he accused her of
8  doing that resulted -- that resulted in her
9  termination?
10    MR. SULLIVAN:  Objection to form.
11    THE WITNESS:  Well, I don't -- I
12  don't see him agreeing to -- to what she is
13  proposing.
14  BY MR. THOMAS:
15    Q. You don't think "thanks for the
16  heads-up" is an agreement that the allocation
17  is okay?
18    A. I don't -- I don't think that.
19  When -- when someone says "thanks for the
20  heads-up," it doesn't say "I agree," no.
21    Q. Okay.  It -- can you think of any
22  time in the company where a woman's word has
23  been believed over a man's --
24    MR. SULLIVAN:  Objection to form.
25  BY MR. THOMAS:

Page 205

D. Berardo

1
2     Q. -- when you were the head of HR at
3  Absolute?
4     A. I mean, I -- absolutely, but I -- I
5  can't think of specifics.
6     Q. One example.  Just give me one.
7     A. I mean, I -- you're -- you're asking
8  me something from five years -- five
9  years-plus ago.
10    Q. Yeah.  Can you remember any time in
11  the entire time you worked at Absolute for the
12  five years that HR ever accepted the word of a
13  man -- of a woman over a man?
14    MR. SULLIVAN:  Objection to form.
15    THE WITNESS:  I -- I -- off the top
16  of my head, I can't recall situations on
17  either -- either way.  I mean...
18  BY MR. THOMAS:
19    Q. Well -- well, what about -- well, the
20  last several we've been over, you have
21  accepted the man's word over the woman's, no
22  doubt.  Right?
23    MR. SULLIVAN:  Objection to form.
24    THE WITNESS:  Sorry -- sorry, what
25  are you referencing?

TSG Reporting - Worldwide 877-702-9580

Page 206

D. Berardo

1
2  BY MR. THOMAS:
3      Q. I'm referencing Thomas Kenny's
4  comment that made women feel uncomfortable,
5  and they said that was typical of him, and
6  nothing happened to Thomas Kenny, and --
7  because it was believed it was not
8  discrimination. I'm talking here about Todd
9  Awtry approving the commission payments to
10  Mary Piehler and trying to get her fired two
11  months later and you, again, believing, as you
12  sit here today, Todd Awtry over Mary Piehler.
13      MR. SULLIVAN: Objection.
14      THE WITNESS: That's --
15  BY MR. THOMAS:
16      Q. So those are two examples going that
17  way. Can you think of any examples where a
18  woman has ever been believed at Absolute over
19  a man?
20      A. So --
21      MR. SULLIVAN: Objection to form.
22      THE WITNESS: -- sorry, you -- the
23  way you described that was not accurate.
24  BY MR. THOMAS:
25      Q. Okay. Let's -- let's go back to the

Page 207

D. Berardo

1
2  point.
3      A. Sure.
4      Q. Give me an example of where a woman's
5  word was believed over a man's at Absolute.
6      MR. SULLIVAN: Objection to form.
7      THE WITNESS: You're -- you're -- I
8  mean, you're asking me for -- to -- to come
9  up with specific examples from five years
10  ago about conversations --
11  BY MR. THOMAS:
12      Q. Any specific example.
13      A. I don't --
14      Q. One.
15      A. I -- I just don't -- I just can't
16  think of anything right now.
17      Q. Okay. Now -- and you're head of HR,
18  so you know this is going on here, and you
19  don't even think it's worthy of investigating
20  why Todd Awtry, several months later, is
21  trying to get Mary Piehler fired, even though
22  he knew how the commissions were being done
23  several months earlier?
24      MR. SULLIVAN: Objection to form.
25      THE WITNESS: So he has -- he has

Page 208

D. Berardo

1
2  asked the questions not just for Mary, but
3  "do we have enough grounds for termination
4  for all three?"
5  BY MR. THOMAS:
6      Q. Okay. But Mary Piehler is one of
7  them.
8      A. Correct.
9      Q. Right? Can we agree on that?
10      A. Yeah. Yes, we can.
11      Q. Okay. So -- and two months -- two or
12  three months before, Todd Awtry said "thanks
13  for the heads-up."
14      A. He said "thanks --"
15      Q. So --
16      A. "-- for the -- thanks for --"
17      Q. -- [indiscernible] --
18      A. "-- the heads-up."
19      Q. Let's just take that back. When he
20  received that email, if he thought that what
21  Mary Piehler was doing was wrong, it should
22  have raised a red flag in your mind that he
23  was setting her up for termination several
24  months later.
25      MR. SULLIVAN: Objection to form.

Page 209

D. Berardo

1
2      THE WITNESS: I don't have -- know
3  how one equals the other. I think it was
4  determined --
5  BY MR. THOMAS:
6      Q. So let's -- okay. [Indiscernible] --
7      MR. SULLIVAN: Wait a minute.
8  BY MR. THOMAS:
9      Q. -- [indiscernible] --
10      MR. SULLIVAN: Had you --
11  BY MR. THOMAS:
12      Q. -- [indiscernible] --
13      MR. SULLIVAN: -- finished your --
14  had you finished your answer?
15      THE WITNESS: Yes.
16  BY MR. THOMAS:
17      Q. Well, if you don't understand the --
18  if you don't understand the question, let me
19  -- let me rephrase it.
20      MR. SULLIVAN: I don't think he said
21  he didn't understand it. He just hadn't
22  finished answering.
23      MR. THOMAS: Can the court reporter
24  read back his answer.
25      MR. SULLIVAN: The portion before you

D. Berardo

1  
2  cut him off?
3  MR. THOMAS: Yeah.
4  MR. SULLIVAN: Okay.
5  THE COURT REPORTER: I actually
6  didn't get it because of the interruptions.
7  BY MR. THOMAS:
8  Q. So let me tell you how one equals the
9  other here. Mary Piehler sent this email to
10  Todd Awtry in March. If Todd Awtry thought
11  this was -- this commission system was grounds
12  for termination, what he was doing was setting
13  her up and waiting until several months later
14  and then saying "I think we have grounds to
15  fire all three," would that concern you?
16  MR. SULLIVAN: Objection to form.
17  THE WITNESS: I -- I just don't agree
18  with your assessment, so...
19  BY MR. THOMAS:
20  Q. Okay. And you don't agree with my
21  assessment, because it appears as though Todd
22  is saying it's fine; this commission system is
23  fine. Right?
24  MR. SULLIVAN: Objection to form.
25  THE WITNESS: He says "thanks for

D. Berardo

1  
2  heads-up."
3  BY MR. THOMAS:
4  Q. What -- what -- what is he doing
5  there? Is he -- does he think the commission
6  system is okay or not okay?
7  MR. SULLIVAN: Objection to form.
8  THE WITNESS: I don't know.
9  BY MR. THOMAS:
10  Q. Okay. Is that something you should
11  have looked at, given the fact that he tried
12  to fire the employee two months later?
13  MR. SULLIVAN: Objection to form.
14  THE WITNESS: From my recollection,
15  the reason why this didn't move forward and
16  was ambiguous was because of this email,
17  so...
18  BY MR. THOMAS:
19  Q. So why didn't you look at what Todd
20  Awtry -- what Todd Awtry was up to?
21  MR. SULLIVAN: Objection to form.
22  THE WITNESS: There were -- there
23  were -- I -- I didn't -- I didn't have any
24  concerns. I mean...
25  BY MR. THOMAS:

D. Berardo

1  
2  Q. You don't have any concerns when an
3  employee -- when a manager is trying to fire
4  an employee when he shouldn't, and he knows
5  that -- he knows that he's not telling -- that
6  the employee is doing things correctly?
7  MR. SULLIVAN: Objection to form.
8  BY MR. THOMAS:
9  Q. That doesn't concern you?
10  MR. SULLIVAN: Objection to form.
11  THE WITNESS: Well -- well, that's
12  why we had this investigation. Because the
13  company investigated, and then it was
14  determined, because of this email, that the
15  allegation -- or the -- how the -- the
16  businesses were booked, it was -- it was
17  ambiguous, because this email that Mary had
18  sent to Todd that said "thanks for
19  heads-up."
20  BY MR. THOMAS:
21  Q. And you didn't bother -- it didn't
22  concern you at all to investigate what was --
23  what Todd was up to?
24  MR. SULLIVAN: Objection to form.
25  THE WITNESS: Well, I -- I -- from

D. Berardo

1  
2  what I recall, Todd -- Todd forgot --
3  forgot about this email.
4  BY MR. THOMAS:
5  Q. Well, forgot? Or did you investigate
6  whether he truly forgot? Or did you look at
7  it at all? Or did you just say, "oh,
8  whatever."
9  A. How would we --
10  Q. "A man is trying -- I hear a man is
11  trying to fire a woman at Absolute. That --
12  we didn't fire her, so we're not even going to
13  bother looking into what the man is doing."
14  A. So --
15  MR. SULLIVAN: Objection to form.
16  THE WITNESS: -- just -- just to
17  clarify again, he was asking for
18  termination of all three, and there's --
19  BY MR. THOMAS:
20  Q. Okay. But [indiscernible] --
21  A. -- two men --
22  Q. -- about Mary --
23  A. There's two men and one woman, so --
24  Q. M'mm-hmm?
25  A. -- so I -- no, I mean, the -- the

---

D. Berardo

1  
2 connection -- I mean, I didn't --  
3     Q. You didn't draw that?  
4     A. I didn't draw that --  
5     Q. You, as head of -- you, as head of  
6 HR, didn't draw the connection?  
7     A. I -- I -- no, I didn't draw the  
8 connection, and I -- and I still wouldn't draw  
9 it today.  
10     Q. You didn't draw the connection even  
11 after Ms. Piehler said that Todd Awtry was out  
12 to get her, didn't you?  
13     MR. SULLIVAN: Objection to form.  
14     THE WITNESS: Out to get her?  
15 BY MR. THOMAS:  
16     Q. Yeah.  
17     A. I -- I don't recall her saying that.  
18 I mean, maybe she -- she did. I don't...  
19     Q. And you didn't investigate her  
20 complaints about Todd Awtry saying that she  
21 was stealing and lying falsely? You didn't  
22 even bother to look at that?  
23     MR. SULLIVAN: Objection to form.  
24     THE WITNESS: This whole  
25     investigation was around that.

---

D. Berardo

1  
2 BY MR. THOMAS:  
3     Q. Okay. And what did you do to counsel  
4 Todd Awtry about his conduct in this  
5 situation?  
6     MR. SULLIVAN: Objection to form.  
7     THE WITNESS: I mean, I'm -- I'm --  
8 so I'm -- I'm certain that there were  
9 conversations with Todd. I -- I don't  
10 recall specifically what was said to him.  
11 BY MR. THOMAS:  
12     Q. Did they include saying to him that  
13 he should not be treating his female  
14 subordinates the way he had been?  
15     A. No.  
16     MR. SULLIVAN: Objection to form.  
17     THE WITNESS: No, there was no  
18 conversations.  
19     UNIDENTIFIED SPEAKER: Can we just  
20 [indiscernible] --  
21 BY MR. THOMAS:  
22     Q. Sorry, go ahead.  
23     A. There was no conversations of that  
24 nature.  
25     Q. Because that was not something you

---

D. Berardo

1  
2 even investigated, was it?  
3     MR. SULLIVAN: Objection to form.  
4     THE WITNESS: That he was  
5 discriminating against Mary because of her  
6 gender?  
7 BY MR. THOMAS:  
8     Q. Correct.  
9     A. It was not something we investigated  
10 because it was not something that we thought  
11 was relevant in the situation.  
12     Q. It never crossed your mind, never  
13 raised a red flag; right?  
14     MR. SULLIVAN: Objection to form.  
15     THE WITNESS: No, there -- there were  
16 three people involved in this situation,  
17 and two were male.  
18 BY MR. THOMAS:  
19     Q. Oh, so that means that that -- it  
20 couldn't be discrimination against Mary  
21 Piehler because of her gender?  
22     MR. SULLIVAN: Objection to form.  
23     THE WITNESS: Well, I mean, no, I'm  
24 not saying that, but I'm -- I'm saying that  
25 there -- there was -- there would be no red

---

D. Berardo

1  
2 flags in my head that this was because of  
3 her gender. That's what I'm telling you.  
4 BY MR. THOMAS:  
5     Q. Even when she complained about it, it  
6 raised no red flags?  
7     A. Complained that she was discriminated  
8 on because of her gender? Is that what you're  
9 asking me?  
10     Q. We'll -- we'll come back to that.  
11     A. Okay.  
12     MR. THOMAS: Let's go to -- if the  
13 court reporter could show the witness  
14 Exhibit Awtry 76.  
15     THE WITNESS: Okay.  
16 BY MR. THOMAS:  
17     Q. Just to get the timeline straight  
18 here, on June 26th, Todd Awtry is saying that  
19 he believes there's enough grounds to  
20 terminate Mary Piehler. Ultimately, she's not  
21 terminated because there -- she didn't do  
22 anything wrong. And then on July 2nd, what  
23 does she want to -- what does he want to do to  
24 Mary Piehler?  
25     A. So from reading this email, he wants

---

Page 218

D. Berardo

1  to put her on a performance improvement plan
2  because of her Manage and Service numbers.
3      Q. So within five days of not being able
4  to fire her, he then switches reasons and
5  wants to put her on a PIP for something else;
6  right?
7      MR. SULLIVAN: Objection to form.
8      THE WITNESS: That's correct.
9  BY MR. THOMAS:
10     Q. And what do you tell him?
11     A. So I -- I asked him -- I asked him
12  about:
13       Would we be singling her out by
14     putting her on a PIP? We just came off an
15     investigation, so things are a little
16     sensitive. Are there any RDs in the same
17     boat?"
18     Q. And were you the one who stopped the
19  PIP from going forward?
20     A. I mean, I don't recall specifically,
21  but, I mean, I -- you know, judging from this
22  email, it seems like, you know, I may have
23  advised against it. I -- I don't know what
24  the sequence of events were after this email

Page 219

D. Berardo

1  or what was back and forth after this specific
2  email.
3     Q. And just a few -- few moments ago,
4  you said you didn't think that Mary Piehler
5  was being treated differently because of her
6  gender, but --
7     A. Correct.
8     Q. -- in an email a week later, you say:
9      My only concern would be if we are
10    singling her out."
11  So it did occur to you that you were -- that
12  Mary Piehler was being singled out, didn't it?
13     MR. SULLIVAN: Objection to form.
14     THE WITNESS: Singling -- yeah,
15    singled out compared to her peers, the
16    other regional directors.
17  BY MR. THOMAS:
18     Q. And did you conduct any investigation
19  as to whether Mary Piehler was being singled
20  out by Todd Awtry?
21     A. Well, I had -- I asked the question,
22  and he provided me the numbers.
23     Q. And then did you conduct any further
24  investigation as to -- I mean, would you be

Page 220

D. Berardo

1  concerned to find out that a manager was
2  singling out one of his subordinates?
3     A. Well, for performance, that wouldn't
4  concern me.
5     Q. Okay. But you, in this case,
6  indicated that the PIP shouldn't go forward;
7  correct?
8     A. I -- I don't think I indicated that.
9  I -- I asked the question.
10     Q. Okay. And so did you do anything
11  else to follow up on your question about
12  whether she was being singled out after you
13  got Todd's answer?
14     A. I don't -- I don't recall what
15  happened after Todd responded to me. I don't
16  remember.
17     Q. You don't remember doing any
18  investigation as to whether it was for
19  discrimination or other reasons; right?
20     A. No, there was -- there was no
21  discrimination brought to me, so I don't
22  recall any sort of investigations around
23  discrimination. Based on -- you know, based
24  on gender or -- or any protected grounds.

Page 221

D. Berardo

1  This was about performance.
2     Q. Well, when a -- when a manager is
3  singling out
4  a woman on his staff for a PIP and a
5  termination for reasons that he had been
6  informed were okay, it never -- it doesn't --
7  that -- discrimination didn't cross your mind?
8  That's the type of HR culture you were running
9  there?
10     MR. SULLIVAN: Objection to form.
11     THE WITNESS: The -- the PIP was
12    concerning her performance, so he may have
13    been singling her -- her out based on her
14    performance with her peers, and that
15    happens all the time.
16  BY MR. THOMAS:
17     Q. You -- it didn't -- it didn't strike
18  you as coincidental that, within a week of
19  Todd failing to get Mary fired on the DOE
20  issue, that he's coming back and trying to put
21  her on a PIP for something else?
22     MR. SULLIVAN: Objection to form.
23     THE WITNESS: Well, I mean, the --
24    the -- the new fiscal year starts in July

D. Berardo

1
2  of every year, I believe, from Absolute.
3  So, I mean, it -- it -- it didn't -- it
4  didn't concern me about any sort of
5  protected discrimination.
6      MR. THOMAS:  Could you read --
7  Jessica, could you read the question back
8  to Mr. Berardo.
9      (REPORTER READ BACK)
10      MR. SULLIVAN:  Objection to form.
11      THE WITNESS:  I -- I wouldn't say
12  it's coincidental, but, obviously, I had a
13  -- I had a concern, and I asked the
14  question.  So I had a concern enough that I
15  asked the question about her performance.
16  BY MR. THOMAS:
17      Q. All right.  Have you ever heard of an
18  employee being put on a PIP for following a
19  CEO's direction?
20      MR. SULLIVAN:  Objection to form.
21      THE WITNESS:  A CEO's direction?
22  BY MR. THOMAS:
23      Q. Yes.
24      A. I mean, not off the top of my head.
25      Q. It would be kind of strange, wouldn't

D. Berardo

1
2  it?
3      MR. SULLIVAN:  Objection to form.
4      THE WITNESS:  To follow an order from
5  a CEO, and then be put on a PIP because you
6  followed that order?
7  BY MR. THOMAS:
8      Q. Yeah.
9      A. I -- yeah, I would say that would be
10  strange.
11      Q. Are you aware that Geoff Haydon said
12  that he wanted the company to focus on selling
13  Computrace and only sell Manage and Service to
14  current clients?
15      MR. SULLIVAN:  Objection to form.
16      THE WITNESS:  I mean, I don't -- I
17  don't recall that, but...
18  BY MR. THOMAS:
19      Q. Do you have any reason to doubt that
20  was true?
21      A. No.
22      Q. And what is Mr. Awtry faulting
23  Ms. Piehler for here as to why she was -- why
24  she was being singled out?
25      A. Well, this was Manage and Service.

D. Berardo

1
2      MR. THOMAS:  Now, let's -- if the
3  court reporter could mark Exhibit Berardo
4  L.  And, Jessica, are you -- when I'm doing
5  new exhibits that you have, are you going
6  off numerically from where we left off at
7  85?
8      THE COURT REPORTER:  Yes, if that's
9  what you would like.
10      MR. THOMAS:  Perfect.
11      THE COURT REPORTER:  Okay.
12      MR. THOMAS:  Let's go off the record
13  for a second.
14      VIDEOGRAPHER:  Going off record.  The
15  time is 4:23.
16      (PROCEEDINGS RECESSED AT 4:23 P.M.)
17      (PROCEEDINGS RECONVENED AT 4:25?P.M.)
18      VIDEOGRAPHER:  Back on the record.
19  The time is 4:25.
20  BY MR. THOMAS:
21      Q. Mr. Berardo, you're free to read as
22  much of Exhibit 86 as you would like.
23  However, I'm only going to be really asking
24  you about the forwarding emails from
25  Mr. Awtry.  So let me know when you're ready.

D. Berardo

1
2      A. The -- sorry, the -- the from email
3  from Mr. Awtry?
4      Q. Yeah, where he says:
5      I highlighted a few, but encourage
6      you to read all of it."
7      MS. LESTRADE:  Oh.  That is not
8  exhibit -- what has been marked as
9  Exhibit 86.
10      MR. THOMAS:  Okay.  What is the Bates
11  number at the bottom of that, Jessica?
12  Let's -- let's go off the record.
13      VIDEOGRAPHER:  Going off record.  The
14  time is 4:26.
15      (PROCEEDINGS RECESSED AT 4:26?P.M.)
16      (PROCEEDINGS RECONVENED AT 4:38?P.M.)
17      VIDEOGRAPHER:  Back on the record.
18  The time is 4:39.
19      (Exhibit 86 was marked for
20  identification and is attached hereto.)
21  BY MR. THOMAS:
22      Q. All right.  Let me start again, Mr.
23  Berardo.  Sorry for that confusion there.
24  You're welcome to read as much as Exhibit 86
25  as you would like, which, for the record, is

Page 226

D. Berardo

1
2  Bates number DEFS08824 to DEFS08830. But I'm
3  only going to really ask you about the very
4  top of the first page, which is Todd sending
5  you this email.
6        So let me know when you're ready,
7  and I can ask you questions.
8     A. Sure. I don't -- I don't need to --
9  unless you want me to read it all, I don't
10 need to read it all, just because you --
11    Q. No, I --
12    A. I --
13    Q. -- don't -- I don't need you to.
14    A. Okay.
15    Q. Okay. So, now, just for the -- for
16 the sake of chronology, back at the end of
17 June, very end of June, Todd Awtry says that
18 he thinks he has grounds to fire Mary Piehler.
19 HR gets involved. Mary Piehler is not fired.
20 July 2nd, about a week later, he tries to put
21 Mary Piehler on a PIP. Again, involves HR.
22 And she is not put on a PIP. Then a month
23 later in August, he is forwarding to you an
24 email that Mary Piehler wrote -- oh, what was
25 that? -- 15 months before and -- about Mary

Page 227

D. Berardo

1
2  Piehler's comments on Todd Awtry and -- and
3  his job.
4        Why was Todd Awtry forwarding you
5  this email in August?
6     MR. SULLIVAN: Objection to form.
7     THE WITNESS: So, from what I recall,
8  he was -- he was -- he was just made --
9  made aware. He was made aware of this
10 email.
11 BY MR. THOMAS:
12    Q. He was just made aware of that email?
13    A. I mean, from my recollection, he was
14 just --
15    Q. I will testify to you that -- I will
16 represent to you that his testimony was that
17 he was aware of the email almost --
18    A. Okay.
19    Q. -- at the time it was -- it was sent,
20 so --
21    A. Okay. So -- so my recollection is
22 incorrect. So -- so did he -- had he just
23 received the email? Or he said that he's had
24 this email for a long time?
25    Q. He said that he had the email for a

Page 228

D. Berardo

1
2  long time.
3     A. Okay. Fair enough. I -- I don't
4  recall why he sent it to me on the 15th of
5  August.
6     Q. Was he still trying to get Mary
7  fired?
8     MR. SULLIVAN: Objection to form.
9     THE WITNESS: I don't recall our
10 conversations about this email.
11 BY MR. THOMAS:
12    Q. Or trying to put her in a bad light?
13    MR. SULLIVAN: Objection to form.
14    THE WITNESS: That -- that would be
15 more of a question for Todd.
16 BY MR. THOMAS:
17    Q. It seems like every couple of weeks
18 or months starting in June, he's on Mary
19 Piehler's tail, singling her out to HR in
20 various ways. Is that fair to say?
21    MR. SULLIVAN: Objection to form.
22    THE WITNESS: I wouldn't say singling
23 out, no. That -- that wouldn't be
24 accurate.
25 BY MR. THOMAS:

Page 229

D. Berardo

1
2     Q. Well -- well, I think that's the word
3  that you used; right? "Singling out"?
4     A. Not in that context.
5     Q. What context -- what context did you
6  not use it -- I mean, what context did you use
7  it in?
8     A. If I -- if I can see the prior
9  exhibit, then I can -- I can tell you exactly
10 how I was...
11    Q. Exhibit 70 -- we -- we don't need to
12 do that. We -- we've been through that --
13    A. Okay.
14    Q. -- your use of the word -- I -- when
15 I said "singling," I was only, you know, using
16 your phrase.
17       But why is -- as an HR person,
18 aren't you a little concerned at this point
19 that you've got a manager trying to -- trying
20 to go after one of his employees again and
21 again and again?
22    MR. SULLIVAN: Objection to form.
23    THE WITNESS: Are you asking me about
24 this specific email? Or --
25 BY MR. THOMAS:

TSG Reporting - Worldwide 877-702-9580

Page 230

D. Berardo

1
2     Q. This email with -- what was preceded
3  by the PIP email that was preceded by the
4  termination email.  We had three -- three
5  attempts in a row by Todd Awtry to -- to go
6  after Mary Piehler in the space of a month and
7  a half.
8        MR. SULLIVAN:  Objection to form.
9        THE WITNESS:  In my opinion, they
10    were all valid concerns.
11  BY MR. THOMAS:
12    Q. Well, the DOE was not a valid
13  concern, was it?  She didn't do anything wrong
14  there.
15    A. So it was -- it was determined that
16  it was inconclusive.
17    Q. Okay.  So that was not a valid
18  concern, was it?
19        MR. SULLIVAN:  Objection to form.
20        THE WITNESS:  It was a valid concern
21    -- when we did the investigation, it was,
22    yes.
23  BY MR. THOMAS:
24    Q. Well, was it a valid concern for him
25  who, two months before, knew how the

Page 231

D. Berardo

1
2  commissions were being allocated?
3        MR. SULLIVAN:  Objection to form.
4        THE WITNESS:  If I can see -- I think
5    we discussed this before, but if we could
6    -- if we want to discuss it again, I -- if
7    I can see the --
8  BY MR. THOMAS:
9    Q. Sure.
10    A. -- prior exhibits.
11        THE COURT REPORTER:  Which number?
12  BY MR. THOMAS:
13    Q. I think we can all agree that as of
14  -- if you take a look at Exhibit 71, as of
15  March 17th, Todd Awtry was fully aware of how
16  the commissions at the DOE were going to be
17  allocated; correct?
18    A. I don't have Exhibit 71 in front of
19  me, sorry.  Can we...
20    Q. We'll get that for you.
21    A. Thank you.  Right.  So this is where
22  he said "thanks for heads-up."
23    Q. Right.  Where he was informed of how
24  the commissions for DOE were being done;
25  correct?

Page 232

D. Berardo

1
2    A. Yeah, Mary -- yeah, Mary was -- was
3  emailing him about that.
4    Q. And, Mr. Berardo, I don't want to
5  nitpick with you on all of these exhibits.  I
6  will just say to you you see all of this going
7  on in the space of a month and a half, and it
8  doesn't occur to you that Todd Awtry was out
9  to get Mary Piehler?
10        MR. SULLIVAN:  Objection to form.
11        THE WITNESS:  That did not cross my
12    mind because, again, these were all --
13  BY MR. THOMAS:
14    Q. As even a possibility?
15    A. These were all legitimate --
16  legitimate concerns that Todd had towards
17  Mary.
18    Q. Even as a possibility, it never
19  crossed your mind?
20    A. No.
21    Q. Okay.  Do you think that that is a
22  common-sense perspective on the situation?
23        MR. SULLIVAN:  Objection to form.
24        THE WITNESS:  Yes.
25  BY MR. THOMAS:

Page 233

D. Berardo

1
2    Q. And not only is Todd out to get Mary
3  in each of these situations, but they're all
4  sort of different; right?  Tries one; it
5  doesn't work.  Tries something else; it
6  doesn't work.  Tries something else; it
7  doesn't work.  Right?
8        MR. SULLIVAN:  Objection to form.
9        THE WITNESS:  No, I wouldn't
10    characterize it like that.
11  BY MR. THOMAS:
12    Q. Okay.  And you didn't investigate to
13  see how it should be characterized, did you?
14        MR. SULLIVAN:  Objection to form.
15        THE WITNESS:  Investigate what?
16  BY MR. THOMAS:
17    Q. How Todd Awtry was going after Mary
18  Piehler?
19    A. There was --
20        MR. SULLIVAN:  Objection to form.
21        THE WITNESS:  There was nothing to
22    investigate.
23  BY MR. THOMAS:
24    Q. And when you saw the email from Mary
25  Piehler with Jermaine O'Dondow [phonetic] down

D. Berardo

below, you didn't recommend Ms. Piehler's
termination, did you?
     A. I don't -- I don't recall what --
what was discussed.
     Q. Do you -- do you recall any
discussions that she should be disciplined?
     A. I don't -- I don't recall our
discussions, no.
     Q. Okay.  And you don't recall any
discussions that she should be counselled?
     A. No, I don't recall any discussions.
     Q. Or terminated?
     A. I mean, I just don't remember if we
had those conversations.  I don't know.
     Q. All right.  Let's go to Exhibit 21,
if that could be marked.
     MR. SULLIVAN:  Shouldn't need to mark
it.  It's already been marked.
     THE COURT REPORTER:  So, sorry, am I
marking it 87?
     MR. SULLIVAN:  No, it's already been
marked as 21.
     THE WITNESS:  Thank you.
BY MR. THOMAS:

D. Berardo

     Q. Why don't you read it over, and when
you've had a chance, I will have some
questions for you on it.
     A. Oh, this was in order, actually, from
front to back.  I read the last -- I will
start at the beginning.  Okay.
     Q. All right.  Did you take any steps to
probe the complaints made by Mary Piehler in
this exhibit?
     MR. SULLIVAN:  Objection to form.
     THE WITNESS:  I can't recall
specifically, but -- but reading through
it, it's -- the numbers -- I mean, the
numbers seemed like they were system
issues, so I likely wouldn't have
investigated that.
     MR. THOMAS:  I will request any
documentation -- any HR review that was
performed of this --
     THE WITNESS:  Not --
     MR. THOMAS:  -- exhibit.
BY MR. THOMAS:
     Q. I will just give one example.
     A. Not to my recollection.

D. Berardo

     Q. In the second line, she says:
          I don't want to be known as a
     troublemaker."
Right?
     A. Okay.
     Q. Third line, she says she wants to be
paid -- paid fairly.  At the bottom paragraph,
she refers to a man who's getting paid full
value, and she isn't getting commissions and
under investigation for selling DOE.  Do you
see those comments?
     A. I do, yes.
     Q. Okay.  Did you see them at the -- did
you read them at the time?
     A. I would have, yes.
     Q. Is this an example of you thinking
that Mary Piehler was passionate or difficult
to deal with?
     MR. SULLIVAN:  Objection to form.
     THE WITNESS:  I mean, I don't -- I
don't recall what I thought when I received
the email.  I don't remember.
BY MR. THOMAS:
     Q. Didn't you make a comment like that

D. Berardo

earlier today?  That you thought that Mary
could be passionate in her communication?
     A. I don't -- I don't recall.  We can
definitely read back what I -- what I wrote
[sic], if you like.
     Q. Well, do you think she -- do you
think she was passionate in her -- in her
communications?
     A. Was she -- was she passionate?  I
mean, she didn't shy away from communicating.
     Q. Did you -- you talked before about
how you had conversations with her, and they
would end up going round and round.  Do you
remember that?
     A. They would go around in circles
sometimes, yes.
     Q. Is this an example of it going around
in circles?
     A. Well, I don't -- I don't think so.
It's one -- it's a -- one email to me.  So I
can't recall if I went around and around with
her.
     Q. Okay.  Turning to the last page, do
you see that under number 4, about seven lines

D. Berardo

1
2  down, she says:
3       All I asked was to be treated the
4  same."
5  Do you see that?
6       A. Can you -- so it's, sorry, the
7  second-to-last page?
8       Q. Second-to-last page. P818, item
9  number 4. Six, seven lines down:
10      All I asked was to be treated the
11 same."
12 Do you see that?
13      A."All I asked was to be treated the
14 same."
15 Yeah.
16      Q. Was that an unfair request from a
17 woman at Absolute?
18      MR. SULLIVAN: Objection to form.
19      THE WITNESS: Yeah, I would say
20 it's a -- no, it's a fair request from
21 anyone at Absolute.
22 BY MR. THOMAS:
23      Q. Is it a fair request from someone at
24 Absolute that they want to be -- from a woman
25 at Absolute, that she wants to be paid fairly?

D. Berardo

1
2       MR. SULLIVAN: Objection to form.
3       THE WITNESS: I -- I don't think
4  that -- again, from -- from anyone that --
5  anyone, it would be valid to say they want
6  to be paid fairly.
7  BY MR. THOMAS:
8       Q. And if they take that to HR, that's
9  something that HR should look at; right?
10      MR. SULLIVAN: Objection to form.
11      THE WITNESS: If they say that they
12 were paid unfairly because they were
13 female? Or because of gender? Is that
14 what you're asking me?
15 BY MR. THOMAS:
16      Q. Well, I'm asking -- let's just start
17 with someone who says "I'm not being paid
18 fairly" and goes to HR. Should HR look at
19 that?
20      A. We -- it happens all the time, and
21 people's perception of being paid fairly, it's
22 just --
23      Q. I'm asking whether HR should look at
24 that issue.
25      A. We should talk to the employee and

D. Berardo

1
2  ask what the employee may be speaking of.
3       MR. THOMAS: Going to page -- we --
4  and we will request documentation of that
5  ever occurring.
6  BY MR. THOMAS:
7       Q. Going to page P817, do you remember
8  that Todd Awtry shared the performance reviews
9  of his subordinates with all of his
10 subordinates --
11      A. Yes.
12      Q. -- by email?
13      A. I do remember that.
14      MR. SULLIVAN: Objection to form.
15 BY MR. THOMAS:
16      Q. Is that an example of him in his
17 professional, buttoned-up attitude that he was
18 bringing to Absolute?
19      A. I would say that's not an -- not an
20 example of that.
21      Q. Did you see that Mary Piehler
22 complained about him doing that?
23      A. Did she -- sorry, in this thread,
24 she -- did she complain to me about it, sorry?
25      Q. P817.

D. Berardo

1
2       A. 17. So, sorry, because there's -- it
3  -- it doesn't show who this was sent to on my
4  copy.
5       Q. Okay. If you go to the top of page
6  P811, who is dberardo@absolute.com?
7       A. So you're asking me who
8  dberardo@absolute.com is?
9       Q. M'mm-hmm.
10      A. That's me.
11      Q. Okay. And do you see in the first
12 line where it says "Daniel"?
13      A. Yes. No, there was a -- there's a
14 whole bunch of --
15      Q. Okay. So I'm ask -- so would you go
16 to page 817. Do you see in there where she
17 tells you that -- that these emails were sent
18 out to everybody in her group?
19      A. Yeah, and I recall -- I recall this.
20      Q. Okay. And in the paragraph above,
21 she mentions the fact that a manager who was
22 there less than six months, Troy, a male, is
23 able to get a higher performance rating, and
24 his commentary is the same as hers, which is
25 "I have not had a chance to observe the

D. Berardo

1  competency."  That's what Todd Awtry said.
2  Did you look into that, as to why a male could
3  -- could -- with less than six months'
4  experience get a higher score on a
5  performance --
6      MR. SULLIVAN:  Objection to form.
7  BY MR. THOMAS:
8      Q. -- review than Mary Piehler when Todd
9  Awtry said he didn't have any basis to do the
10 review?
11     MR. SULLIVAN:  Objection to form.
12     THE WITNESS:  I don't -- I don't
13 recall -- I don't recall looking into
14 specific performance reviews.
15     MR. THOMAS:  We would request the
16 production of any documents reflecting any
17 HR review of those issues.
18 BY MR. THOMAS:
19     Q. Now, Mr. Berardo, what -- what --
20 well, let's do this:  Let's just go off the
21 record for five minutes here.  Thanks.
22     VIDEOGRAPHER:  Going off record.  The
23 time is 5:04.  This is the end of media 1.
24     (PROCEEDINGS RECESSED AT 5:04?P.M.)

D. Berardo

1     (PROCEEDINGS RECONVENED AT 5:13 P.M.)
2     VIDEOGRAPHER:  Back on the record.
3  The time is 5:13.
4  BY MR. THOMAS:
5      Q. All right, Mr. Berardo.  Thank you
6  for that break there.  Would it be fair to say
7  that at Absolute when women complained about
8  how they were being treated, that their
9  complaints just kind of disappeared?
10     MR. SULLIVAN:  Objection to form.
11     THE WITNESS:  It would not be fair to
12 say.
13 BY MR. THOMAS:
14     Q. Kind of ignored?
15     A. No.
16     Q. Well, let's -- let's take a look
17 here, if we could.
18     And if the court reporter could show
19 Mr. Berardo Piehler Exhibit 22.  You can read
20 as much of it as you want.  I -- why don't --
21 yeah, why don't you go ahead and read the
22 whole thing, and let me know when you're done.
23 I'm not going to be going over the jellybean
24 stuff at the end, but you can read whatever --

D. Berardo

1  as much as -- as much as you would like.
2      A. Okay.
3      Q. All right.  I would like to direct
4  your attention to DEFS2550 and the very top
5  email from you.
6      A. M'mm-hmm.
7      Q. You say:
8      Thanks, Mary.  I don't recall ever
9  having a conversation about your
10 performance reviews with Todd.  In fact, I
11 don't even recall a conversation with you
12 about not receiving your last performance
13 review.  Of course, I've had a lot of
14 conversations, so I can't say for certain.
15 My memory has failed me in the past.  It's
16 not my practice to discuss private
17 conversations, though, so I apologize if
18 this did happen."
19 Do you see your comment there?
20     A. I do see my comment, yes.
21     Q. And what date was that?
22     A. It looks like it's August 11th, 2014.
23     Q. How long before that had Mary Piehler
24 complained about the evaluations with Todd?

