

LAURA M. LESTRADE
(212) 415-9227
FAX (212) 953-7201
lestrade.laura@dorsey.com

March 7, 2023

**<u>VIA ECF</u>**

Honorable Elizabeth A. Wolford
United States District Judge
100 State Street
Rochester, New York 14614

> Re:  Mary Van Brunt-Piehler v. Absolute Software, Inc., Absolute Software
>      Corporation, Geoff Haydon, Thomas Kenny and Todd Awtry
>      16 Civ. 6313 (EAW) (MWP)

Dear Judge Wolford,

Enclosed hereto are Defendants' counter-designations from the deposition of Daniel Berardo.

Respectfully submitted,

*/s/ Laura Lestrade*
Laura Lestrade

cc:   J. Nelson Thomas, Esq. (via ecf)
      nthomas@theemploymentattorneys.com
      Jonathan W. Ferris, Esq. (via ecf)
      jferris@theemploymentattorneys.com

      Attorneys for Plaintiff

# EXHIBIT A

# Designations

| Designation | Count |
| --- | --- |
| • Defendant's Additional Designations | 12 |

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3              WESTERN DISTRICT OF NEW YORK
 4
 5     MARY VAN BRUNT-PIEHLER,    )
 6              Plaintiff,  )
 7              v.       )  No. 16-cv-6313
 8     ABSOLUTE SOFTWARE, INC.,   )  (EAW) (MWP)
 9     ABSOLUTE SOFTWARE          )
10     CORPORATION, GEOFF HAYDON, )
11     THOMAS KENNY, and TODD AWTRY)
12              Defendants.  )
13     _____    )
14
15
16
17           DEPOSITION OF DANIEL BERARDO
18                 Vancouver, BC
19              Wednesday, May 8, 2019
20
21
22
23
24     Reported by:
          JESSICA D. ARCHIBALD
25     JOB NO. 160294
```

Page 2

```
 1
 2
 3
 4              Wednesday, May 8, 2019
 5                 10:58 a.m.
 6
 7
 8        Deposition of DANIEL BERARDO, held at
 9     the offices of DORSEY & WHITNEY LLP, 1095 West
10     Pender Street, Suite 1070, Vancouver, BC,
11     before Jessica D. Archibald, Official Reporter,
12     authorized to administer oaths in the province
13     of British Columbia.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2     A P P E A R A N C E S:
 3
 4
 5        THOMAS & SOLOMON
 6        Attorneys for Plaintiff
 7           693 EAST AVENUE
 8           ROCHESTER, NY 14607
 9        BY:   NELSON THOMAS, ESQ.,
10           via teleconference;
11
12
13        DORSEY & WHITNEY
14        Attorneys for Defendants
15           51 WEST 52ND STREET
16           NEW YORK, NY 10019
17        BY:   MARK SULLIVAN, ESQ.,
18           LAURA LESTRADE, ESQ.
19
20
21
22     ALSO PRESENT:
23        Maninder Malli, Esq., Absolute Software
24        Mike Elderkin - videographer
25
```

Page 4

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED
 3     by and between the attorneys for the
 4     respective parties herein, that filing and
 5     sealing be and the same are hereby waived.
 6        IT IS FURTHER STIPULATED AND AGREED
 7     that all objections, except as to the form
 8     of the question, shall be reserved to the
 9     time of the trial.
10        IT IS FURTHER STIPULATED AND AGREED
11     that the within deposition may be sworn to
12     and signed before any officer authorized
13     to administer an oath, with the same
14     force and effect as if signed and sworn to
15     before the Court.
16
17
18
19                 - oOo -
20
21
22
23
24
25
```

Page 5

D. Berardo

1
2  VIDEOGRAPHER:  This is the start of
3  media number 1 in the video-recorded
4  deposition of Daniel Berardo in the matter
5  of Mary Van Brunt-Piehler versus Absolute
6  Software Incorporated et al. in the United
7  States District Court Western District of
8  New York. The case number is 16-cv-6313.
9  This deposition is being held at 1985 West
10  Pender Street, Vancouver, British Columbia,
11  Canada, on May 8th, 2019, at approximately
12  10:59 a.m.
13  My name is Mike Elderkin. I am the
14  legal video specialist from TSG Reporting
15  Incorporated headquartered at 747 3rd
16  Avenue, New York, New York. The court
17  reporter is Jessica Archibald, in
18  association with TSG Reporting.
19  Will counsel please introduce
20  yourselves.
21  MR. SULLIVAN:  Mark Sullivan and
22  Laura Lestrade from Dorsey & Whitney on
23  behalf of the defendants. Also present in
24  the room is Maninder Malli, in-house
25  counsel for Absolute.

Page 6

D. Berardo

1
2  MR. THOMAS:  Nelson Thomas at Thomas
3  & Solomon on behalf of the plaintiff, Mary
4  Piehler.
5  VIDEOGRAPHER:  Will the court --
6  MS. VAN BRUNT-PIEHLER:  Mary Piehler,
7  plaintiff.
8  VIDEOGRAPHER:  Will the court
9  reporter please swear in the witness.
10  D A N I E L B E R A R D O,
11  called as a witness, having been duly
12  sworn by a Notary Public, was examined and
13  testified as follows:
14  EXAMINATION BY
15  MR. THOMAS:
16  Q:  All right. Now that we're on the
17  record, I just...
18  For the videographer, I just want to
19  confirm that the audio coming in through the
20  telephone is going in okay for the playback
21  for the video here. Is that -- are we all --
22  are we all good with that?
23  VIDEOGRAPHER:  Yes.
24  MR. THOMAS:  Okay. Perfect. And
25  then also, Mark, I just -- I know the

Page 7

D. Berardo

1
2  deposition is occurring in Canada, but I --
3  we're under -- I assume we're all in
4  agreement that we're using FRCP rules and
5  American rules of procedure and all that
6  stuff?
7  MR. SULLIVAN:  Yes, we are.
8  MR. THOMAS:  Okay. All right.
9  BY MR. THOMAS:
10  Q:  Mr. Berardo, I'm Nelson Thomas, and I
11  am the attorney representing Mary Piehler in
12  this case. Have you ever given a deposition
13  before?
14  A:  I have not.
15  Q:  Okay. What did you do to prepare for
16  today's deposition?
17  A:  We met with -- with Mark and Laura on
18  Monday, and then a couple of months back, just
19  when we weren't sure of when the deposition
20  date would be, we also met for a few hours.
21  Q:  Okay. And where was -- and I'm --
22  I'm having a little bit of trouble hearing
23  you. Can you move the microphone closer to
24  your...
25  A:  Oh, sure.

Page 8

D. Berardo

1
2  Q:  Or whichever -- I don't know where
3  the...
4  MR. MALLI:  Maybe just speak up a
5  little bit.
6  THE WITNESS:  Sure, yeah, I can speak
7  up a little bit.
8  BY MR. THOMAS:
9  Q:  Okay.
10  A:  Okay.
11  Q:  Great. Thank you. When you met with
12  Laura a few months ago, where was that?
13  A:  That was -- that was here at -- at
14  their office.
15  Q:  How long was the meeting on Monday?
16  A:  It was three hours or just under.
17  Q:  And the meeting back several months
18  ago, what was -- how long was that?
19  A:  I don't recall specifically.
20  Probably in the same neighbourhood, three to
21  four hours.
22  Q:  Did you review documents as part of
23  that process?
24  A:  We did, yes.
25  Q:  What documents did you review?

Page 9

D. Berardo

1  A:  There were some emails and -- some
2  emails. I think that's all I recall. I --
3  there was the --
4  Q:  How many --
5  A:  There was the --
6  Q:  -- in total did you get?
7  A:  I was going to say there was the --
8  also the -- a bit of the Absolute policy, a
9  section of the Absolute policy. How many
10  emails? Maybe 10 to 20 threads.
11  Q:  Besides the 10 to 20 emails and the
12  Absolute policies, did you review anything
13  else?
14  A:  Not that I recall off the top of my
15  head right now.
16  Q:  Tell me a little bit about your
17  employment history before coming to Absolute.
18  A:  Sure. Specific to HR? Or, I mean,
19  how far do you want me to go back?
20  Q:  Why don't -- let's just -- very
21  quickly, where did you graduate high school?
22  A:  Sure. I graduated high school in
23  Burnaby, British Columbia, at a high school
24  called 'Alpha Secondary.'

*(lines renumbered below)*

Page 9 (continued)
1  D. Berardo
2  A:  There were some emails and -- some
3  emails. I think that's all I recall. I --
4  there was the --
5  Q:  How many --
6  A:  There was the --
7  Q:  -- in total did you get?
8  A:  I was going to say there was the --
9  also the -- a bit of the Absolute policy, a
10  section of the Absolute policy. How many
11  emails? Maybe 10 to 20 threads.
12  Q:  Besides the 10 to 20 emails and the
13  Absolute policies, did you review anything
14  else?
15  A:  Not that I recall off the top of my
16  head right now.
17  Q:  Tell me a little bit about your
18  employment history before coming to Absolute.
19  A:  Sure. Specific to HR? Or, I mean,
20  how far do you want me to go back?
21  Q:  Why don't -- let's just -- very
22  quickly, where did you graduate high school?
23  A:  Sure. I graduated high school in
24  Burnaby, British Columbia, at a high school
25  called 'Alpha Secondary.'

Page 10

1  D. Berardo
2  Q:  What year was that?
3  A:  1997.
4  Q:  Okay. And then did you attend
5  college after that?
6  A:  Yeah, I attended university at -- I
7  graduated from Simon Fraser University, also
8  in Burnaby, British Columbia.
9  Q:  And what year was that?
10  A:  I graduated in 2002.
11  Q:  And what was your first full-time
12  employment after graduation?
13  A:  First full-time employment was an
14  office coordinator-type job at a company
15  called 'Marsh' in Vancouver.
16  Q:  And how long were you -- when did you
17  start that job, and when did you end it?
18  A:  So I started that job in 2002, and
19  then I ended in two thousand and -- 2003.
20  Q:  And what was your next position?
21  A:  Then I went to Disney World, and I
22  worked at Disney World for a year. Yeah.
23  Q:  What did -- what did you do at Disney
24  World?
25  A:  I was a Canadian cultural

Page 11

1  D. Berardo
2  representative, but, essentially, I was
3  working at Epcot in the restaurant.
4  Q:  Okay. Got it.
5  A:  Yeah.
6  Q:  Which -- what -- what country?
7  A:  Canada.
8  Q:  Okay.
9  A:  Yeah.
10  Q:  Okay. Very good. After -- after you
11  were at Disney World, where did you go next?
12  A:  So I went to -- briefly, at a company
13  called 'Willis.' I was there just for a few
14  months until I went back to Marsh.
15  Q:  What did you do at Willis?
16  A:  Same -- same -- it was an office-type
17  job; filing, mailroom, reception.
18  Q:  And then how long were you at Willis
19  for?
20  A:  It was just a few months. Just a few
21  months before I went back to Marsh.
22  Q:  And how long were you at Marsh?
23  A:  I was at Marsh until 2006, so it was
24  -- it was probably early 2005 -- early 2005 to
25  September 2006.

Page 12

1  D. Berardo
2  Q:  And what was your position there?
3  A:  Same type of position; office
4  coordinator.
5  Q:  All right. And then what was your
6  next position?
7  A:  So -- but I should say during this
8  time, I was in -- I was also in school. I was
9  in -- part-time taking a management
10  certificate in human resources, so -- in 2005
11  through 2007. In 2006, I -- I moved to a
12  company called 'Radical Entertainment' in
13  Vancouver.
14  Q:  What do they do?
15  A:  Video games.
16  Q:  Okay. And what was your role there?
17  A:  I was an HR -- HR coordinator. I
18  started off as an HR coordinator.
19  Q:  And how long were you at Radical
20  Entertainment?
21  A:  So I was there until the very end of
22  2010.
23  Q:  And what was your next job after
24  that?
25  A:  So my -- my next job was at a company

Page 13

```
             D. Berardo
 1
 2    -- it was, again, only for a couple of months
 3    before I joined Absolute. It was a mining
 4    company. The -- the name escapes me for some
 5    reason. It was a mining company in Vancouver.
 6    I was there for two and a half years. It was
 7    called 'Wardrop Engineering.' Did I -- sorry,
 8    I -- I'm not sure I said -- I was there for
 9    two and a half months.
10    Q:   Oh, okay. That's what I was going to
11    ask. Okay.
12    A:   I may have said years. It was
13    months.
14    Q:   Okay. It felt like two and a half
15    years; right?
16    A:   Yeah, it did.
17    Q:   All right. Following that, you went
18    to Absolute, and when was that?
19    A:   That was June of 2011.
20    Q:   And what was your role at Absolute?
21    A:   So I started off in June 2011 as a
22    senior HR generalist.
23    Q:   And what was your next position?
24    A:   So my next position -- so once the
25    head of -- the head of HR left -- I want to
```

Page 14

```
             D. Berardo
 1
 2    say -- it was towards the end of 2012. So
 3    when she left, I assumed the position of head
 4    of HR. My technical -- or, sorry, my -- my
 5    position was HR manager, and then subsequently
 6    promoted to HR director at some point.
 7    Q:   And approximately when was that?
 8    A:   Promoted to HR director, probably
 9    twenty -- 2014. Maybe mid-2014.
10    Q:   And what was your next position?
11    A:   So I just -- so I was an HR director
12    until I left Absolute Software.
13    Q:   Let me just make sure that I have
14    this correct.
15    A:   Sure.
16    Q:   That you were a senior HR generalist
17    when you started in June of 2011; you became
18    an HR manager when the head of HR left in
19    2012; then you became head of HR; and then HR
20    director; and then you left in 2014?
21    A:   Yeah, at the -- sorry, no, I left at
22    the very end of 2015. So December --
23    Q:   2015?
24    A:   Yeah, the very end of 2015.
25    Q:   Now, there was a complete turnover in
```

Page 15

```
             D. Berardo
 1
 2    HR between 2015 and 2016 --
 3    MR. SULLIVAN:   Objection.
 4    BY MR. THOMAS:
 5    Q:   -- at Absolute; right?
 6    MR. SULLIVAN:   Objection to form.
 7    THE WITNESS:   No, there was a -- I
 8    would say there -- there was a turnover
 9    once I had left in 2016. Not -- not
10    during --
11    BY MR. THOMAS:
12    Q:   What -- what prompted --
13    A:   -- 2015.
14    Q:   -- that? What prompted that?
15    A:   My departure.
16    Q:   And what -- what about your departure
17    prompted the turnover?
18    A:   I -- I don't -- I don't know. I --
19    I'm not sure, just because I wasn't at
20    Absolute at that time.
21    Q:   Were you -- were you in touch with
22    people who were at Absolute --
23    MR. SULLIVAN:   Objection to form.
24    BY MR. THOMAS:
25    Q:   -- in the HR department?
```

Page 16

```
             D. Berardo
 1
 2    A:   I was, yeah. I had a few -- couple
 3    people that I kept in touch with in the HR
 4    department.
 5    Q:   What did they say to you about why --
 6    what was happening?
 7    MR. SULLIVAN:   Objection to form.
 8    THE WITNESS:   I think they -- the new
 9    head of HR, they -- you know, they just
10    weren't really getting along with her.
11    BY MR. THOMAS:
12    Q:   Was that Amanda Mallow?
13    A:   It was, yes.
14    Q:   Why did you decide to leave Absolute?
15    A:   I was head-hunted by a company in
16    Vancouver, and it was just a good next step in
17    my career.
18    Q:   Now, when you were at Absolute, you
19    reported to the head of HR until -- and who
20    was the head of HR?
21    A:   Oh, no, sorry, I -- oh, sorry, until
22    she left. Sorry. Her name was Leah Rubin.
23    Q:   Okay.
24    A:   Yes.
25    Q:   And when you became HR manager, who
```

Berardo_Daniel

Page 17

1    D. Berardo
2    did you report to?
3    A:  I reported in to Errol Olsen.
4    Q:  Okay. Did you report in to Errol
5    Olsen the entire time until you left?
6    MR. SULLIVAN:  Objection to form.
7    THE WITNESS:  From -- from what I
8    recall, yes.
9    BY MR. THOMAS:
10   Q:  And when did you officially get the
11   title 'head of HR'?
12   A:  So I -- I guess I -- essentially, I
13   never had, officially, the title of 'head of
14   HR.' I was the head of HR, but -- but, again,
15   I was -- I was -- the first title was 'HR
16   manager,' and then I was subsequently promoted
17   to HR director.
18   Q:  Oh, okay.
19   A:  Yeah.
20   Q:  So when you were -- so is it your
21   testimony that when you were HR manager, that
22   was the equivalent of head of HR?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  I was leading the
25   department.

Page 18

1    D. Berardo
2    BY MR. THOMAS:
3    Q:  Okay. Did they conduct a search for
4    a replacement for Leah Rubin when she
5    departed?
6    A:  Not that I recall.
7    Q:  You just advanced into the position
8    upon her departure?
9    A:  Correct. I mean, I was, yeah, asked
10   to -- to assume the role.
11   Q:  How -- how did you feel about ABT --
12   how did you feel about Absolute sales culture
13   under Thomas Kenny and Todd Awtry during the
14   time that you were there?
15   MR. SULLIVAN:  Objection to form.
16   THE WITNESS:  Sorry, can you -- can
17   you clarify? What -- what do you mean by
18   how I felt about it? Like...
19   BY MR. THOMAS:
20   Q:  What was your -- as an HR
21   professional, what was your --
22   A:  Sure.
23   Q:  -- observation about how they were
24   conducting themselves at the company?
25   A:  Sure.

Page 19

1    D. Berardo
2    MR. SULLIVAN:  Objection to form.
3    THE WITNESS:  Okay.
4    MR. SULLIVAN:  And, Mark, what is your
5    -- and just one second. I'm -- sorry to
6    cut you off, Dan -- or Mr. Berardo.
7    Mark, what is your objection?
8    MR. SULLIVAN:  It's calling for an
9    opinion. It's also ambiguous.
10   BY MR. THOMAS:
11   Q:  Well, let me make it clear,
12   Mr. Berardo. I'm asking for your observations
13   about what you saw in terms of Thomas Kenny
14   and Todd Awtry's conduct from an HR
15   perspective while they were at -- while you
16   were at Absolute with them.
17   MR. SULLIVAN:  Objection so form.
18   THE WITNESS:  Sorry, and specifically
19   when they first came in? Is that the time
20   frame you're asking me about.
21   BY MR. THOMAS:
22   Q:  Why don't we start there and go all
23   the way through.
24   A:  Sure. Okay. So -- so I -- so,
25   previously, I -- I don't think that we --

Page 20

1    D. Berardo
2    Absolute had -- or, to my knowledge, had a
3    sales organization that was led by people that
4    had come from a larger company, a larger
5    corporation. So I saw them coming in and
6    putting in some -- some more -- or some more
7    professional ways of -- professional ways of
8    conducting -- you know, running the sales
9    organization. Kind of that was my -- that was
10   my observation, is that they were -- is that
11   they were trying to advance the sales
12   organization to be a bit more of a
13   professionally run company. Or organization.
14   Q:  What -- did your view of their -- the
15   cultures that they brought change over time?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  Did it -- are you
18   asking did it change the culture of the
19   sales organization?
20   BY MR. THOMAS:
21   Q:  No, did your view change?
22   A:  Did my view --
23   Q:  So they basically came in, and you
24   thought they brought a more professional --
25   tried to bring a more professional approach.

Page 21

D. Berardo

1   A:  It did -- it did not --
2   Q:  Was that the opinion you held the
3   entire time --
4   A:  It --
5   Q:  -- while you were there?
6   A:  Yes, it was. Yeah.
7   Q:  What -- what other observations did
8   you have about how they ran the sales culture
9   at Absolute while you were there?
10  MR. SULLIVAN:  Objection to form.
11  THE WITNESS:  I don't -- is there --
12  is there something specific -- I -- that
13  you're looking for or? Just --
14  BY MR. THOMAS:
15  Q:  Just -- just -- just your
16  observations, if -- if you saw them conduct
17  themselves in any way other than professionals
18  during the time that you were there.
19  MR. SULLIVAN:  Objection to form.
20  THE WITNESS:  You know, not that I --
21  not that I recall on the whole.
22  BY MR. THOMAS:
23  Q:  What about not on the whole, more
24  specifically?

Page 22

D. Berardo

1   MR. SULLIVAN:  Objection to form.
2   THE WITNESS:  I mean -- I mean, off
3   the top of my head, I -- I can't think of a
4   specific incident at -- at this time.
5   BY MR. THOMAS:
6   Q:  Did you think that Mr. Awtry
7   conducted himself in a professional manner
8   when he was working at Absolute from a -- let
9   me strike that.
10  What was your observation about how
11  Mr. Awtry conducted himself from an HR point
12  of view during the time that he was employed
13  at Absolute and you were there?
14  MR. SULLIVAN:  Objection to form.
15  THE WITNESS:  It -- sorry, it's hard
16  for me to answer a question -- just an
17  observation question with -- without
18  knowing kind of specifically what you're --
19  what you're asking. You know, I -- I
20  worked with him over the course of two and
21  a half years or so, maybe three years. I
22  mean, again, I -- for the most part, from
23  what I recall, he -- he always conducted
24  himself professionally.

Page 23

D. Berardo

1   Q:  Do you recall times when you felt he
2   BY MR. THOMAS:
3   was not conducting himself professionally?
4   MR. SULLIVAN:  Objection to form.
5   THE WITNESS:  I mean, there's --
6   there's a -- there's a -- I don't remember
7   anything specifically, but -- I mean, I
8   would just be speculating without referring
9   back to emails. It's just -- it was just a
10  really long time ago.
11  BY MR. THOMAS:
12  Q:  Well, from the emails you took a look
13  at on Monday --
14  A:  Sure.
15  Q:  -- do you remember anything in there
16  that made you think that he conducted himself
17  in ways other than professionally, based on
18  your observations?
19  A:  From the emails on Monday? Not that
20  I recall, no.
21  Q:  Okay. What about Mary Piehler? What
22  was your view of how she conducted herself
23  from an HR point of view -- strike that.
24  What were your observations about

Page 24

D. Berardo

1   how Mary Piehler conducted herself, from an HR
2   point of view, when both you and her were
3   working at the company?
4   MR. SULLIVAN:  Objection to form.
5   THE WITNESS:  So, you know, Mary
6   was -- you know, she -- she was very -- my
7   observations were she was very passionate
8   about her -- her business. And from --
9   from what I recall -- again, this is just a
10  broad generalization from what I
11  remember -- is that she was very -- she
12  objected to a lot of items that were coming
13  down, and that, you know, perhaps she
14  was -- she was difficult to work with.
15  BY MR. THOMAS:
16  Q:  Did you find her difficult to work
17  with?
18  A:  Not all the time. At points, from
19  what I recall, yes.
20  Q:  Tell me a time when you found her
21  difficult to work with.
22  A:  Again, it's -- it's hard to remember
23  specifics. I -- I remember just phone calls
24  where, a lot of times, our conversations would

Berardo_Daniel

**Page 25**

D. Berardo

1 be going in a round -- going around in a lot
2 of circles. Never really taking ownership of
3 situations. So it was -- it was, you know,
4 generally, never her fault.
5 Again, I preface that with saying this is
6 just a general observation, so -- so for me to
7 give a specific time when that happened would
8 be difficult for me to recall right now.
9 Q: Yeah, in speculating about it, do you
10 remember anything?
11 A: Any specific incidences?
12 Q: Yes.
13 A: Nothing off the top of my head right
14 now.
15 Q: Tell me a little bit about your
16 employment since you have left Absolute.
17 A: Sure. So I -- I went to a company
18 called 'Hyperwallet' in Vancouver. Assumed
19 the position of VP of people. And so I -- I
20 have been there ever since.
21 Q: What is your role there?
22 A: So my role is the head of HR. I will
23 preface that with saying that our company was
24 acquired by PayPal, and so my role has changed

**Page 26**

D. Berardo

1 since the acquisition, since January 1st, so
2 I'm, you know, not the VP of people. So
3 I'm -- I'm head of people for specific -- the
4 Hyperwallet division within PayPal.
5 Q: Were you aware of surveys that were
6 done of employees in 2014 to get employee
7 feedback?
8 A: Yes. Yeah.
9 Q: Did any of those -- did you get the
10 chance to see the results of those surveys?
11 A: In 2014, yes, I did. Yeah.
12 Q: Did those results raise any concerns
13 with you?
14 A: Yeah, absolutely, they did. Yeah.
15 Q: Why?
16 A: There was a -- there was a number of
17 areas the company had to work on, in terms of
18 culture -- I mean, there was -- there was
19 other areas. I mean, we -- we came up with
20 a -- with a list of areas that the company
21 needed to work on, and we came up with a plan
22 to work on them. Like, another example that
23 comes to mind is around compensation, coming
24 up with a professional compensation plan for

**Page 27**

D. Berardo

1 the company. You know, there -- there was
2 definitely other areas too that we worked on.
3 Q: Do you remember the report showing
4 serious concerns about Todd and -- Todd Awtry
5 and Thomas Kenny's professionalism?
6 MR. SULLIVAN: Objection to form.
7 THE WITNESS: So I -- I viewed -- I
8 did view some of those documents during the
9 review on Monday just very briefly, but I
10 do recall there being some comments in the
11 survey about Thomas and Todd.
12 BY MR. THOMAS:
13 Q: Did -- did those affect -- when you
14 saw them at the time in 2014, did you pay any
15 attention to them in terms of your view of
16 Thomas and Todd?
17 MR. SULLIVAN: Objection to form.
18 THE WITNESS: So, sorry, can you
19 clarify. What do you mean by in terms of
20 my view?
21 BY MR. THOMAS:
22 Q: I had asked you what your view was of
23 Thomas --
24 A: Oh, right.

**Page 28**

D. Berardo

1 Q: -- Kenny and Todd Awtry when they
2 worked at Absolute and you worked there. Do
3 you remember that a few minutes ago?
4 A: I do, yes.
5 Q: And I'm asking you, when you were
6 there and you saw these reports about the
7 professionalism of Thomas and Todd as reported
8 by people within the company, to what degree,
9 if any, did it affect your view of their
10 professionalism?
11 MR. SULLIVAN: Objection to form.
12 THE WITNESS: So from what I recall,
13 my view didn't change. Absolute had come
14 from an environment where our founder CEO
15 was very heavily sales-focussed. So it was
16 -- it was a bit of a family-type culture.
17 And so I think I knew when we were bringing
18 in Thomas and TK that -- sorry, 'TK,'
19 Thomas and Todd -- that -- that there would
20 be a shift and some resistance to the --
21 the type of culture or the type of sales
22 environment that they -- they would be
23 bringing to -- into the company.
24 BY MR. THOMAS:

Berardo_Daniel

Page 29

1    D. Berardo
2    Q:  You said the founder of the company
3    was very sales-focussed. Did I hear you
4    correctly?
5    A:  I mean, from what -- yeah, I mean, I
6    worked with him for -- until he left the
7    company for a year and a half. And so, from
8    what I recall, he was very sales-focussed.
9    Q:  And were Thomas Kenny and Todd Awtry
10   less sales-focussed than him?
11   A:  No. No. I mean, just -- it was just
12   a different -- a different approach.
13   Q:  And what -- how was that approach
14   different?
15   A:  So I think John's -- who was the
16   founder CEO -- he was a bit -- again, a bit
17   more family -- to use the word -- the term
18   'family,' but, you know, we're all in this --
19   you know, not all in this together, but we're
20   all part of the same family, for example. A
21   bit difficult to describe. Whereas they came
22   in as a bit more corporate and -- and
23   professional and buttoned-up.
24   Q:  So you're saying Thomas Kenny and
25   Todd Awtry came in as more professional and

Page 30

1    D. Berardo
2    buttoned-up?
3    A:  Correct, yes.
4    Q:  Okay. When you saw the comments
5    about Thomas and Todd's conduct at the company
6    in the 2014 survey, what steps did you take to
7    remedy the problems that were -- if any, that
8    were raised in the survey?
9    MR. SULLIVAN:  Objection to form.
10   THE WITNESS:  I don't -- I don't
11   recall specifically, but, you know, I --
12   yeah, I don't -- I don't recall
13   specifically. I'm sorry.
14   BY MR. THOMAS:
15   Q:  Do you recall generally?
16   A:  Well, I don't think that we -- you
17   know, I would be -- I would just be
18   speculating on -- on kind of the conversations
19   that I -- I may have had with my boss about
20   it, but -- but we --
21   Q:  I'm not asking you about
22   conversations with your boss. I'm asking
23   about steps that the company took in response
24   to the survey regarding the professionalism or
25   lack thereof of Thomas Kenny and Todd Awtry.

Page 31

1    D. Berardo
2    MR. SULLIVAN:  Objection to form.
3    THE WITNESS:  The company -- you
4    know, the company didn't find anything in
5    the survey that would have caused concern
6    that would have -- you know, that would
7    have made us take steps to change the -- or
8    -- or to rectify the situation.
9    BY MR. THOMAS:
10   Q:  So, for instance, when there were
11   comments about the vision and strategy of
12   company, and the comments that came back were
13   things like:
14   Thomas Kenny has not told the team
15   what the company strategy is. Poor
16   communicator and keeps information to
17   himself.'
18   The company did not view that as -- well, you
19   didn't view that as a problem that needed to
20   be remedied; correct?
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  I can't say I didn't.
23   I just don't recall. I mean, as I said
24   before, there may have been conversations,
25   and there may have been some type of -- you

Page 32

1    D. Berardo
2    know, I -- I would be speculating. You
3    know, the company listened to all the
4    comments, and there may or may not have
5    been conversations with them about
6    communicating better.
7    BY MR. THOMAS:
8    Q:  But you don't -- you -- sitting here
9    today, you don't recall changing your
10   opinion -- well, let me read you some more.
11   A:  Sure.
12   Q:  Another comment:
13   Terrible communication from Thomas
14   Kenny and Todd Awtry. Unclear strategy.
15   Poor decision-making. Questioning
16   integrity of company.'
17   That -- that was not something that made you
18   change your view of Thomas and Todd?
19   A:  So --
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  There were -- there
22   were hundreds or maybe even thousands of
23   comments in the survey, and so -- we looked
24   at the survey as a whole, so those
25   individual comments did not change my view.

Page 33

1     D. Berardo
2     MR. THOMAS:  If I could ask the court
3     reporter to give Mr. Berardo a copy of
4     Exhibit 67. So that was Awtry 67.
5     THE COURT REPORTER:  Do you mind if
6     we go off the record so I can get it out of
7     the box?
8     MR. THOMAS:  Off the record, on the
9     record, however you would like.
10    THE COURT REPORTER:  Okay. We should
11    go off.
12    MR. THOMAS:  If you want to go off,
13    I'm fine with that. If you want to stay
14    on, we can. Either way.
15    THE COURT REPORTER:  Okay. Thanks.
16    VIDEOGRAPHER:  Going off record. The
17    time is 11:31.
18    (PROCEEDINGS RECESSED AT 11:31?A.M.)
19    (PROCEEDINGS RECONVENED AT 11:32?A.M.)
20    VIDEOGRAPHER:  We're back on the
21    record. The time is 11:32.
22    BY MR. THOMAS:
23    Q:  Mr. Berardo, I'm showing you what has
24    previously been marked as Awtry Exhibit 67.
25    If you can take some time and look through

Page 34

1     D. Berardo
2     that. And this is -- this is a document you
3     saw on Monday too; correct?
4     A:  It may -- it may have been. I
5     didn't -- we didn't review it in detail. So
6     this is -- this looks similar, yes.
7     Q:  Okay. What I would like you to do is
8     read the document -- take your time -- and let
9     me know if there's any positive comments in
10    here about Thomas Kenny or Todd Awtry.
11    MR. SULLIVAN: Objection to form.
12    THE WITNESS: Okay. So you want me
13    to read all 29 pages?
14    BY MR. THOMAS:
15    Q:  If you would like, yes.
16    A:  Okay.
17    Q:  Oh, one thing before you do that,
18    Mr. Berardo, who -- ELT at Absolute refers to
19    the 'executive leadership team'; right?
20    A:  That's correct.
21    Q:  Who was on the executive leadership
22    team in the end of -- or, let's say, in August
23    of 2014?
24    A:  It -- I don't -- I -- I can't recall
25    names specifically. It would be the head of

Page 35

1     D. Berardo
2     each department. I'm sure someone could get
3     that information for you.
4     Q:  But that was -- Thomas and Todd were
5     two of those people; correct?
6     A:  Thomas for sure. Todd, I would
7     assume. But I don't know for certain.
8     Q:  All right. Go ahead and -- and you
9     can read the report, and let me know if
10    there's anything positive in there about
11    either -- either of them.
12    MR. SULLIVAN:  Objection to form.
13    THE WITNESS:  Can I use your -- do
14    you want me to highlight them -- do you
15    want me to highlight any positives, and
16    then read them to you after? Or do you
17    want me to read them as I go?
18    BY MR. THOMAS:
19    Q:  Yeah, you can read them to me -- you
20    can read them to me at the end. Yeah.
21    A:  At the end? Okay.
22    Q:  Or now. Or now, if you would like
23    to. If you've found any.
24    A:  Sure. I will just read them as I go,
25    then. I -- it's going to be -- it depends on

Page 36

1     D. Berardo
2     who you ask if this is positive or not, but
3     this -- this says:
4     Transitional feel will start to
5     settle nicely as the necessary roles are
6     filled.'
7     I'm not sure what that refers to.
8     Q:  I -- right now, I'm asking about
9     positive comments about Thomas or Todd. Is
10    that a positive comment about Thomas or Todd?
11    A:  It -- it may have been. It may not
12    have been. I don't know. It doesn't -- it
13    doesn't state the names.
14    Q:  I'm not asking you to speculate. I'm
15    only asking you to -- when you look at -- when
16    you look at something -- something that you
17    know is positive about the staff.
18    A:  Sure. With their names attached?
19    Q:  I presume so, unless there's some
20    other way you can identify that they're being
21    referred to.
22    A:  So -- yeah, so there was nothing --
23    nothing specific that I saw that called --
24    called out Thomas and TK -- sorry, I just keep
25    on saying 'Thomas and TK' -- Thomas and Todd,

Page 37

D. Berardo

1    D. Berardo
2    you know, complimenting them or -- or being
3    positive.
4    Q:    Okay. What was the purpose of this
5    survey?
6    A:    It was to gather -- gather feedback
7    from employees on a wide range of topics and
8    to help guide kind of some key -- key
9    strategic initiatives over the course of the
10   next year or 18 months.
11   Q:    And how was the information in the
12   surveys used to derive key strategic
13   decisions?
14   A:    Well, we --
15   Q:    Or what was the word you used? Key
16   strategic? What was it?
17   A:    I don't recall what I said, sorry.
18   Strategic initiatives?
19   Q:    Initiatives.
20   A:    Yeah.
21   Q:    So how -- how would the survey help
22   that?
23   A:    We identified -- I mean, I'm --
24   I'm -- I can't remember everything that we
25   did. One of the -- one of the -- one of the

Page 38

1    D. Berardo
2    things --
3    Q:    And I'm -- I'm sorry. I'm actually
4    asking a different -- different question.
5    At -- at a general level, why was this survey
6    helpful in deriving key strategic initiatives?
7    A:    Yeah.
8    Q:    How would it be used in that process?
9    A:    Yeah, and I --
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  And I should say this
12   was kind of specific to the people,
13   culture, HR, not necessarily business --
14   business strategic decisions. Why it would
15   be helpful is because it -- the feedback
16   comes directly from employees, and -- and
17   we want to ensure that we have an engaged
18   workforce. And so figuring out what is --
19   what the main issues are in the company and
20   then trying to rectify them is something
21   that's important -- was important in this
22   company, but is important in any company, I
23   think.
24   BY MR. THOMAS:
25   Q:    All right. Well, we -- we talked

Page 39

1    D. Berardo
2    about the positive, or lack thereof, comments
3    about Thomas and Todd. I would like to now
4    read you several sections from the report. I
5    will start on page DEFS1387:
6    Thomas Kenny has not told the team
7    what the corporate strategy is. Poor
8    communicator and keeps information to
9    himself.'
10   Next comment, same page:
11   Terrible communication from Thomas
12   Kenny and Todd Awtry. Unclear strategy.
13   Poor decision-making. Questioning
14   integrity of company.'
15   Turning to the next page, there's a comment:
16   Key leadership roles are leaving.
17   The wrong people. Thomas Kenny and Todd
18   Awtry have pushed out the executives; i.e.,
19   Abigail Maines. Upper management should
20   not have let this happen.'
21   Turning to page DEFS01390:
22   No manager. ELT has no integrity.
23   Thomas Kenny allows Todd Awtry to hire a
24   sibling; i.e., nepotism. Trust is broken.
25   No one will trust him.'

Page 40

1    D. Berardo
2    Next quote on that page:
3    No manager did more than one year.
4    Lack of communication and connection
5    between Thomas Kenny and Todd Awtry and
6    sales.'
7    Next comment, same page:
8    The new RD hiring of Kenny affected
9    ELT integrity.'
10   Turning to the next page of the survey,
11   DEFS1391 (as read):
12   Level of two-way communication from
13   the ELT has decreased greatly over the past
14   -- over the last nine months.'
15   Next page, DEFS01392:
16   Strongly supported by media manager.
17   Great deal of respect for this person.
18   Communication in Abigail Maines departure
19   was not handled properly. Felt inaccurate.
20   Thomas Kenny wanting to cover himself for
21   blame. Very typical behaviour.'
22   Turning to the next page, DEFS1393:
23   Disjointed organization. Thomas
24   Kenny and Todd Awtry messed up sales
25   organization. Ineffective multiple

Page 41

| | D. Berardo |
|---|---|
| 1 | D. Berardo |
| 2 | reporting for different positions. |
| 3 | Demotivated employees equals low sales.' |
| 4 | Turning to DEFS1395: |
| 5 | Current leadership of Todd Awtry and |
| 6 | Thomas Kenny not receptive to any kind of |
| 7 | feedback.' |
| 8 | Turning to DEFS1397: |
| 9 | Had a good team leader. Abigail |
| 10 | Maines let go, who was great. What has |
| 11 | Thomas Kenny contributed? Was it worth |
| 12 | it?' |
| 13 | Next quote: |
| 14 | Staff are afraid to speak about |
| 15 | management. Not encouraged. If you speak |
| 16 | up, you will lose your job.' |
| 17 | Next page (as read): |
| 18 | Get Abigail Maines back. Promote to |
| 19 | help and retain relationship with other |
| 20 | companies. Move -- need to move Thomas |
| 21 | Kennedy [sic] and 'sidekick' Todd Awtry, |
| 22 | who does not belong, and ensure we retain |
| 23 | the talent we already have.' |
| 24 | And turning to page DEFS1411 (as read): |
| 25 | Current leadership of Todd and Thomas |

Page 42

| | D. Berardo |
|---|---|
| 1 | D. Berardo |
| 2 | Kennedy -- Thomas Kenny grossly |
| 3 | under-qualified. Becomes more and more |
| 4 | apparent with decisions being made and the |
| 5 | direction they are taking the company. ELT |
| 6 | and the board not seriously concerned. No |
| 7 | communication from leadership team, |
| 8 | prioritization of non-impactful decisions, |
| 9 | questions around the rapid build-up of the |
| 10 | CER team. Don't currently have the |
| 11 | existing business to keep the people in a |
| 12 | position adequately occupied. The VAR |
| 13 | program is designed to increase business. |
| 14 | It has gotten off to an incredibly slow |
| 15 | start. Need to put some focus on |
| 16 | marketing. There are major concerns about |
| 17 | lack of adversity throughout the company. |
| 18 | Only have one female member of the ELT. |
| 19 | Have no female representation on the |
| 20 | management team listed on our website, nor |
| 21 | on our board. Women at Absolute are paid |
| 22 | less than their counterparts. Difficult |
| 23 | for them to advance their careers and |
| 24 | increase their earnings. Ethical question |
| 25 | regarding nepotism and the hiring of the |

Page 43

| | D. Berardo |
|---|---|
| 1 | D. Berardo |
| 2 | new sales manager. Claim that a local |
| 3 | candidate could not be found is essentially |
| 4 | dishonest. The sales team has serious |
| 5 | reservations about the ability to have an |
| 6 | open and honest relationship with the new |
| 7 | manager. Seem to be no efforts to brand |
| 8 | Absolute as the leader in any area -- in |
| 9 | any arena. Customers do not recognize our |
| 10 | name. Aren't seen as a leader in any of |
| 11 | our competitive spaces.' |
| 12 | Now, given those comments about the people, |
| 13 | culture, and HR, what did you do in terms of |
| 14 | working with Thomas and Todd to derive key |
| 15 | strategic initiatives based on you what saw in |
| 16 | the survey? |
| 17 | MR. SULLIVAN:  Objection to form. |
| 18 | THE WITNESS:  So -- so my role was |
| 19 | not to -- I -- I didn't have the capacity |
| 20 | to work with each individual department. |
| 21 | My role was to work on the HR initiatives |
| 22 | for the company as a whole. |
| 23 | BY MR. THOMAS: |
| 24 | Q:  What did Absolute do to rectify the |
| 25 | issues that were raised in the survey in |

Page 44

| | D. Berardo |
|---|---|
| 1 | D. Berardo |
| 2 | regard to Thomas Kenny and Todd Awtry? |
| 3 | MR. SULLIVAN:  Objection to form. |
| 4 | THE WITNESS:  I don't recall, and -- |
| 5 | I -- I don't recall. |
| 6 | BY MR. THOMAS: |
| 7 | Q:  But the purpose of the survey was to |
| 8 | have these issues raised and then rectify |
| 9 | them; right? |
| 10 | MR. SULLIVAN:  Objection to form. |
| 11 | THE WITNESS:  In -- in general, yes. |
| 12 | As I mentioned before, there are thousands |
| 13 | of comments, so it would be unlikely that |
| 14 | we would be able to address every single |
| 15 | comment in the survey. |
| 16 | BY MR. THOMAS: |
| 17 | Q:  I'm not asking about every single |
| 18 | comment in the survey. I'm talking about the |
| 19 | multiple comments I just read to you. That |
| 20 | was not something Absolute chose to address? |
| 21 | MR. SULLIVAN:  Objection to form. |
| 22 | THE WITNESS:  I don't have that |
| 23 | information. It may have been. I don't -- |
| 24 | I -- I may have had conversations -- I -- I |
| 25 | would just be speculating. I don't recall. |

Page 45

1    D. Berardo
2    BY MR. THOMAS:
3    Q:  Well, I don't want your speculation.
4    A:  Sure.
5    Q:  I want your direct knowledge of
6    anything that Absolute did to rectify the
7    issues that were raised in the survey, which
8    was one of the purposes of the survey.
9    A:  I don't --
10   MS. LESTRADE:  Objection.
11   THE WITNESS:  I don't -- I don't
12   have -- I don't have the -- I don't recall.
13   I don't recall what the company did,
14   specifically.
15   BY MR. THOMAS:
16   Q:  And you were head of HR at this time?
17   A:  That's correct.
18   Q:  And do you have any documents that
19   would refresh your recollection of anything
20   that occurred?
21   A:  Maybe. I mean, I don't have any
22   documents in front of me. There may be
23   emails. I don't recall the...
24   Q:  And you are telling -- are you saying
25   under oath that after reading the comments in

Page 46

1    D. Berardo
2    these surveys, you continued to believe that
3    Thomas Kenny and Todd Awtry brought a level of
4    professionalism in terms of sales to Absolute?
5    MR. SULLIVAN:  Objection to form.
6    THE WITNESS:  Yes, I did, after the
7    survey. Correct.
8    BY MR. THOMAS:
9    Q:  Okay. What in the survey made you
10   think they brought in a level of
11   professionalism to the sales force at
12   Absolute?
13   MR. SULLIVAN:  Objection to form.
14   THE WITNESS:  So the surveys is one
15   point in --
16   BY MR. THOMAS:
17   Q:  Sorry, let me -- let me rephrase that
18   question. What, if anything, in this survey
19   led you to believe that they brought a level
20   of professionalism to Absolute?
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  I mean, the surveys at
23   one point in time -- I -- I understood,
24   from a holistic point of view, that change
25   is hard for people, and it always is very

Page 47

1    D. Berardo
2    difficult for people. And so any time --
3    any time there's -- any time there's change
4    in organization, there's going to be people
5    that are -- that are not happy with that
6    change.
7    So -- so my understanding, when I
8    read the survey, there obviously are
9    various comments on different things, but
10   when you -- when you look at it from a --
11   from a bigger picture, it didn't change my
12   view about Thomas and Todd coming in to
13   kind of button up the -- the sales
14   organization.
15   BY MR. THOMAS:
16   Q:  What comment in here made you think
17   they were -- they came in and buttoned up the
18   sales organization?
19   MR. SULLIVAN:  Objection to form.
20   THE WITNESS:  There were no comments
21   in here that -- that did that.
22   BY MR. THOMAS:
23   Q:  Okay. And you did the survey to
24   understand how the people and culture in HR
25   roles were viewed within the company; right?

Page 48

1    D. Berardo
2    MR. SULLIVAN:  Objection to form.
3    THE WITNESS:  Sorry, can you repeat
4    that question.
5    BY MR. THOMAS:
6    Q:  Yes.
7    Can the court reporter read it back,
8    please.
9    (REPORTER READ BACK)
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  The people and culture
12   in HR roles. Sorry, I still don't --
13   BY MR. THOMAS:
14   Q:  I believe you referred to the people,
15   culture, and HR roles earlier as being what
16   this survey was looking at. Am I correct on
17   that?
18   A:  People, culture, and HR roles. I
19   mean, the -- it wasn't looking at HR roles.
20   We were --
21   Q:  Was it looking at people and culture
22   of the company?
23   A:  Yeah, we were -- it -- it tries to
24   get the -- an understanding of the level of
25   engagement within the company.

Berardo_Daniel

Page 49

D. Berardo

1
2   Q:  Do you have any reason to believe the
3   survey was done inaccurately?
4   A:  We used a third-party vendor and --
5   who was -- who was a professional company that
6   did surveys and had scientific backings around
7   the questions that they asked. So there's no
8   reason for me to believe that the way we
9   worded the survey or how we conducted the
10  survey was -- was incorrect.
11  Q:  Or the results are inaccurate? Did
12  you think the results were inaccurate?
13  A:  No.
14  MR. SULLIVAN:  Objection to form.
15  THE WITNESS:  No, I did not.
16  BY MR. THOMAS:
17  Q:  Did you share the results of the
18  survey with Todd Awtry?
19  A:  Yes. I mean, just from this email,
20  it looks like I did. Wait. Hold on. Sorry.
21  The email was sent to Thomas Kenny. So I
22  only -- it looks like I only sent it to -- to
23  Thomas. I don't recall if I had shared this
24  with Todd.
25  Q:  Did -- to what degree, if any, did

Page 50

D. Berardo

1
2   reading the survey raise concerns in your mind
3   about how Thomas Kenny and Todd Awtry were
4   running their sales team?
5   MR. SULLIVAN:  Objection to form.
6   THE WITNESS:  I can't -- I can't
7   recall -- I can't recall what I was
8   thinking at that time.
9   BY MR. THOMAS:
10  Q:  Sitting here today, what does it make
11  you think about how Thomas and Todd were
12  running their sales team?
13  MR. SULLIVAN:  Objection to form.
14  THE WITNESS:  I mean, again, the -- I
15  look at -- I mean, I -- I look at -- when I
16  look at employee surveys, I look at -- you
17  know, there -- there's a lot more than the
18  comments as well. There -- there are
19  the -- you know, there's the numerical
20  values that go with each question.
21  BY MR. THOMAS:
22  Q:  Where's the numerical values?
23  A:  I don't know. I mean, they're part
24  of the survey, obviously.
25  Q:  Do you think -- do you know if there

Page 51

D. Berardo

1
2   are any numerical values?
3   A:  Well, it wouldn't -- there would be
4   numerical values based on each question,
5   asking people to rate --
6   MR. THOMAS:  Okay. Well, first of
7   all, let me request a production of those
8   numerical values.
9   BY MR. THOMAS:
10  Q:  But I'm asking you, sitting here
11  today with that survey in front of you, how
12  does that make you feel about how Thomas and
13  Todd were conducting themselves in terms of
14  their employees in the sales organization?
15  MR. SULLIVAN:  Objection to form.
16  THE WITNESS:  Well, I -- I would -- I
17  would -- the feedback that I would give,
18  sitting here today, is that it seemed like
19  communication wasn't as good as it could
20  have been with the strategy. And so I
21  would -- I would likely give the feedback
22  to improve communication.
23  BY MR. THOMAS:
24  Q:  Let me ask you -- so from an HR
25  perspective, sitting here today, when you look

Page 52

D. Berardo

1
2   at that report, what is your observation about
3   how Thomas and Todd were conducting themselves
4   in the sales organization?
5   MR. SULLIVAN:  Objection to form.
6   THE WITNESS:  I mean, I -- I don't --
7   you're asking me here today, but how they
8   were conducting themselves was five years
9   ago, so it's hard for me to sit here to
10  answer that question when I'm reading a
11  survey that's -- you know, I just don't
12  have --
13  BY MR. THOMAS:
14  Q:  Well, this is -- let's go through
15  this. This is a survey you commissioned;
16  correct?
17  A:  That's correct, yeah.
18  Q:  And you did the survey so that you
19  could get feedback from employees; correct?
20  A:  Correct, yes.
21  Q:  And you feel the feedback was
22  accurate?
23  A:  I mean, the -- the feedback -- the
24  feedback were people's opinions, yes.
25  Q:  Which is what you were soliciting?

Page 53

```
1       D. Berardo
2       A:  Correct, yes.
3       Q:  And you have an extensive background
4       in human resources; correct?
5       A:  Yeah, we went through my background,
6       so I'm not sure if you call it 'extensive' at
7       this point, but it -- that would be -- if
8       that's your opinion, then, okay.
9       Q:  Do you have a graduate degree in
10      human resources?
11      A:  I have a -- I have a management
12      certificate from BCIT.
13      Q:  In human resources?
14      A:  That's correct, yes.
15      Q:  And how long have you been doing
16      human resources?
17      A:  Since 2006.
18      Q:  Okay. So with that as background and
19      the survey that you commissioned to find out
20      what -- how the sales organization was being
21      run and that you believe is accurate, what is
22      your view as to how Thomas Kenny and Todd
23      Awtry were performing in terms of the sales
24      organization?
25      MR. SULLIVAN:  Objection to form.
```

Page 54

```
1       D. Berardo
2       THE WITNESS:  So I need to say the
3       survey was not conducted to see how the
4       sales organization was running; it was
5       conducted for the entire company. So
6       it's -- it's difficult for me to answer --
7       BY MR. THOMAS:
8       Q:  Let's just focus on the sales --
9       let's just focus on the sales portion of it.
10      A:  Sure. I mean, my answer hasn't
11      changed from the last time you asked.
12      Q:  Which was that communication was
13      lacking --
14      A:  From reading --
15      Q:  -- at least?
16      A:  From reading this, it seemed like
17      there -- there could be improved
18      communication. From reading the comments,
19      yes.
20      Q:  And you remember no steps that you
21      took or that Absolute took when you were head
22      of HR to remedy that; correct?
23      MR. SULLIVAN:  Objection to form.
24      THE WITNESS:  Yeah, I mean, again, I
25      just can't remember the specifics.
```

Page 55

```
1       D. Berardo
2       BY MR. THOMAS:
3       Q:  And you characterized their
4       performance as being buttoned-up and
5       professional; correct?
6       A:  I -- that was my -- that was my
7       opinion or my overall view.
8       Q:  Does -- does seeing this report
9       change that?
10      A:  No. I mean, I saw the report when it
11      came out.
12      Q:  So did your view of Thomas and Todd's
13      performance remain just the same about them
14      being buttoned-up and professional before
15      reading this report as it was after?
16      A:  I mean, in general, yes, from what I
17      recall.
18      Q:  And you took no steps in regards to
19      the issues that were raised there?
20      A:  No, I didn't say that. I said that I
21      don't recall the steps that were taken.
22      Can I take a break?
23      MR. SULLIVAN:  Sure.
24      MR. THOMAS:  Yeah.
25      VIDEOGRAPHER:  Going off record. The
```

Page 56

```
1       D. Berardo
2       time is 12:22.
3               (PROCEEDINGS RECESSED AT 12:22?P.M.)
4               (PROCEEDINGS RECONVENED AT 12:33 P.M.)
5       VIDEOGRAPHER:  Back on the record.
6       The time is 12:33.
7       MR. THOMAS:  Oh, I need to take a
8       call here. Hang on. I'll be -- I'll be
9       right back.
10      VIDEOGRAPHER:  Going off record. The
11      time is 12:33.
12              (PROCEEDINGS RECESSED AT 12:33?P.M.)
13              (PROCEEDINGS RECONVENED AT 12:38 P.M.)
14      VIDEOGRAPHER:  Back on the record.
15      The time is 12:38.
16      BY MR. THOMAS:
17      Q:  All right. Mr. Berardo, what would
18      more, in your -- based on your personal
19      knowledge, what would more accurately reflect
20      the observations of the professionalism of
21      Thomas Kenny and Todd Awtry's interactions
22      with employees; what we see in the survey or
23      your -- or your recollection five years later?
24      MR. SULLIVAN:  Objection to form.
25      THE WITNESS:  Sorry, I don't -- I
```

Page 57

D. Berardo
1   D. Berardo
2   don't know how to answer that question. I
3   don't understand the question.
4   BY MR. THOMAS:
5   Q:  What part of it don't you understand?
6   A:  Can you repeat the question.
7   Q:  Sure.
8   Can the court reporter read it back.
9   (REPORTER READ BACK)
10  MR. SULLIVAN:  Objection to form.
11  THE WITNESS:  Are we -- are you
12  asking for my opinion?
13  BY MR. THOMAS:
14  Q:  Not for your opinion. Based on --
15  based on your knowledge of how well you
16  recollect things and how well the survey was
17  done, which do you -- which, in your
18  understanding personally, would be more
19  accurate?
20  MR. SULLIVAN:  Objection to form.
21  THE WITNESS:  Well, so this -- again,
22  the survey was taken in -- at one point in
23  time over the course of two weeks, and my
24  observations was over the course of two or
25  three years, so I -- I would -- I -- you

Page 58

1   D. Berardo
2   know, I would say that my recollection
3   overall is probably more accurate than
4   the -- than the employee survey.
5   BY MR. THOMAS:
6   Q:  Do you have any reason to believe
7   employees felt any better about Thomas and
8   Todd in the weeks and years after the survey
9   while you were still employed there than they
10  did at the time the survey was taken?
11  MR. SULLIVAN:  Objection to form.
12  THE WITNESS:  Yes. I mean, I think,
13  from what I recall, the communication did
14  get better. And, you know, we didn't do
15  any formal -- unfortunately, we didn't do
16  any -- we didn't do a follow-up survey
17  after this before I had left Absolute,
18  but -- but my observations were that things
19  were better.
20  BY MR. THOMAS:
21  Q:  Didn't you -- well, first of all,
22  didn't you do a survey -- a culture survey
23  June 1st, 2015?
24  A:  I -- it's -- I don't recall, but
25  it's -- it's -- it's possible. Do we -- I

Page 59

1   D. Berardo
2   don't know if we have a copy of it or...
3   Q:  Well, that -- by the guiding
4   coalitions, was it -- it was performed -- it
5   was done by the guiding coalition?
6   A:  Oh, there was -- we -- we did do a --
7   we -- we -- we did it -- it's possible we did
8   a -- I -- the guiding coalition was to
9   discover what our values were at Absolute. So
10  I -- I don't recall if that was a full survey.
11  Q:  Okay. Do you -- do you remember
12  referring to it as a 'corporate cultural
13  assessment survey'?
14  A:  I -- I don't recall what it was
15  called.
16  MR. THOMAS:  Okay. We would request
17  the production of that survey and the
18  results of it.
19  BY MR. THOMAS:
20  Q:  Did you have any other -- were you
21  aware that Todd Awtry performed a survey,
22  monthly survey of his sales employees
23  regarding their views of his performance?
24  A:  I don't -- I don't recall. Not --
25  I'm not answering that it -- it didn't happen;

Page 60

1   D. Berardo
2   I just don't recall off the top of my head
3   right now.
4   Q:  Is there any other data points that
5   you can point to that would indicate employees
6   felt that Thomas and Todd did a better job
7   after the survey was performed --
8   MR. SULLIVAN:  Objection to form.
9   BY MR. THOMAS:
10  Q:  -- during the time that you were
11  there?
12  A:  Any -- any, like, surveys or any --
13  anything that was written down?
14  Q:  Any data points whatsoever.
15  MR. SULLIVAN:  Objection to form.
16  THE WITNESS:  I mean, just -- just, I
17  guess, observations, from what I recall.
18  And --
19  BY MR. THOMAS:
20  Q:  Did you observe at the time -- did
21  you observe -- at the time that Exhibit --
22  Awtry Exhibit 67 was being done, did you
23  observe that people didn't like working with
24  Thomas and Todd?
25  MR. SULLIVAN:  Objection to form.

Page 61

```
 1        D. Berardo
 2    THE WITNESS:  Sorry, can -- can you
 3    repeat the --
 4    BY MR. THOMAS:
 5    Q:  And felt they were unprofessional?
 6    A:  Can you repeat the question?
 7    Q:  Sure.
 8    When -- well, first of all, we will
 9    request the production of the survey, monthly
10    survey by Todd Awtry.
11    But, additionally, let's talk about
12    the survey. You were aware that Thomas and
13    Todd had problems in terms of communicating
14    with their employees, in terms of employees'
15    view of their professionalism, in terms of
16    employees' view of their trust in them.
17    Correct? You were aware of -- you were aware
18    of that; correct?
19    MR. SULLIVAN:  Objection to form.
20    THE WITNESS:  So I -- I read the
21    employee survey, but I wouldn't
22    characterize it like you characterized it.
23    BY MR. THOMAS:
24    Q:  What -- what -- what of my
25    characterization don't you agree with?
```

Page 62

```
 1        D. Berardo
 2    A:  There were -- well, in the survey,
 3    there were people that did talk about the
 4    communication. Sorry, you also mentioned
 5    their professionalism?
 6    Q:  Yes. Did you -- did you read that
 7    survey and felt the people thought they were
 8    doing a professional job?
 9    A:  Sorry, when I read the survey, did I
10    think that they were doing a professional job?
11    Q:  That people were -- didn't have any
12    concerns about their professionalism?
13    MR. SULLIVAN:  Objection to form.
14    THE WITNESS:  Just for -- reading it
15    now, there were a couple comments that I
16    read, but at -- at the time, there was
17    nothing overall that -- that caused me
18    great concern.
19    BY MR. THOMAS:
20    Q:  That wasn't my question to you. My
21    question to you was to be -- well, let me ask
22    you -- let me change it. When you got this
23    survey in August of 2014, did the comments
24    about Todd and Thomas surprise you at all?
25    MR. SULLIVAN:  Objection to form.
```

Page 63

```
 1        D. Berardo
 2    THE WITNESS:  I don't recall. I
 3    don't remember.
 4    BY MR. THOMAS:
 5    Q:  You don't recall them surprising you?
 6    A:  No, I just don't recall what my
 7    reaction was.
 8    Q:  Were you concerned at all about the
 9    comment that was made about how women were
10    being treated by Absolute?
11    MR. SULLIVAN:  Objection to form.
12    THE WITNESS:  I don't -- I don't
13    recall that -- I don't recall my reaction
14    to that comment.
15    BY MR. THOMAS:
16    Q:  So, now, you're -- let me just get
17    this straight. You're head of HR when the
18    survey comes in; correct?
19    A:  That's correct.
20    Q:  How important is it for you, as an HR
21    head, to make sure that the company's not
22    discriminating against women?
23    A:  That's --
24    MR. SULLIVAN:  Objection to form.
25    THE WITNESS:  It's very important.
```

Page 64

```
 1        D. Berardo
 2    BY MR. THOMAS:
 3    Q:  One of your most important
 4    requirements as head of HR?
 5    MR. SULLIVAN:  Objection to form.
 6    THE WITNESS:  It's one of the -- it's
 7    one of the most important requirements.
 8    BY MR. THOMAS:
 9    Q:  Okay. And would you take action if
10    you heard people saying that women were not
11    being treated fairly at Absolute?
12    MR. SULLIVAN:  Objection to form.
13    THE WITNESS:  Absolutely. If someone
14    came up to me and -- and they -- they --
15    they -- of course I would, yes.
16    BY MR. THOMAS:
17    Q:  What happens if they put it in a
18    survey?
19    MR. SULLIVAN:  Objection to form.
20    BY MR. THOMAS:
21    Q:  Would you take action then?
22    A:  It would --
23    MR. SULLIVAN:  Objection to form.
24    Sorry.
25    THE WITNESS:  It would be very
```

Page 65

1       D. Berardo
2    difficult to take action on an anonymous
3    survey without specifics.
4    BY MR. THOMAS:
5    Q:  What about a complaint that women
6    weren't being treated fairly, and they were
7    being paid less? Would you take any action if
8    that came to you in a survey, or would you
9    just ignore it?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  So -- so being treated
12   fairly, there's -- there -- there's nothing
13   specific. If there was -- if there's
14   something specific, I -- I definitely would
15   look into it. Being paid fairly, again,
16   this is -- this -- you're asking me what I
17   would do now?
18   BY MR. THOMAS:
19   Q:  No, I'm asking you, as head of HR at
20   Absolute, was it your policy or practice to
21   act on complaints of sex discrimination when
22   they came across your desk?
23   A:  Well, absolutely.
24   Q:  What would cause you not to act on a
25   complaint of discrimination that came across

Page 66

1       D. Berardo
2    your desk?
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  I don't know -- I'm
5    sorry. I don't know how to answer that
6    question.
7    BY MR. THOMAS:
8    Q:  Can you think of any circumstances
9    where you shouldn't act on it if it came
10   across your desk as head of HR, a complaint
11   about being discriminated against?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  If -- if someone came
14   to me and...
15   BY MR. THOMAS:
16   Q:  I'm not talking about coming to you.
17   I'm talking about a report in any way, shape,
18   or form coming across your desk. Under what
19   circumstances would you ignore it?
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  I -- I mean, I don't --
22   I mean, I can't think of any
23   different circumstances in my head right
24   now. So, I mean, I can't say, absolutely
25   certain, that there wouldn't be a case

Page 67

1       D. Berardo
2    where I would give pause and think about
3    it. I -- I mean, I -- that's why I said I
4    don't know how to answer this question.
5    If -- if there was -- if -- if there
6    was a -- if there was someone that -- that
7    raised some sort of discrimination claim, I
8    would take action on it, absolutely.
9    BY MR. THOMAS:
10   Q:  Well, what happens if it -- well,
11   let's go to take a look at Exhibit 67,
12   DEFS1411. Do you see in the second bullet
13   point where it says:
14   Women at Absolute are paid less than
15   their counterparts. Difficult for them to
16   advance their careers and increase their
17   earnings'?
18   Do you see that?
19   A:  Yes, I do.
20   Q:  Did you or did you not read that
21   survey in August of 2014?
22   A:  So I -- I did read the survey. I
23   mean, again, there were likely hundreds or
24   thousands of comments. But I did my best to
25   go through all the -- all the -- all the --

Page 68

1       D. Berardo
2    all the comments.
3    Q:  What action did you take in regards
4    to the comment I just read you?
5    A:  I don't recall.
6    Q:  You don't recall examining the pay
7    practices of Absolute to see if women were
8    paid less?
9    A:  No, I don't recall.
10   Q:  Do you recall looking to see why it
11   was difficult for women to advance in their
12   careers and increase their earnings?
13   MR. SULLIVAN:  Objection to form.
14   THE WITNESS:  I don't recall.
15   BY MR. THOMAS:
16   Q:  Is that something you would recall
17   doing?
18   MR. SULLIVAN:  Objection to form.
19   THE WITNESS:  I don't -- I don't
20   know. I mean, I don't know if I would -- I
21   mean, it's a hard question to answer if I
22   would recall something, if I would know how
23   to -- or I would recall something that I
24   may have done in the past. I mean, I don't
25   know how to answer that question. I'm

Berardo_Daniel

Page 69

1    D. Berardo
2    sorry.
3    BY MR. THOMAS:
4    Q:   Truthfully is how I would like you to
5    answer it.
6    MR. SULLIVAN:  Objection to form.
7    THE WITNESS:  Can you -- can you
8    please repeat the question? Oh, so can you
9    please repeat the question?
10   MR. THOMAS:  Yeah, the court reporter
11   -- can the court reporter read it back,
12   please.
13   (REPORTER READ BACK)
14   THE WITNESS:  Correct. And, as I
15   said, I don't recall.
16   BY MR. THOMAS:
17   Q:   Are you aware of any documents
18   reflecting any action that you took whatsoever
19   regarding the complaint about discrimination
20   about pay disparities within Absolute?
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  I don't -- I don't
23   recall.
24   BY MR. THOMAS:
25   Q:   It was one of the most important

Page 70

1    D. Berardo
2    parts of your job. Is that what you had said?
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  Against discrimination,
5    yes, that's -- that is what I said.
6    BY MR. THOMAS:
7    Q:   And the reason that you did the
8    survey, which you believe was done accurately,
9    was to find out what strategic initiatives
10   needed to be done in terms of people and
11   culture and HR at Absolute; correct?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  For -- for the -- yes,
14   for HR and people and engagement, yes.
15   BY MR. THOMAS:
16   Q:   And someone complained to you that
17   women are not being paid as much as their
18   counterparts and it's difficult for them to
19   advance in their careers, and you can remember
20   doing nothing about that?
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  I don't recall if I --
23   if we did or did not take any action on
24   this. I don't recall. I'm sorry.
25   BY MR. THOMAS:

Page 71

1    D. Berardo
2    Q:   Is this something you should have
3    taken action on?
4    MR. SULLIVAN:  Objection to form.
5    THE WITNESS:  Are you asking me --
6    BY MR. THOMAS:
7    Q:   Or is it something you would have
8    ignored?
9    MR. SULLIVAN:  Objection to form.
10   THE WITNESS:  Are you asking me what
11   I would do right now?
12   BY MR. THOMAS:
13   Q:   No, I'm asking you at the time, under
14   Absolute's policies, is this something that
15   you should have taken a look at?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  Under Absolute --
18   BY MR. THOMAS:
19   Q:   Or is it something that you should
20   have ignored?
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  No, I -- I don't know
23   the answer -- I don't know the answer to
24   that. I...
25   BY MR. THOMAS:

Page 72

1    D. Berardo
2    Q:   You don't know if you --
3    A:   I --
4    Q:   -- should have taken any action in
5    response to a complaint by an employee that
6    women are paid less than men?
7    A:   So --
8    MR. SULLIVAN:  So objection to form.
9    THE WITNESS:  So this is an anonymous
10   survey, so -- so, again, if someone came to
11   me -- if someone came to me, obviously, I
12   would have taken action. You know, right
13   now, I mean, I -- I can't think of what I
14   would have --
15   BY MR. THOMAS:
16   Q:   I'm not asking you right now.
17   A:   So I -- I -- it's hard for my mind to
18   go back five years, so that's why I'm saying I
19   can't recall. So if you're asking me what I
20   would do now, I can tell you. I just -- I --
21   you know, I can't reverse my mind five years
22   ago.
23   Q:   Why can't -- why aren't you sure
24   about what you were supposed to have done five
25   years ago?

Page 73

1      D. Berardo
2    MR. SULLIVAN: Objection to form.
3    THE WITNESS: Well, because I
4    can't -- I can't recall what I did. So for
5    me to just speculate --
6    BY MR. THOMAS:
7    Q: I'm not asking you what you did. I'm
8    asking you what you should have done.
9    MR. SULLIVAN: Objection to form.
10    BY MR. THOMAS:
11    Q: Should you have taken a look at the
12    claim that women across the board were being
13    paid less than their counterparts at Absolute?
14    Should you have looked at that?
15    MR. SULLIVAN: Objection to form.
16    THE WITNESS: So if I was to look at
17    this right now, I -- I -- and someone had,
18    you know, pointed this out specifically,
19    I -- I would have taken a look.
20    MR. THOMAS: Okay. We would like any
21    documents that reflect any taking a look or
22    any investigation or anything that was done
23    by Mr. Berardo in regards to anything that
24    relates to the survey, but specifically
25    that section.

Page 74

1      D. Berardo
2    BY MR. THOMAS:
3    Q: Do you remember giving the -- the
4    survey to Geoff Haydon, the new CEO?
5    A: I don't remember that, no.
6    Q: Do you remember him requesting that
7    he see the names of the employees who made the
8    comments?
9    A: I don't recall.
10    Q: Is it possible that he did?
11    MR. SULLIVAN: Objection to form.
12    THE WITNESS: I mean, anything is
13    possible. It's possible that he said that.
14    BY MR. THOMAS:
15    Q: Should -- was the survey told to
16    employees that it was going to be done
17    anonymously?
18    A: Yes, it was.
19    Q: Would there be any reason that
20    Mr. Haydon should have been able to see the
21    names of the employees that made the comments?
22    MR. SULLIVAN: Objection to form.
23    THE WITNESS: I mean, from my
24    perspective, no. That's my opinion.
25    BY MR. THOMAS:

Page 75

1      D. Berardo
2    Q: But any perspective, that you're
3    aware of?
4    A: I mean, I can only give you my
5    opinion.
6    Q: Well, I'm not -- I'm not asking for
7    your opinion. But based on your role as HR
8    manager --
9    A: Sure.
10    Q: -- having conducted the survey and
11    working at Absolute, was it appropriate for
12    Mr. Haydon to see the names of the people who
13    made the comments?
14    A: Sure.
15    MR. SULLIVAN: Objection to form.
16    BY MR. THOMAS:
17    Q: From any perspective?
18    A: No. No, it would not -- it would not
19    have been appropriate.
20    Q: I would like to talk about Absolute's
21    policy when you worked there in regards to you
22    investigating complaints from employees.
23    Okay?
24    A: Sure.
25    Q: Okay. Did Absolute have a policy

Page 76

1      D. Berardo
2    about investigating complaints coming from
3    employees?
4    A: You know, I don't have the policy
5    manual in -- in front of me, but I believe it
6    was in the handbook.
7    Q: What was -- what's your understanding
8    of what that policy is?
9    A: I don't -- I don't recall the
10    specific policy. I'm sorry.
11    Q: Okay. Well, let me ask you this: If
12    someone came to you and complained about how
13    they were being treated, was that -- did you
14    have a responsibility to investigate that
15    complaint?
16    A: Absolutely. If it was discrimination
17    or -- harassment, absolutely, I had a
18    responsibility.
19    Q: Retaliation too?
20    A: Retaliation too, absolutely.
21    Q: Unfair treatment?
22    MR. SULLIVAN: Objection to form.
23    THE WITNESS: Unfair treatment of --
24    of -- of what?
25    BY MR. THOMAS:

05/08/2019   Case 6:16-cv-06313-EAW-MWP   Document 356   Filed 03/07/23   Page 23 of 91
Berardo_Daniel

Page 77

```
 1     D. Berardo
 2   Q:  That an employee comes and says
 3   they're being treated unfairly by their
 4   manager in the company. Do you have a duty
 5   to -- did you have a duty to investigate that?
 6   A:  Based --
 7   MR. SULLIVAN:  Objection to form.
 8   THE WITNESS:  Based on their -- based
 9   on their gender or based on their age or --
10   or based on protected grounds? Or -- or
11   just that they're not being treated fairly
12   in their opinion?
13   BY MR. THOMAS:
14   Q:  Well, let's break it down into two --
15   two categories. Let's start with a complaint
16   on any basis. Just that 'I'm being treated
17   unfairly.' Did you have an obligation to
18   follow up to see what was going on?
19   A:  Well, I would ask the employee on --
20   on what basis. You know, a lot of times,
21   there's -- oftentimes, there's always
22   disagreements between managers and employees,
23   so I wouldn't be following up --
24   Q:  No, it wasn't -- sorry. Go ahead.
25   A:  No, I wouldn't be following -- I was
```

Page 78

```
 1     D. Berardo
 2   just going to say I wouldn't be following up
 3   on every single -- every single, you know,
 4   management/employee disagreement, unless it
 5   was something that I had a duty to
 6   investigate.
 7   Q:  And what did you consider those
 8   duties to -- the duty to investigate covered
 9   what?
10   A:  Well, anything -- anything that -- if
11   there was someone who was being discriminated
12   on -- based on protected grounds, any -- any
13   sort of bullying or -- or sexual harassment.
14   Q:  You said bullying, sexual harassment,
15   discriminated. Anything else?
16   A:  I mean, if someone came to me --
17   any -- any sort of, like, crimes, anything --
18   fraud, embezzlement. I mean, anything of that
19   nature, anything illegal.
20   Q:  Would there ever be a reason for --
21   you described the grounds that you thought you
22   had a duty to investigate. Would there ever
23   be a reason not to investigate those types of
24   complaints?
25   MR. SULLIVAN:  Objection to form.
```

Page 79

```
 1     D. Berardo
 2   THE WITNESS:  Not that I'm -- not
 3   that I'm aware of.
 4   BY MR. THOMAS:
 5   Q:  And in addition to -- did you have
 6   any obligation besides simply investigating
 7   them? Did you have a duty to remedy the
 8   problems?
 9   MR. SULLIVAN:  Objection to form.
10   THE WITNESS:  The -- I mean, the --
11   the company to investigate and -- or --
12   and to remedy the situation. Not just to
13   investigate, to substantiate the
14   allegation. If the allegation was
15   substantiated, then to ensure that -- that
16   it was corrected.
17   BY MR. THOMAS:
18   Q:  What level of harassment by a manager
19   to their -- to their employee was okay at
20   Absolute?
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  What level of, like,
23   sexual harassment? Are you asking about
24   sexual harassment? Or what do you mean,
25   'harassment'?
```

Page 80

```
 1     D. Berardo
 2   BY MR. THOMAS:
 3   Q:  Okay. Well, let's say sexual
 4   harassment. What level of sexual harassment
 5   was okay at Absolute?
 6   A:  There was no -- there was no level of
 7   sexual harassment that was okay.
 8   Q:  What level of -- is it okay for a
 9   manager at Absolute just simply to harass an
10   employee, even if it's not sexual?
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  I mean, I would -- I
13   would need to you clarify what you meant by
14   'harassment.' If you --
15   BY MR. THOMAS:
16   Q:  What do you mean by -- when you use
17   the word 'harassment,' what do you mean by
18   'harassment'?
19   A:  Well, generally, harassment is sexual
20   harassment, if -- I mean, if a manager is
21   stalking someone outside of work. I mean...
22   Q:  What happens if it's not sexual in
23   nature? Is it okay to be -- for a manager to
24   harass their employee at Absolute?
25   MR. SULLIVAN:  Objection to form.
```

Page 81

```
1        D. Berardo
2    THE WITNESS:  Again, I -- I need to
3    understand specifically the example that
4    you're asking about.
5    BY MR. THOMAS:
6    Q:   So there are some -- some forms of
7    harassment by a manager that might be okay?
8    MR. SULLIVAN:  Objection to form.
9    THE WITNESS:  I -- that's not what I
10   said.
11   BY MR. THOMAS:
12   Q:   Well, what about -- why do you -- I
13   mean, what is confusing to you about the
14   question?
15   A:   Well, harassment --
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  Harassment can be -- it
18   can -- it can be defined in many different
19   ways by many different people, so I --
20   BY MR. THOMAS:
21   Q:   Give me a definition of harassment
22   that would be okay -- that someone could
23   define something as harassment that would be
24   okay at Absolute.
25   MR. SULLIVAN:  Objection to form.
```

Page 82

```
1        D. Berardo
2    THE WITNESS:  I mean, the -- the way
3    I define harassment, I don't think anything
4    would be okay, if -- if --
5    BY MR. THOMAS:
6    Q:   And you define it as...?
7    A:   I -- I define it as kind of
8    nonbusiness -- nonbusiness-type behaviour of a
9    sexual or nonsexual nature that -- that, you
10   know, makes the other employee feel
11   uncomfortable. I mean, again, this is just
12   off the top of my head, so it's hard for me to
13   come up with a full definition.
14   Q:   We'll take that definition. Was that
15   ever okay at Absolute?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  If -- if someone was
18   harassing someone for nonbusiness reasons,
19   no, it was not okay.
20   BY MR. THOMAS:
21   Q:   If they were harassing them for
22   business reasons, was it okay?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  I guess I need to
25   understand -- I mean, you're asking me
```

Page 83

```
1    the -- you're asking me harassment for
2    business reasons. I don't -- I don't -- I
3    need to understand what your definition of
4    harassment is for me to answer that
5    question.
6    BY MR. THOMAS:
7    Q:   I'm going of your definition, and
8    you said for nonbusiness -- you -- you said
9    'for nonbusiness reasons.' So I'm asking --
10   I'm trying to understand what you're talking
11   about. And so when you say nonbusiness
12   reasons versus business reasons, what is the
13   difference between those?
14   A:   Well, there's a lot of times --
15   Q:   In your -- in your -- in your view.
16   A:   Sure. There's a lot of times with a
17   manager and an employee when there are
18   uncomfortable conversations about performance;
19   correct -- changing your performance,
20   correcting performance. And so, you know,
21   those -- those types of business conversations
22   happen in companies all the time.
23   Q:   Is it okay if a manager yells at an
24   employee during a business conversation?
```

Page 84

```
1        D. Berardo
2    MR. SULLIVAN:  Objection to form.
3    THE WITNESS:  I mean, in -- in my
4    view, it's not a best practice.
5    MR. THOMAS:
6    Q:   Is it -- at Absolute, was that okay?
7    MR. SULLIVAN:  Objection to form.
8    BY MR. THOMAS:
9    Q:   Like, was that okay for a manager to
10   do?
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  I mean, I -- I can't
13   speak on behalf of the company. I mean,
14   for myself --
15   BY MR. THOMAS:
16   Q:   Well, I'm asking on behalf of HR for
17   the company.
18   A:   Well, I said --
19   Q:   As an HR -- as an HR -- as head of
20   HR, was it okay for managers to yell at
21   employees about business things?
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  It's -- it's not
24   something that I would encourage.
25   Absolutely not. Not a best practice.
```

Berardo_Daniel

Page 85

1   D. Berardo
2   BY MR. THOMAS:
3   Q:  I'm not asking whether it's a best
4   practice. I'm asking if -- was it okay at
5   Absolute for a manager to do that?
6   MR. SULLIVAN:  Objection to form.
7   THE WITNESS:  I would -- if I found
8   out the manager was doing that, I would
9   coach the manager on how to communicate a
10  bit more effectively.
11  BY MR. THOMAS:
12  Q:  Which would mean not to do it?
13  A:  Which would mean --
14  Q:  Not to yell?
15  A:  -- not to do it, yes.
16  Q:  Okay. What about falsely accusing
17  someone of stealing? Is that something a
18  manager should do at Absolute?
19  MR. SULLIVAN:  Objection to form.
20  THE WITNESS:  Falsely accusing
21  someone of stealing. I mean, if -- if it
22  was false, obviously, the manager shouldn't
23  be telling an employee that they're
24  stealing if they're not stealing. I
25  mean...

Page 86

1   D. Berardo
2   BY MR. THOMAS:
3   Q:  And that was not allowed at Absolute?
4   MR. SULLIVAN:  Objection to form.
5   BY MR. THOMAS:
6   Q:  Or was it allowed?
7   MR. SULLIVAN:  Objection to form.
8   THE WITNESS:  Was it allowed at
9   Absolute? I mean, are you --
10  BY MR. THOMAS:
11  Q:  Was -- let me rephrase the question.
12  Was it or was it not allowed at Absolute for
13  managers to falsely accuse their employees of
14  stealing?
15  MR. SULLIVAN:  Objection to form.
16  THE WITNESS:  Again, I don't really
17  understand the question. You're asking me
18  if it was okay for a manager to tell an
19  employee that he or she is stealing when
20  they're not stealing. Is that what you're
21  asking me?
22  BY MR. THOMAS:
23  Q:  Correct.
24  A:  So I would say that --
25  Q:  Yes.

Page 87

1   D. Berardo
2   A:  -- that would not be okay for a
3   manager to tell an employee that they're
4   stealing when they're not stealing or when
5   there's no evidence of stealing.
6   Q:  And you're saying that -- you said a
7   few things, but you're talking about under
8   Absolute policy; right? That wouldn't be
9   acceptable?
10  MR. SULLIVAN:  Objection to form.
11  THE WITNESS:  No, I'm not saying
12  under Absolute policy, just because I don't
13  have the policies in front of me. I -- I
14  don't recall the policies.
15  BY MR. THOMAS:
16  Q:  Do you think it was -- was it your
17  understanding that it was okay for people --
18  for a manager to falsely accuse someone of
19  stealing at Absolute under Absolute's polices?
20  MR. SULLIVAN:  Objection to form.
21  THE WITNESS:  Again, I don't have the
22  policies in front of me, so I don't recall
23  specific policies about anything against
24  managers specifically or in the policy
25  for -- you know, anything in the policy

Page 88

1   D. Berardo
2   that would say that managers are not
3   allowed to tell employees that they are
4   stealing when they're not stealing. I
5   don't know if the policy covered that
6   specifically.
7   BY MR. THOMAS:
8   Q:  It might have; it might not. Either
9   way, it could have -- Absolute -- it could
10  have been okay at Absolute for that to happen;
11  right?
12  A:  I --
13  MR. SULLIVAN:  Objection to form.
14  THE WITNESS:  That's not what I said.
15  BY MR. THOMAS:
16  Q:  Okay. Sitting here right now, is it
17  possible that under Absolute's policy, falsely
18  accusing an employee of stealing was okay?
19  MR. SULLIVAN:  Objection to form.
20  THE WITNESS:  I don't -- I can't
21  answer that question because I don't have
22  the policy in front of me, and I -- I don't
23  have intimate knowledge with the policy
24  right now.
25  BY MR. THOMAS:

Page 89

D. Berardo

1    D. Berardo
2    Q:  So it's possible --
3    MR. SULLIVAN:  Objection to form.
4    BY MR. THOMAS:
5    Q:  -- that that was okay?
6    A:  I --
7    Q:  Because if it's not possible, the
8    answer is, no, that wasn't allowed under
9    Absolute policy. If you say you're not sure,
10   it means maybe it's possible; maybe it isn't.
11   Right?
12   A:  I mean, I'm just saying I just don't
13   recall. I don't recall --
14   Q:  Okay.
15   A:  -- the policy. I'm sorry.
16   Q:  Maybe that sort of thing is what can
17   happen at Absolute?
18   MR. SULLIVAN:  Is that a question?
19   MR. THOMAS:  Yeah.
20   MR. SULLIVAN:  Objection to the form
21   of that question.
22   THE WITNESS:  Can you repeat the
23   question, please.
24   BY MR. THOMAS:
25   Q:  So maybe it was okay at Absolute for

Page 90

D. Berardo

1    D. Berardo
2    managers to falsely accuse their employees of
3    stealing? As you sit here today, that might
4    have been okay?
5    MR. SULLIVAN:  Objection to form.
6    THE WITNESS:  Well, I don't have the
7    information in front of me about the
8    policy, so I -- I can't answer whether it
9    would be okay or not okay.
10   BY MR. THOMAS:
11   Q:  But maybe?
12   MR. SULLIVAN:  I'm sorry. I didn't
13   hear that. Can you --
14   THE COURT REPORTER:  But maybe.
15   MR. SULLIVAN:  Oh. Objection to
16   form.
17   I'm sorry. Was that a question again
18   or a statement?
19   MR. THOMAS:  A question. Maybe,
20   question mark.
21   MR. SULLIVAN:  Objection to form.
22   MS. LESTRADE:  Asked and answered.
23   MR. SULLIVAN:  And asked and answered
24   multiple times.
25   THE WITNESS:  So as I have answered

Page 91

D. Berardo

1    D. Berardo
2    before, I don't have --
3    BY MR. THOMAS:
4    Q:  So let me -- let me -- let me
5    rephrase the question. As you sit here today,
6    you can't foreclose the possibility that
7    Absolute would allow managers to tell their
8    employees that they -- tell their employees
9    falsely that they were stealing stuff; right?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  I mean, based on the
12   policy, I -- I just -- I don't have the
13   information to say yes or no to that.
14   BY MR. THOMAS:
15   Q:  Based on what your knowledge is of
16   Absolute, do you have the ability to say yes
17   or no to that?
18   MR. SULLIVAN:  Objection to form.
19   THE WITNESS:  Based on my knowledge
20   of Absolute? So not the policy?
21   BY MR. THOMAS:
22   Q:  As serving -- as serving there in --
23   as head of HR for -- or the HR department for
24   four-plus years.
25   MR. SULLIVAN:  Objection to form.

Page 92

D. Berardo

1    D. Berardo
2    THE WITNESS:  So I think I have
3    answered the question before, that if -- do
4    I think it's okay for a manager to say to
5    an employee that he or she is stealing when
6    they're not stealing. My opinion is
7    that -- my opinion is that that would not
8    be okay when I was the head of HR.
9    BY MR. THOMAS:
10   Q:  And that would be -- and your
11   understanding is that would be against policy
12   when you were head of HR there; correct?
13   A:  No.
14   MR. SULLIVAN:  Objection to form.
15   THE WITNESS:  That is -- that's not
16   my understanding. Because I -- I have
17   already answered that I don't have
18   knowledge of the policy off the top of my
19   head, so I can't answer that question.
20   BY MR. THOMAS:
21   Q:  What does -- what did Absolute policy
22   require you in HR to do to remedy harassment
23   of employees by their managers?
24   A:  I don't -- I -- I don't recall the
25   specific policy.

Page 93

D. Berardo

1    Q:  In general. Do they require you to
2    do anything or not?
3    A:  In -- if someone was sexually -- if
4    someone has -- had accused someone of sexually
5    harassing? Is that what you're asking?
6    Q:  Or just harassment on any -- on any
7    basis -- on any basis, based on their
8    complaints of discrimination, based on gender.
9    A:  Sure.
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  Sure. If it -- if
12   there was harassment based on gender or
13   discrimination, we definitely would have to
14   investigate.
15   BY MR. THOMAS:
16   Q:  When you worked at Absolute, did you
17   consider someone to be complaining about
18   discrimination only if they specifically said
19   they were being treated illegally under
20   discrimination laws?
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  Well, no. I -- someone
23   could tell me -- you know, someone could
24   tell me -- you know, if someone told me --

Page 94

D. Berardo

1    I mean, someone doesn't have to say 'I was
2    treated -- I was treated illegally based on
3    protected grounds.' I mean, they would
4    likely tell me the circumstances, and then
5    we could determine if it was sexual
6    harassment or -- or bullying or -- or
7    something that they were being
8    discriminated based on protected grounds.
9    BY MR. THOMAS:
10   Q:  And it wouldn't be just statements --
11   you wouldn't require them to make a statement
12   to you like 'I'm being discriminated against
13   on the basis of sex' before you would you
14   consider it a --
15   A:  No.
16   Q:  -- complaint; correct?
17   A:  No. Absolutely. Someone wouldn't
18   have to specifically say they were being
19   discriminated on the basis of sex.
20   Q:  If somebody came to you and said --
21   let's say a woman came to you and said 'all
22   I'm asking -- all I'm asking is to be treated
23   the same' in comparison with her male
24   employees, would you -- would that raise an

Page 95

D. Berardo

1    issue of discrimination with you?
2    MR. SULLIVAN:  Objection to form.
3    THE WITNESS:  I -- I would -- I would
4    talk to that employee to get a -- get some
5    specifics on -- on what she may be speaking
6    about.
7    BY MR. THOMAS:
8    Q:  What happens if a female employee
9    came to you and said that she just wants to be
10   paid fairly? Would that -- would you consider
11   that to be something that you needed to follow
12   up on in terms of potential discrimination?
13   MR. SULLIVAN:  Objection to form.
14   THE WITNESS:  I would definitely talk
15   to her about specifics of -- of what she
16   would be referring to so I could -- I could
17   investigate further.
18   BY MR. THOMAS:
19   Q:  What happens if a woman came to you
20   and said that she wanted to -- when she said
21   that a male employee was being paid full value
22   and that she wanted to be paid full value too
23   for her work?
24   MR. SULLIVAN:  Objection to form.

Page 96

D. Berardo

1    BY MR. THOMAS:
2    Q:  Would that have raised a concern in
3    your mind that you needed to look at potential
4    discrimination?
5    MR. SULLIVAN:  Objection to form.
6    THE WITNESS:  Again, I -- I would --
7    I would -- I -- I would talk to the
8    employee to get -- to gather more
9    information.
10   BY MR. THOMAS:
11   Q:  Why?
12   A:  Because I would understand -- want to
13   understand why the employee -- why the
14   employee is thinking that way, who is the --
15   who the employee is comparing themselves to.
16   We would need to look at, you know, probably a
17   whole bunch of different factors on, you know,
18   what job they're doing, what level they're
19   working at, what their experience, their
20   background, their education is.
21   Q:  And you would follow up on -- on
22   comments like that?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  Yeah, if someone -- if

Page 97

D. Berardo

1   someone came to me and -- I would
2   definitely be having that conversation with
3   that person to -- to gather more
4   information from that person.
5   BY MR. THOMAS:
6       Q:  What happens if an employee came to
7   you and said that she's worried about being
8   retaliated -- it -- well, strike that.
9   What happens if an employee came to
10  you and said that she was worried that she
11  doesn't want to be known as a 'troublemaker'?
12  Would that raise concerns with you?
13  MR. SULLIVAN:  Objection to form.
14  THE WITNESS:  Well, I mean, it
15  would -- it would definitely set off some
16  red flags in my -- in my mind. And I would
17  -- I would ask some probing questions on --
18  on why the employee felt that way.
19  BY MR. THOMAS:
20      Q:  What happens if a female employee
21  came to you and said that she's being treated
22  differently than her male counterparts? What
23  would you do?
24  MR. SULLIVAN:  Objection to form.

Page 98

D. Berardo

1   THE WITNESS:  I would ask -- I -- I
2   would ask, again, specific questions and
3   follow up and get -- get some more
4   specifics from that employee.
5   BY MR. THOMAS:
6       Q:  These -- is it fair to say all these
7   types of questions that we went over would be
8   the types of questions that would raise red
9   flags in your mind from a discrimination point
10  of view in HR?
11  MR. SULLIVAN:  Objection to form.
12  THE WITNESS:  It would cause me to
13  ask some more questions to the employees
14  for sure.
15  BY MR. THOMAS:
16      Q:  Because, potentially, the complaints
17  are about discrimination; right?
18  MR. SULLIVAN:  Objection to form.
19  THE WITNESS:  Potentially.
20  BY MR. THOMAS:
21      Q:  There are other types of questions
22  that employees would ask you that wouldn't
23  raise any red flags, and you wouldn't need to
24  follow up on; correct? Because they wouldn't

Page 99

D. Berardo

1   be suggesting discrimination; right?
2   MR. SULLIVAN:  Objection to form.
3   THE WITNESS:  I mean, there's --
4   yeah, employees could ask me a whole bunch
5   of different questions that wouldn't raise
6   red flags for me.
7   BY MR. THOMAS:
8       Q:  Well, most -- and most of the time,
9   when employees ask you questions, you don't
10  feel the need to ask more probing questions to
11  find out if they're talking about
12  discrimination. Is that fair to say?
13  MR. SULLIVAN:  Objection to form.
14  BY MR. THOMAS:
15      Q:  When you were at Absolute?
16      A:  No, that's not fair to say.
17      Q:  Do you say that most -- do you say
18  that, most of the time employees ask you
19  questions, you feel the need to probe more to
20  see if there's discrimination going on?
21  MR. SULLIVAN:  Objection to form.
22  THE WITNESS:  It -- it depends what
23  kind of questions they've asked -- they
24  asked me.

Page 100

D. Berardo

1   BY MR. THOMAS:
2       Q:  Okay. And, in fact, the questions we
3   just went over would be the types of questions
4   that would suggest potential discrimination to
5   you; right?
6   MR. SULLIVAN:  Objection to form.
7   THE WITNESS:  They would cause me to
8   ask more questions, yes.
9   BY MR. THOMAS:
10      Q:  Because of discrimination; right?
11      A:  Well, just because, in my head, I --
12  I would want to understand if -- yeah, if
13  there was some sort of discrimination or -- or
14  harassment.
15      Q:  Now, you say that you would ask more
16  probing questions. How would you -- what do
17  you mean by that?
18  MR. SULLIVAN:  Objection to form.
19  THE WITNESS:  I would ask some
20  follow-up -- I mean, it depends on what
21  they're telling me, but I would ask some
22  follow-up questions, and I would ask for
23  specifics so I -- so I could understand the
24  situation.

Page 101

```
1     D. Berardo
2   BY MR. THOMAS:
3     Q:  Would you document what the employee
4    told you?
5   MR. SULLIVAN:  Objection to form.
6   THE WITNESS:  I -- I --
7   BY MR. THOMAS:
8     Q:  In response to -- in response to your
9    questions?
10  MR. SULLIVAN:  Objection to form.
11  THE WITNESS:  Yeah, I -- I would -- I
12   mean, yeah, if -- if they were coming to me
13   for -- for -- for something that may be
14   discriminatory, I would document it.
15  BY MR. THOMAS:
16    Q:  And what sort of follow-up would you
17   do after you documented their responses?
18  MR. SULLIVAN:  Objection to form.
19  THE WITNESS:  So if there was --
20   sorry, if there was discrimination, or if
21   there was not discrimination?
22  BY MR. THOMAS:
23    Q:  Well, once you asked the follow-up --
24   what would you -- let me ask you this --
25    A:  Sure.
```

Page 102

```
1     D. Berardo
2     Q:  -- what would you do to further
3    investigate whether there was discrimination
4    based on what the employee said?
5   MR. SULLIVAN:  Objection to form.
6   THE WITNESS:  You know, it would --
7    it would depend on the -- it would depend
8    on the circumstances. I mean, there could
9    be thousands of situations, so it really
10   would -- it really would depend.
11   Oftentimes, we have to look at was there
12   anyone else in the room, witnesses. I
13   would -- you know, again, this is just
14   me -- this is what I would do -- I'm just
15   telling you what I would do right now. Not
16   back then.
17  BY MR. THOMAS:
18    Q:  I want -- I want to talk about what
19   you would do -- what you would do when you
20   were head of HR at Absolute.
21    A:  Sure. I mean, we would -- we would
22   have to investigate any sort of
23   discriminations, and we would, you know, do so
24   by -- I would do so by, you know, raising it
25   with our legal counsel to help guide us
```

Page 103

```
1     D. Berardo
2    through that of -- of any -- with any sort of
3    investigations that we may have to -- we may
4    have to conduct.
5     Q:  Would you raise the issues with the
6    people who were being accused of doing the
7    discrimination?
8   MR. SULLIVAN:  Objection to form.
9   THE WITNESS:  It's based on -- based
10   on the -- it's -- it's based on -- I mean,
11   it would be based on the circumstances,
12   but, oftentimes, you do have to interview
13   the witnesses, and -- and those that are
14   being accused to come up with the -- with
15   the answer.
16  BY MR. THOMAS:
17    Q:  Would you document those
18   interactions?
19  MR. SULLIVAN:  Objection to form.
20  THE WITNESS:  Yes, you would -- you
21   would document those interactions.
22  BY MR. THOMAS:
23    Q:  Is there ever a time when, if an
24   employee raised the sorts of questions I
25   just -- well, let me -- let me go back through
```

Page 104

```
1     D. Berardo
2    that.
3    Is there ever a time that an
4    employee said something to you like 'all I ask
5    for is to be treated the same --' if a female
6    employee -- strike that.
7    If a female employee said something
8    like 'all I ask is to be treated the same'
9    when comparing herself to male counterparts,
10   is there ever a situation where you wouldn't
11   follow up and ask questions of her about that?
12  MR. SULLIVAN:  Objection to form.
13  THE WITNESS:  So if -- I mean --
14  MR. THOMAS:  What is -- what is the
15   basis of the objection?
16  MR. SULLIVAN:  It's calling for a
17   hypothetical.
18  MR. THOMAS:  No, I'm -- okay. Then
19   let me make it clear.
20  BY MR. THOMAS:
21    Q:  Under Absolute's policy and
22   practices, as HR manager, would there ever be
23   a time that you wouldn't follow up and ask a
24   woman further questions when she says 'all I
25   ask is to be treated the same' and comparing
```

Page 105

```
1       D. Berardo
2    herself to male colleagues?
3    A:  So, again, I can't speak to the
4    policy specifically, because I don't have it
5    in front of me right now. I don't recall
6    specifically what it said. But I will say
7    that if someone was in my office at Absolute
8    and she said what you just said, I would
9    always -- I would always ask a follow-up
10   question to her and -- and get more
11   information.
12   Q:  Same for a female employee who says
13   that she just wants to be paid fairly?
14   A:  I would ask her -- I would ask her
15   more information.
16   Q:  Always?
17   MR. SULLIVAN:  Objection to form.
18   THE WITNESS:  Yeah, I would never
19   shoo that person out of my office. I would
20   always ask some more questions.
21   BY MR. THOMAS:
22   Q:  Would you always ask under -- as --
23   as 'H' -- as the head of HR, if a woman said
24   that she wants to be paid full value for her
25   work and says that male employees are being
```

Page 106

```
1       D. Berardo
2    paid full value but she isn't, would you
3    always ask follow-up questions for that?
4    MR. SULLIVAN:  Objection to form.
5    THE WITNESS:  Yeah, I would ask
6    follow-up questions.
7    MR. THOMAS:  What is -- so what is
8    the basis of the objection, Mark?
9    MR. SULLIVAN:  Hypothetical.
10   BY MR. THOMAS:
11   Q:  I'm talking about -- well, let me --
12   I'm not asking hypothetical. I'm talking
13   about under your practices at -- as head of
14   HR, would you always follow up with a woman
15   who said -- that came to you and said 'I want
16   to be paid full value for my work' and
17   compared herself to a male employee who she
18   said was being paid full value?
19   MR. SULLIVAN:  Objection to form.
20   THE WITNESS:  Yes, I would have.
21   MR. THOMAS:  What is the objection,
22   Mark?
23   MR. SULLIVAN:  Vague, ambiguous.
24   MR. THOMAS:  What is vague and
25   ambiguous about it?
```

Page 107

```
1       D. Berardo
2    MR. SULLIVAN:  The circumstances
3    surrounding your -- what is, essentially, a
4    hypothetical. I don't follow them. I
5    think it's -- I think they're vague and
6    ambiguous. I'm not directing --
7    MR. THOMAS:  Okay.
8    BY MR. THOMAS:
9    Q:  Go ahead, Mr. Berardo.
10   MR. SULLIVAN:  -- him not to answer,
11   but I -- I have asserted objection based on
12   form.
13   BY MR. THOMAS:
14   Q:  Go ahead, Mr. Berardo. You would
15   always ask -- correct? -- under those
16   circumstances?
17   A:  Yes, I would always ask follow-up
18   questions.
19   Q:  If a female employee said she didn't
20   want to be known as a troublemaker when she
21   was complaining about her treatment by her
22   male manager, would you always ask follow-up
23   questions for that?
24   A:  Yes, I --
25   MR. SULLIVAN:  Objection to form.
```

Page 108

```
1       D. Berardo
2    THE WITNESS:  Yes, I would ask
3    follow-up questions.
4    BY MR. THOMAS:
5    Q:  And you would always ask follow-up
6    questions if a female employee told you that
7    she was being treated differently than her
8    male counterparts; correct?
9    MR. SULLIVAN:  Objection to form.
10   THE WITNESS:  I would ask follow-up
11   questions, yes.
12   BY MR. THOMAS:
13   Q:  And let me just ask you -- I have
14   more to go here. Are you -- in terms of a
15   lunch -- I -- I mean, I'm in a different time
16   zone than you. So I'm -- I don't need a lunch
17   break, but I don't know what you all are
18   thinking. Do you want a -- do you need a
19   lunch break? Do you want to take some time
20   now? Or what is your thought?
21   MR. SULLIVAN:  How are you doing?
22   THE WITNESS:  I'm -- I'm good, if you
23   are.
24   MR. SULLIVAN:  Yeah, we -- we can
25   continue going. What -- I -- is --
```

Page 109

D. Berardo

1
2  MS. LESTRADE:  Yeah.
3  MR. SULLIVAN:  -- everyone else good
4  with that?
5  MS. LESTRADE:  Sure. We've got our
6  lunches here.
7  MR. SULLIVAN:  Yeah.
8  MR. THOMAS:  Okay. Fine.
9  MR. SULLIVAN:  Let's ask the court
10  reporter. You will need a lunch break.
11  What -- can you go another half hour, or do
12  you want to stop now?
13  THE COURT REPORTER:  Yeah,
14  absolutely. Another half hour is fine.
15  MR. SULLIVAN:  All right. Why don't
16  we go another half hour and see where we
17  are then?
18  MR. THOMAS:  Okay.
19  BY MR. THOMAS:
20  Q:  Mr. Berardo, let me also say that,
21  about today's deposition, if at any point you
22  need a break, of course just let us know.
23  We'll be glad to accommodate it. If I've got
24  a question pending, I may just want to finish
25  off the question and answer before, but we can

Page 110

D. Berardo

1
2  take a break.
3  A:  Sure. Thank you.
4  MR. SULLIVAN:  Do you need a break
5  now, or are you --
6  THE WITNESS:  I'm good right now.
7  BY MR. THOMAS:
8  Q:  And -- sorry, go ahead. And then
9  also, too, if you're -- and I think we have
10  been doing this so far, but if you have any
11  problems understanding the question I'm asking
12  you, will you be sure to let me know before
13  you answer it?
14  A:  Yes. Yeah.
15  Q:  And -- and you -- also, too, if I ask
16  you a question and it can be answered several
17  different ways and you're not sure which way
18  to answer it, just let me know that too before
19  you answer, if that's okay.
20  A:  Sure, yeah.
21  Q:  Were you aware about Errol Olsen
22  engaging in a nude swim when he was -- when he
23  was at -- working at Absolute?
24  MR. SULLIVAN:  Objection to form.
25  THE WITNESS:  So I -- I came on after

Page 111

D. Berardo

1
2  that incident, but -- but I -- I was made
3  -- made aware of that incident.
4  BY MR. THOMAS:
5  Q:  Who made you aware of it?
6  A:  I don't -- I don't recall
7  specifically. I don't recall specifically who
8  made me aware.
9  Q:  Was it told to you through official
10  channels, or was it sort of just gossip?
11  A:  It was -- it was -- it was most
12  likely gossip.
13  Q:  And what did you hear about what he
14  had done?
15  A:  So from -- from what I recall, it
16  was -- it was -- there was the CEO, the CFO,
17  and the COO, and they went skinny-dipping in a
18  pool.
19  Q:  Is that the most significant part of
20  it?
21  A:  From -- from what I recall.
22  Q:  It was not that significant that it
23  was in front of a whole bunch of employees?
24  A:  No, so, sorry, it was -- so from --
25  from -- from what I recall, from what was told

Page 112

D. Berardo

1
2  to me, it was in front of -- I'm not sure if
3  it was a whole bunch of employees. It was in
4  front of at least --
5  Q:  Well, it was at least -- at least in
6  front of a number of employees; correct?
7  A:  I -- I would say at least in front of
8  one employee. There may have been more.
9  Q:  So who -- who was that employee?
10  A:  I don't know. I -- I wasn't there,
11  and so I don't have specifics.
12  Q:  Was it done at a company event?
13  A:  I don't know.
14  Q:  At the pool that the company -- or
15  the hotel the company was staying at?
16  A:  I don't know.
17  Q:  And Mr. Olsen was your -- was the
18  one -- the head of HR? I mean, or who -- that
19  -- into who HR reported?
20  MR. SULLIVAN:  Objection to form.
21  THE WITNESS:  When I -- when I -- he
22  was -- he was the -- he -- I reported in to
23  him when I became the HR manager. Previous to that, Leah had
24  reported in to the CEO.
25  BY MR. THOMAS:

Page 113

D. Berardo

2  Q:  Okay. So when you came onboard, they
3  shifted over your forwarding relationship to
4  the guy who had swum naked in front of at
5  least one employee, if not more, at a company
6  event previously; correct?
7  MR. SULLIVAN:  Objection to form.
8  THE WITNESS:  I -- I started
9  reporting to Errol when I became the HR
10  manager, correct.
11  BY MR. THOMAS:
12  Q:  Did you think it was weird at all
13  that you were reporting to a person who --
14  well, first of all, what -- what do you think
15  of the CFO swimming naked in front of
16  employees at a company event --
17  MR. SULLIVAN:  Objection --
18  BY MR. THOMAS:
19  Q:  -- from an HR perspective?
20  MR. SULLIVAN:  Objection to form.
21  THE WITNESS:  So you're asking for my
22  personal opinion?
23  BY MR. THOMAS:
24  Q:  No, your opinion as an HR -- I mean,
25  as -- with your background in HR --

Page 114

D. Berardo

2  A:  Sure.
3  Q:  -- and working at Absolute.
4  MR. SULLIVAN:  Objection to form.
5  THE WITNESS:  Sure. Obviously, it's
6  inappropriate. Absolutely inappropriate.
7  BY MR. THOMAS:
8  Q:  And was there any discipline taken in
9  terms of Mr. Olsen?
10  A:  I wasn't --
11  MR. SULLIVAN:  Objection to form.
12  THE WITNESS:  I wasn't at the company
13  at that time. I -- I don't know.
14  BY MR. THOMAS:
15  Q:  Did it concern you at all that you
16  were suddenly reporting in HR -- in to someone
17  who had engaged in absolutely inappropriate
18  behaviour?
19  MR. SULLIVAN:  Objection to form.
20  THE WITNESS:  I don't recall -- I
21  don't recall how I felt about it.
22  Q:  How do you feel about it now?
23  MR. SULLIVAN:  Objection to form.
24  THE WITNESS:  How do I feel about it

Page 115

D. Berardo

2  now? You know -- so, again, if you're
3  asking for my personal opinion, I don't
4  know the --
5  BY MR. THOMAS:
6  Q:  No, your -- your opinion as -- with
7  your background in HR.
8  MR. SULLIVAN:  Objection to form.
9  BY MR. THOMAS:
10  Q:  Should HR be reporting in to the guy
11  who engaged in absolutely inappropriate
12  behaviour with other employees of a sexual
13  nature?
14  MR. SULLIVAN:  Objection to form.
15  THE WITNESS:  Well, there was --
16  there was no other -- there was no other
17  choice at that point on where to report in
18  to, so under the circumstances --
19  BY MR. THOMAS:
20  Q:  So it was fine?
21  MR. SULLIVAN:  Objection to form.
22  THE WITNESS:  Under the
23  circumstances, that's who I reported in to.
24  BY MR. THOMAS:
25  Q:  You could have reported in to the

Page 116

D. Berardo

2  CEO.
3  MR. SULLIVAN:  Objection to form.
4  BY MR. THOMAS:
5  Q:  As was done before; right?
6  A:  The CEO was part of that incident.
7  Q:  Oh, okay. So, yeah, I guess we have
8  the CEO engaged in absolutely inappropriate
9  behaviour; right?
10  MR. SULLIVAN:  Objection to form.
11  THE WITNESS:  Those were -- that's --
12  that was the gossip that I heard. Again, I
13  wasn't at the company at that time.
14  BY MR. THOMAS:
15  Q:  But assuming it to be true, that they
16  were swimming naked in front of at least one
17  employee at a company event -- the CEO did
18  that; is that correct?
19  MR. SULLIVAN:  Objection to form.
20  THE WITNESS:  Again, this was -- it's
21  gossip. So I wasn't there. I -- I don't
22  know for certain.
23  BY MR. THOMAS:
24  Q:  Who was it, to your understanding,
25  that engaged in a nude swim in front of

Page 117

```
1        D. Berardo
2        employees?
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  I mean, the gossip that
5        I heard was the -- were -- was the -- were the CEO, the CFO, and
6        the COO.
7    BY MR. THOMAS:
8    Q:   From an HR perspective, what -- what
9        does that make you feel about Absolute as the
10       company?
11   MR. SULLIVAN:  Objection.
12   BY MR. THOMAS:
13   Q:   That the CEO, CFO, and COO are
14       swimming naked in front of employees at a
15       company event?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  As I mentioned before,
18       it -- I -- I would feel that that's
19       completely inappropriate.
20   BY MR. THOMAS:
21   Q:   And what did you feel about working
22       in the HR role for a company that had the top
23       level management engaging in that behaviour?
24   MR. SULLIVAN:  Objection to form.
25   THE WITNESS:  Well, so me and my
```

Page 118

```
1        D. Berardo
2        previous manager felt that we could add
3        some professional capabilities and
4        professional HR support to the company, so
5        we -- we felt that we could make a positive
6        impact.
7    BY MR. THOMAS:
8    Q:   And so when you say there really
9        wasn't anyone -- there wasn't really any other
10       choice, the reason there wasn't any other
11       choice was because the entire top management
12       of the company, you understood, had engaged in
13       absolutely inappropriate behaviour, so you're
14       going to be stuck with one of them. Right?
15   MR. SULLIVAN:  Objection to form.
16   THE WITNESS:  So, I mean, from the
17       gossip that I heard -- again, I wasn't
18       there -- I mean, that was my opinion. I
19       mean...
20   BY MR. THOMAS:
21   Q:   What does that symbolize to you about
22       the culture of Absolute?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  The culture of Absolute
25       when?
```

Page 119

```
1        D. Berardo
2    BY MR. THOMAS:
3    Q:   When you started working at Absolute.
4        What did that symbolize for you about the
5        culture at Absolute?
6    MR. SULLIVAN:  Objection to form.
7    THE WITNESS:  Well, I think the
8        culture at Absolute, when I started,
9        definitely needed some -- it definitely
10       needed some work. And -- and -- and that's
11       why, you know, when our -- our founder CEO
12       resigned and we went on a search for a new
13       CEO, brought in some new sales
14       professionals, that's why I felt it was a
15       positive -- those were -- those were
16       positive developments.
17   BY MR. THOMAS:
18   Q:   Why did -- why did the culture need
19       changing, from your HR perspective?
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  Typically, with founder
22       CEOs, you know, they -- they -- they hold
23       the company near and dear. They don't like
24       a lot of change. So I felt for the company
25       to take it to the next level, that it
```

Page 120

```
1        D. Berardo
2        needed some outside help.
3    BY MR. THOMAS:
4    Q:   Because...?
5    A:   I mean, from a business perspective,
6        understanding the importance of HR. That's
7        just from my perspective. From a sales
8        perspective, from a product's perspective, I
9        think an outside person can provide a lot of
10       value.
11   Q:   And one of the -- one of the bad
12       things about the culture at Absolute was the
13       top three people in the company would swim
14       naked at a company event in front of other
15       employees. That was the culture; correct?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  I wouldn't define
18       the --
19   BY MR. THOMAS:
20   Q:   That needed help?
21   A:   No, I -- I -- I wouldn't define the
22       culture as -- from that specific incident.
23   Q:   Isn't that typical of the way that --
24       it was -- it was acceptable for that to happen
25       at Absolute; right?
```

Page 121

```
1      D. Berardo
2      MR. SULLIVAN:  Objection to form.
3      THE WITNESS:  I wasn't there at the
4      time, so I can't say if it was acceptable
5      or not acceptable.
6      BY MR. THOMAS:
7      Q:   Well, let's talk about Errol Olsen
8      who was one of the three people. Where is he
9      today?
10     A:   My understanding is that he's still
11     at Absolute.
12     Q:   M'mm-hmm. What -- what position had
13     he held when you were looking for a new CEO?
14     A:   He was interim CEO.
15     Q:   M'mm-hmm. Was that a good -- a good
16     way to have the -- culture of the company,
17     from your HR perspective?
18     MR. SULLIVAN:  Objection to form.
19     THE WITNESS:  I mean, from my
20     perspective, Errol -- Errol was a very --
21     he was a highly engaged leader that really
22     cared about people. That was my --
23     BY MR. THOMAS:
24     Q:   Are you referring to the nude swim as
25     being highly engaged and very caring about
```

Page 122

```
1      D. Berardo
2      people?
3      MR. SULLIVAN:  Objection to form.
4      BY MR. THOMAS:
5      Q:   Doing -- doing that in front of other
6      employees, that's very caring?
7      A:   No, that's -- that's not what I
8      was --
9      Q:   It's --
10     A:   -- referring to.
11     Q:   -- certainly very engaged. I would
12     agree with you there.
13     MR. SULLIVAN:  Objection to form.
14     THE WITNESS:  That's not what I was
15     referring to.
16     BY MR. THOMAS:
17     Q:   Okay. Well, would that be an example
18     of him being highly engaged, jumping in a pool
19     naked in front of other employees?
20     MR. SULLIVAN:  Objection to form.
21     THE WITNESS:  That would not be an
22     example of that, no.
23     BY MR. THOMAS:
24     Q:   Okay. Would that be an example of
25     him -- well, why -- well, why don't you -- I
```

Page 123

```
1      D. Berardo
2      mean, here is a guy who engaged in that
3      behaviour and managed to stay as CFO of the
4      company -- to come in from CEO and stay as
5      CFO. How -- how were -- did your -- how were
6      you able to change that culture?
7      MR. SULLIVAN:  Objection to form.
8      BY MR. THOMAS:
9      Q:   Where someone -- where someone can
10     engage in absolutely inappropriate behaviour
11     and have that sort of career in the company?
12     MR. SULLIVAN:  Objection to form.
13     THE WITNESS:  So I think that's --
14     that's more of a question for the board of
15     directors. From -- from my -- all my
16     interactions with Errol, he was always
17     respectful in his communication to me, to
18     employees. So, I mean -- and -- and he was
19     very supportive of us creating a very
20     engaged workforce.
21     BY MR. THOMAS:
22     Q:   And he was the one chosen to have HR
23     report in to him as well; correct?
24     MR. SULLIVAN:  Objection to form.
25     THE WITNESS:  Yes. I reported in to
```

Page 124

```
1      D. Berardo
2      him when I became the HR manager.
3      BY MR. THOMAS:
4      Q:   When did you become aware of Thomas
5      Kenny's comments about Absolute's hiring
6      criteria during the New York -- Westin
7      New York City meeting in April 2015?
8      MR. SULLIVAN:  Objection to form.
9      THE WITNESS:  I became aware of it
10     once Mary was terminated and we were in
11     discussions with her lawyer, and the lawyer
12     brought up the comment to us.
13     BY MR. THOMAS:
14     Q:   Was it a failure on the part of HR
15     that you didn't become aware of that until
16     someone threatened to file a lawsuit?
17     MR. SULLIVAN:  Objection to form.
18     THE WITNESS:  I -- I would --
19     BY MR. THOMAS:
20     Q:   Months later?
21     A:   No. I don't know how we would have
22     had this information unless the employee came
23     forward with the information.
24     Q:   How many people were in the meeting?
25     A:   I don't recall specifically. I
```

Page 125

1      D. Berardo
2  wasn't at the meeting.
3      MR. THOMAS:  Okay. All right. If
4  the court reporter can get Exhibit 38 for
5  the witness, Kenny 38. We can go on or off
6  the record. It does not matter to me.
7      THE COURT REPORTER:  It's fine.
8      BY MR. THOMAS:
9      Q:  All right. Once you have the
10  document, I would like you to return -- I
11  would like you to turn to response to
12  interrogatory 15, which is on page 17.
13      A:  Number 15, sorry?
14      Q:  Yeah. Actually, I mean, before we
15  even go to that, I mean, would you -- would
16  you have expected in HR that you should have
17  been informed of the comments that Thomas
18  Kenny made?
19      MR. SULLIVAN:  Objection to form.
20      THE WITNESS:  If someone had taken
21  offence to them, I would -- I would have
22  appreciated someone coming to talk to me
23  about it.
24      BY MR. THOMAS:
25      Q:  What about even if someone hadn't

Page 126

1      D. Berardo
2  taken offence to them, just the fact that they
3  were being put out there as the hiring
4  criteria for Absolute. Is it something you
5  would have liked to have been told about?
6      MR. SULLIVAN:  Objection to form.
7      THE WITNESS:  I don't think that it
8  was -- I mean, my opinion is that it was
9  not being put out as a hiring criteria.
10      BY MR. THOMAS:
11      Q:  Or, I mean, was it -- were there --
12  well, did -- well, let me ask you this: Did
13  you understand that Mr. Kenny said that
14  this -- that he was referring to the type of
15  people that Geoff Haydon wanted to have hired
16  in the company?
17      MR. SULLIVAN:  Objection to form.
18      THE WITNESS:  Is there -- sorry, can
19  I -- can I look at the quote again?
20  Because -- is there --
21      BY MR. THOMAS:
22      Q:  All right. We'll -- yeah, we'll --
23  we can go there. Hang on here.
24      A:  Sure.
25      MR. THOMAS:  If the court reporter

Page 127

1      D. Berardo
2  could get Exhibits 36 and 37, Kenny 36 and
3  Kenny 37 for the witness.
4      BY MR. THOMAS:
5      Q:  What I would ask you --
6      A:  This is 38.
7      Q:  -- to do, Mr. Berardo, is read over
8  Exhibit 36 and 37, and then I'm going to ask
9  you some questions about them.
10      A:  Sure.
11      This is 37.
12      THE COURT REPORTER:  Yeah, and then
13  what is the next one?
14      THE WITNESS:  This is 38.
15      BY MR. THOMAS:
16      Q:  And I believe if we go in
17  chronological order -- you can take a look --
18  but I think Exhibit 37 -- oh, I'm sorry.
19  Wait, no. Actually, this is -- yeah, 36 takes
20  place chronologically before Exhibit 37,
21  but --
22      MR. SULLIVAN:  Nelson, the court
23  reporter has not yet located Exhibit 36.
24      MR. THOMAS:  Okay. All right.
25      Thank you.

Page 128

1      D. Berardo
2      THE COURT REPORTER:  Can we actually
3  go off the record?
4      VIDEOGRAPHER:  Going off record. The
5  time is 1:45.
6      (PROCEEDINGS RECESSED AT 1:45 P.M.)
7      (PROCEEDINGS RECONVENED AT 2:44 P.M.)
8      VIDEOGRAPHER:  We're back on the
9  record. The time is 2:44.
10      BY MR. THOMAS:
11      Q:  All right. Hey. Thank you very
12  much.
13      Mr. Berardo, we'll go over those
14  exhibits in just a second.
15      A:  Sure.
16      Q:  Before I do that, one follow-up
17  question I had for you was you -- when we were
18  talking about the nude swim that the COO, CEO,
19  and CFO participated in, you said you think
20  there was one other -- one other employee
21  present -- or at least one other employee that
22  you thought might be present. Who was that?
23      MR. THOMAS:  Objection to form.
24      THE WITNESS:  So, sorry, I -- I don't
25  know. I -- I wasn't there. I didn't read

Page 129

D. Berardo

1    any reports. Just pure gossip and
2    speculation.
3    BY MR. THOMAS:
4    Q:  Yeah, sure.
5    A:  So I don't know.
6    Q:  I will take your gossip and
7    speculation.
8    A:  Oh, I don't -- I don't -- wouldn't
9    know who that employee was. I was just
10   speculating that there would be at least one
11   employee there, if there was -- you know, it
12   turned out to be an issue.
13   Q:  Were you aware that an employee
14   posted a Facebook page about it?
15   A:  I was not, no.
16   Q:  Okay. All right. So have you had a
17   chance to look at Exhibits 36 and 37?
18   A:  I have not, no.
19   Q:  Okay. Why don't you go ahead and
20   take a look.
21   A:  Sure. Okay.
22   Q:  So I guess the first question I have
23   for you is, turning to Exhibit 36, page
24   DEF9807, did you understand that the comment

Page 130

D. Berardo

1    at issue was 'the CEO does not want to hire
2    people who are at the end of their rainbow; he
3    just wants to hire guys who are athletes, talk
4    trash, and are aggressive'?
5    A:  Yeah, I believe that, just from my
6    recollection, that was the quote that you --
7    that you had provided to us that -- that
8    Thomas allegedly made.
9    Q:  Do you consider that to be referring
10   to hiring criteria?
11   A:  Absolutely not.
12   Q:  When it says 'the CEO does not want
13   to hire,' you don't think that's hiring
14   criteria?
15   A:  I -- I -- recruiting and hiring to me
16   meant at no time did -- did -- did this ever
17   get sent to us to hire, you know...
18   Q:  I'm not asking that. I'm asking you,
19   though, the statement 'the CEO does not want
20   to hire blank, blank, blank,' that is a
21   reference, whether true or not, to hiring
22   criteria; correct?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  So you're asking for my

Page 131

D. Berardo

1    opinion?
2    BY MR. THOMAS:
3    Q:  No, I'm asking for -- all my
4    questions today will be you with your HR
5    background.
6    A:  So if someone -- yeah, so if -- if
7    someone said to me 'the CEO does not want to
8    hire,' that would refer to hiring some -- you
9    know, what he does -- who he does and doesn't
10   want to hire, sure.
11   Q:  Okay. Now, I think you're also
12   saying that what was said was -- was not --
13   did not accurately reflect the company's
14   hiring criteria; right?
15   A:  This -- this does not reflect the
16   company's hiring criteria, no.
17   Q:  Would you have expected employees to
18   tell you about statements like this that were
19   made at company events?
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  Yeah, I mean, if
22   they -- if they -- if they took offence to
23   it or --
24   BY MR. THOMAS:

Page 132

D. Berardo

1    Even if -- even if they didn't take
2    offence.
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  'The CEO does not want
5    to hire people who are at the end of their
6    rainbow. He just wants to hire guys who
7    are athletes, talk trash, and are
8    aggressive.' I mean, as the head of HR, I
9    would have liked if someone would have, you
10   know, brought this to my attention, if --
11   if -- if it was said.
12   BY MR. THOMAS:
13   Q:  And no one brought it your
14   attention -- correct? -- until this lawsuit?
15   A:  That's correct.
16   Q:  Now, is it true that Thomas Kenny did
17   not deny that he made these statements?
18   MR. SULLIVAN:  Objection to form.
19   THE WITNESS:  So just referring back
20   to the email, so I said Thomas does not --
21   does not deny that he said these comments,
22   but he said that they were taken out of
23   context. So -- so that's -- you know,
24   that's a fact that is in the -- that is in

Page 133

```
1        D. Berardo
2    the exhibit.
3    BY MR. THOMAS:
4    Q:  And that's a fact that you recorded;
5    right?
6    A:  That's correct.
7    Q:  And that you accurately recorded?
8    A:  I -- I would presume I accurately --
9    I accurately recorded this, yes.
10   Q:  Did Thomas ever deny to you that he
11   made these comments?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  From what I recall,
14   he -- I mean, when I had the conversation
15   with him, I don't think he ever admitted
16   that he said -- he said the -- you know, he
17   said it exactly as quoted. You know, so I
18   don't -- I don't recall if --
19   BY MR. THOMAS:
20   Q:  What did he -- what did he say he
21   said?
22   A:  I don't -- I don't recall -- what I
23   recall is kind of in the email and how he --
24   how he would have explained that, if he had
25   said -- if he had said 'end of the rainbow,'
```

Page 134

```
1        D. Berardo
2    what he was referring to -- you know, says he
3    was referring to those that are 'coasting in
4    their careers and just collecting a
5    paycheque.'
6    Q:  Was that him denying the comment was
7    made?
8    A:  I don't think that was him denying
9    the comment was made, no.
10   Q:  Did he ever deny to you that the
11   comment was made?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  I don't -- I don't -- I
14   don't recall him ever admitting that the --
15   that the comment was made exactly how it
16   was laid out.
17   BY MR. THOMAS:
18   Q:  My question to you is did he ever
19   deny making the comment?
20   A:  I -- I don't remember. I don't
21   recall if he ever denied it or not.
22   Q:  And, in fact, if you turn to
23   Exhibit 37, you asked him three main
24   questions. 'Where does this statement come
25   from?'
```

Page 135

```
1        D. Berardo
2    A:  Right.
3    Q:  And he said to you he was referring
4    to the environment where Geoff came from, not
5    a specific quote from Geoff.
6    A:  Okay.
7    Q:  Right? Is that what he told you?
8    A:  I would presume so, if it's -- if
9    it's on here. I would have recorded this
10   accurately.
11   Q:  And you also would have recorded
12   accurately his statement to you Geoff never
13   said the statement to TK?
14   A:  If that's what he said and I wrote
15   down, that would be accurate.
16   Q:  Well, I'm asking you -- well, let's
17   go -- let's -- let's go through -- let's start
18   with Exhibit 36.
19   A:  Sure.
20   Q:  Anything that you have written in 36
21   that is not accurate?
22   A:  Again, I -- I can only presume five
23   years ago or four years ago, whenever I wrote
24   this down, that I would -- I would only have
25   written down accurate -- accurate things. So
```

Page 136

```
1        D. Berardo
2    everything in here --
3    Q:  I'm asking you -- so -- so is there
4    any -- do you have any reason to believe that
5    any statement of yours in Exhibit Kenny 36 is
6    inaccurate?
7    A:  No, I have no reason to believe that.
8    Q:  Turning to Exhibit 37, do you have
9    any reason to believe that any statement that
10   you wrote in Exhibit 37 is inaccurate?
11   A:  No.
12   Q:  Do you remember anything in
13   Exhibit 36 from those conversations that you
14   relate that you left out?
15   A:  Not that I recall.
16   Q:  Any --
17   A:  I --
18   Q:  -- statements that related to the
19   conversations you had in Exhibit 37 that you
20   left out?
21   A:  No. I mean, I -- I can't recall the
22   actual conversation in my mind.
23   Q:  So is there anything you can remember
24   leaving out in Exhibit 37?
25   A:  No. I don't recall the conversation,
```

Page 137

```
1      D. Berardo
2      so --- I -- I don't recall the conversation.
3      So, therefore, you know, it's hard for me to
4      answer that question, if I left anything out,
5      because I don't recall the conversation.
6      Q:  In Exhibit 38 and 37, you were
7      sending the information to your in-house
8      lawyer, Oliver de Geest, and your outside
9      lawyer, Aaron Goldstein. Correct?
10     A:  Yes.
11     Q:  Would you have had every incentive to
12     be accurate and complete in what you wrote up
13     to them?
14     MR. SULLIVAN:  Objection to form.
15     THE WITNESS:  Well, I would -- I
16     would have only told them -- I would have
17     only told them the truth. Absolutely.
18     BY MR. THOMAS:
19     Q:  And would there be any reason that
20     you would have left out any important
21     information to them from these conversations?
22     MR. SULLIVAN:  Objection to form.
23     THE WITNESS:  Not -- not that I
24     recall. I don't recall the conversation,
25     so it's hard -- it's hard --
```

Page 138

```
1      D. Berardo
2      BY MR. THOMAS:
3      Q:  My question is -- my question to you
4      is different. My question to you is is there
5      any reason you would have not been complete in
6      describing the conversation that you occur --
7      that occurred with Mr. Kenny --
8      MR. SULLIVAN:  Objection to form.
9      BY MR. THOMAS:
10     Q:  -- on any important point?
11     A:  Nothing that I can think of.
12     Q:  Now, on page 36, you said that you
13     spoke to seven people from the meeting. Do
14     you see that?
15     A:  Oh, Exhibit 36?
16     Q:  Yeah.
17     A:  Yeah, I do.
18     Q:  Who were those seven people?
19     A:  I don't -- I don't recall their
20     names.
21     Q:  Two women who were present recalled
22     the statement. Do you see that?
23     A:  I do see that, yes.
24     Q:  And brushed it off. They 'know how
25     TK is.' Do you see that?
```

Page 139

```
1      D. Berardo
2      A:  I do see that, yes.
3      Q:  And they did interpret it in a
4      negative way; is that correct?
5      A:  Yes, I do see that.
6      Q:  Did it concern you, as head of HR,
7      that the two women you interviewed viewed the
8      comment in a negative way?
9      MR. SULLIVAN:  Objection to form.
10     THE WITNESS:  So, I mean, I can't
11     remember how I -- I felt when I spoke with
12     them. I will say, as the head of HR, yeah,
13     it would concern me.
14     BY MR. THOMAS:
15     Q:  And did it concern you that they
16     thought that they -- they 'know how TK is' --
17     MR. SULLIVAN:  Objection to form.
18     BY MR. THOMAS:
19     Q:  -- in terms of him making comments
20     like that?
21     A:  I can't say that was in reference to
22     him making comments like that. I'm not sure
23     what that -- what that was reference -- what
24     -- what that exactly was referencing.
25     Q:  And, now, you said you would have
```

Page 140

```
1      D. Berardo
2      expected someone at Absolute who was bothered
3      by the comment to -- that you would have
4      expected to have heard about it; correct?
5      MR. SULLIVAN:  Objection to form.
6      BY MR. THOMAS:
7      Q:  At the time.
8      A:  I would have -- I would have expected
9      it -- I would have -- I mean, I would -- I
10     would have liked someone to raise it, if -- if
11     they felt offended by it, yes.
12     Q:  And these people did interpret it in
13     a negative way, didn't they?
14     MR. SULLIVAN:  Objection to form.
15     THE WITNESS:  Yeah. From that
16     statement, yes.
17     BY MR. THOMAS:
18     Q:  And they didn't feel comfortable
19     raising it with you, did they?
20     MR. SULLIVAN:  Objection to form.
21     THE WITNESS:  So I -- I can't
22     interpret how they felt.
23     BY MR. THOMAS:
24     Q:  No, my question to you is they did
25     not -- well, I -- they never raised it --
```

Page 141

D. Berardo

1    strike that.
2    They never raised it with you, did
3    they?
4    A:  They did not raise it, correct.
5    Q:  Let's go back to Exhibit 67.
6    A:  67?
7    Q:  And if you would go to page
8    DEFS1411 -- and, actually, no, I'm sorry.
9    Well, let's look at that. On DEFS -- I'm
10   sorry. Yeah, let's look at DEFS1411, the
11   middle of that second bullet where it talks
12   about the lack of female representation,
13   diversity of the company, the fact that women
14   are paid less and can't advance their careers.
15   And then go to the comment on page
16   DEFS1395 where the respondent said:
17   'The current leadership of Todd Awtry
18   and Thomas Kenny is not receptive to any
19   kind of feedback.'
20   And DEFS1397, the second bullet below
21   'comments,' which says:
22   'Staff are afraid to truly speak about
23   management. Not encouraged. If you speak
24   up, you will lose your job.'

Page 142

D. Berardo

1    So compare those comments from the survey back
2    in 2014 with the culture in 2015 that felt
3    uncomfortable when comments are made about
4    hiring criteria and raising them with HR. How
5    much had changed?
6    MR. SULLIVAN:  Objection to form.
7    THE WITNESS:  Well, I mean, you're --
8    you're picking one comment out of, you
9    know...
10   BY MR. THOMAS:
11   Q:  I picked three.
12   A:  Well, three comments. It could be
13   the same person out of 300-plus people. So I
14   don't think that one comment would --
15   Q:  So three comments.
16   A:  Sure -- those three comments is
17   representative of the culture of -- of
18   Absolute or the culture of speaking up.
19   Q:  Well, it's representative in 2015
20   that two women who thought these comments were
21   negative towards them and typical of Thomas
22   Kenny didn't feel comfortable mentioning that
23   to you. Correct? You had to find out through
24   a lawsuit?

Page 143

D. Berardo

1    MR. SULLIVAN:  Objection to form.
2    THE WITNESS:  So, you know, what I
3    would say is that I don't know how they
4    felt or why they didn't bring it up, but I
5    think it would be speculation to say that
6    they didn't bring it up because they felt
7    uncomfortable.
8    BY MR. THOMAS:
9    Q:  Do you know any other reason why they
10   wouldn't bring it up to HR?
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  It could be because
13   they just brushed it off as -- as no big
14   deal.
15   BY MR. THOMAS:
16   Q:  Typical Thomas Kenny, the way he is?
17   MR. SULLIVAN:  Objection to form.
18   THE WITNESS:  I don't know. I would
19   -- I would be speculating. It would be
20   best to speak to these witnesses.
21   BY MR. THOMAS:
22   Q:  I don't think -- I don't think you
23   would be speculating about that, because they
24   told you they knew that's how -- they brushed

Page 144

D. Berardo

1    it off because they knew that's how Thomas
2    Kenny was.
3    A:  But --
4    MR. SULLIVAN:  Objection to form. Is
5    that a question?
6    MR. THOMAS:  Yeah.
7    BY MR. THOMAS:
8    Q:  I don't think you're speculating, are
9    you? Because that's what they told you?
10   A:  As I --
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  As I mentioned before,
13   they 'know how TK is,' I -- I don't have
14   any context or remember any context on why
15   they said that or what they meant by that.
16   BY MR. THOMAS:
17   Q:  Did any red flags go off with you
18   when you found out that two female employees
19   felt that they were receiving negative
20   comments from their -- the executive vice
21   president of sales, and they didn't feel
22   comfortable coming to you? And you knew there
23   was people in the past had said that they
24   weren't comfortable raising issues about

Page 145

D. Berardo

1    Thomas Kenny? Did any red flags go off in
2    your head at this --
3    MS. LEWIS:  That's too vague.
4    MR. THOMAS:
5    Q:  -- point?
6    A:  So --
7    MR. THOMAS:  Objection to form.
8    THE WITNESS:  So I don't know --
9    you're saying that they didn't feel
10   comfortable coming to me, and I think
11   that's a misrepresentation of the facts.
12   Unless they said that --
13   BY MR. THOMAS:
14   Q:  Well, they didn't come to you. Did
15   it raise a red flag to you that they didn't
16   come to you and people had reported being
17   uncomfortable about raising issues about
18   Thomas Kenny?
19   MR. SULLIVAN:  Objection to form.
20   THE WITNESS:  Well, I spoke with them
21   about it, and they felt comfortable
22   speaking with me when I spoke to them about
23   it.
24   BY MR. THOMAS:

Page 146

D. Berardo

1    Q:  So this didn't raise any red flags to
2    you, then?
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  I mean, it -- when
5    would it have raised red flags? After the
6    fact -- after when I spoke with them?
7    BY MR. THOMAS:
8    Q:  I'm just asking you if it did or
9    didn't. During the conversation, after the
10   conversation, at any point --
11   A:  It --
12   Q:  -- did it raise any red flags with
13   you?
14   A:  It didn't. Because from -- from --
15   what I recall of the conversation is that
16   they -- they didn't -- you know, again, they
17   -- they -- they brushed it off. They didn't
18   view it as discriminatory.
19   Q:  Well, why did they brush it off
20   again? I -- we keep coming back to that. Why
21   did they brush it off?
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  I don't know. I don't
24   -- I don't recall.

Page 147

D. Berardo

1    BY MR. THOMAS:
2    Q:  Why did they tell you they brushed it
3    off?
4    A:  I don't recall.
5    Q:  Why don't -- what did -- what did you
6    say in your email that -- of why they brushed
7    it off?
8    A:  Well, it -- it says there they 'know
9    how TK is.'
10   Q:  M'mm-hmm. What do you -- red flags
11   didn't go off in your head when two females
12   tell you that they brushed off negative sexual
13   discriminatory comments from their manager
14   because they knew that's how he is?
15   MR. SULLIVAN:  Objection to form.
16   THE WITNESS:  We were -- we were
17   investigating this comment, so it was a bit
18   too late for red flags to go off in my
19   head, because we were already investigating
20   the comment.
21   BY MR. THOMAS:
22   Q:  Well, there -- well, what about -- do
23   you mean it's too -- it's too late to -- what
24   do you mean by it's too late?

Page 148

D. Berardo

1    A:  Well, I was already speaking with
2    them, so when a red flag usually goes off in
3    my head is if -- is if we're just finding out
4    about something for the first time.
5    Q:  Aren't you just finding out about
6    something for the first time here?
7    A:  Well, we were finding out -- we -- we
8    knew that Thomas had allegedly said something,
9    and we were investigating the comment. We
10   talked to seven employees, according to the
11   email, and three of the employees remember the
12   comment. So --
13   Q:  My question to you is, yes or no, red
14   flags went off in your head or didn't go off
15   in your head when these women reported this to
16   you?
17   A:  I --
18   MR. SULLIVAN:  Objection to form.
19   THE WITNESS:  I don't recall if red
20   flags went off in my head.
21   BY MR. THOMAS:
22   Q:  Did you do any follow-up
23   investigation on what they said?
24   MR. SULLIVAN:  Objection to form.

Berardo_Daniel

Page 149

D. Berardo
2  THE WITNESS:  So from what I recall,
3  this was -- this was the investigation, and
4  I don't recall -- I don't recall what was
5  done after this.
6  BY MR. THOMAS:
7  Q:  Were Thomas Kenny's comments
8  acceptable --
9  MR. SULLIVAN:  Objection --
10 BY MR. THOMAS:
11 Q:  -- under Absolute's HR policy and
12 hiring criteria?
13 MR. SULLIVAN:  Objection to form.
14 THE WITNESS:  I don't have the policy
15 in front of me, so I can't speak to the
16 policy. I think --
17 BY MR. THOMAS:
18 Q:  Does that help -- let me ask you
19 this: Did -- is what Thomas Kenny said
20 appropriate [lost connection] hiring criteria?
21 MR. SULLIVAN:  Objection to form.
22 THE WITNESS:  So if we're taking -- I
23 mean, if we're taking his quotes as what he
24 actually said, I -- you know, I would say
25 it's -- it's not -- and -- and if you're

Page 150

D. Berardo
2  interpreting it like you -- like you...
3  BY MR. THOMAS:
4  Q:  I'm not interpreting it. I'm just
5  asking. I -- thank you for your answer.
6  What did you do to Thomas Kenny for
7  making these comments?
8  MR. SULLIVAN:  Objection to form.
9  THE WITNESS:  We -- we investigated
10 the comments. From what I recall, the
11 company determined that there was nothing
12 further to investigate.
13 BY MR. THOMAS:
14 Q:  And what sort of disciplinary action
15 was taken against an executive vice president
16 who made inappropriate hiring comments which,
17 in turn, made women feel in a negative way?
18 MR. SULLIVAN:  Objection to form.
19 THE WITNESS:  I don't -- I don't
20 recall -- I don't recall what was done.
21 BY MR. THOMAS:
22 Q:  You don't recall taking any action
23 against Thomas Kenny, do you?
24 A:  Well, I -- I don't recall what action
25 was taken. I'm -- I'm sure --

Page 151

D. Berardo
2  Q:  Was any action taken?
3  A:  I don't recall.
4  Q:  Okay. Do you have any documents that
5  indicate any action was taken?
6  A:  I mean, I don't -- I don't work for
7  the company anymore, so...
8  Q:  When you were there from -- well, you
9  were there at the time. Do you remember
10 taking any action?
11 A:  What I'm saying is I don't recall --
12 I don't recall what was discussed; if it was a
13 verbal, or if there was something else that
14 was done. I -- I don't remember.
15 Q:  Was there a verbal?
16 A:  I don't remember. I don't recall.
17 Q:  Should some action have been taken
18 against Thomas Kenny?
19 MR. SULLIVAN:  Objection to form.
20 THE WITNESS:  We investigated, and --
21 BY MR. THOMAS:
22 Q:  My question is should any action have
23 been taken against him?
24 A:  So we --
25 MR. SULLIVAN:  Objection to form.

Page 152

D. Berardo
2  THE WITNESS:  We investigated, and it
3  was determined --
4  BY MR. THOMAS:
5  Q:  I'm not asking you whether you
6  investigated. I'm asking you should any
7  action have been taken against him?
8  A:  So the --
9  MR. SULLIVAN:  Objection to form.
10 THE WITNESS:  The action was -- doing
11 an investigation was part of the action
12 against him. Because we're --
13 BY MR. THOMAS:
14 Q:  Oh, so just investigating him is
15 action against him?
16 A:  Well, if the investigation finds that
17 something was -- was inappropriate and against
18 company policy, then there would be action
19 against that employee.
20 Q:  And just doing the investigation is
21 taking sort of a personnel action against
22 somebody in the company, isn't it?
23 MR. SULLIVAN:  Objection to form.
24 THE WITNESS:  Sorry, what do you mean
25 by that question?

Page 153

D. Berardo

1    BY MR. THOMAS:
2
3    Q:  Well, I think you said just doing the
4    investigation was action enough.
5    A:  No -- no, I --
6    Q:  [Indiscernible] --
7    A:  -- didn't -- I didn't say that. I
8    didn't say it's --
9    Q:  Okay.
10   A:  -- action enough.
11   Q:  But doing an investigation was part
12   of the company's action against him; correct?
13   A:  Well, it's -- it's part of -- I mean,
14   it's part of -- when someone makes a
15   complaint, an investigation is -- is -- is an
16   action you take towards finding out the facts
17   and the truth and coming up with a resolution.
18   Q:  What were the facts and the truth
19   here?
20   A:  What were the facts and the truth
21   here?
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  I mean, the -- the
24   facts were that Mary had alleged that this
25   comment was made, and -- and we -- we

Page 154

D. Berardo

1    investigated what he meant by each of these
2    comments -- or each of his comments, and it
3    was determined that -- it was determined
4    that -- that -- that the intent of the
5    comments were not -- were not based on any
6    sort of discrimination.
7    BY MR. THOMAS:
8    Q:  Where was that determination
9    recorded?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  I mean, I -- I don't
12   recall. I mean, part of it is here on --
13   MR. THOMAS:  Okay. We request the
14   production of any documents reflecting any
15   determination, any action, anything
16   involving Tom Kenny and the company's
17   investigation.
18   BY MR. THOMAS:
19   Q:  Let me ask you -- you said it was
20   determined. The truth -- the truth was that
21   he did make those comments; correct?
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  That's not what I said.
24   He was alleged --

Page 155

D. Berardo

1    BY MR. THOMAS:
2
3    Q:  I'm asking you now.
4    A:  So he was alleged to have made those
5    comments. He --
6    Q:  Did he -- did he make -- did he make
7    them?
8    MR. SULLIVAN:  Objection to form.
9    THE WITNESS:  So he didn't deny the
10   comments. I don't -- I don't recall if
11   he -- I mean, I -- I don't recall what he
12   said.
13   BY MR. THOMAS:
14   Q:  Well, you weren't there, but what --
15   you can look at your emails. What was he
16   alleged to have said?
17   A:  Well, he was -- he was alleged to
18   have said what -- what Mary -- what you had
19   brought forward during our negotiations.
20   Q:  And did you come to -- what
21   conclusion did you come to as to whether he
22   made those comments?
23   A:  So I'm not sure if we ever came to a
24   conclusion if he or if he didn't make those
25   exact comments.

Page 156

D. Berardo

1    Q:  Okay.
2    A:  I don't recall.
3    Q:  But, Mr. Berardo, you're telling me
4    under oath that as an HR official and -- and
5    you have an executive vice president for sales
6    who tells a room of sales employees 'the CEO
7    does not want to hire people who are at the
8    end of their rainbow; he just wants to hire
9    guys who are athletes, talk trash, and are
10   aggressive.' You're telling me that you never
11   came to a conclusion as to whether he said
12   that or not?
13   MR. SULLIVAN:  Objection to form.
14   THE WITNESS:  I -- I don't -- I don't
15   recall -- I don't recall the specific notes
16   from the -- with our conversations with the
17   witnesses there. I mean, I wasn't -- I
18   wasn't there.
19   BY MR. THOMAS:
20   Q:  That's not my question. Do you
21   remember what my question was, Mr. Berardo?
22   A:  No. Go ahead. Repeat it.
23   Q:  Okay. My question to you is -- well,
24   actually, I will have the court reporter read

Page 157

```
1    D. Berardo
2    it back.
3    A:  Sure.
4       (REPORTER READ BACK)
5    THE WITNESS:  I -- I don't recall if
6    we came to a conclusion or not.
7    BY MR. THOMAS:
8    Q:  You should have -- you should have,
9    though, one way or the other; right?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  I don't know if we
12   should have or shouldn't have. I just know
13   that -- I don't recall -- I don't recall
14   the conversations around it if it was
15   determined whether he said that or not.
16   BY MR. THOMAS:
17   Q:  Well, if you're supposed to come to
18   the truth of an allegation, how can you do
19   that if you don't determine whether the person
20   said what was supposed -- what they said was
21   said?
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  Well, I think it came
24   down to -- I mean, his words could be
25   interpreted different ways by different
```

Page 158

```
1    D. Berardo
2    people. So it's -- sometimes it's very
3    difficult to come to the absolute truth.
4    BY MR. THOMAS:
5    Q:  So you -- you found that -- you found
6    his statement here and his non-denial that he
7    made them difficult to decide what to do?
8    MR. SULLIVAN:  Objection to form.
9    THE WITNESS:  So from what I recall,
10   it -- it -- it wasn't -- it -- it wasn't
11   clear. It wasn't black and white. It
12   was -- you know, he explained what he meant
13   by -- by what he said. And it was
14   interpreted differently -- it was
15   interpreted differently.
16   BY MR. THOMAS:
17   Q:  Is this an example of Mr. Kenny's
18   professionalism -- professionalism that you
19   thought so highly of?
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  Is this an example of
22   his professionalism? I mean, you're asking
23   for my opinion?
24   BY MR. THOMAS:
25   Q:  As an HR person, yes.
```

Page 159

```
1    D. Berardo
2    MR. SULLIVAN:  Objection to form.
3    BY MR. THOMAS:
4    Q:  Is this a professional HR way to
5    approach hiring decisions and communications
6    with employees?
7    A:  So --
8    MR. SULLIVAN:  Objection to form.
9    THE WITNESS:  So I don't think this
10   was a way to -- this was never -- he was
11   never directed to hire people. I can
12   attest to that --
13   BY MR. THOMAS:
14   Q:  Well, what were the first three --
15   what are the first three words of the comment?
16   Or the first five words?
17   A:  So the first five --
18   Q:  'The CEO does not want to hire.'
19   A:  So that's what --
20   Q:  That's what you're saying doesn't
21   relate to hiring decisions?
22   A:  So that's what alleged -- that's what
23   alleged -- yeah, that's the alleged quote.
24   Q:  Alleged quote is the one that he does
25   not deny making; right?
```

Page 160

```
1    D. Berardo
2    A:  It says that Thomas did not deny he
3    -- that he said these comments, but they were
4    taken out of context, yes.
5    Q:  Okay. So he doesn't deny that he
6    said the CEO does not want to hire people who
7    are at the end of their rainbow; he just wants
8    to hire guys who are athletes, talk trash, and
9    are aggressive. Is this an example of a
10   professional, buttoned-down comment by Thomas
11   Kenny?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  I mean, no.
14   BY MR. THOMAS:
15   Q:  Did it -- did it surprise you that he
16   would make such a comment?
17   MR. SULLIVAN:  Objection to form.
18   THE WITNESS:  So it -- did it
19   surprise -- yeah, I mean, from what I
20   recall, I was a bit surprised that he
21   said -- that it was alleged that he said
22   this.
23   BY MR. THOMAS:
24   Q:  And that he didn't deny that he said
25   it?
```

Page 161

```
1      D. Berardo
2    MR. SULLIVAN:  Objection to form.
3    BY MR. THOMAS:
4    Q:  You keep saying 'alleged.' He
5      'allegedly' said it. Do you think we can drop
6      'allegedly' at this point because he doesn't
7      deny that he said it?
8    MS. LESTRADE:  No.
9    MR. SULLIVAN:  Objection to form.
10   BY MR. THOMAS:
11   Q:  Or do you still want to say
12     'alleged'?
13   A:  Well, from -- from what I recall, I
14     mean, the -- the quote is very specific, and
15     he wasn't sure -- he wasn't sure exactly what
16     he said. So I would hate for it to be
17     the truth -- I would hate for it to be brought
18     forward as the absolute truth, because, from
19     what I recall, you know, he didn't -- he
20     didn't -- he didn't remember it exactly like
21     it was -- like it was said. He just didn't
22     deny that --
23   Q:  You don't --
24   A:  -- something like --
25   Q:  Yeah, you -- you don't --
```

Page 162

```
1      D. Berardo
2    A:  -- that was said.
3    Q:  -- mention that in either Exhibit 36
4      or 37 that he doesn't remember it exactly, do
5      you?
6    A:  Sorry?
7    Q:  You don't mention anywhere in
8      Exhibit 36 or 37 that he doesn't remember it
9      exactly, do you?
10   A:  I don't know. A lot of this is
11     redacted, so --
12   Q:  No, no, I'm asking you in -- anywhere
13     in 36 or 37 --
14   A:  Oh, sure.
15   Q:  -- did he -- did you say that he
16     didn't remember it exactly?
17   A:  No, I don't think -- not -- not in --
18     not in what I'm looking at right now, I did
19     not say that.
20   Q:  And -- and, in fact, the female
21     employees said they know how he is; right?
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  They know how TK is,
24     yes. That's what's down here.
25   BY MR. THOMAS:
```

Page 163

```
1      D. Berardo
2    Q:  Okay. And who were the two female
3      employees you talked to?
4    A:  So I don't know for -- I don't know
5      for certain. I -- I believe one was Myra.
6    Q:  Myra Moy-Gregory?
7    A:  Yes.
8    Q:  And the second? Amy Rathbun?
9    A:  Amy Rathbun, yes.
10   Q:  Do you think they were being honest
11     with you?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  I -- I don't know -- I
14     don't -- I can't answer what -- what
15     they -- if they were being honest or if
16     they were not being honest. I mean, I
17     would assume -- I would think that they
18     would be honest with me, yes.
19   BY MR. THOMAS:
20   Q:  Now, is it indicative of Absolute
21     culture that the executive vice president for
22     sales can say 'the CEO does not want to hire
23     people who are at the end of their rainbow; he
24     just wants to hire guys who are athletes, talk
25     trash, and are aggressive,' and suffer no
```

Page 164

```
1      D. Berardo
2    repercussions for doing so?
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  Again, I -- I don't
5      know if he suffered any repercussions --
6    BY MR. THOMAS:
7    Q:  If he didn't suffer any, that -- it's
8      okay at Absolute?
9    MR. SULLIVAN:  Objection to form.
10   THE WITNESS:  If he -- if he
11     didn't -- sorry, if he didn't?
12   BY MR. THOMAS:
13   Q:  Are you aware of any -- are you aware
14     of any negative consequences he suffered?
15   A:  I mean, I -- I don't recall. I mean,
16     Thomas was --
17   Q:  Okay. Is that -- is that --
18   A:  Thomas was --
19   Q:  -- acceptable, under Absolute
20     culture, to make comments like this and no one
21     have any record of any negative repercussion
22     to him whatsoever?
23   MR. SULLIVAN:  Wait a minute.
24     Will you -- will you finish your
25     prior answer.
```

Page 165

```
1       D. Berardo
2     THE WITNESS:  Can you read back what
3     I was...
4       (REPORTER READ BACK)
5     THE WITNESS:  I mean, I was going to
6     say Thomas was eventually terminated from
7     Absolute.
8     BY MR. THOMAS:
9     Q:   How long after this?
10    A:   I -- I think it was after I left.
11    Q:   So we're talking a year?
12    A:   So, no, I left at the end of -- I
13    left at the end of 2016. So this was six
14    months -- I don't remember if Thomas was
15    terminated before or after. I'm sure we can
16    get that to you.
17    Q:   Yeah, we -- we have that information.
18    A:   Sure.
19    Q:   But setting aside -- we have the
20    reason for his termination. Leaving -- I will
21    just represent to you they're not because of
22    this.
23    Is there any -- is it indicative of
24    the culture at Absolute that a person can make
25    a comment like Thomas Kenny did and suffer no
```

Page 166

```
1       D. Berardo
2     repercussions?
3     MR. SULLIVAN:  Objection to form.
4     THE WITNESS:  If the -- if the
5     comment -- if the comment was found to be
6     discriminary, I would say that it would
7     not be indicative of the culture. But we
8     -- we investigated, and it was determined
9     that the -- his intentions were not to be
10    discriminary.
11    BY MR. THOMAS:
12    Q:   And because he didn't have that
13    intention, he suffered no repercussions for
14    what he said?
15    MR. SULLIVAN:  Objection to form.
16    THE WITNESS:  Again, I don't -- I
17    don't recall if there were any
18    repercussions or not.
19    BY MR. THOMAS:
20    Q:   I'm asking you would it be indicative
21    of Absolute culture that a person could say
22    this, regardless of --
23    MS. LESTRADE:  Asked and --
24    BY MR. THOMAS:
25    Q:   -- their intentions --
```

Page 167

```
1       D. Berardo
2     MS. LESTRADE:  -- answered.
3     BY MR. THOMAS:
4     Q:   -- and suffer no negative
5     repercussions? Would that be indicative of
6     how you all ran things?
7     A:   I think --
8     MR. SULLIVAN:  Objection to form.
9     THE WITNESS:  -- I already answered
10    that question.
11    BY MR. THOMAS:
12    Q:   Which is, yes, that it --
13    MR. SULLIVAN:  Objection to --
14    BY MR. THOMAS:
15    Q:   -- could be indicative?
16    MR. SULLIVAN:  Objection to form.
17    THE WITNESS:  No, I don't think
18    that's what I said.
19    BY MR. THOMAS:
20    Q:   I said regardless of his intentions.
21    Let's assume his intentions were fine.
22    A:   His intentions were fine --
23    Q:   It's fine for someone to say this if
24    they have good intentions, and nothing happens
25    to them at Absolute? That's the kind of
```

Page 168

```
1       D. Berardo
2     culture you all have?
3     MR. SULLIVAN:  Objection to form.
4     THE WITNESS:  That's not the type of
5     culture we have.
6     BY MR. THOMAS:
7     Q:   But that's what happened here.
8     MR. SULLIVAN:  Objection to form.
9     THE WITNESS:  I think that comments
10    can be interpreted in a number of different
11    ways to a number of different people.
12    BY MR. THOMAS:
13    Q:   And some are acceptable?
14    MR. SULLIVAN:  Objection to form.
15    THE WITNESS:  I mean, that's --
16    that's -- that would be someone's opinion,
17    if they're acceptable or not.
18    BY MR. THOMAS:
19    Q:   Well, let me ask you this: As an HR
20    person, is this an acceptable comment for an
21    executive vice president of sales to make,
22    regardless of their intention?
23    MR. SULLIVAN:  Objection to form.
24    THE WITNESS:  I think that there
25    would -- there would be some coaching after
```

Page 169

```
1    D. Berardo
2    for sure. If -- if it wasn't -- if it
3    was -- there is -- there's better ways to
4    say it, yes.
5    BY MR. THOMAS:
6    Q:  So, no, it's not acceptable; correct?
7    MR. SULLIVAN:  Objection to form.
8    THE WITNESS:  It's not for me to
9    determine whether it's acceptable or not.
10   BY MR. THOMAS:
11   Q:  You're -- but, I mean, you're head of
12   HR.
13   A:  Well --
14   Q:  What do you mean it's not up to you
15   to determine whether a discriminatory comment
16   is acceptable or not?
17   A:  So --
18   MR. SULLIVAN:  Objection to form.
19   THE WITNESS:  So, again, we're -- we
20   -- we determined --
21   BY MR. THOMAS:
22   Q:  Wait, wait, wait. I want to get back
23   to that. It's not your job? It's not your
24   job to determine whether this -- a
25   discriminatory comment is acceptable or not?
```

Page 170

```
1    D. Berardo
2    A:  That --
3    Q:  You really -- do you stand by that?
4    A:  No, that's not what I said. You're
5    --
6    Q:  Well, let's read back your answer.
7    A:  You're now --
8    MR. THOMAS:  Court reporter, can you
9    read back his answer --
10   THE WITNESS:  You're --
11   MR. THOMAS:  -- about what he said
12   about it being his job.
13   THE WITNESS:  Can you also read back
14   his question, though, so it's not taken out
15   of context.
16   MR. THOMAS:  Absolutely. Please read
17   the question and answer back.
18   (REPORTER READ BACK)
19   THE WITNESS:  So what I meant --
20   BY MR. THOMAS:
21   Q:  It's not -- it's not for you to
22   determine whether a comment like this is
23   acceptable or not?
24   A:  So if I -- so --
25   MR. SULLIVAN:  Objection to form.
```

Page 171

```
1    D. Berardo
2    THE WITNESS:  So when you speak like
3    that, it -- it just -- it confuses me a bit
4    on -- on what we -- we've just talked
5    about.
6    Can you just read back --
7    BY MR. THOMAS:
8    Q:  All right. Let's -- let's start
9    again.
10   A:  Thank --
11   Q:  Is it your job to determine whether a
12   comment about people -- that people make about
13   hiring criteria of the company are acceptable
14   or not?
15   A:  Well, if they're -- yeah, if
16   they're -- if they're discriminatory or not,
17   that is -- that is part of my job.
18   Absolutely.
19   Q:  Okay. And do you find the comment
20   that Thomas -- when you -- when you were head
21   of HR for Absolute, did you find the comment
22   that Thomas Kenny made acceptable or not?
23   A:  Through the investigation, we
24   determined that it -- there wasn't any sort of
25   discrimination. His intent was not
```

Page 172

```
1    D. Berardo
2    discriminatory. As I said before, there are
3    better ways -- there were better -- there
4    would be better ways to -- to say what he was
5    trying to say.
6    Were they discriminatory? We determined
7    that they weren't. I don't know what -- what
8    more you want me to say about that.
9    Q:  Just the truth.
10   A:  That -- that's the truth.
11   Q:  That it was acceptable?
12   MR. SULLIVAN:  Objection --
13   MS. LESTRADE:  Oh, my god.
14   MR. SULLIVAN:  Objection to form.
15   BY MR. THOMAS:
16   Q:  I mean, it's not -- I mean,
17   Mr. Berardo, it's acceptable, or it's not. I
18   will let you choose which -- I mean, I -- I
19   just need the -- I just want the truth. Did
20   you find it acceptable or not acceptable, what
21   he said?
22   A:  Well, I don't think it's --
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  I don't think it's --
25   it's -- it's black and white. Again,
```

Page 173

```
1      D. Berardo
2      there's -- there's different
3      interpretations of the way different people
4      say things. Or different -- different --
5      people say things, and they can be
6      interpreted differently, right, by
7      different people.
8      So we found that the way -- his
9      intent was not discriminatory. And so
10     could he have said it better? I already
11     said yes. I don't know how to answer if it
12     was acceptable or not and -- and in what
13     context.
14     BY MR. THOMAS:
15     Q:  Why is it not -- why is it not
16     discriminatory to say that you want to hire
17     guys who are athletes, talk trash, and get in
18     each other's faces? Why is that not
19     discriminatory?
20     MR. SULLIVAN:  Objection to form.
21     THE WITNESS:  Because we determined
22     that what he meant -- what he was referring
23     to were -- by 'guys' -- I mean, it says
24     here by 'guys,' that's just the way he
25     referenced all people, 'guys.' 'Hey, you
```

Page 174

```
1      D. Berardo
2      guys.' He says it in a generic term, like
3      many people do. At no time did he ever
4      mean men.
5      So -- so when we looked -- when we
6      looked and we asked him -- you know, again,
7      we didn't find his intent to be
8      discriminatory.
9      BY MR. THOMAS:
10     Q:  However, you did find two women who
11     the comment -- they interpreted it in a
12     negative way?
13     A:  Sure, yes.
14     Q:  Right? So on one -- on one hand, you
15     have two women who interpreted it in a
16     negative way; on the other hand, you have an
17     inappropriate comment, but you take the man's
18     word that he didn't mean it in a
19     discriminatory way. Is that how -- is that
20     how it shook out?
21     MR. SULLIVAN:  Objection to form.
22     THE WITNESS:  No, because there --
23     there -- there was context, and there was
24     discussions with these two women. And
25     sitting here today, I can't remember -- you
```

Page 175

```
1      D. Berardo
2      know, I can't remember what they meant by
3      -- when they said they interpreted it in a
4      negative way. Negative doesn't --
5      BY MR. THOMAS:
6      Q:  What weight did you -- what weight
7      did you give to their concerns?
8      MR. SULLIVAN:  Were you finished with
9      your answer?
10     THE WITNESS:  I was saying negative
11     --
12     BY MR. THOMAS:
13     Q:  Were you -- yeah, were you finished?
14     Did you have anything else?
15     A:  Yeah, I was going to say 'negative'
16     doesn't necessarily mean 'discriminatory.'
17     Q:  Okay. What weight did you give to
18     his comments?
19     MR. SULLIVAN:  Objection to form.
20     THE WITNESS:  We -- we would have
21     given -- we would have given their -- their
22     comments equal weight. Absolutely.
23     BY MR. THOMAS:
24     Q:  Somehow, though, the man ends up not
25     getting punished; correct?
```

Page 176

```
1      D. Berardo
2      MR. SULLIVAN:  Objection to form.
3      THE WITNESS:  Because it was
4      determined that his comments were not
5      discriminatory.
6      BY MR. THOMAS:
7      Q:  And one of the people that made that
8      determination was Errol Olsen; correct?
9      MR. SULLIVAN:  Objection to form.
10     THE WITNESS:  I don't -- I don't
11     recall who -- who all was involved with the
12     determination.
13     BY MR. THOMAS:
14     Q:  Well, why don't you turn to page
15     DEFS09807, where you say:
16     Hi, Aaron. Our CFO spoke to Thomas
17     Kenny last week.'
18     Who was your CFO?
19     A:  Our CFO was Errol Olsen.
20     Q:  So the guy who swam nude in front of
21     employees at the -- at the gathering to whom
22     HR reported is the one who is involved in this
23     investigation; correct?
24     MR. SULLIVAN:  Objection to form.
25     BY MR. THOMAS:
```

Page 177

```
1      D. Berardo
2    Q:  Just so I'm clear.
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  Errol was involved with
5     the investigation.
6    BY MR. THOMAS:
7    Q:  Right? And I -- just to be clear,
8     he's the one who swam nude in front of other
9     employees at an employee event; correct?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  I wasn't there. I
12    don't know. Again, it was gossip.
13   BY MR. THOMAS:
14   Q:  And then, somehow, the man's word
15    gets believed; right?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  What -- what man's word
18    gets believed?
19   BY MR. THOMAS:
20   Q:  That would be Mr. Kenny's.
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  It was -- yeah, it was
23    -- well, it was determined that -- that
24    his -- you know, that his statement was not
25    discriminatory.
```

Page 178

```
1      D. Berardo
2    BY MR. THOMAS:
3    Q:  What a shock.
4    MR. SULLIVAN:  Is that a question?
5    MR. THOMAS:  No, just a statement.
6    MR. SULLIVAN:  Or a speech?
7    MR. THOMAS:  Actually, I don't think
8     it was long enough for a speech, but
9     whatever you -- whatever you want to call
10    it is fine with me.
11   MR. SULLIVAN:  We'll call it a
12    speech.
13   MR. THOMAS:  It was a part -- maybe a
14    part of the closing statement.
15   BY MR. THOMAS:
16   Q:  Have you ever heard about -- did you
17    ever hear about the movie 'Mall Cops'?
18   A:  'Mall Cops'?
19   Q:  Yes.
20   A:  I think so, yeah.
21   Q:  Do you remember the -- the joke in
22    there was that mall cops -- all that mall cops
23    do is observe and report?
24   A:  I -- I don't -- I don't recall that,
25    no.
```

Page 179

```
1      D. Berardo
2    Q:  Okay. Do you feel that you were
3     doing more in this situation than a mall cop,
4     whose job was to observe and report?
5    MR. SULLIVAN:  Don't answer that.
6     That's an insulting question. Don't answer
7     that question.
8     Move on.
9    BY MR. THOMAS:
10   Q:  Did you do anything -- did you do
11    anything more in this case besides observe and
12    report?
13   A:  Clearly. We investigated.
14   Q:  You observed and you reported, but
15    you didn't take any action, did you?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  I don't recall which
18    action we took. We had a -- we made a
19    determination, which is action.
20   BY MR. THOMAS:
21   Q:  And the action and determination was
22    there was nothing -- there was nothing wrong
23    here?
24   A:  There was no discrimination that
25    was -- that was intended here, correct.
```

Page 180

```
1      D. Berardo
2    Q:  Did you attend the 2015 executive
3     managers' meeting in Whistler?
4    A:  I -- I attended. I did attend an
5     executive leadership team meeting in Whistler.
6     I don't recall if it was 2015. It must have
7     been.
8    Q:  Sorry, what was that?
9    A:  I said it must have been. I did
10    attend an executive leadership team meeting in
11    Whistler.
12   Q:  Do you remember any women being
13    present there?
14   A:  I don't recall, no.
15   Q:  What was discussed in that meeting?
16   A:  It was a -- it was a lot of strategy.
17    I mean, I --
18   Q:  Discussions about who were going to
19    be retained, who were going to be let go?
20   A:  No. No. It was -- I -- from -- from
21    -- from my recollection, it -- it wasn't that
22    type of meeting. It was about the strategy of
23    the company.
24   Q:  Was it about the reorganization?
25   A:  I don't remember if -- if we
```

Page 181

D. Berardo

1  discussed any -- any reorganization. I don't
2
3  recall.
4  Q:  Let me ask you did Amy Rathbun ever
5  complain to you about her treatment at the
6  company?
7  A:  Never.
8  Q:  And you wouldn't consider her
9  comments to you on Exhibit 36 an example of
10  complaining about that; right?
11  A:  I don't -- I don't remember our
12  conversation specifically, so I can't even
13  answer that question.
14  Q:  But she was one of the ones you
15  interviewed; right?
16  A:  That's -- that -- from my
17  recollection, yes.
18  Q:  And she interpreted Tom Kenny's
19  comments in a negative way; right?
20  A:  That's what it says here, yes.
21  Q:  And that she knows that's how Tom
22  Kenny is; right?
23  A:  They know how TK is. That's what it
24  says, yes.
25  Q:  And you -- and you don't consider

Page 182

D. Berardo

1
2  that her complaining about being -- feeling
3  discriminated against?
4  A:  I don't recall our conversation, our
5  specific conversation. I -- I know Amy and I
6  had a lot of conversations, and -- and never
7  once did it come up that she ever felt or
8  interpreted comments as discriminatory.
9  Q:  Let's go now to Exhibit 38 and the
10  answer to interrogatory 15, which is on
11  page 17. If you go to the last sentence, it
12  talks about who was at the meeting when Thomas
13  Kenny made his comments. Do you see that?
14  A:  What page are we looking at? Sorry.
15  Q:  Page 17.
16  A:  Oh, 15 here?
17  MS. LESTRADE:  Yeah.
18  THE WITNESS:  Number 15?
19  MR. SULLIVAN:  Yes.
20  THE WITNESS:  Okay.
21  MR. SULLIVAN:  I think the question
22  is on the prior page.
23  THE WITNESS:  Okay.
24  BY MR. THOMAS:
25  Q:  All right. The culture that exists

Page 183

D. Berardo

1  at Absolute resulted in none of those people
2  telling you what Thomas Kenny said about the
3  hiring criteria at Absolute; correct?
4  MR. SULLIVAN:  Objection to form.
5  THE WITNESS:  That's not correct.
6  BY MR. THOMAS:
7  Q:  Did -- did any of them come to you
8  and tell you --
9  MR. SULLIVAN:  Objection --
10  BY MR. THOMAS:
11  Q:  -- without you asking them first?
12  MR. SULLIVAN:  Objection to form.
13  THE WITNESS:  No one told me about
14  those comments.
15  BY MR. THOMAS:
16  Q:  Okay. And that's consistent with how
17  things happened at Absolute, isn't it?
18  MR. SULLIVAN:  Objection to form.
19  THE WITNESS:  That's incorrect.
20  BY MR. THOMAS:
21  Q:  It's inconsistent?
22  A:  No, I said your statement is
23  incorrect.
24  Q:  Okay. Why is it incorrect?
25

Page 184

D. Berardo

1
2  A:  Because you're -- you're making the
3  assumption that no one would come or raise
4  issues at Absolute, and that was the culture.
5  Q:  No one came or raised issues about
6  Thomas Kenny's comment, did they? None of
7  those people?
8  A:  About his comment, no.
9  Q:  That's the kind of culture that
10  existed at Absolute, isn't it?
11  MR. SULLIVAN:  Objection to form.
12  THE WITNESS:  It -- that is -- I -- I
13  don't agree with what you're saying.
14  BY MR. THOMAS:
15  Q:  Why is -- why is -- why is that
16  not -- is it consistent with the culture at
17  Absolute or not consistent?
18  MR. SULLIVAN:  Objection to form.
19  THE WITNESS:  We have -- there --
20  there was numerous times where people have
21  come to raise concerns about various
22  different issues, so it's not indicative of
23  the culture.
24  BY MR. THOMAS:
25  Q:  So this was a -- this was surprising,

Page 185

| | |
|---|---|
| 1 | D. Berardo |
| 2 | that people didn't come to you about this? |
| 3 | MR. SULLIVAN:  Objection to form. |
| 4 | THE WITNESS:  I don't -- I don't |
| 5 | remember my feelings. |
| 6 | BY MR. THOMAS: |
| 7 | Q:  Sitting here today, are you surprised |
| 8 | that people did not come to you about it? |
| 9 | MR. SULLIVAN:  Objection to form. |
| 10 | BY MR. THOMAS: |
| 11 | Q:  Given the culture at Absolute at the |
| 12 | time? |
| 13 | MR. SULLIVAN:  Objection to form. |
| 14 | THE WITNESS:  Do I find it |
| 15 | surprising? I -- I think -- I think I |
| 16 | mentioned before I would have liked -- you |
| 17 | know, I would have appreciated if someone |
| 18 | would have raised it to me. |
| 19 | BY MR. THOMAS: |
| 20 | Q:  My question to you is is it |
| 21 | consistent with Absolute culture that no one |
| 22 | came forward? |
| 23 | A:  I think I -- |
| 24 | MR. SULLIVAN:  Objection to form. |
| 25 | THE WITNESS:  I've already answered |

Page 186

| | |
|---|---|
| 1 | D. Berardo |
| 2 | that question numerous times. |
| 3 | BY MR. THOMAS: |
| 4 | Q:  And your answer is that it's |
| 5 | inconsistent; correct? |
| 6 | MR. SULLIVAN:  Objection to form. |
| 7 | THE WITNESS:  The -- no one -- no one |
| 8 | coming to me was inconsistent with what the |
| 9 | culture generally was at Absolute. |
| 10 | BY MR. THOMAS: |
| 11 | Q:  Were you aware at that Whistler -- |
| 12 | that Whistler meeting about employees that |
| 13 | Absolute wanted to retain and intend to stay |
| 14 | on? |
| 15 | A:  I don't -- I don't recall the |
| 16 | conversation, off the top of my head. |
| 17 | Q:  Do you remember a point in time where |
| 18 | Ms. Piehler was investigated regarding the |
| 19 | Department of Education, the DOE? |
| 20 | A:  Yeah. |
| 21 | Q:  Tell me what you remember about that. |
| 22 | A:  That someone had raised concerns |
| 23 | that -- that -- |
| 24 | Q:  Who was that -- who was that someone? |
| 25 | A:  So I think, originally -- and -- and |

Page 187

| | |
|---|---|
| 1 | D. Berardo |
| 2 | this is -- my -- memory may be failing me, |
| 3 | so I -- I want to make sure I say that. But I |
| 4 | think it was -- they didn't come directly to |
| 5 | me, but -- but they -- but it was -- it was |
| 6 | Matt Meanchoff. He raised it to someone. It |
| 7 | could have been -- it was someone in finance, |
| 8 | perhaps. It could have been Errol; it could |
| 9 | have been Lee. I'm not sure. About Mary and |
| 10 | her team booking business in a certain way, |
| 11 | booking it as new business versus renewal |
| 12 | business. |
| 13 | Q:  Did you participate in the |
| 14 | investigation of the DOE issue? |
| 15 | A:  Limitedly. |
| 16 | Q:  What -- tell -- describe your role. |
| 17 | A:  So from -- from what I recall, I had |
| 18 | sat on -- I sat -- sat on an interview or two, |
| 19 | but it was largely a -- it was largely a |
| 20 | number. So they were -- they were trying to |
| 21 | find out -- trying to find out how these |
| 22 | numbers got booked into where. So it was |
| 23 | largely, I think, run by finance. Perhaps |
| 24 | legal. I don't recall specifically. |
| 25 | Q:  Who -- who do -- what interviews do |

Page 188

| | |
|---|---|
| 1 | D. Berardo |
| 2 | you remember sitting in on? |
| 3 | A:  I don't -- I don't recall off the top |
| 4 | of my head. |
| 5 | Q:  Were you aware that regional |
| 6 | directors are generally not responsible for |
| 7 | recording orders on sales in their region? |
| 8 | A:  They would ultimately be responsible |
| 9 | because they have people reporting in to them, |
| 10 | so they do have the ultimate responsibility. |
| 11 | Q:  But they're -- but you understand |
| 12 | they're not the ones responsible for entering |
| 13 | the sales or the orders; correct? |
| 14 | A:  Well, the -- the data entry? They |
| 15 | wouldn't -- I -- to my knowledge, they |
| 16 | wouldn't be, actually, data-inputting the |
| 17 | numbers into the system. That wouldn't be |
| 18 | their -- |
| 19 | Q:  Or deciding where they should go; |
| 20 | correct? |
| 21 | A:  No, ultimately -- so -- ultimately, I |
| 22 | believe that's their responsibility. That's |
| 23 | just my understanding of it. I -- I -- I was |
| 24 | not in sales ops, and I didn't really have |
| 25 | visibility into how business was booked, |

Page 189

```
D. Berardo
1   D. Berardo
2   specifically. But -- but the regional --
3   regional directors would -- would ultimately
4   be responsible for the team that they have
5   under them.
6   Q:  Did you know that Absolute
7   investigated Mary Piehler and her subordinate,
8   Charles Springgay, in relation to the issue of
9   the DOE?
10  A:  Yes.
11  Q:  And what is the race of Charles
12  Springgay?
13  A:  I mean, I don't know the specific
14  race. He is -- he --
15  Q:  African American?
16  A:  No. Charles Springgay would be --
17  would be of Asian decent, perhaps.
18  Q:  Do you know or not know?
19  A:  I mean, I -- I'm -- I would only
20  visually -- be visually observing. So I don't
21  know for certain what his background was.
22  Q:  Fair to say that he's a racial
23  minority?
24  A:  It depends how you define racial
25  minority. In --
```

Page 190

```
1   D. Berardo
2   Q:  As an HR person.
3   A:  In Vancouver -- in Vancouver, he
4   would not be considered a racial minority.
5   Q:  In the United States, would he be
6   considered a racial minority?
7   MR. SULLIVAN:  Objection to form.
8   THE WITNESS:  I believe so.
9   BY MR. THOMAS:
10  Q:  Now, Mary Piehler and Charles
11  Springgay were investigated, but Mike Kenny -
12  Mike Kenny and his subordinate, Justin
13  Peacock, weren't investigated as part of this;
14  correct?
15  A:  I don't --
16  Q:  DOE.
17  A:  I don't recall. I -- I don't know
18  the specifics. Or recall the specifics.
19  Q:  Do you have any reason to believe
20  that Mike Kenny was investigated?
21  A:  I don't even know if he was -- he was
22  employed at that time. I don't know. I don't
23  -- I don't recall.
24  Q:  Do you have any reason to believe he
25  was investigated?
```

Page 191

```
1   D. Berardo
2   A:  I don't recall.
3   Q:  Why weren't Mike Kenny's commissions
4   held on his DOE orders?
5   MR. SULLIVAN:  Objection to form.
6   THE WITNESS:  I don't know.
7   BY MR. THOMAS:
8   Q:  But Mary Piehler's were; correct?
9   MR. SULLIVAN:  Objection to form.
10  THE WITNESS:  I -- I don't recall the
11  specifics on -- on -- on that.
12  BY MR. THOMAS:
13  Q:  Do you remember the time Mary
14  Piehler's commissions were withheld?
15  A:  If you're asking me to answer with
16  certainty, I can't answer with certainty. I
17  don't remember.
18  Q:  What is your recollection right now?
19  A:  My recollection from -- from -- from
20  what I remember is that there was a number of
21  people who had their commission withheld
22  during the investigation. I --
23  Q:  Who were -- who were they?
24  A:  Well, so -- so under investigation, I
25  think it was Charles, Mary, and I think it was
```

Page 192

```
1   D. Berardo
2   Justin Peacock. Those were kind of --
3   Q:  But not Ian Dunton, and not Mike
4   Kenny; correct?
5   A:  I don't remember. Perhaps. I -- I
6   don't know.
7   Q:  Did you approve of not paying Mary
8   her commissions for the DOE order -- for the
9   DOE orders, even though the investigation had
10  not been completed?
11  MR. SULLIVAN:  Objection to form.
12  THE WITNESS:  Did I approve us --
13  Hyperwallet not paying -- sorry, did I
14  approve Absolute not paying her
15  commissions?
16  BY MR. THOMAS:
17  Q:  Yes.
18  A:  That wouldn't have been my
19  determination.
20  Q:  Were you involved in the
21  determination?
22  A:  I don't recall.
23  Q:  Why would someone's commission --
24  from an HR perspective, why would someone's
25  commissions be withheld when the investigation
```

1      D. Berardo
2    had not even been completed?
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  So I -- I can only -- I
5    can only -- I can only speculate, like --
6    BY MR. THOMAS:
7    Q:   No, I'm not asking you to speculate.
8    As an HR manager at Absolute --
9    A:   Right.
10   Q:   -- why would an employee's
11   commissions be held under your tenure when the
12   investigation into the issue had not been
13   completed?
14   A:   So --
15   MR. SULLIVAN:  Objection to form.
16   THE WITNESS:  -- are we talking about
17   in general? Or are we talking about the
18   specific incident?
19   BY MR. THOMAS:
20   Q:   We'll take -- we'll take DOE
21   specifically.
22   A:   Because I don't recall -- I don't
23   recall why or why not for that --
24   Q:   Would there ever -- would there ever
25   be a reason to withhold someone's commissions

1      D. Berardo
2    when an investigation hadn't been completed,
3    again, in your role as head of HR at Absolute?
4    MR. SULLIVAN:  Objection to form.
5    THE WITNESS:  During an
6    investigation, if we were investigating
7    something, I think it -- it would be
8    justified to withhold commissions.
9    BY MR. THOMAS:
10   Q:   Would it be justified to withhold
11   some people's commissions but not others?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  I mean -- I mean, it
14   would depend on the circumstances. I don't
15   know how to answer that.
16   BY MR. THOMAS:
17   Q:   What about withholding them from the
18   minority female employees, but paying them to
19   the white male employees? Would that be
20   acceptable?
21   A:   No, it wouldn't --
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  It would not be
24   acceptable to withhold or not withhold
25   based on race or gender.

1      D. Berardo
2    BY MR. THOMAS:
3    Q:   Would that be consistent with
4    Absolute's culture, though?
5    A:   Well --
6    MR. SULLIVAN:  Objection to form.
7    THE WITNESS:  -- absolutely not.
8    BY MR. THOMAS:
9    Q:   Isn't it true that Mary Piehler was
10   totally exonerated on the issue of the DOE
11   orders?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  I don't know if I would
14   use those terms. I -- from what I recall,
15   it was determined that -- that a definitive
16   determination couldn't be made, and so the
17   commissions were paid out as was booked.
18   BY MR. THOMAS:
19   Q:   Isn't it true that Todd Awtry
20   acknowledged that he had been told that that's
21   how the commissions were paid?
22   MR. SULLIVAN:  Objection to form.
23   BY MR. THOMAS:
24   Q:   Were going to be paid?
25   A:   I don't recall.

1      D. Berardo
2    Q:   Well, then, how can -- how can you
3    not recall that and recall that there was not
4    complete exoneration for Mary Piehler?
5    MR. SULLIVAN:  Objection to form.
6    THE WITNESS:  Well, I -- I recall --
7    well, I don't recall that -- you're asking
8    me -- you're asking me a specific question
9    about Todd. I don't remember that
10   interaction with Todd.
11   BY MR. THOMAS:
12   Q:   Do you remember there -- was there
13   any wrongdoing associated with Mary Piehler
14   coming out of the DOE investigation?
15   A:   I mean, I...
16   Q:   That you recall?
17   A:   That I recall?
18   Q:   Yeah.
19   A:   Not that I recall.
20   Q:   It's true that Todd Awtry tried to
21   get Mary Piehler fired over the DOE
22   commissions; correct?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  Not that I recall, no.
25   MR. THOMAS:  If the court reporter

Berardo_Daniel

Page 197

```
1        D. Berardo
2    could show the witness Awtry Exhibit 73 as
3    well as Exhibit 74.
4    THE WITNESS:  Just while we're doing
5    that, can I just take a quick break?
6    MR. SULLIVAN:  Sure.
7    VIDEOGRAPHER:  Going off the record.
8    The time is 3:49.
9        (PROCEEDINGS RECESSED AT 3:49?P.M.)
10       (PROCEEDINGS RECONVENED AT 3:57 P.M.)
11   VIDEOGRAPHER:  Back on the record.
12   The time is 3:57.
13   BY MR. THOMAS:
14   Q:  Okay. Let me show you what has been
15   marked as Exhibit 73 and 74. Once you've had
16   a chance to read them, let me know.
17   A:  Sure. Okay.
18   Q:  Does -- do these exhibits refresh
19   your recollection as to whether Todd Awtry was
20   trying to get Mary Piehler fired over the DOE
21   issue?
22   A:  Does it -- does it -- I mean, I don't
23   know how to answer that question. I mean,
24   I -- I see here he asks -- he asks us:
25   Do we have enough grounds to -- for
```

Page 198

```
1        D. Berardo
2    termination for all three?'
3    Q:  And what does he say immediately
4    after that?
5    A:  So he says:
6    I believe we do, but I want others'
7    thoughts.'
8    Q:  So does that suggest to you that Todd
9    Awtry was trying to get Mary Piehler fired
10   over the DOE issue?
11   A:  No, I would say that he was asking
12   for multiple people's opinions on if there was
13   enough grounds for termination.
14   Q:  What was his opinion?
15   A:  Well, he says:
16   I believe we do, but want others'
17   thoughts.'
18   Q:  Yeah, so what was his opinion?
19   A.'I believe we do, but we want other's
20   thoughts.'
21   Q:  No, no, I didn't ask you -- what --
22   what was his opinion. His opinion was 'I
23   believe we do'; correct?
24   A:  Oh.
25   MR. SULLIVAN:  Objection to form.
```

Page 199

```
1        D. Berardo
2    THE WITNESS:  Sure. 'I believe we
3    do.'
4    BY MR. THOMAS:
5    Q:  All right. And then what did you --
6    do you remember responding to him at all?
7    A:  I don't recall off the top -- I don't
8    -- I don't recall if I responded or -- or
9    didn't. I don't know.
10   Q:  Okay. Was this the email you saw in
11   preparation for this deposition today?
12   A:  I don't -- I mean, thinking back, I
13   think at one point, we did look at this email
14   on Exhibit 73, but not -- I don't recall
15   looking at 74. I could be wrong.
16   Q:  And on 74, he pushes again, doesn't
17   he, for an answer to his question as to
18   whether Mary Piehler can be fired, and he
19   thought that there were grounds to do so.
20   Right?
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  Response to my
23   question. I don't know what he was
24   referring to.
25   BY MR. THOMAS:
```

Page 200

```
1        D. Berardo
2    Q:  What question had he asked the day
3    before to the same recipients?
4    A:  So this was June 27th, 2014, at 10:33
5    a.m. And then June 26th at 5:03 to Lee,
6    Michael, Matt -- well, Matt's on this email,
7    but not on this email. So it's not the same
8    recipients. But on the --
9    Q:  Almost -- almost -- almost identical
10   recipients. Fair to say?
11   A:  And here he includes Michael Kenny
12   and Thomas -- or, sorry, Michael Kenny was
13   involved -- or was in the June 26th email, but
14   Thomas --
15   Q:  It's virtually the same -- it's
16   virtually the same recipients. And the next
17   morning, he had [indiscernible] demanding an
18   answer to his question, didn't he?
19   MR. SULLIVAN:  Objection to form.
20   THE WITNESS:  So I can't answer that
21   because I don't know if this is related.
22   BY MR. THOMAS:
23   Q:  And was...
24   A:  Like, the --
25   Q:  It's strange, isn't it --
```

Berardo_Daniel

Page 201

D. Berardo

1    A:  Okay.
2    Q:  -- that Todd Awtry is trying to get
3    Mary Piehler fired, which is several months
4    before Mary Piehler had told him about how the
5    commissions would be allocated, and he thanked
6    her for the heads-up. Right?
7    MR. SULLIVAN:  Object --
8    BY MR. THOMAS:
9    Q:  Isn't that weird?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  I think he was
12   asking -- he was asking if there was enough
13   grounds for termination.
14   BY MR. THOMAS:
15   Q:  But why should there be enough
16   grounds when three -- when, several months
17   before, he was told by Mary this is the way
18   things were going to be done, and he thanked
19   her for it?
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  I'm sorry. What
22   exhibit was at that? Just to --
23   MR. THOMAS:  If the court reporter
24   could show him Exhibit Awtry 71.

Page 202

D. Berardo

1    THE WITNESS:  Okay.
2    BY MR. THOMAS:
3    Q:  So March 17th, Todd is told exactly
4    how this allocation is going to go. He thanks
5    Mary Piehler for it. And in June, he's trying
6    to get her fired over it. Does that -- does
7    that concern you at all?
8    A:  Well --
9    MR. SULLIVAN:  Objection to form.
10   THE WITNESS:  -- all I see is -- is
11   he -- him saying 'thanks for the -- for
12   heads -- thanks for heads-up.'
13   BY MR. THOMAS:
14   Q:  Okay.
15   A:  I don't see any --
16   Q:  Does this concern you at all that he
17   knew this was how the DOE was going to be
18   allocated; he said 'thanks for the heads-up';
19   and then, several months later, was trying to
20   fire Mary Piehler over it?
21   MR. SULLIVAN:  Objection to form.
22   BY MR. THOMAS:
23   Q:  Does that concern you?
24   A:  Well, I don't -- I don't know if he

Page 203

D. Berardo

1    was trying to fire Mary. He asked, 'Do we
2    have grounds enough for termination?'
3    Q:  Does it concern you that he thought
4    there were grounds enough for termination
5    when, several months before, he had been told
6    how the allocation was going to go, and he
7    thanked Mary Piehler for the heads-up?
8    MR. SULLIVAN:  Objection to form.
9    BY MR. THOMAS:
10   Q:  Does that concern you?
11   A:  I -- I don't know if he -- I don't
12   know if he had agreed to this or he had forgot
13   about this. You know...
14   Q:  My question to you is does it concern
15   you?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  I don't remember if it
18   concerned me or not.
19   BY MR. THOMAS:
20   Q:  Does it concern you sitting here
21   today?
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  Well, knowing the
24   facts, it doesn't concern me.

Page 204

D. Berardo

1    BY MR. THOMAS:
2    Q:  Why?
3    A:  Just because this email seems pretty
4    ambiguous.
5    Q:  How is it ambiguous when it precisely
6    describes the issue that he accused her of
7    doing that resulted -- that resulted in her
8    termination?
9    MR. SULLIVAN:  Objection to form.
10   THE WITNESS:  Well, I don't -- I
11   don't see him agreeing to -- to what she is
12   proposing.
13   BY MR. THOMAS:
14   Q:  You don't think 'thanks for the
15   heads-up' is an agreement that the allocation
16   is okay?
17   A:  I don't -- I don't think that.
18   When -- when someone says 'thanks for the
19   heads-up,' it doesn't say 'I agree,' no.
20   Q:  Okay. It -- can you think of any
21   time in the company where a woman's word has
22   been believed over a man's --
23   MR. SULLIVAN:  Objection to form.
24   BY MR. THOMAS:

Page 205

D. Berardo

1  Q: -- when you were the head of HR at
2  Absolute?
3
4  A: I mean, I -- absolutely, but I -- I
5  can't think of specifics.
6  Q: One example. Just give me one.
7  A: I mean, I -- you're -- you're asking
8  me something from five years -- five
9  years-plus ago.
10  Q: Yeah. Can you remember any time in
11  the entire time you worked at Absolute for the
12  five years that HR ever accepted the word of a
13  man -- of a woman over a man?
14  MR. SULLIVAN: Objection to form.
15  THE WITNESS: I -- I -- off the top
16  of my head, I can't recall situations on
17  either -- either way. I mean...
18  BY MR. THOMAS:
19  Q: Well -- well, what about -- well, the
20  last several we've been over, you have
21  accepted the man's word over the woman's, no
22  doubt. Right?
23  MR. SULLIVAN: Objection to form.
24  THE WITNESS: Sorry -- sorry, what
25  are you referencing?

Page 206

D. Berardo

1
2  BY MR. THOMAS:
3  Q: I'm referencing Thomas Kenny's
4  comment that made women feel uncomfortable,
5  and they said that that was typical of him, and
6  nothing happened to Thomas Kenny, and --
7  because it was believed it was not
8  discrimination. I'm talking here about Todd
9  Awtry approving the commission payments to
10  Mary Piehler and trying to get her fired two
11  months later and you, again, believing, as you
12  sit here today, Todd Awtry over Mary Piehler.
13  MR. SULLIVAN: Objection.
14  THE WITNESS: That's --
15  BY MR. THOMAS:
16  Q: So those are two examples going that
17  way. Can you think of any examples where a
18  woman has ever been believed at Absolute over
19  a man?
20  A: So --
21  MR. SULLIVAN: Objection to form.
22  THE WITNESS: -- sorry, you -- the
23  way you described that was not accurate.
24  BY MR. THOMAS:
25  Q: Okay. Let's -- let's go back to the

Page 207

D. Berardo

1  point.
2
3  A: Sure.
4  Q: Give me an example of where a woman's
5  word was believed over a man's at Absolute.
6  MR. SULLIVAN: Objection to form.
7  THE WITNESS: You're -- you're -- I
8  mean, you're asking me for -- to -- to come
9  up with specific examples from five years
10  ago about conversations --
11  BY MR. THOMAS:
12  Q: Any specific example.
13  A: I don't --
14  Q: One.
15  A: I -- I just don't -- I just can't
16  think of anything right now.
17  Q: Okay. Now -- and you're head of HR,
18  so you know this is going on here, and you
19  don't even think it's worthy of investigating
20  why Todd Awtry, several months later, is
21  trying to get Mary Piehler fired, even though
22  he knew how the commissions were being done
23  several months earlier?
24  MR. SULLIVAN: Objection to form.
25  THE WITNESS: So he has -- he has

Page 208

D. Berardo

1
2  asked the questions not just for Mary, but
3  'do we have enough grounds for termination
4  for all three?'
5  BY MR. THOMAS:
6  Q: Okay. But Mary Piehler is one of
7  them.
8  A: Correct.
9  Q: Right? Can we agree on that?
10  A: Yeah. Yes, we can.
11  Q: Okay. So -- and two months -- two or
12  three months before, Todd Awtry said 'thanks
13  for the heads-up.'
14  A: He said 'thanks --'
15  Q: So --
16  A: '-- for the -- thanks for --'
17  Q: -- [indiscernible] --
18  A: '-- the heads-up.'
19  Q: Let's just take that back. When he
20  received that email, if he thought that what
21  Mary Piehler was doing was wrong, it should
22  have raised a red flag in your mind that he
23  was setting her up for termination several
24  months later.
25  MR. SULLIVAN: Objection to form.

**Page 209**

```
1    D. Berardo
2    THE WITNESS:  I don't have -- know
3    how one equals the other. I think it was
4    determined --
5    BY MR. THOMAS:
6    Q:  So let's -- okay. [Indiscernible] --
7    MR. SULLIVAN:  Wait a minute.
8    BY MR. THOMAS:
9    Q:  -- [indiscernible] --
10   MR. SULLIVAN:  Had you --
11   BY MR. THOMAS:
12   Q:  -- [indiscernible] --
13   MR. SULLIVAN:  -- finished your --
14   had you finished your answer?
15   THE WITNESS:  Yes.
16   BY MR. THOMAS:
17   Q:  Well, if you don't understand the --
18   if you don't understand the question, let me
19   -- let me rephrase it.
20   MR. SULLIVAN:  I don't think he said
21   he didn't understand it. He just hadn't
22   finished answering.
23   MR. THOMAS:  Can the court reporter
24   read back his answer.
25   MR. SULLIVAN:  The portion before you
```

**Page 210**

```
1    D. Berardo
2    cut him off?
3    MR. THOMAS:  Yeah.
4    MR. SULLIVAN:  Okay.
5    THE COURT REPORTER:  I actually
6    didn't get it because of the interruptions.
7    BY MR. THOMAS:
8    Q:  So let me tell you how one equals the
9    other here. Mary Piehler sent this email to
10   Todd Awtry in March. If Todd Awtry thought
11   this was -- this commission system was grounds
12   for termination, what he was doing was setting
13   her up and waiting until several months later
14   and then saying 'I think we have grounds to
15   fire all three,' would that concern you?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  I -- I just don't agree
18   with your assessment, so...
19   BY MR. THOMAS:
20   Q:  Okay. And you don't agree with my
21   assessment, because it appears as though Todd
22   is saying it's fine; this commission system is
23   fine. Right?
24   MR. SULLIVAN:  Objection to form.
25   THE WITNESS:  He says 'thanks for
```

**Page 211**

```
1    D. Berardo
2    heads-up.'
3    BY MR. THOMAS:
4    Q:  What -- what -- what is he doing
5    there? Is he -- does he think the commission
6    system is okay or not okay?
7    MR. SULLIVAN:  Objection to form.
8    THE WITNESS:  I don't know.
9    BY MR. THOMAS:
10   Q:  Okay. Is that something you should
11   have looked at, given the fact that he tried
12   to fire the employee two months later?
13   MR. SULLIVAN:  Objection to form.
14   THE WITNESS:  From my recollection,
15   the reason why this didn't move forward and
16   was ambiguous was because of this email,
17   so...
18   BY MR. THOMAS:
19   Q:  So why didn't you look at what Todd
20   Awtry -- what Todd Awtry was up to?
21   MR. SULLIVAN:  Objection to form.
22   THE WITNESS:  There were -- there
23   were -- I -- I didn't -- I didn't have any
24   concerns. I mean...
25   BY MR. THOMAS:
```

**Page 212**

```
1    D. Berardo
2    Q:  You don't have any concerns when an
3    employee -- when a manager is trying to fire
4    an employee when he shouldn't, and he knows
5    that -- he knows that he's not telling -- that
6    the employee is doing things correctly?
7    MR. SULLIVAN:  Objection to form.
8    BY MR. THOMAS:
9    Q:  That doesn't concern you?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  Well -- well, that's
12   why we had this investigation. Because the
13   company investigated, and then it was
14   determined, because of this email, that the
15   allegation -- or the -- how the -- the
16   businesses were booked, it was -- it was
17   ambiguous, because this email that Mary had
18   sent to Todd that said 'thanks for
19   heads-up.'
20   BY MR. THOMAS:
21   Q:  And you didn't bother -- it didn't
22   concern you at all to investigate what was --
23   what Todd was up to?
24   MR. SULLIVAN:  Objection to form.
25   THE WITNESS:  Well, I -- I -- from
```

Page 213

```
1        D. Berardo
2    what I recall, Todd -- Todd forgot --
3    forgot about this email.
4    BY MR. THOMAS:
5    Q:  Well, forgot? Or did you investigate
6    whether he truly forgot? Or did you look at
7    it at all? Or did you just say, 'oh,
8    whatever.'
9    A:  How would we --
10   Q:  'A man is trying -- I hear a man is
11   trying to fire a woman at Absolute. That --
12   we didn't fire her, so we're not even going to
13   bother looking into what the man is doing.'
14   A:  So --
15   MR. SULLIVAN:  Objection to form.
16   THE WITNESS:  -- just -- just to
17   clarify again, he was asking for
18   termination of all three, and there's --
19   BY MR. THOMAS:
20   Q:  Okay. But [indiscernible] --
21   A:  -- two men --
22   Q:  -- about Mary --
23   A:  There's two men and one woman, so --
24   Q:  M'mm-hmm?
25   A:  -- so I -- no, I mean, the -- the
```

Page 214

```
1        D. Berardo
2    connection -- I mean, I didn't --
3    Q:  You didn't draw that?
4    A:  I didn't draw that --
5    Q:  You, as head of -- you, as head of
6    HR, didn't draw the connection?
7    A:  I -- I -- no, I didn't draw the
8    connection, and I -- and I still wouldn't draw
9    it today.
10   Q:  You didn't draw the connection even
11   after Ms. Piehler said that Todd Awtry was out
12   to get her, didn't you?
13   MR. SULLIVAN:  Objection to form.
14   THE WITNESS:  Out to get her?
15   BY MR. THOMAS:
16   Q:  Yeah.
17   A:  I -- I don't recall her saying that.
18   I mean, maybe she -- she did. I don't...
19   Q:  And you didn't investigate her
20   complaints about Todd Awtry saying that she
21   was stealing and lying falsely? You didn't
22   even bother to look at that?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  This whole
25   investigation was around that.
```

Page 215

```
1        D. Berardo
2    BY MR. THOMAS:
3    Q:  Okay. And what did you do to counsel
4    Todd Awtry about his conduct in this
5    situation?
6    MR. SULLIVAN:  Objection to form.
7    THE WITNESS:  I mean, I'm -- I'm --
8    so I'm -- I'm certain that there were
9    conversations with Todd. I -- I don't
10   recall specifically what was said to him.
11   BY MR. THOMAS:
12   Q:  Did they include saying to him that
13   he should not be treating his female
14   subordinates the way he had been?
15   A:  No.
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  No, there was no
18   conversations.
19   UNIDENTIFIED SPEAKER:  Can we just
20   [indiscernible] --
21   BY MR. THOMAS:
22   Q:  Sorry, go ahead.
23   A:  There was no conversations of that
24   nature.
25   Q:  Because that was not something you
```

Page 216

```
1        D. Berardo
2    even investigated, was it?
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  That he was
5    discriminating against Mary because of her
6    gender?
7    BY MR. THOMAS:
8    Q:  Correct.
9    A:  It was not something we investigated
10   because it was not something that we thought
11   was relevant in the situation.
12   Q:  It never crossed your mind, never
13   raised a red flag; right?
14   MR. SULLIVAN:  Objection to form.
15   THE WITNESS:  No, there -- there were
16   three people involved in this situation,
17   and two were male.
18   BY MR. THOMAS:
19   Q:  Oh, so that means that that -- it
20   couldn't be discrimination against Mary
21   Piehler because of her gender?
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  Well, I mean, no, I'm
24   not saying that, but I'm -- I'm saying that
25   there -- there was -- there would be no red
```

Page 217

D. Berardo

1    flags in my head that this was because of
2    her gender. That's what I'm telling you.
3    BY MR. THOMAS:
4    Q:   Even when she complained about it, it
5    raised no red flags?
6    A:   Complained that she was discriminated
7    on because of her gender? Is that what you're
8    asking me?
9    Q:   We'll -- we'll come back to that.
10   A:   Okay.
11   MR. THOMAS:  Let's go to -- if the
12   court reporter could show the witness
13   Exhibit Awtry 76.
14   THE WITNESS:  Okay.
15   BY MR. THOMAS:
16   Q:   Just to get the timeline straight
17   here, on June 26th, Todd Awtry is saying that
18   he believes there's enough grounds to
19   terminate Mary Piehler. Ultimately, she's not
20   terminated because there -- she didn't do
21   anything wrong. And then on July 2nd, what
22   does she want to -- what does he want to do to
23   Mary Piehler?
24   A:   So from reading this email, he wants

Page 218

D. Berardo

1    to put her on a performance improvement plan
2    because of her Manage and Service numbers.
3    Q:   So within five days of not being able
4    to fire her, he then switches reasons and
5    wants to put her on a PIP for something else;
6    right?
7    MR. SULLIVAN:  Objection to form.
8    THE WITNESS:  That's correct.
9    BY MR. THOMAS:
10   Q:   And what do you tell him?
11   A:   So I -- I asked him -- I asked him
12   about:
13   Would we be singling her out by
14   putting her on a PIP? We just came off an
15   investigation, so things are a little
16   sensitive. Are there any RDs in the same
17   boat?'
18   Q:   And were you the one who stopped the
19   PIP from going forward?
20   A:   I mean, I don't recall specifically,
21   but, I mean, I -- you know, judging from this
22   email, it seems like, you know, I may have
23   advised against it. I -- I don't know what
24   the sequence of events were after this email

Page 219

D. Berardo

1    or what was back and forth after this specific
2    email.
3    Q:   And just a few -- few moments ago,
4    you said you didn't think that Mary Piehler
5    was being treated differently because of her
6    gender, but --
7    A:   Correct.
8    Q:   -- in an email a week later, you say:
9    My only concern would be if we are
10   singling her out.'
11   So it did occur to you that you were -- that
12   Mary Piehler was being singled out, didn't it?
13   MR. SULLIVAN:  Objection to form.
14   THE WITNESS:  Singling -- yeah,
15   singled out compared to her peers, the
16   other regional directors.
17   BY MR. THOMAS:
18   Q:   And did you conduct any investigation
19   as to whether Mary Piehler was being singled
20   out by Todd Awtry?
21   A:   Well, I had -- I asked the question,
22   and he provided me the numbers.
23   Q:   And then did you conduct any further
24   investigation as to -- I mean, would you be

Page 220

D. Berardo

1    concerned to find out that a manager was
2    singling out one of his subordinates?
3    A:   Well, for performance, that wouldn't
4    concern me.
5    Q:   Okay. But you, in this case,
6    indicated that the PIP shouldn't go forward;
7    correct?
8    A:   I -- I don't think I indicated that.
9    I -- I asked the question.
10   Q:   Okay. And so did you do anything
11   else to follow up on your question about
12   whether she was being singled out after you
13   got Todd's answer?
14   A:   I don't -- I don't recall what
15   happened after Todd responded to me. I don't
16   remember.
17   Q:   You don't remember doing any
18   investigation as to whether it was for
19   discrimination or other reasons; right?
20   A:   No, there was -- there was no
21   discrimination brought to me, so I don't
22   recall any sort of investigations around
23   discrimination. Based on -- you know, based
24   on gender or -- or any protected grounds.

Page 221

```
1        D. Berardo
2    This was about performance.
3        Q:  Well, when a -- when a manager is
4    singling out
5    a woman on his staff for a PIP and a
6    termination for reasons that he had been
7    informed were okay, it never -- it doesn't --
8    that -- discrimination didn't cross your mind?
9    That's the type of HR culture you were running
10   there?
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  The -- the PIP was
13   concerning her performance, so he may have
14   been singling her -- her out based on her
15   performance with her peers, and that
16   happens all the time.
17   BY MR. THOMAS:
18       Q:  You -- it didn't -- it didn't strike
19   you as coincidental that, within a week of
20   Todd failing to get Mary fired on the DOE
21   issue, that he's coming back and trying to put
22   her on a PIP for something else?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  Well, I mean, the --
25   the -- the new fiscal year starts in July
```

Page 222

```
1        D. Berardo
2    of every year, I believe, from Absolute.
3    So, I mean, it -- it -- it didn't -- it
4    didn't concern me about any sort of
5    protected discrimination.
6    MR. THOMAS:  Could you read --
7    Jessica, could you read the question back
8    to Mr. Berardo.
9        (REPORTER READ BACK)
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  I -- I wouldn't say
12   it's coincidental, but, obviously, I had a
13   -- I had a concern, and I asked the
14   question. So I had a concern enough that I
15   asked the question about her performance.
16   BY MR. THOMAS:
17       Q:  All right. Have you ever heard of an
18   employee being put on a PIP for following a
19   CEO's direction?
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  A:  CEO's direction?
22   BY MR. THOMAS:
23       Q:  Yes.
24       A:  I mean, not off the top of my head.
25       Q:  It would be kind of strange, wouldn't
```

Page 223

```
1        D. Berardo
2    it?
3    MR. SULLIVAN:  Objection to form.
4    THE WITNESS:  To follow an order from
5    a CEO, and then be put on a PIP because you
6    followed that order?
7    BY MR. THOMAS:
8        Q:  Yeah.
9        A:  I -- yeah, I would say that would be
10   strange.
11       Q:  Are you aware that Geoff Haydon said
12   that he wanted the company to focus on selling
13   Computrace and only sell Manage and Service to
14   current clients?
15   MR. SULLIVAN:  Objection to form.
16   THE WITNESS:  I mean, I don't -- I
17   don't recall that, but...
18   BY MR. THOMAS:
19       Q:  Do you have any reason to doubt that
20   was true?
21       A:  No.
22       Q:  And what is Mr. Awtry faulting
23   Ms. Piehler for here as to why she was -- why
24   she was being singled out?
25       A:  Well, this was Manage and Service.
```

Page 224

```
1        D. Berardo
2    MR. THOMAS:  Now, let's -- if the
3    court reporter could mark Exhibit Berardo
4    L. And, Jessica, are you -- when I'm doing
5    new exhibits that you have, are you going
6    off numerically from where we left off at
7    85?
8    THE COURT REPORTER:  Yes, if that's
9    what you would like.
10   MR. THOMAS:  Perfect.
11   THE COURT REPORTER:  Okay.
12   MR. THOMAS:  Let's go off the record
13   for a second.
14   VIDEOGRAPHER:  Going off record. The
15   time is 4:23.
16       (PROCEEDINGS RECESSED AT 4:23 P.M.)
17       (PROCEEDINGS RECONVENED AT 4:25?P.M.)
18   VIDEOGRAPHER:  Back on the record.
19   The time is 4:25.
20   BY MR. THOMAS:
21       Q:  Mr. Berardo, you're free to read as
22   much of Exhibit 86 as you would like.
23   However, I'm only going to be really asking
24   you about the forwarding emails from
25   Mr. Awtry. So let me know when you're ready.
```

Berardo_Daniel

Page 225

```
 1    D. Berardo
 2   A:  The -- sorry, the -- the from email
 3     from Mr. Awtry?
 4   Q:  Yeah, where he says:
 5     I highlighted a few, but encourage
 6     you to read all of it.'
 7   MS. LESTRADE:  Oh. That is not
 8     exhibit -- what has been marked as
 9     Exhibit 86.
10   MR. THOMAS:  Okay. What is the Bates
11     number at the bottom of that, Jessica?
12     Let's -- let's go off the record.
13   VIDEOGRAPHER:  Going off record. The
14     time is 4:26.
15         (PROCEEDINGS RECESSED AT 4:26?P.M.)
16         (PROCEEDINGS RECONVENED AT 4:38?P.M.)
17   VIDEOGRAPHER:  Back on the record.
18     The time is 4:39.
19     (Exhibit 86 was marked for
20      identification and is attached hereto.)
21   BY MR. THOMAS:
22   Q:  All right. Let me start again, Mr.
23     Berardo. Sorry for that confusion there.
24     You're welcome to read as much as Exhibit 86
25     as you would like, which, for the record, is
```

Page 226

```
 1    D. Berardo
 2     Bates number DEFS08824 to DEFS08830. But I'm
 3     only going to really ask you about the very
 4     top of the first page, which is Todd sending
 5     you this email.
 6     So let me know when you're ready,
 7     and I can ask you questions.
 8   A:  Sure. I don't -- I don't need to --
 9     unless you want me to read it all, I don't
10     need to read it all, just because you --
11   Q:  No, I --
12   A:   I --
13   Q:  -- don't -- I don't need you to.
14   A:  Okay.
15   Q:  Okay. So, now, just for the -- for
16     the sake of chronology, back at the end of
17     June, very end of June, Todd Awtry says that
18     he thinks he has grounds to fire Mary Piehler.
19     HR gets involved. Mary Piehler is not fired.
20     July 2nd, about a week later, he tries to put
21     Mary Piehler on a PIP. Again, involves HR.
22     And she is not put on a PIP. Then a month
23     later in August, he is forwarding to you an
24     email that Mary Piehler wrote -- oh, what was
25     that? -- 15 months before and -- about Mary
```

Page 227

```
 1    D. Berardo
 2     Piehler's comments on Todd Awtry and -- and
 3     his job.
 4     Why was Todd Awtry forwarding you
 5     this email in August?
 6   MR. SULLIVAN: Objection to form.
 7   THE WITNESS: So, from what I recall,
 8     he was -- he was -- he was just made --
 9     made aware. He was made aware of this
10     email.
11   BY MR. THOMAS:
12   Q:  He was just made aware of that email?
13   A:  I mean, from my recollection, he was
14     just --
15   Q:  I will testify to you that -- I will
16     represent to you that his testimony was that
17     he was aware of the email almost --
18   A:  Okay.
19   Q:  -- at the time it was -- it was sent,
20     so --
21   A:  Okay. So -- so my recollection is
22     incorrect. So -- so did he -- had he just
23     received the email? Or he said that he's had
24     this email for a long time?
25   Q:  He said that he had the email for a
```

Page 228

```
 1    D. Berardo
 2     long time.
 3   A:  Okay. Fair enough. I -- I don't
 4     recall why he sent it to me on the 15th of
 5     August.
 6   Q:  Was he still trying to get Mary
 7     fired?
 8   MR. SULLIVAN: Objection to form.
 9   THE WITNESS: I don't recall our
10     conversations about this email.
11   BY MR. THOMAS:
12   Q:  Or trying to put her in a bad light?
13   MR. SULLIVAN: Objection to form.
14   THE WITNESS: That -- that would be
15     more of a question for Todd.
16   BY MR. THOMAS:
17   Q:  It seems like every couple of weeks
18     or months starting in June, he's on Mary
19     Piehler's tail, singling her out to HR in
20     various ways. Is that fair to say?
21   MR. SULLIVAN: Objection to form.
22   THE WITNESS: I wouldn't say singling
23     out, no. That -- that wouldn't be
24     accurate.
25   BY MR. THOMAS:
```

Page 229

D. Berardo

1
2  Q:  Well -- well, I think that's the word
3  that you used; right? 'Singling out'?
4  A:  Not in that context.
5  Q:  What context -- what context did you
6  not use it -- I mean, what context did you use
7  it in?
8  A:  If I -- if I can see the prior
9  exhibit, then I can -- I can tell you exactly
10  how I was...
11  Q:  Exhibit 70 -- we -- we don't need to
12  do that. We -- we've been through that --
13  A:  Okay.
14  Q:  -- your use of the word -- I -- when
15  I said 'singling,' I was only, you know, using
16  your phrase.
17  But why is -- as an HR person,
18  aren't you a little concerned at this point
19  that you've got a manager trying to -- trying
20  to go after one of his employees again and
21  again and again?
22  MR. SULLIVAN:  Objection to form.
23  THE WITNESS:  Are you asking me about
24  this specific email? Or --
25  BY MR. THOMAS:

Page 230

D. Berardo

1
2  Q:  This email with -- what was preceded
3  by the PIP email that was preceded by the
4  termination email. We had three -- three
5  attempts in a row by Todd Awtry to -- to go
6  after Mary Piehler in the space of a month and
7  a half.
8  MR. SULLIVAN:  Objection to form.
9  THE WITNESS:  In my opinion, they
10  were all valid concerns.
11  BY MR. THOMAS:
12  Q:  Well, the DOE was not a valid
13  concern, was it? She didn't do anything wrong
14  there.
15  A:  So it was -- it was determined that
16  it was inconclusive.
17  Q:  Okay. So that was not a valid
18  concern, was it?
19  MR. SULLIVAN:  Objection to form.
20  THE WITNESS:  It was a valid concern
21  -- when we did the investigation, it was,
22  yes.
23  BY MR. THOMAS:
24  Q:  Well, was it a valid concern for him
25  who, two months before, knew how the

Page 231

D. Berardo

1
2  commissions were being allocated?
3  MR. SULLIVAN:  Objection to form.
4  THE WITNESS:  If I can see -- I think
5  we discussed this before, but if we could
6  -- if we want to discuss it again, I -- if
7  I can see the --
8  BY MR. THOMAS:
9  Q:  Sure.
10  A:  -- prior exhibits.
11  THE COURT REPORTER:  Which number?
12  BY MR. THOMAS:
13  Q:  I think we can all agree that as of
14  -- if you take a look at Exhibit 71, as of
15  March 17th, Todd Awtry was fully aware of how
16  the commissions at the DOE were going to be
17  allocated; correct?
18  A:  I don't have Exhibit 71 in front of
19  me, sorry. Can we...
20  Q:  We'll get that for you.
21  A:  Thank you. Right. So this is where
22  he said 'thanks for heads-up.'
23  Q:  Right. Where he was informed of how
24  the commissions for DOE were being done;
25  correct?

Page 232

D. Berardo

1
2  A:  Yeah, Mary -- yeah, Mary was -- was
3  emailing him about that.
4  Q:  And, Mr. Berardo, I don't want to
5  nitpick with you on all of these exhibits. I
6  will just say to you see all of this going
7  on in the space of a month and a half, and it
8  doesn't occur to you that Todd Awtry was out
9  to get Mary Piehler?
10  MR. SULLIVAN:  Objection to form.
11  THE WITNESS:  That did not cross my
12  mind because, again, these were all --
13  BY MR. THOMAS:
14  Q:  As even a possibility?
15  A:  These were all legitimate --
16  legitimate concerns that Todd had towards
17  Mary.
18  Q:  Even as a possibility, it never
19  crossed your mind?
20  A:  No.
21  Q:  Okay. Do you think that that is a
22  common-sense perspective on the situation?
23  MR. SULLIVAN:  Objection to form.
24  THE WITNESS:  Yes.
25  BY MR. THOMAS:

Page 233

D. Berardo

1    Q:   And not only is Todd out to get Mary
2    in each of these situations, but they're all
3    sort of different; right? Tries one; it
4    doesn't work. Tries something else; it
5    doesn't work. Tries something else; it
6    doesn't work. Right?
7    MR. SULLIVAN:  Objection to form.
8    THE WITNESS:  No, I wouldn't
9    characterize it like that.
10   BY MR. THOMAS:
11   Q:   Okay. And you didn't investigate to
12   see how it should be characterized, did you?
13   MR. SULLIVAN:  Objection to form.
14   THE WITNESS:  Investigate what?
15   BY MR. THOMAS:
16   Q:   How Todd Awtry was going after Mary
17   Piehler?
18   A:   There was --
19   MR. SULLIVAN:  Objection to form.
20   THE WITNESS:  There was nothing to
21   investigate.
22   BY MR. THOMAS:
23   Q:   And when you saw the email from Mary
24   Piehler with Jermaine O'Dondow [phonetic] down

Page 233

1    D. Berardo
2    Q:   And not only is Todd out to get Mary
3    in each of these situations, but they're all
4    sort of different; right? Tries one; it
5    doesn't work. Tries something else; it
6    doesn't work. Tries something else; it
7    doesn't work. Right?
8    MR. SULLIVAN:  Objection to form.
9    THE WITNESS:  No, I wouldn't
10   characterize it like that.
11   BY MR. THOMAS:
12   Q:   Okay. And you didn't investigate to
13   see how it should be characterized, did you?
14   MR. SULLIVAN:  Objection to form.
15   THE WITNESS:  Investigate what?
16   BY MR. THOMAS:
17   Q:   How Todd Awtry was going after Mary
18   Piehler?
19   A:   There was --
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  There was nothing to
22   investigate.
23   BY MR. THOMAS:
24   Q:   And when you saw the email from Mary
25   Piehler with Jermaine O'Dondow [phonetic] down

Page 234

1    D. Berardo
2    below, you didn't recommend Ms. Piehler's
3    termination, did you?
4    A:   I don't -- I don't recall what --
5    what was discussed.
6    Q:   Do you -- do you recall any
7    discussions that she should be disciplined?
8    A:   I don't -- I don't recall our
9    discussions, no.
10   Q:   Okay. And you don't recall any
11   discussions that she should be counselled?
12   A:   No, I don't recall any discussions.
13   Q:   Or terminated?
14   A:   I mean, I just don't remember if we
15   had those conversations. I don't know.
16   Q:   All right. Let's go to Exhibit 21,
17   if that could be marked.
18   MR. SULLIVAN:  Shouldn't need to mark
19   it. It's already been marked.
20   THE COURT REPORTER:  So, sorry, am I
21   marking it 87?
22   MR. SULLIVAN:  No, it's already been
23   marked as 21.
24   THE WITNESS:  Thank you.
25   BY MR. THOMAS:

Page 235

1    D. Berardo
2    Q:   Why don't you read it over, and when
3    you've had a chance, I will have some
4    questions for you on it.
5    A:   Oh, this was in order, actually, from
6    front to back. I read the last -- I will
7    start at the beginning. Okay.
8    Q:   All right. Did you take any steps to
9    probe the complaints made by Mary Piehler in
10   this exhibit?
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  I can't recall
13   specifically, but -- but reading through
14   it, it's -- the numbers -- I mean, the
15   numbers seemed like they were system
16   issues, so I likely wouldn't have
17   investigated that.
18   MR. THOMAS:  I will request any
19   documentation -- any HR review that was
20   performed of this --
21   THE WITNESS:  Not --
22   MR. THOMAS:  -- exhibit.
23   BY MR. THOMAS:
24   Q:   I will just give one example.
25   A:   Not to my recollection.

Page 236

1    D. Berardo
2    Q:   In the second line, she says:
3    I don't want to be known as a
4    troublemaker.'
5    Right?
6    A:   Okay.
7    Q:   Third line, she says she wants to be
8    paid -- paid fairly. At the bottom paragraph,
9    she refers to a man who's getting paid full
10   value, and she isn't getting commissions and
11   under investigation for selling DOE. Do you
12   see those comments?
13   A:   I do, yes.
14   Q:   Okay. Did you see them at the -- did
15   you read them at the time?
16   A:   I would have, yes.
17   Q:   Is this an example of you thinking
18   that Mary Piehler was passionate or difficult
19   to deal with?
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  I mean, I don't -- I
22   don't recall what I thought when I received
23   the email. I don't remember.
24   BY MR. THOMAS:
25   Q:   Didn't you make a comment like that

Page 237

```
1    D. Berardo
2    earlier today? That you thought that Mary
3    could be passionate in her communication?
4    A:  I don't -- I don't recall. We can
5    definitely read back what I -- what I wrote
6    [sic], if you like.
7    Q:  Well, do you think she -- do you
8    think she was passionate in her -- in her
9    communications?
10   A:  Was she -- was she passionate? I
11   mean, she didn't shy away from communicating.
12   Q:  Did you -- you talked before about
13   how you had conversations with her, and they
14   would end up going round and round. Do you
15   remember that?
16   A:  They would go around in circles
17   sometimes, yes.
18   Q:  Is this an example of it going around
19   in circles?
20   A:  Well, I don't -- I don't think so.
21   It's one -- it's a -- one email to me. So I
22   can't recall if I went around and around with
23   her.
24   Q:  Okay. Turning to the last page, do
25   you see that under number 4, about seven lines
```

Page 238

```
1    D. Berardo
2    down, she says:
3    All I asked was to be treated the
4    same.'
5    Do you see that?
6    A:  Can you -- so it's, sorry, the
7    second-to-last page?
8    Q:  Second-to-last page. P818, item
9    number 4. Six, seven lines down:
10   All I asked was to be treated the
11   same.'
12   Do you see that?
13   A.'All I asked was to be treated the
14   same.'
15   Yeah.
16   Q:  Was that an unfair request from a
17   woman at Absolute?
18   MR. SULLIVAN:  Objection to form.
19   THE WITNESS:  Yeah, I would say
20   it's a -- no, it's a fair request from
21   anyone at Absolute.
22   BY MR. THOMAS:
23   Q:  Is it a fair request from someone at
24   Absolute that they want to be -- from a woman
25   at Absolute, that she wants to be paid fairly?
```

Page 239

```
1    D. Berardo
2    MR. SULLIVAN:  Objection to form.
3    THE WITNESS:  I -- I don't think
4    that -- again, from -- from anyone that --
5    anyone, it would be valid to say they want
6    to be paid fairly.
7    BY MR. THOMAS:
8    Q:  And if they take that to HR, that's
9    something that HR should look at; right?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  If they say that they
12   were paid unfairly because they were
13   female? Or because of gender? Is that
14   what you're asking me?
15   BY MR. THOMAS:
16   Q:  Well, I'm asking -- let's just start
17   with someone who says 'I'm not being paid
18   fairly' and goes to HR. Should HR look at
19   that?
20   A:  We -- it happens all the time, and
21   people's perception of being paid fairly, it's
22   just --
23   Q:  I'm asking whether HR should look at
24   that issue.
25   A:  We should talk to the employee and
```

Page 240

```
1    D. Berardo
2    ask what the employee may be speaking of.
3    MR. THOMAS:  Going to page -- we --
4    and we will request documentation of that
5    ever occurring.
6    BY MR. THOMAS:
7    Q:  Going to page P817, do you remember
8    that Todd Awtry shared the performance reviews
9    of his subordinates with all of his
10   subordinates --
11   A:  Yes.
12   Q:  -- by email?
13   A:  I do remember that.
14   MR. SULLIVAN:  Objection to form.
15   BY MR. THOMAS:
16   Q:  Is that an example of him in his
17   professional, buttoned-up attitude that he was
18   bringing to Absolute?
19   A:  I would say that's not an -- not an
20   example of that.
21   Q:  Did you see that Mary Piehler
22   complained about him doing that?
23   A:  Did she -- sorry, in this thread,
24   she -- did she complain to me about it, sorry?
25   Q:  P817.
```

Page 241

D. Berardo

1    A:  17. So, sorry, because there's -- it
2    -- it doesn't show who this was sent to on my
3    copy.
4    Q:  Okay. If you go to the top of page
5    P811, who is dberardo@absolute.com?
6    A:  So you're asking me who
7    dberardo@absolute.com is?
8    Q:  M'mm-hmm.
9    A:  That's me.
10   Q:  Okay. And do you see in the first
11   line where it says 'Daniel'?
12   A:  Yes. No, there was a -- there's a
13   whole bunch of --
14   Q:  Okay. So I'm ask -- so would you go
15   to page 817. Do you see in there where she
16   tells you that -- that these emails were sent
17   out to everybody in her group?
18   A:  Yeah, and I recall -- I recall this.
19   Q:  Okay. And in the paragraph above,
20   she mentions the fact that a manager who was
21   there less than six months, Troy, a male, is
22   able to get a higher performance rating, and
23   his commentary is the same as hers, which is
24   'I have not had a chance to observe the

Page 242

D. Berardo

1    competency.' That's what Todd Awtry said.
2    Did you look into that, as to why a male could
3    -- could -- with less than six months'
4    experience get a higher score on a
5    performance --
6    MR. SULLIVAN:  Objection to form.
7    BY MR. THOMAS:
8    Q:  -- review than Mary Piehler when Todd
9    Awtry said he didn't have any basis to do the
10   review?
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  I don't -- I don't
13   recall -- I don't recall looking into
14   specific performance reviews.
15   MR. THOMAS:  We would request the
16   production of any documents reflecting any
17   HR review of those issues.
18   BY MR. THOMAS:
19   Q:  Now, Mr. Berardo, what -- what --
20   well, let's do this: Let's just go off the
21   record for five minutes here. Thanks.
22   VIDEOGRAPHER:  Going off record. The
23   time is 5:04. This is the end of media 1.
24   (PROCEEDINGS RECESSED AT 5:04?P.M.)

Page 243

D. Berardo

1    (PROCEEDINGS RECONVENED AT 5:13 P.M.)
2    VIDEOGRAPHER:  Back on the record.
3    The time is 5:13.
4    BY MR. THOMAS:
5    Q:  All right, Mr. Berardo. Thank you
6    for that break there. Would it be fair to say
7    that at Absolute when women complained about
8    how they were being treated, that their
9    complaints just kind of disappeared?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  It would not be fair to
12   say.
13   BY MR. THOMAS:
14   Q:  Kind of ignored?
15   A:  No.
16   Q:  Well, let's -- let's take a look
17   here, if we could.
18   And if the court reporter could show
19   Mr. Berardo Piehler Exhibit 22. You can read
20   as much of it as you want. I -- why don't --
21   yeah, why don't you go ahead and read the
22   whole thing, and let me know when you're done.
23   I'm not going to be going over the jellybean
24   stuff at the end, but you can read whatever --

Page 244

D. Berardo

1    as much as -- as much as you would like.
2    A:  Okay.
3    Q:  All right. I would like to direct
4    your attention to DEFS2550 and the very top
5    email from you.
6    A:  M'mm-hmm.
7    Q:  You say:
8    Thanks, Mary. I don't recall ever
9    having a conversation about your
10   performance reviews with Todd. In fact, I
11   don't even recall a conversation with you
12   about not receiving your last performance
13   review. Of course, I've had a lot of
14   conversations, so I can't say for certain.
15   My memory has failed me in the past. It's
16   not my practice to discuss private
17   conversations, though, so I apologize if
18   this did happen.'
19   Do you see your comment there?
20   A:  I do see my comment, yes.
21   Q:  And what date was that?
22   A:  It looks like it's August 11th, 2014.
23   Q:  How long before that had Mary Piehler
24   complained about the evaluations with Todd?

Page 245

D. Berardo

1
2   A:  The -- him sending out the -- the
3   numbers?
4   Q:  If you look at Exhibit 21, I think it
5   will refresh your recollection.
6   A:  It was July 6th, 2014.
7   Q:  So how -- how -- how long between the
8   two -- between the two emails?
9   A:  So July 6th, 2014, and August 6th,
10  2014. Or August 11th. So just over a month.
11  Q:  Okay. So, like, a month and five
12  days. You totally forgot about Mary -- Mary
13  Piehler's complaints about how her manager was
14  evaluating her; correct?
15  MR. SULLIVAN:  Objection to form.
16  THE WITNESS:  I say:
17  In fact, I don't even recall a
18  conversation with you about not receiving
19  your last performance review.'
20  BY MR. THOMAS:
21  Q:  If you go to Exhibit 21, page P817,
22  Ms. Piehler says, at the second paragraph:
23  However, what I questioned even more
24  was that I still have never had a
25  performance review with Todd? Not to

Page 246

D. Berardo

1
2   mention, I do find it unprofessional that
3   he shares these ratings with an email
4   distribution list.'
5   A:  Okay.
6   Q:  So within the space of a month, you
7   thought that you had forgotten about Mary
8   Piehler's complaint about how Todd was
9   treating her in terms of her performance
10  evaluations. Fair to say?
11  A:  No. I said:
12  In fact, I don't recall a
13  conversation with you about receiving your
14  last performance review.'
15  Q:  Oh, but you meant you did remember an
16  email, but you didn't remember a conversation?
17  A:  I -- I don't recall what I -- I
18  don't -- I don't recall what I remember or
19  don't remember back then. I'm just going --
20  Q:  Okay.
21  A:  -- by what's --
22  Q:  Well, let's look --
23  A:  -- in the email.
24  Q:  -- at what you said. Do you consider
25  it truthful and transparent to say to someone

Page 247

D. Berardo

1
2   'I don't remember a conversation with you'
3   when -- when you're referring to an email they
4   sent you complaining about discrimination?
5   MR. SULLIVAN:  Objection to form.
6   THE WITNESS:  So the email that she
7   sent to me was not complaining about
8   discrimination, and I said, 'I -- I don't
9   even recall -- I don't recall the
10  conversation with you.' So I think --
11  BY MR. THOMAS:
12  Q:  So you had forgotten about it within
13  a month?
14  MR. SULLIVAN:  Objection to form.
15  THE WITNESS:  I mean, we're talking
16  about a conversation, so I'm not sure -- I
17  have to read this email over again to see
18  if Mary's --
19  BY MR. THOMAS:
20  Q:  Sure.
21  A:  -- referring --
22  Q:  Read it again.
23  A:  -- referring to a conversation or the
24  email she sent me.
25  Q:  I don't want us to keep going around

Page 248

D. Berardo

1
2   and around about this, Mr. Berardo. I think
3   it's important that we get to the point.
4   A:  Sure. Absolutely.
5   So, I mean, just reading from the emails,
6   it -- it might be possible that I didn't
7   remember this one line from this nine-page
8   email a month and a half ago.
9   Q:  Well, let's -- let's count the lines
10  of that. Let's go to P817. It actually
11  starts on page 816, number 3, 'manager
12  performance reviews.' Bold, highlighted. 1,
13  2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,
14  15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25,
15  26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36,
16  37, 38, 39, 40, 41, 42, 43, 44 -- 46, 47, 48,
17  49, 50. Really, 50 lines in that email;
18  right? About it?
19  MR. SULLIVAN:  Objection to form. 50
20  lines -- I'm sorry. 50 lines in the
21  entire --
22  MS. LESTRADE:  Nine-page email?
23  MR. SULLIVAN:  -- the nine-page
24  document, Exhibit 21?
25  MR. THOMAS:  In Exhibit 21, yes.

Page 249

D. Berardo

1    D. Berardo
2    MR. SULLIVAN:  Are you --
3    MR. THOMAS:  [Indiscernible] --
4    MR. SULLIVAN:  -- representing that
5    Exhibit 21 is 50 lines?
6    MR. THOMAS:  No, I'm representing
7    that there's 50 lines of discussion
8    relating to the performance evaluation.
9    MR. SULLIVAN:  Okay. So --
10   MR. THOMAS:  I'm not representing
11   anything. I'm asking -- if he doesn't
12   think there's 50 lines there, he can let me
13   know. But I don't -- he -- he testified
14   under oath that there was 1.
15   MR. SULLIVAN:  I'm -- I'm just
16   confused. 50 lines of what? Just so we're
17   clear on that.
18   MR. THOMAS:  Discussion about his --
19   the performance evaluation. Three
20   managers' performance reviews. It deals
21   with two issues: Not receiving a
22   performance evaluation --
23   MS. LESTRADE:  Two issues.
24   MR. THOMAS:  -- and two then being
25   emails sent out to everybody in the

Page 250

1    D. Berardo
2    company.
3    THE WITNESS:  Okay. Well, I was
4    referring to this line:
5    However, what I questioned even more
6    was that I still never had a performance
7    review with Todd.'
8    BY MR. THOMAS:
9    Q:  Well, let's go back. What about the
10   first line:
11   I emailed Tina on December 30th to
12   see if there was ever a review done for me
13   by Todd. Her email --'
14   A:  Okay.
15   Q.'-- exchange is below.'
16   A:  Okay.
17   Q.'Have you ever seen the review he
18   wrote for me? I attached the PDF. Todd
19   wrote one sentence for each category. 'I
20   only had six months' visibility to observe
21   this competency."
22   I won't keep reading it, but it's fair to say
23   that her complaint didn't -- wasn't 1 line;
24   correct?
25   A. Okay. It was more than 1 line.

Page 251

1    D. Berardo
2    Q:  And more like 50. In an entire
3    section of the email.
4    A:  I don't know if the -- this email
5    here you're referring to that I wrote talked
6    about not receiving her performance review.
7    So I don't think that all 50 lines --
8    Q:  Well, go read -- go read what you
9    said -- go read your own words from it.
10   A.'In fact, I don't even recall a
11   conversation with you about not receiving
12   your last performance review.'
13   Q:  Yeah. Now, is it because you ignored
14   her complaint or you just forgot about it that
15   you didn't remember it a month later?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  I -- I don't recall. I
18   don't recall why.
19   BY MR. THOMAS:
20   Q:  Is it because you didn't --
21   obviously, you weren't investigating it.
22   MR. SULLIVAN:  Objection to form.
23   THE WITNESS:  Investigating that she
24   didn't receive a review?
25   BY MR. THOMAS:

Page 252

1    D. Berardo
2    Q:  That she didn't receive a performance
3    review and that her manager emailed out the
4    reviews to other people.
5    MR. SULLIVAN:  Objection to form.
6    THE WITNESS:  So those are two
7    separate issues.
8    BY MR. THOMAS:
9    Q:  As well as her comment that all she
10   wanted to do was be treated fairly.
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  If -- if you want to go
13   through -- I'm happy to go through each
14   issue one by one, but they're separate
15   issues.
16   BY MR. THOMAS:
17   Q:  Well, I'm just wondering if you had
18   any -- you had obviously forgotten about the
19   performance review issue -- well, strike that.
20   Had you forgotten about the
21   performance review about a month later, or did
22   you just ignore it when it first came in?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  I have already answered
25   that question, but I don't recall.

Page 253

1      D. Berardo
2    BY MR. THOMAS:
3      Q:  Okay. It's possible you could have
4    ignored it; it's possible you just forgot it?
5    MR. SULLIVAN:  Objection to form.
6    THE WITNESS:  That's your opinion.
7    BY MR. THOMAS:
8      Q:  No, I'm asking you for your -- for
9    what you mean by 'I don't -- it -- it could
10   be.' What --
11   MR. SULLIVAN:  Objection --
12   BY MR. THOMAS:
13     Q:  -- [indiscernible] --
14   MR. SULLIVAN:  -- to form.
15   THE WITNESS:  I didn't say it could
16   be. I said I don't --
17   BY MR. THOMAS:
18     Q:  Okay. Well, what -- did -- did you
19   forget it?
20   A:  No, I said I don't recall.
21     Q:  Or did you just never read it to
22   begin with?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  I don't recall. I
25   don't have a recollection of it.

Page 254

1      D. Berardo
2    BY MR. THOMAS:
3      Q:  Okay. It could be either of those?
4    MR. SULLIVAN:  Objection to form.
5    THE WITNESS:  I don't have a
6    recollection of it, so I can't answer that
7    question.
8    BY MR. THOMAS:
9      Q:  Okay. Well, I'm asking you could it
10   be anything else besides those two, that you
11   never read it, or you forgot about it?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  I mean, yeah, I could
14   have forgotten about it. I -- I mean, I --
15   I doubt that I wouldn't have read it. But
16   I may have forgotten that I had -- didn't
17   read these two sentences in this nine-page
18   email.
19   BY MR. THOMAS:
20     Q:  Okay. And you -- do you understand
21   why -- well, let's -- go to Mary
22   Piehler's comment on Exhibit 22 where she
23   says, in the email to you at the end of the
24   second paragraph (as read):
25   What I want to stop is Todd being

Page 255

1      D. Berardo
2    asked about something, denying it, and then
3    someone thinking I did not tell the truth
4    when, in -- when, in reality, it is true
5    and documented. I would not tell HR or an
6    ELT member anything I could not
7    substantiate.'
8      Do you see that?
9    A:  I see that, yes.
10     Q:  Do you think Mary Piehler could have
11   felt that when she was communicating with you
12   it just ended up that your -- her complaints
13   to you were ignored, and that it just went
14   around and around, and you would forget
15   things, and you wouldn't pay attention to what
16   was going on, and she just -- it was very
17   difficult communicating with you?
18   A:  Absolutely --
19   MR. SULLIVAN:  Objection to form.
20   THE WITNESS:  Absolutely not. We
21   talked on a number of occasions.
22   BY MR. THOMAS:
23     Q:  Okay. But, well, she raises a major
24   concern with you about how her male superior
25   is conducting her performance appraisals, the

Page 256

1      D. Berardo
2    same one who has just tried to put her on a
3    PIP, fire her, and forwarded you an email
4    about [lost connection] somebody thinks
5    warrants termination, and you can't even
6    remember what she said to you a month ago in
7    an email?
8    MR. SULLIVAN:  Objection to form.
9    BY MR. THOMAS:
10     Q:  Wouldn't that be a concern if you
11   were an employee?
12   MR. SULLIVAN:  Objection to form.
13   THE WITNESS:  No, we're human.
14   BY MR. THOMAS:
15     Q:  Well, you say -- let's go to
16   Exhibit 17. Your email on July 1st on page
17   DEFS02585 says:
18   Coming from an HR background, it's
19   always been drilled in my head to get
20   everything in writing.'
21   A:  Where are we? Sorry, where are we?
22     Q:  Exhibit 17, DEFS02585.
23   A:  585. Okay.
24     Q:  And you see you said to Mary Piehler:
25   Coming from an HR background, it has

Page 257

D. Berardo

1  always been drilled in my head to get
2  everything in writing.'
3  Do you see that?
4
5  A:  Yes.
6  Q:  And Mary Piehler put it in writing,
7  and it was forgotten or ignored --
8  A:  Mary --
9  Q:  -- by HR?
10  MR. SULLIVAN:  Objection to form.
11  THE WITNESS:  That she didn't --
12  BY MR. THOMAS:
13  Q:  Right?
14  A:  That she didn't receive a performance
15  review? I can't --
16  Q:  Her complaint was ignored or
17  forgotten; right?
18  MR. SULLIVAN:  Objection to form.
19  BY MR. THOMAS:
20  Q:  Even though she put it in writing?
21  A:  I can't say what happened after that
22  email or if I had conversations with her. We
23  had many conversations on the phone.
24  Q:  And what good did it do her to put it
25  in writing to HR?

Page 258

D. Berardo

1
2  MR. SULLIVAN:  Objection to form.
3  THE WITNESS:  Are you asking me what
4  she thought?
5  BY MR. THOMAS:
6  Q:  Yeah. What good did it do? It was
7  forgotten in a month.
8  MR. SULLIVAN:  Objection to form.
9  BY MR. THOMAS:
10  Q:  Or ignored.
11  A:  Okay.
12  Q:  What good did it do for her to put it
13  in writing?
14  MR. SULLIVAN:  Objection to form.
15  THE WITNESS:  I -- I don't know -- I
16  don't know how to answer that question.
17  BY MR. THOMAS:
18  Q:  No. All right. Let's move on.
19  What investigations did you do in HR
20  to ensure that Mary Piehler was being treated
21  fairly by the company?
22  A:  Are you talking about a specific
23  incident?
24  Q:  Anything you have done.
25  A:  We have gone through --

Page 259

D. Berardo

1
2  Q:  Anything where you list it.
3  A:  We have gone through a number of
4  scenarios.
5  Q:  You didn't lift -- tell me one right
6  now where you lifted a finger to help Mary
7  Piehler from being treated unfairly at
8  Absolute.
9  A:  We did the --
10  MR. SULLIVAN:  Objection to form.
11  THE WITNESS:  We did a DOE -- DOE
12  investigation.
13  BY MR. THOMAS:
14  Q:  That was protecting her?
15  A:  It absolutely was, yes.
16  Q:  Or was she the one -- she -- wasn't
17  she the target of the investigation?
18  A:  She was a subject -- she was one of
19  the three subjects of the investigation, from
20  what I recall.
21  Q:  So being a subject of an
22  investigation is an example of you ensuring
23  that she was treated fairly?
24  A:  Absolutely, it is.
25  Q:  And her being withheld commissions

Page 260

D. Berardo

1
2  during that investigation is an example of her
3  being treated fairly?
4  MR. SULLIVAN:  Objection to form.
5  THE WITNESS:  That's -- that wasn't
6  my call, so I can't really answer that
7  question.
8  BY MR. THOMAS:
9  Q:  As an HR, though -- as an HR -- as
10  head of HR, withholding someone's pay during
11  an investigation, you think, is a way to
12  ensure they're being treated fairly?
13  A:  We -- we didn't withhold pay; we
14  withheld commissions while the investigation
15  was underway, so --
16  Q:  What's the difference between --
17  sorry. Go ahead.
18  A:  So I would think that that would be
19  a -- that would be fair to do in this -- in
20  that sort of circumstance.
21  Q:  What is the difference between pay
22  and commissions?
23  A:  Pay can be defined as base pay --
24  commissions, base pay, bonus. There's lots of
25  variable different types of pay.

Page 261

```
1       D. Berardo
2    Q:  Any other -- any other examples of
3    you in HR doing anything to protect Mary
4    Piehler from being treated unfairly besides
5    targeting her for an investigation?
6    A:  Well --
7    MR. SULLIVAN:  Objection to form.
8    THE WITNESS:  -- Mary and I spoke a
9    number of different times in a number of
10   different emails, and if she would have
11   raised anything that may have been
12   discriminatory, of course we would have
13   investigated it even further.
14   BY MR. THOMAS:
15   Q:  So you -- did you investigate
16   anything ever?
17   A:  Not from a discriminatory point of
18   view.
19   Q:  Okay.
20   A:  I would say --
21   Q:  Despite all the conversations with
22   Mary Piehler, the emails we have seen, you
23   never once investigated discrimination?
24   MR. SULLIVAN:  Objection to form.
25   THE WITNESS:  That's correct. That
```

Page 262

```
1       D. Berardo
2    was never raised. Or -- and that was never
3    apparent in any of the -- any of the
4    documents or any of the complaints that
5    were ever forwarded.
6    BY MR. THOMAS:
7    Q:  Anything else that you did to protect
8    her from being treated unfairly?
9    MR. SULLIVAN:  Objection to form.
10   THE WITNESS:  Not that I recall.
11   BY MR. THOMAS:
12   Q:  Before an employee is terminated for
13   poor performance, what steps should an
14   employer go through with that employee --
15   MR. SULLIVAN:  Objection to form.
16   BY MR. THOMAS:
17   Q:  -- from a human resources
18   perspective?
19   A:  I can speak in general.
20   Q:  Well, let's -- okay. Go ahead.
21   A:  Sure. So it -- it's -- it would
22   depend -- so if it's for performance, it would
23   depend if -- if the person can actually make a
24   turnaround. If the person can make a
25   turnaround, they generally will have a verbal
```

Page 263

```
1       D. Berardo
2    warning, sometimes a written warning, a
3    performance improvement plan. Sometimes those
4    steps are skipped, depending on the
5    circumstances.
6    If the person has -- if the manager feels
7    that there's no hope in the person
8    improving -- improving, we can move forward
9    directly with terminations -- termination, at
10   times. It's all going to be circumstantial,
11   depending on the circumstances.
12   Q:  Let me show you Exhibit 57, if the
13   court reporter can show that to you. If you
14   could turn to DEFS268.
15   MS. LESTRADE:  I think you should
16   read the whole document.
17   THE WITNESS:  Yeah, can I read the
18   whole document? Just because I'm --
19   BY MR. THOMAS:
20   Q:  Yeah, sure.
21   A:  Thank you.
22   Q:  Have you -- let me ask you this:
23   Have you seen the document before?
24   A:  I -- we did -- I did see this when we
25   were preparing.
```

Page 264

```
1       D. Berardo
2    Q:  If you need to read it again, feel
3    free.
4    A:  Thank you. Okay.
5    Q:  Do you see 2.3.2 on page DEFS268?
6    A:  Yeah.
7    Q:  And were those -- was that the policy
8    that was in effect at Absolute when
9    Ms. Piehler was terminated?
10   A:  I can't say for certain if this is
11   the policy that was in effect. It changed
12   from time to time.
13   MR. THOMAS:  We would request the
14   updated copy.
15   BY MR. THOMAS:
16   Q:  I will represent to you, though,
17   Mr. Berardo, that this is the copy that was
18   produced to --
19   A:  Sure.
20   Q:  -- us by Absolute.
21   A:  Okay. So just under the assumption,
22   this would be the policy -- if this was the
23   policy that was in force when she was
24   terminated. Okay.
25   Q:  And does it mention anywhere about
```

Page 265

D. Berardo
1
2    the fact that steps can be skipped if a
3    manager wants to skip them?
4    A:  Well, from -- from reading it, so
5    this policy is only for -- is only for
6    enforcement of policy and other rules. So
7    this is not necessarily performance-related.
8    So it's not something we would follow for a --
9    like, a performance-related conversation. And
10   it does say, in 2.1:
11   Infringements range from minor to
12   very serious, ultimately extending to
13   criminal acts; and therefore, the actions
14   required by managers and HR may vary in
15   sensitivity.'
16   Under 2.3 --
17   Q:  So it's your testimony that Mary
18   Piehler was not fired for violating any
19   company policy; correct?
20   A:  That's correct, from my recollection.
21   Q:  Was there anything that she violated
22   that Absolute expected from -- from her as a
23   policy matter as an employee?
24   A:  Not that I recall.
25   Q:  Okay. And there's nothing about, in

Page 266

D. Berardo
1
2    2.3.2 about skipping steps because of a
3    manager; correct?
4    MR. SULLIVAN:  Objection to form.
5    THE WITNESS:  Yeah, sure, under
6    number 2, 'preparation':
7    Consideration of the disciplinary
8    measure should consider the following
9    options.'
10   So I would refer back to the word 'consider.'
11   So it doesn't lay out the steps, all four
12   steps. It just says 'consider,' so...
13   BY MR. THOMAS:
14   Q:  In Ms. Piehler's case, were these
15   steps considered?
16   A:  I wouldn't -- this doesn't apply to
17   Ms. Piehler's case, so those steps --
18   Q:  My question was -- to you was were
19   these steps considered in Ms. Piehler's case?
20   A:  No -- no, they weren't, because they
21   don't apply to her.
22   Q:  Why did they not -- what -- what
23   steps -- the steps -- what steps did apply to
24   her in terms of what was expected in terms of
25   interaction between her and the company?

Page 267

D. Berardo
1
2    MR. SULLIVAN:  Objection to form.
3    THE WITNESS:  What -- so, sorry,
4    which -- can you -- can you repeat the
5    question? I'm sorry.
6    BY MR. THOMAS:
7    Q:  Sure. What -- what -- was the reason
8    the company -- in terms of the reason for
9    Ms. Piehler's termination, what steps prior to
10   her termination were supposed to go -- were
11   supposed to occur before -- before she was --
12   strike -- strike that.
13   At Absolute when you were there,
14   when Ms. Piehler was terminated --
15   A:  Yeah.
16   Q:  -- what steps was Absolute supposed
17   to go through before terminating her?
18   MR. SULLIVAN:  Objection to form.
19   THE WITNESS:  From my recollection,
20   we weren't really required to follow any
21   specific steps.
22   BY MR. THOMAS:
23   Q:  You didn't look at giving Ms. Piehler
24   a verbal warning?
25   A:  Not under the circumstances, no.

Page 268

D. Berardo
1
2    A:  written warning?
3    A:  No.
4    Q:  You didn't consider putting her on a
5    PIP?
6    A:  Before she was terminated?
7    Q:  Yeah.
8    A:  No.
9    Q:  Yeah, that's right. Because I want
10   to differentiate that from the one that
11   Mr. Awtry attempted.
12   A:  Right.
13   Q:  So you just jumped straight from
14   ground -- from zero to termination without
15   going through any of those steps?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  We --
18   BY MR. THOMAS:
19   Q:  Or even looking at them.
20   MR. THOMAS:  Objection to form.
21   THE WITNESS:  Well, these steps don't
22   apply to -- in -- in --
23   BY MR. THOMAS:
24   Q:  I'm not asking you that. I'm asking
25   you did you think about any of those steps

Berardo_Daniel

Page 269

1    D. Berardo
2    with Ms. Piehler?
3    A:  Well, no, because they don't apply.
4    Q:  Let me try again. Did you think
5    about the steps of a verbal warning to
6    Ms. Piehler?
7    A:  No, because it didn't apply.
8    Q:  Did you apply -- did you think about
9    any written warning?
10   A:  No, because it didn't apply.
11   Q:  Did you think about giving her a PIP?
12   A:  No, because it didn't apply.
13   Q:  Did you think about suspending her?
14   A:  No, because it didn't apply.
15   Q:  And do you think that's an
16   appropriate way to treat an employee, is to
17   terminate them without giving them a verbal
18   warning?
19   A:  Under the --
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  Under the
22   circumstances, yes.
23   BY MR. THOMAS:
24   Q:  Why?
25   A:  Because the -- from my perspective,

Page 270

1    D. Berardo
2    the -- the -- between Todd and Mary, their
3    working relationship was -- was a difficult
4    one, and so Todd was not able to work with
5    Mary effectively.
6    Q:  Anything else?
7    A:  I mean, no.
8    Q:  Okay. Let's go to -- let's talk
9    about performance reviews at Absolute. Did
10   Absolute give performance reviews?
11   A:  Yes.
12   Q:  Was that a function that was carried
13   out through the HR -- in part through the HR
14   department?
15   A:  It was administered -- administered
16   through the HR department, yes.
17   Q:  What is the purpose of performance
18   reviews?
19   A:  To review performance.
20   Q:  For? What purpose?
21   A:  Well, for -- for feedback, for...
22   Q:  Feedback to the -- feedback to the
23   employee; correct?
24   A:  Correct. Feedback to the employee
25   for the employee to -- to -- to have some, you

Page 271

1    D. Berardo
2    know, opportunity to talk about what sort of
3    personal growth they want to take in their
4    career, and, you know, to -- to highlight
5    things that employees -- the employee would be
6    doing well and things the employee, you know,
7    could improve on.
8    Q:  And to give an employee an
9    opportunity to improve on that before being
10   fired; right?
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  I -- I don't know if
13   that's the -- if -- if that's the reason of
14   a performance review.
15   BY MR. THOMAS:
16   Q:  You don't -- you don't think one of
17   the purposes of a performance review is to
18   give an employee an opportunity to improve
19   their performance so they won't get fired?
20   A:  I mean, I think that would be taking
21   it to the extreme. If the person was being
22   fired -- it -- it's not designed for that. An
23   annual performance --
24   Q:  Or -- or to tell an employee where
25   they should improve their performance so the

Page 272

1    D. Berardo
2    company won't be in a position where they
3    think they need to fire the employee; right?
4    A:  Well, sure, that would be accurate,
5    that -- that a performance review is -- is
6    there to provide that feedback to help the
7    employee with their performance, yes.
8    MR. THOMAS:  Okay. If the court
9    reporter can show the witness Kenny
10   Exhibit 34.
11   BY MR. THOMAS:
12   Q:  Once you've had a chance to read
13   that, let me know.
14   MS. LESTRADE:  What number?
15   MR. SULLIVAN:  34.
16   BY MR. THOMAS:
17   Q:  Mr. Berardo, you saw this exhibit on
18   Monday, didn't you?
19   A:  I didn't -- not from my recollection,
20   I didn't.
21   Q:  Okay.
22   A:  Okay. You can go ahead.
23   Q:  Okay. First of all, this document
24   says -- at the top right, it says 'performed
25   on.' What does 'performed on' mean at

Page 273

D. Berardo

1 Absolute in performance reviews in that
2 location? The top right-hand corner of the
3 first page.
4
5 A: Yeah. I'm -- I'm -- I'm only
6 speculating because I don't recall
7 specifically, but it -- it's likely when the
8 review was -- was submitted. But, again, I
9 would be speculating.
10 Q: Now, is there anything in Exhibit --
11 is Exhibit 34 the last performance evaluation
12 Ms. Piehler ever received?
13 A: I -- I don't know. I don't know the
14 answer to that question.
15 Q: When was Ms. Piehler fired?
16 A: Was it July of twenty -- 2015?
17 Q: So can you -- how -- let me ask you
18 this: How far in advance was this performance
19 review prior to her termination?
20 A: Well, this was for the previous -- or
21 the last six months of 2014, and it was
22 completed on -- in February, so it was --
23 Q: How far was that from when she was
24 terminated?
25 A: It was about five months.

Page 274

D. Berardo

1 
2 Q: Okay. Is there anything in
3 Exhibit 34 which is consistent with an
4 employee who is about to be terminated in four
5 months?
6 A: For --
7 MR. SULLIVAN: Objection -- objection
8 to form.
9 THE WITNESS: For performance?
10 BY MR. THOMAS:
11 Q: For any reason.
12 A: Well, for performance, I would say --
13 I would say there's nothing out -- that stands
14 out here.
15 Q: That would indicate the employee was
16 about to be terminated?
17 A: Underperforming, yeah.
18 Q: Or was there anything in here that
19 highlighted -- let me ask you this: Is there
20 anything in here that indicates that Todd
21 Awtry found Ms. Piehler difficult to work
22 with?
23 MR. SULLIVAN: Objection to form.
24 MR. THOMAS: Hey, John.
25 THE WITNESS: Not that I read.

Page 275

D. Berardo

1 
2 BY MR. THOMAS:
3 Q: Okay. And, in fact, to the contrary,
4 if you go to -- is there anything in here that
5 indicates that she's unsupportive of
6 management decisions?
7 A: Well, I mean, her responses -- I
8 mean, her responses are -- are -- you know,
9 her -- her responses are -- are -- you know,
10 they -- they tend to be reasons or -- or
11 excuses versus accepting the feedback.
12 Q: My question to you was is there
13 anything in here -- in here that indicates she
14 was unsupportive of the management decisions?
15 A: Well, I -- I mean, that kind of
16 implies that you're unsupportive, if you're
17 not taking the feedback.
18 Q: Where -- where does -- where does she
19 not take the feedback?
20 A: Well, I can only -- I mean, it's just
21 from -- from writing. I mean, there's nothing
22 explicit here, if that's what you're asking.
23 She doesn't say anything like --
24 Q: Anything -- what -- I'm asking you
25 what you're referring to.

Page 276

D. Berardo

1 
2 A: 
3 Q: How about this: Why don't we go to
4 DEFS10579. And the question is:
5 Does she approach the business with a
6 can-do attitude that supports the business
7 initiatives?'
8 Do you see that?
9 A: I do, yes.
10 Q: And what is she rated?
11 A: She's rated a 3 out of 5.
12 Q: Which is a -- verbally, a what?
13 A: I -- I don't recall. I think it --
14 it --
15 Q: That means 'meets expectations,'
16 isn't it?
17 A: I think that's what it is. I think
18 it's 'meet expectations.'
19 Q: Well, can you see it right there?
20 A: Can -- can I see what?
21 Q: 'Your evaluation result meets
22 expectations'?
23 A: Oh, yes. Sorry. Yes. 'Meets
24 expectations.'
25 Q: Why don't -- why don't you read

Page 277

D. Berardo

1    aloud the reviewer comment on this.
2    A:  Reviewer comments?
3    You are absolutely --'
4    Q:  Yeah.
5    A.'You are absolutely a
6    roll-your-shelves-up kind of person. Would
7    ask to look at challenges inside ABT as
8    'how do we get it done?' versus 'it's
9    broken.' While I agree much is broken, the
10   exception is leadership will figure out a
11   way.'
12   Q:  Okay. What about -- how about
13   'ensuring the team is deriving a strong
14   relationship with all OEMs and their patch,'
15   Exhibit 10577?
16   A:  Okay.
17   Q:  What was she rated there?
18   A:  She was rated 4 out of 5 or 'exceeds
19   expectations.'
20   Q:  And that's 'exceeds expectations,'
21   you said?
22   A:  Correct.
23   Q:  I won't keep going through it.
24   A:  Okay.

Page 278

D. Berardo

1    Q:  But let me also take a look at
2    Exhibit 59. I'm sorry. Wait. Awtry
3    Exhibit 58.
4    If you could, Court Reporter, just
5    show that to the...
6    THE WITNESS:  Thanks.
7    BY MR. THOMAS:
8    Q:  Let me know when you have had a
9    chance to read Exhibit 58.
10   A:  Okay.
11   Q:  Now, the issues that Mr. Awtry is
12   raising regarding Mr. Young are also not
13   related to policy, are they?
14   A:  No, they're -- it -- it appears that
15   they're performance.
16   Q:  And what does he do -- first of all,
17   is Mr. Young a male or a female?
18   A:  He's a male.
19   Q:  What does Mr. Awtry do in terms of
20   his male subordinates when there's an issue
21   about their performance?
22   A:  Are --
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  Are you asking me what

Page 279

D. Berardo

1    he did with Warren Young?
2    BY MR. THOMAS:
3    Q:  Yeah. Does he provide a written
4    warning?
5    A:  It appears that he provided a written
6    warning, yes.
7    Q:  Did he do that for Ms. Piehler?
8    A:  Sorry?
9    Q:  Did he do that for Ms. Piehler?
10   A:  Around her performance?
11   Q:  Yeah.
12   A:  Her termination wasn't based on
13   performance.
14   Q:  What was it based on?
15   A:  I have already answered that
16   question.
17   Q:  What did you say?
18   THE WITNESS:  Can you repeat what I
19   said.
20   THE COURT REPORTER:  I'll need the
21   words to find it.
22   THE WITNESS:  Oh, the words to --
23   BY MR. THOMAS:
24   Q:  You need -- you need to say it again.

Page 280

D. Berardo

1    A:  Okay.
2    Q:  She was fired based on what? Not
3    policy.
4    A:  No.
5    Q:  Not performance. What, then?
6    A:  It -- she was -- she was terminated
7    based on her -- from what I recall, from my
8    recollection, it was her and Todd's
9    difficult -- difficult -- difficult working
10   relationship. Like, they --
11   Q:  Which was not a performance issue by
12   her; correct?
13   A:  Which is not a -- was not a measure
14   of her numbers or her --
15   Q:  It was -- it wasn't also a measure of
16   her complying with policy at Absolute, was it?
17   A:  No, this didn't have anything to do
18   with policy. Not that I recall. I -- I
19   haven't read the entire policy manual.
20   Q:  If you read Exhibit 58 and
21   Exhibit 34, who would you think is more likely
22   to get terminated in the next five months?
23   MR. SULLIVAN:  Objection to form.
24   THE WITNESS:  I -- I under -- I under

Page 281

```
1    D. Berardo
2    -- based on performance?
3    BY MR. THOMAS:
4    Q:  No, just who is more likely to get
5    terminated --
6    MR. SULLIVAN:  Objection to form.
7    BY MR. THOMAS:
8    Q:  -- based on your experience in HR
9    and --
10   A:  I -- I would never make that call
11   without knowing more facts based on two emails
12   -- or two documents. I would never make that
13   call.
14   Q:  Based on those two, though, who would
15   be in more trouble?
16   A:  I would never -- I would never make
17   that call.
18   Q:  When a manager says to you 'you
19   mentioned to me in one of our previous
20   conversations, not Friday,' that:
21   I know I'm running out of time, and
22   if I continue to miss my quota, you won't
23   have to manage me out of the business,
24   which leads me to believe you understand
25   the urgency to correct performance
```

Page 282

```
1    D. Berardo
2    immediately.'
3    Do you see that? In Exhibit 58.
4    A:  Yeah. And what line is that?
5    Q:  The second-to-last.
6    A:  Second-to-last line?
7    Q:  Exhibit 58.
8    A:  Oh, the last page? The first --
9    Q:  First -- first page.
10   A:  Oh, the first page, the last line?
11   Or the...
12   Q:  Second-to-last line.
13   A:  Oh, right. Okay.
14   Q:  Second-to-last paragraph.
15   A:  Okay.
16   Q:  Do you see that?
17   A:  I do.
18   Q:  Mary Piehler never got a warning like
19   that, did she?
20   A:  Well, this was -- this was a
21   performance -- this was a performance issue,
22   so Mary never got a performance-based warning
23   because there was no big performance numbers
24   or quota that --
25   Q:  Let's not go round and round about
```

Page 283

```
1    this, Mr. Berardo.
2    A:  Okay.
3    Q:  Let's just get to the point.
4    A:  Sure.
5    Q:  She was never given a warning like
6    that; right?
7    A:  She was never given a warning about
8    her performance, no.
9    Q:  Or given a warning in any sense that
10   she was about to be terminated?
11   A:  warning that she was -- a heads-up
12   that she was going to be terminated? Not that
13   -- not -- my recollection is that she was not
14   given a heads-up that she was going to be
15   terminated.
16   Q:  Or a warning that if she continued to
17   engage in certain behaviour, she was likely to
18   be terminated?
19   A:  I -- I can only speak for myself and
20   my knowledge, and my knowledge --
21   Q:  Do you have any knowledge that she
22   was given any warning that her employment was
23   in jeopardy?
24   A:  Not my -- not to my recollection.
```

Page 284

```
1    D. Berardo
2    Q:  But Mr. Young, the male employee,
3    was?
4    A:  Based on his performance --
5    Q:  Correct?
6    A:  -- yes. Yeah.
7    Q:  And, in fact, Mr. Young wasn't even
8    fired; he was kept on with the same pay after
9    this. Does that surprise you?
10   A:  I don't recall the --
11   MR. SULLIVAN:  Objection --
12   THE WITNESS:  -- circumstances.
13   MR. SULLIVAN:  -- to form.
14   BY MR. THOMAS:
15   Q:  Okay. Tell me about the open
16   door-policy at Absolute.
17   MR. SULLIVAN:  Objection to form.
18   THE WITNESS:  I mean, the open-door
19   policy was that, you know, if -- if anyone
20   had an issue or a complaint, they could
21   come to anyone on the leadership team.
22   BY MR. THOMAS:
23   Q:  And would they be fired for any
24   issues they raised?
25   A:  Any --
```

Page 285

D. Berardo

1    Q: Under the open-door policy?
2    A: Any issues that they raised?
3    Q: Yeah.
4    A: Would they be fired because of it? I
5    mean --
6    Q: Yeah.
7    A: -- I can't -- I can't speculate what
8    someone would come and -- and tell us. If
9    they were telling us they were doing something
10   illegal, yeah, they could get fired.
11   Q: But in terms of their comments about
12   how the company could be run better or
13   differently, that wouldn't -- and -- and they
14   came forward under the open-door policy, they
15   weren't going to risk termination for doing
16   that, were they?
17   MR. SULLIVAN: Objection to form.
18   THE WITNESS: I -- I can't say that
19   they were or weren't. You know, if --
20   if --
21   BY MR. THOMAS:
22   Q: So it's possible someone could -- so
23   you're saying that under the open-door policy,
24   someone could come to their manager, express

Page 286

D. Berardo

1    thoughts about how the company could be run
2    better, and they could be fired for it?
3    MR. THOMAS: Objection to form.
4    BY MR. THOMAS:
5    Q: That was the open-door policy at
6    Absolute?
7    A: I wouldn't say that's the open-door
8    policy, but, I mean, it -- it would depend on
9    circumstances.
10   Q: Did you say that it is the open-door
11   policy, what I --
12   A: No.
13   Q: -- just described?
14   A: I said that wouldn't be the open-door
15   policy --
16   Q: Okay.
17   A: -- but it would depend on
18   circumstances.
19   MR. THOMAS: If you -- if the court
20   reporter could show the witness Exhibit 24.
21   THE WITNESS: Thank you.
22   BY MR. THOMAS:
23   Q: Once you have finished -- once you've
24   had a chance to read it, let me know.

Page 287

D. Berardo

1    A: Okay. Okay.
2    Q: Now that you have read that, could
3    you -- would you say that that email was
4    degrading to Todd Awtry?
5    MR. SULLIVAN: Objection to form.
6    THE WITNESS: Degrading to Todd
7    Awtry?
8    BY MR. THOMAS:
9    Q: Yeah. What Mary Piehler said, was
10   she being degrading to Todd Awtry?
11   A: It was very contradictory to what
12   Todd was trying to tell her.
13   Q: My question to you was is Mary
14   Piehler being degrading to Todd Awtry in that
15   email?
16   MR. SULLIVAN: Objection to form.
17   THE WITNESS: I mean, that's -- in my
18   opinion?
19   BY MR. THOMAS:
20   Q: As an HR person at Absolute, yes, do
21   you consider this to be degrading treatment
22   from one employee to another?
23   MR. SULLIVAN: Objection to form.
24   THE WITNESS: I don't know if I -- I

Page 288

D. Berardo

1    wouldn't use the word 'degrading.'
2    BY MR. THOMAS:
3    Q: Would you use the term 'berating'?
4    A: Sorry?
5    Q: Berating, b-e-r-a-t-i-n-g. Berating.
6    Would you say Mary Piehler was berating Todd
7    Awtry in this email?
8    MR. THOMAS: Objection to form.
9    THE WITNESS: Can -- can you -- can
10   you define 'berating' to me.
11   BY MR. THOMAS:
12   Q: What does -- what does 'berating'
13   mean to you?
14   A: I guess someone that is -- you know,
15   some -- someone that is -- that is not showing
16   respect.
17   Q: You think Mary Piehler is not showing
18   respect to Todd in this email?
19   A: Yeah, I think there's -- there's
20   points where she's not.
21   Q: Do you think Todd is showing respect
22   to Mary in this email?
23   MR. SULLIVAN: Objection to form.
24   THE WITNESS: From reading it, I

Page 289

```
1     D. Berardo
2   mean, it seems like Todd is trying to
3   provide her some of the -- some feedback.
4   BY MR. THOMAS:
5   Q:  What do you think of Mary's comments
6   about what Todd was saying to her? Do you
7   think that was appropriate?
8   MR. SULLIVAN:  Objection to form.
9   THE WITNESS:  Can you point me to --
10  to -- to the paragraph you're speaking of.
11  BY MR. THOMAS:
12  Q:  Well, we can just start with in the
13  first italicized thing:
14  Criticizing me and my 'leadership' in
15  front of one of my peers is not really the
16  right thing to do. You even commented that
17  you were going to 'get personal' before you
18  started to criticize me? Obviously, I can
19  sense you're annoyed and frustrated, but I
20  was being honest, and my reps will back up
21  everything that I told you. There is no
22  hidden agenda here. I was clear,
23  transparent, and doing what I still believe
24  was the right thing, telling my manager the
25  concerns of my team. I don't see this as
```

Page 290

```
1     D. Berardo
2   bad leadership at all.'
3   A:  Okay. And so, sorry, what was the --
4   what was the original question?
5   Q:  Do you think that it was appropriate
6   for Todd Awtry to say to an employee that he's
7   about to get personal with her?
8   MR. SULLIVAN:  Objection to form.
9   BY MR. THOMAS:
10  Q:  And do so in front of her peers?
11  A:  If -- I mean, if that is what he --
12  if that is what he said, to 'get personal,'
13  I'm not sure what he meant by that.
14  Q:  Is there ways that that would be
15  okay?
16  A:  Is there a way to -- that that would
17  be okay?
18  Q:  For a manager to speak to a
19  subordinate with a -- in front of a peer?
20  MR. SULLIVAN:  Objection to form.
21  THE WITNESS:  If that's what he said,
22  if he actually said 'I'm going to get
23  personal,' I probably would coach him to --
24  I would ask what is he trying to say and
25  coach him to use other language besides
```

Page 291

```
1     D. Berardo
2   'get personal.'
3   BY MR. THOMAS:
4   Q:  Anything in those three paragraphs
5   where Mary is berating or showing lack of
6   respect to Todd?
7   A:  Well, just the overall email. Not
8   really -- just from my point of view, not --
9   not really taking any of the feedback or
10  taking any ownership.
11  Q:  Why don't we do this: Show me one
12  sentence or one paragraph where Mary Piehler
13  is showing a lack of respect to Todd.
14  MR. SULLIVAN:  Objection to form.
15  THE WITNESS:  I -- there's -- there's
16  no -- no one sentence. I -- my point was
17  that Todd was providing her feedback, and
18  the email was all about her, you know,
19  providing contrary opinions to Todd.
20  BY MR. THOMAS:
21  Q:  And on the open-door policy, she was
22  free to provide contrary opinions to Todd;
23  correct?
24  MR. SULLIVAN:  Objection to form.
25  THE WITNESS:  I don't have the
```

Page 292

```
1     D. Berardo
2   open-door policy in front of me, so if -- I
3   don't know if we have that as an exhibit.
4   BY MR. THOMAS:
5   Q:  Do you have any reason to believe
6   that's not true?
7   MR. SULLIVAN:  Objection to form.
8   THE WITNESS:  I mean, someone has --
9   someone has a right to say whatever they
10  want.
11  BY MR. THOMAS:
12  Q:  Under the open-door policy, that's
13  what's allowed; right?
14  A:  Well, I think any human has a right
15  to say -- you can say anything to anyone, if
16  you really want to.
17  Q:  I'm talking about the open-door
18  policy in HR. Was it okay for some -- for a
19  subordinate to say something to a manager
20  about how -- how they thought the company
21  could do better?
22  A:  I -- I would need to see the actual
23  open-door policy.
24  Q:  Any reason you think that Mary
25  Piehler violated that policy, based on what
```

Page 293

D. Berardo

1    you know right now, from Exhibit 24?
2    A:  If you can show me the policy, I can
3    answer that question.
4    Q:  No, I'm saying -- I'm asking you
5    based on your knowledge.
6    A:  Based on my knowledge of the
7    open-door policy, I mean, my vague knowledge
8    of what the open-door policy was I don't think
9    got into specifics of what you can and can't
10   do. So I can't answer that question.
11   Q:  Do you think Exhibit 24 warranted an
12   employee's termination? And, specifically,
13   Mary Piehler's?
14   MR. SULLIVAN:  Objection to form.
15   THE WITNESS:  If we're -- if -- are
16   we talking about a single document? If --
17   if I was presented --
18   BY MR. THOMAS:
19   Q:  Yes.
20   A:  -- a single document?
21   Q:  Yes.
22   A:  You know, it -- it would essentially
23   be up to the manager, and we would have that
24   conversation. It's hard for me to answer

Page 294

D. Berardo

1    that, because it's -- it's not just a single
2    email.
3    Q:  Well, what did -- what emails did you
4    look in -- did -- were you -- let me ask
5    you this: Were you involved in the decision
6    to terminate Ms. Piehler?
7    A:  The decision came from -- the
8    decision came from Todd to terminate --
9    Q:  Did you --
10   A:  -- Mary.
11   Q:  Did you do anything besides observe
12   and report it?
13   A:  I --
14   MR. SULLIVAN:  Objection to form.
15   THE WITNESS:  I had conversations --
16   we definitely had conversations with Todd.
17   BY MR. THOMAS:
18   Q:  When did you have those
19   conversations?
20   A:  Before -- I mean, before the decision
21   was made.
22   Q:  Did you question whether
23   discrimination might be an issue?
24   A:  No, because I've never observed any

Page 295

D. Berardo

1    sort of discrimination.
2    Q:  Did you investigate -- did you talk
3    to Todd about Mary Piehler's complaints
4    about -- that she had made to you about him?
5    Did you investigate those?
6    MR. SULLIVAN:  Objection to form.
7    THE WITNESS:  I don't -- I don't have
8    recollection of that.
9    BY MR. THOMAS:
10   Q:  Would there ever be a reason for a
11   manager not to tell HR that they were looking
12   to replace an employee?
13   MR. SULLIVAN:  Objection to form.
14   THE WITNESS:  Sorry, would there ever
15   be a reason why a manager wouldn't tell HR
16   that they were looking to replace an
17   employee?
18   BY MR. THOMAS:
19   Q:  Yeah.
20   A:  Well, if they're looking to replace
21   the HR person, that would be a reason.
22   Q:  Other than that?
23   A:  There may be other reasons. I -- I
24   mean, I can't think of the thousands and

Page 296

D. Berardo

1    thousands of reasons off the top of my head.
2    Not off the top of my head right now.
3    Q:  What about not telling Recruiting
4    that they're looking to replace a manager?
5    MR. SULLIVAN:  Objection to form.
6    THE WITNESS:  Not telling --
7    BY MR. THOMAS:
8    Q:  Any reason -- any reason -- any
9    reason that a supervisor should keep
10   Recruiting in the dark about it?
11   A:  It's -- it's possible if they want to
12   keep something confidential, that they -- they
13   keep it to a limited amount of people before
14   they replace someone.
15   Q:  I'm talking about Recruiting.
16   A:  So you're -- you're asking if --
17   sorry, can you repeat the question, then.
18   Q:  Yes. Should a -- if a supervisor is
19   looking to replace a manager --
20   A:  Yeah.
21   Q:  -- should that supervisor keep
22   Recruiting in the dark when they're out
23   advertising for the job?
24   MR. SULLIVAN:  Objection to form.

Page 297

1    D. Berardo
2    THE WITNESS: That happens, yes.
3    BY MR. THOMAS:
4    Q: Should it --
5    MR. SULLIVAN: Objection to form.
6    BY MR. THOMAS:
7    Q: -- from an HR perspective? When?
8    A: In circumstances. Just when it's a
9    sensitive termination.
10   Q: Why shouldn't Recruiting be told?
11   A: Because you want to keep -- you want
12   to keep sensitive information as tight as
13   possible and not tell -- only tell people that
14   it -- that's -- that would be absolutely
15   necessary to know.
16   Q: Where did you first learn that Mary
17   Piehler was going to be -- was under
18   consideration for termination?
19   A: I don't recall the specific date.
20   It -- it was -- it could have been a month,
21   month and a half, couple of months before she
22   was actually terminated. I -- but my -- I
23   don't -- I don't know the specific dates, so I
24   wouldn't hold to that -- that date.
25   Q: What is a position number at

Page 298

1    D. Berardo
2    Absolute?
3    A: A position number is something that
4    was controlled by finance. And so every
5    position had a number, and then an employee
6    was assigned to that number. And so an
7    employee could leave, and their employee
8    number could leave with them, but the position
9    number would stay with that position. So
10   the -- there could be multiple employees in
11   that same position number over the course of
12   the years.
13   Q: Did each employee have a separate
14   position number?
15   A: They should have, yes. At -- at --
16   we -- I should say that we implemented
17   position numbers at a certain point. They
18   weren't always at Absolute, and I don't know
19   when they were actually -- they were actually
20   implemented.
21   Q: But once you had a position number --
22   once you had implemented position numbers,
23   only one employee had a position number;
24   correct? Or each employee had a unique
25   position number; right?

Page 299

1    D. Berardo
2    A: I mean, generally, this was, again,
3    managed by finance, so I'm -- I'm not the
4    expert when it comes to position numbers. So
5    it would probably be someone in finance that
6    would be able to answer that definite -- more
7    definitively.
8    Q: When somebody left and a new person
9    took their role, they would be given the same
10   position number?
11   A: When someone left and a new --
12   Q: As the person -- as the person who
13   left?
14   A: It -- it's a possibility. Or -- so,
15   usually, that -- yeah, usually, the position
16   number would stay around, unless the position
17   was eliminated. And someone would -- would
18   take that position number, in general, I
19   think.
20   Q: What if the position was changed?
21   Would a new position number be created?
22   A: I don't know the answer to that. I'm
23   not sure. It's a finance question.
24   MR. THOMAS: If you could show,
25   Jessica, the witness Exhibit 81.

Page 300

1    D. Berardo
2    THE WITNESS: Thanks.
3    BY MR. THOMAS:
4    Q: And, Mr. Berardo, I would like you to
5    read that exhibit and let me know when you're
6    done.
7    Jessica, just to save some time,
8    from the new exhibits, Berardo new exhibits,
9    if you could pull O, P, I, J, and N. And you
10   can mark those. Those will be coming for the
11   witness next.
12   MS. LESTRADE: Did we lose her?
13   MR. MANINDER: That might have been
14   Mary falling off.
15   MR. THOMAS: Mary, are you still
16   there?
17   MS. LESTRADE: I think she may have
18   fallen off.
19   MR. THOMAS: Oh, okay. Want to just
20   loop her back in there? Or did she -- did
21   she call in?
22   MS. LESTRADE: No, we can call her,
23   but -- yeah, hold on.
24   MR. THOMAS: Okay.
25   MS. LESTRADE: I will try to get her

Page 301

```
1      D. Berardo
2    back.
3    THE COURT REPORTER:  Let's go off the
4    record.
5    MS. LESTRADE:  Okay.
6    THE WITNESS:  Can we take a
7    two-minute break, then.
8    MS. LESTRADE:  Sure, yeah.
9    VIDEOGRAPHER:  Going off record. The
10   time is 6:18.
11         (PROCEEDINGS RECESSED AT 6:18 P.M.)
12         (PROCEEDINGS RECONVENED AT 6:27?P.M.)
13   VIDEOGRAPHER:  Back on the record.
14   The time is 6:27.
15   BY MR. THOMAS:
16   Q:  All right. Mr. Berardo, does
17   Exhibit 81 accurately describe the termination
18   meeting with Ms. Piehler?
19   A:  Yeah, from my recollection, it does.
20   Q:  Did you consider the exit interview
21   to be bizarre?
22   A:  The -- the request for the -- the
23   exit interview?
24   Q:  No, sorry, the termination meeting.
25   Did you consider the termination meeting to be
```

Page 302

```
1      D. Berardo
2    bizarre?
3    A:  No.
4    Q:  Did you consider Mary's reaction at
5    the termination meeting to be bizarre?
6    A:  No.
7    Q:  Why was a third party present for the
8    meeting?
9    A:  Because I couldn't be there in
10   person, and so it's a best practice to have
11   another person in the room.
12   Q:  Was it appropriate for Ms. Piehler's
13   severance, financial, and benefits to be
14   discussed with a third party?
15   MR. SULLIVAN:  Objection to form.
16   THE WITNESS:  It's -- it's -- it's
17   common -- it's common -- if someone is
18   witnessing a termination, it's common
19   practice for them to be in the room during
20   that termination meeting. The full
21   termination meeting.
22   BY MR. THOMAS:
23   Q:  Without going around and around, is
24   that a yes or a no?
25   A:  Can you repeat the question.
```

Page 303

```
1      D. Berardo
2    MR. THOMAS:  Yes. Can the court
3    reporter read it back.
4         (REPORTER READ BACK)
5    THE WITNESS:  Yes, it was appropriate
6    for that to be discussed while that third
7    party was in the room.
8    BY MR. THOMAS:
9    Q:  Why was Tom Ioele hiding and not
10   present?
11   A:  I don't -- I don't know. I don't
12   know that he was even hiding.
13   Q:  Why wasn't he -- why wasn't he
14   present in the room?
15   A:  Well, we had the -- that
16   representative in the room, Catherine.
17   Q:  And let's go through here. Where was
18   -- where was Tom in relation to the meeting?
19   A:  I -- I don't know. I don't have any
20   recollection of Tom.
21   Q:  Well, he's listed as being present in
22   the room. Do you see that?
23   A:  Yes.
24   Q:  How come Mary Piehler couldn't see
25   him?
```

Page 304

```
1      D. Berardo
2    A:  I mean, he must -- he must have
3    been present. Because at -- the bottom
4    sentence says:
5    Tom indicated he would follow up with
6    Mary, since he knows her personally.'
7    Maybe --
8    Q:  Why -- why wasn't he -- where was --
9    was he hiding somewhere in the room?
10   A:  Perhaps he was on the phone. I -- I
11   don't -- I don't recall.
12   Q:  Well, you said he had to be present
13   in the room.
14   A:  Sorry, present? I -- I was not
15   present in the room, and it marks me as
16   present. So he could have been on the phone.
17   I -- I don't know.
18   Q:  But you're marked -- you're marked as
19   being on the phone.
20   A:  Okay. I don't -- I don't know.
21   Q:  Is there any good explanation as to
22   why someone would hide in the middle of a
23   termination meeting?
24   MR. SULLIVAN:  Objection to form.
25   THE WITNESS:  Why someone would hide
```

Berardo_Daniel

Page 305

D. Berardo

1
2    in a termination meeting? Is this a
3    hypothetical question?
4    BY MR. THOMAS:
5    Q:  Well, Tom Ioele was present for the
6    termination meeting but was hiding somewhere
7    where he couldn't be seen by Ms. Piehler. Is
8    there any good reason for that?
9    A:  I don't think that's --
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  I don't think that's an
12   accurate statement.
13   BY MR. THOMAS:
14   Q:  Which part of it is not accurate?
15   A:  That he was hiding in the room.
16   Q:  Well, why couldn't he -- okay. If --
17   if you're in a conference room in a hotel and
18   three people are present -- four, including
19   Ms. Piehler -- why couldn't Mr. Ioele be seen?
20   MR. SULLIVAN:  Objection to form.
21   THE WITNESS:  I mean, I think that's
22   a question for Catherine and Tom. I -- I
23   wasn't in the room, so --
24   BY MR. THOMAS:
25   Q:  Not you as head of HR?

Page 306

D. Berardo

1
2    A:  I wasn't in the room, so I didn't
3    observe who was in -- who was actually in the
4    room, unfortunately.
5    Q:  It wouldn't be appropriate for him
6    to -- for someone to not make themselves known
7    and hide in a room during a termination
8    meeting, would it?
9    MR. SULLIVAN:  Objection to form.
10   THE WITNESS:  If -- if you're
11   speaking in a general sense, yes, it would
12   not be appropriate for someone to hide in a
13   room during a termination --
14   BY MR. THOMAS:
15   Q:  What about in --
16   A:  -- meeting.
17   Q:  -- in Mary Piehler's case? Would it
18   be appropriate there?
19   A:  If he was hiding?
20   Q:  Or not visible.
21   A:  If he was hiding and he didn't make
22   himself present to Mary?
23   Q:  Correct.
24   A:  I imagine that would be
25   inappropriate, yes.

Page 307

D. Berardo

1
2    Q:  Did you know that Ms. Piehler's
3    husband had cancer?
4    A:  I'm -- I'm not sure if I knew before
5    the termination. I definitely knew after the
6    termination when speaking with Mary.
7    Q:  And didn't Absolute promise that they
8    were going to continue Ms. Piehler's health
9    benefits?
10   A:  I don't recall Absolute making
11   that promise. Generally, in the -- in
12   the -- in the severance, it's part of a
13   severance to -- I just don't -- I can't speak
14   to it. I don't -- I don't have the
15   termination letter in front of me. I don't
16   know what was offered or what wasn't.
17   Q:  Did you talk to Ms. Piehler about her
18   medical coverage? Because you cancelled it on
19   them and Mr. Piehler when he was going in for
20   cancer surgery?
21   A:  I'm -- we may have spoken. Mary and
22   I spoke quite a bit on the phone after the
23   termination. I don't --
24   Q:  Did it include the fact that you had
25   cancelled the health insurance on her husband

Page 308

D. Berardo

1
2    who had cancer, despite promising not to do
3    so?
4    A:  So --
5    MR. SULLIVAN:  Objection to form.
6    THE WITNESS:  Yeah, the way the
7    insurance works in the US is -- is
8    insurance is not cancelled. Someone can go
9    on COBRA and can continue that coverage
10   once -- once the payment has stopped from
11   the company.
12   BY MR. THOMAS:
13   Q:  My question to you is didn't you
14   cancel Ms. Piehler's insurance immediately
15   upon her exit meeting, even though you had
16   told her it was not being cancelled?
17   MR. SULLIVAN:  Objection to form.
18   BY MR. THOMAS:
19   Q:  And the only way she found out was
20   when her husband went in for cancer treatment,
21   and there was no medical coverage?
22   A:  No, I wouldn't say that's accurate.
23   We would have went through this with her in
24   the termination letter, and it would have been
25   laid out in the termination letter.

Page 309

1    D. Berardo
2    Q:  You're not saying -- so you're
3    denying that you all cancelled the insurance
4    on Mary Piehler and her husband who had
5    cancer?
6    A:  I -- I'm not denying the fact that
7    the company stopped paying for coverage and
8    she was referred to COBRA. What I'm saying is
9    that -- is that that was all laid out in
10   the -- in the -- in the severance package, and
11   that would have been -- gone -- we would have
12   gone over that during that termination
13   meeting.
14   Q:  Now, how much -- how do you determine
15   how much severance an employee is to receive
16   when they are terminated?
17   A:  Typically, it's a -- it's a question
18   that -- that we have with our legal counsel,
19   and so it -- it will depend on -- on the
20   circumstance, and then that -- that will be
21   discussed with the legal counsel to come up
22   with a recommendation, depending on the
23   circumstances. And location.
24   Q:  Do you ever offer severance to an
25   employee who resigns voluntarily?

Page 310

1    D. Berardo
2    A:  Resigns voluntarily? It can happen.
3    Q:  Do you know why Amy Rathbun was
4    offered such a large severance package, even
5    though she resigned voluntarily?
6    A:  I wasn't around for Amy's
7    resignation. I don't know the details.
8    Q:  What would be the circumstances under
9    which a person would be offered a large
10   severance package when they left voluntarily?
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  So you're -- you're --
13   you're just asking me in general
14   hypothetically?
15   BY MR. THOMAS:
16   Q:  No, at HR -- at Absolute when you
17   were in HR.
18   MR. SULLIVAN:  Objection to form.
19   THE WITNESS:  I don't recall -- I
20   don't recall us offering a severance
21   package to someone that resigned
22   voluntarily. My recollection -- I don't
23   recall that.
24   BY MR. THOMAS:
25   Q:  All right. Let me show you

Page 311

1    D. Berardo
2    Exhibits -- what has been marked as
3    Exhibits 87 through 91. Let me know when you
4    have had a chance to read those.
5    (Exhibit 87 was marked for
6    identification and is attached hereto.)
7    (Exhibit 88 was marked for
8    identification and is attached hereto.)
9    (Exhibit 89 was marked for
10   identification and is attached hereto.)
11   (Exhibit 90 was marked for
12   identification and is attached hereto.)
13   (Exhibit 91 was marked for
14   identification and is attached hereto.)
15   MR. THOMAS:  And, Jessica, if you can
16   mark Berardo Exhibit A as 92.
17   (Exhibit 92 was marked for
18   identification and is attached hereto.)
19   MR. THOMAS:  And, Jessica, one more
20   exhibit. Berardo Exhibit X as 93.
21   (Exhibit 93 was marked for
22   identification and is attached hereto.)
23   THE WITNESS:  Okay.
24   BY MR. THOMAS:
25   Q:  All right. These -- these documents,

Page 312

1    D. Berardo
2    some of which are redacted, involve
3    discussions with legal and other people
4    regarding Ms. Piehler's termination.
5    Do you -- how far in advance of
6    consulting legal do you remember discussing
7    Ms. Piehler's termination?
8    A:  With Todd?
9    Q:  With anyone.
10   A:  I don't -- I don't recall
11   specifically the -- the timeline of -- of who
12   I talked to about, you know, her termination
13   before we spoke with legal.
14   Q:  How -- how long -- how soon after the
15   idea of her being terminated did you contact
16   legal?
17   A:  It -- it -- I don't -- I don't know
18   the answer to that. It -- it would have been
19   fairly quickly, I would imagine.
20   Q:  And 'fairly quickly' meaning a week
21   or two?
22   A:  I don't -- I don't know. I -- I
23   don't have specific times.
24   Q:  Well, you used the words 'fairly
25   quickly,' so I'm asking what you mean by --

## Page 313

D. Berardo

```
2    A:  Yeah.
3    Q:  -- 'fairly quickly.'
4    A:  It could be -- it could be a day; it
5      could be a couple of weeks.
6    Q:  Okay.
7    A:  I don't know.
8    Q:  Do you wish you had known about
9      Thomas Kenny's comment when you made -- when
10     the termination decision was made?
11   MR. SULLIVAN:  Objection to form.
12   THE WITNESS:  Do I -- do I wish?
13   BY MR. THOMAS:
14   Q:  Would you like -- let me put it this
15     way: Would you like to have known about it?
16   MR. SULLIVAN:  Objection to form.
17   THE WITNESS:  Well, as I said before,
18     I would have liked to have known about it
19     when -- when it happened, yes.
20   BY MR. THOMAS:
21   Q:  Would you have liked to have known
22     about it in terms of how you would have
23     approached the termination decision?
24   A:  No.
25   MR. SULLIVAN:  Objection to form.
```

## Page 314

D. Berardo

```
2    THE WITNESS:  No.
3    BY MR. THOMAS:
4    Q:  What could you have done better in
5      dealing with Mary Piehler at Absolute, from an
6      HR perspective?
7    MR. SULLIVAN:  Objection to form.
8    THE WITNESS:  You know, I believe --
9      oh.
10   MR. SULLIVAN:  Keep going.
11   MS. LESTRADE:  Just keep going.
12   THE WITNESS:  Okay. Yeah, I believe
13     that -- that -- that I did everything that
14     I felt was appropriate at the time in -- in
15     -- in dealing with Mary.
16   Oh, he -- he can't hear us either.
17   MR. SULLIVAN:  Is Mary still on?
18   THE COURT REPORTER:  Okay.
19   VIDEOGRAPHER:  Should we --
20   MS. LESTRADE:  Hello?
21   VIDEOGRAPHER:  -- go off record,
22     counsel? Should we go off?
23   MR. SULLIVAN:  It's his -- it's his
24     deposition --
25   MS. LESTRADE:  It's his deposition.
```

## Page 315

D. Berardo

```
2    MR. SULLIVAN:  -- but I guess he
3      can't hear us, so...
4    MS. LESTRADE:  I don't think we -- I
5      don't think we --
6    MS. VAN BRUNT-PIEHLER:  Yes.
7    MS. LESTRADE:  -- need to.
8    MS. VAN BRUNT-PIEHLER:  I'm still on.
9    MR. SULLIVAN:  Okay.
10   MS. LESTRADE:  Oh.
11   MR. SULLIVAN:  We lost Nelson. We'll
12     patch him back in.
13   MS. VAN BRUNT-PIEHLER:  Okay.
14   MR. SULLIVAN:  He -- he's got to call
15     us, because it's just going to go to his --
16   MR. MALLI:  Unless he gives us the
17     number again.
18   MS. LESTRADE:  Let's see. Maybe they
19     will fix it and get their act together on
20     their end.
21   MR. SULLIVAN:  He's got to call us.
22   MS. LESTRADE:  Ms. Piehler, are you
23     still on the line?
24   MR. SULLIVAN:  Hit the resume.
25     Resume.
```

## Page 316

D. Berardo

```
2    MS. LESTRADE:  Resume?
3    MR. SULLIVAN:  Yeah. Okay.
4    MS. LESTRADE:  Hello? Is there
5      anyone on the line?
6    MS. VAN BRUNT-PIEHLER:  Mary is on.
7    MS. LESTRADE:  Okay.
8    MR. SULLIVAN:  Okay.
9    MS. LESTRADE:  We're going to have to
10     end the call with you because their --
11   MS. VAN BRUNT-PIEHLER:  Okay.
12   MS. LESTRADE:  -- phone isn't
13     working.
14   MR. SULLIVAN:  We'll -- we'll connect
15     back in when they call here, so --
16   MS. VAN BRUNT-PIEHLER:  Okay. No
17     problem.
18   MR. SULLIVAN:  -- stand -- stand by.
19   MS. LESTRADE:  Okay.
20   MR. MALLI:  Do you want me to hang
21     up?
22   MR. SULLIVAN:  Yeah.
23   MS. LESTRADE:  Yes.
24   MR. SULLIVAN:  Hang up, and we'll
25     call you back.
```

Page 317

```
1      D. Berardo
2      MS. LESTRADE:  Okay.
3      MS. VAN BRUNT-PIEHLER:  Okay.
4      MS. LESTRADE:  Bye.
5      Is he going to call? Does he know to
6      call, do you think?
7      MR. SULLIVAN:  What does that say?
8      MS. LESTRADE:  'We're going to take
9      ours off 'night' so you can call.'
10     MR. SULLIVAN:  Okay. All right.
11     MS. LESTRADE:  Okay. So --
12     MR. SULLIVAN:  Let's try again.
13     MS. LESTRADE:  -- now?
14     UNIDENTIFIED SPEAKER:  Thank you for
15     calling Thomas & Solomon. This is Kyle.
16     How can I help you?
17     MS. LESTRADE:  Hi, we're in the
18     middle of a deposition with Nelson Thomas.
19     THE WITNESS:  Okay. One moment,
20     please.
21     MS. LESTRADE:  We need get him on the
22     line.
23     MR. THOMAS:  Hey. Do we have you
24     back?
25     MR. SULLIVAN:  Yeah. We'll patch in
```

Page 318

```
1      D. Berardo
2      Mary.
3      MR. THOMAS:  Okay. Perfect.
4      Thank you.
5      MS. VAN BRUNT-PIEHLER:  Hello, Mary
6      Piehler.
7      MR. SULLIVAN:  Hi. Hold on. We're
8      going to get Nelson on.
9      MS. VAN BRUNT-PIEHLER:  Okay. Sure.
10     MS. LESTRADE:  Everyone on?
11     MR. THOMAS:  I'm here.
12     MS. VAN BRUNT-PIEHLER:  Ms. Piehler?
13     MS. VAN BRUNT-PIEHLER:  I'm here.
14     MS. LESTRADE:  Okay.
15     MR. SULLIVAN:  Okay.
16     MR. THOMAS:  Okay.
17     MS. VAN BRUNT-PIEHLER:  I'm here.
18     MR. SULLIVAN:  Yeah.
19     MS. LESTRADE:  Okay.
20     MR. SULLIVAN:  We're good.
21     MR. THOMAS:  Great. Can we go back
22     on the -- I don't -- did we go off the
23     record or --
24     MR. SULLIVAN:  Yes. Yes. No?
25     THE COURT REPORTER:  No.
```

Page 319

```
1      D. Berardo
2      VIDEOGRAPHER:  No.
3      MR. SULLIVAN:  Okay. We're back on.
4      Well, we're on.
5      MR. THOMAS:  All right. And then can
6      the court reporter read back the last
7      question and the answer until it stopped.
8      (REPORTER READ BACK)
9      BY MR. THOMAS:
10     Q:  From where you sit today, would you
11     have done anything differently?
12     MR. SULLIVAN:  Objection to form.
13     THE WITNESS:  I -- I wouldn't, no.
14     MR. THOMAS:  All right. And can the
15     court reporter show the witness what has
16     been marked as Exhibit 92.
17     BY MR. THOMAS:
18     Q:  Is this the severance package that
19     you said would explain to Ms. Piehler when her
20     medical benefits would end?
21     A:  I believe so, yes.
22     Q:  And tell me what you told her when
23     they would end.
24     A:  Well, I -- I would have went through
25     this -- I mean, I -- I don't remember the --
```

Page 320

```
1      D. Berardo
2      Q:  Well, go through it -- go through it
3      and tell me when it says they're going to end.
4      A:  Sure. So it says (as read):
5      Benefits: Your group extended health
6      and dental benefits will cease at the end
7      of the month on the -- July 31st, 2015.
8      You have the election under COBRA
9      legislation to continue your group health,
10     vision care, and dental plan by paying the
11     premiums. You will receive a notification
12     from our COBRA administrative, COBRA help.'
13     Q:  You may need to read just a little
14     slower for the court reporter there.
15     THE WITNESS:  Sorry. Do you...
16     THE COURT REPORTER:  That's okay. I
17     got it.
18     THE WITNESS:  Okay.
19     To be eligible, you must respond to
20     the notice by August 30th, 2015.'
21     And then it goes on about life insurance.
22     BY MR. THOMAS:
23     Q:  Isn't it -- isn't it true that cut
24     Mary Piehler's health insurance off before
25     July 31st?
```

Page 321

D. Berardo

1
2   A:  Not -- not that I recall, unless it
3   was an administrative error.
4   Q:  Okay. Do you remember that she
5   called you because her husband was going in
6   for cancer treatment, and he didn't have
7   health coverage because Absolute had cut his
8   benefits off?
9   A:  I don't recall that conversation,
10  but, you know, I'm not saying that it -- that
11  that didn't happen. I just don't recall it.
12  Q:  You do recall many conversations with
13  Mary Piehler after her termination about her
14  health benefits; right?
15  A:  Her health benefits -- benefits
16  specifically?
17  Q:  Yes.
18  A:  I mean, I just -- I just don't -- I
19  don't recall the specifics of -- of health
20  benefit questions or conversations.
21  Q:  Or benefits generally? Do you
22  remember a number of calls with Mary Piehler
23  about benefits generally?
24  A:  Sorry, what -- can you repeat the
25  question.

Page 322

D. Berardo

1
2   Q:  Yes. I believe you testified earlier
3   that you remember a number of calls with
4   Ms. Piehler after her termination about her
5   benefits.
6   MR. SULLIVAN:  Objection to form.
7   BY MR. THOMAS:
8   Q:  Correct?
9   A:  I don't -- I don't know if I said
10  that. There was a number of calls with Mary
11  Piehler after when we were trying to negotiate
12  a settlement.
13  Q:  And you don't remember the fact that
14  you had cut off her husband's health insurance
15  who had cancer?
16  A:  I don't recall. If -- if that did
17  happen, it -- it would have been an
18  administrative error and been rectified
19  immediately.
20  Q:  You seem to -- do you have -- do you
21  have difficulty recalling conversations with
22  people?
23  MR. SULLIVAN:  Objection to form.
24  THE WITNESS:  Yes, five years ago in
25  the past, I would. Five years in the past,

Page 323

D. Berardo

1
2   I would, yes.
3   BY MR. THOMAS:
4   Q:  Even something like being responsible
5   for cutting off somebody's medical coverage
6   for their husband who has cancer?
7   MR. SULLIVAN:  Objection to form.
8   BY MR. THOMAS:
9   Q:  That would sort of slip by?
10  MR. SULLIVAN:  Objection to form.
11  THE WITNESS:  I -- I -- I don't know
12  what you're asking me. If you can repeat
13  the question.
14  BY MR. THOMAS:
15  Q:  Yeah. Are you -- are you the type of
16  person who would forget the fact that your HR
17  department cut off health benefits for an
18  employee who you fired and whose husband was
19  relying on them for his cancer treatments?
20  MR. SULLIVAN:  Objection to form.
21  THE WITNESS:  Are you asking me five
22  -- four years later if I would remember
23  that?
24  BY MR. THOMAS:
25  Q:  Yeah.

Page 324

D. Berardo

1
2   A:  It's possible that I wouldn't, four
3   years after the fact.
4   Q:  Let's go to Exhibit 93. When you've
5   had a chance to read it, let me know.
6   A:  Sure. Ready.
7   Q:  Okay. Why did you say that you
8   normally don't do exit interviews for this
9   type of circumstance?
10  A:  We don't do exit -- we -- we never do
11  exit interviews for terminations that are
12  initiated by the employer.
13  Q:  Why don't you -- why -- why wouldn't
14  you do those?
15  A:  Most companies don't, from -- from my
16  understanding, best practice, is because the
17  purpose of the exit interviews is to gather
18  information to, you know, help improve the --
19  you know, it could be the culture or -- or
20  whatever it might be of the company.
21  Generally, terminated employees don't provide
22  constructive -- constructive information,
23  and -- and, generally, we -- really want to
24  understand the reasons why people are leaving.
25  That's the main purpose of the exit interview.

Page 325

```
1       D. Berardo
2    And in this circumstance -- that just
3    wasn't the circumstance in this.
4    Q:  If someone was fired for
5    discriminatory reasons, wouldn't you want to
6    get their input on that --
7    MR. SULLIVAN:  Objection --
8    BY MR. THOMAS:
9    Q:  -- in their exit interview?
10   MR. SULLIVAN:  Objection to form.
11   THE WITNESS:  In this circumstance,
12   she wasn't terminated for discriminatory
13   reasons.
14   BY MR. THOMAS:
15   Q:  I'm not -- I'm just asking you, as an
16   HR manager at Absolute, wouldn't you want to
17   know that from an employee, if they thought
18   they were fired for discriminatory reasons?
19   A:  So if I --
20   MR. SULLIVAN:  Objection -- objection
21   to form.
22   THE WITNESS:  If, hypothetically,
23   someone was terminated because of
24   discriminatory reasons, would we want to
25   know about that?
```

Page 326

```
1       D. Berardo
2    BY MR. THOMAS:
3    Q:  Yes.
4    A:  Yes -- yes, we would.
5    Q:  And if they felt they were
6    discriminated for discriminatory reasons,
7    wouldn't you want to know that too?
8    MR. SULLIVAN:  Objection to form.
9    THE WITNESS:  Yes, we would want to
10   know that. At least, I would want to know
11   that.
12   BY MR. THOMAS:
13   Q:  Did you ever ask that of Ms. Piehler?
14   MR. SULLIVAN:  Objection to form.
15   THE WITNESS:  No, it's not a -- not a
16   question that -- that we generally ask.
17   BY MR. THOMAS:
18   Q:  All right. I have -- let me just
19   take a quick look here. All right. I have
20   nothing further at this time.
21   MR. SULLIVAN:  Take a break?
22   MS. LESTRADE:  Yeah.
23   MR. SULLIVAN:  All right. We're
24   going to take a --
25   MS. LESTRADE:  Probably just --
```

Page 327

```
1       D. Berardo
2    MR. SULLIVAN:  -- ten-minute break or
3    so.
4    MS. LESTRADE:  More than that.
5    MR. SULLIVAN:  Okay.
6    MR. THOMAS:  Okay.
7    VIDEOGRAPHER:  Going off the record.
8    MS. LESTRADE:  Yeah.
9    VIDEOGRAPHER:  The time is 6:55.
10   (PROCEEDINGS RECESSED AT 6:55?P.M.)
11   (PROCEEDINGS RECONVENED AT 7:14 P.M.)
12   VIDEOGRAPHER:  Back on the record.
13   The time is 7:14.
14   EXAMINATION BY
15   MS. LESTRADE:
16   Q:  Good evening, Mr. Berardo. As you
17   know, my name is Laura Lestrade. I represent
18   the defendants in this action, and I'm going
19   to be asking you some questions. The same
20   rules apply; if you need to take a break, just
21   let me know, and we'll try to accommodate
22   that. Just I --
23   MR. THOMAS:  Laura, can you speak up
24   just a little bit. Because I'm having a
25   little trouble hearing you.
```

Page 328

```
1       D. Berardo
2    BY MS. LESTRADE:  Sure.
3    Q:  I just ask that you -- you -- we
4    don't take a break while there is a question
5    pending.
6    I would like you to turn to
7    Exhibit 67. You reviewed this document in
8    detail earlier today. You could --
9    A:  Yes.
10   Q:  -- review it a little further, if you
11   want to just refresh yourself.
12   A:  I recall the document.
13   Q:  Okay. Does this survey provide you
14   with any reason to believe that Todd Awtry or
15   Thomas Kenny discriminated against Mary
16   Piehler?
17   A:  Absolutely --
18   MR. THOMAS:  Objection.
19   THE WITNESS:  Absolutely not.
20   BY MS. LESTRADE:
21   Q:  Does anything in this survey provide
22   you with any reason to believe that Thomas
23   Kenny or Todd Awtry discriminated against
24   older employees?
25   A:  Absolutely not.
```

Page 329

```
1      D. Berardo
2    MR. THOMAS:  Objection.
3    BY MS. LESTRADE:
4    Q:  Did this survey provide you with any
5      reason to believe that Todd Awtry or Thomas
6      Kenny discriminated against older employees?
7    MR. THOMAS:  Objection.
8    THE WITNESS:  Absolutely not.
9    BY MS. LESTRADE:
10    Q:  Did this survey provide you any
11      reason to believe that Todd Awtry or Thomas
12      Kenny treated women differently in terms of
13      communicating company strategies or
14      initiatives?
15    A:  Absolutely not.
16    MR. THOMAS:  Objection.
17    THE WITNESS:  Absolutely not.
18    BY MS. LESTRADE:
19    Q:  Did this survey provide you with any
20      reason to believe that Todd Awtry or Thomas
21      Kenny treated older people differently in
22      terms of communicating company strategies or
23      initiatives?
24    MR. THOMAS:  Objection.
25    THE WITNESS:  Absolutely not.
```

Page 330

```
1      D. Berardo
2    BY MS. LESTRADE:
3    Q:  We discussed earlier that Ms. Piehler
4      raised some concerns with you concerning --
5      about her treatment at Absolute. Did any of
6      the concerns raised by Ms. Piehler involve
7      sexual harassment?
8    A:  Never.
9    MR. THOMAS:  Objection.
10    BY MS. LESTRADE:
11    Q:  Did any of the concerns raised by
12      Ms. Piehler involve discrimination of any
13      kind?
14    A:  Never.
15    BY MS. LESTRADE:
16    Q:  Did any --
17    MR. THOMAS:  Objection.
18    BY MS. LESTRADE:
19    Q:  -- of the concerns raised by
20      Ms. Piehler involve crimes, criminal activity?
21    A:  Never.
22    Q:  Or fraud or --
23    MR. THOMAS:  Objection.
24    BY MS. LESTRADE:
25    Q:  -- embezzlement?
```

Page 331

```
1      D. Berardo
2    A:  No.
3    Q:  Did any of Ms. Piehler's complaints
4      give rise to a duty to investigate those
5      complaints?
6    A:  No.
7    MR. THOMAS:  Objection.
8    BY MS. LESTRADE:
9    Q:  Can I have you look at Exhibit 21
10      again. If you could turn to it in the book.
11    A:  Sure. Okay.
12    Q:  I'm going to direct your attention to
13      the first paragraph. And the one, two, three,
14      four -- fifth line down towards the end where
15      it -- it says:
16      We did not launch a corporate
17      investigation in my CER, who I identified
18      as having a part-time job during the day
19      when Absolute is paying him to be here
20      hunting business in the northeast. We
21      continue to pay him at full value.'
22      Are you familiar with that -- do you -- do you
23      know what Ms. Piehler was referring to there?
24    A:  I remember a situation --
25    MR. THOMAS:  Objection.
```

Page 332

```
1      D. Berardo
2    THE WITNESS:  I remember a situation
3      where an employee was away at lunchtime for
4      a period of time, and it was determined
5      that he was -- he was teaching a fitness
6      class or something -- something or
7      something to that effect.
8    BY MS. LESTRADE:
9    Q:  Was an inquiry done into this
10      situation?
11    A:  I don't --
12    MR. THOMAS:  Objection.
13    THE WITNESS:  I don't recall the
14      specifics of how -- how much we
15      investigated. We definitely did
16      investigate, and it was determined that he
17      was essentially just leaving on his lunch
18      hour.
19    BY MS. LESTRADE:
20    Q:  M'mm-hmm.
21    A:  So nothing further was done. Because
22      it was -- it -- it wasn't deemed as
23      inappropriate.
24    Q:  And there was some testimony earlier
25      about an allegation that Todd Awtry shared
```

Page 333

D. Berardo

1    performance reviews of his reports with
2    everyone on his team. Was it -- did he -- did
3    he share the reviews themselves?
4    A:  No. From my recollection --
5    MR. THOMAS:  Objection.
6    THE WITNESS:  From my recollection,
7    it was the -- it was the ratings on those
8    reviews in -- in a spread -- spreadsheet
9    that he had pasted in an email.
10   BY MS. LESTRADE:
11   Q:  M'mm-hmm. Okay. I'm going to have
12   you look at Exhibits 62, 63, 64, and 66.
13   A:  Starting with 62, sorry?
14   Q:  62, 63, 64, and 66.
15   A:  Okay.
16   Q:  Just briefly, just if you could focus
17   on the review periods for each review.
18   A:  Sure. Through -- sorry, through 64?
19   Q:  62, 63, 64, and 66.
20   A:  And 66. Okay.
21   Q:  Did Todd Awtry prepare performance
22   reviews for Mary Piehler for each evaluation
23   period that he supervised her?
24   A:  So that --

Page 334

D. Berardo

1    MR. THOMAS:  Objection.
2    THE WITNESS:  Let me quickly review
3    again.
4    BY MS. LESTRADE:
5    Q:  M'mm-hmm.
6    A:  Yes, with the exception of the last
7    six months, because the review period -- the
8    review period hadn't started by the time Mary
9    exited.
10   Q:  Okay. And if you look at
11   Exhibit 62 --
12   A:  Okay.
13   Q:  -- if you look at the reviewer
14   comments, most of the reviewer comments say:
15   I only had six months visibility to
16   observe the competency.'
17   Is that correct?
18   A:  That's correct.
19   Q:  Are you aware whether Mr. Awtry gave
20   that same review comment for his other reports
21   during that time -- that time frame?
22   A:  Yeah, from -- from my recollection --
23   MR. THOMAS:  Objection.
24   THE WITNESS:  From my recollection,

Page 335

D. Berardo

1    this is -- he -- he copy and pasted the
2    same 'I only had six months visibility to
3    observe this competency' for all his direct
4    reports during that review period.
5    BY MS. LESTRADE:
6    Q:  And his direct reports during that
7    review period, do you remember who they were?
8    A:  They would --
9    MR. THOMAS:  Objection.
10   THE WITNESS:  They would have been
11   the regional directors. Specifically -- I
12   don't remember specifically.
13   BY MS. LESTRADE:
14   Q:  So it was all regional directors that
15   reported to him at -- at that time?
16   MR. THOMAS:  Objection.
17   THE WITNESS:  In --
18   MR. THOMAS:  Objection.
19   THE WITNESS:  In North America, yeah.
20   BY MS. LESTRADE:
21   Q:  M'mm-hmm. Regional directors and/or
22   area vice presidents?
23   A:  Yes. Yeah. They were kind of one
24   and the same. Some people were AVP; some

Page 336

D. Berardo

1    people were regional directors. Yes.
2    Q:  When Mary Piehler complained about
3    not having received a performance review, did
4    it require an investigation by you?
5    A:  Not a formal --
6    MR. THOMAS:  Objection.
7    THE WITNESS:  Not a -- it wouldn't --
8    it wouldn't set off a formal investigation,
9    no.
10   BY MS. LESTRADE:
11   Q:  Do you think Mary Piehler was treated
12   unfairly by Absolute?
13   A:  I do --
14   MR. THOMAS:  Objection.
15   THE WITNESS:  I do not.
16   BY MS. LESTRADE:
17   Q:  And in your -- as an -- as an HR
18   director at Absolute during that time frame,
19   do you believe -- would it be appropriate for
20   an employee to be terminated for repeatedly
21   disagreeing with her manager on business
22   issues?
23   MR. THOMAS:  Objection.
24   THE WITNESS:  I -- I would say

Page 337

D. Berardo

1    that -- that would be a conversation I
2    would have with the manager, and -- and it
3    -- it would be a valid reason to terminate
4    someone, yes.
5    BY MS. LESTRADE:
6    Q:  Can you turn to Exhibit 17, please.
7    And on the third page, which is DEFS02585, in
8    this email from you to Ms. Piehler,
9    Ms. Piehler states -- at three lines up from
10   this first full paragraph, she --
11   A:  Yeah.
12   Q:  -- says:
13   I am not attempting to overreact. I
14   am covering myself in case this witch-hunt
15   continues in FY15.'
16   Do you know what she -- did you understand
17   what she meant by 'this witch-hunt'?
18   MR. THOMAS:  Objection.
19   THE WITNESS:  I would only be
20   speculating what I -- what I thought back
21   then.
22   BY MS. LESTRADE:
23   Q:  M'mm-hmm.
24   MR. THOMAS:  Objection.

Page 338

D. Berardo

1    BY MS. LESTRADE:
2    Q:  Well, let me -- did you consider the
3    investigation into the DOE commission payments
4    to be a witch-hunt?
5    A:  Absolutely not, no.
6    MR. THOMAS:  Objection.
7    BY MS. LESTRADE:
8    Q:  Are you aware of any actions by Todd
9    Awtry that cause you to think that he
10   discriminated against Mary Piehler on the
11   basis of age or sex?
12   A:  Absolutely --
13   MR. THOMAS:  Objection.
14   THE WITNESS:  Absolutely not.
15   BY MS. LESTRADE:
16   Q:  Are you aware of any actions by
17   Thomas Kenny that cause you to think that he
18   discriminated against Mary Piehler on the
19   basis of age or sex?
20   MR. THOMAS:  Objection.
21   THE WITNESS:  Absolutely not.
22   BY MS. LESTRADE:
23   Q:  Are you aware of any actions by Geoff
24   Haydon that cause you to think that he

Page 339

D. Berardo

1    discriminated against Mary Piehler on the
2    basis of age or sex?
3    MR. THOMAS:  Objection.
4    THE WITNESS:  Absolutely not.
5    BY MS. LESTRADE:
6    Q:  Are you aware of any actions by
7    anyone at Absolute that cause you to think
8    that Absolute discriminated against Mary
9    Piehler on the basis of age or sex?
10   A:  Not that I --
11   MR. THOMAS:  Objection.
12   THE WITNESS:  Yeah, not that I
13   recall, no.
14   BY MS. LESTRADE:
15   Q:  As the head of HR, were you
16   responsible for the recruiting function?
17   A:  Yeah, the recruiting function --
18   MR. THOMAS:  I didn't hear -- sorry,
19   what was that? I didn't hear for the...
20   BY MS. LESTRADE:
21   Q:  I said as -- as the head of HR, were
22   you responsible for the recruiting function?
23   MR. THOMAS:  Objection.
24   THE WITNESS:  Yes, the recruiting

Page 340

D. Berardo

1    function rolled up to me. Reported in to
2    me. Yes.
3    BY MS. LESTRADE:
4    Q:  Were you ever given any instruction
5    by anyone at Absolute that Absolute wanted to
6    focus on hiring younger or male employees?
7    A:  Never.
8    Q:  Did you ever give any such
9    instruction to --
10   MR. THOMAS:  Objection.
11   BY MS. LESTRADE:
12   Q:  -- your -- to the recruiters who
13   reported to you?
14   A:  Absolutely not.
15   Q:  Did --
16   MR. THOMAS:  Objection.
17   BY MS. LESTRADE:
18   Q:  Did you ever give any such
19   instruction to internal recruiters that
20   Absolute used in finding candidates for
21   employment?
22   A:  Absolutely not.
23   MR. THOMAS:  Objection.
24   BY MS. LESTRADE:

Page 341

D. Berardo

1  D. Berardo
2  Q:  Was it Absolute's policy to hire
3  younger and male employees?
4  A:  It was not.
5  MR. THOMAS:  Objection.
6  BY MS. LESTRADE:
7  Q:  Yeah. Did you ever hear Geoff Haydon
8  say that he wanted to get rid of older
9  employees?
10  A:  Never.
11  Q:  Did you --
12  MR. THOMAS:  Objection.
13  BY MS. LESTRADE:
14  Q:  Did you ever hear Geoff Haydon say
15  that he wanted to get rid of female employees?
16  A:  Never.
17  Q:  Did you --
18  MR. THOMAS:  Objection.
19  BY MS. LESTRADE:
20  Q:  -- ever hear Geoff Haydon say he
21  wanted to hire male employees?
22  A:  Never.
23  MR. THOMAS:  Objection.
24  BY MS. LESTRADE:
25  Q:  Did you ever hear Geoff say -- Haydon

Page 342

D. Berardo

1  D. Berardo
2  say he wanted to hire young employees?
3  A:  No. Never.
4  MR. THOMAS:  Objection.
5  BY MS. LESTRADE:
6  Q:  Did Geoff Haydon express any hiring
7  criteria for people he wanted to join
8  Absolute?
9  MR. THOMAS:  Objection.
10  THE WITNESS:  Not to the -- not to
11  the best of my recollection. The decisions
12  were generally left in the hands of the
13  hiring managers.
14  BY MS. LESTRADE:
15  Q:  M'mm-hmm. Did Geoff Haydon have a
16  vision for changing the business direction of
17  the company?
18  A:  Yes.
19  MR. THOMAS:  Objection.
20  THE WITNESS:  Yes. That's -- I think
21  that's why he came into the company.
22  BY MS. LESTRADE:
23  Q:  M'mm-hmm.
24  A:  Yeah.
25  Q:  And what -- what kinds of business

Page 343

D. Berardo

1  was he looking to -- what kind of business was
2  he looking to turn Absolute into?
3  MR. THOMAS:  Objection.
4  THE WITNESS:  So I -- I can just
5  answer from an HR perspective --
6  BY MS. LESTRADE:
7  Q:  M'mm-hmm.
8  A:  -- but -- but my observation is that,
9  you know, he wanted to turn Absolute into a
10  world-class organization and wanted -- wanted
11  to expand our reach, our revenue, improve our
12  products, and -- and -- you know, essentially,
13  that's what I recall.
14  Q:  Okay. I would like you to take a
15  look at -- again, at Exhibit 21. Actually,
16  first, look at Exhibit 17.
17  A:  Okay.
18  Q:  In -- on the third page, 2585,
19  Ms. Piehler is complaining to you about Todd
20  Awtry; is that correct?
21  A:  Let me --
22  MR. THOMAS:  Objection.
23  THE WITNESS:  Let me just quickly --
24  quickly read it again. Yeah, the subject

Page 344

D. Berardo

1  D. Berardo
2  was Todd Awtry.
3  BY MS. LESTRADE:
4  Q:  Okay. And in the very first line of
5  the last -- the -- the -- actually, it's the
6  second-to-last paragraph. She says:
7  I have seen published numbers that
8  are wrong.'
9  Do you see that?
10  A:  Yes, I do.
11  Q:  Okay. And -- then on page 2584
12  at the bottom, you say:
13  Hi, Mary. Can you give me more
14  colour into your second-to-last paragraph.'
15  Do you see that?
16  A:  I do, yes.
17  Q:  Okay. And the second-to-last
18  paragraph is on the preceding page where she
19  talks about published numbers that are wrong?
20  A:  Right. Yeah.
21  Q:  Okay. So if you go back to
22  Exhibit 21 --
23  A:  Okay.
24  Q:  -- the first line, she says:
25  Daniel, in response to your request,

Berardo_Daniel

Page 345

D. Berardo

1 here is a little colour in the comments I
2 made to you.'
3 And much of this email is Ms. Piehler
4 forwarding to you email correspondence that
5 she had with Dan Miller about the reporting of
6 sales numbers. Is that correct?
7 A: Yes.
8 Q: Okay. Who was Dan Miller?
9 MR. THOMAS: Objection.
10 THE WITNESS: Dan Miller was a -- he
11 worked in the sales ops team. I'm not sure
12 what his position was, but he worked in the
13 sales operations team.
14 BY MS. LESTRADE:
15 Q: And was he responsible for reporting
16 the numbers?
17 MR. THOMAS: Objection.
18 THE WITNESS: I don't -- I don't
19 recall if he was responsible for reporting
20 the numbers, but he was responsible for --
21 for -- for gathering the numbers. And --
22 and, perhaps, yeah, reporting them to --
23 you know, to, like, the finance team.
24 BY MS. LESTRADE:

Page 346

D. Berardo

1 Q: M'mm-hmm. Okay. Was Todd Awtry
2 responsible for gathering the numbers for the
3 finance team?
4 A: He was not, no.
5 MR. THOMAS: Objection.
6 THE WITNESS: Not to the -- not to
7 the best of my recollection.
8 BY MS. LESTRADE:
9 Q: Okay. Mr. Berardo, I would -- I
10 would like you to look again at Exhibit 81.
11 A: Okay.
12 Q: On the second page.
13 A: Okay.
14 Q: There was some suggestion earlier
15 that -- that a Tom Ioele may have been hiding
16 in the conference room where the termination
17 took place. Can you look at three lines from
18 the bottom of that email.
19 A: Three lines from the bottom?
20 Q: I mean, not of the email.
21 A: Oh.
22 Q: Of the -- on the page that's
23 DEFS07446.
24 A: Right. So it says:

Page 347

D. Berardo

1 Tom came into the...'
2 Where it says:
3 Tom came into the room after Mary
4 left the parking lot, and we debriefed what
5 had taken place with Todd and Daniel'?
6 Q: Yeah. Okay. Does that -- does that
7 refresh your recollection -- recollection at
8 all that Mr. Ioele was, in fact, not in the
9 room during the termination meeting and was
10 not, in fact, hiding in the room?
11 MR. THOMAS: Objection.
12 THE WITNESS: I don't -- I don't -- I
13 don't recall the -- I don't recall vivid
14 memories of the -- of the call. But, I
15 mean, I -- when the -- this termination
16 note was sent to me, I mean, I reviewed it,
17 and -- and -- and I said that it was
18 accurate. So -- so, you know, three
19 years -- three and a half years ago me
20 would have said that this is -- this is
21 what happened.
22 BY MS. LESTRADE:
23 Q: Okay. I have no more questions.
24 EXAMINATION BY

Page 348

D. Berardo

1 MR. THOMAS:
2 Q: Mr. Berardo, where -- why wasn't
3 Mr. Ioele in the room, like the notes say?
4 A: Why wasn't?
5 Q: Why wasn't he?
6 A: Why wasn't he in the room? Well, we
7 just -- from my recollection, we just asked
8 one person from the -- from the company to be
9 in the room. So I don't know why he wasn't in
10 the room.
11 Q: Why did you ask only one person?
12 A: That's -- that was all that was
13 really necessary.
14 Q: Why was -- why was he necessary to be
15 there at all, then?
16 A: I -- I don't know. You -- you would
17 have to ask Catherine. I -- I don't know
18 why -- why Catherine brought him to -- to the
19 meeting.
20 Q: And you don't know why Catherine kept
21 him out -- kept him out of Mary's sight
22 until after the meeting was over and then
23 brought him in; right?
24 A: I don't -- I don't recall why, no.

(Note: line numbering shown follows the transcript format; page 345 lines continue "25 BY MS. LESTRADE:"; page 346 line 25 "A: Right. So it says:"; page 347 line 25 "EXAMINATION BY"; page 348 line 25 "A: I don't -- I don't recall why, no.")

Page 349

1   D. Berardo

2   Q: And you don't know where he was

3   situated so that Mary couldn't see him during

4   the meeting; correct? Or before the meeting?

5   A: Well, it says here:

6   Tom came into the room after Mary

7   left.'

8   So according to these notes, Tom wasn't in the

9   room. I don't know where he was situated

10   before --

11   Q: Do you know where he was?

12   A: I don't, no.

13   Q: And do you know why he was somewhere

14   where Mary couldn't see him, apparently?

15   A: He was outside the room, because he

16   wasn't part of the termination meeting.

17   Q: That wasn't my question.

18   A: Sorry, can you repeat your question.

19   MR. THOMAS: Yes. Could the court

20   reporter read it back.

21   (REPORTER READ BACK)

22   THE WITNESS: I -- I don't know -- I

23   don't know why he was outside the room.

24   BY MR. THOMAS:

25   Q: Nothing further.

Page 350

1   D. Berardo

2   VIDEOGRAPHER: Okay. This concludes

3   today's deposition. Going off record at

4   7:40.

5

6

7   (PROCEEDINGS ADJOURNED AT 7:40 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   //

25   //

Page 351

1

2   REPORTER CERTIFICATION

3   I, Jessica D. Archibald, Official

4   Reporter in the Province of British Columbia,

5   Canada, BCSRA No. 607, do hereby certify:

6

7   That the proceedings were taken down

8   by me in shorthand at the time and place

9   herein set forth and thereafter transcribed,

10   and the same is a true and correct and

11   complete transcript of said proceedings to the

12   best of my skill and ability.

13

14   IN WITNESS WHEREOF, I have hereunto

15   subscribed my name this 22nd day of May 2019.

16

17

18

19   _____

20   Jessica D Archibald

21   Official Reporter, CSR(A)

22

23

24

25

Page 352

1   I N D E X

2

3   INDEX OF EXAMINATIONS:

4   EXAMINATION      PAGE

5   MR. THOMAS      6

6   MS. LESTRADE      327

7   MR. THOMAS      348

8

9   E X H I B I T S:

10

11   NUMBER    DESCRIPTION      PAGE

12   Exhibit 86   Documents DEFS08824 to

13   DEFS08830; Exhibit Berardo L    225

14   Exhibit 87   Berardo Exhibit O      311

15   Exhibit 88   Berardo Exhibit P      311

16   Exhibit 89   Berardo Exhibit I      311

17   Exhibit 90   Berardo Exhibit J      311

18   Exhibit 91   Berardo Exhibit N      311

19   Exhibit 92   Berardo Exhibit A      311

20   Exhibit 93   Berardo Exhibit X      311

21

22

23

24

25

26

27

28

29

30