D. Berardo

1      A. The -- him sending out the -- the
2  numbers?
3      Q. If you look at Exhibit 21, I think it
4  will refresh your recollection.
5      A. It was July 6th, 2014.
6      Q. So how -- how -- how long between the
7  two -- between the two emails?
8      A. So July 6th, 2014, and August 6th,
9  2014.  Or August 11th.  So just over a month.
10     Q. Okay.  So, like, a month and five
11 days.  You totally forgot about Mary -- Mary
12 Piehler's complaints about how her manager was
13 evaluating her; correct?
14     MR. SULLIVAN:  Objection to form.
15     THE WITNESS:  I say:
16     In fact, I don't even recall a
17 conversation with you about not receiving
18 your last performance review."
19 BY MR. THOMAS:
20     Q. If you go to Exhibit 21, page P817,
21 Ms. Piehler says, at the second paragraph:
22     However, what I questioned even more
23 was that I still have never had a
24 performance review with Todd?  Not to

Page 246

D. Berardo

1
2   mention, I do find it unprofessional that
3   he shares these ratings with an email
4   distribution list."
5       A. Okay.
6       Q. So within the space of a month, you
7   thought that you had forgotten about Mary
8   Piehler's complaint about how Todd was
9   treating her in terms of her performance
10  evaluations.  Fair to say?
11      A. No.  I said:
12          In fact, I don't recall a
13      conversation with you about receiving your
14      last performance review."
15      Q. Oh, but you meant you did remember an
16  email, but you didn't remember a conversation?
17      A. I -- I don't recall what I -- I
18  don't -- I don't recall what I remember or
19  don't remember back then.  I'm just going --
20      Q. Okay.
21      A. -- by what's --
22      Q. Well, let's look --
23      A. -- in the email.
24      Q. -- at what you said.  Do you consider
25  it truthful and transparent to say to someone

Page 247

D. Berardo

1
2   "I don't remember a conversation with you"
3   when -- when you're referring to an email they
4   sent you complaining about discrimination?
5       MR. SULLIVAN:  Objection to form.
6       THE WITNESS:  So the email that she
7   sent to me was not complaining about
8   discrimination, and I said, "I -- I don't
9   even recall -- I don't recall the
10  conversation with you."  So I think --
11  BY MR. THOMAS:
12      Q. So you had forgotten about it within
13  a month?
14      MR. SULLIVAN:  Objection to form.
15      THE WITNESS:  I mean, we're talking
16  about a conversation, so I'm not sure -- I
17  have to read this email over again to see
18  if Mary's --
19  BY MR. THOMAS:
20      Q. Sure.
21      A. -- referring --
22      Q. Read it again.
23      A. -- referring to a conversation or the
24  email she sent me.
25      Q. I don't want us to keep going around

Page 248

D. Berardo

1
2   and around about this, Mr. Berardo.  I think
3   it's important that we get to the point.
4       A. Sure.  Absolutely.
5       So, I mean, just reading from the emails,
6   it -- it might be possible that I didn't
7   remember this one line from this nine-page
8   email a month and a half ago.
9       Q. Well, let's -- let's count the lines
10  of that.  Let's go to P817.  It actually
11  starts on page 816, number 3, "manager
12  performance reviews."  Bold, highlighted.  1,
13  2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,
14  15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25,
15  26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36,
16  37, 38, 39, 40, 41, 42, 43, 44 -- 46, 47, 48,
17  49, 50.  Really, 50 lines in that email;
18  right?  About it?
19      MR. SULLIVAN:  Objection to form.  50
20  lines -- I'm sorry.  50 lines in the
21  entire --
22      MS. LESTRADE:  Nine-page email?
23      MR. SULLIVAN:  -- the nine-page
24  document, Exhibit 21?
25      MR. THOMAS:  In Exhibit 21, yes.

Page 249

D. Berardo

1
2       MR. SULLIVAN:  Are you --
3       MR. THOMAS:  [Indiscernible] --
4       MR. SULLIVAN:  -- representing that
5   Exhibit 21 is 50 lines?
6       MR. THOMAS:  No, I'm representing
7   that there's 50 lines of discussion
8   relating to the performance evaluation.
9       MR. SULLIVAN:  Okay.  So --
10      MR. THOMAS:  I'm not representing
11  anything.  I'm asking -- if he doesn't
12  think there's 50 lines there, he can let me
13  know.  But I don't -- he -- he testified
14  under oath that there was 1.
15      MR. SULLIVAN:  I'm -- I'm just
16  confused.  50 lines of what?  Just so we're
17  clear on that.
18      MR. THOMAS:  Discussion about his --
19  the performance evaluation.  Three
20  managers' performance reviews.  It deals
21  with two issues:  Not receiving a
22  performance evaluation --
23      MS. LESTRADE:  Two issues.
24      MR. THOMAS:  -- and two then being
25  emails sent out to everybody in the

D. Berardo

1
2 company.
3     THE WITNESS: Okay. Well, I was
4 referring to this line:
5         However, what I questioned even more
6 was that I still never had a performance
7 review with Todd."
8 BY MR. THOMAS:
9     Q. Well, let's go back. What about the
10 first line:
11         I emailed Tina on December 30th to
12 see if there was ever a review done for me
13 by Todd. Her email --"
14     A. Okay.
15     Q."-- exchange is below."
16     A. Okay.
17     Q."Have you ever seen the review he
18 wrote for me? I attached the PDF. Todd
19 wrote one sentence for each category. 'I
20 only had six months' visibility to observe
21 this competency.'"
22 I won't keep reading it, but it's fair to say
23 that her complaint didn't -- wasn't 1 line;
24 correct?
25     A. Okay. It was more than 1 line.

D. Berardo

1
2     Q. And more like 50. In an entire
3 section of the email.
4     A. I don't know if the -- this email
5 here you're referring to that I wrote talked
6 about not receiving her performance review.
7 So I don't think that all 50 lines --
8     Q. Well, go read -- go read what you
9 said -- go read your own words from it.
10     A."In fact, I don't even recall a
11 conversation with you about not receiving
12 your last performance review."
13     Q. Yeah. Now, is it because you ignored
14 her complaint or you just forgot about it that
15 you didn't remember it a month later?
16     MR. SULLIVAN: Objection to form.
17     THE WITNESS: I -- I don't recall. I
18 don't recall why.
19 BY MR. THOMAS:
20     Q. Is it because you didn't --
21 obviously, you weren't investigating it.
22     MR. SULLIVAN: Objection to form.
23     THE WITNESS: Investigating that she
24 didn't receive a review?
25 BY MR. THOMAS:

D. Berardo

1
2     Q. That she didn't receive a performance
3 review and that her manager emailed out the
4 reviews to other people.
5     MR. SULLIVAN: Objection to form.
6     THE WITNESS: So those are two
7 separate issues.
8 BY MR. THOMAS:
9     Q. As well as her comment that all she
10 wanted to do was be treated fairly.
11     MR. SULLIVAN: Objection to form.
12     THE WITNESS: If -- if you want to go
13 through -- I'm happy to go through each
14 issue one by one, but they're separate
15 issues.
16 BY MR. THOMAS:
17     Q. Well, I'm just wondering if you had
18 any -- you had obviously forgotten about the
19 performance review issue -- well, strike that.
20         Had you forgotten about the
21 performance review about a month later, or did
22 you just ignore it when it first came in?
23     MR. SULLIVAN: Objection to form.
24     THE WITNESS: I have already answered
25 that question, but I don't recall.

D. Berardo

1
2 BY MR. THOMAS:
3     Q. Okay. It's possible you could have
4 ignored it; it's possible you just forgot it?
5     MR. SULLIVAN: Objection to form.
6     THE WITNESS: That's your opinion.
7 BY MR. THOMAS:
8     Q. No, I'm asking you for your -- for
9 what you mean by "I don't -- it -- it could
10 be." What --
11     MR. SULLIVAN: Objection --
12 BY MR. THOMAS:
13     Q. -- [indiscernible] --
14     MR. SULLIVAN: -- to form.
15     THE WITNESS: I didn't say it could
16 be. I said I don't --
17 BY MR. THOMAS:
18     Q. Okay. Well, what -- did -- did you
19 forget it?
20     A. No, I said I don't recall.
21     Q. Or did you just never read it to
22 begin with?
23     MR. SULLIVAN: Objection to form.
24     THE WITNESS: I don't recall. I
25 don't have a recollection of it.

D. Berardo

BY MR. THOMAS:

Q. Okay. It could be either of those?

MR. SULLIVAN: Objection to form.

THE WITNESS: I don't have a recollection of it, so I can't answer that question.

BY MR. THOMAS:

Q. Okay. Well, I'm asking you could it be anything else besides those two, that you never read it, or you forgot about it?

MR. SULLIVAN: Objection to form.

THE WITNESS: I mean, yeah, I could have forgotten about it. I -- I mean, I -- I doubt that I wouldn't have read it. But I may have forgotten that I had -- didn't read these two sentences in this nine-page email.

BY MR. THOMAS:

Q. Okay. And you -- do you understand why -- well, let's -- let's go to Mary Piehler's comment on Exhibit 22 where she says, in the email to you at the end of the second paragraph (as read):

What I want to stop is Todd being

D. Berardo

asked about something, denying it, and then someone thinking I did not tell the truth when, in -- when, in reality, it is true and documented. I would not tell HR or an ELT member anything I could not substantiate."

Do you see that?

A. I see that, yes.

Q. Do you think Mary Piehler could have felt that when she was communicating with you it just ended up that your -- her complaints to you were ignored, and that it just went around and around, and you would forget things, and you wouldn't pay attention to what was going on, and she just -- it was very difficult communicating with you?

A. Absolutely --

MR. SULLIVAN: Objection to form.

THE WITNESS: Absolutely not. We talked on a number of occasions.

BY MR. THOMAS:

Q. Okay. But, well, she raises a major concern with you about how her male superior is conducting her performance appraisals, the

D. Berardo

same one who has just tried to put her on a PIP, fire her, and forwarded you an email about [lost connection] somebody thinks warrants termination, and you can't even remember what she said to you a month ago in an email?

MR. SULLIVAN: Objection to form.

BY MR. THOMAS:

Q. Wouldn't that be a concern if you were an employee?

MR. SULLIVAN: Objection to form.

THE WITNESS: No, we're human.

BY MR. THOMAS:

Q. Well, you say -- let's go to Exhibit 17. Your email on July 1st on page DEFS02585 says:

Coming from an HR background, it's always been drilled in my head to get everything in writing."

A. Where are we? Sorry, where are we?

Q. Exhibit 17, DEFS02585.

A. 585. Okay.

Q. And you see you said to Mary Piehler:

Coming from an HR background, it has

D. Berardo

always been drilled in my head to get everything in writing."

Do you see that?

A. Yes.

Q. And Mary Piehler put it in writing, and it was forgotten or ignored --

A. Mary --

Q. -- by HR?

MR. SULLIVAN: Objection to form.

THE WITNESS: That she didn't --

BY MR. THOMAS:

Q. Right?

A. That she didn't receive a performance review? I can't --

Q. Her complaint was ignored or forgotten; right?

MR. SULLIVAN: Objection to form.

BY MR. THOMAS:

Q. Even though she put it in writing?

A. I can't say what happened after that email or if I had conversations with her. We had many conversations on the phone.

Q. And what good did it do her to put it in writing to HR?

D. Berardo
1
2      MR. SULLIVAN: Objection to form.
3      THE WITNESS: Are you asking me what
4  she thought?
5  BY MR. THOMAS:
6      Q. Yeah. What good did it do? It was
7  forgotten in a month.
8      MR. SULLIVAN: Objection to form.
9  BY MR. THOMAS:
10     Q. Or ignored.
11     A. Okay.
12     Q. What good did it do for her to put it
13 in writing?
14     MR. SULLIVAN: Objection to form.
15     THE WITNESS: I -- I don't know -- I
16  don't know how to answer that question.
17 BY MR. THOMAS:
18     Q. No. All right. Let's move on.
19     What investigations did you do in HR
20 to ensure that Mary Piehler was being treated
21 fairly by the company?
22     A. Are you talking about a specific
23 incident?
24     Q. Anything you have done.
25     A. We have gone through --

D. Berardo
1
2      Q. Anything where you list it.
3      A. We have gone through a number of
4  scenarios.
5      Q. You didn't lift -- tell me one right
6  now where you lifted a finger to help Mary
7  Piehler from being treated unfairly at
8  Absolute.
9      A. We did the --
10     MR. SULLIVAN: Objection to form.
11     THE WITNESS: We did a DOE -- DOE
12  investigation.
13 BY MR. THOMAS:
14     Q. That was protecting her?
15     A. It absolutely was, yes.
16     Q. Or was she the one -- she -- wasn't
17 she the target of the investigation?
18     A. She was a subject -- she was one of
19 the three subjects of the investigation, from
20 what I recall.
21     Q. So being a subject of an
22 investigation is an example of you ensuring
23 that she was treated fairly?
24     A. Absolutely, it is.
25     Q. And her being withheld commissions

D. Berardo
1
2  during that investigation is an example of her
3  being treated fairly?
4      MR. SULLIVAN: Objection to form.
5      THE WITNESS: That's -- that wasn't
6  my call, so I can't really answer that
7  question.
8  BY MR. THOMAS:
9      Q. As an HR, though -- as an HR -- as
10 head of HR, withholding someone's pay during
11 an investigation, you think, is a way to
12 ensure they're being treated fairly?
13     A. We -- we didn't withhold pay; we
14 withheld commissions while the investigation
15 was underway, so --
16     Q. What's the difference between --
17 sorry. Go ahead.
18     A. So I would think that that would be
19 a -- that would be fair to do in this -- in
20 that sort of circumstance.
21     Q. What is the difference between pay
22 and commissions?
23     A. Pay can be defined as base pay --
24 commissions, base pay, bonus. There's lots of
25 variable different types of pay.

D. Berardo
1
2      Q. Any other -- any other examples of
3  you in HR doing anything to protect Mary
4  Piehler from being treated unfairly besides
5  targeting her for an investigation?
6      A. Well --
7      MR. SULLIVAN: Objection to form.
8      THE WITNESS: -- Mary and I spoke a
9  number of different times in a number of
10  different emails, and if she would have
11  raised anything that may have been
12  discriminatory, of course we would have
13  investigated it even further.
14 BY MR. THOMAS:
15     Q. So you -- did you investigate
16 anything ever?
17     A. Not from a discriminatory point of
18 view.
19     Q. Okay.
20     A. I would say --
21     Q. Despite all the conversations with
22 Mary Piehler, the emails we have seen, you
23 never once investigated discrimination?
24     MR. SULLIVAN: Objection to form.
25     THE WITNESS: That's correct. That

Page 262

D. Berardo

1
2  was never raised.  Or -- and that was never
3  apparent in any of the -- any of the
4  documents or any of the complaints that
5  were ever forwarded.
6  BY MR. THOMAS:
7      Q. Anything else that you did to protect
8  her from being treated unfairly?
9          MR. SULLIVAN:  Objection to form.
10         THE WITNESS:  Not that I recall.
11 BY MR. THOMAS:
12     Q. Before an employee is terminated for
13 poor performance, what steps should an
14 employer go through with that employee --
15         MR. SULLIVAN:  Objection to form.
16 BY MR. THOMAS:
17     Q. -- from a human resources
18 perspective?
19     A. I can speak in general.
20     Q. Well, let's -- okay.  Go ahead.
21     A. Sure.  So it -- it's -- it would
22 depend -- so if it's for performance, it would
23 depend if -- if the person can actually make a
24 turnaround.  If the person can make a
25 turnaround, they generally will have a verbal

Page 263

D. Berardo

1
2  warning, sometimes a written warning, a
3  performance improvement plan.  Sometimes those
4  steps are skipped, depending on the
5  circumstances.
6      If the person has -- if the manager feels
7  that there's no hope in the person
8  improving -- improving, we can move forward
9  directly with terminations -- termination, at
10 times.  It's all going to be circumstantial,
11 depending on the circumstances.
12     Q. Let me show you Exhibit 57, if the
13 court reporter can show that to you.  If you
14 could turn to DEFS268.
15         MS. LESTRADE:  I think you should
16 read the whole document.
17         THE WITNESS:  Yeah, can I read the
18 whole document?  Just because I'm --
19 BY MR. THOMAS:
20     Q. Yeah, sure.
21     A. Thank you.
22     Q. Have you -- let me ask you this:
23 Have you seen the document before?
24     A. I -- we did -- I did see this when we
25 were preparing.

Page 264

D. Berardo

1
2      Q. If you need to read it again, feel
3  free.
4      A. Thank you.  Okay.
5      Q. Do you see 2.3.2 on page DEFS268?
6      A. Yeah.
7      Q. And were those -- was that the policy
8  that was in effect at Absolute when
9  Ms. Piehler was terminated?
10     A. I can't say for certain if this is
11 the policy that was in effect.  It changed
12 from time to time.
13         MR. THOMAS:  We would request the
14 updated copy.
15 BY MR. THOMAS:
16     Q. I will represent to you, though,
17 Mr. Berardo, that this is the copy that was
18 produced to --
19     A. Sure.
20     Q. -- us by Absolute.
21     A. Okay.  So just under the assumption,
22 this would be the policy -- if this was the
23 policy that was in force when she was
24 terminated.  Okay.
25     Q. And does it mention anywhere about

Page 265

D. Berardo

1
2  the fact that steps can be skipped if a
3  manager wants to skip them?
4      A. Well, from -- from reading it, so
5  this policy is only for -- is only for
6  enforcement of policy and other rules.  So
7  this is not necessarily performance-related.
8  So it's not something we would follow for a --
9  like, a performance-related conversation.  And
10 it does say, in 2.1:
11         Infringements range from minor to
12     very serious, ultimately extending to
13     criminal acts; and therefore, the actions
14     required by managers and HR may vary in
15     sensitivity."
16 Under 2.3 --
17     Q. So it's your testimony that Mary
18 Piehler was not fired for violating any
19 company policy; correct?
20     A. That's correct, from my recollection.
21     Q. Was there anything that she violated
22 that Absolute expected from -- from her as a
23 policy matter as an employee?
24     A. Not that I recall.
25     Q. Okay.  And there's nothing about, in

Page 266

D. Berardo

2.3.2 about skipping steps because of a
manager; correct?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  Yeah, sure, under
number 2, "preparation":
        Consideration of the disciplinary
measure should consider the following
options."
So I would refer back to the word "consider."
So it doesn't lay out the steps, all four
steps.  It just says "consider," so...
BY MR. THOMAS:
    Q. In Ms. Piehler's case, were these
steps considered?
    A. I wouldn't -- this doesn't apply to
Ms. Piehler's case, so those steps --
    Q. My question was -- so you was were
these steps considered in Ms. Piehler's case?
    A. No -- no, they weren't, because they
don't apply to her.
    Q. Why did they not -- what -- what
steps -- the steps -- what steps did apply to
her in terms of what was expected in terms of
interaction between her and the company?

Page 267

D. Berardo

        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  What -- so, sorry,
which -- can you -- can you repeat the
question?  I'm sorry.
BY MR. THOMAS:
    Q. Sure.  What -- what -- was the
company -- in terms of the reason for
Ms. Piehler's termination, what steps prior to
her termination were supposed to go -- were
supposed to occur before -- before she was --
strike -- strike that.
        At Absolute when you were there,
when Ms. Piehler was terminated --
    A. Yeah.
    Q. -- what steps was Absolute supposed
to go through before terminating her?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  From my recollection,
we weren't really required to follow any
specific steps.
BY MR. THOMAS:
    Q. You didn't look at giving Ms. Piehler
a verbal warning?
    A. Not under the circumstances, no.

Page 268

D. Berardo

    Q. A written warning?
    A. No.
    Q. You didn't consider putting her on a
PIP?
    A. Before she was terminated?
    Q. Yeah.
    A. No.
    Q. Yeah, that's right.  Because I want
to differentiate that from the one that
Mr. Awtry attempted.
    A. Right.
    Q. So you just jumped straight from
ground -- from zero to termination without
going through any of those steps?
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  We --
BY MR. THOMAS:
    Q. Or even looking at them.
        MR. THOMAS:  Objection to form.
        THE WITNESS:  Well, these steps don't
apply to -- in -- in --
BY MR. THOMAS:
    Q. I'm not asking you that.  I'm asking
you did you think about any of those steps

Page 269

D. Berardo

with Ms. Piehler?
    A. Well, no, because they don't apply.
    Q. Let me try again.  Did you think
about the steps of a verbal warning to
Ms. Piehler?
    A. No, because it didn't apply.
    Q. Did you apply -- did you think about
any written warning?
    A. No, because it didn't apply.
    Q. Did you think about giving her a PIP?
    A. No, because it didn't apply.
    Q. Did you think about suspending her?
    A. No, because it didn't apply.
    Q. And do you think that's an
appropriate way to treat an employee, is to
terminate them without giving them a verbal
warning?
    A. Under the --
        MR. SULLIVAN:  Objection to form.
        THE WITNESS:  Under the
circumstances, yes.
BY MR. THOMAS:
    Q. Why?
    A. Because the -- from my perspective,

Page 270

D. Berardo

1   the -- the -- between Todd and Mary, their
2   working relationship was -- was a difficult
3   one, and so Todd was not able to work with
4   Mary effectively.
5        Q. Anything else?
6        A. I mean, no.
7        Q. Okay. Let's go to -- let's talk
8   about performance reviews at Absolute. Did
9   Absolute give performance reviews?
10       A. Yes.
11       Q. Was that a function that was carried
12   out through the HR -- in part through the HR
13   department?
14       A. It was administered -- administered
15   through the HR department, yes.
16       Q. What is the purpose of performance
17   reviews?
18       A. To review performance.
19       Q. For? What purpose?
20       A. Well, for -- for feedback, for...
21       Q. Feedback to the -- feedback to the
22   employee; correct?
23       A. Correct. Feedback to the employee
24   for the employee to -- to -- to have some, you

Page 271

D. Berardo

1   know, opportunity to talk about what sort of
2   personal growth they want to take in their
3   career, and, you know, to -- to highlight
4   things that employees -- the employee would be
5   doing well and things the employee, you know,
6   could improve on.
7        Q. And to give an employee an
8   opportunity to improve on that before being
9   fired; right?
10       MR. SULLIVAN: Objection to form.
11       THE WITNESS: I -- I don't know if
12   that's the -- if -- if that's the reason of
13   a performance review.
14   BY MR. THOMAS:
15       Q. You don't -- you don't think one of
16   the purposes of a performance review is to
17   give an employee an opportunity to improve
18   their performance so they won't get fired?
19       A. I mean, I think that would be taking
20   it to the extreme. If the person was being
21   fired -- it -- it's not designed for that. An
22   annual performance --
23       Q. Or -- or to tell an employee where
24   they should improve their performance so the

Page 272

D. Berardo

1   company won't be in a position where they
2   think they need to fire the employee; right?
3        A. Well, sure, that would be accurate,
4   that -- that a performance review is -- is
5   there to provide that feedback to help the
6   employee with their performance, yes.
7        MR. THOMAS: Okay. If the court
8   reporter can show the witness Kenny
9   Exhibit 34.
10   BY MR. THOMAS:
11       Q. Once you've had a chance to read
12   that, let me know.
13       MS. LESTRADE: What number?
14       MR. SULLIVAN: 34.
15   BY MR. THOMAS:
16       Q. Mr. Berardo, you saw this exhibit on
17   Monday, didn't you?
18       A. I didn't -- not from my recollection,
19   I didn't.
20       Q. Okay.
21       A. Okay. You can go ahead.
22       Q. Okay. First of all, this document
23   says -- at the top right, it says "performed
24   on." What does "performed on" mean at

Page 273

D. Berardo

1   Absolute in performance reviews in that
2   location? The top right-hand corner of the
3   first page.
4        A. Yeah. I'm -- I'm -- I'm only
5   speculating because I don't recall
6   specifically, but it -- it's likely when the
7   review was -- was submitted. But, again, I
8   would be speculating.
9        Q. Now, is there anything in Exhibit --
10   is Exhibit 34 the last performance evaluation
11   Ms. Piehler ever received?
12       A. I -- I don't know. I don't know the
13   answer to that question.
14       Q. When was Ms. Piehler fired?
15       A. Was it July of twenty -- 2015?
16       Q. So can you -- how -- let me ask you
17   this: How far in advance was this performance
18   review prior to her termination?
19       A. Well, this was for the previous -- or
20   the last six months of 2014, and it was
21   completed on -- in February, so it was --
22       Q. How far was that from when she was
23   terminated?
24       A. It was about five months.

D. Berardo

Q. Okay. Is there anything in
Exhibit 34 which is consistent with an
employee who is about to be terminated in four
months?
A. For --
MR. SULLIVAN: Objection -- objection
to form.
THE WITNESS: For performance?
BY MR. THOMAS:
Q. For any reason.
A. Well, for performance, I would say --
I would say there's nothing out -- that stands
out here.
Q. That would indicate the employee was
about to be terminated?
A. Underperforming, yeah.
Q. Or was there anything in here that
highlighted -- let me ask you this: Is there
anything in here that indicates that Todd
Awtry found Ms. Piehler difficult to work
with?
MR. SULLIVAN: Objection to form.
MR. THOMAS: Hey, John.
THE WITNESS: Not that I read.

D. Berardo
BY MR. THOMAS:
Q. Okay. And, in fact, to the contrary,
if you go to -- is there anything in here that
indicates that she's unsupportive of
management decisions?
A. Well, I mean, her responses -- I
mean, her responses are -- are -- you know,
her -- her responses are -- are -- you know,
they -- they tend to be reasons or -- or
excuses versus accepting the feedback.
Q. My question to you was is there
anything in here -- in here that indicates she
was unsupportive of the management decisions?
A. Well, I -- I mean, that kind of
implies that you're unsupportive, if you're
not taking the feedback.
Q. Where -- where does -- where does she
not take the feedback?
A. Well, I can only -- I mean, it's just
from -- from writing. I mean, there's nothing
explicit here, if that's what you're asking.
She doesn't say anything like --
Q. Anything -- what -- I'm asking you
what you're referring to.

D. Berardo
A. Okay.
Q. How about this: Why don't we go to
DEFS10579. And the question is:
Does she approach the business with a
can-do attitude that supports the business
initiatives?"
Do you see that?
A. I do, yes.
Q. And what is she rated?
A. She's rated a 3 out of 5.
Q. Which is a -- verbally, a what?
A. I -- I don't recall. I think it --
it --
Q. That means "meets expectations,"
isn't it?
A. I think that's what it is. I think
it's "meet expectations."
Q. Well, can you see it right there?
A. Can -- can I see what?
Q. "Your evaluation result meets
expectations"?
A. Oh, yes. Sorry. Yes. "Meets
expectations."
Q. Why don't -- and why don't you read

D. Berardo
aloud the reviewer comment on this.
A. Reviewer comments?
You are absolutely --"
Q. Yeah.
A."You are absolutely a
roll-your-shelves-up kind of person. Would
ask to look at challenges inside ABT as
'how do we get it done?' versus 'it's
broken.' While I agree much is broken, the
exception is leadership will figure out a
way."
Q. Okay. What about -- how about
"ensuring the team is deriving a strong
relationship with all OEMs and their patch,"
Exhibit 10577?
A. Okay.
Q. What was she rated there?
A. She was rated 4 out of 5 or "exceeds
expectations."
Q. And that's "exceeds expectations,"
you said?
A. Correct.
Q. I won't keep going through it.
A. Okay.

D. Berardo

1
2    Q. But let me also take a look at
3    Exhibit 59. I'm sorry. Wait. Awtry
4    Exhibit 58.
5        If you could, Court Reporter, just
6    show that to the...
7        THE WITNESS: Thanks.
8    BY MR. THOMAS:
9        Q. Let me know when you have had a
10   chance to read Exhibit 58.
11       A. Okay.
12       Q. Now, the issues that Mr. Awtry is
13   raising regarding Mr. Young are also not
14   related to policy, are they?
15       A. No, they're -- it -- it appears that
16   they're performance.
17       Q. And what does he do -- first of all,
18   is Mr. Young a male or a female?
19       A. He's a male.
20       Q. What does Mr. Awtry do in terms of
21   his male subordinates when there's an issue
22   about their performance?
23       A. Are --
24       MR. SULLIVAN: Objection to form.
25       THE WITNESS: Are you asking me what

D. Berardo

1
2    he did with Warren Young?
3    BY MR. THOMAS:
4        Q. Yeah. Does he provide a written
5    warning?
6        A. It appears that he provided a written
7    warning, yes.
8        Q. Did he do that for Ms. Piehler?
9        A. Sorry?
10       Q. Did he do that for Ms. Piehler?
11       A. Around her performance?
12       Q. Yeah.
13       A. Her termination wasn't based on
14   performance.
15       Q. What was it based on?
16       A. I have already answered that
17   question.
18       Q. What did you say?
19       THE WITNESS: Can you repeat what I
20   said.
21       THE COURT REPORTER: I'll need the
22   words to find it.
23       THE WITNESS: Oh, the words to --
24   BY MR. THOMAS:
25       Q. You need -- you need to say it again.

D. Berardo

1
2        A. Okay.
3        Q. She was fired based on what? Not
4    policy.
5        A. No.
6        Q. Not performance. What, then?
7        A. It -- she was -- she was terminated
8    based on her -- from what I recall, from my
9    recollection, it was her and Todd's
10   difficult -- difficult -- difficult working
11   relationship. Like, they --
12       Q. Which was not a performance issue by
13   her; correct?
14       A. Which is not a -- was not a measure
15   of her numbers or her --
16       Q. It was -- it wasn't also a measure of
17   her complying with policy at Absolute, was it?
18       A. No, this didn't have anything to do
19   with policy. Not that I recall. I -- I
20   haven't read the entire policy manual.
21       Q. If you read Exhibit 58 and
22   Exhibit 34, who would you think is more likely
23   to get terminated in the next five months?
24       MR. SULLIVAN: Objection to form.
25       THE WITNESS: I -- I under -- I under

D. Berardo

1
2    -- based on performance?
3    BY MR. THOMAS:
4        Q. No, just who is more likely to get
5    terminated --
6        MR. SULLIVAN: Objection to form.
7    BY MR. THOMAS:
8        Q. -- based on your experience in HR
9    and --
10       A. I -- I would never make that call
11   without knowing more facts based on two emails
12   -- or two documents. I would never make that
13   call.
14       Q. Based on those two, though, who would
15   be in more trouble?
16       A. I would never -- I would never make
17   that call.
18       Q. When a manager says to you "you
19   mentioned to me in one of our previous
20   conversations, not Friday," that:
21       I know I'm running out of time, and
22   if I continue to miss my quota, you won't
23   have to manage me out of the business,
24   which leads me to believe you understand
25   the urgency to correct performance

Page 282

D. Berardo

1    immediately."
2    Do you see that?  In Exhibit 58.
3        A. Yeah.  And what line is that?
4        Q. The second-to-last.
5        A. Second-to-last line?
6        Q. Exhibit 58.
7        A. Oh, the last page?  The first --
8        Q. First -- first page.
9        A. Oh, the first page, the last line?
10   Or the...
11       Q. Second-to-last line.
12       A. Oh, right.  Okay.
13       Q. Second-to-last paragraph.
14       A. Okay.
15       Q. Do you see that?
16       A. I do.
17       Q. Mary Piehler never got a warning like
18   that, did she?
19       A. Well, this was -- this was a
20   performance -- this was a performance issue,
21   so Mary never got a performance-based warning
22   because there was no big performance numbers
23   or quota that --
24       Q. Let's not go round and round about

Page 283

D. Berardo

1    this, Mr. Berardo.
2        A. Okay.
3        Q. Let's just get to the point.
4        A. Sure.
5        Q. She was never given a warning like
6    that; right?
7        A. She was never given a warning about
8    her performance, no.
9        Q. Or given a warning in any sense that
10   she was about to be terminated?
11       A. A warning that was -- a heads-up
12   that she was going to be terminated?  Not that
13   -- not -- my recollection is that she was not
14   given a heads-up that she was going to be
15   terminated.
16       Q. Or a warning that if she continued to
17   engage in certain behaviour, she was likely to
18   be terminated?
19       A. I -- I can only speak for myself and
20   my knowledge, and my knowledge --
21       Q. Do you have any knowledge that she
22   was given any warning that her employment was
23   in jeopardy?
24       A. Not my -- not to my recollection.

Page 284

D. Berardo

1        Q. But Mr. Young, the male employee,
2    was?
3        A. Based on his performance --
4        Q. Correct?
5        A. -- yes.  Yeah.
6        Q. And, in fact, Mr. Young wasn't even
7    fired; he was kept on with the same pay after
8    this.  Does that surprise you?
9        A. I don't recall the --
10           MR. SULLIVAN:  Objection --
11           THE WITNESS:  -- circumstances.
12           MR. SULLIVAN:  -- to form.
13   BY MR. THOMAS:
14       Q. Okay.  Tell me about the open
15   door-policy at Absolute.
16           MR. SULLIVAN:  Objection to form.
17           THE WITNESS:  I mean, the open-door
18       policy was that, you know, if -- if anyone
19       had an issue or a complaint, they could
20       come to anyone on the leadership team.
21   BY MR. THOMAS:
22       Q. And would they be fired for any
23   issues they raised?
24       A. Any --

Page 285

D. Berardo

1        Q. Under the open-door policy?
2        A. Any issues that they raised?
3        Q. Yeah.
4        A. Would they be fired because of it?  I
5    mean --
6        Q. Yeah.
7        A. -- I can't -- I can't speculate what
8    someone would come and -- and tell us.  If
9    they were telling us they were doing something
10   illegal, yeah, they could get fired.
11       Q. But in terms of their comments about
12   how the company could be run better or
13   differently, that wouldn't -- and -- and they
14   came forward under the open-door policy, they
15   weren't going to risk termination for doing
16   that, were they?
17           MR. SULLIVAN:  Objection to form.
18           THE WITNESS:  I -- I can't say that
19       they were or weren't.  You know, if --
20       if --
21   BY MR. THOMAS:
22       Q. So it's possible someone could -- so
23   you're saying that under the open-door policy,
24   someone could come to their manager, express

1             D. Berardo
2 thoughts about how the company could be run
3 better, and they could be fired for it?
4      MR. THOMAS: Objection to form.
5 BY MR. THOMAS:
6      Q. That was the open-door policy at
7 Absolute?
8      A. I wouldn't say that's the open-door
9 policy, but, I mean, it -- it would depend on
10 circumstances.
11      Q. Did you say that it is the open-door
12 policy, what I --
13      A. No.
14      Q. -- just described?
15      A. I said that wouldn't be the open-door
16 policy --
17      Q. Okay.
18      A. -- but it would depend on
19 circumstances.
20      MR. THOMAS: If you -- if the court
21 reporter could show the witness Exhibit 24.
22      THE WITNESS: Thank you.
23 BY MR. THOMAS:
24      Q. Once you have finished -- once you've
25 had a chance to read it, let me know.

1             D. Berardo
2      A. Okay. Okay.
3      Q. Now that you have read that, could
4 you -- would you say that that email was
5 degrading to Todd Awtry?
6      MR. SULLIVAN: Objection to form.
7      THE WITNESS: Degrading to Todd
8 Awtry?
9 BY MR. THOMAS:
10      Q. Yeah. What Mary Piehler said, was
11 she being degrading to Todd Awtry?
12      A. It was very contradictory to what
13 Todd was trying to tell her.
14      Q. My question to you was is Mary
15 Piehler being degrading to Todd Awtry in that
16 email?
17      MR. SULLIVAN: Objection to form.
18      THE WITNESS: I mean, that's -- in my
19 opinion?
20 BY MR. THOMAS:
21      Q. As an HR person at Absolute, yes, do
22 you consider this to be degrading treatment
23 from one employee to another?
24      MR. SULLIVAN: Objection to form.
25      THE WITNESS: I don't know if I -- I

1             D. Berardo
2 wouldn't use the word "degrading."
3 BY MR. THOMAS:
4      Q. Would you use the term "berating"?
5      A. Sorry?
6      Q. Berating, b-e-r-a-t-i-n-g. Berating.
7 Would you say Mary Piehler was berating Todd
8 Awtry in this email?
9      MR. THOMAS: Objection to form.
10      THE WITNESS: Can -- can you -- can
11 you define "berating" to me.
12 BY MR. THOMAS:
13      Q. What does -- what does "berating"
14 mean to you?
15      A. I guess someone that is -- you know,
16 some -- someone that is -- that is not showing
17 respect.
18      Q. You think Mary Piehler is not showing
19 respect to Todd in this email?
20      A. Yeah, I think there's -- there's
21 points where she's not.
22      Q. Do you think Todd is showing respect
23 to Mary in this email?
24      MR. SULLIVAN: Objection to form.
25      THE WITNESS: From reading it, I

1             D. Berardo
2 mean, it seems like Todd is trying to
3 provide her some of the -- some feedback.
4 BY MR. THOMAS:
5      Q. What do you think of Mary's comments
6 about what Todd was saying to her? Do you
7 think that was appropriate?
8      MR. SULLIVAN: Objection to form.
9      THE WITNESS: Can you point me to --
10 to -- to the paragraph you're speaking of.
11 BY MR. THOMAS:
12      Q. Well, we can just start with in the
13 first italicized thing:
14      Criticizing me and my 'leadership' in
15 front of one of my peers is not really the
16 right thing to do. You even commented that
17 you were going to 'get personal' before you
18 started to criticize me? Obviously, I can
19 sense you're annoyed and frustrated, but I
20 was being honest, and my reps will back up
21 everything I told you. There is no
22 hidden agenda here. I was clear,
23 transparent, and doing what I still believe
24 was the right thing, telling my manager the
25 concerns of my team. I don't see this as

Page 290

D. Berardo

1  bad leadership at all."
2      A. Okay. And so, sorry, what was the --
3  what was the original question?
4      Q. Do you think that it was appropriate
5  for Todd Awtry to say to an employee that he's
6  about to get personal with her?
7      MR. SULLIVAN: Objection to form.
8  BY MR. THOMAS:
9      Q. And do so in front of her peers?
10     A. If -- I mean, if that is what he --
11  if that is what he said, to "get personal,"
12  I'm not sure what he meant by that.
13     Q. Is there ways that that would be
14  okay?
15     A. Is there a way to -- that that would
16  be okay?
17     Q. For a manager to speak to a
18  subordinate with a -- in front of a peer?
19     MR. SULLIVAN: Objection to form.
20     THE WITNESS: If that's what he said,
21  if he actually said "I'm going to get
22  personal," I probably would coach him to --
23  I would ask what is he trying to say and
24  coach him to use other language besides
25

Page 291

D. Berardo

1  "get personal."
2  BY MR. THOMAS:
3      Q. Anything in those three paragraphs
4  where Mary is berating or showing lack of
5  respect to Todd?
6      A. Well, just the overall email. Not
7  really -- just from my point of view, not --
8  not really taking any of the feedback or
9  taking any ownership.
10     Q. Why don't we do this: Show me one
11  sentence or one paragraph where Mary Piehler
12  is showing a lack of respect to Todd.
13     MR. SULLIVAN: Objection to form.
14     THE WITNESS: I -- there's -- there's
15  no -- no one sentence. I -- my point was
16  that Todd was providing her feedback, and
17  the email was all about her, you know,
18  providing contrary opinions to Todd.
19  BY MR. THOMAS:
20     Q. And on the open-door policy, she was
21  free to provide contrary opinions to Todd;
22  correct?
23     MR. SULLIVAN: Objection to form.
24     THE WITNESS: I don't have the
25

Page 292

D. Berardo

1  open-door policy in front of me, so if -- I
2  don't know if we have that as an exhibit.
3  BY MR. THOMAS:
4      Q. Do you have any reason to believe
5  that's not true?
6      MR. SULLIVAN: Objection to form.
7      THE WITNESS: I mean, someone has --
8  someone has a right to say whatever they
9  want.
10  BY MR. THOMAS:
11     Q. Under the open-door policy, that's
12  what's allowed; right?
13     A. Well, I think any human has a right
14  to say -- you can say anything to anyone, if
15  you really want to.
16     Q. I'm talking about the open-door
17  policy in HR. Was it okay for some -- for a
18  subordinate to say something to a manager
19  about how -- how they thought the company
20  could do better?
21     A. I -- I would need to see the actual
22  open-door policy.
23     Q. Any reason you think that Mary
24  Piehler violated that policy, based on what
25

Page 293

D. Berardo

1  you know right now, from Exhibit 24?
2      A. If you can show me the policy, I can
3  answer that question.
4      Q. No, I'm saying -- I'm asking you
5  based on your knowledge.
6      A. Based on my knowledge of the
7  open-door policy, I mean, my vague knowledge
8  of what the open-door policy was I don't think
9  got into specifics of what you can and can't
10  do. So I can't answer that question.
11     Q. Do you think Exhibit 24 warranted an
12  employee's termination? And, specifically,
13  Mary Piehler's?
14     MR. SULLIVAN: Objection to form.
15     THE WITNESS: If we're -- if -- are
16  we talking about a single document? If --
17  if I was presented --
18  BY MR. THOMAS:
19     Q. Yes.
20     A. -- a single document?
21     Q. Yes.
22     A. You know, it -- it would essentially
23  be up to the manager, and we would have that
24  conversation. It's hard for me to answer
25

D. Berardo

1 that, because it's -- it's not just a single
2 email.
3 
4     Q. Well, what did -- what emails did you
5 look at in -- did -- were you -- let me ask
6 you this:  Were you involved in the decision
7 to terminate Ms. Piehler?
8     A. The decision came from -- the
9 decision came from Todd to terminate --
10     Q. Did you --
11     A. -- Mary.
12     Q. Did you do anything besides observe
13 and report it?
14     A. I --
15     MR. SULLIVAN:  Objection to form.
16     THE WITNESS:  I had conversations --
17 we definitely had conversations with Todd.
18 BY MR. THOMAS:
19     Q. When did you have those
20 conversations?
21     A. Before -- I mean, before the decision
22 was made.
23     Q. Did you question whether
24 discrimination might be an issue?
25     A. No, because I've never observed any

D. Berardo

1 sort of discrimination.
2     Q. Did you investigate -- did you talk
3 to Todd about Mary Piehler's complaints
4 about -- that she had made to you about him?
5 Did you investigate those?
6     MR. SULLIVAN:  Objection to form.
7     THE WITNESS:  I don't -- I don't have
8 recollection of that.
9 BY MR. THOMAS:
10     Q. Would there ever be a reason for a
11 manager not to tell HR that they were looking
12 to replace an employee?
13     MR. SULLIVAN:  Objection to form.
14     THE WITNESS:  Sorry, would there ever
15 be a reason why a manager wouldn't tell HR
16 that they were looking to replace an
17 employee?
18 BY MR. THOMAS:
19     Q. Yeah.
20     A. Well, if they're looking to replace
21 the HR person, that would be a reason.
22     Q. Other than that?
23     A. There may be other reasons.  I -- I
24 mean, I can't think of the thousands and

D. Berardo

1 thousands of reasons off the top of my head.
2 Not off the top of my head right now.
3     Q. What about not telling Recruiting
4 that they're looking to replace a manager?
5     MR. SULLIVAN:  Objection to form.
6     THE WITNESS:  Not telling --
7 BY MR. THOMAS:
8     Q. Any reason -- any reason -- any
9 reason that a supervisor should keep
10 Recruiting in the dark about it?
11     A. It's -- it's possible if they want to
12 keep something confidential, that they -- they
13 keep it to a limited amount of people before
14 they replace someone.
15     Q. I'm talking about Recruiting.
16     A. So you're -- you're asking if --
17 sorry, can you repeat the question, then.
18     Q. Yes.  Should a -- if a supervisor is
19 looking to replace a manager --
20     A. Yeah.
21     Q. -- should that supervisor keep
22 Recruiting in the dark when they're out
23 advertising for the job?
24     MR. SULLIVAN:  Objection to form.

D. Berardo

1     THE WITNESS:  That happens, yes.
2 BY MR. THOMAS:
3     Q. Should it --
4     MR. SULLIVAN:  Objection to form.
5 BY MR. THOMAS:
6     Q. -- from an HR perspective?  When?
7     A. In circumstances.  Just when it's a
8 sensitive termination.
9     Q. Why shouldn't Recruiting be told?
10     A. Because you want to keep -- you want
11 to keep sensitive information as tight as
12 possible and not tell -- only tell people that
13 it -- that's -- that would be absolutely
14 necessary to know.
15     Q. Where did you first learn that Mary
16 Piehler was going to be -- was under
17 consideration for termination?
18     A. I don't recall the specific date.
19 It -- it was -- it could have been a month,
20 month and a half, couple of months before she
21 was actually terminated.  I -- but my -- I
22 don't -- I don't know the specific dates, so I
23 wouldn't hold to that -- that date.
24     Q. What is a position number at

D. Berardo

Absolute?

A. A position number is something that was controlled by finance. And so every position had a number, and then an employee was assigned to that number. And so an employee could leave, and their employee number could leave with them, but the position number would stay with that position. So the -- there could be multiple employees in that same position number over the course of the years.

Q. Did each employee have a separate position number?

A. They should have, yes. At -- at -- we -- I should say that we implemented position numbers at a certain point. They weren't always at Absolute, and I don't know when they were actually -- they were actually implemented.

Q. But once you had a position number -- once you had implemented position numbers, only one employee had a position number; correct? Or each employee had a unique position number; right?

D. Berardo

A. I mean, generally, this was, again, managed by finance, so I'm -- I'm not the expert when it comes to position numbers. So it would probably be someone in finance that would be able to answer that definite -- more definitively.

Q. When somebody left and a new person took their role, they would be given the same position number?

A. When someone left and a new --

Q. As the person -- as the person who left?

A. It -- it's a possibility. Or -- so, usually, that -- yeah, usually, the position number would stay around, unless the position was eliminated. And someone would -- would take that position number, in general, I think.

Q. What if the position was changed? Would a new position number be created?

A. I don't know the answer to that. I'm not sure. It's a finance question.

MR. THOMAS: If you could show, Jessica, the witness Exhibit 81.

D. Berardo

THE WITNESS: Thanks.

BY MR. THOMAS:

Q. And, Mr. Berardo, I would like you to read that exhibit and let me know when you're done.

Jessica, just to save some time, from the new exhibits, Berardo new exhibits, if you could pull O, P, I, J, and N. And you can mark those. Those will be coming for the witness next.

MS. LESTRADE: Did we lose her?

MR. MANINDER: That might have been Mary falling off.

MR. THOMAS: Mary, are you still there?

MS. LESTRADE: I think she may have fallen off.

MR. THOMAS: Oh, okay. Want to just loop her back in there? Or did she -- did she call in?

MS. LESTRADE: No, we can call her, but -- yeah, hold on.

MR. THOMAS: Okay.

MS. LESTRADE: I will try to get her

D. Berardo

back.

THE COURT REPORTER: Let's go off the record.

MS. LESTRADE: Okay.

THE WITNESS: Can we take a two-minute break, then.

MS. LESTRADE: Sure, yeah.

VIDEOGRAPHER: Going off record. The time is 6:18.

(PROCEEDINGS RECESSED AT 6:18 P.M.)

(PROCEEDINGS RECONVENED AT 6:27 P.M.)

VIDEOGRAPHER: Back on the record. The time is 6:27.

BY MR. THOMAS:

Q. All right. Mr. Berardo, does Exhibit 81 accurately describe the termination meeting with Ms. Piehler?

A. Yeah, from my recollection, it does.

Q. Did you consider the exit interview to be bizarre?

A. The -- the request for the -- the exit interview?

Q. No, sorry, the termination meeting. Did you consider the termination meeting to be

Page 302

D. Berardo

1
2  bizarre?
3      A. No.
4      Q. Did you consider Mary's reaction at
5  the termination meeting to be bizarre?
6      A. No.
7      Q. Why was a third party present for the
8  meeting?
9      A. Because I couldn't be there in
10 person, and so it's a best practice to have
11 another person in the room.
12     Q. Was it appropriate for Ms. Piehler's
13 severance, financial, and benefits to be
14 discussed with a third party?
15     MR. SULLIVAN:  Objection to form.
16     THE WITNESS:  It's -- it's -- it's
17 common -- it's common -- if someone is
18 witnessing a termination, it's common
19 practice for them to be in the room during
20 that termination meeting.  The full
21 termination meeting.
22 BY MR. THOMAS:
23     Q. Without going around and around, is
24 that a yes or a no?
25     A. Can you repeat the question.

Page 303

D. Berardo

1
2      MR. THOMAS:  Yes.  Can the court
3  reporter read it back.
4      (REPORTER READ BACK)
5      THE WITNESS:  Yes, it was appropriate
6  for that to be discussed while that third
7  party was in the room.
8  BY MR. THOMAS:
9      Q. Why was Tom Ioele hiding and not
10 present?
11     A. I don't -- I don't know.  I don't
12 know that he was even hiding.
13     Q. Why wasn't he -- why wasn't he
14 present in the room?
15     A. Well, we had the -- that
16 representative in the room, Catherine.
17     Q. And let's go through here.  Where was
18 -- where was Tom in relation to the meeting?
19     A. I -- I don't know.  I don't have any
20 recollection of Tom.
21     Q. Well, he's listed as being present in
22 the room.  Do you see that?
23     A. Yes.
24     Q. How come Mary Piehler couldn't see
25 him?

Page 304

D. Berardo

1
2      A. I mean, he must -- he must have
3  been present.  Because at -- the bottom
4  sentence says:
5      Tom indicated he would follow up with
6      Mary, since he knows her personally."
7  Maybe --
8      Q. Why -- why wasn't he -- where was --
9  was he hiding somewhere in the room?
10     A. Perhaps he was on the phone.  I -- I
11 don't -- I don't recall.
12     Q. Well, you said he had to be present
13 in the room.
14     A. Sorry, present?  I -- I was not
15 present in the room, and it marks me as
16 present.  So he could have been on the phone.
17 I -- I don't know.
18     Q. But you're marked -- you're marked as
19 being on the phone.
20     A. Okay.  I don't -- I don't know.
21     Q. Is there any good explanation as to
22 why someone would hide in the middle of a
23 termination meeting?
24     MR. SULLIVAN:  Objection to form.
25     THE WITNESS:  Why someone would hide

Page 305

D. Berardo

1
2  in a termination meeting?  Is this a
3  hypothetical question?
4  BY MR. THOMAS:
5      Q. Well, Tom Ioele was present for the
6  termination meeting but was hiding somewhere
7  where he couldn't be seen by Ms. Piehler.  Is
8  there any good reason for that?
9      A. I don't think that's --
10     MR. SULLIVAN:  Objection to form.
11     THE WITNESS:  I don't think that's an
12 accurate statement.
13 BY MR. THOMAS:
14     Q. Which part of it is not accurate?
15     A. That he was hiding in the room.
16     Q. Well, why couldn't he -- okay.  If --
17 if you're in a conference room in a hotel and
18 three people are present -- four, including
19 Ms. Piehler -- why couldn't Mr. Ioele be seen?
20     MR. SULLIVAN:  Objection to form.
21     THE WITNESS:  I mean, I think that's
22 a question for Catherine and Tom.  I -- I
23 wasn't in the room, so --
24 BY MR. THOMAS:
25     Q. Not you as head of HR?

Page 306

D. Berardo

1
2      A. I wasn't in the room, so I didn't
3  observe who was in -- who was actually in the
4  room, unfortunately.
5      Q. It wouldn't be appropriate for him
6  to -- for someone to not make themselves known
7  and hide in a room during a termination
8  meeting, would it?
9          MR. SULLIVAN: Objection to form.
10         THE WITNESS: If -- if you're
11 speaking in a general sense, yes, it would
12 not be appropriate for someone to hide in a
13 room during a termination --
14 BY MR. THOMAS:
15     Q. What about in --
16     A. -- meeting.
17     Q. -- in Mary Piehler's case? Would it
18 be appropriate there?
19     A. If he was hiding?
20     Q. Or not visible.
21     A. If he was hiding and he didn't make
22 himself present to Mary?
23     Q. Correct.
24     A. I imagine that would be
25 inappropriate, yes.

Page 307

D. Berardo

1
2      Q. Did you know that Ms. Piehler's
3  husband had cancer?
4      A. I'm -- I'm not sure if I knew before
5  the termination. I definitely knew after the
6  termination when speaking with Mary.
7      Q. And didn't Absolute promise that they
8  were going to continue Ms. Piehler's health
9  benefits?
10     A. I don't recall Absolute making
11 that -- that promise. Generally, in the -- in
12 the -- in the severance, it's part of a
13 severance to -- I just don't -- I can't speak
14 to it. I don't -- I don't have the
15 termination letter in front of me. I don't
16 know what was offered or what wasn't.
17     Q. Did you talk to Ms. Piehler about her
18 medical coverage? Because you cancelled it on
19 them and Mr. Piehler when he was going in for
20 cancer surgery?
21     A. I'm -- we may have spoken. Mary and
22 I spoke quite a bit on the phone after the
23 termination. I don't --
24     Q. Did it include the fact that you had
25 cancelled the health insurance on her husband

Page 308

D. Berardo

1
2  who had cancer, despite promising not to do
3  so?
4      A. So --
5          MR. SULLIVAN: Objection to form.
6          THE WITNESS: Yeah, the way the
7  insurance works in the US is -- is
8  insurance is not cancelled. Someone can go
9  on COBRA and can continue that coverage
10 once -- once the payment has stopped from
11 the company.
12 BY MR. THOMAS:
13     Q. My question to you is didn't you
14 cancel Ms. Piehler's insurance immediately
15 upon her exit meeting, even though you had
16 told her it was not being cancelled?
17         MR. SULLIVAN: Objection to form.
18 BY MR. THOMAS:
19     Q. And the only way she found out was
20 when her husband went in for cancer treatment,
21 and there was no medical coverage?
22     A. No, I wouldn't say that's accurate.
23 We would have went through this with her in
24 the termination letter, and it would have been
25 laid out in the termination letter.

Page 309

D. Berardo

1
2      Q. You're not saying -- so you're
3  denying that you all cancelled the insurance
4  on Mary Piehler and her husband who had
5  cancer?
6      A. I -- I'm not denying the fact that
7  the company stopped paying for coverage and
8  she was referred to COBRA. What I'm saying is
9  that -- is that that was all laid out in
10 the -- in the -- in the severance package, and
11 that would have been -- gone -- we would have
12 gone over that during that termination
13 meeting.
14     Q. Now, how much -- how do you determine
15 how much severance an employee is to receive
16 when they are terminated?
17     A. Typically, it's a -- it's a question
18 that -- that we have with our legal counsel,
19 and so it -- it will depend on -- on the
20 circumstance, and then that -- that will be
21 discussed with the legal counsel to come up
22 with a recommendation, depending on the
23 circumstances. And location.
24     Q. Do you ever offer severance to an
25 employee who resigns voluntarily?

D. Berardo

1
2       A. Resigns voluntarily?  It can happen.
3       Q. Do you know why Amy Rathbun was
4   offered such a large severance package, even
5   though she resigned voluntarily?
6       A. I wasn't around for Amy's
7   resignation.  I don't know the details.
8       Q. What would be the circumstances under
9   which a person would be offered a large
10  severance package when they left voluntarily?
11      MR. SULLIVAN:  Objection to form.
12      THE WITNESS:  So you're -- you're --
13  you're just asking me in general
14  hypothetically?
15  BY MR. THOMAS:
16      Q. No, at HR -- at Absolute when you
17  were in HR.
18      MR. SULLIVAN:  Objection to form.
19      THE WITNESS:  I don't recall -- I
20  don't recall us offering a severance
21  package to someone that resigned
22  voluntarily.  My recollection -- I don't
23  recall that.
24  BY MR. THOMAS:
25      Q. All right.  Let me show you

D. Berardo

1
2   Exhibits -- what has been marked as
3   Exhibits 87 through 91.  Let me know when you
4   have had a chance to read those.
5       (Exhibit 87 was marked for
6   identification and is attached hereto.)
7       (Exhibit 88 was marked for
8   identification and is attached hereto.)
9       (Exhibit 89 was marked for
10  identification and is attached hereto.)
11      (Exhibit 90 was marked for
12  identification and is attached hereto.)
13      (Exhibit 91 was marked for
14  identification and is attached hereto.)
15      MR. THOMAS:  And, Jessica, if you can
16  mark Berardo Exhibit A as 92.
17      (Exhibit 92 was marked for
18  identification and is attached hereto.)
19      MR. THOMAS:  And, Jessica, one more
20  exhibit.  Berardo Exhibit X as 93.
21      (Exhibit 93 was marked for
22  identification and is attached hereto.)
23      THE WITNESS:  Okay.
24  BY MR. THOMAS:
25      Q. All right.  These -- these documents,

D. Berardo

1
2   some of which are redacted, involve
3   discussions with legal and other people
4   regarding Ms. Piehler's termination.
5       Do you -- how far in advance of
6   consulting legal do you remember discussing
7   Ms. Piehler's termination?
8       A. With Todd?
9       Q. With anyone.
10      A. I don't -- I don't recall
11  specifically the -- the timeline of -- of who
12  I talked to about, you know, her termination
13  before we spoke with legal.
14      Q. How -- how long -- how soon after the
15  idea of her being terminated did you contact
16  legal?
17      A. It -- it -- I don't -- I don't know
18  the answer to that.  It -- it would have been
19  fairly quickly, I would imagine.
20      Q. And "fairly quickly" meaning a week
21  or two?
22      A. I don't -- I don't know.  I -- I
23  don't have specific times.
24      Q. Well, you used the words "fairly
25  quickly," so I'm asking what you mean by --

D. Berardo

1
2       A. Yeah.
3       Q. -- "fairly quickly."
4       A. It could be -- it could be a day; it
5   could be a couple of weeks.
6       Q. Okay.
7       A. I don't know.
8       Q. Do you wish you had known about
9   Thomas Kenny's comment when you made -- when
10  the termination decision was made?
11      MR. SULLIVAN:  Objection to form.
12      THE WITNESS:  Do I -- do I wish?
13  BY MR. THOMAS:
14      Q. Would you like -- let me put it this
15  way:  Would you like to have known about it?
16      MR. SULLIVAN:  Objection to form.
17      THE WITNESS:  Well, as I said before,
18  I would have liked to have known about it
19  when -- when it happened, yes.
20  BY MR. THOMAS:
21      Q. Would you have liked to have known
22  about it in terms of how you would have
23  approached the termination decision?
24      A. No.
25      MR. SULLIVAN:  Objection to form.

Page 314

D. Berardo

1
2     THE WITNESS:  No.
3     BY MR. THOMAS:
4         Q.  What could you have done better in
5     dealing with Mary Piehler at Absolute, from an
6     HR perspective?
7         MR. SULLIVAN:  Objection to form.
8         THE WITNESS:  You know, I believe --
9     oh.
10        MR. SULLIVAN:  Keep going.
11        MS. LESTRADE:  Just keep going.
12        THE WITNESS:  Okay.  Yeah, I believe
13    that -- that -- that I did everything that
14    I felt was appropriate at the time in -- in
15    -- in dealing with Mary.
16        Oh, he -- he can't hear us either.
17        MR. SULLIVAN:  Is Mary still on?
18        THE COURT REPORTER:  Okay.
19        VIDEOGRAPHER:  Should we --
20        MS. LESTRADE:  Hello?
21        VIDEOGRAPHER:  -- go off record,
22    counsel?  Should we go off?
23        MR. SULLIVAN:  It's his -- it's his
24    deposition --
25        MS. LESTRADE:  It's his deposition.

Page 315

D. Berardo

1
2         MR. SULLIVAN:  -- but I guess he
3     can't hear us, so...
4         MS. LESTRADE:  I don't think we -- I
5     don't think we --
6         MS. VAN BRUNT-PIEHLER:  Yes.
7         MS. LESTRADE:  -- need to.
8         MS. VAN BRUNT-PIEHLER:  I'm still on.
9         MR. SULLIVAN:  Okay.
10        MS. LESTRADE:  Oh.
11        MR. SULLIVAN:  We lost Nelson.  We'll
12    patch him back in.
13        MS. VAN BRUNT-PIEHLER:  Okay.
14        MR. SULLIVAN:  He -- he's got to call
15    us, because it's just going to go to his...
16        MR. MALLI:  Unless he gives us the
17    number again.
18        MS. LESTRADE:  Let's see.  Maybe they
19    will fix it and get their act together on
20    their end.
21        MR. SULLIVAN:  He's got to call us.
22        MS. LESTRADE:  Ms. Piehler, are you
23    still on the line?
24        MR. SULLIVAN:  Hit the resume.
25    Resume.

Page 316

D. Berardo

1
2         MS. LESTRADE:  Resume?
3         MR. SULLIVAN:  Yeah.  Okay.
4         MS. LESTRADE:  Hello?  Is there
5     anyone on the line?
6         MS. VAN BRUNT-PIEHLER:  Mary is on.
7         MS. LESTRADE:  Okay.
8         MR. SULLIVAN:  Okay.
9         MS. LESTRADE:  We're going to have to
10    end the call with you because their --
11        MS. VAN BRUNT-PIEHLER:  Okay.
12        MS. LESTRADE:  -- phone isn't
13    working.
14        MR. SULLIVAN:  We'll -- we'll connect
15    back in when they call here, so --
16        MS. VAN BRUNT-PIEHLER:  Okay.  No
17    problem.
18        MR. SULLIVAN:  -- stand -- stand by.
19        MS. LESTRADE:  Okay.
20        MR. MALLI:  Do you want me to hang
21    up?
22        MR. SULLIVAN:  Yeah.
23        MS. LESTRADE:  Yes.
24        MR. SULLIVAN:  Hang up, and we'll
25    call you back.

Page 317

D. Berardo

1
2         MS. LESTRADE:  Okay.
3         MS. VAN BRUNT-PIEHLER:  Okay.
4         MS. LESTRADE:  Bye.
5         Is he going to call?  Does he know to
6     call, do you think?
7         MR. SULLIVAN:  What does that say?
8         MS. LESTRADE:  "We're going to take
9     ours off 'night' so you can call."
10        MR. SULLIVAN:  Okay.  All right.
11        MS. LESTRADE:  Okay.  So --
12        MR. SULLIVAN:  Let's try again.
13        MS. LESTRADE:  -- now?
14        UNIDENTIFIED SPEAKER:  Thank you for
15    calling Thomas & Solomon.  This is Kyle.
16    How can I help you?
17        MS. LESTRADE:  Hi, we're in the
18    middle of a deposition with Nelson Thomas.
19        THE WITNESS:  Okay.  One moment,
20    please.
21        MS. LESTRADE:  We need get him on the
22    line.
23        MR. THOMAS:  Hey.  Do we have you
24    back?
25        MR. SULLIVAN:  Yeah.  We'll patch in

80 (Pages 314 to 317)

D. Berardo

1 Mary.
2        MR. THOMAS: Okay. Perfect.
3 Thank you.
4        MS. VAN BRUNT-PIEHLER: Hello, Mary
5 Piehler.
6        MR. SULLIVAN: Hi. Hold on. We're
7 going to get Nelson on.
8        MS. VAN BRUNT-PIEHLER: Okay. Sure.
9        MS. LESTRADE: Everyone on?
10        MR. THOMAS: I'm here.
11        MS. LESTRADE: Ms. Piehler?
12        MS. VAN BRUNT-PIEHLER: I'm here.
13        MS. LESTRADE: Okay.
14        MR. SULLIVAN: Okay.
15        MR. THOMAS: Okay.
16        MS. VAN BRUNT-PIEHLER: I'm here.
17        MR. SULLIVAN: Yeah.
18        MS. LESTRADE: Okay.
19        MR. SULLIVAN: We're good.
20        MR. THOMAS: Great. Can we go back
21 on the -- I don't -- did we go off the
22 record or --
23        MR. SULLIVAN: Yes. Yes. No?
24        THE COURT REPORTER: No.

D. Berardo

1        VIDEOGRAPHER: No.
2        MR. SULLIVAN: Okay. We're back on.
3 Well, we're on.
4        MR. THOMAS: All right. And then can
5 the court reporter read back the last
6 question and the answer until it stopped.
7        (REPORTER READ BACK)
8 BY MR. THOMAS:
9     Q. From where you sit today, would you
10 have done anything differently?
11        MR. SULLIVAN: Objection to form.
12        THE WITNESS: I -- I wouldn't, no.
13        MR. THOMAS: All right. And can the
14 court reporter show the witness what has
15 been marked as Exhibit 92.
16 BY MR. THOMAS:
17     Q. Is this the severance package that
18 you said would explain to Ms. Piehler when her
19 medical benefits would end?
20     A. I believe so, yes.
21     Q. And tell me what you told her when
22 they would end.
23     A. Well, I -- I would have went through
24 this -- I mean, I -- I don't remember the --

D. Berardo

1     Q. Well, go through it -- go through it
2 and tell me when it says they're going to end.
3     A. Sure. So it says (as read):
4        Benefits: Your group extended health
5 and dental benefits will cease at the end
6 of the month on the -- July 31st, 2015.
7 You have the election under COBRA
8 legislation to continue your group health,
9 vision care, and dental plan by paying the
10 premiums. You will receive a notification
11 from our COBRA administrative, COBRA help."
12     Q. You may need to read just a little
13 slower for the court reporter there.
14        THE WITNESS: Sorry. Do you...
15        THE COURT REPORTER: That's okay. I
16 got it.
17        THE WITNESS: Okay.
18        To be eligible, you must respond to
19 the notice by August 30th, 2015."
20 And then it goes on about life insurance.
21 BY MR. THOMAS:
22     Q. Isn't it -- isn't it true that cut
23 Mary Piehler's health insurance off before
24 July 31st?

D. Berardo

1     A. Not -- not that I recall, unless it
2 was an administrative error.
3     Q. Okay. Do you remember that she
4 called you because her husband was going in
5 for cancer treatment, and he didn't have
6 health coverage because Absolute had cut his
7 benefits off?
8     A. I don't recall that conversation,
9 but, you know, I'm not saying that it -- that
10 that didn't happen. I just don't recall it.
11     Q. You do recall many conversations with
12 Mary Piehler after her termination about her
13 health benefits; right?
14     A. Her health benefits -- benefits
15 specifically?
16     Q. Yes.
17     A. I mean, I just -- I just don't -- I
18 don't recall the specifics of -- of health
19 benefit questions or conversations.
20     Q. Or benefits generally? Do you
21 remember a number of calls with Mary Piehler
22 about benefits generally?
23     A. Sorry, what -- can you repeat the
24 question.

D. Berardo

Q. Yes. I believe you testified earlier
that you remember a number of calls with
Ms. Piehler after her termination about her
benefits.

MR. SULLIVAN: Objection to form.
BY MR. THOMAS:

Q. Correct?

A. I don't -- I don't know if I said
that. There was a number of calls with Mary
Piehler after when we were trying to negotiate
a settlement.

Q. And you don't remember the fact that
you had cut off her husband's health insurance
who had cancer?

A. I don't recall. If -- if that did
happen, it -- it would have been an
administrative error and been rectified
immediately.

Q. You seem to -- do you have -- do you
have difficulty recalling conversations with
people?

MR. SULLIVAN: Objection to form.

THE WITNESS: Yes, five years ago in
the past, I would. Five years in the past,

D. Berardo

I would, yes.
BY MR. THOMAS:

Q. Even something like being responsible
for cutting off somebody's medical coverage
for their husband who has cancer?

MR. SULLIVAN: Objection to form.
BY MR. THOMAS:

Q. That would sort of slip by?

MR. SULLIVAN: Objection to form.

THE WITNESS: I -- I -- I don't know
what you're asking me. If you can repeat
the question.
BY MR. THOMAS:

Q. Yeah. Are you -- are you the type of
person who would forget the fact that your HR
department cut off health benefits for an
employee who you fired and whose husband was
relying on them for his cancer treatments?

MR. SULLIVAN: Objection to form.

THE WITNESS: Are you asking me five
-- four years later if I would remember
that?
BY MR. THOMAS:

Q. Yeah.

D. Berardo

A. It's possible that I wouldn't, four
years after the fact.

Q. Let's go to Exhibit 93. When you've
had a chance to read it, let me know.

A. Sure. Ready.

Q. Okay. Why did you say that you
normally don't do exit interviews for this
type of circumstance?

A. We don't do exit -- we -- we never do
exit interviews for terminations that are
initiated by the employer.

Q. Why don't you -- why -- why wouldn't
you do those?

A. Most companies don't, from -- from my
understanding, best practice, is because the
purpose of the exit interviews is to gather
information to, you know, help improve the --
you know, it could be the culture or -- or
whatever it might be of the company.
Generally, terminated employees don't provide
constructive -- constructive information,
and -- and, generally, we -- we really want to
understand the reasons why people are leaving.
That's the main purpose of the exit interview.

D. Berardo

And in this circumstance -- that just
wasn't the circumstance in this.

Q. If someone was fired for
discriminatory reasons, wouldn't you want to
get their input on that --

MR. SULLIVAN: Objection --
BY MR. THOMAS:

Q. -- in their exit interview?

MR. SULLIVAN: Objection to form.

THE WITNESS: In this circumstance,
she wasn't terminated for discriminatory
reasons.
BY MR. THOMAS:

Q. I'm not -- I'm just asking you, as an
HR manager at Absolute, wouldn't you want to
know that from an employee, if they thought
they were fired for discriminatory reasons?

A. So if I --

MR. SULLIVAN: Objection -- objection
to form.

THE WITNESS: If, hypothetically,
someone was terminated because of
discriminatory reasons, would we want to
know about that?

1                   D. Berardo
2    BY MR. THOMAS:
3         Q. Yes.
4         A. Yes -- yes, we would.
5         Q. And if they felt they were
6    discriminated for discriminatory reasons,
7    wouldn't you want to know that too?
8         MR. SULLIVAN:  Objection to form.
9         THE WITNESS:  Yes, we would want to
10   know that.  At least, I would want to know
11   that.
12   BY MR. THOMAS:
13        Q. Did you ever ask that of Ms. Piehler?
14        MR. SULLIVAN:  Objection to form.
15        THE WITNESS:  No, it's not a -- not a
16   question that -- that we generally ask.
17   BY MR. THOMAS:
18        Q. All right.  I have -- let me just
19   take a quick look here.  All right.  I have
20   nothing further at this time.
21        MR. SULLIVAN:  Take a break?
22        MS. LESTRADE:  Yeah.
23        MR. SULLIVAN:  All right.  We're
24   going to take a --
25        MS. LESTRADE:  Probably just --

1                   D. Berardo
2         MR. SULLIVAN:  -- ten-minute break or
3    so.
4         MS. LESTRADE:  More than that.
5         MR. SULLIVAN:  Okay.
6         MR. THOMAS:  Okay.
7         VIDEOGRAPHER:  Going off the record.
8         MS. LESTRADE:  Yeah.
9         VIDEOGRAPHER:  The time is 6:55.
10        (PROCEEDINGS RECESSED AT 6:55?P.M.)
11        (PROCEEDINGS RECONVENED AT 7:14 P.M.)
12        VIDEOGRAPHER:  Back on the record.
13   The time is 7:14.
14   EXAMINATION BY
15   MS. LESTRADE:
16        Q. Good evening, Mr. Berardo.  As you
17   know, my name is Laura Lestrade.  I represent
18   the defendants in this action, and I'm going
19   to be asking you some questions.  The same
20   rules apply; if you need to take a break, just
21   let me know, and we'll try to accommodate
22   that.  Just I --
23        MR. THOMAS:  Laura, can you speak up
24   just a little bit.  Because I'm having a
25   little trouble hearing you.

1                   D. Berardo
2    BY MS. LESTRADE:  Sure.
3         Q. I just ask that you -- you -- we
4    don't take a break while there is a question
5    pending.
6         I would like you to turn to
7    Exhibit 67.  You reviewed this document in
8    detail earlier today.  You could --
9         A. Yes.
10        Q. -- review it a little further, if you
11   want to just refresh yourself.
12        A. I recall the document.
13        Q. Okay.  Does this survey provide you
14   with any reason to believe that Todd Awtry or
15   Thomas Kenny discriminated against Mary
16   Piehler?
17        A. Absolutely --
18        MR. THOMAS:  Objection.
19        THE WITNESS:  Absolutely not.
20   BY MS. LESTRADE:
21        Q. Does anything in this survey provide
22   you with any reason to believe that Thomas
23   Kenny or Todd Awtry discriminated against
24   older employees?
25        A. Absolutely not.

1                   D. Berardo
2         MR. THOMAS:  Objection.
3    BY MS. LESTRADE:
4         Q. Did this survey provide you with any
5    reason to believe that Todd Awtry or Thomas
6    Kenny discriminated against older employees?
7         MR. THOMAS:  Objection.
8         THE WITNESS:  Absolutely not.
9    BY MS. LESTRADE:
10        Q. Did this survey provide you any
11   reason to believe that Todd Awtry or Thomas
12   Kenny treated women differently in terms of
13   communicating company strategies or
14   initiatives?
15        A. Absolutely not.
16        MR. THOMAS:  Objection.
17        THE WITNESS:  Absolutely not.
18   BY MS. LESTRADE:
19        Q. Did this survey provide you with any
20   reason to believe that Todd Awtry or Thomas
21   Kenny treated older people differently in
22   terms of communicating company strategies or
23   initiatives?
24        MR. THOMAS:  Objection.
25        THE WITNESS:  Absolutely not.

Page 330

D. Berardo

1
2   BY MS. LESTRADE:
3       Q. We discussed earlier that Ms. Piehler
4   raised some concerns with you concerning --
5   about her treatment at Absolute.  Did any of
6   the concerns raised by Ms. Piehler involve
7   sexual harassment?
8       A. Never.
9           MR. THOMAS:  Objection.
10  BY MS. LESTRADE:
11      Q. Did any of the concerns raised by
12  Ms. Piehler involve discrimination of any
13  kind?
14      A. Never.
15  BY MS. LESTRADE:
16      Q. Did any --
17          MR. THOMAS:  Objection.
18  BY MS. LESTRADE:
19      Q. -- of the concerns raised by
20  Ms. Piehler involve crimes, criminal activity?
21      A. Never.
22      Q. Or fraud or --
23          MR. THOMAS:  Objection.
24  BY MS. LESTRADE:
25      Q. -- embezzlement?

Page 331

D. Berardo

1
2       A. No.
3       Q. Did any of Ms. Piehler's complaints
4   give rise to a duty to investigate those
5   complaints?
6       A. No.
7           MR. THOMAS:  Objection.
8   BY MS. LESTRADE:
9       Q. Can I have you look at Exhibit 21
10  again.  If you could turn to it in the book.
11      A. Sure.  Okay.
12      Q. I'm going to direct your attention to
13  the first paragraph.  And the one, two, three,
14  four -- fifth line down towards the end where
15  it -- it says:
16          We did not launch a corporate
17      investigation in my CER, who I identified
18      as having a part-time job during the day
19      when Absolute is paying him to be here
20      hunting business in the northeast.  We
21      continue to pay him at full value."
22  Are you familiar with that -- do you -- do you
23  know what Ms. Piehler was referring to there?
24      A. I remember a situation --
25          MR. THOMAS:  Objection.

Page 332

D. Berardo

1
2           THE WITNESS:  I remember a situation
3   where an employee was away at lunchtime for
4   a period of time, and it was determined
5   that he was -- he was teaching a fitness
6   class or something -- something --
7   something to that effect.
8   BY MS. LESTRADE:
9       Q. Was an inquiry done into this
10  situation?
11      A. I don't --
12          MR. THOMAS:  Objection.
13          THE WITNESS:  I don't recall the
14  specifics of how -- how much we
15  investigated.  We definitely did
16  investigate, and it was determined that he
17  was essentially just leaving on his lunch
18  hour.
19  BY MS. LESTRADE:
20      Q. M'mm-hmm.
21      A. So nothing further was done.  Because
22  it was -- it -- it wasn't deemed as
23  inappropriate.
24      Q. And there was some testimony earlier
25  about an allegation that Todd Awtry shared

Page 333

D. Berardo

1
2   performance reviews of his reports with
3   everyone on his team.  Was it -- did he -- did
4   he share the reviews themselves?
5       A. No.  From my recollection --
6           MR. THOMAS:  Objection.
7           THE WITNESS:  From my recollection,
8   it was the -- it was the ratings on those
9   reviews in -- in a spread -- spreadsheet
10  that he had pasted in an email.
11  BY MS. LESTRADE:
12      Q. M'mm-hmm.  Okay.  I'm going to have
13  you look at Exhibits 62, 63, 64, and 66.
14      A. Starting with 62, sorry?
15      Q. 62, 63, 64, and 66.
16      A. Okay.
17      Q. Just briefly, just if you could focus
18  on the review periods for each review.
19      A. Sure.  Through -- sorry, through 64?
20      Q. 62, 63, 64, and 66.
21      A. And 66.  Okay.
22      Q. Did Todd Awtry prepare performance
23  reviews for Mary Piehler for each evaluation
24  period that he supervised her?
25      A. So that --

D. Berardo

1
2    MR. THOMAS:  Objection.
3    THE WITNESS:  Let me quickly review
4    again.
5  BY MS. LESTRADE:
6    Q. M'mm-hmm.
7    A. Yes, with the exception of the last
8  six months, because the review period -- the
9  review period hadn't started by the time Mary
10  exited.
11    Q. Okay.  And if you look at
12  Exhibit 62 --
13    A. Okay.
14    Q. -- if you look at the reviewer
15  comments, most of the reviewer comments say:
16    I only had six months visibility to
17    observe the competency."
18  Is that correct?
19    A. That's correct.
20    Q. Are you aware whether Mr. Awtry gave
21  that same review comment for his other reports
22  during that time -- that time frame?
23    A. Yeah, from -- from my recollection --
24    MR. THOMAS:  Objection.
25    THE WITNESS:  From my recollection,

D. Berardo

1
2  this is -- he -- he copy and pasted the
3  same "I only had six months visibility to
4  observe this competency" for all his direct
5  reports during that review period.
6  BY MS. LESTRADE:
7    Q. And his direct reports during that
8  review period, do you remember who they were?
9    A. They would --
10    MR. THOMAS:  Objection.
11    THE WITNESS:  They would have been
12  the regional directors.  Specifically -- I
13  don't remember specifically.
14  BY MS. LESTRADE:
15    Q. So it was all regional directors that
16  reported to him at -- at that time?
17    MR. THOMAS:  Objection.
18    THE WITNESS:  In --
19    MR. THOMAS:  Objection.
20    THE WITNESS:  In North America, yeah.
21  BY MS. LESTRADE:
22    Q. M'mm-hmm.  Regional directors and/or
23  area vice presidents?
24    A. Yes.  Yeah.  They were kind of one
25  and the same.  Some people were AVP; some

D. Berardo

1
2  people were regional directors.  Yes.
3    Q. When Mary Piehler complained about
4  not having received a performance review, did
5  it require an investigation by you?
6    A. Not a formal --
7    MR. THOMAS:  Objection.
8    THE WITNESS:  Not a -- it wouldn't --
9  it wouldn't set off a formal investigation,
10  no.
11  BY MS. LESTRADE:
12    Q. Do you think Mary Piehler was treated
13  unfairly by Absolute?
14    A. I do --
15    MR. THOMAS:  Objection.
16    THE WITNESS:  I do not.
17  BY MS. LESTRADE:
18    Q. And in your -- as an -- as an HR
19  director at Absolute during that time frame,
20  do you believe -- would it be appropriate for
21  an employee to be terminated for repeatedly
22  disagreeing with her manager on business
23  issues?
24    MR. THOMAS:  Objection.
25    THE WITNESS:  I -- I would say

D. Berardo

1
2  that -- that would be a conversation I
3  would have with the manager, and -- and it
4  -- it would be a valid reason to terminate
5  someone, yes.
6  BY MS. LESTRADE:
7    Q. Can you turn to Exhibit 17, please.
8  And on the third page, which is DEFS02585, in
9  this email from you to Ms. Piehler,
10  Ms. Piehler states -- at three lines up from
11  this first full paragraph, she --
12    A. Yeah.
13    Q. -- says:
14    I am not attempting to overreact.  I
15  am covering myself in case this witch-hunt
16  continues in FY15."
17  Do you know what she -- did you understand
18  what she meant by "this witch-hunt"?
19    MR. THOMAS:  Objection.
20    THE WITNESS:  I would only be
21  speculating what I -- what I thought back
22  then.
23  BY MS. LESTRADE:
24    Q. M'mm-hmm.
25    MR. THOMAS:  Objection.

D. Berardo

BY MS. LESTRADE:

   Q. Well, let me -- did you consider the investigation into the DOE commission payments to be a witch-hunt?

   A. Absolutely not, no.

    MR. THOMAS:  Objection.

BY MS. LESTRADE:

   Q. Are you aware of any actions by Todd Awtry that cause you to think that he discriminated against Mary Piehler on the basis of age or sex?

   A. Absolutely --

    MR. THOMAS:  Objection.

    THE WITNESS:  Absolutely not.

BY MS. LESTRADE:

   Q. Are you aware of any actions by Thomas Kenny that cause you to think that he discriminated against Mary Piehler on the basis of age or sex?

    MR. THOMAS:  Objection.

    THE WITNESS:  Absolutely not.

BY MS. LESTRADE:

   Q. Are you aware of any actions by Geoff Haydon that cause you to think that he

D. Berardo

discriminated against Mary Piehler on the basis of age or sex?

    MR. THOMAS:  Objection.

    THE WITNESS:  Absolutely not.

BY MS. LESTRADE:

   Q. Are you aware of any actions by anyone at Absolute that cause you to think that Absolute discriminated against Mary Piehler on the basis of age or sex?

   A. Not that I --

    MR. THOMAS:  Objection.

    THE WITNESS:  Yeah, not that I recall, no.

BY MS. LESTRADE:

   Q. As the head of HR, were you responsible for the recruiting function?

   A. Yeah, the recruiting function --

    MR. THOMAS:  I didn't hear -- sorry, what was that?  I didn't hear for the...

BY MS. LESTRADE:

   Q. I said as -- as the head of HR, were you responsible for the recruiting function?

    MR. THOMAS:  Objection.

    THE WITNESS:  Yes, the recruiting

D. Berardo

function rolled up to me.  Reported in to me.  Yes.

BY MS. LESTRADE:

   Q. Were you ever given any instruction by anyone at Absolute that Absolute wanted to focus on hiring younger or male employees?

   A. Never.

   Q. Did you ever give any such instruction to --

    MR. THOMAS:  Objection.

BY MS. LESTRADE:

   Q. -- your -- to the recruiters who reported to you?

   A. Absolutely not.

   Q. Did --

    MR. THOMAS:  Objection.

BY MS. LESTRADE:

   Q. Did you ever give any such instruction to internal recruiters that Absolute used in finding candidates for employment?

   A. Absolutely not.

    MR. THOMAS:  Objection.

BY MS. LESTRADE:

D. Berardo

   Q. Was it Absolute's policy to hire younger and male employees?

   A. It was not.

    MR. THOMAS:  Objection.

BY MS. LESTRADE:

   Q. Yeah.  Did you ever hear Geoff Haydon say that he wanted to get rid of older employees?

   A. Never.

   Q. Did you --

    MR. THOMAS:  Objection.

BY MS. LESTRADE:

   Q. Did you ever hear Geoff Haydon say that he wanted to get rid of female employees?

   A. Never.

   Q. Did you --

    MR. THOMAS:  Objection.

BY MS. LESTRADE:

   Q. -- ever hear Geoff Haydon say he wanted to hire male employees?

   A. Never.

    MR. THOMAS:  Objection.

BY MS. LESTRADE:

   Q. Did you ever hear Geoff say -- Haydon

Page 342

D. Berardo

1  
2  say he wanted to hire young employees?  
3      A. No.  Never.  
4      MR. THOMAS:  Objection.  
5  BY MS. LESTRADE:  
6      Q. Did Geoff Haydon express any hiring  
7  criteria for people he wanted to join  
8  Absolute?  
9      MR. THOMAS:  Objection.  
10     THE WITNESS:  Not to the -- not to  
11  the best of my recollection.  The decisions  
12  were generally left in the hands of the  
13  hiring managers.  
14  BY MS. LESTRADE:  
15     Q. M'mm-hmm.  Did Geoff Haydon have a  
16  vision of changing the business direction of  
17  the company?  
18     A. Yes.  
19     MR. THOMAS:  Objection.  
20     THE WITNESS:  Yes.  That's -- I think  
21  that's why he came into the company.  
22  BY MS. LESTRADE:  
23     Q. M'mm-hmm.  
24     A. Yeah.  
25     Q. And what -- what kinds of business  

Page 343

D. Berardo

1  
2  was he looking to -- what kind of business was  
3  he looking to turn Absolute into?  
4      MR. THOMAS:  Objection.  
5      THE WITNESS:  So I -- I can just  
6  answer from an HR perspective --  
7  BY MS. LESTRADE:  
8      Q. M'mm-hmm.  
9      A. -- but -- but my observation is that,  
10  you know, he wanted to turn Absolute into a  
11  world-class organization and wanted -- wanted  
12  to expand our reach, our revenue, improve our  
13  products, and -- and -- you know, essentially,  
14  that's what I recall.  
15     Q. Okay.  I would like you to take a  
16  look at -- again, at Exhibit 21.  Actually,  
17  first, look at Exhibit 17.  
18     A. Okay.  
19     Q. In -- on the third page, 2585,  
20  Ms. Piehler is complaining to you about Todd  
21  Awtry; is that correct?  
22     A. Let me --  
23     MR. THOMAS:  Objection.  
24     THE WITNESS:  Let me just quickly --  
25  quickly read it again.  Yeah, the subject  

Page 344

D. Berardo

1  
2  was Todd Awtry.  
3  BY MS. LESTRADE:  
4      Q. Okay.  And in the very first line of  
5  the last -- the -- the -- actually, it's the  
6  second-to-last paragraph.  She says:  
7      I have seen published numbers that  
8      are wrong."  
9  Do you see that?  
10     A. Yes, I do.  
11     Q. Okay.  And -- and then on page 2584  
12  at the bottom, you say:  
13     Hi, Mary.  Can you give me more  
14     colour into your second-to-last paragraph."  
15  Do you see that?  
16     A. I do, yes.  
17     Q. Okay.  And the second-to-last  
18  paragraph is on the preceding page where she  
19  talks about published numbers that are wrong?  
20     A. Right.  Yeah.  
21     Q. Okay.  So if you go back to  
22  Exhibit 21 --  
23     A. Okay.  
24     Q. -- the first line, she says:  
25     Daniel, in response to your request,  

Page 345

D. Berardo

1  
2  here is a little colour in the comments I  
3  made to you."  
4  And much of this email is Ms. Piehler  
5  forwarding to you email correspondence that  
6  she had with Dan Miller about the reporting of  
7  sales numbers.  Is that correct?  
8      A. Yes.  
9      Q. Okay.  Who was Dan Miller?  
10     MR. THOMAS:  Objection.  
11     THE WITNESS:  Dan Miller was a -- he  
12  worked in the sales ops team.  I'm not sure  
13  what his position was, but he worked in the  
14  sales operations team.  
15  BY MS. LESTRADE:  
16     Q. And was he responsible for reporting  
17  the numbers?  
18     MR. THOMAS:  Objection.  
19     THE WITNESS:  I don't -- I don't  
20  recall if he was responsible for reporting  
21  the numbers, but he was responsible for --  
22  for -- for gathering the numbers.  And --  
23  and, perhaps, yeah, reporting them to --  
24  you know, to, like, the finance team.  
25  BY MS. LESTRADE:

D. Berardo

1
2   Q. M'mm-hmm.  Okay.  Was Todd Awtry
3   responsible for gathering the numbers for the
4   finance team?
5   A. He was not, no.
6   MR. THOMAS:  Objection.
7   THE WITNESS:  Not to the -- not to
8   the best of my recollection.
9   BY MS. LESTRADE:
10   Q. Okay.  Mr. Berardo, I would -- I
11   would like you to look again at Exhibit 81.
12   A. Okay.
13   Q. On the second page.
14   A. Okay.
15   Q. There was some suggestion earlier
16   that -- that a Tom Ioele may have been hiding
17   in the conference room where the termination
18   took place.  Can you look at three lines from
19   the bottom of that email.
20   A. Three lines from the bottom?
21   Q. I mean, not of the email.
22   A. Oh.
23   Q. Of the -- on the page that's
24   DEFS07446.
25   A. Right.  So it says:

D. Berardo

1
2   Tom came into the..."
3   Where it says:
4   Tom came into the room after Mary
5   left the parking lot, and we debriefed what
6   had taken place with Todd and Daniel"?
7   Q. Yeah.  Okay.  Does that -- does that
8   refresh your recollection -- recollection at
9   all that Mr. Ioele was, in fact, not in the
10   room during the termination meeting and was
11   not, in fact, hiding in the room?
12   MR. THOMAS:  Objection.
13   THE WITNESS:  I don't -- I don't -- I
14   don't recall the -- I don't recall vivid
15   memories of the -- of the call.  But, I
16   mean, I -- when the -- this termination
17   note was sent to me, I mean, I reviewed it,
18   and -- and -- and I said that it was
19   accurate.  So -- so, you know, three
20   years -- three and a half years ago me
21   would have said that this is -- this is
22   what happened.
23   BY MS. LESTRADE:
24   Q. Okay.  I have no more questions.
25   EXAMINATION BY

D. Berardo

1
2   MR. THOMAS:
3   Q. Mr. Berardo, where -- why wasn't
4   Mr. Ioele in the room, like the notes say?
5   A. Why wasn't?
6   Q. Why wasn't he?
7   A. Why wasn't he in the room?  Well, we
8   just -- from my recollection, we just asked
9   one person from the -- from the company to be
10   in the room.  So I don't know why he wasn't in
11   the room.
12   Q. Why did you ask only one person?
13   A. That's -- that was all that was
14   really necessary.
15   Q. Why was -- why was he necessary to be
16   there at all, then?
17   A. I -- I don't know.  You -- you would
18   have to ask Catherine.  I -- I don't know
19   why -- why Catherine brought him to -- to the
20   meeting.
21   Q. And you don't know why Catherine kept
22   him out -- kept him outside of Mary's sight
23   until after the meeting was over and then
24   brought him in; right?
25   A. I don't -- I don't recall why, no.

D. Berardo

1
2   Q. And you don't know where he was
3   situated so that Mary couldn't see him during
4   the meeting; correct?  Or before the meeting?
5   A. Well, it says here:
6   Tom came into the room after Mary
7   left."
8   So according to these notes, Tom wasn't in the
9   room.  I don't know where he was situated
10   before --
11   Q. Do you know where he was?
12   A. I don't, no.
13   Q. And do you know why he was somewhere
14   where Mary couldn't see him, apparently?
15   A. He was outside the room, because he
16   wasn't part of the termination meeting.
17   Q. That wasn't my question.
18   A. Sorry, can you repeat your question.
19   MR. THOMAS:  Yes.  Could the court
20   reporter read it back.
21   (REPORTER READ BACK)
22   THE WITNESS:  I -- I don't know -- I
23   don't know why he was outside the room.
24   BY MR. THOMAS:
25   Q. Nothing further.

Page 350

```
 1              D. Berardo
 2       VIDEOGRAPHER:  Okay.  This concludes
 3   today's deposition.  Going off record at
 4   7:40.
 5
 6
 7       (PROCEEDINGS ADJOURNED AT 7:40 P.M.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   //
25   //
```

Page 351

```
 1
 2            REPORTER CERTIFICATION
 3       I, Jessica D. Archibald, Official
 4   Reporter in the Province of British Columbia,
 5   Canada, BCSRA No. 607, do hereby certify:
 6
 7       That the proceedings were taken down
 8   by me in shorthand at the time and place
 9   herein set forth and thereafter transcribed,
10   and the same is a true and correct and
11   complete transcript of said proceedings to the
12   best of my skill and ability.
13
14       IN WITNESS WHEREOF, I have hereunto
15   subscribed my name this 22nd day of May 2019.
16
17
18
19       _____
20       Jessica D Archibald
21       Official Reporter, CSR(A)
22
23
24
25
```

Page 352

```
 1            I N D E X
 2
 3   INDEX OF EXAMINATIONS:
 4   EXAMINATION                  PAGE
 5       MR. THOMAS               6
 6       MS. LESTRADE             327
 7       MR. THOMAS               348
 8
 9         E X H I B I T S :
10
11   NUMBER     DESCRIPTION            PAGE
12   Exhibit 86   Documents DEFS08824 to
13         DEFS08830; Exhibit Berardo L    225
14   Exhibit 87    Berardo Exhibit O      311
15   Exhibit 88    Berardo Exhibit P      311
16   Exhibit 89    Berardo Exhibit I      311
17   Exhibit 90    Berardo Exhibit J      311
18   Exhibit 91    Berardo Exhibit N      311
19   Exhibit 92    Berardo Exhibit A      311
20   Exhibit 93    Berardo Exhibit X      311
21
22
23
24
25
```

89 (Pages 350 to 352)

**A**

a.m 2:5 5:12 200:5
Aaron 137:9
  176:16
Abigail 39:19
  40:18 41:9,18
ability 43:5 91:16
  351:12
able 44:14 74:20
  123:6 218:4
  241:23 270:4
  299:6
absolute 1:8,9 3:23
  5:5,25 9:9,10,13
  9:18 13:3,18,20
  14:12 15:5,20,22
  16:14,18 18:12
  19:16 20:2 21:10
  22:9,14 25:17
  28:3,14 34:18
  42:21 43:8,24
  44:20 45:6 46:4
  46:12,20 54:21
  58:17 59:9 63:10
  64:11 65:20
  67:14 68:7 69:20
  70:11 71:17
  73:13 75:11,25
  79:20 80:5,9,24
  81:24 82:15 84:6
  85:5,18 86:3,9,12
  87:8,12,19 88:9
  88:10 89:9,17,25
  91:7,16,20 92:21
  93:17 99:16
  102:20 105:7
  110:23 114:3
  117:9 118:22,24
  119:3,5,8 120:12
  120:25 121:11
  126:4 140:2
  142:19 158:3
  161:18 163:20
  164:8,19 165:7
  165:24 166:21
  167:25 171:21
  183:2,4,18 184:4
  184:10,17 185:11

185:21 186:9,13
189:6 192:14
193:8 194:3
205:3,11 206:18
207:5 213:11
222:2 238:17,21
238:24,25 240:18
243:8 259:8
264:8,20 265:22
267:13,16 270:9
270:10 273:2
280:17 284:16
286:7 287:21
298:2,18 307:7
307:10 310:16
314:5 321:7
325:16 330:5
331:19 336:13,19
339:8,9 340:6,6
340:21 342:8
343:3,10
Absolute's 71:14
  75:20 87:19
  88:17 104:21
  124:5 149:11
  195:4 341:2
absolutely 26:15
  64:13 65:23
  66:24 67:8 76:16
  76:17,20 84:25
  94:18 109:14
  114:6,17 115:11
  116:8 118:13
  123:10 130:12
  137:17 170:16
  171:18 175:22
  195:7 205:4
  248:4 255:18,20
  259:15,24 277:4
  277:6 297:14
  328:17,19,25
  329:8,15,17,25
  338:6,13,15,22
  339:5 340:15,23
ABT 18:11 277:8
acceptable 87:9
  120:24 121:4,5
  149:8 164:19

168:13,17,20
169:6,9,16,25
170:23 171:13,22
172:11,17,20,20
173:12 194:20,24
accepted 205:12,21
accepting 275:11
accommodate
  109:23 327:21
accurate 52:22
  53:21 57:19 58:3
  135:15,21,25,25
  137:12 206:23
  228:24 272:4
  305:12,14 308:22
  347:19
accurately 56:19
  70:8 131:14
  133:7,8,9 135:10
  135:12 301:17
accuse 86:13 87:18
  90:2
accused 93:5 103:6
  103:14 204:7
accusing 85:16,20
  88:18
acknowledged
  195:20
acquired 25:25
acquisition 26:2
act 65:21,24 66:9
  315:19
action 64:9,21 65:2
  65:7 67:8 68:3
  69:18 70:23 71:3
  72:4,12 150:14
  150:22,24 151:2
  151:5,10,17,22
  152:7,10,11,15,18
  152:21 153:4,10
  153:12,16 154:16
  179:15,18,19,21
  327:18
actions 265:13
  338:9,17,24
  339:7
activity 330:20
acts 265:13

actual 136:22
  292:22
add 118:2
addition 79:5
additionally 61:11
address 44:14,20
adequately 42:12
ADJOURNED
  350:7
administer 2:12
  4:13
administered
  270:15,15
administrative
  320:12 321:3
  322:18
admitted 133:15
admitting 134:14
advance 20:11
  42:23 67:16
  68:11 70:19
  141:15 273:18
  312:5
advanced 18:7
adversity 42:17
advertising 296:24
advised 218:24
affect 27:14 28:10
afraid 41:14
  141:23
African 189:15
age 77:9 338:12,20
  339:3,10
agenda 289:22
aggressive 130:5
  132:9 156:11
  160:9 163:25
ago 8:12,18 23:11
  28:4 52:9 72:22
  72:25 135:23,23
  205:9 207:10
  219:4 248:8
  256:6 322:24
  347:20
agree 61:25 122:12
  184:13 204:20
  208:9 210:17,20
  231:13 277:10

agreed 4:2,6,10
  203:13
agreeing 204:12
agreement 7:4
  204:16
ahead 35:8 77:24
  107:9,14 110:8
  129:20 156:23
  215:22 243:22
  260:17 262:20
  272:22
al 5:6
allegation 79:14,14
  157:18 212:15
  332:25
alleged 153:24
  154:25 155:4,16
  155:17 159:22,23
  159:23,24 160:21
  161:4,12
allegedly 130:9
  148:9 161:5,6
allocated 201:6
  202:19 231:2,17
allocation 202:5
  203:7 204:16
allow 91:7
allowed 86:3,6,8,12
  88:3 89:8 292:13
allows 39:23
aloud 277:2
Alpha 9:25
Amanda 16:12
ambiguous 19:9
  106:23,25 107:6
  204:5,6 211:16
  212:17
America 335:20
American 7:5
  189:15
amount 296:14
Amy 163:8,9 181:4
  182:5 310:3
Amy's 310:6
and/or 335:22
annoyed 289:19
annual 271:23
anonymous 65:2

72:9
anonymously
  74:17
answer 22:17
  52:10 54:6,10
  57:2 66:5 67:4
  68:21,25 69:5
  71:23,23 83:5
  88:21 89:8 90:8
  92:19 103:15
  107:10 109:25
  110:13,18,19
  137:4 150:5
  163:14 164:25
  170:6,9,17
  173:11 175:9
  179:5,6 181:13
  182:10 186:4
  191:15,16 194:15
  197:23 199:17
  200:18,20 209:14
  209:24 220:14
  254:6 258:16
  260:6 273:14
  293:4,11,25
  299:6,22 312:18
  319:7 343:6
answered 90:22,23
  90:25 92:3,17
  110:16 167:2,9
  185:25 252:24
  279:16
answering 59:25
  209:22
anymore 151:7
apologize 244:18
apparent 42:4
  262:3
apparently 349:14
appears 210:21
  278:15 279:6
apply 266:16,21,23
  268:22 269:3,7,8
  269:10,12,14
  327:20
appraisals 255:25
appreciated 125:22
  185:17

approach 20:25
  29:12,13 159:5
  276:5
approached 313:23
appropriate 75:11
  75:19 149:20
  269:16 289:7
  290:5 302:12
  303:5 306:5,12
  306:18 314:14
  336:20
approve 192:7,12
  192:14
approving 206:9
approximately
  5:11 14:7
April 124:7
Archibald 1:24
  2:11 5:17 351:3
  351:20
area 43:8 335:23
areas 26:18,20,21
  27:3
arena 43:9
Asian 189:17
aside 165:19
asked 18:9 27:23
  49:7 54:11 90:22
  90:23 99:24,25
  101:23 134:23
  166:23 174:6
  200:2 203:2
  208:2 218:12,12
  219:22 220:10
  222:13,15 238:3
  238:10,13 255:2
  348:8
asking 19:12,20
  20:18 22:20 28:6
  30:21,22 36:8,14
  36:15 38:4 44:17
  51:5,10 52:7
  57:12 65:16,19
  71:5,10,13 72:16
  72:19 73:7,8 75:6
  79:23 81:4 82:25
  83:2,10 84:16
  85:3,4 86:17,21

93:6 94:23,23
  106:12 110:11
  113:21 115:3
  130:19,19,25
  131:4 135:16
  136:3 146:9
  150:5 152:5,6
  155:3 158:22
  162:12 166:20
  183:12 191:15
  193:7 196:7,8
  198:11 201:13,13
  205:7 207:8
  213:17 217:9
  224:23 229:23
  239:14,16,23
  241:7 249:11
  253:8 254:9
  258:3 268:24,24
  275:22,24 278:25
  293:5 296:17
  310:13 312:25
  323:12,21 325:15
  327:19
asks 197:24,24
asserted 107:11
assessment 59:13
  210:18,21
assigned 298:6
associated 196:13
association 5:18
assume 7:3 18:10
  35:7 163:17
  167:21
assumed 14:3
  25:19
assuming 116:15
assumption 184:3
  264:21
athletes 130:4
  132:8 156:10
  160:8 163:24
  173:17
attached 36:18
  225:20 250:18
  311:6,8,10,12,14
  311:18,22
attempted 268:11

attempting 337:14
attempts 230:5
attend 10:4 180:2,4
  180:10
attended 10:6
  180:4
attention 27:16
  132:11,15 244:5
  255:15 331:12
attest 159:12
attitude 240:17
  276:6
attorney 7:11
attorneys 3:6,14
  4:3
audio 6:19
August 34:22
  62:23 67:21
  226:23 227:5
  228:5 244:23
  245:9,10 320:20
authorized 2:12
  4:12
Avenue 3:7 5:16
AVP 335:25
aware 26:6 59:21
  61:12,17,17
  69:17 75:3 79:3
  110:21 111:3,5,8
  124:4,9,15
  129:14 164:13,13
  186:11 188:5
  223:11 227:9,9
  227:12,17 231:15
  334:20 338:9,17
  338:24 339:7
Awtry 1:11 18:13
  22:7,12 27:5 28:2
  29:9,25 30:25
  32:14 33:4,24
  34:10 39:12,18
  39:23 40:5,24
  41:5,21 44:2 46:3
  49:18 50:3 53:23
  59:21 60:22
  61:10 141:18
  195:19 196:20
  197:2,19 198:9

201:3,25 206:9
  206:12 207:20
  208:12 210:10,10
  211:20,20 214:11
  214:20 215:4
  217:14,18 219:21
  223:22 224:25
  225:3 226:17
  227:2,4 230:5
  231:15 232:8
  233:17 240:8
  242:2,10 268:11
  274:21 278:3,12
  278:20 287:5,8
  287:11,15 288:8
  290:6 328:14,23
  329:5,11,20
  332:25 333:22
  334:20 338:10
  343:21 344:2
  346:2
Awtry's 19:14
  56:21

_____
        B
B 6:10 352:9
b-e-r-a-t-i-n-g
  288:6
back 7:18 8:17
  9:20 11:14,21
  23:10 31:12
  33:20 41:18 48:7
  48:9 56:5,9,14
  57:8,9 69:11,13
  72:18 102:16
  103:25 128:8
  132:20 141:6
  142:2 146:21
  157:2,4 165:2,4
  169:22 170:6,9
  170:13,17,18
  171:6 197:11
  199:12 206:25
  208:19 209:24
  217:10 219:2
  221:21 222:7,9
  224:18 225:17
  226:16 235:6

237:5 243:3
246:19 250:9
266:10 289:20
300:20 301:2,13
303:3,4 315:12
316:15,25 317:24
318:21 319:3,6,8
327:12 337:21
344:21 349:20,21
background 53:3,5
53:18 96:21
113:25 115:7
131:6 189:21
256:18,25
backings 49:6
bad 120:11 228:12
290:2
base 260:23,24
based 23:18 43:15
51:4 56:18 57:14
57:15 75:7 77:6,8
77:8,9,10 78:12
91:11,15,19 93:8
93:9,13 94:3,9
102:4 103:9,9,10
103:11 107:11
154:6 194:25
220:24,24 221:14
279:13,15 280:3
280:8 281:2,8,11
281:14 284:4
292:25 293:6,7
basically 20:23
basis 77:16,20 93:8
93:8 94:14,20
104:15 106:8
242:10 338:12,20
339:3,10
Bates 225:10 226:2
BC 1:18 2:10
BCIT 53:12
BCSRA 351:5
beginning 235:7
behalf 5:23 6:3
84:13,16
behaviour 40:21
82:8 114:18
115:12 116:9

117:23 118:13
123:3,10 283:18
believe 46:2,19
48:14 49:2,8
53:21 58:6 70:8
76:5 127:16
130:6 136:4,7,9
163:5 188:22
190:8,19,24
198:6,16,19,23
199:2 222:2
281:24 289:23
292:5 314:8,12
319:21 322:2
328:14,22 329:5
329:11,20 336:20
believed 177:15,18
204:23 206:7,18
207:5
believes 217:19
believing 206:11
belong 41:22
benefit 321:20
benefits 302:13
307:9 319:20
320:5,6 321:8,14
321:15,15,21,23
322:5 323:17
Berardo 1:17 2:8
5:1,4 6:1 7:1,10
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1,6,12
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1,3,23
34:1,18 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1,17 57:1
58:1 59:1 60:1

61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1,23 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1,9,14
108:1 109:1,20
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1,7
128:1,13 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1,4,22 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1

170:1 171:1
172:1,17 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1,8 223:1
224:1,3,21 225:1
225:23 226:1
227:1 228:1
229:1 230:1
231:1 232:1,4
233:1 234:1
235:1 236:1
237:1 238:1
239:1 240:1
241:1 242:1,20
243:1,6,20 244:1
245:1 246:1
247:1 248:1,2
249:1 250:1
251:1 252:1
253:1 254:1
255:1 256:1
257:1 258:1
259:1 260:1
261:1 262:1
263:1 264:1,17

265:1 266:1
267:1 268:1
269:1 270:1
271:1 272:1,17
273:1 274:1
275:1 276:1
277:1 278:1
279:1 280:1
281:1 282:1
283:1,2 284:1
285:1 286:1
287:1 288:1
289:1 290:1
291:1 292:1
293:1 294:1
295:1 296:1
297:1 298:1
299:1 300:1,4,8
301:1,16 302:1
303:1 304:1
305:1 306:1
307:1 308:1
309:1 310:1
311:1,16,20
312:1 313:1
314:1 315:1
316:1 317:1
318:1 319:1
320:1 321:1
322:1 323:1
324:1 325:1
326:1 327:1,16
328:1 329:1
330:1 331:1
332:1 333:1
334:1 335:1
336:1 337:1
338:1 339:1
340:1 341:1
342:1 343:1
344:1 345:1
346:1,10 347:1
348:1,3 349:1
350:1 352:13,14
352:15,16,17,18
352:19,20
berating 288:4,6,6
288:7,11,13

291:5
best 67:24 84:4,25
  85:3 143:21
  302:10 324:16
  342:11 346:8
  351:12
better 32:6 58:7,14
  58:19 60:6 169:3
  172:3,3,4 173:10
  285:13 286:3
  292:21 314:4
big 143:14 282:23
bigger 47:11
bit 7:22 8:5,7 9:9
  9:17 20:12 25:16
  28:17 29:16,16
  29:21,22 85:10
  147:18 160:20
  171:3 307:22
  327:24
bizarre 301:21
  302:2,5
black 158:11
  172:25
blame 40:21
blank 130:21,21,21
  73:12 123:14
boat 218:18
Bold 248:12
bonus 260:24
book 331:10
booked 187:22
  188:25 195:17
  212:16
booking 187:10,11
boss 30:19,22
bother 212:21
  213:13 214:22
bothered 140:2
bottom 225:11
  236:8 304:3
  344:12 346:19,20
box 33:7
brand 43:7
break 55:22 77:14
  108:17,19 109:10
  109:22 110:2,4

197:5 243:7
  301:7 326:21
  327:2,20 328:4
briefly 11:12 27:10
  333:17
bring 20:25 143:5
  143:7,11
bringing 28:18,24
  240:18
British 2:13 5:10
  9:24 10:8 351:4
broad 24:11
broken 39:24
  277:10,10
brought 20:15,24
  46:3,10,19
  119:13 124:12
  132:11,14 155:19
  161:17 220:22
  348:19,24
Brunt-Piehler 1:5
  5:5 6:6 315:6,8
  315:13 316:6,11
  316:16 317:3
  318:5,9,13,17
brush 146:20,22
brushed 138:24
  143:14,25 146:18
  147:3,7,13
build-up 42:9
bullet 67:12 141:12
  141:21
bullying 78:13,14
  94:7
bunch 96:18 99:5
  111:23 112:3
  241:14
Burnaby 9:24 10:8
business 24:9
  38:13,14 42:11
  42:13 82:22 83:3
  83:13,22,25
  84:21 120:5
  187:10,11,12
  188:25 276:5,6
  281:23 331:20
  336:22 342:16,25
  343:2

businesses 212:16
button 47:13
buttoned 47:17
buttoned-down
  160:10
buttoned-up 29:23
  30:2 55:4,14
  240:17
Bye 317:4

———————
C
———————
C 3:2
call 53:6 56:8
  178:9,11 260:6
  281:10,13,17
  300:21,22 315:14
  315:21 316:10,15
  316:25 317:5,6,9
  347:15
called 6:11 9:25
  10:15 11:13
  12:12 13:7 25:19
  36:23,24 59:15
  321:5
calling 19:8 104:16
  317:15
calls 24:24 321:22
  322:3,10
can-do 276:6
Canada 5:11 7:2
  11:7 351:5
Canadian 10:25
cancel 308:14
cancelled 307:18
  307:25 308:8,16
  309:3
cancer 307:3,20
  308:2,20 309:5
  321:6 322:15
  323:6,19
candidate 43:3
candidates 340:21
capabilities 118:3
capacity 43:19
care 320:10
cared 121:22
career 16:17
  123:11 271:4

careers 42:23
  67:16 68:12
  70:19 134:4
  141:15
caring 121:25
  122:6
carried 270:12
case 5:8 7:12 66:25
  179:11 220:6
  266:14,17,19
  306:17 337:15
categories 77:15
category 250:19
Catherine 303:16
  305:22 348:18,19
  348:21
cause 65:24 98:13
  100:8 338:10,18
  338:25 339:8
caused 31:5 62:17
cease 320:6
CEO 28:15 29:16
  74:4 111:16
  112:24 116:2,6,8
  116:17 117:5,13
  119:11,13 121:13
  121:14 123:4
  128:18 130:2,13
  130:20 131:8
  132:5 156:7
  159:18 160:6
  163:22 223:5
CEO's 222:19,21
CEOs 119:22
CER 42:10 331:17
certain 35:7 66:25
  116:22 163:5
  187:10 189:21
  215:8 244:15
  264:10 283:18
  298:17
certainly 122:11
certainty 191:16
  191:16
certificate 12:10
  53:12
CERTIFICATI...
  351:2

certify 351:5
CFO 111:16
  113:15 117:5,13
  123:3,5 128:19
  176:16,18,19
challenges 277:8
chance 26:11
  129:18 197:16
  235:3 241:25
  272:12 278:10
  286:25 311:4
  324:5
change 20:15,18,21
  28:14 31:7 32:18
  32:25 46:24 47:3
  47:6,11 55:9
  62:22 119:24
  123:6
changed 25:25
  54:11 142:6
  264:11 299:20
changing 32:9
  83:20 119:19
  342:16
channels 111:10
characterization
  61:25
characterize 61:22
  233:10
characterized 55:3
  61:22 233:13
Charles 189:8,11
  189:16 190:10
  191:25
choice 115:17
  118:10,11
choose 172:18
chose 44:20
chosen 123:22
chronological
  127:17
chronologically
  127:20
chronology 226:16
circles 25:3 237:16
  237:19
circumstance
  260:20 309:20

324:9 325:2,3,11
circumstances 66:8
  66:19,23 94:5
  102:8 103:11
  107:2,16 115:18
  115:23 194:14
  263:5,11 267:25
  269:22 284:12
  286:10,19 297:8
  309:23 310:8
circumstantial
  263:10
City 124:7
claim 43:2 67:7
  73:12
clarify 18:17 27:20
  80:13 213:17
class 332:6
clear 19:11 104:19
  158:11 177:2,7
  249:17 289:22
Clearly 179:13
clients 223:14
closer 7:23
closing 178:14
coach 85:9 290:23
  290:25
coaching 168:25
coalition 59:5,8
coalitions 59:4
coasting 134:3
COBRA 308:9
  309:8 320:8,12
  320:12
coincidental
  221:19 222:12
colleagues 105:2
collecting 134:4
college 10:5
colour 344:14
  345:2
Columbia 2:13
  5:10 9:24 10:8
  351:4
come 20:4 28:14
  82:13 103:14
  123:4 134:24
  145:15,17 155:20

155:21 157:17
158:3 182:7
183:8 184:3,21
185:2,8 187:4
207:8 217:10
284:21 285:9,25
303:24 309:21
comes 26:24 38:16
  63:18 77:2 299:4
comfortable
  140:18 142:23
  144:23,25 145:11
  145:22
coming 6:19 9:18
  20:5 24:13 26:24
  47:12 66:16,18
  76:2 101:12
  125:22 144:23
  145:11 146:21
  153:17 186:8
  196:14 221:21
  256:18,25 300:10
comment 32:12
  36:10 39:10,15
  40:7 44:15,18
  47:16 63:9,14
  68:4 124:12
  129:25 134:6,9
  134:11,15,19
  139:8 140:3
  141:16 142:9,15
  147:18,21 148:10
  148:13 153:25
  159:15 160:10,16
  165:25 166:5,5
  168:20 169:15,25
  170:22 171:12,19
  171:21 174:11,17
  184:6,8 206:4
  236:25 244:20,21
  252:9 254:22
  277:2 313:9
  334:21
commentary
  241:24
commented 289:16
comments 27:11
  30:4 31:11,12

32:4,23,25 34:9
36:9 39:2 43:12
44:13,19 45:25
47:9,20 50:18
54:18 62:15,23
67:24 68:2 74:8
74:21 75:13
96:23 124:5
125:17 132:22
133:11 139:19,22
141:22 142:2,4
142:13,16,17,21
144:21 147:14
149:7 150:7,10
150:16 154:3,3,6
154:22 155:5,10
155:22,25 160:3
164:20 168:9
175:18,22 176:4
181:9,19 182:8
182:13 183:15
227:2 236:12
277:3 285:12
289:5 334:15,15
345:2
commission 191:21
  192:23 206:9
  210:11,22 211:5
  338:4
commissioned
  52:15 53:19
commissions 191:3
  191:14 192:8,15
  192:25 193:11,25
  194:8,11 195:17
  195:21 196:22
  201:6 207:22
  231:2,16,24
  236:10 259:25
  260:14,22,24
common 302:17,17
  302:18
common-sense
  232:22
communicate 85:9
communicating
  32:6 61:13
  237:11 255:11,17

329:13,22
communication
  32:13 39:11 40:4
  40:12,18 42:7
  51:19,22 54:12
  54:18 58:13 62:4
  123:17 237:3
communications
  159:5 237:9
communicator
  31:16 39:8
companies 41:20
  83:23 324:15
company 10:14
  11:12 12:12,25
  13:4,5 16:15
  18:24 20:4,13
  24:4 25:18,24
  26:18,21 27:2
  28:9,24 29:2,7
  30:5,23 31:3,4,12
  31:15,18 32:3,16
  38:19,22,22
  39:14 42:5,17
  43:22 45:13
  47:25 48:22,25
  49:5 54:5 77:4
  79:11 84:13,17
  112:12,14,15
  113:5,16 114:12
  116:13,17 117:10
  117:15,22 118:4
  118:12 119:23,24
  120:13,14 121:16
  123:4,11 126:16
  131:20 141:14
  150:11 151:7
  152:18,22 171:13
  180:23 181:6
  204:22 212:13
  223:12 250:2
  258:21 265:19
  266:25 267:8
  272:2 285:13
  286:2 292:20
  308:11 309:7
  324:20 329:13,22
  342:17,21 348:9

company's 63:21
  131:14,17 153:12
  154:17
compare 142:2
compared 106:17
  219:16
comparing 96:16
  104:9,25
comparison 94:24
compensation
  26:24,25
competency 242:2
  250:21 334:17
  335:4
competitive 43:11
complain 181:5
  240:24
complained 70:16
  76:12 217:5,7
  240:22 243:8
  244:25 336:3
complaining 93:18
  107:21 181:10
  182:2 247:4,7
  343:20
complaint 65:5,25
  66:10 69:19 72:5
  76:15 77:15
  94:17 153:15
  246:8 250:23
  251:14 257:16
  284:20
complaints 65:21
  75:22 76:2 78:24
  93:9 98:17
  214:20 235:9
  243:10 245:13
  255:12 262:4
  295:4 331:3,5
complete 14:25
  137:12 138:5
  196:4 351:11
completed 192:10
  193:2,13 194:2
  273:22
completely 117:19
complimenting
  37:2

complying 280:17
Computrace
    223:13
concern 31:5 62:18
    96:3 114:15
    139:6,13,15
    202:8,17,24
    203:4,11,15,21,25
    210:15 212:9,22
    219:10 220:5
    222:4,13,14
    230:13,18,20,24
    255:24 256:10
concerned 42:6
    63:8 203:19
    220:2 229:18
concerning 221:13
    330:4
concerns 26:13
    27:5 42:16 50:2
    62:12 97:13
    175:7 184:21
    186:22 211:24
    212:2 230:10
    232:16 289:25
    330:4,6,11,19
concludes 350:2
conclusion 155:21
    155:24 156:12
    157:6
conduct 18:3 19:14
    21:17 30:5 103:4
    215:4 219:19,24
conducted 22:8,12
    22:24 23:17,23
    24:2 49:9 54:3,5
    75:10
conducting 18:24
    20:8 23:4 51:13
    52:3,8 255:25
conference 305:17
    346:17
confidential 296:13
confirm 6:19
confused 249:16
confuses 171:3
confusing 81:13
confusion 225:23

connect 316:14
connection 40:4
    149:20 214:2,6,8
    214:10 256:4
consequences
    164:14
consider 78:7
    93:18 94:15
    95:11 130:10
    181:8,25 246:24
    266:8,10,12
    268:4 287:22
    301:20,25 302:4
    338:3
consideration
    266:7 297:18
considered 190:4,6
    266:15,19
consistent 183:17
    184:16,17 185:21
    195:3 274:3
constructive
    324:22,22
consulting 312:6
contact 312:15
context 132:24
    144:15,15 160:4
    170:15 173:13
    174:23 229:4,5,5
    229:6
continue 108:25
    281:22 307:8
    308:9 320:9
    331:21
continued 46:2
    283:17
continues 337:16
contradictory
    287:12
contrary 275:3
    291:19,22
contributed 41:11
controlled 298:4
conversation 83:25
    97:3 133:14
    136:22,25 137:2
    137:5,24 138:6
    146:10,11,16

181:12 182:4,5
    186:16 244:10,12
    245:18 246:13,16
    247:2,10,16,23
    251:11 265:9
    293:25 321:9
    337:2
conversations
    24:25 30:18,22
    31:24 32:5 44:24
    83:19,22 136:13
    136:19 137:21
    156:17 157:14
    182:6 207:10
    215:9,18,23
    228:10 234:15
    237:13 244:15,18
    257:22,23 261:21
    281:20 294:16,17
    294:20 321:12,20
    322:21
COO 111:17 117:6
    117:13 128:18
coordinator 12:4
    12:17,18
coordinator-type
    10:14
cop 179:3
cops 178:17,18,22
    178:22
copy 33:3 59:2
    241:4 264:14,17
    335:2
corner 273:3
corporate 29:22
    39:7 59:12
    331:16
corporation 1:10
    20:5
correct 14:14 18:9
    30:3 31:20 34:3
    34:20 35:5 45:17
    46:7 48:16 52:16
    52:17,19,20 53:2
    53:4,14 54:22
    55:5 61:17,18
    63:18,19 69:14
    70:11 83:20

86:23 92:12
    94:17 98:25
    107:15 108:8
    112:6 113:6,10
    116:18 120:15
    123:23 130:23
    132:15,16 133:6
    137:9 139:4
    140:4 141:5
    142:24 153:12
    154:22 169:6
    175:25 176:8,23
    177:9 179:25
    183:4,6 186:5
    188:13,20 190:14
    191:8 192:4
    196:22 198:23
    208:8 216:8
    218:9 219:8
    220:8 231:17,25
    245:14 250:24
    261:25 265:19,20
    266:3 270:23,24
    277:23 280:13
    281:25 284:5
    291:23 298:24
    306:23 322:8
    334:18,19 343:21
    345:7 349:4
    351:10
corrected 79:16
correcting 83:21
correctly 29:4
    212:6
correspondence
    345:5
counsel 5:19,25
    102:25 215:3
    309:18,21 314:22
counselled 234:11
count 248:9
counterparts 42:22
    67:15 70:18
    73:13 97:23
    104:9 108:8
country 11:6
couple 7:18 13:2
    16:2 62:15

228:17 297:21
    313:5
course 22:21 37:9
    57:23,24 64:15
    109:22 244:14
    261:12 298:11
court 1:2 4:15 5:7
    5:16 6:5,8 33:2,5
    33:10,15 48:7
    57:8 69:10,11
    90:14 109:9,13
    125:4,7 126:25
    127:12,22 128:2
    156:25 170:8
    196:25 201:24
    209:23 210:5
    217:13 224:3,8
    224:11 231:11
    234:20 243:19
    263:13 272:8
    278:5 279:21
    286:20 301:3
    303:2 314:18
    318:25 319:6,15
    320:14,16 349:19
cover 40:20
coverage 307:18
    308:9,21 309:7
    321:7 323:5
covered 78:8 88:5
covering 337:15
created 299:21
creating 123:19
crimes 78:17
    330:20
criminal 265:13
    330:20
criteria 124:6
    126:4,9 130:11
    130:15,23 131:15
    131:17 142:5
    149:12,20 171:13
    183:4 342:7
criticize 289:18
Criticizing 289:14
cross 221:8 232:11
crossed 216:12
    232:19

CSR(A) 351:21
cultural 10:25
  59:12
culture 18:12
  20:18 21:9 26:19
  28:17,22 38:13
  43:13 47:24
  48:11,15,18,21
  58:22 70:11
  118:22,24 119:5
  119:8,18 120:12
  120:15,22 121:16
  123:6 142:3,18
  142:19 163:21
  164:20 165:24
  166:7,21 168:2,5
  182:25 184:4,9
  184:16,23 185:11
  185:21 186:9
  195:4 221:9
  324:19
cultures 20:15
current 41:5,25
  141:18 223:14
currently 42:10
Customers 43:9
cut 19:6 210:2
  320:23 321:7
  322:14 323:17
cutting 323:5

_____
D
D 1:24 2:11 5:1 6:1
  6:10,10 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1

51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1

164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1

260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1 313:1
314:1 315:1
316:1 317:1
318:1 319:1
320:1 321:1
322:1 323:1
324:1 325:1
326:1 327:1
328:1 329:1
330:1 331:1
332:1 333:1
334:1 335:1
336:1 337:1
338:1 339:1
340:1 341:1
342:1 343:1
344:1 345:1
346:1 347:1
348:1 349:1
350:1 351:3,20
352:1
Dan 19:6 345:6,9

345:11
Daniel 1:17 2:8 5:4
  241:12 344:25
  347:6
dark 296:11,23
data 60:4,14
  188:14
data-inputting
  188:16
date 7:20 244:22
  297:19,24
dates 297:23
day 200:2 313:4
  331:18 351:15
days 218:4 245:12
dberardo@absol...
  241:6,8
de 137:8
deal 40:17 143:15
  236:19
dealing 314:5,15
deals 249:20
dear 119:23
debriefed 347:5
December 14:22
  250:11
decent 189:17
decide 16:14 158:7
deciding 188:19
decision 294:6,8,9
  294:21 313:10,23
decision-making
  32:15 39:13
decisions 37:13
  38:14 42:4,8
  159:5,21 275:6
  275:14 342:11
decreased 40:13
deemed 332:22
DEF9807 129:25
defendants 1:12
  3:14 5:23 327:18
define 81:23 82:3,6
  82:7 120:17,21
  189:24 288:11
defined 81:18
  260:23
definite 299:6

definitely 27:3
65:14 93:14
95:15 97:3,16
119:9,9 237:5
294:17 307:5
332:15
definition 81:21
82:13,14 83:4,8
definitive 195:15
definitively 299:7
DEFS 141:10
DEFS01390 39:21
DEFS01392 40:15
DEFS02585 256:17
256:22 337:8
DEFS07446 346:24
DEFS08824 226:2
352:12
DEFS08830 226:2
352:13
DEFS09807 176:15
DEFS10579 276:4
DEFS1387 39:5
DEFS1391 40:11
DEFS1393 40:22
DEFS1395 41:4
141:17
DEFS1397 41:8
141:21
DEFS1411 41:24
67:12 141:9,11
DEFS2550 244:5
DEFS268 263:14
264:5
degrading 287:5,7
287:11,15,22
288:2
degree 28:9 49:25
53:9
demanding 200:17
Demotivated 41:3
denied 134:21
dental 320:6,10
deny 132:18,22
133:10 134:10,19
155:9 159:25
160:2,5,24 161:7
161:22

denying 134:6,8
255:2 309:3,6
departed 18:5
department 15:25
16:4 17:25 35:2
43:20 91:23
186:19 270:14,16
323:17
departure 15:15,16
18:8 40:18
depend 102:7,7,10
194:14 262:22,23
286:9,18 309:19
depending 263:4
263:11 309:22
depends 35:25
99:23 100:21
189:24
deposition 1:17 2:8
4:11 5:4,9 7:2,12
7:16,19 109:21
199:11 314:24,25
317:18 350:3
derive 37:12 43:14
deriving 38:6
277:14
describe 29:21
187:16 301:17
described 78:21
206:23 286:14
describes 204:7
describing 138:6
DESCRIPTION
352:11
designed 42:13
271:22
desk 65:22 66:2,10
66:18
despite 261:21
308:2
detail 34:5 328:8
details 310:7
determination
154:9,16 176:8
176:12 179:19,21
192:19,21 195:16
determine 94:6
157:19 169:9,15

169:24 170:22
171:11 309:14
determined 150:11
152:3 154:4,4,21
157:15 166:8
169:20 171:24
172:6 173:21
176:4 177:23
195:15 209:4
212:14 230:15
332:4,16
developments
119:16
difference 83:14
260:16,21
different 29:12,12
29:14 38:4,4 41:2
47:9 66:23 81:18
81:19 96:18 99:6
108:15 110:17
138:4 157:25,25
168:10,11 173:2
173:3,4,4,7
184:22 233:4
260:25 261:9,10
differentiate
268:10
differently 97:23
108:7 158:14,15
173:6 219:6
285:14 319:11
329:12,21
difficult 24:15,17
24:22 25:9 29:21
42:22 47:2 54:6
65:2 67:15 68:11
70:18 158:3,7
236:18 255:17
270:3 274:21
280:10,10,10
difficulty 322:21
direct 45:5 244:4
331:12 335:4,7
directed 159:11
directing 107:6
direction 42:5
222:19,21 342:16
directly 38:16

187:4 263:9
director 14:6,8,11
14:20 17:17
336:19
directors 123:15
188:6 189:3
219:17 335:12,15
335:22 336:2
disagreeing 336:22
disagreement 78:4
disagreements
77:22
disappeared
243:10
disciplinary 150:14
266:7
discipline 114:8
disciplined 234:7
discover 59:9
discriminated
66:11 78:11,15
94:9,13,20 182:3
217:7 326:6
328:15,23 329:6
338:11,19 339:2
339:9
discriminating
63:22 216:5
discrimination
65:21,25 67:7
69:19 70:4 76:16
93:9,14,19,21
95:2,13 96:5
98:10,18 99:2,13
99:21 100:5,11
100:14 101:20,21
102:3 103:7
154:7 171:25
179:24 206:8
216:20 220:20,22
220:24 221:8
222:5 247:4,8
261:23 294:24
295:2 330:12
discriminations
102:23
discriminatory
101:14 146:19

147:14 166:6,10
169:15,25 171:16
172:2,6 173:9,16
173:19 174:8,19
175:16 176:5
177:25 182:8
261:12,17 325:5
325:12,18,24
326:6
discuss 231:6
244:17
discussed 151:12
180:15 181:2
231:5 234:5
302:14 303:6
309:21 330:3
discussing 312:6
discussion 249:7
249:18
discussions 124:11
174:24 180:18
234:7,9,11,12
312:3
dishonest 43:4
Disjointed 40:23
Disney 10:21,22,23
11:11
disparities 69:20
distribution 246:4
District 1:2,3 5:7,7
diversity 141:14
division 26:5
document 34:2,8
101:3,14 103:17
103:21 125:10
248:24 263:16,18
263:23 272:23
293:17,21 328:7
328:12
documentation
235:19 240:4
documented
101:17 255:5
documents 8:22,25
27:9 45:18,22
69:17 73:21
151:4 154:15
242:17 262:4

281:12 311:25
352:12
DOE 186:19
187:14 189:9
190:16 191:4
192:8,9 193:20
195:10 196:14,21
197:20 198:10
202:18 221:20
230:12 231:16,24
236:11 259:11,11
338:4
doing 53:15 62:8
62:10 68:17
70:20 85:8 96:19
103:6 108:21
110:10 122:5,5
152:10,20 153:3
153:11 164:2
179:3 197:4
204:8 208:21
210:12 211:4
212:6 213:13
220:18 224:4
240:22 261:3
271:6 285:10,16
289:23
door-policy 284:16
Dorsey 2:9 3:13
5:22
doubt 205:22
223:19 254:15
draw 214:3,4,6,7,8
214:10
drilled 256:19
257:2
drop 161:5
duly 6:11
Dunton 192:3
duties 78:8
duty 77:4,5 78:5,8
78:22 79:7 331:4

E

E 3:2,2 6:10,10
352:1,9
earlier 48:15
207:23 237:2

322:2 328:8
330:3 332:24
346:15
early 11:24,24
earnings 42:24
67:17 68:12
EAST 3:7
EAW 1:8
education 96:21
186:19
effect 4:14 264:8
264:11 332:7
effectively 85:10
270:5
efforts 43:7
either 33:14 35:11
35:11 88:8 162:3
205:17,17 254:3
314:16
Elderkin 3:24 5:13
election 320:8
eligible 320:19
eliminated 299:17
ELT 34:18 39:22
40:9,13 42:5,18
255:6
email 49:19,21
132:21 133:23
147:7 148:12
199:10,13 200:6
200:7,13 204:4
208:20 210:9
211:16 212:14,17
213:3 217:25
218:23,25 219:3
219:9 225:2
226:5,24 227:5
227:10,12,17,23
227:24,25 228:10
229:24 230:2,3,4
233:24 236:23
237:21 240:12
244:6 246:3,16
246:23 247:3,6
247:17,24 248:8
248:17,22 250:13
251:3,4 254:18
254:23 256:3,7

256:16 257:22
287:4,16 288:8
288:19,23 291:7
291:18 294:3
333:10 337:9
345:4,5 346:19
346:21
emailed 250:11
252:3
emailing 232:3
emails 9:2,3,11,12
23:10,13,20
45:23 155:15
224:24 241:17
245:8 248:5
249:25 261:10,22
281:11 294:4
embezzlement
78:18 330:25
employed 22:13
58:9 190:22
employee 26:7
50:16 58:4 61:21
72:5 77:2,19
79:19 80:10,24
82:10 83:18,25
85:23 86:19 87:3
88:18 92:5 95:5,9
95:22 96:9,14,15
96:16 97:7,10,19
97:21 98:5 101:3
102:4 103:24
104:4,6,7 105:12
106:17 107:19
108:6 112:8,9
113:5 116:17
124:22 128:20,21
129:10,12,14
152:19 177:9
211:12 212:3,4,6
222:18 239:25
240:2 256:11
262:12,14 265:23
269:16 270:23,24
270:25 271:5,6,8
271:18,24 272:3
272:7 274:4,15
284:2 287:23

290:6 295:13,18
298:5,7,7,13,23
298:24 309:15,25
323:18 325:17
332:3 336:21
employee's 193:10
293:13
employees 26:7
37:7 38:16 41:3
51:14 52:19
56:22 58:7 59:22
60:5 61:14,14,16
74:7,16,21 75:22
76:3 77:22 84:21
86:13 88:3 90:2
91:8,8 92:23
94:25 98:14,23
99:5,10,19
105:25 111:23
112:3,6 113:16
115:12 117:2,14
120:15 122:6,19
123:18 131:18
144:19 148:11,12
156:7 159:6
162:21 163:3
176:21 177:9
186:12 194:18,19
229:20 271:5
298:10 324:21
328:24 329:6
340:7 341:3,9,15
341:21 342:2
employer 262:14
324:12
employment 9:18
10:12,13 25:17
283:23 340:22
encourage 84:24
225:5
encouraged 41:15
141:24
ended 10:19
255:12
ends 175:24
enforcement 265:6
engage 123:10
283:18

engaged 38:17
114:17 115:11
116:8,25 118:12
121:21,25 122:11
122:18 123:2,20
engagement 48:25
70:14
engaging 110:22
117:23
Engineering 13:7
ensure 38:17 41:22
79:15 258:20
260:12
ensuring 259:22
277:14
entering 188:12
Entertainment
12:12,20
entire 17:5 21:4
54:5 118:11
205:11 248:21
251:2 280:20
entry 188:14
environment 28:15
28:23 135:4
Epcot 11:3
equal 175:22
equals 41:3 209:3
210:8
equivalent 17:22
Errol 17:3,4
110:21 113:9
121:7,20,20
123:16 176:8,19
177:4 187:8
error 321:3 322:18
escapes 13:4
Esq 3:9,17,18,23
essentially 11:2
17:12 43:3 107:3
293:23 332:17
343:13
et 5:6
Ethical 42:24
evaluating 245:14
evaluation 249:8
249:19,22 273:11
276:21 333:23

evaluations 244:25
  246:10
evening 327:16
event 112:12 113:6
  113:16 116:17
  117:15 120:14
  177:9
events 131:20
  218:25
eventually 165:6
everybody 241:18
  249:25
evidence 87:5
exact 155:25
exactly 133:17
  134:15 139:24
  161:15,20 162:4
  162:9,16 202:4
  229:9
EXAMINATION
  6:14 327:14
  347:25 352:4
EXAMINATIONS
  352:3
examined 6:12
examining 68:6
example 26:23
  29:20 81:3
  122:17,22,24
  158:17,21 160:9
  181:9 205:6
  207:4,12 235:24
  236:17 237:18
  240:16,20 259:22
  260:2
examples 206:16
  206:17 207:9
  261:2
exceeds 277:19,21
exception 277:11
  334:7
exchange 250:15
excuses 275:11
executive 34:19,21
  144:21 150:15
  156:6 163:21
  168:21 180:2,5
  180:10

executives 39:18
exhibit 33:4,24
  60:21,22 67:11
  125:4 127:8,18
  127:20,23 129:24
  133:2 134:23
  135:18 136:5,8
  136:10,13,19,24
  137:6 138:15
  141:6 162:3,8
  181:9 182:9
  197:2,3,15
  199:14 201:23,25
  217:14 224:3,22
  225:8,9,19,24
  229:9,11 231:14
  231:18 234:16
  235:10,22 243:20
  245:4,21 248:24
  248:25 249:5
  254:22 256:16,22
  263:12 272:10,17
  273:10,11 274:3
  277:16 278:3,4
  278:10 280:21,22
  282:3,7 286:21
  292:3 293:2,12
  299:25 300:5
  301:17 311:5,7,9
  311:11,13,16,17
  311:20,20,21
  319:16 324:4
  328:7 331:9
  334:12 337:7
  343:16,17 344:22
  346:11 352:12,13
  352:14,14,15,15
  352:16,16,17,17
  352:18,18,19,19
  352:20,20
exhibits 127:2
  128:14 129:18
  197:18 224:5
  231:10 232:5
  300:8,8 311:2,3
  333:13
existed 184:10
existing 42:11

exists 182:25
exit 301:20,23
  308:15 324:8,10
  324:11,17,25
  325:9
exited 334:10
exonerated 195:10
exoneration 196:4
expand 343:12
expectations
  276:15,18,22,24
  277:20,21
expected 125:16
  131:18 140:2,4,8
  265:22 266:24
experience 96:20
  242:5 281:8
expert 299:4
explain 319:19
explained 133:24
  158:12
explanation 304:21
explicit 275:22
express 285:25
  342:6
extended 320:5
extending 265:12
extensive 53:3,6
extreme 271:21

——————
        F
——————
Facebook 129:15
faces 173:18
fact 100:3 126:2
  132:25 133:4
  134:22 141:14
  146:7 162:20
  211:11 241:21
  244:11 245:17
  246:12 251:10
  265:2 275:3
  284:7 307:24
  309:6 322:13
  323:16 324:3
  347:9,11
factors 96:18
facts 145:12
  153:16,18,20,24

203:25 281:11
failed 244:16
failing 187:2
  221:20
failure 124:14
fair 98:7 99:13,17
  189:22 200:10
  228:3,20 238:20
  238:23 243:7,12
  246:10 250:22
  260:19
fairly 64:11 65:6
  65:12,15 77:11
  95:11 105:13
  236:8 238:25
  239:6,18,21
  252:10 258:21
  259:23 260:3,12
  312:19,20,24
  313:3
fallen 300:18
falling 300:14
false 85:22
falsely 85:16,20
  86:13 87:18
  88:17 90:2 91:9
  214:21
familiar 331:22
family 29:17,18,20
family-type 28:17
far 9:20 110:10
  273:18,23 312:5
fault 25:5
faulting 223:22
February 273:22
feedback 26:8 37:6
  38:15 41:7 51:17
  51:21 52:19,21
  52:23,24 141:20
  270:21,22,22,24
  272:6 275:11,17
  275:19 289:3
  291:9,17
feel 18:11,12 36:4
  51:12 52:21
  82:10 99:11,20
  114:23,25 117:9
  117:18,21 140:18

142:23 144:22
  145:10 150:17
  179:2 206:4
  264:2
feeling 182:2
feelings 185:5
feels 263:6
felt 13:14 18:18
  23:3 40:19 58:7
  60:6 61:5 62:7
  97:19 114:21
  118:2,5 119:14
  119:24 139:11
  140:11,22 142:3
  143:5,7 144:20
  145:22 182:7
  255:11 314:14
  326:5
female 42:18,19
  95:9 97:21 104:5
  104:7 105:12
  107:19 108:6
  141:13 144:19
  162:20 163:2
  194:18 215:13
  239:13 278:18
  341:15
females 147:12
fifth 331:14
figure 277:11
figuring 38:18
file 124:16
filing 4:4 11:17
filled 36:6
finance 187:7,23
  298:4 299:3,5,23
  345:24 346:4
financial 302:13
find 24:17 31:4
  53:19 70:9 99:12
  142:24 171:19,21
  172:20 174:7,10
  185:14 187:21,21
  220:2 246:2
  279:22
finding 148:4,6,8
  153:16 340:21
finds 152:16

fine 33:13 109:8,14
  115:20 125:7
  167:21,22,23
  178:10 210:22,23
finger 259:6
finish 109:24
  164:24
finished 175:8,13
  209:13,14,22
  286:24
fire 202:21 203:2
  210:15 211:12
  212:3 213:11,12
  218:5 226:18
  256:3 272:3
fired 196:21
  197:20 198:9
  199:18 201:4
  202:7 206:10
  207:21 221:20
  226:19 228:7
  265:18 271:10,19
  271:22 273:15
  280:3 284:8,23
  285:5,11 286:3
  323:18 325:4,18
first 10:11,13
  17:15 19:19 51:6
  58:21 61:8
  113:14 129:23
  148:5,7 159:14
  159:15,16,17
  183:12 226:4
  241:11 250:10
  252:22 272:23
  273:4 278:17
  282:8,9,9,10
  289:13 297:16
  331:13 337:11
  343:17 344:4,24
fiscal 221:25
fitness 332:5
five 52:8 56:23
  72:18,21,24
  135:22 159:16,17
  205:8,8,12 207:9
  218:4 242:22
  245:11 273:25

280:23 322:24,25
  323:21
fix 315:19
flag 145:16 148:3
  208:22 216:13
flags 97:17 98:10
  98:24 99:7
  144:18 145:2
  146:2,6,13
  147:11,19 148:15
  148:21 217:2,6
focus 42:15 54:8,9
  223:12 333:17
  340:7
follow 77:18 95:12
  96:22 98:4,25
  104:11,23 106:14
  107:4 220:12
  223:4 265:8
  267:20 304:5
follow-up 58:16
  100:21,23 101:16
  101:23 105:9
  106:3,6 107:17
  107:22 108:3,5
  108:10 128:16
  148:23
followed 223:6
following 13:17
  77:23,25 78:2
  222:18 266:8
follows 6:13
force 4:14 46:11
  264:23
foreclose 91:6
forget 253:19
  255:14 323:16
forgot 203:13
  213:2,3,5,6
  245:12 251:14
  253:4 254:11
forgotten 246:7
  247:12 252:18,20
  254:14,16 257:7
  257:17 258:7
form 4:7 15:6,23
  16:7 17:6,23
  18:15 19:2,17

20:16 21:11,20
  22:2,15 23:5 24:5
  27:7,18 28:12
  30:9 31:2,21
  32:20 34:11
  35:12 38:10
  43:17 44:3,10,21
  46:5,13,21 47:19
  48:2,10 49:14
  50:5,13 51:15
  52:5 53:25 54:23
  56:24 57:10,20
  58:11 60:8,15,25
  61:19 62:13,25
  63:11,24 64:5,12
  64:19,23 65:10
  66:3,12,18,20
  68:13,18 69:6,21
  70:3,12,21 71:4,9
  71:16,21 72:8
  73:2,9,15 74:11
  74:22 75:15
  76:22 77:7 78:25
  79:9,21 80:11,25
  81:8,16,25 82:16
  82:23 84:2,7,11
  84:22 85:6,19
  86:4,7,15 87:10
  87:20 88:13,19
  89:3,20 90:5,16
  90:21 91:10,18
  91:25 92:14
  93:11,22 95:3,14
  95:25 96:6,24
  97:14,25 98:12
  98:19 99:3,14,22
  100:7,19 101:5
  101:10,18 102:5
  103:8,19 104:12
  105:17 106:4,19
  107:12,25 108:9
  110:24 112:20
  113:7,20 114:4
  114:11,19,24
  115:8,14,21
  116:3,10,19
  117:3,16,24
  118:15,23 119:6

119:20 120:16
  121:2,18 122:3
  122:13,20 123:7
  123:12,24 124:8
  124:17 125:19
  126:6,17 128:23
  130:24 131:21
  132:4,19 133:12
  134:12 137:14,22
  138:8 139:9,17
  140:5,14,20
  142:7 143:2,12
  143:18 144:5,12
  145:8,20 146:4
  146:23 147:16
  148:19,25 149:13
  149:21 150:8,18
  151:19,25 152:9
  152:23 153:22
  154:11,23 155:8
  156:14 157:10,22
  158:8,20 159:2,8
  160:12,17 161:2
  161:9 162:22
  163:12 164:3,9
  166:3,15 167:8
  167:16 168:3,8
  168:14,23 169:7
  169:18 170:25
  172:14,23 173:20
  174:21 175:19
  176:2,9,24 177:3
  177:10,16,21
  179:16 183:5,13
  183:19 184:11,18
  185:3,9,13,24
  186:6 190:7
  191:5,9 192:11
  193:3,15 194:4
  194:12,22 195:6
  195:12,22 196:5
  196:23 198:25
  199:21 200:19
  201:11,21 202:10
  202:22 203:9,17
  203:23 204:10,24
  205:14,23 206:21
  207:6,24 208:25

210:16,24 211:7
  211:13,21 212:7
  212:10,24 213:15
  214:13,23 215:6
  215:16 216:3,14
  216:22 218:8
  219:14 221:11,23
  222:10,20 223:3
  223:15 227:6
  228:8,13,21
  229:22 230:8,19
  231:3 232:10,23
  233:8,14,20
  235:11 236:20
  238:18 239:2,10
  240:14 242:7,12
  243:11 245:15
  247:5,14 248:19
  251:16,22 252:5
  252:11,23 253:5
  253:14,23 254:4
  254:12 255:19
  256:8,12 257:10
  257:18 258:2,8
  258:14 259:10
  260:4 261:7,24
  262:9,15 266:4
  267:2,18 268:16
  268:20 269:20
  271:11 274:8,23
  278:24 280:24
  281:6 284:13,17
  285:18 286:4
  287:6,17,24
  288:9,24 289:8
  290:8,20 291:14
  291:24 292:7
  293:15 294:15
  295:7,14 296:6
  296:25 297:5
  302:15 304:24
  305:10,20 306:9
  308:5,17 310:11
  310:18 313:11,16
  313:25 314:7
  319:12 322:6,23
  323:7,10,20
  325:10,21 326:8

326:14
formal 58:15 336:6
336:9
forms 81:6
forth 219:2 351:9
forward 124:23
155:19 161:18
185:22 211:15
218:20 220:7
263:8 285:15
forwarded 256:3
262:5
forwarding 113:3
224:24 226:23
227:4 345:5
found 24:21 35:23
43:3 85:7 144:19
158:5,5 166:5
173:8 274:21
308:19
founder 28:15 29:2
29:16 119:11,21
four 8:21 135:23
266:11 274:4
305:18 323:22
324:2 331:14
four-plus 91:24
frame 19:20
334:22 336:19
Fraser 10:7
fraud 78:18 330:22
FRCP 7:4
free 224:21 264:3
291:22
Friday 281:20
front 45:22 51:11
76:5 87:13,22
88:22 90:7 105:5
111:23 112:2,4,6
112:7 113:4,15
116:16,25 117:14
120:14 122:5,19
149:15 176:20
177:8 231:18
235:6 289:15
290:10,19 292:2
307:15
frustrated 289:19

full 59:10 82:13
95:22,23 105:24
106:2,16,18
236:9 302:20
331:21 337:11
full-time 10:11,13
fully 231:15
function 270:12
339:17,18,23
340:2
further 4:6,10
95:18 102:2
104:24 150:12
219:24 261:13
326:20 328:10
332:21 349:25
FY15 337:16

                G
games 12:15
gather 37:6,6 96:9
97:4 324:17
gathering 176:21
345:22 346:3
Geest 137:8
gender 77:9 93:9
93:13 194:25
216:6,21 217:3,8
219:7 220:25
239:13
general 25:7 38:5
44:11 55:16 93:2
193:17 262:19
299:18 306:11
310:13
generalist 13:22
14:16
generalization
24:11
generally 25:5
30:15 80:19
186:9 188:6
262:25 299:2
307:11 321:21,23
324:21,23 326:16
342:12
generic 174:2
Geoff 1:10 74:4

126:15 135:4,5
135:12 223:11
338:24 341:7,14
341:20,25 342:6
342:15
getting 16:10
175:25 236:9,10
give 25:8 33:3
51:17,21 67:2
75:4 81:21 175:7
175:17 205:6
207:4 235:24
270:10 271:8,18
331:4 340:9,19
344:13
given 7:12 43:12
175:21,21 185:11
211:11 283:6,8
283:10,15,23
299:9 340:5
gives 315:16
giving 74:3 267:23
269:11,17
glad 109:23
go 9:20 11:11
19:22 33:6,11,12
35:8,17,24 41:10
50:20 52:14
67:11,25 72:18
77:24 103:25
107:9,14 108:14
109:11,16 110:8
125:5,15 126:23
127:16 128:3,13
129:20 135:17,17
141:6,8,16
144:18 145:2
147:12,19 148:15
156:23 180:19
182:9,11 188:19
202:5 203:7
206:25 215:22
217:12 220:7
224:12 225:12
229:20 230:5
234:16 237:16
241:5,15 242:21
243:22 245:21

248:10 250:9
251:8,8,9 252:12
252:13 254:21
256:15 260:17
262:14,20 267:10
267:17 270:8
272:22 275:4
276:3 282:25
301:3 303:17
308:8 314:21,22
315:15 318:21,22
320:2,2 324:4
344:21
god 172:13
goes 148:3 239:18
320:21
going 6:20 9:8
13:10 25:2,2
33:16 35:25 47:4
55:25 56:10
74:16 77:18 78:2
83:8 99:21
108:25 118:14
127:8 128:4
165:5 175:15
180:18,19 195:24
197:7 201:19
202:5,18 203:7
206:16 207:18
213:12 218:20
224:5,14,23
225:13 226:3
231:16 232:6
233:17 237:14,18
240:3,7 242:23
243:24,24 246:19
247:25 255:16
263:10 268:15
277:24 283:13,15
285:16 289:17
290:22 297:17
301:9 302:23
307:8,19 314:10
314:11 315:15
316:9 317:5,8
318:8 320:3
321:5 326:24
327:7,18 331:12

333:12 350:3
Goldstein 137:9
good 6:22 11:10
16:16 41:9 51:19
108:22 109:3
110:6 121:15,15
167:24 257:24
258:6,12 304:21
305:8 318:20
327:16
gossip 111:10,12
116:12,21 117:4
118:17 129:2,7
177:12
gotten 42:14
graduate 9:22 53:9
graduated 9:23
10:7,10
graduation 10:12
great 8:11 40:17
41:10 62:18
318:21
greatly 40:13
grossly 42:2
ground 268:14
grounds 77:10
78:12,21 94:4,9
197:25 198:13
199:19 201:14,17
203:3,5 208:3
210:11,14 217:19
220:25 226:18
group 241:18
320:5,9
growth 271:3
guess 17:12 60:17
82:24 116:7
129:23 288:15
315:2
guide 37:8 102:25
guiding 59:3,5,8
guy 113:4 115:10
123:2 176:20
guys 130:4 132:7
156:10 160:8
163:24 173:17,23
173:24,25 174:2

**H**

H 105:23 352:9
half 13:6,9,14
　22:22 29:7
　109:11,14,16
　230:7 232:7
　248:8 297:21
　347:20
hand 174:14,16
handbook 76:6
handled 40:19
hands 342:12
hang 56:8 126:23
　316:20,24
happen 39:20
　59:25 83:23
　88:10 89:17
　120:24 244:19
　310:2 321:11
　322:17
happened 25:8
　168:7 183:18
　206:6 220:16
　257:21 313:19
　347:22
happening 16:6
happens 64:17
　67:10 80:22 95:9
　95:20 97:7,10,21
　167:24 221:16
　239:20 297:2
happy 47:5 252:13
harass 80:9,24
harassing 82:18,21
　93:6
harassment 76:17
　78:13,14 79:18
　79:23,24,25 80:4
　80:4,7,14,17,18
　80:19,20 81:7,15
　81:17,21,23 82:3
　83:2,5 92:22 93:7
　93:13 94:7
　100:15 330:7
hard 22:16 24:23
　46:25 52:9 68:21
　72:17 82:12
　137:3,25,25

293:25
hate 161:16,17
Haydon 1:10 74:4
　74:20 75:12
　126:15 223:11
　338:25 341:7,14
　341:20,25 342:6
　342:15
head 9:16 13:25,25
　14:3,18,19 16:9
　16:19,20 17:11
　17:13,14,22 22:4
　25:14,23 26:4
　34:25 45:16
　54:21 60:2 63:17
　63:21 64:4 65:19
　66:10,23 82:12
　84:19 91:23 92:8
　92:12,19 100:12
　102:20 105:23
　106:13 112:18
　132:9 139:6,12
　145:3 147:12,20
　148:4,15,16,21
　169:11 171:20
　186:16 188:4
　194:3 205:2,16
　207:17 214:5,5
　217:2 222:24
　256:19 257:2
　260:10 296:2,3
　305:25 339:16,22
head-hunted 16:15
headquartered
　5:15
heads 202:13
heads-up 201:7
　202:13,19 203:8
　204:16,20 208:13
　208:18 211:2
　212:19 231:22
　283:12,15
health 307:8,25
　320:5,9,24 321:7
　321:14,15,19
　322:14 323:17
hear 29:3 90:13
　111:13 178:17

213:10 314:16
　315:3 339:19,20
　341:7,14,20,25
heard 64:10
　116:12 117:5
　118:17 140:4
　178:16 222:17
hearing 7:22
　327:25
heavily 28:16
held 2:8 5:9 21:3
　121:13 191:4
　193:11
Hello 314:20 316:4
　318:5
help 37:8,21 41:19
　102:25 120:2,20
　149:18 259:6
　272:6 317:16
　320:12 324:18
helpful 38:6,15
hereto 225:20
　311:6,8,10,12,14
　311:18,22
hereunto 351:14
Hey 128:11 173:25
　274:24 317:23
Hi 176:16 317:17
　318:7 344:13
hidden 289:22
hide 304:22,25
　306:7,12
hiding 303:9,12
　304:9 305:6,15
　306:19,21 346:16
　347:11
high 9:22,23,24
higher 241:23
　242:5
highlight 35:14,15
　271:4
highlighted 225:5
　248:12 274:19
highly 121:21,25
　122:18 158:19
hire 39:23 130:2,4
　130:14,18,21
　131:9,11 132:6,7

156:8,9 159:11
　159:18 160:6,8
　163:22,24 173:16
　341:2,21 342:2
hired 126:15
hiring 40:8 42:25
　124:5 126:3,9
　130:11,14,16,22
　131:9,15,17
　142:5 149:12,20
　150:16 159:5,21
　171:13 183:4
　340:7 342:6,13
history 9:18
Hit 315:24
hold 49:20 119:22
　297:24 300:23
　318:7
holistic 46:24
honest 43:6 163:10
　163:15,16,18
　289:20
hope 263:7
hotel 112:15
　305:17
hour 109:11,14,16
　332:18
hours 7:20 8:16,21
HR 9:19 12:17,17
　12:18 13:22,25
　14:4,5,6,8,11,16
　14:18,18,19,19
　15:2,25 16:3,9,19
　16:20,25 17:11
　17:14,14,15,17,21
　17:22 18:20
　19:14 22:12
　23:24 24:2 25:23
　38:13 43:13,21
　45:16 47:24
　48:12,15,18,19
　51:24 54:22
　63:17,20 64:4
　65:19 66:10
　70:11,14 75:7
　84:16,19,19,20
　91:23,23 92:8,12
　92:22 98:11

102:20 104:22
　105:23 106:14
　112:18,19,23
　113:9,19,24,25
　114:16 115:7,10
　117:8,22 118:4
　119:19 120:6
　121:17 123:22
　124:2,14 125:16
　131:5 132:9
　139:6,12 142:5
　143:11 149:11
　156:5 158:25
　159:4 168:19
　169:12 171:21
　176:22 190:2
　192:24 193:8
　194:3 205:2,12
　207:17 214:6
　221:9 226:19,21
　228:19 229:17
　235:19 239:8,9
　239:18,18,23
　242:18 255:5
　256:18,25 257:9
　257:25 258:19
　260:9,9,10 261:3
　265:14 270:13,13
　270:16 281:8
　287:21 292:18
　295:12,16,22
　297:7 305:25
　310:16,17 314:6
　323:16 325:16
　336:18 339:16,22
　343:6
human 12:10 53:4
　53:10,13,16
　256:13 262:17
　292:14
hundreds 32:22
　67:23
hunting 331:20
husband 307:3,25
　308:20 309:4
　321:5 323:6,18
husband's 322:14
Hyperwallet 25:19

26:5 192:13
hypothetical
104:17 106:9,12
107:4 305:3
hypothetically
310:14 325:22

**I**

i.e 39:18,24
Ian 192:3
idea 312:15
identical 200:9
identification
225:20 311:6,8
311:10,12,14,18
311:22
identified 37:23
331:17
identify 36:20
ignore 65:9 66:19
252:22
ignored 71:8,20
243:15 251:13
253:4 255:13
257:7,16 258:10
illegal 78:19
285:11
illegally 93:20 94:3
imagine 306:24
312:19
immediately 198:3
282:2 308:14
322:19
impact 118:6
implemented
298:16,20,22
implies 275:16
importance 120:6
important 38:21
38:21,22 63:20
63:25 64:3,7
69:25 137:20
138:10 248:3
improve 51:22
271:7,9,18,25
324:18 343:12
improved 54:17
improvement

218:2 263:3
improving 263:8,8
in-house 5:24
137:7
inaccurate 40:19
49:11,12 136:6
136:10
inaccurately 49:3
inappropriate
114:6,6,17
115:11 116:8
117:19 118:13
123:10 150:16
152:17 174:17
306:25 332:23
incentive 137:11
incidences 25:12
incident 22:5 111:2
111:3 116:6
120:22 193:18
258:23
include 215:12
307:24
includes 200:11
including 305:18
inconclusive
230:16
inconsistent 183:22
186:5,8
Incorporated 5:6
5:15
incorrect 49:10
183:20,24,25
227:22
increase 42:13,24
67:16 68:12
incredibly 42:14
INDEX 352:3
indicate 60:5 151:5
274:15
indicated 220:7,9
304:5
indicates 274:20
275:5,13
indicative 163:20
165:23 166:7,20
167:5,15 184:22
indiscernible 153:6

200:17 208:17
209:6,9,12
213:20 215:20
249:3 253:13
individual 32:25
43:20
Ineffective 40:25
information 31:16
35:3 37:11 39:8
44:23 90:7 91:13
96:10 97:5
105:11,15 124:22
124:23 137:7,21
165:17 297:12
324:18,22
informed 125:17
221:7 231:23
Infringements
265:11
initiated 324:12
initiatives 37:9,18
37:19 38:6 43:15
43:21 70:9 276:7
329:14,23
input 325:6
inquiry 332:9
inside 277:8
instance 31:10
instruction 340:5
340:10,20
insulting 179:6
insurance 307:25
308:7,8,14 309:3
320:21,24 322:14
integrity 32:16
39:14,22 40:9
intend 186:13
intended 179:25
intent 154:5
171:25 173:9
174:7
intention 166:13
168:22
intentions 166:9,25
167:20,21,22,24
interaction 196:10
266:25
interactions 56:21

103:18,21 123:16
interim 121:14
internal 340:20
interpret 139:3
140:12,22
interpretations
173:3
interpreted 157:25
158:14,15 168:10
173:6 174:11,15
175:3 181:18
182:8
interpreting 150:2
150:4
interrogatory
125:12 182:10
interruptions
210:6
interview 103:12
187:18 301:20,23
324:25 325:9
interviewed 139:7
181:15
interviews 187:25
324:8,11,17
intimate 88:23
introduce 5:19
investigate 76:14
77:5 78:6,8,22,23
79:11,13 93:15
95:18 102:3,22
150:12 212:22
213:5 214:19
233:12,15,22
261:15 295:3,6
331:4 332:16
investigated 150:9
151:20 152:2,6
154:2 166:8
179:13 186:18
189:7 190:11,13
190:20,25 212:13
216:2,9 235:17
261:13,23 332:15
investigating 75:22
76:2 79:6 147:18
147:20 148:10
152:14 194:6

207:19 251:21,23
investigation 73:22
148:24 149:3
152:11,16,20
153:4,11,15
154:18 171:23
176:23 177:5
187:14 191:22,24
192:9,25 193:12
194:2,6 196:14
212:12 214:25
218:16 219:19,25
220:19 230:21
236:11 259:12,17
259:19,22 260:2
260:11,14 261:5
331:17 336:5,9
338:4
investigations
103:3 220:23
258:19
involve 312:2
330:6,12,20
involved 176:11,22
177:4 192:20
200:13 216:16
226:19 294:6
involves 226:21
involving 154:17
Ioele 303:9 305:5
305:19 346:16
347:9 348:4
issue 95:2 129:13
130:2 187:14
189:8 193:12
195:10 197:21
198:10 204:7
221:21 239:24
252:14,19 278:21
280:12 282:21
284:20 294:24
issues 38:19 43:25
44:8 45:7 55:19
103:5 144:25
145:18 184:4,5
184:22 235:16
242:18 249:21,23
252:7,15 278:12

284:24 285:3
  336:23
italicized 289:13
item 238:8
items 24:13

_____
**J**
J 300:9 352:17
January 26:2
jellybean 243:24
jeopardy 283:24
Jermaine 233:25
Jessica 1:24 2:11
  5:17 222:7 224:4
  225:11 299:25
  300:7 311:15,19
  351:3,20
job 1:25 10:14,17
  10:18 11:17
  12:23,25 41:16
  60:6 62:8,10 70:2
  96:19 141:25
  169:23,24 170:12
  171:11,17 179:4
  227:3 296:24
  331:18
John 274:24
John's 29:15
join 342:7
joined 13:3
joke 178:21
judging 218:22
July 217:22 221:25
  226:20 245:6,9
  256:16 273:16
  320:7,25
jumped 268:13
jumping 122:18
June 13:19,21
  14:17 58:23
  200:4,5,13 202:6
  217:18 226:17,17
  228:18
justified 194:8,10
Justin 190:12
  192:2

_____
**K**

keep 36:24 42:11
  146:21 161:4
  247:25 250:22
  277:24 296:10,13
  296:14,22 297:11
  297:12 314:10,11
keeps 31:16 39:8
Kennedy 41:21
  42:2
Kenny 1:11 18:13
  19:13 28:2 29:9
  29:24 30:25
  31:14 32:14
  34:10 39:6,12,17
  39:23 40:5,8,20
  40:24 41:6,11
  42:2 44:2 46:3
  49:21 50:3 53:22
  56:21 125:5,18
  126:13 127:2,3
  132:17 136:5
  138:7 141:19
  142:23 143:17
  144:3 145:2,19
  149:19 150:6,23
  151:18 154:17
  160:11 165:25
  171:22 176:17
  181:22 182:13
  183:3 190:11,12
  190:20 192:4
  200:11,12 206:6
  272:9 328:15,23
  329:6,12,21
  338:18
Kenny's 27:6
  124:5 149:7
  158:17 177:20
  181:18 184:6
  191:3 206:3
  313:9
kept 16:3 284:8
  348:21,22
key 37:8,8,12,15
  38:6 39:16 43:14
kind 20:9 22:19
  30:18 37:8 38:12
  41:6 47:13 82:7

99:24 133:23
  141:20 167:25
  184:9 192:2
  222:25 243:10,15
  275:15 277:7
  330:13 335:24
  343:2
kinds 342:25
knew 28:18 143:25
  144:2,23 147:15
  148:9 202:18
  207:22 230:25
  307:4,5
know 6:25 8:2
  15:18 16:9 20:8
  21:21 22:20 24:6
  24:7,14 25:4 26:3
  27:2 29:18,19
  30:11,17 31:4,6
  32:2,3 34:9 35:7
  35:9 36:12,17
  37:2 50:17,19,23
  50:25 52:11 57:2
  58:2,14 59:2 66:4
  66:5 67:4 68:20
  68:20,22,25
  71:22,23 72:2,12
  72:21 73:18 76:4
  77:20 78:3 82:10
  83:21 87:25 88:5
  93:24,25 96:17
  96:18 102:6,13
  102:23,24 108:17
  109:22 110:12,18
  112:10,13,16
  114:13 115:2,4
  116:22 119:11,22
  124:21 128:25
  129:6,10,12
  130:18 131:10
  132:11,24 133:16
  133:17 134:2
  137:3 138:24
  139:16 142:10
  143:3,4,10,19
  144:14 145:9
  146:17,24 147:9
  149:24 157:11,12

158:12 161:19
  162:10,21,23
  163:4,4,13 164:5
  172:7 173:11
  174:6 175:2
  177:12,24 181:23
  182:5 185:17
  189:6,13,18,18,21
  190:17,21,22
  191:6 192:6
  194:15 195:13
  197:16,23 199:9
  199:23 200:21
  202:25 203:12,13
  203:14 207:18
  209:2 211:8
  218:22,23,24
  220:24 224:25
  226:6 229:15
  234:15 243:23
  249:13 251:4
  258:15,16 271:2
  271:4,6,12
  272:13 273:13,13
  275:8,9 278:9
  281:21 284:19
  285:20 286:25
  287:25 288:15
  291:18 292:3
  293:2,23 297:15
  297:23 298:18
  299:22 300:5
  303:11,12,19
  304:17,20 307:2
  307:16 310:3,7
  311:3 312:12,17
  312:22 313:7
  314:8 317:5
  321:10 322:9
  323:11 324:5,18
  324:19 325:17,25
  326:7,10,10
  327:17,21 331:23
  337:17 343:10,13
  345:24 347:19
  348:10,17,18,21
  349:2,9,11,13,22
  349:23

knowing 22:19
  203:24 281:11
knowledge 20:2
  45:5 56:19 57:15
  88:23 91:15,19
  92:18 188:15
  283:21,21,22
  293:6,7,8
known 97:12
  107:20 236:3
  306:6 313:8,15
  313:18,21
knows 181:21
  212:4,5 304:6
Kyle 317:15

_____
**L**
L 6:10 224:4
  352:13
lack 30:25 39:2
  40:4 42:17
  141:13 291:5,13
lacking 54:13
laid 134:16 308:25
  309:9
language 290:25
large 310:4,9
largely 187:19,19
  187:23
larger 20:4,4
late 147:19,24,25
launch 331:16
Laura 3:18 5:22
  7:17 8:12 327:17
  327:23
laws 93:21
lawsuit 124:16
  132:15 142:25
lawyer 124:11,11
  137:8,9
lay 266:11
leader 41:9 43:8,10
  121:21
leadership 34:19
  34:21 39:16 41:5
  41:25 42:7
  141:18 180:5,10
  277:11 284:21

289:14 290:2
leading 17:24
leads 281:24
Leah 16:22 18:4
    112:23
learn 297:16
leave 16:14 298:7,8
leaving 39:16
    136:24 165:20
    324:24 332:17
led 20:3 46:19
Lee 187:9 200:5
left 13:25 14:3,12
    14:18,20,21 15:9
    16:22 17:5 25:17
    29:6 58:17
    136:14,20 137:4
    137:20 165:10,12
    165:13 224:6
    299:8,11,13
    310:10 342:12
    347:5 349:7
legal 5:14 102:25
    187:24 309:18,21
    312:3,6,13,16
legislation 320:9
legitimate 232:15
    232:16
Lestrade 3:18 5:22
    45:10 90:22
    109:2,5 161:8
    166:23 167:2
    172:13 182:17
    225:7 248:22
    249:23 263:15
    272:14 300:12,17
    300:22,25 301:5
    301:8 314:11,20
    314:25 315:4,7
    315:10,18,22
    316:2,4,7,9,12,19
    316:23 317:2,4,8
    317:11,13,17,21
    318:10,12,14,19
    326:22,25 327:4
    327:8,15,17
    328:2,20 329:3,9
    329:18 330:2,10

330:15,18,24
331:8 332:8,19
333:11 334:5
335:6,14,21
336:11,17 337:6
337:23 338:2,8
338:16,23 339:6
339:15,21 340:4
340:12,18,25
341:6,13,19,24
342:5,14,22
343:7 344:3
345:15,25 346:9
347:23 352:6
let's 9:21 34:22
    52:14 54:8,9
    61:11 67:11
    77:14,15 80:3
    94:22 109:9
    121:7 135:16,17
    135:17,17 141:6
    141:10,11 167:21
    170:6 171:8,8
    182:9 206:25,25
    208:19 209:6
    217:12 224:2,12
    225:12,12 234:16
    239:16 242:21,21
    243:17,17 246:22
    248:9,9,10 250:9
    254:21,21 256:15
    258:18 262:20
    270:8,8 282:25
    283:4 301:3
    303:17 315:18
    317:12 324:4
letter 307:15
    308:24,25
level 38:5 40:12
    46:3,10,19 48:24
    79:18,22 80:4,6,8
    96:19 117:23
    119:25
LEWIS 145:4
life 320:21
lift 259:5
lifted 259:6
light 228:12

liked 126:5 132:10
    140:10 185:16
    313:18,21
limited 296:14
Limitedly 187:15
line 236:2,7 241:12
    248:7 250:4,10
    250:23,25 282:4
    282:6,10,12
    315:23 316:5
    317:22 331:14
    344:4,24
lines 237:25 238:9
    248:9,17,20,20
    249:5,7,12,16
    251:7 337:10
    346:18,20
list 26:21 246:4
    259:2
listed 42:20 303:21
listened 32:3
little 7:22 8:5,7
    9:17 25:16
    218:16 229:18
    320:13 327:24,25
    328:10 345:2
LLP 2:9
local 43:2
located 127:23
location 273:3
    309:23
long 8:15,18 10:16
    11:18,22 12:19
    23:11 53:15
    165:9 178:8
    227:24 228:2
    244:24 245:7
    312:14
look 23:13 33:25
    36:15,16 47:10
    50:15,15,16,16
    51:25 65:15
    67:11 71:15
    73:11,16,19,21
    96:4,17 102:11
    126:19 127:17
    129:18,21 141:10
    141:11 155:15

199:13 211:19
213:6 214:22
231:14 239:9,18
239:23 242:3
243:17 245:4
246:22 267:23
277:8 278:2
294:5 326:19
331:9 333:13
334:11,14 343:16
343:17 346:11,18
looked 32:23 73:14
    174:5,6 211:11
looking 21:14
    48:16,19,21
    68:10 121:13
    162:18 182:14
    199:15 213:13
    242:14 268:19
    295:12,17,21
    296:5,20 343:2,3
looks 34:6 49:20,22
    244:23
loop 300:20
lose 41:16 141:25
    300:12
lost 149:20 256:4
    315:11
lot 24:13,25 25:2
    50:17 77:20
    83:15,17 119:24
    120:9 162:10
    180:16 182:6
    244:14 347:5
lots 260:24
low 41:3
lunch 108:15,16,19
    109:10 332:17
lunches 109:6
lunchtime 332:3
lying 214:21

──────────
M
──────────
M'mm-hmm
    121:12,15 147:11
    213:24 241:9
    244:7 332:20
    333:12 334:6

335:22 337:24
342:15,23 343:8
346:2
mailroom 11:17
main 38:19 134:23
    324:25
Maines 39:19
    40:18 41:10,18
major 42:16
    255:23
making 134:19
    139:19,22 150:7
    159:25 184:2
    307:10
male 94:24 95:22
    97:23 104:9
    105:2,25 106:17
    107:22 108:8
    194:19 216:17
    241:22 242:3
    255:24 278:18,19
    278:21 284:2
    340:7 341:3,21
mall 178:17,18,22
    178:22 179:3
Malli 3:23 5:24 8:4
    315:16 316:20
Mallow 16:12
man 175:24 205:13
    205:13 206:19
    213:10,10,13
    236:9
man's 174:17
    177:14,17 204:23
    205:21 207:5
manage 218:3
    223:13,25 281:23
managed 123:3
    299:3
management 12:9
    39:19 41:15
    42:20 53:11
    117:23 118:11
    141:24 275:6,14
management/em...
    78:4
manager 14:5,18
    16:25 17:16,21

39:22 40:3,16
43:2,7 75:8 77:4
79:18 80:9,20,23
81:7 83:18,24
84:9 85:5,8,9,18
85:22 86:18 87:3
87:18 92:4
104:22 107:22
112:23 113:10
118:2 124:2
147:14 193:8
212:3 220:2
221:3 229:19
241:21 245:13
248:11 252:3
263:6 265:3
266:3 281:18
285:25 289:24
290:18 292:19
293:24 295:12,16
296:5,20 325:16
336:22 337:3
managers 77:22
84:20 86:13
87:24 88:2 90:2
91:7 92:23 180:3
249:20 265:14
342:13
Maninder 3:23
5:24 300:13
manner 22:8
manual 76:5
280:20
March 202:4
210:10 231:15
mark 3:17 5:21
6:25 7:17 19:4,7
90:20 106:8,22
224:3 234:18
300:10 311:16
marked 33:24
197:15 225:8,19
234:17,19,23
304:18,18 311:2
311:5,7,9,11,13
311:17,21 319:16
marketing 42:16
marking 234:21

marks 304:15
Marsh 10:15 11:14
11:21,22,23
Mary 1:5 5:6 6:3,6
7:11 23:22 24:2,6
124:10 153:24
155:18 187:9
189:7 190:10
191:8,13,25
192:7 195:9
196:4,13,21
197:20 198:9
199:18 201:4,5
201:18 202:6,21
203:2,8 206:10
206:12 207:21
208:2,6,21 210:9
212:17 213:22
216:5,20 217:20
217:24 219:5,13
219:20 221:20
226:18,19,21,24
226:25 228:6,18
230:6 232:2,2,9
232:17 233:2,17
233:24 235:9
236:18 237:2
240:21 242:9
244:9,24 245:12
245:12 246:7
254:21 255:10
256:24 257:6,8
258:20 259:6
261:3,8,22
265:17 270:2,5
282:18,22 287:10
287:14 288:7,18
288:23 291:5,12
292:24 293:14
294:11 295:4
297:16 300:14,15
303:24 304:6
306:17,22 307:6
307:21 309:4
314:5,15,17
316:6 318:2,5
320:24 321:13,22
322:10 328:15

333:23 334:9
336:3,12 338:11
338:19 339:2,9
344:13 347:4
349:3,6,14
Mary's 247:18
289:5 302:4
348:22
Matt 187:6 200:6
Matt's 200:6
matter 5:4 125:6
265:23
mean 9:19 18:9,17
22:3,3,23 23:6,8
26:19,20 27:20
29:5,5,11 31:23
37:23 45:21
46:22 48:19
49:19 50:14,15
50:23 52:6,23
54:10,24 55:10
55:16 58:12
60:16 66:21,22
66:24 67:3,23
68:20,21,24
72:13 74:12,23
75:4 78:16,18
79:10,24 80:12
80:16,17,20,21
81:13 82:2,11,25
84:3,12,13 85:12
85:13,21,25 86:9
89:12 91:11 94:2
94:4 97:15 99:4
100:18,21 101:12
102:8,21 103:10
104:13 108:15
112:18 113:24
117:4 118:16,18
118:19 120:5
121:19 123:2,18
125:14,15 126:8
126:11 131:22
132:9 133:14
136:21 139:10
140:9 142:8
146:5 147:24,25
149:23 151:6

152:24 153:13,23
154:12,13 155:11
156:18 157:24
158:22 160:13,19
161:14 163:16
164:15,15 165:5
168:15 169:11,14
172:16,16,18
173:23 174:4,18
175:16 180:17
189:13,19 194:13
194:13 196:15
197:22,23 199:12
205:4,7,17 207:8
211:24 213:25
214:2,18 215:7
216:23 218:21,22
219:25 221:24
222:3,24 223:16
227:13 229:6
234:14 235:14
236:21 237:11
247:15 248:5
253:9 254:13,14
270:7 271:20
272:25 275:7,8
275:15,20,21
284:18 285:6
286:9 287:18
288:14 289:2
290:11 292:8
293:8 294:21
295:25 299:2
304:2 305:21
312:25 319:25
321:18 346:21
347:16,17
Meanchoff 187:6
meaning 312:20
means 89:10
216:19 276:15
meant 80:13
130:17 144:16
154:2 158:12
170:19 173:22
175:2 246:15
290:13 337:18
measure 266:8

280:14,16
media 5:3 40:16
242:24
medical 307:18
308:21 319:20
323:5
meet 276:18
meeting 8:15,17
124:7,24 125:2
138:13 180:3,5
180:10,15,22
182:12 186:12
301:18,24,25
302:5,8,20,21
303:18 304:23
305:2,6 306:8,16
308:15 309:13
347:10 348:20,23
349:4,4,16
meets 276:15,21,23
member 42:18
255:6
memories 347:15
memory 187:2
244:16
men 72:6 174:4
213:21,23
mention 162:3,7
246:2 264:25
mentioned 44:12
62:4 117:17
144:13 185:16
281:19
mentioning 142:23
mentions 241:21
messed 40:24
met 7:17,20 8:11
Michael 200:6,11
200:12
microphone 7:23
mid-2014 14:9
middle 141:12
304:22 317:18
Mike 3:24 5:13
190:11,12,20
191:3 192:3
Miller 345:6,9,11
million 66:22

mind 26:24 33:5
50:2 72:17,21
96:4 97:17 98:10
136:22 208:22
216:12 221:8
232:12,19
mining 13:3,5
minor 265:11
minority 189:23,25
190:4,6 194:18
minute 164:23
209:7
minutes 28:4
242:22
misrepresentation
145:12
moment 317:19
moments 219:4
Monday 7:18 8:15
23:14,20 27:10
34:3 272:18
month 226:22
230:6 232:7
245:10,11 246:6
247:13 248:8
251:15 252:21
256:6 258:7
297:20,21 320:7
monthly 59:22
61:9
months 7:18 8:12
8:17 11:14,20,21
13:2,9,13 37:10
40:14 124:20
165:14 201:4,17
202:20 203:6
206:11 207:20,23
208:11,12,24
210:13 211:12
226:25 228:18
230:25 241:22
242:4 250:20
273:21,25 274:5
280:23 297:21
334:8,16 335:3
morning 200:17
move 7:23 41:20
41:20 179:8

211:15 258:18
263:8
moved 12:11
movie 178:17
Moy-Gregory
163:6
multiple 40:25
44:19 90:24
198:12 298:10
MWP 1:8
Myra 163:5,6

**N**

N 3:2 6:10 300:9
352:1,18
naked 113:4,15
116:16 117:14
120:14 122:19
name 5:13 13:4
16:22 43:10
327:17 351:15
names 34:25 36:13
36:18 74:7,21
75:12 138:20
nature 78:19 80:23
82:9 115:13
215:24
near 119:23
necessarily 38:13
175:16 265:7
necessary 36:5
297:15 348:14,15
need 41:20 42:15
54:2 56:7 80:13
81:2 82:24 83:4
96:17 98:24
99:11,20 108:16
108:18 109:10,22
110:4 119:18
172:19 226:8,10
226:13 229:11
234:18 264:2
272:3 279:21,25
279:25 292:22
315:7 317:21
320:13 327:20
needed 26:22
31:19 70:10

95:12 96:4 119:9
119:10 120:2,20
negative 139:4,8
140:13 142:22
144:20 147:13
150:17 164:14,21
167:4 174:12,16
175:4,4,10,15
181:19
negotiate 322:11
negotiations
155:19
neighbourhood
8:20
Nelson 3:9 6:2 7:10
127:22 315:11
317:18 318:8
nepotism 39:24
42:25
never 17:13 25:3,5
105:18 135:12
140:25 141:3
156:11 159:10,11
181:7 182:6
216:12,12 221:7
232:18 245:24
250:6 253:21
254:11 261:23
262:2,2 281:10
281:12,16,16
282:18,22 283:6
283:8 294:25
324:10 330:8,14
330:21 340:8
341:10,16,22
342:3
new 1:3 3:16 5:8
5:16,16 16:8 40:8
43:2,6 74:4
119:12,13 121:13
124:6,7 187:11
221:25 224:5
299:8,11,21
300:8,8
nicely 36:5
night 317:9
nine 40:14
nine-page 248:7,22

248:23 254:17
nitpick 232:5
non-denial 158:6
non-impactful 42:8
nonbusiness 82:8
82:18 83:9,10,12
nonbusiness-type
82:8
nonsexual 82:9
normally 324:8
North 335:20
northeast 331:20
Notary 6:12
note 347:17
notes 156:16 348:4
349:8
notice 320:20
notification 320:11
nude 110:22
116:25 121:24
128:18 176:20
177:8
number 5:3,8
26:17 112:6
125:13 168:10,11
182:18 187:20
191:20 225:11
226:2 231:11
237:25 238:9
248:11 255:21
259:3 261:9,9
266:6 272:14
297:25 298:3,5,6
298:8,9,11,14,21
298:23,25 299:10
299:16,18,21
315:17 321:22
322:3,10 352:11
numbers 187:22
188:17 218:3
219:23 235:14,15
245:3 280:15
282:23 298:17,22
299:4 344:7,19
345:7,17,21,22
346:3
numerical 50:19
50:22 51:2,4,8

numerically 224:6
numerous 184:20
186:2
NY 3:8,16

**O**

O 6:10 300:9
352:14
O'Dondow 233:25
oath 4:13 45:25
156:5 249:14
oaths 2:12
Object 201:8
objected 24:13
objection 15:3,6,23
16:7 17:6,23
18:15 19:2,7,17
20:16 21:11,20
22:2,15 23:5 24:5
27:7,18 28:12
30:9 31:2,21
32:20 34:11
35:12 38:10
43:17 44:3,10,21
45:10 46:5,13,21
47:19 48:2,10
49:14 50:5,13
51:15 52:5 53:25
54:23 56:24
57:10,20 58:11
60:8,15,25 61:19
62:13,25 63:11
63:24 64:5,12,19
64:23 65:10 66:3
66:12,20 68:13
68:18 69:6,21
70:3,12,21 71:4,9
71:16,21 72:8
73:2,9,15 74:11
74:22 75:15
76:22 77:7 78:25
79:9,21 80:11,25
81:8,16,25 82:16
82:23 84:2,7,11
84:22 85:6,19
86:4,7,15 87:10
87:20 88:13,19
89:3,20 90:5,15

90:21 91:10,18
91:25 92:14
93:11,22 95:3,14
95:25 96:6,24
97:14,25 98:12
98:19 99:3,14,22
100:7,19 101:5
101:10,18 102:5
103:8,19 104:12
104:15 105:17
106:4,8,19,21
107:11,25 108:9
110:24 112:20
113:7,17,20
114:4,11,19,24
115:8,14,21
116:3,10,19
117:3,11,16,24
118:15,23 119:6
119:20 120:16
121:2,18 122:3
122:13,20 123:7
123:12,24 124:8
124:17 125:19
126:6,17 128:23
130:24 131:21
132:4,19 133:12
134:12 137:14,22
138:8 139:9,17
140:5,14,20
142:7 143:2,12
143:18 144:5,12
145:8,20 146:4
146:23 147:16
148:19,25 149:9
149:13,21 150:8
150:18 151:19,25
152:9,23 153:22
154:11,23 155:8
156:14 157:10,22
158:8,20 159:2,8
160:12,17 161:2
161:9 162:22
163:12 164:3,9
166:3,15 167:8
167:13,16 168:3
168:8,14,23
169:7,18 170:25

172:12,14,23
173:20 174:21
175:19 176:2,9
176:24 177:3,10
177:16,21 179:16
183:5,10,13,19
184:11,18 185:3
185:9,13,24
186:6 190:7
191:5,9 192:11
193:3,15 194:4
194:12,22 195:6
195:12,22 196:5
196:23 198:25
199:21 200:19
201:11,21 202:10
202:22 203:9,17
203:23 204:10,24
205:14,23 206:13
206:21 207:6,24
208:25 210:16,24
211:7,13,21
212:7,10,24
213:15 214:13,23
215:6,16 216:3
216:14,22 218:8
219:14 221:11,23
222:10,20 223:3
223:15 227:6
228:8,13,21
229:22 230:8,19
231:3 232:10,23
233:8,14,20
235:11 236:20
238:18 239:2,10
240:14 242:7,12
243:11 245:15
247:5,14 248:19
251:16,22 252:5
252:11,23 253:5
253:11,23 254:4
254:12 255:19
256:8,12 257:10
257:18 258:2,8
258:14 259:10
260:4 261:7,24
262:9,15 266:4
267:2,18 268:16

268:20 269:20
271:11 274:7,7
274:23 278:24
280:24 281:6
284:11,17 285:18
286:4 287:6,17
287:24 288:9,24
289:8 290:8,20
291:14,24 292:7
293:15 294:15
295:7,14 296:6
296:25 297:5
302:15 304:24
305:10,20 306:9
308:5,17 310:11
310:18 313:11,16
313:25 314:7
319:12 322:6,23
323:7,10,20
325:7,10,20,20
326:8,14 328:18
329:2,7,16,24
330:9,17,23
331:7,25 332:12
333:6 334:2,24
335:10,17,19
336:7,15,24
337:19,25 338:7
338:14,21 339:4
339:12,24 340:11
340:17,24 341:5
341:12,18,23
342:4,9,19 343:4
343:23 345:10,18
346:6 347:12
objections 4:7
obligation 77:17
79:6
observation 18:23
20:10 22:11,18
25:7 52:2 343:9
observations 19:12
21:8,17 23:19,25
24:8 56:20 57:24
58:18 60:17
observe 60:20,21
60:23 178:23
179:4,11 241:25

250:20 294:12
306:3 334:17
335:4
observed 179:14
294:25
observing 189:20
obviously 47:8
50:24 72:11
85:22 114:5
222:12 251:21
252:18 289:18
occasions 255:21
occupied 42:12
occur 138:6 219:12
232:8 267:11
occurred 45:20
138:7
occurring 7:2
240:5
OEMs 277:15
offence 125:21
126:2 131:23
132:3
offended 140:11
offer 309:24
offered 307:16
310:4,9
offering 310:20
office 8:14 10:14
12:3 105:7,19
office-type 11:16
officer 4:12
offices 2:9
official 2:11 111:9
156:5 351:3,21
officially 17:10,13
oftentimes 77:21
102:11 103:12
oh 7:25 13:10
16:21,21 17:18
27:25 34:17 56:7
59:6 69:8 90:15
116:7 127:18
129:9 138:15
152:14 162:14
172:13 182:16
198:24 213:7
216:19 225:7

226:24 235:5
246:15 276:23
279:23 282:8,10
282:13 300:19
314:9,16 315:10
346:22
okay 6:20,24 7:8
7:15,21 8:9,10
10:4 11:4,8,10
12:16 13:10,11
13:14 16:23 17:4
17:18 18:3 19:3
19:24 23:22 30:4
33:10,15 34:7,12
34:16 35:21 37:4
46:9 47:23 51:6
53:8,18 59:11,16
64:9 73:20 75:23
75:25 76:11
79:19 80:3,5,7,8
80:23 81:7,22,24
82:4,15,19,22
83:24 84:6,9,20
85:4,16 86:18
87:2,17 88:10,16
88:18 89:5,14,25
90:4,9,9 92:4,8
100:3 104:18
107:7 109:8,18
110:19 113:2
116:7 122:17,24
125:3 127:24
129:17,20,22
131:12 135:6
151:4 153:9
154:14 156:2,24
160:5 163:2
164:8,17 171:19
175:17 179:2
182:20,23 183:17
183:25 197:14,17
199:10 201:2
202:2,15 204:17
204:21 206:25
207:17 208:6,11
209:6 210:4,20
211:6,6,10
213:20 215:3

217:11,15 220:6
220:11 221:7
224:11 225:10
226:14,15 227:18
227:21 228:3
229:13 230:17
232:21 233:12
234:10 235:7
236:6,14 237:24
241:5,11,15,20
244:3 245:11
246:5,20 249:9
250:3,14,16,25
253:3,18 254:3,9
254:20 255:23
256:23 258:11
261:19 262:20
264:4,21,24
265:25 270:8
272:8,21,22,23
274:2 275:3
276:2 277:13,17
277:25 278:11
280:2 282:13,15
283:3 284:15
286:17 287:2,2
290:3,15,17
292:18 300:19,24
301:5 304:20
305:16 311:23
313:6 314:12,18
315:9,13 316:3,7
316:8,11,16,19
317:2,3,10,11,19
318:3,9,14,15,16
318:19 319:3
320:16,18 321:4
324:7 327:5,6
328:13 331:11
333:12,16,21
334:11,13 343:15
343:18 344:4,11
344:17,21,23
345:9 346:2,10
346:12,14 347:7
347:24 350:2
older 328:24 329:6
329:21 341:8

Oliver 137:8
Olsen 17:3,5
  110:21 112:17
  114:9 121:7
  176:8,19
onboard 113:2
once 13:24 15:9
  101:23 124:10
  125:9 182:7
  197:15 261:23
  272:12 286:24,24
  298:21,22 308:10
  308:10
ones 181:14 188:12
oOo 4:19
open 43:6 284:15
open-door 284:18
  285:2,15,24
  286:6,8,11,15
  291:21 292:2,12
  292:17,23 293:8
  293:9
operations 345:14
opinion 19:9 21:3
  32:10 53:8 55:7
  57:12,14 74:24
  75:5,7 77:12 92:6
  92:7 113:22,24
  115:3,6 118:18
  126:8 131:2
  158:23 168:16
  198:14,18,22,22
  230:9 253:6
  287:19
opinions 52:24
  198:12 291:19,22
opportunity 271:2
  271:9,18
ops 188:24 345:12
options 266:9
order 127:17 192:8
  223:4,6 235:5
orders 188:7,13
  191:4 192:9
  195:11
organization 20:3
  20:9,12,13,19
  40:23,25 47:4,14

47:18 51:14 52:4
  53:20,24 54:4
  343:11
original 290:4
originally 186:25
other's 173:18
  198:19
outside 80:21
  120:2,9 137:8
  348:22 349:15,23
overall 55:7 58:3
  62:17 291:7
overreact 337:14
ownership 25:3
  291:10

**P**

P 3:2,2 300:9
  352:15
P.M 56:4,13 128:6
  128:7 197:10
  224:16 243:2
  301:11 327:11
  350:7
P811 241:6
P817 240:7,25
  245:21 248:10
P818 238:8
package 309:10
  310:4,10,21
  319:18
page 39:5,10,15,21
  40:2,7,10,15,22
  41:17,24 125:12
  129:15,24 138:12
  141:8,16 176:14
  182:11,14,15,22
  226:4 237:24
  238:7,8 240:3,7
  241:5,16 245:21
  248:11 256:16
  264:5 273:4
  282:8,9,10 337:8
  343:19 344:11,18
  346:13,23 352:4
  352:11
pages 34:13
paid 42:21 65:7,15

67:14 68:8 70:17
  72:6 73:13 95:11
  95:22,23 105:13
  105:24 106:2,16
  106:18 141:15
  195:17,21,24
  236:8,8,9 238:25
  239:6,12,17,21
paragraph 236:8
  241:20 245:22
  254:24 282:14
  289:10 291:12
  331:13 337:11
  344:6,14,18
paragraphs 291:4
parking 347:5
part 8:22 22:23
  29:20 50:23 57:5
  111:19 116:6
  124:14 152:11
  153:11,13,14
  154:13 171:17
  178:13,14 190:13
  270:13 305:14
  307:12 349:16
part-time 12:9
  331:18
participate 187:13
participated
  128:19
parties 4:4
parts 70:2
party 302:7,14
  303:7
passionate 24:8
  236:18 237:3,8
  237:10
pasted 333:10
  335:2
patch 277:15
  315:12 317:25
pause 67:2
pay 27:15 68:6
  69:20 255:15
  260:10,13,21,23
  260:23,24,25
  284:8 331:21
paycheque 134:5

paying 192:7,13,14
  194:18 309:7
  320:10 331:19
payment 308:10
payments 206:9
  338:4
PayPal 25:25 26:5
PDF 250:18
Peacock 190:13
  192:2
peer 290:19
peers 219:16
  221:15 289:15
  290:10
Pender 2:10 5:10
pending 109:24
  328:5
people 15:22 16:3
  20:3 25:20 26:3,4
  28:9 35:5 38:12
  39:17 42:11
  43:12 46:25 47:2
  47:4,24 48:11,14
  48:18,21 51:5
  60:23 62:3,7,11
  64:10 70:10,14
  75:12 81:19
  87:17 103:6
  120:13 121:8,22
  122:2 124:24
  126:15 130:3
  132:6 138:13,18
  140:12 142:14
  144:24 145:17
  156:8 158:2
  159:11 160:6
  163:23 168:11
  171:12,12 173:3
  173:5,7,25 174:3
  176:7 183:2
  184:7,20 185:2,8
  188:9 191:21
  216:16 252:4
  296:14 297:13
  305:18 312:3
  322:22 324:24
  329:21 335:25
  336:2 342:7

people's 52:24
194:11 198:12
239:21
perception 239:21
Perfect 6:24
224:10 318:3
performance 55:4
55:13 59:23
83:19,20,21
218:2 220:4
221:2,13,15
222:15 240:8
241:23 242:6,15
244:11,13 245:19
245:25 246:9,14
248:12 249:8,19
249:20,22 250:6
251:6,12 252:2
252:19,21 255:25
257:14 262:13,22
263:3 270:9,10
270:17,19 271:14
271:17,19,23,25
272:5,7 273:2,11
273:18 274:9,12
278:16,22 279:11
279:14 280:6,12
281:2,25 282:21
282:21,23 283:9
284:4 333:2,22
336:4
performance-bas...
282:22
performance-rel...
265:7,9
performed 59:4,21
60:7 235:20
272:24,25
performing 53:23
period 40:17 97:4
period 332:4
333:24 334:8,9
335:5,8
periods 333:18
person 40:17 97:4
97:5 105:19
113:13 120:9
142:14 157:19
158:25 165:24

166:21 168:20
190:2 229:17
262:23,24 263:6
263:7 271:21
277:7 287:21
295:22 299:8,12
299:12 302:10,11
310:9 323:16
348:9,12
personal 56:18
113:22 115:3
271:3 289:17
290:7,12,23
291:2
personally 57:18
304:6
personnel 152:21
perspective 19:15
51:25 74:24 75:2
75:17 113:19
117:8 119:19
120:5,7,8,8
121:17,20 192:24
232:22 262:18
269:25 297:7
314:6 343:6
phone 24:24
257:23 304:10,16
304:19 307:22
316:12
phonetic 233:25
phrase 229:16
picked 142:12
picking 142:9
picture 47:11
Piehler 6:4,6 7:11
23:22 24:2
186:18 189:7
190:10 195:9
196:4,13,21
197:20 198:9
199:18 201:4,5
202:6,21 203:8
206:10,12 207:21
208:6,21 210:9
214:11 216:21
217:20,24 219:5
219:13,20 223:23

226:18,19,21,24
230:6 232:9
233:18,25 235:9
236:18 240:21
242:9 243:20
244:24 245:22
255:10 256:24
257:6 258:20
259:7 261:4,22
264:9 265:18
267:14,23 269:2
269:6 273:12,15
274:21 279:8,10
282:18 287:10,15
288:7,18 291:12
292:25 294:7
297:17 301:18
303:24 305:7,19
307:17,19 309:4
314:5 315:22
318:6,12 319:19
321:13,22 322:4
322:11 326:13
328:16 330:3,6
330:12,20 331:23
333:23 336:3,12
337:9,10 338:11
338:19 339:2,10
343:20 345:4
Piehler's 191:8,14
227:2 228:19
234:2 245:13
246:8 254:22
266:14,17,19
267:9 293:14
295:4 302:12
306:17 307:2,8
308:14 312:4,7
320:24 331:3
PIP 218:6,15,20
220:7 221:5,12
221:22 222:18
223:5 226:21,22
230:3 256:3
268:5 269:11
place 127:20
346:18 347:6
351:8

plaintiff 1:6 3:6
6:3,7
plan 26:22,25
218:2 263:3
320:10
playback 6:20
please 5:19 6:9
48:8 69:8,9,12
89:23 170:16
317:20 337:7
point 14:6 22:12
23:24 24:3 46:15
46:23,24 53:7
57:22 60:5 67:13
98:10 109:21
115:17 138:10
145:6 146:11
161:6 186:17
199:13 207:2
229:18 248:3
261:17 283:4
289:9 291:8,16
298:17
pointed 73:18
points 24:19 60:4
60:14 288:21
polices 87:19
policies 9:13 71:14
87:13,14,22,23
policy 9:9,10 65:20
75:21,25 76:4,8
76:10 87:8,12,24
87:25 88:5,17,22
88:23 89:9,15
90:8 91:12,20
92:11,18,21,25
104:21 105:4
149:11,14,16
152:18 264:7,11
264:22,23 265:5
265:6,19,23
278:14 280:4,17
280:19,20 284:19
285:2,15,24
286:6,9,12,16
291:21 292:2,12
292:18,23,25
293:3,8,9 341:2

pool 111:18 112:14
122:18
poor 31:15 32:15
39:7,13 262:13
portion 54:9
209:25
position 10:20 12:2
12:3,6 13:23,24
14:3,5,10 18:7
25:20 42:12
121:12 272:2
297:25 298:3,5,8
298:9,11,14,17,21
298:22,23,25
299:4,10,15,16,18
299:20,21 345:13
positions 41:2
positive 34:9 35:10
36:2,9,10,17 37:3
39:2 118:5
119:15,16
positives 35:15
possibility 91:6
232:14,18 299:14
possible 58:25 59:7
74:10,13,13
88:17 89:2,7,10
248:6 253:3,4
285:23 296:12
297:13 324:2
posted 129:15
potential 95:13
96:4 100:5
potentially 98:17
98:20
practice 65:20 84:4
84:25 85:4
244:17 302:10,19
324:16
practices 68:7
104:22 106:13
preceded 230:2,3
preceding 344:18
precisely 204:6
preface 25:6,24
premiums 320:11
preparation
199:11 266:6

prepare 7:15
  333:22
preparing 263:25
present 3:22 5:23
  128:21,22 138:21
  180:13 302:7
  303:10,14,21
  304:3,12,14,15,16
  305:5,18 306:22
presented 293:18
president 144:22
  150:15 156:6
  163:21 168:21
presidents 335:23
presume 36:19
  133:8 135:8,22
pretty 204:4
previous 112:23
  118:2 273:20
  281:19
previously 19:25
  33:24 113:6
prior 164:25
  182:22 229:8
  231:10 267:9
  273:19
prioritization 42:8
private 244:17
probably 8:20
  11:24 14:8 58:3
  96:17 290:23
  299:5 326:25
probe 99:20 235:9
probing 97:18
  99:11 100:17
problem 31:19
  316:17
problems 30:7
  61:13 79:8
  110:11
procedure 7:5
proceedings 33:18
  33:19 56:3,4,12
  56:13 128:6,7
  197:9,10 224:16
  224:17 225:15,16
  242:25 243:2
  301:11,12 327:10

327:11 350:7
  351:7,11
process 8:23 38:8
produced 264:18
product's 120:8
production 51:7
  59:17 61:9
  154:15 242:17
products 343:13
professional 18:21
  20:7,7,24,25 22:8
  26:25 29:23,25
  49:5 55:5,14 62:8
  62:10 118:3,4
  159:4 160:10
  240:17
professionalism
  27:6 28:8,11
  30:24 46:4,11,20
  56:20 61:15 62:5
  62:12 158:18,18
  158:22
professionally
  20:13 22:25 23:4
  23:18
professionals 21:18
  119:14
program 42:13
promise 307:7,11
promising 308:2
Promote 41:18
promoted 14:6,8
  17:16
prompted 15:12,14
  15:17
properly 40:19
proposing 204:13
protect 261:3
  262:7
protected 77:10
  78:12 94:4,9
  220:25 222:5
protecting 259:14
provide 120:9
  272:6 279:4
  289:3 291:22
  324:21 328:13,21
  329:4,10,19

provided 130:8
  219:23 279:6
providing 291:17
  291:19
province 2:12
  351:4
Public 6:12
published 344:7,19
pull 300:9
punished 175:25
pure 129:2
purpose 37:4 44:7
  270:17,20 324:17
  324:25
purposes 45:8
  271:17
pushed 39:18
pushes 199:16
put 42:15 64:17
  126:3,9 218:2,6
  221:21 222:18
  223:5 226:20,22
  228:12 256:2
  257:6,20,24
  258:12 313:14
putting 20:6
  218:15 268:4
_____
  Q
question 4:8 22:17
  22:18 38:4 42:24
  46:18 48:4 50:20
  51:4 52:10 57:2,3
  57:6 61:6 62:20
  62:21 66:6 67:4
  68:21,25 69:8,9
  81:14 83:6 86:11
  86:17 88:21
  89:18,21,23
  90:17,19,20 91:5
  92:3,19 105:10
  109:24,25 110:11
  110:16 123:14
  128:17 129:23
  134:18 137:4
  138:3,3,4 140:24
  146:6 148:14
  151:22 152:25

156:21,22,24
  167:10 170:14,17
  178:4 179:6,7
  181:13 182:21
  185:20 186:2
  196:8 197:23
  199:17,23 200:2
  200:18 203:15
  209:18 219:22
  220:10,12 222:7
  222:14,15 228:15
  252:25 254:7
  258:16 260:7
  266:18 267:5
  273:14 275:12
  276:4 279:17
  287:14 290:4
  293:4,11 294:23
  296:18 299:23
  302:25 305:3,22
  308:13 309:17
  319:7 321:25
  323:13 326:16
  328:4 349:17,18
questioned 245:23
  250:5
Questioning 32:15
  39:13
questions 42:9
  49:7 97:18 98:3,8
  98:9,14,22 99:6
  99:10,11,20,24
  100:3,4,9,17,23
  101:9 103:24
  104:11,24 105:20
  106:3,6 107:18
  107:23 108:3,6
  108:11 127:9
  131:5 134:24
  208:2 226:7
  235:4 321:20
  327:19 347:24
quick 197:5 326:19
quickly 9:22
  312:19,20,25
  313:3 334:3
  343:24,25
quite 307:22

quota 281:22
  282:24
quote 40:2 41:13
  126:19 130:7
  135:5 159:23,24
  161:14
quoted 133:17
quotes 149:23
_____
  R
R 3:2 6:10,10
race 189:11,14
  194:25
racial 189:22,24
  190:4,6
Radical 12:12,19
rainbow 130:3
  132:7 133:25
  156:9 160:7
  163:23
raise 26:13 50:2
  94:25 97:13 98:9
  98:24 99:6 103:5
  140:10 141:5
  145:16 146:2,13
  184:3,21
raised 30:8 43:25
  44:8 45:7 55:19
  67:7 96:3 103:24
  140:25 141:3
  146:6 184:5
  185:18 186:22
  187:6 208:22
  216:13 217:6
  261:11 262:2
  284:24 285:3
  330:4,6,11,19
raises 255:23
raising 102:24
  140:19 142:5
  144:25 145:18
  278:13
ran 21:9 167:6
range 37:7 265:11
rapid 42:9
rate 51:5
rated 276:10,11
  277:18,19

Rathbun 163:8,9
181:4 310:3
rating 241:23
ratings 246:3
333:8
RD 40:8
RDs 218:17
reach 343:12
reaction 63:7,13
302:4
read 32:10 34:8,13
35:9,16,17,19,20
35:24 39:4 40:11
41:17,24 44:19
47:8 48:7,9 57:8
57:9 61:20 62:6,9
62:16 67:20,22
68:4 69:11,13
127:7 128:25
156:25 157:4
165:2,4 170:6,9
170:13,16,18
171:6 197:16
209:24 222:6,7,9
224:21 225:6,24
226:9,10 235:2,6
236:15 237:5
243:20,22,25
247:17,22 251:8
251:8,9 253:21
254:11,15,17,24
263:16,17 264:2
272:12 274:25
276:25 278:10
280:20,21 286:25
287:3 300:5
303:3,4 311:4
319:6,8 320:4,13
324:5 343:25
349:20,21
reading 45:25 50:2
52:10 54:14,16
54:18 55:15
62:14 217:25
235:13 248:5
250:22 265:4
288:25
ready 224:25 226:6

324:6
reality 255:4
really 16:10 23:11
25:3 86:16 102:9
102:10 118:8,9
121:21 170:3
188:24 224:23
226:3 248:17
260:6 267:20
289:15 291:8,9
292:16 324:23
348:14
reason 13:5 49:2,8
58:6 70:7 74:19
78:20,23 118:10
136:4,7,9 137:19
138:5 143:10
165:20 190:19,24
193:25 211:15
223:19 267:8
271:13 274:11
292:5,24 295:11
295:16,22 296:9
296:9,10 305:8
328:14,22 329:5
329:11,20 337:4
reasons 82:18,22
83:3,10,13,13
218:5 220:20
221:6 275:10
295:24 296:2
324:24 325:5,13
325:18,24 326:6
recall 8:19 9:3,15
17:8 18:6 21:22
22:24 23:3,21
24:10,20 25:9
27:11 28:13 29:8
30:11,12,15
31:23 32:9 34:24
37:17 44:4,5,25
45:12,13,23
49:23 50:7,7
55:17,21 58:13
58:24 59:10,14
59:24 60:2,17
63:2,5,6,13,13
68:5,6,9,10,14,16

68:22,23 69:15
69:23 70:22,24
72:19 73:4 74:9
76:9 87:14,22
89:13,13 92:24
105:5 111:6,7,15
111:21,25 114:20
114:21 124:25
133:13,18,22,23
134:14,21 136:15
136:21,25 137:2
137:5,24,24
138:19 146:16,25
147:5 148:20
149:2,4,4 150:10
150:20,20,22,24
151:3,11,12,16
154:13 155:10,11
156:3,16,16
157:5,13,13
158:9 160:20
161:13,19 164:15
166:17 176:11
178:24 179:17
180:6,14 181:3
182:4 186:15
187:17,24 188:3
190:17,18,23
191:2,10 192:22
193:22,23 195:14
195:25 196:3,3,6
196:7,16,17,19,24
199:7,8,14
205:16 213:2
214:17 215:10
218:21 220:15,23
223:17 227:7
228:4,9 234:4,6,8
234:10,12 235:12
236:22 237:4,22
241:19,19 242:14
242:14 244:9,12
245:17 246:12,17
246:18 247:9,9
251:10,17,18
252:25 253:20,24
259:20 262:10
265:24 273:6

276:13 280:8,19
284:10 297:19
304:11 307:10
310:19,20,23
312:10 321:2,9
321:11,12,19
322:16 328:12
332:13 339:14
343:14 345:20
347:14,14 348:25
recalled 138:21
recalling 322:21
receive 251:24
252:2 257:14
309:15 320:11
received 208:20
227:23 236:22
273:12 336:4
receiving 144:20
244:13 245:18
246:13 249:21
251:6,11
reception 11:17
receptive 41:6
141:19
RECESSED 33:18
56:3,12 128:6
197:9 224:16
225:15 242:25
301:11 327:10
recipients 200:3,8
200:10,16
recognize 43:9
recollect 57:16
recollection 45:19
56:23 58:2 130:7
180:21 181:17
191:18,19 197:19
211:14 227:13,21
235:25 245:5
253:25 254:6
265:20 267:19
272:19 280:9
283:14,25 295:9
301:19 303:20
310:22 333:5,7
334:23,25 342:11
346:8 347:8,8

348:8
recommend 234:2
recommendation
309:22
RECONVENED
33:19 56:4,13
128:7 197:10
224:17 225:16
243:2 301:12
327:11
record 6:17 33:6,8
33:9,16,21 55:25
56:5,10,14 125:6
128:3,4,9 164:21
197:7,11 224:12
224:14,18 225:12
225:13,17,25
242:22,23 243:3
301:4,9,13
314:21 318:23
327:7,12 350:3
recorded 133:4,7,9
135:9,11 154:10
recording 188:7
recruiters 340:13
340:20
recruiting 130:16
296:4,11,16,23
297:10 339:17,18
339:23,25
rectified 322:18
rectify 31:8 38:20
43:24 44:8 45:6
red 97:17 98:9,24
99:7 144:18
145:2,16 146:2,6
146:13 147:11,19
148:3,14,20
208:22 216:13,25
217:6
redacted 162:11
312:2
refer 131:9 266:10
reference 130:22
139:21,23
referenced 173:25
referencing 139:24
205:25 206:3

referred 36:21
  48:14 309:8
referring 23:9
  59:12 95:17
  121:24 122:10,15
  126:14 130:10
  132:20 134:2,3
  135:3 173:22
  199:24 247:3,21
  247:23 250:4
  251:5 275:25
  331:23
refers 34:18 36:7
  236:9
reflect 56:19 73:21
  131:14,16
reflecting 69:18
  154:15 242:17
refresh 45:19
  197:18 245:5
  328:11 347:8
regard 44:2
regarding 30:24
  42:25 59:23
  69:19 186:18
  278:13 312:4
regardless 166:22
  167:20 168:22
regards 55:18 68:3
  73:23 75:21
region 188:7
regional 188:5
  189:2,3 219:17
  335:12,15,22
  336:2
relate 136:14
  159:21
related 136:18
  200:21 278:14
relates 73:24
relating 249:8
relation 189:8
  303:18
relationship 41:19
  43:6 113:3 270:3
  277:15 280:11
relevant 216:11
relying 323:19

remain 55:13
remedied 31:20
remedy 30:7 54:22
  79:7,12 92:22
remember 23:7,16
  24:12,23,24
  25:11 27:4 28:4
  37:24 54:20,25
  59:11 63:3 70:19
  74:3,5,6 134:20
  136:12,23 139:11
  144:15 148:12
  151:9,14,16
  156:22 161:20
  162:4,8,16
  165:14 174:25
  175:2 178:21
  180:12,25 181:11
  185:5 186:17,21
  188:2 191:13,17
  191:20 192:5
  196:9,12 199:6
  203:18 205:10
  220:17,18 234:14
  236:23 237:15
  240:7,13 246:15
  246:16,18,19
  247:2 248:7
  251:15 256:6
  312:6 319:25
  321:4,22 322:3
  322:13 323:22
  331:24 332:2
  335:8,13
renewal 187:11
reorganization
  180:24 181:2
repeat 48:3 57:6
  61:3,6 69:8,9
  89:22 156:23
  267:4 279:19
  296:18 302:25
  321:24 323:12
  349:18
repeatedly 336:21
repercussion
  164:21
repercussions

164:2,5 166:2,13
  166:18 167:5
rephrase 46:17
  86:11 91:5
  209:19
replace 295:13,17
  295:21 296:5,15
  296:20
replacement 18:4
report 17:2,4 27:4
  35:9 39:4 52:2
  55:8,10,15 66:17
  115:17 123:23
  178:23 179:4,12
  294:13
reported 1:24
  16:19 17:3 28:8
  112:19,22,24
  115:23,25 123:25
  145:17 148:16
  176:22 179:14
  335:16 340:2,14
reporter 2:11 5:17
  6:9 33:3,5,10,15
  48:7,9 57:8,9
  69:10,11,13
  90:14 109:10,13
  125:4,7 126:25
  127:12,23 128:2
  156:25 157:4
  165:4 170:8,18
  196:25 201:24
  209:23 210:5
  217:13 222:9
  224:3,8,11
  231:11 234:20
  243:19 263:13
  272:9 278:5
  279:21 286:21
  301:3 303:3,4
  314:18 318:25
  319:6,8,15
  320:14,16 349:20
  349:21 351:2,4
  351:21
reporting 5:14,18
  41:2 113:9,13
  114:16 115:10

188:9 345:6,16
  345:20,23
reports 28:7 129:2
  333:2 334:21
  335:5,7
represent 165:21
  227:16 264:16
  327:17
representation
  42:19 141:13
representative
  11:2 142:18,20
  303:16
representing 7:11
  249:4,6,10
reps 289:20
request 51:7 59:16
  61:9 154:14
  235:18 238:16,20
  238:23 240:4
  242:16 264:13
  301:22 344:25
requesting 74:6
require 92:22 93:2
  94:12 336:5
required 265:14
  267:20
requirements 64:4
  64:7
reservations 43:5
reserved 4:8
resignation 310:7
resigned 119:12
  310:5,21
resigns 309:25
  310:2
resistance 28:21
resolution 153:17
resources 12:10
  53:4,10,13,16
  262:17
respect 40:17
  288:17,19,22
  291:6,13
respectful 123:17
respective 4:4
respond 320:19
responded 199:8

220:16
respondent 141:17
responding 199:6
response 30:23
  72:5 101:8,8
  125:11 199:22
  344:25
responses 101:17
  275:7,8,9
responsibile
  188:12
responsibility
  76:14,18 188:10
  188:22
responsible 188:6
  188:8 189:4
  323:4 339:17,23
  345:16,20,21
  346:3
restaurant 11:3
result 276:21
resulted 183:2
  204:8,8
results 26:11,13
  49:11,12,17
  59:18
resume 315:24,25
  316:2
retain 41:19,22
  186:13
retained 180:19
retaliated 97:9
Retaliation 76:19
  76:20
return 125:10
revenue 343:12
reverse 72:21
review 8:22,25
  9:13 27:10 34:5
  235:19 242:9,11
  242:18 244:14
  245:19,25 246:14
  250:7,12,17
  251:6,12,24
  252:3,19,21
  257:15 270:19
  271:14,17 272:5
  273:8,19 328:10

333:18,18 334:3
334:8,9,21 335:5
335:8 336:4
reviewed 328:7
347:17
reviewer 277:2,3
334:14,15
reviews 240:8
242:15 244:11
248:12 249:20
252:4 270:9,10
270:18 273:2
333:2,4,9,23
rid 341:8,15
right 6:16 7:8 9:16
12:5 13:15,17
15:5 25:9,14
27:25 34:19 35:8
36:8 38:25 44:9
47:25 56:9,17
60:3 66:23 71:11
72:12,16 73:17
87:8 88:11,16,24
89:11 91:9 98:18
99:2 100:6,11
102:15 105:5
109:15 110:6
116:5,9 118:14
120:25 125:3,9
126:22 127:24
128:11 129:17
131:15 133:5
135:2,7 157:9
159:25 162:18,21
171:8 173:6
174:14 177:7,15
181:10,15,19,22
182:25 191:18
193:9 199:5,20
201:7 205:22
207:16 208:9
210:23 216:13
218:7 220:20
222:17 225:22
229:3 231:21,23
233:4,7 234:16
235:8 236:5
239:9 243:6

244:4 248:18
257:13,17 258:18
259:5 268:9,12
271:10 272:3,24
276:19 282:13
283:7 289:16,24
292:9,13,14
293:2 296:3
298:25 301:16
310:25 311:25
317:10 319:5,14
321:14 326:18,19
326:23 344:20
346:25 348:24
right-hand 273:3
rise 331:4
risk 285:16
ROCHESTER 3:8
role 12:16 13:20
18:10 25:22,23
25:25 43:18,21
75:7 117:22
187:16 194:3
299:9
roles 36:5 39:16
47:25 48:12,15
48:18,19
roll-your-shelves...
277:7
rolled 340:2
room 5:24 102:12
156:7 302:11,19
303:7,14,16,22
304:9,13,15
305:15,17,23
306:2,4,7,13
346:17 347:4,10
347:11 348:4,7
348:10,11 349:6
349:9,15,23
round 25:2 237:14
237:14 282:25,25
row 230:5
Rubin 16:22 18:4
rules 7:4,5 265:6
327:20
run 20:13 53:21
187:23 285:13

286:2
running 20:8 50:4
50:12 54:4 221:9
281:21

S

S 3:2 352:9
sake 226:16
sales 18:12 20:3,8
20:11,19 21:9
28:22 40:6,24
41:3 43:2,4 46:4
46:11 47:13,18
50:4,12 51:14
52:4 53:20,23
54:4,8,9 59:22
119:13 120:7
144:22 156:6,7
163:22 168:21
188:7,13,24
345:7,12,14
sales-focussed
28:16 29:3,8,10
sat 187:18,18,18
save 300:7
saw 19:13 20:5
21:17 27:15 28:7
30:4 34:3 36:23
43:15 55:10
199:10 233:24
272:17
saying 25:6,24
29:24 36:25
45:24 64:10
72:18 87:6,11
89:12 131:13
145:10 151:11
159:20 161:4
175:10 184:13
202:12 210:14,22
214:17,20 215:12
216:24,24 217:18
285:24 289:6
293:5 309:2,8
321:10
says 36:3 67:13
77:2 104:24
105:12,25 130:13

134:2 141:22
147:9 160:2
173:23 174:2
181:20,24 198:5
198:15 204:19
210:25 225:4
226:17 236:2,7
238:2 239:17
241:12 245:22
254:23 256:17
266:12 272:24,24
281:18 304:4
320:3,4 331:15
337:13 344:6,24
346:25 347:3
349:5
scenarios 259:4
school 9:22,23,24
12:8
scientific 49:6
score 242:5
sealing 4:5
search 18:3 119:12
second 19:5 67:12
128:14 141:12,21
163:8 224:13
236:2 245:22
254:24 346:13
second-to-last
238:7,8 282:5,6
282:12,14 344:6
344:14,17
Secondary 9:25
section 9:10 73:25
251:3
sections 39:4
see 26:11 54:3
56:22 67:12,18
68:7,10 74:7,20
75:12 77:18
99:21 109:16
138:14,22,23,25
139:2,5 182:13
197:24 202:11,16
204:12 229:8
231:4,7 232:6
233:13 236:12,14
237:25 238:5,12

240:21 241:11,16
244:20,21 247:17
250:12 255:8,9
256:24 257:4
263:24 264:5
276:8,19,20
282:3,16 289:25
292:22 303:22,24
315:18 344:9,15
349:3,14
seeing 55:8
seen 43:10 250:17
261:22 263:23
305:7,19 344:7
sell 223:13
selling 223:12
236:11
sending 137:7
226:4 245:2
senior 13:22 14:16
sense 283:10
289:19 306:11
sensitive 218:17
297:9,12
sensitivity 265:15
sent 49:21,22
130:18 210:9
212:18 227:19
228:4 241:3,17
247:4,7,24
249:25 347:17
sentence 182:11
250:19 291:12,16
304:4
sentences 254:17
separate 252:7,14
298:13
September 11:25
sequence 218:25
serious 27:5 43:4
265:12
seriously 42:6
Service 218:3
223:13,25
serving 91:22,22
set 97:16 336:9
351:9
setting 165:19

208:23 210:12
settle 36:5
settlement 322:12
seven 138:13,18
  148:11 237:25
  238:9
severance 302:13
  307:12,13 309:10
  309:15,24 310:4
  310:10,20 319:18
sex 65:21 94:14,20
  338:12,20 339:3
  339:10
sexual 78:13,14
  79:23,24 80:3,4,7
  80:10,19,22 82:9
  94:6 115:12
  147:13 330:7
sexually 93:4,5
shape 66:17
share 49:17 333:4
shared 49:23 240:8
  332:25
shares 246:3
shift 28:21
shifted 113:3
shock 178:3
shoo 105:19
shook 174:20
shorthand 351:8
show 197:2,14
  201:25 217:13
  241:3 243:19
  263:12,13 272:9
  278:6 286:21
  291:11 293:3
  299:24 310:25
  319:15
showing 27:4 33:23
  288:16,18,22
  291:5,13
shy 237:11
sibling 39:24
sic 41:21 237:6
sidekick 41:21
sight 348:22
signed 4:12,14
significant 111:19

111:22
similar 34:6
Simon 10:7
simply 79:6 80:9
single 44:14,17
  78:3,3 293:17,21
  294:2
singled 219:13,16
  219:20 220:13
  223:24
singling 218:14
  219:11,15 220:3
  221:4,14 228:19
  228:22 229:3,15
sit 52:9 90:3 91:5
  206:12 319:10
sitting 32:8 50:10
  51:10,18,25
  88:16 174:25
  185:7 188:2
  203:21
situated 349:3,9
situation 31:8
  79:12 100:25
  104:10 179:3
  215:5 216:11,16
  232:22 331:24
  332:2,10
situations 25:4
  102:9 205:16
  233:3
six 165:13 238:9
  241:22 242:4
  250:20 273:21
  334:8,16 335:3
skill 351:12
skinny-dipping
  111:17
skip 265:3
skipped 263:4
  265:2
skipping 266:2
slip 323:9
slow 42:14
slower 320:14
Software 1:8,9
  3:23 5:6 14:12
soliciting 52:25

Solomon 3:5 6:3
  317:15
somebody 94:21
  152:22 256:4
  299:8
somebody's 323:5
someone's 168:16
  192:23,24 193:25
  260:10
soon 312:14
sorry 13:7 14:4,21
  16:21,21,22
  18:16 19:5,18
  22:16 27:19
  28:19 30:13
  36:24 37:17 38:3
  46:17 48:3,12
  49:20 56:25 61:2
  62:4,9 64:24 66:5
  69:2 70:24 76:10
  77:24 89:15
  90:12,17 101:20
  110:8 111:24
  125:13 126:18
  127:18 128:24
  141:9,11 152:24
  162:6 164:11
  180:8 182:14
  192:13 200:12
  201:22 205:24,24
  206:22 215:22
  225:2,23 231:19
  234:20 238:6
  240:23,24 241:2
  248:20 256:21
  260:17 267:3,5
  276:23 278:3
  279:9 288:5
  290:3 295:15
  296:18 301:24
  304:14 320:15
  321:24 333:14,19
  339:19 349:18
sort 67:7 78:13,17
  89:16 100:14
  101:16 102:22
  103:2 111:10
  123:11 150:14

152:21 154:7
  171:24 220:23
  222:4 233:4
  260:20 271:2
  295:2 323:9
sorts 103:24
space 230:6 232:7
  246:6
spaces 43:11
speak 8:4,6 41:14
  41:15 84:13
  105:3 141:23,24
  143:21 149:15
  171:2 262:19
  283:20 290:18
  307:13 327:23
SPEAKER 215:19
  317:14
speaking 95:6
  142:19 145:23
  148:2 240:2
  289:10 306:11
  307:6
specialist 5:14
specific 9:19 21:13
  22:5 25:8,12 26:4
  36:23 38:12
  65:13,14 76:10
  87:23 92:25 98:3
  120:22 135:5
  156:16 161:14
  182:5 189:13
  193:18 196:8
  207:9,12 219:2
  229:24 242:15
  258:22 267:21
  297:19,23 312:23
specifically 8:19
  19:18 21:25
  22:19 23:8 30:11
  30:13 34:25
  45:14 73:18,24
  81:3 87:24 88:6
  93:19 94:19
  105:4,6 111:7,7
  124:25 181:12
  187:24 189:2
  193:21 215:10

218:21 235:13
  273:7 293:13
  312:11 321:16
  335:12,13
specifics 24:24
  54:25 65:3 95:6
  95:16 98:5
  100:24 112:11
  190:18,18 191:11
  205:5 293:10
  321:19 332:14
speculate 36:14
  73:5 193:5,7
  285:8
speculating 23:9
  25:10 30:18 32:2
  44:25 129:11
  143:20,24 144:9
  273:6,9 337:21
speculation 45:3
  129:3,8 143:6
speech 178:6,8,12
spoke 138:13
  139:11 145:21,23
  146:7 176:16
  261:8 307:22
  312:13
spoken 307:21
spread 333:9
spreadsheet 333:9
Springgay 189:8
  189:12,16 190:11
staff 36:17 41:14
  141:23 221:5
stalking 80:21
stand 170:3 316:18
  316:18
stands 274:13
start 5:2 10:17
  19:22 36:4 39:5
  42:15 77:15
  135:17 171:8
  225:22 235:7
  239:16 289:12
started 10:18
  12:18 13:21
  14:17 113:8
  119:3,8 289:18

334:9
starting 228:18
333:14
starts 221:25
248:11
state 36:13
statement 90:18
94:12 130:20
134:24 135:12,13
136:5,9 138:22
140:16 158:6
177:24 178:5,14
183:23 305:12
statements 94:11
131:19 132:18
136:18
states 1:2 5:7 190:5
337:10
stay 33:13 123:3,4
186:13 298:9
299:16
staying 112:15
stealing 85:17,21
85:24,24 86:14
86:19,20 87:4,4,5
87:19 88:4,4,18
90:3 91:9 92:5,6
214:21
step 16:16
steps 30:6,23 31:7
54:20 55:18,21
235:8 262:13
263:4 265:2
266:2,11,12,15,17
266:19,23,23,23
267:9,16,21
268:15,21,25
269:5
STIPULATED 4:2
4:6,10
stop 109:12 254:25
stopped 218:19
308:10 309:7
319:7
straight 63:17
217:17 268:13
strange 200:25
222:25 223:10

strategic 37:9,12
37:16,18 38:6,14
43:15 70:9
strategies 329:13
329:22
strategy 31:11,15
32:14 39:7,12
51:20 180:16,22
Street 2:10 3:15
5:10
strike 22:10 23:24
97:9 104:6 141:2
221:18 252:19
267:12,12
strong 277:14
Strongly 40:16
stuck 118:14
stuff 7:6 91:9
243:25
subject 259:18,21
343:25
subjects 259:19
submitted 273:8
subordinate 189:7
190:12 290:19
292:19
subordinates
215:14 220:3
240:9,10 278:21
subscribed 351:15
subsequently 14:5
17:16
substantiate 79:13
255:7
substantiated
79:15
suddenly 114:16
suffer 163:25
164:7 165:25
167:4
suffered 164:5,14
166:13
suggest 100:5
198:8
suggesting 99:2
suggestion 346:15
Suite 2:10
Sullivan 3:17 5:21

5:21 7:7 15:3,6
15:23 16:7 17:6
17:23 18:15 19:2
19:8,17 20:16
21:11,20 22:2,15
23:5 24:5 27:7,18
28:12 30:9 31:2
31:21 32:20
34:11 35:12
38:10 43:17 44:3
44:10,21 46:5,13
46:21 47:19 48:2
48:10 49:14 50:5
50:13 51:15 52:5
53:25 54:23
55:23 56:24
57:10,20 58:11
60:8,15,25 61:19
62:13,25 63:11
63:24 64:5,12,19
64:23 65:10 66:3
66:12,20 68:13
68:18 69:6,21
70:3,12,21 71:4,9
71:16,21 72:8
73:2,9,15 74:11
74:22 75:15
76:22 77:7 78:25
79:9,21 80:11,25
81:8,16,25 82:16
82:23 84:2,7,11
84:22 85:6,19
86:4,7,15 87:10
87:20 88:13,19
89:3,18,20 90:5
90:12,15,21,23
91:10,18,25
92:14 93:11,22
95:3,14,25 96:6
96:24 97:14,25
98:12,19 99:3,14
99:22 100:7,19
101:5,10,18
102:5 103:8,19
104:12,16 105:17
106:4,9,19,23
107:2,10,25
108:9,21,24

109:3,7,9,15
110:4,24 112:20
113:7,17,20
114:4,11,19,24
115:8,14,21
116:3,10,19
117:3,11,16,24
118:15,23 119:6
119:20 120:16
121:2,18 122:3
122:13,20 123:7
123:12,24 124:8
124:17 125:19
126:6,17 127:22
130:24 131:21
132:4,19 133:12
134:12 137:14,22
138:8 139:9,17
140:5,14,20
142:7 143:2,12
143:18 144:5,12
145:20 146:4,23
147:16 148:19,25
149:9,13,21
150:8,18 151:19
151:25 152:9,23
153:22 154:11,23
155:8 156:14
157:10,22 158:8
158:20 159:2,8
160:12,17 161:2
161:9 162:22
163:12 164:3,9
164:23 166:3,15
167:8,13,16
168:3,8,14,23
169:7,18 170:25
172:12,14,23
173:20 174:21
175:8,19 176:2,9
176:24 177:3,10
177:16,21 178:4
178:6,11 179:5
179:16 182:19,21
183:5,10,13,19
184:11,18 185:3
185:9,13,24
186:6 190:7

191:5,9 192:11
193:3,15 194:4
194:12,22 195:6
195:12,22 196:5
196:23 197:6
198:25 199:21
200:19 201:8,11
201:21 202:10,22
203:9,17,23
204:10,24 205:14
205:23 206:13,21
207:6,24 208:25
209:7,10,13,20,25
210:4,16,24
211:7,13,21
212:7,10,24
213:15 214:13,23
215:6,16 216:3
216:14,22 218:8
219:14 221:11,23
222:10,20 223:3
223:15 227:6
228:8,13,21
229:22 230:8,19
231:3 232:10,23
233:8,14,20
234:18,22 235:11
236:20 238:18
239:2,10 240:14
242:7,12 243:11
245:15 247:5,14
248:19,23 249:2
249:4,9,15
251:16,22 252:5
252:11,23 253:5
253:11,14,23
254:4,12 255:19
256:8,12 257:10
257:18 258:2,8
258:14 259:10
260:4 261:7,24
262:9,15 266:4
267:2,18 268:16
269:20 271:11
272:15 274:7,23
278:24 280:24
281:6 284:11,13
284:17 285:18

287:6,17,24
288:24 289:8
290:8,20 291:14
291:24 292:7
293:15 294:15
295:7,14 296:6
296:25 297:5
302:15 304:24
305:10,20 306:9
308:5,17 310:11
310:18 313:11,16
313:25 314:7,10
314:17,23 315:2
315:9,11,14,21,24
316:3,8,14,18,22
316:24 317:7,10
317:12,25 318:7
318:15,18,20,24
319:3,12 322:6
322:23 323:7,10
323:20 325:7,10
325:20 326:8,14
326:21,23 327:2
327:5
superior 255:24
supervised 333:24
supervisor 296:10
296:19,22
support 118:4
supported 40:16
supportive 123:19
supports 276:6
supposed 72:24
157:17,20 267:10
267:11,16
sure 7:19,25 8:6
9:19,23 13:8
14:13,15 15:19
18:22,25 19:24
23:15 25:18
32:11 35:2,6,24
36:7,18 45:4 53:6
54:10 55:23 57:7
61:7 63:21 72:23
75:9,14,24 83:17
89:9 93:10,12
98:15 101:25
102:21 109:5

110:3,12,17,20
112:2 114:2,5
126:24 127:10
128:15 129:5,22
131:11 135:19
139:22 142:17
150:25 155:23
157:3 161:15,15
162:14 165:15,18
169:2 174:13
187:3,9 197:6,17
199:2 207:3
226:8 231:9
247:16,20 248:4
262:21 263:20
264:19 266:5
267:7 272:4
283:5 290:13
299:23 301:8
307:4 318:9
320:4 324:6
328:2 331:11
333:19 345:12
surgery 307:20
surprise 62:24
160:15,19 284:9
surprised 160:20
185:7
surprising 63:5
184:25 185:15
surrounding 107:3
survey 27:12 30:6
30:8,24 31:5
32:23,24 37:5,21
38:5 40:10 43:16
43:25 44:7,15,18
45:7,8 46:7,9,18
47:8,23 48:16
49:3,9,10,18 50:2
50:24 51:11
52:11,15,18
53:19 54:3 56:22
57:16,22 58:4,8
58:10,16,22,22
59:10,13,17,21,22
60:7 61:9,10,12
61:21 62:2,7,9,23
63:18 64:18 65:3

65:8 67:21,22
70:8 72:10 73:24
74:4,15 75:10
142:2 328:13,21
329:4,10,19
surveys 26:6,11
37:12 46:2,14,22
49:6 50:16 60:12
suspending 269:13
swam 176:20 177:8
swear 6:9
swim 110:22
116:25 120:13
121:24 128:18
swimming 113:15
116:16 117:14
switches 218:5
sworn 4:11,14 6:12
swum 113:4
symbolize 118:21
119:4
system 188:17
210:11,22 211:6
235:15

<hr>

**T**

T 352:9
tail 228:19
take 30:6 31:7
33:25 34:8 55:22
56:7 64:9,21 65:2
65:7 67:8,11 68:3
70:23 82:14
108:19 110:2
119:25 127:17
129:7,21 132:2
153:16 174:17
179:15 193:20,20
197:5 208:19
231:14 235:8
239:8 243:17
271:3 275:19
278:2 299:18
301:6 317:8
326:19,21,24
327:20 328:4
343:15
taken 55:21 57:22

58:10 71:3,15
72:4,12 73:11,19
114:8 125:20
126:2 132:23
150:15,25 151:2
151:5,17,23
152:7 160:4
170:14 347:6
351:7
takes 127:19
talent 41:23
talk 61:11 62:3
75:20 95:5,15
96:8 102:13
121:7 125:22
130:4 132:8
156:10 160:8
163:24 173:17
239:25 270:8
271:2 295:3
307:17
talked 38:25
148:11 163:3
171:4 237:12
251:5 255:21
312:12
talking 44:18
66:16,17 83:11
87:7 99:12
106:11,12 128:18
165:11 193:16,17
206:8 247:15
258:22 292:17
293:17 296:16
talks 141:12
182:12 344:19
target 259:17
targeting 261:5
teaching 332:5
team 31:14 34:19
34:22 39:6 41:9
42:7,10,20 43:4
50:4,12 180:5,10
187:10 189:4
277:14 284:21
289:25 333:3
345:12,14,24
346:4

technical 14:4
teleconference
3:10
telephone 6:20
tell 9:17 24:21
25:16 72:20
86:18 87:3 88:3
91:7,8 93:24,25
94:5 131:19
147:3,13 183:9
186:21 187:16
210:8 218:11
229:9 255:3,5
259:5 271:24
284:15 285:9
287:13 295:12,16
297:13,13 319:22
320:3
telling 45:24 85:23
100:22 102:15
156:4,11 183:3
212:5 217:3
285:10 289:24
296:4,7
tells 156:7 241:17
ten-minute 327:2
tend 275:10
tenure 193:11
term 29:17 174:2
288:4
terminate 217:20
269:17 294:7,9
337:4
terminated 124:10
165:6,15 217:21
234:13 262:12
264:9,24 267:14
268:6 273:24
274:4,16 280:7
280:23 281:5
283:11,13,16,19
297:22 309:16
312:15 324:21
325:12,23 336:21
terminating 267:17
termination 165:20
198:2,13 201:14
203:3,5 204:9

208:3,23 210:12
213:18 221:6
230:4 234:3
256:5 263:9
267:9,10 268:14
273:19 279:13
285:16 293:13
297:9,18 301:17
301:24,25 302:5
302:18,20,21
304:23 305:2,6
306:7,13 307:5,6
307:15,23 308:24
308:25 309:12
312:4,7,12
313:10,23 321:13
322:4 346:17
347:10,16 349:16
terminations 263:9
324:11
terms 19:13 26:18
27:16,20 43:13
46:4 51:13 53:23
61:13,14,15
70:10 95:13
108:14 114:9
139:19 195:14
246:9 266:24,24
267:8 278:20
285:12 313:22
329:12,22
Terrible 32:13
39:11
testified 6:13
249:13 322:2
testify 227:15
testimony 17:21
227:16 265:17
332:24
thank 8:11 110:3
127:25 128:11
150:5 171:10
231:21 234:24
243:6 263:21
264:4 286:22
317:14 318:4
thanked 201:6,19
203:8

thanks 33:15 202:5
202:12,13,19
204:15,19 208:12
208:14,16 210:25
212:18 231:22
242:22 244:9
278:7 300:2
thereof 30:25 39:2
thing 34:17 89:16
243:23 289:13,16
289:24
things 31:13 38:2
47:9 57:16 58:18
84:21 87:7
120:12 135:25
167:6 173:4,5
183:18 201:19
212:6 218:16
255:15 271:5,6
think 9:3 16:8
19:25 22:4,7
23:17 28:18
29:15 30:16
38:23 46:10
47:16 49:12
50:11,25 58:12
62:10 66:8,22
67:2 72:13 82:3
87:16 92:2,4
107:5,5 110:9
113:12,14 119:7
120:9 123:13
126:7 127:18
128:19 130:14
131:12 133:15
134:8 138:11
142:15 143:6,23
143:23 144:9
145:11 149:16
153:3 157:23
159:9 161:5
162:17 163:10,17
165:10 167:7,17
168:9,24 172:22
172:24 178:7,20
182:21 185:15,15
185:23 186:25
187:4,23 191:25

191:25 194:7
199:13 201:12
204:15,18,21
205:5 206:17
207:16,19 209:3
209:20 210:14
211:5 219:5
220:9 229:2
231:4,13 232:21
237:7,8,20 239:3
245:4 247:10
248:2 249:12
251:7 255:10
260:11,18 263:15
268:25 269:4,8
269:11,13,15
271:16,20 272:3
276:13,17,17
280:22 288:18,20
288:22 289:5,7
290:5 292:14,24
293:9,12 295:25
299:19 300:17
305:9,11,21
315:4,5 317:6
336:12 338:10,18
338:25 339:8
342:20
thinking 50:8
96:15 108:18
199:12 236:17
255:3
thinks 226:18
256:4
third 236:7 302:7
302:14 303:6
337:8 343:19
third-party 49:4
Thomas 1:11 3:5,9
6:2,2,2,15,24 7:8
7:9,10 8:8 15:4
15:11,24 16:11
17:9 18:2,13,19
19:4,10,13,21
20:20 21:15,23
22:6 23:2,12
24:16 27:6,12,13
27:17,22,24 28:8

28:19,20,25 29:9
29:24 30:5,14,25
31:9,14 32:7,13
32:18 33:2,8,12
33:22 34:10,14
35:4,6,18 36:9,10
36:24,25,25
38:24 39:3,6,11
39:17,23 40:5,20
40:23 41:6,11,20
41:25 42:2 43:14
43:23 44:2,6,16
45:2,15 46:3,8,16
47:12,15,22 48:5
48:13 49:16,21
49:23 50:3,9,11
50:21 51:6,9,12
51:23 52:3,13
53:22 54:7 55:2
55:12,24 56:7,16
56:21 57:4,13
58:5,7,20 59:16
59:19 60:6,9,19
60:24 61:4,12,23
62:19,24 63:4,15
64:2,8,16,20 65:4
65:18 66:7,15
67:9 68:15 69:3
69:10,16,24 70:6
70:15,25 71:6,12
71:18,25 72:15
73:6,10,20 74:2
74:14,25 75:16
76:25 77:13 79:4
79:17 80:2,15
81:5,11,20 82:5
82:20 83:7 84:5,8
84:15 85:2,11
86:2,5,10,22
87:15 88:7,15,25
89:4,19,24 90:10
90:19 91:3,14,21
92:9,20 93:16
94:10 95:8,19
96:2,11 97:6,20
98:6,16,21 99:8
99:15 100:2,10
101:2,7,15,22

102:17 103:16,22
104:14,18,20
105:21 106:7,10
106:21,24 107:7
107:8,13 108:4
108:12 109:8,18
109:19 110:7
111:4 112:25
113:11,18,23
114:7,14,22
115:5,9,19,24
116:4,14,23
117:7,12,20
118:7,20 119:2
119:17 120:3,19
121:6,23 122:4
122:16,23 123:8
123:21 124:3,4
124:13,19 125:3
125:8,17,24
126:10,21,25
127:4,15,24
128:10,23 129:4
130:9 131:3,25
132:13,17,21
133:3,10,19
134:17 137:18
138:2,9 139:14
139:18 140:6,17
140:23 141:19
142:11,22 143:9
143:16,17,22
144:2,7,8,17
145:2,5,8,14,19
145:25 146:8
147:2,22 148:9
148:22 149:6,7
149:10,17,19
150:3,6,13,21,23
151:18,21 152:4
152:13 153:2
154:8,14,19
155:2,13 156:20
157:7,16 158:4
158:16,24 159:3
159:13 160:2,10
160:14,23 161:3
161:10 162:25

163:19 164:6,12
164:16,18 165:6
165:8,14,25
166:11,19,24
167:3,11,14,19
168:6,12,18
169:5,10,21
170:8,11,16,20
171:7,20,22
172:15 173:14
174:9 175:5,12
175:23 176:6,13
176:16,25 177:6
177:13,19 178:2
178:5,7,13,15
179:9,20 182:12
182:24 183:3,7
183:11,16,21
184:6,14,24
185:6,10,19
186:3,10 190:9
191:7,12 192:16
193:6,19 194:9
194:16 195:2,8
195:18,23 196:11
196:25 197:13
199:4,25 200:12
200:14,22 201:9
201:15,24 202:3
202:14,23 203:10
203:20 204:2,14
204:25 205:18
206:2,3,6,15,24
207:11 208:5
209:5,8,11,16,23
210:3,7,19 211:3
211:9,18,25
212:8,20 213:4
213:19 214:15
215:2,11,21
216:7,18 217:4
217:12,16 218:10
219:18 221:17
222:6,16,22
223:7,18 224:2
224:10,12,20
225:10,21 227:11
228:11,16,25

229:25 230:11,23
231:8,12 232:13
232:25 233:11,16
233:23 234:25
235:18,22,23
236:24 238:22
239:7,15 240:3,6
240:15 242:8,16
242:19 243:5,14
245:20 247:11,19
248:25 249:3,6
249:10,18,24
250:8 251:19,25
252:8,16 253:2,7
253:12,17 254:2
254:8,19 255:22
256:9,14 257:12
257:19 258:5,9
258:17 259:13
260:8 261:14
262:6,11,16
263:19 264:13,15
266:13 267:6,22
268:18,20,23
269:23 271:15
272:8,11,16
274:10,24 275:2
278:8 279:3,24
281:3,7 284:14
284:22 285:22
286:4,5,20,23
287:9,20 288:3,9
288:12 289:4,11
290:9 291:3,20
292:4,11 293:19
294:18 295:10,19
296:8 297:3,6
299:24 300:3,15
300:19,24 301:15
302:22 303:2,8
305:4,13,24
306:14 308:12,18
310:15,24 311:15
311:19,24 313:9
313:13,20 314:3
317:15,18,23
318:3,11,16,21
319:5,9,14,17

320:22 322:7
323:3,8,14,24
325:8,14 326:2
326:12,17 327:6
327:23 328:15,18
328:22 329:2,5,7
329:11,16,20,24
330:9,17,23
331:7,25 332:12
333:6 334:2,24
335:10,17,19
336:7,15,24
337:19,25 338:7
338:14,18,21
339:4,12,19,24
340:11,17,24
341:5,12,18,23
342:4,9,19 343:4
343:23 345:10,18
346:6 347:12
348:2 349:19,24
352:5,7
thought 20:24 62:7
78:21 108:20
128:22 139:16
142:21 158:19
199:19 203:4
208:20 210:10
216:10 236:22
237:2 246:7
258:4 292:20
325:17 337:21
thoughts 198:7,17
198:20 286:2
thousand 10:19
thousands 32:22
44:12 67:24
102:9 295:25
296:2
thread 240:23
threads 9:11
threatened 124:16
three 8:16,20 22:22
57:25 120:13
121:8 134:23
142:12,13,16,17
148:12 159:14,15
198:2 201:17

208:4,12 210:15
213:18 216:16
230:4,4 249:19
259:19 291:4
305:18 331:13
337:10 346:18,20
347:19,20
tight 297:12
time 4:9 12:8 15:20
17:5 18:14 19:19
20:15 21:4,19
22:5,13 23:11
24:19,21 25:8
27:15 33:17,21
33:25 34:8 45:16
46:23 47:2,3,3
50:8 54:11 56:2,6
56:11,15 57:23
58:10 60:10,20
60:21 62:16
71:13 83:23 99:9
99:19 103:23
104:3,23 108:15
108:19 114:13
116:13 121:4
128:5,9 130:17
140:7 148:5,7
151:9 174:3
185:12 186:17
190:22 191:13
197:8,12 204:22
205:10,11 221:16
224:15,19 225:14
225:18 227:19,24
228:2 236:15
239:20 242:24
243:4 264:12,12
281:21 300:7
301:10,14 314:14
326:20 327:9,13
332:4 334:9,22
334:22 335:16
336:19 351:8
timeline 217:17
312:11
times 23:3 24:25
77:20 83:15,17
90:24 184:20

186:2 261:9
263:10 312:23
Tina 250:11
title 17:11,13,15
TK 28:19,19 36:24
36:25 135:13
138:25 139:16
144:14 147:10
162:23 181:23
today 32:9 50:10
51:11,18,25 52:7
90:3 91:5 121:9
131:5 174:25
185:7 199:11
203:22 206:12
214:9 237:2
319:10 328:8
today's 7:16
109:21 350:3
Todd 1:11 18:13
19:14 27:5,5,12
27:17 28:2,8,20
29:9,25 30:25
32:14,18 34:10
35:4,6 36:9,10,25
39:3,12,17,23
40:5,24 41:5,21
41:25 43:14 44:2
46:3 47:12 49:18
49:24 50:3,11
51:13 52:3 53:22
56:21 58:8 59:21
60:6,24 61:10,13
62:24 141:18
195:19 196:9,10
196:20 197:19
198:8 201:3
202:4 206:8,12
207:20 208:12
210:10,10,21
211:19,20 212:18
212:23 213:2,2
214:11,20 215:4
215:9 217:18
219:21 220:16
221:20 226:4,17
227:2,4 228:15
230:5 231:15

232:8,16 233:2
233:17 240:8
242:2,9 244:11
244:25 245:25
246:8 250:7,13
250:18 254:25
270:2,4 274:20
287:5,7,11,13,15
288:7,19,22
289:2,6 290:6
291:6,13,17,19,22
294:9,17 295:4
312:8 328:14,23
329:5,11,20
332:25 333:22
338:9 343:20
344:2 346:2
347:6
Todd's 30:5 55:12
220:14 280:9
told 31:14 39:6
74:15 93:25
101:4 108:6
111:9,25 126:5
135:7 137:16,17
143:25 144:10
183:14 195:20
201:5,18 202:4
203:6 289:21
297:10 308:16
319:22
Tom 154:17
181:18,21 303:9
303:18,20 304:5
305:5,22 346:16
347:2,4 349:6,8
top 9:15 22:4 25:14
60:2 82:12 92:18
117:22 118:11
120:13 186:16
188:3 199:7
205:15 222:24
226:4 241:5
244:5 272:24
273:3 296:2,3
topics 37:7
total 9:7
totally 195:10

245:12
touch 15:21 16:3
transcribed 351:9
transcript 351:11
Transitional 36:4
transparent 246:25
289:23
trash 130:5 132:8
156:10 160:8
163:25 173:17
treat 269:16
treated 63:10
64:11 65:6,11
76:13 77:3,11,16
93:20 94:3,3,23
97:22 104:5,8,25
108:7 219:6
238:3,10,13
243:9 252:10
258:20 259:7,23
260:3,12 261:4
262:8 329:12,21
336:12
treating 215:13
246:9
treatment 76:21,23
107:21 181:5
287:22 308:20
321:6 330:5
treatments 323:19
trial 4:9
tried 20:25 196:20
211:11 256:2
tries 48:23 226:20
233:4,5,6
trouble 7:22
281:15 327:25
troublemaker
97:12 107:20
236:4
Troy 241:22
true 116:15 130:22
132:17 195:9,19
196:20 223:20
255:4 292:6
320:23 351:10
truly 141:23 213:6
trust 39:24,25

61:16
truth 137:17
153:17,18,20
154:21,21 157:18
158:3 161:17,18
172:9,10,19
255:3
truthful 246:25
Truthfully 69:4
try 269:4 300:25
317:12 327:21
trying 20:11 38:20
83:11 172:5
187:20,21 197:20
198:9 201:3
202:6,20 203:2
206:10 207:21
212:3 213:10,11
221:21 228:6,12
229:19,19 287:13
289:2 290:24
322:11
TSG 5:14,18
turn 125:11 134:22
150:17 176:14
263:14 328:6
331:10 337:7
343:3,10
turnaround 262:24
262:25
turned 129:13
turning 39:15,21
40:10,22 41:4,8
41:24 129:24
136:8 237:24
turnover 14:25
15:8,17
twenty 14:9 273:16
two 10:19 13:6,9
13:14 22:21 35:5
57:23,24 77:14
77:15 138:21
139:7 142:21
144:19 147:12
163:2 174:10,15
174:24 187:18
206:10,16 208:11
208:11 211:12

213:21,23 216:17
230:25 245:8,8
249:21,23,24
252:6 254:10,17
281:11,12,14
312:21 331:13
two-minute 301:7
two-way 40:12
type 12:3 28:22,22
31:25 126:14
168:4 180:22
221:9 323:15
324:9
types 78:23 83:22
98:8,9,22 100:4
260:25
typical 40:21
120:23 142:22
143:17 206:5
Typically 119:21
309:17

_____

U

ultimate 188:10
ultimately 188:8
188:21,21 189:3
217:20 265:12
Unclear 32:14
39:12
uncomfortable
82:11 83:19
142:4 143:8
145:18 206:4
under-qualified
42:3
Underperforming
274:17
understand 47:24
57:3,5 81:3 82:25
83:4,11 86:17
96:13,14 100:13
100:24 126:13
129:25 188:11
209:17,18,21
254:20 281:24
324:24 337:17
understanding
47:7 48:24 57:18

76:7 87:17 92:11
92:16 110:11
116:24 120:6
121:10 188:23
324:16
understood 46:23
118:12
underway 260:15
unfair 76:21,23
238:16
unfairly 77:3,17
239:12 259:7
261:4 262:8
336:13
unfortunately
58:15 306:4
UNIDENTIFIED
215:19 317:14
unique 298:24
United 1:2 5:6
190:5
university 10:6,7
unprofessional
61:5 246:2
unsupportive
275:5,14,16
updated 264:14
Upper 39:19
urgency 281:25
use 29:17 35:13
80:16 195:14
229:6,6,14 288:2
288:4 290:25
usually 148:3
299:15,15

_____

V

v 1:7
vague 106:23,24
107:5 145:4
293:8
valid 230:10,12,17
230:20,24 239:5
337:4
value 95:22,23
105:24 106:2,16
106:18 120:10
236:10 331:21

values 50:20,22
51:2,4,8 59:9
Van 1:5 5:5 6:6
315:6,8,13 316:6
316:11,16 317:3
318:5,9,13,17
Vancouver 1:18
2:10 5:10 10:15
12:13 13:5 16:16
25:19 190:3,3
VAR 42:12
variable 260:25
various 47:9
184:21 228:20
vary 265:14
vendor 49:4
verbal 151:13,15
262:25 267:24
269:5,17
verbally 276:12
versus 5:5 83:13
187:11 275:11
277:9
vice 144:21 150:15
156:6 163:21
168:21 335:23
video 5:14 6:21
12:15
video-recorded 5:3
videographer 3:24
5:2 6:5,8,18,23
33:16,20 55:25
56:5,10,14 128:4
128:8 197:7,11
224:14,18 225:13
225:17 242:23
243:3 301:9,13
314:19,21 319:2
327:7,9,12 350:2
view 20:14,21,22
22:13 23:23,24
24:3 27:9,16,21
27:23 28:10,14
31:18,19 32:18
32:25 46:24
47:12 53:22 55:7
55:12 61:15,16
83:16 84:4 98:11

146:19 261:18
291:8
viewed 27:8 47:25
139:7
views 59:23
violated 265:21
292:25
violating 265:18
virtually 200:15,16
visibility 188:25
250:20 334:16
335:3
visible 306:20
vision 31:11
320:10 342:16
visually 189:20,20
vivid 347:14
voluntarily 309:25
310:2,5,10,22
VP 25:20 26:3

**W**

wait 49:20 127:19
164:23 169:22,22
169:22 209:7
278:3
waiting 210:13
waived 4:5
want 6:18 9:20
13:25 33:12,13
34:12 35:14,15
35:17 38:17 45:3
45:5 96:13 97:12
100:13 102:18,18
106:15 107:20
108:18,19 109:12
109:24 130:2,13
130:20 131:8,11
132:5 156:8
159:18 160:6
161:11 163:22
169:22 172:8,19
173:16 178:9
187:3 198:6,16
198:19 217:23,23
226:9 231:6
232:4 236:3
238:24 239:5

243:21 247:25
252:12 254:25
268:9 271:3
292:10,16 296:12
297:11,11 300:19
316:20 324:23
325:5,16,24
326:7,9,10
328:11
wanted 95:21,23
126:15 186:13
223:12 252:10
340:6 341:8,15
341:21 342:2,7
343:10,11,11
wanting 40:20
wants 95:10 105:13
105:24 130:4
132:7 156:9
160:7 163:24
217:25 218:6
236:7 238:25
265:3
Wardrop 13:7
warning 263:2,2
267:24 268:2
269:5,9,18 279:5
279:7 282:18,22
283:6,8,10,12,17
283:23
warranted 293:12
warrants 256:5
Warren 279:2
wasn't 15:19 48:19
51:19 62:20
77:24 89:8
112:10 114:10,12
116:13,21 118:9
118:9,10,17
121:3 125:2
128:25 156:18,19
158:10,10,11
161:15,15 169:2
171:24 177:11
180:21 250:23
259:16 260:5
279:13 280:16
284:7 303:13,13

304:8 305:23
306:2 307:16
310:6 325:3,12
332:22 348:3,5,6
348:7,10 349:8
349:16,17
way 19:23 21:18
33:14 36:20 49:8
66:17 82:2 88:9
96:15 97:19
110:17 120:23
121:16 139:4,8
140:13 143:17
150:17 157:9
159:4,10 173:3,8
173:24 174:12,16
174:19 175:4
181:19 187:10
201:18 205:17
206:17,23 215:14
260:11 269:16
277:12 290:16
308:6,19 313:15
ways 20:7,7 23:18
81:19 110:17
157:25 168:11
169:3 172:3,4
228:20 290:14
we'll 82:14 109:23
126:22,22 128:13
178:11 193:20,20
217:10,11 231:20
315:11 316:14,14
316:24 317:25
327:21
we're 6:16 7:3,3,4
29:18,19 33:20
128:8 148:4
149:22,23 152:12
165:11 169:19
197:4 213:12
247:15 249:16
256:13 293:16
316:9 317:8,17
318:7,20 319:3,4
326:23
we've 109:5 171:4
205:20 229:12

website 42:20
Wednesday 1:19
2:4
week 176:17 219:9
221:19 226:20
312:20
weeks 57:23 58:8
228:17 313:5
weight 175:6,6,17
175:22
weird 113:12
201:10
welcome 225:24
went 10:21 11:12
11:14,21 13:17
25:18 53:5 98:8
100:4 111:17
119:12 148:15,21
237:22 255:13
308:20,23 319:24
weren't 7:19 16:10
65:6 144:25
155:14 172:7
190:13 191:3
251:21 266:20
267:20 285:16,20
298:18
West 2:9 3:15 5:9
Western 1:3 5:7
Westin 124:6
whatsoever 60:14
69:18 164:22
WHEREOF
351:14
whichever 8:2
Whistler 180:3,5
180:11 186:11,12
white 158:11
172:25 194:19
Whitney 2:9 3:13
5:22
wide 37:7
Willis 11:13,15,18
wish 313:8,12
witch-hunt 337:15
337:18 338:5
withheld 191:14,21
192:25 259:25

260:14
withhold 193:25
194:8,10,24,24
260:13
withholding
194:17 260:10
witness 6:9,11 8:6
15:7 16:8 17:7,24
18:16 19:3,18
20:17 21:12,21
22:3,16 23:6 24:6
27:8,19 28:13
30:10 31:3,22
32:21 34:12
35:13 38:11
43:18 44:4,11,22
45:11 46:6,14,22
47:20 48:3,11
49:15 50:6,14
51:16 52:6 54:2
54:24 56:25
57:11,21 58:12
60:16 61:2,20
62:14 63:2,12,25
64:6,13,25 65:11
66:4,13,21 68:14
68:19 69:7,14,22
70:4,13,22 71:5
71:10,17,22 72:9
73:3,16 74:12,23
76:23 77:8 79:2
79:10,22 80:12
81:2,9,17 82:2,17
82:24 84:3,12,23
85:7,20 86:8,16
87:11,21 88:14
88:20 89:22 90:6
90:25 91:11,19
92:2,15 93:12,23
95:4,15 96:7,25
97:15 98:2,13,20
99:4,23 100:8,20
101:6,11,19
102:6 103:9,20
104:13 105:18
106:5,20 108:2
108:10,22 110:6
110:25 112:21

113:8,21 114:5
114:12,20,25
115:15,22 116:11
116:20 117:4,17
117:25 118:16,24
119:7,21 120:17
121:3,19 122:14
122:21 123:13,25
124:9,18 125:5
125:20 126:7,18
127:3,14 128:24
130:25 131:22
132:5,20 133:13
134:13 137:15,23
139:10 140:15,21
142:8 143:3,13
143:19 144:13
145:9,21 146:5
146:24 147:17
148:20 149:2,14
149:22 150:9,19
151:20 152:2,10
152:24 153:23
154:12,24 155:9
156:15 157:5,11
157:23 158:9,21
159:9 160:13,18
162:23 163:13
164:4,10 165:2,5
166:4,16 167:9
167:17 168:4,9
168:15,24 169:8
169:19 170:10,13
170:19 171:2
172:24 173:21
174:22 175:10,20
176:3,10 177:4
177:11,17,22
179:17 182:18,20
182:23 183:6,14
183:20 184:12,19
185:4,14,25
186:7 190:8
191:6,10 192:12
193:4,16 194:5
194:13,23 195:7
195:13 196:6,24
197:2,4 199:2,22

200:20 201:12,22
202:2,11 203:18
203:24 204:11
205:15,24 206:14
206:22 207:7,25
209:2,15 210:17
210:25 211:8,14
211:22 212:11,25
213:16 214:14,24
215:7,17 216:4
216:15,23 217:13
217:15 218:9
219:15 221:12,24
222:11,21 223:4
223:16 227:7
228:9,14,22
229:23 230:9,20
231:4 232:11,24
233:9,15,21
234:24 235:12,21
236:21 238:19
239:3,11 242:13
243:12 245:16
247:6,15 250:3
251:17,23 252:6
252:12,24 253:6
253:15,24 254:5
254:13 255:20
256:13 257:11
258:3,15 259:11
260:5 261:8,25
262:10 263:17
266:5 267:3,19
268:17,21 269:21
271:12 272:9
274:9,25 278:7
278:25 279:19,23
280:25 284:12,18
285:19 286:21,22
287:7,18,25
288:10,25 289:9
290:21 291:15,25
292:8 293:16
294:16 295:8,15
296:7 297:2
299:25 300:2,11
301:6 302:16
303:5 304:25

305:11,21 306:10
308:6 310:12,19
311:23 313:12,17
314:2,8,12
317:19 319:13,15
320:15,18 322:24
323:11,21 325:11
325:22 326:9,15
328:19 329:8,17
329:25 332:2,13
333:7 334:3,25
335:11,18,20
336:8,16,25
337:20 338:15,22
339:5,13,25
342:10,20 343:5
343:24 345:11,19
346:7 347:13
349:22 351:14
witnesses 102:12
103:13 143:21
156:18
witnessing 302:18
woman 94:22
95:20 104:24
105:23 106:14
205:13 206:18
213:11,23 221:5
238:17,24
woman's 204:22
205:21 207:4
women 42:21 63:9
63:22 64:10 65:5
67:14 68:7,11
70:17 72:6 73:12
138:21 139:7
141:14 142:21
148:16 150:17
174:10,15,24
180:12 206:4
243:8 329:12
wondering 252:17
word 29:17 37:15
80:17 174:18
177:14,17 204:22
205:12,21 207:5
229:2,14 266:10
288:2

worded 49:9
words 157:24
159:15,16 251:9
279:22,23 312:24
work 24:15,17,22
26:18,22,23
43:20,21 80:21
95:24 105:25
106:16 119:10
151:6 233:5,6,7
270:4 274:21
worked 10:22
22:21 27:3 28:3,3
29:6 75:21 93:17
205:11 345:12,13
workforce 38:18
123:20
working 11:3 22:9
24:4 43:14 60:23
75:11 96:20
110:23 114:3
117:21 119:3
270:3 280:10
316:13
works 308:7
World 10:21,22,24
11:11
world-class 343:11
worried 97:8,11
worth 41:11
worthy 207:19
wouldn't 51:3
61:21 66:25
77:23,25 78:2
87:8 94:11,12,18
98:23,24,25 99:6
104:10,23 120:17
120:21 129:9
143:11 181:8
188:15,16,17
192:18 194:21
214:8 220:4
222:11,25 228:22
228:23 233:9
235:16 254:15
255:15 256:10
266:16 285:14
286:8,15 288:2

295:16 297:24
306:5 308:22
319:13 324:2,13
325:5,16 326:7
336:8,9
writing 256:20
257:3,6,20,25
258:13 275:21
written 60:13
135:20,25 263:2
268:2 269:9
279:4,6
wrong 39:17
179:22 199:15
208:21 217:22
230:13 344:8,19
wrongdoing
196:13
wrote 135:14,23
136:10 137:12
226:24 237:5
250:18,19 251:5

**X**

X 311:20 352:1,9
352:20

**Y**

yeah 8:6 10:6,22
11:5,9 13:16
14:21,24 16:2
17:19 18:9 21:7
25:10 26:9,12,15
26:15 29:5 30:12
35:19,20 36:22
37:20 38:7,9
48:23 52:17 53:5
54:24 55:24
69:10 89:19
96:25 99:5
100:13 101:11,12
105:18 106:5
108:24 109:2,7
109:13 110:14,20
116:7 125:14
126:22 127:12,19
129:5 130:6
131:7,22 138:16

138:17 139:12
140:15 141:11
144:7 159:23
160:19 161:25
165:17 171:15
175:13,15 177:22
178:20 182:17
186:20 196:18
198:18 205:10
208:10 210:3
214:16 219:15
223:8,9 225:4
232:2,2 238:15
238:19 241:19
243:22 251:13
254:13 258:6
263:17,20 264:6
266:5 267:15
268:7,9 273:5
274:17 277:5
279:4,12 282:4
284:6 285:4,7,11
287:10 288:20
295:20 296:21
299:15 300:23
301:8,19 308:6
313:2 314:12
316:3,22 317:25
318:18 323:15,25
326:22 327:8
334:23 335:20,24
337:12 339:13,18
341:7 342:24
343:25 344:20
345:23 347:7
year 10:2,9,22 29:7
37:10 40:3
165:11 221:25
222:2
years 13:6,12,15
22:22,22 52:8
56:23 57:25 58:8
72:18,21,25
91:24 135:23,23
205:8,12 207:9
298:12 322:24,25
323:22 324:3
347:20,20

years-plus 205:9
yell 84:20 85:14
yells 83:24
York 1:3 3:16 5:8
5:16,16 124:6,7
young 278:13,18
279:2 284:2,7
342:2
younger 340:7
341:3

**Z**

zero 268:14
zone 108:16

**0**

**1**

1 5:3 242:24
248:12 249:14
250:23,25
1:45 128:5,6
10 9:11,12 248:13
10:33 200:4
10:58 2:5
10:59 5:12
10019 3:16
10577 277:16
1070 2:10
1095 2:9
11 248:13
11:31 33:17
11:31?A.M 33:18
11:32 33:21
11:32?A.M 33:19
11th 244:23 245:10
12 248:13
12:22 56:2
12:22?P.M 56:3
12:33 56:4,6,11
12:33?P.M 56:12
12:38 56:13,15
13 248:13
14 248:13
14607 3:8
15 125:12,13
182:10,16,18
226:25 248:14
15th 228:4

16 248:14
16-cv-6313 1:7 5:8
160294 1:25
17 125:12 182:11
182:15 241:2
248:14 256:16,22
337:7 343:17
17th 202:4 231:15
18 37:10 248:14
19 248:14
1985 5:9
1997 10:3
1st 26:2 58:23
256:16

**2**

2 248:13 266:6
2.1 265:10
2.3 265:16
2.3.2 264:5 266:2
2:44 128:7,9
20 9:11,12 248:14
2002 10:18
2003 10:19
2005 11:24,24
12:10
2006 11:23,25
12:11 53:17
2007 12:11
2010 12:22
2011 13:19,21
14:17
2012 14:2,19
2014 14:9,20 26:7
26:12 27:15 30:6
34:23 62:23
67:21 142:3
200:4 244:23
245:6,9,10
273:21
2015 14:22,23,24
15:2,13 58:23
124:7 142:3,20
180:2,6 273:16
320:7,20
2016 15:2,9 165:13
2019 1:19 2:4 5:11
351:15

21 234:16,23 245:4
245:21 248:14,24
248:25 249:5
331:9 343:16
344:22
22 243:20 248:14
254:22
225 352:13
22nd 351:15
23 248:14
24 248:14 286:21
293:2,12
25 248:14
2584 344:11
2585 343:19
26 248:15
26th 200:5,13
217:18
27 248:15
27th 200:4
28 248:15
29 34:13 248:15
2nd 217:22 226:20

**3**

3 248:11,13 276:11
3:49 197:8
3:49?P.M 197:9
3:57 197:10,12
30 248:15
300-plus 142:14
30th 250:11 320:20
31 248:15
311 352:14,15,16
352:17,18,19,20
31st 320:7,25
32 248:15
327 352:6
33 248:15
34 248:15 272:10
272:15 273:11
274:3 280:22
348 352:7
35 248:15
36 127:2,2,8,19,23
129:18,24 135:18
135:20 136:5,13
138:12,15 162:3