**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

MARY VAN BRUNT-PIEHLER,

*Plaintiff,*

*v.*

ABSOLUTE SOFTWARE, INC., ABSOLUTE
SOFTWARE CORPORATION, GEOFF HAYDON,
THOMAS KENNY, and TODD AWTRY,

*Defendants.*

Civil Action No.
**16-CV-6313-EAW-MWP**

**PLAINTIFF'S MEMORANDUM OF LAW OPPOSITION TO DEFENDANTS'**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

**THOMAS & SOLOMON LLP**
*Attorneys for Plaintiffs*
693 East Avenue
Rochester, NY 14607
(585) 272-0540

Of Counsel:   J. Nelson Thomas
              Jonathan W. Ferris

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................... iv

PRELIMINARY STATEMENT ....................................................................... 1

FACTUAL BACKGROUND ........................................................................... 2

  I. Ms. Piehler's Complaints of Gender Discrimination ................................ 2

  II. Absolute's Understanding of Complaints of Gender Discrimination ....................... 5

III. Absolute's Awareness of Ms. Piehler's Protected Activity and Subsequent Retaliation ........ 7

IV. Ms. Piehler's Final Performance Review ............................................. 9

V. Absolute's Alleged Reasons for Terminating Ms. Piehler ....................... 9

ARGUMENT ............................................................................. 11

  I.    LEGAL STANDARD ........................................................ 11

  II.   VIEWING THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO MS. PIEHLER, THERE WAS SUFFICIENT EVIDENCE FOR A REASONABLE JURY TO FIND THAT SHE ESTABLISHED A PRIMA FACIE CASE OF RETALIATION UNDER THE NYSHRL ....................................................... 12

     A. Absolute understood, or at least was on notice, that Ms. Piehler was engaging in protected activity ................................................................. 12

     B. Ms. Piehler engaged in protected activity ............................................. 19

        1. The analysis of whether Ms. Piehler actually engaged in protected activity is unnecessary as Absolute perceived her as complaining about gender discrimination ................................. 19

        2. The jury reasonably found that Ms. Piehler's complaints about gender discrimination were protected activity ........................... 20

     C. Ms. Piehler's Complaints of Gender Discrimination Were a "But For" Cause of the Multiple Adverse Actions That She Suffered……………………..…………………………………………...………23

D.  Ms. Piehler Proved a Casual Connection Between Her Complaints of Gender Discrimination and Her Termination……………………………..……………….25

    1.  The passage of more than three months between Ms. Piehler's complaints of gender discrimination and her termination is not automatically fatal to a finding of casual connection…………………………………………………...26

    2.  The jury rejected Absolute's other arguments that a casual connection was not established…………………………………………...………29

    3.  A causal connection exists because of the escalating, negative conduct that Ms. Piehler endured……………………………………………...……30

    4.  Ms. Piehler is not relying on temporal scope alone……………………………………………………31

III.  ABSOLUTE'S REQUEST FOR A PARTIAL DISMISSAL IN UNWARRANTED AND THE COURT SHOULD SCHEDULE THE DAMAGES PHASE OF THE TRIAL……………………………………………………………...33

CONCLUSION…………………………………………………………..………34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aspilaire v. Wyeth Pharm*,
  612 F. Supp. 2d 289 (S.D.N.Y. 2009) ................................................. 16

*Baluch v. 300 West 22 Realty, LLC*,
  21-CV-9747 (JPO), 2023 WL 112547 (S.D.N.Y. Jan. 5, 2023).............. 27

*Behringer v. Lavelle School for the Blind*,
  08-CV-4899 (JGK), 2010 WL 5158644 (S.D.N.Y. Dec. 17,2010) ......... 27

*Bernhardt v. Interbank of New York*,
  92 CV 4500, 2009 WL 255992 (E.D.N.Y. Feb. 3, 2009)....................... 27

*Bostock v. Clayton Cnty., Georgia*,
  140 S. Ct. 1731 (2020)........................................................................... 23

*Brock v. Richardson*,
  812 F.2d 121 (3d Cir. 1987) ................................................................. 20

*Brummell v. Webster Cent. Sch. Dist.*,
  06-CV-6437, 2009 WL 232789 (W.D.N.Y. Jan. 29, 2009) ................... 12

*Bucalo v. Shelter Island Union Free Sch. Dist.*,
  691 F.3d 119 (2d Cir. 2012) ........................................................... 26, 27

*Cash v. County of Erie*,
  654 F.3d 324 (2d Cir. 2011) ........................................................... 11, 12

*Cioffi v. Averill Park Central School Dist. Board of Ed.*,
  444 F.3d 158 (2d Cir. 2006) ................................................................. 26

*Cox v. Onondaga Cnty. Sheriff's Dep't*,
  760 F.3d 139 (2d Cir. 2014) ................................................................. 13

*Cruz v. Coach Stores Inc.*,
  202 F.3d 560 ......................................................................................... 21

*Czerwinski v. New York State Dep't of Corr. & Cmty. Supervision*,
  394 F. Supp. 3d 210 (N.D.N.Y. 2019).................................................. 12

*Dupee v. Klaff's, Inc.*,
  462 F. Supp. 2d 233 (D. Conn. 2006).................................................... 27

*E.E.O. C. v. Ethan Allen, Inc.*,
  44 F.3d 116 (2d Cir. 1994) ................................................................... 31

*Espinal v. Goord*,
  558 F.3d 119 ......................................................................................... 27

*Fogleman v. Mercy Hosp.*,
  282 F.3d (3d Cir. 2002) ........................................................................ 20

*Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*,
  136 F.3d 276 (2d Cir.1998) .................................................................. 12

*Giordano-Forkan v. N.Y.C. Dep't of Educ.*,
  13 Civ. 06950 (GBD), 2014 WL 5369426 (S.D.N.Y. Oct. 17, 2014)..... 25

iv

*Gordon v. N.Y.C. Bd. of Educ.*,
  232 F.3d 111 (2d Cir. 2000) .................................................................. 26
*Grant v. Bethlehem Steel Corp.*,
  622 F.2d 43 (2d Cir. 1980) .................................................................... 27
*Gronowski v. Spencer*,
  424 F.3d 285 (2d Cir. 2005) .................................................................. 11
*Grosso v City University of New York*,
  03–cv–2619 (NRB), 2005 WL 627644 (S.D.N.Y. Mar. 16, 2005) ......................... 20
*Heffernan v. City of Paterson*,
  136 S. Ct. 1412 (2016) ......................................................................... 20
*Hicks v. Baines*,
  593 F.3d 159 (2d Cir. 2010) .................................................................. 24
*Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*,
  470 F. Supp. 2d 345 (S.D.N.Y. 2007) .................................................. 12, 18
*Jones v. Target Corp.*,
  792 F. App'x 54 (2d Cir. 2019) .............................................................. 24
*Kinneary v. City of New York*,
  601 F.3d 151 (2d Cir. 2010) .................................................................. 11
*Kirkweg v. NYC Dept. of Educ.*,
  633 Fed. Appx. 40 (2d Cir. Feb. 16, 2016) ............................................... 25
*Lawrence v. Mehlman*,
  389 F. App'x 54 (2d Cir. 2010) .............................................................. 25
*Lee v. Overseas Shipholding Grp., Inc.*,
  00 CIV. 9682 (DLC), 2001 WL 849747 (S.D.N.Y. July 30, 2001) ......................... 27
*Lenzi v. Systemax, Inc.*,
  944 F.3d 97 (2d Cir. 2019) .................................................................... 22
*Meloff v. N.Y. Life Ins. Co.*,
  240 F.3d 138 (2d Cir. 2001) .................................................................. 11
*Morse v. Fusto*,
  804 F.3d 538 (2d Cir. 2015) .................................................................. 10
*Ortiz v. Stambach*,
  1:16-CV-00321 EAW, 2023 WL 2058075 (W.D.N.Y. Feb. 17, 2023) ........... 10, 11, 17
*Papelino v. Albany College of Pharmacy of Union University*,
  633 F.3d 81 (2d Cir. 2011) .................................................................... 17
*Parrish v. Sollecito*,
  258 F.Supp.2d 264 (S.D.N.Y. 2003) ....................................................... 27
*Pinner v. Budget Mortg. Bankers, Ltd.*,
  169 F. App'x 599 (2d Cir. 2006) ......................................................... 12, 18
*Ramos v. City of New York*,
  96 CIV. 3787 (DLC), 1997 WL 410493 ..................................................... 21
*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ......................................................................Passim
*Sassaman v. Gamache*,
  566 F.3d 307 (2d Cir. 2009) .................................................................. 13
*Saulpaugh v. Monroe Community Hospital*,
  4 F.3d 134 (2d Cir. 1993) ..................................................................... 31

v

*Smith v. Westchester Cty.*,
  769 F. Supp. 448 (S.D.N.Y. 2011) ........................................................ 25
*Summa v. Hofstra Univ.*,
  708 F.3d 115 (2d Cir. 2013) ....................................................... 26, 27, 28
*Treglia v. Town of Manlius*,
  313 F.3d 713 (2d Cir.2002) ............................................................ 13, 16
*Valleriani v. Route 390 Nissan LLC*,
  41 F. Supp. 3d 307 (W.D.N.Y. 2014)...................................................... 17
*Van Brunt-Piehler v. Absolute Software, Inc.*,
  504 F. Supp. 3d 175 (W.D.N.Y. 2020)..................................................... 22
*Varno v. Canfield*,
  664 Fed. Appx. 63 (2d Cir. 2016)......................................................... 21
*Vera v. Alstom Power, Inc.*,
  189 F. Supp. 3d 360 (D. Conn. 2016)..................................................... 31
*Williams v. Cnty. of Westchester*,
  171 F.3d 98 (2d Cir. 1999) .............................................................. 11
*Ya-Chen Chen v. City University of New York*,
  805 F.3d 59 ............................................................................ 23
*Zann Kwan v. Andalex Grp. LLC*,
  737 F.3d 834 (2d Cir. 2013) .......................................................Passim
*Zellner v. Summerlin*,
  494 F.3d 344 (2d Cir. 2007) ............................................................ 11
*Zelnik v. Fashion Institute of*,
  464 F. 3d 217 (2d Cir. 2006) ........................................................... 24

## PRELIMINARY STATEMENT

Defendants ("Absolute") fall woefully short of meeting their extremely high burden of showing that the jury's verdict was the result of sheer surmise and conjecture. As evidenced by the fact that it deliberated for over six hours over the course of two days, the jury did the exact opposite, taking great care and consideration in reaching its decision. This was not a case in which the jury simply checked "yes" to everything on the verdict sheet, as the jury rejected plaintiff's ("Ms. Piehler") gender discrimination, individual liability, and Equal Pay Act claims, despite arguably stronger evidence as to those claims.

Viewing the evidence in the light most favorable to Ms. Piehler, as this Court must, the jury was more than able to reasonably infer that Ms. Piehler met each of the elements of a prima facie case of discrimination and that Absolute's proffered reasons for terminating Ms. Piehler were pretextual. In an effort to avoid this result, Absolute casts the evidence and testimony in the way that it wishes to view it. In doing so, it implicitly asks the Court to weigh the evidence and make a credibility determination—things which the Court cannot do on this motion. More fundamentally, Absolute fails to recognize (and does not even address) the importance of the Supreme Court's decision in *Reeves v. Sanderson Plumbing Prods., Inc.*, that retaliatory intent can be inferred by the jury simply disbelieving the employer's stated reasons for terminating the employee. 530 U.S. 133, 150-51 (2000). Because the jury was presented with a wealth of evidence in which Absolute's supposed reasons for Ms. Piehler's termination were shown to be, at best inconsistent, and at worse untruthful, the jury could (and likely did) reject the non-discriminatory reasons offered by Absolute. As a result, a reasonable jury could comfortably infer that Ms. Piehler's termination was retaliatory. Combined with the evidence demonstrating that Ms. Piehler has a *prima facie* case of retaliation, the jury's verdict cannot be disturbed.

1

Therefore, Absolute's motion for judgment as a matter of law must be denied.

## FACTUAL BACKGROUND

The jury in this case deliberated over the course of two days and for over a total of six hours before reaching its verdict in favor of Ms. Piehler on her gender discrimination retaliation claim under the New York State Human Rights Law ("NYSHRL"). *See* Declaration of Jonathan W. Ferris ("Ferris Decl."), Exs. A, B (March 15-16, 2023 Trial Trs.) at 1433:6-1441:24; Dkt. 369 (Jury Verdict Sheet). Before reaching its verdict, the jury sent six notes requesting to review numerous exhibits. *See* Court Exhibits 9, 10, 12, 13, 14, 15. During trial, the jury considered the evidence discussed below.

### *Ms. Piehler's Complaints of Gender Discrimination*

On June 30, 2014, Ms. Piehler sent an email to Mr. Berardo requesting to have a confidential phone call with him that day because of Mr. Awtry's treatment towards her. Trial Exhibit 20; *See* Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 291:2-19. The email request does not mention anything about the New York City Department of Education ("DOE") investigation. *Id.* Instead, the subject line of the email indicated that the email was regarding a "Confidential HR issue." *Id.*

Ms. Piehler testified at trial that there was  another male manager, Mike Kenny, at the same level of the company who also received commissions on the DOE account. *Id.* at 211:19-22; 214:6-24. Mike Kenny did not have his commissions withheld despite the fact that he was involved in the process of recording the commissions, whereas Ms. Piehler was not. *Id.* at 214:6-215:6.

Prior to speaking with Mr. Berardo, Ms. Piehler testified that she prepared written notes in preparation for their call. *Id.* 239:21-240:24. In those notes, which were in the form of a draft message to Mr. Awtry, Ms. Piehler stated that she wanted to be "treated with more respect" and

2

wanted the note added to both her and Mr. Awtry's personnel files. *See* Trial Exhibit 18. During the telephone call with Mr. Berardo on June 30, 2014, Ms. Piehler told Mr. Berardo how Mr. Awtry's treatment towards her "left me feeling, and the position that it left me in with my team." *See* Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 292:4-12. In response to a question from counsel regarding the specifics of that conversation, Ms. Piehler testified that "I told him that I was concerned that I wanted to be treated equally to the others. And that I was at a substantial disadvantage based on what had just happened." *See* Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 292:24-293:6. Mr. Berardo asked follow up questions to probe the issue further, but did not ever resolve the complaints that Ms. Piehler raised about being treated equally. *Id.* at 293:7-14. Instead, he suggested that Ms. Piehler reach out to Mr. Olsen. *Id.* at 293:15-16. Mr. Berardo further instructed Ms. Piehler to send the draft message to Mr. Awry, with Mr. Berardo copied. *See* Trial Exhibit 18; Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 242:2-20.

As Mr. Berardo had requested more information about the complaints that Ms. Piehler had raised, she sent him a follow up email on July 6, 2014, adding more "color" to their discussion from the week prior. *See* Trial Exhibit 21; Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 293:17-24. In that email, Ms. Piehler specifically asked to be "treated the same" and that "we treat all regions the same." *See* Trial Exhibit 21. Ms. Piehler further noted that while she was subject to an internal investigation, a male employee who committed an infraction was not investigated and was paid at full value. *Id*. Ms. Piehler also pointed out in the email several ways in which how her and her region were being treated differently, including how her sales records for certain quarters were incorrect, that Mr. Awtry had shared the regional directors' performance reviews, and that Mr. Awtry was inconsistently calculating sales growth amongst the various regions. *Id*. Ms. Piehler further stated that "I don't want to be known as a troublemaker, all I want is the data reflected

3

correctly and to be paid fairly." *Id.* During testimony, Ms. Piehler clarified that the comment "I don't want to be known as a troublemaker" meant that "I didn't want to be known as someone who was just randomly complaining about everything" and that she thought she would be fired if she was considered a troublemaker. *See* Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 294:23-295:15.

Ms. Piehler further testified that she spoke with Mr. Olsen in person the following week during Absolute's Global Sales Meeting at the Pacific Rim Hotel in Vancouver. *Id.* at 347:17-350:7. Ms. Piehler testified that the one-on-one meeting lasted approximately an hour and a half. *Id.* at 347:20-348:1. Ms. Piehler testified that while she did not specifically use the word "discrimination" during that conversation, she "said that I wanted to be treated like the others. I wanted the same respect and to be treated like other managers and I did not feel like that was happening." *Id.* at 350:2-7. Ms. Piehler further stated that Mr. Olsen "knew exactly what had went on" and knew what had caused the unequal treatment towards Ms. Piehler.

Mr. Olsen's own testimony regarding his meeting with Ms. Piehler in Vancouver largely aligned with Ms. Piehler's testimony. *See* Ferris Decl., Ex. G (Olsen Tr.) at 71:17-20; 72:7-14. When asked if Ms. Piehler had expressed concerns with how she was being treated by Mr. Awtry, Mr. Olsen testified under oath that "it was just about how she was treated." *Id.* at 71:17-20. He additionally confirmed that he and Ms. Piehler spoke about how Mr. Awtry did not give Ms. Piehler performance reviews, and that her performance reviews had been shared with others. *Id.* at 72:7-14.

However, when asked if Ms. Piehler had compared her treatment to other regional directors, Mr. Olsen's memory became considerably less clear, stating "I don't recall her comparing her treatment" and just remembering the "general themes" of the meeting. *Id.* at 71:25-72:8. He later contradicted his previous testimony, stating that he didn't remember her complaining

that she wanted to be treated the same as others. *Compare Id.* at 85:2-7 *with* 71:17-20. In contrast to Ms. Piehler's testimony, Mr. Olsen testified that the meeting lasted only twenty minutes. *Id.* at 72:15-20. He further testified that there were "potentially" other issues discussed at the meeting that he could not remember, but only remembered "generalities." *Id.* at 72:21-74:24. Mr. Olsen testified that he could not remember any discussions about the DOE investigation at the Pacific Rim Hotel. *Id.* at 75:2-22; 88:11-17. Mr. Olsen admitted that other things could have been discussed at the meeting, but he could not remember those specific topics one way or another. *Id.* at 75:23-76:4. While Mr. Olsen's testimony was that Ms. Piehler complained about how she was treated, he stated that no formal investigation was conducted other than regarding the performance review issue. *Id.* at 71:17-20; 85:20-25.

***Absolute's Understanding of Complaints of Gender Discrimination***

The jury also heard testimony at trial regarding the circumstances under which Absolute would consider an employee to be complaining of discrimination. *See* Ferris Decl., Ex. H (Berardo Tr.) at 93:17-98:5; 100:3-25. Mr. Berardo, Absolute's former Director of Human Resources, testified that an employee would not need to specifically say that they were being treated differently under discrimination laws, nor that they were being discriminated against on the basis of sex for Absolute to still consider the employee to be making a complaint of discrimination. *Id.* at 93:17-94:20. Mr. Berardo also stated that if an employee came to him complaining about how they were being treated or that they were being retaliated against, Absolute "absolutely" had the responsibility to investigate and substantiate those complaints. *Id.* at 76:11-20; 79:5-16

Mr. Berardo further testified that he considered that Absolute had a duty to investigate if someone was being discriminated against on the basis of a protected characteristic. *Id.* at 78:7-13. However, he would not ask follow up questions to the employee unless he had a duty to investigate.

*Id.* at 77:19-78:6. Conversely, for just "disagreements between managers and employees," there was no need to ask follow up questions. *Id*. at 77:20-23.

Mr. Berardo provided at least six examples of employee interactions that could be complaints of discrimination and would require further investigation. First, he testified that if he heard that women were not being treated fairly at Absolute, he would need to take action to make sure that it was not discrimination. *Id.* at 63:20-64:15; 76:11-18. Second, if a female employee came to him and said that they wanted to be treated the same as their male colleagues, that would raise a possible complaint of discrimination. *Id*. at 94:21-95:7. Third, if a female employee told him that she was being treated differently than her male counterparts, it would require further investigation. *Id*. at 97:21-98:5. Fourth, Mr. Berardo said that if a female employee told him that they just wanted to be paid fairly, that could also mean a potential complaint of discrimination. *Id*. at 95:9-18. Fifth, if a female employee came to him and said that a male employee was being paid full value and she wanted to also be paid full value for her work, it would also raise concerns that the employee was raising a complaint of discrimination. *Id*. at 95:9-97:5. Sixth, he testified that if an employee came forward and stated that they did not want to be known as a "troublemaker," that would also raise concerns that the employee was complaining of discrimination. *Id*. at 97:7-19. In addition to Mr. Berardo's extensive testimony, Mr. Olsen also similarly testified that if an employee complained of discrimination, Absolute was supposed to initiate an investigation. *See* Ferris Decl., Ex. G (Olsen Tr.) at 64:3-7; 143:6-10.

While Mr. Berardo and Mr. Olsen testified as to the circumstances of when an employee's complaint theoretically would be investigated as a complaint of discrimination, that did not appear to align with Absolute's actual practices of handling such complaints. See Ferris Decl., Exs. H, (Berardo Tr.) at 330:3-14; G (Olsen Tr.) at 54:25-58:16; 61:23-63:25; 91:25-93:10. Both Mr.

Berardo and Mr. Olsen testified that Ms. Piehler's complaints of discrimination during their conversations with her were not investigated. *See* Ferris Decl., Ex. H (Berardo Tr.) at 330:3-14; Ferris Decl., Ex. G (Olsen Tr.) at 91:25-93:10. Mr. Olsen testified that he did not consider the discriminatory comments that Mr. Kenny made at the Westin sales meeting on April 30, 2015 to be a complaint, nor did he consider those comments to be discriminatory. *See* Ferris Decl., Ex. G (Olsen Tr.) at 54:25-58:16; 61:23-63:25. Mr. Berardo similarly testified that Absolute did not find Mr. Kenny's comments at the Westin meeting to be discriminatory. Ex. H (Berardo Tr.) at 165:23-166:10. In testifying as to the incident in which Absolute's three top executives, including himself, where swimming nude (or nearly nude) in front of other employees at a company event, Mr. Olsen testified that he did not think it sent any message to Absolute's female employees. Ex. G (Olsen Tr.) at 34:9-15.

***Absolute's Awareness of Ms. Piehler's Protected Activity and Subsequent Retaliation***

Following his discussion with Ms. Piehler in Vancouver, Mr. Olsen told Mr. Awtry that Ms. Piehler had complained about his actions and behavior. Ex. G (Olsen Tr.) at 92:14-23. At trial, the jury heard that after Ms. Piehler made her complaints of discrimination to Mr. Berardo and Mr. Olsen, she was subject to numerous adverse actions. Mr. Awtry angrily yelled at Ms. Piehler in the lobby of Absolute's Vancouver office with other employees around. Ex. D (March 7, 2023 Trial Tr.) at   231:2-234:25. Just weeks later, Ms. Piehler subsequently received a somewhat negative performance review from Mr. Awry, which because it contained factually incorrect information and was discriminating against her region, Ms. Piehler took the unusual step of providing a written addendum disagreeing with the rating. *See* Ex. 11; Ex. 23; Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 244:10-253:19. In the addendum, Ms. Piehler specifically noted that

"I am not being judged fairly" and provides further evidence regarding how "the same standard is not being used" for her region versus other regions. Trial Exhibit 23.

Ms. Piehler also did not receive a pay increase that year. *See* Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 316:15-20. Ms. Piehler also did not receive her full commissions on the DOE account until several months later. Trial Exhibit 252. Further, Ms. Piehler was not involved in meetings about Absolute's reorganization, despite the fact that a lower ranking male employee, Mike Kenny, was included in those discussions. *See* Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 352:9-353:13. Ultimately, Ms. Piehler was terminated on July 1, 2015. *Id.* at 363:10-12.

Following the DOE investigation, Mr. Awtry attempted to fire Ms. Piehler on multiple occasions. Although he testified at trial that Ms. Piehler was ultimately exonerated in the DOE investigation and paid her commissions, Mr. Awtry sought to immediately terminate Ms. Piehler in June 2014. Trial Exhibit 73; Ferris Decl., Ex. M (March 13, 2023 Trial Tr.) at 1107:11-21. However, that request was blocked by Absolute's General Counsel (along with Mr. Berardo, Mr. Ramsden, and others). Trial Exhibit 74. After having his request to terminate Ms. Piehler denied, Mr. Awtry then turned to attempting to place Ms. Piehler on a performance improvement plan for unspecified reasons. Trial Exhibit 76; Ferris Decl., Ex. M (March 13, 2023 Trial Tr.) at 1118:6-1119:8. However, in response Mr. Berardo indicated that because "we've just come off an investigation, so things are a little sensitive" and that it would therefore be unwise to place Ms. Piehler on a performance improvement plan. Trial Exhibit 76.

Furthermore, on August 16, 2014, after becoming aware of Ms. Piehler's complaints and just a week after giving her a negative performance review, Mr. Awtry forwarded an email between Ms. Piehler and Jermain Maldonado—which was then nearly a year and half stale---to Mr. Berardo, indicating in the subject line that "This is the email I mentioned." Trial Exhibit 86. Mr.

Awtry later had Mr. Maldonado recirculate the same underlying email from March 2013 to Mr. Awtry on June 26, 2015, just days before Ms. Piehler was fired. Trial Exhibit 498.

***Ms. Piehler's Final Performance Review***

In her February 5, 2015 performance review, the final review she received before she was terminated, Ms. Piehler received a performance review score of 3.59 out of 5.0. Trial Exhibit 66. In the reviewer notes, Mr. Awtry commented that Ms. Piehler "had a GREAT 1H FY 15[.]" *Id.* Out of the approximately seventeen areas that the review covered, Ms. Piehler was rated as meeting or exceeding expectations in all but two areas. *See id.* Ms. Piehler received positive scores and comments in the questions regarding "Approach the business with a CAN DO attitude that supports the businesses' initiatives" and "Operate within the organizations formal and informal structures and build allies and relationships across the company." *Id*.

***Absolute's Alleged Reasons for Terminating Ms. Piehler***

Absolute ultimately made the decision to terminate Ms. Piehler in early April 2015. *See* Ferris Decl., Ex. S (March 10, 2023 Trial Tr.) at 870:15-19; 1077:14-18. During the trial, Absolute's employees offered differing, and often contradictory reasons for Ms. Piehler's termination. Mr. Berardo testified that Ms. Piehler was not terminated based on her performance, her sales, or any violation of Absolute's policies, but rather due to her working relationship with Mr. Awtry. Ferris Decl., Ex. H (Berardo Tr.) at 279:11-280:20; 282:22-24. Mr. Berardo further testified that while another male regional director was given a written warning about his job performance, Ms. Piehler was not given a written warning nor was she placed on a performance improvement plan before her termination. *Id.* 278:20-279:7; 267:23-268:8.

Mr. Kenny initially testified that there were three reasons for Ms. Piehler's termination, but during his live testimony on the witness stand, changed it to four reasons, ultimately stating

that she was fired because her performance was not consistent, she was difficult to work with, lacked recent cyber security experience, and did not support the company's objectives. *See* Ferris Decl., Ex. S (March 10, 2023 Trial Tr.) at 862:12-863:4. The jury also heard extensive testimony from Mr. Kenny regarding the survey conducted by Absolute where Absolute's employees identified significant communications issues with Mr. Kenny and Mr. Awtry. Trial Exhibit 67; Ferris Decl., Ex. S (March 10, 2023 Trial Tr.) at 853:15-854:16; 854:22-861:3; 864:25-866:7; 866:12-867:20.

During his testimony, Mr. Awtry testified that at the time Ms. Piehler was terminated, she had been consistently overperforming her sales numbers for the several previous quarters. *See* Ferris Decl., Ex. M (March 13, 2023 Trial Tr.) at 1080:2-11; 1081:25-1082:3. Mr. Awtry further stated that while in Ms. Piehler's February 2015 performance review that he told her that she needed to improve her portfolio balance in terms of Absolute Manage and Absolute Service, those portions of the business were sold off approximately four months later. Trial Exhibit 66; Ferris Decl., Ex. M (March 13, 2023 Trial Tr.) at 1065:12-24. Mr. Awtry further testified that while Ms. Piehler was terminated because she did not support management, he admitted that instance on which he relied on that occurred in May 2015 and was thus already after the decision to terminate her was made. *Id.* at 1099:13-1100:16. During direct exam by his own counsel, Mr. Awtry pointed to the March 2013 email from Mr. Maldonado as an example of how Ms. Piehler was unsupportive of the reorganization that would not be occurring until 2015. Trial Exhibit 420; Ferris Decl., Ex. M (March 13, 2023 Trial Tr.) at 953:10-956:14.

The jury also heard Mr. Awtry admit on the witness stand that he was changing his trial testimony from his previous deposition testimony to whether cybersecurity experience was necessary for Absolute's sales employees. *Id.* at 1101:5. Mr. Awtry also testified that he did not

even bother to find out whether Ms. Piehler had cybersecurity experience before terminating her. *Id.* at 1102:12-15.

**ARGUMENT**

## I.  Legal standard.

As Absolute correctly notes in its brief, "there is a high standard" for Courts to grant Rule 50(b) motions. Defs Br. at 4. That burden is even more—"particularly heavy"—"when the jury has deliberated in the case and actually returned its verdict" in favor of the non-movant." *Ortiz v. Stambach*, No. 1:16-CV-00321 EAW, 2023 WL 2058075, at *2 (W.D.N.Y. Feb. 17, 2023) (Wolford, J.) (quoting *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015)). "In such circumstances, a court may set aside the verdict only 'if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it.'" *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations omitted); *Ortiz*, 2023 WL 2058075, at *2 (the Court "must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury.") (quoting *Williams v. Cnty. of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999)). The Court must not "consider evidence favorable to appellant that the jury need not have believed" and "must disregard contradicted evidence and testimony from impeached and interested witnesses that supports" the moving party. *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005) (citing *Reeves*, 530 U.S. at 150). In other words, the

11

question is whether, if credibility assessments are made against the moving party and all reasonable inferences are drawn against the moving party, a reasonable jury nevertheless would have no choice but to find in the movant's favor. *Zellner v. Summerlin*, 494 F.3d 344, 370–71 (2d Cir. 2007). As a result, such motions are granted "sparingly." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001).

## II. Viewing the evidence in the light most favorable to Ms. Piehler, there was sufficient evidence for a reasonable jury to find that she established a prima facie case of retaliation under the NYSHRL.

In addition to the substantial evidence that allowed the jury to infer that Ms. Piehler's termination was because of the protected activity in which she engaged (discussed *infra* at Point III), the evidence presented at trial showed that she met the *prima facie* case of retaliation under the NYSHRL, which required that she show: (1) Absolute understood or could have reasonably understood that she was engaging in protected activity; (2) Ms. Piehler engaged in protected activity; (3) she suffered an adverse action; and (4) Absolute took the adverse action because of her protected activity. *See* Ferris Decl., Ex. A (March 15, 2023 Trial Tr.) at 1397:20-1398:5. Here, viewing the evidence and testimony in the required light most favorable to Ms. Piehler, it simply cannot be said the jury's verdict was the result of "sheer surmise and conjecture." *Cash*, 654 F.3d at 333.

### A. Absolute understood, or could have understood, that Ms. Piehler was engaging in protected activity.

Not surprisingly, when an employer admits that it knew an employee's complaint could stem from the fact that she had been discriminated against, a jury is entitled to draw the (obvious) conclusion that the employer did in fact "know or could have known" that that the employee was engaging in protected activity of complaining about discrimination. Here, when Absolute made

12

such an admission at trial, the jury was entitled to find Ms. Piehler established that element of the *prima facie* case.

The "employer knowledge" prong of the *prima facie* test is at heart a subjective one: did the employer know the employee's complaint was about treatment that might in fact have been discrimination? It does not matter if the employee used the magic words "discrimination," or if in fact the conduct was discriminatory, just that the employee could have been protesting about discrimination *See Wong v. Blind Brook-Rye Union Free Sch. Dist.,* No. 20-CV-2718 (CS), 2022 WL 17586324, at *10 (S.D.N.Y. Dec. 12, 2022) ("There must be something in the protests that could reasonably have led [the employer] to understand that [unlawful discrimination] was the nature of her objections.'") (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998))*; Pinner v. Budget Mortg. Bankers, Ltd.*, 169 F. App'x 599, 600 (2d Cir. 2006); *see also Ramos v. City of New York*, No. 96 Civ. 3787(DLC), 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997) (no "magic words" must be used). When the employer makes that acknowledgement, it avoids the more difficult issue, and the one most often litigated, in which the employer disclaims **any knowledge** that discrimination was even in the picture when the employee complains.[1] Here, there is both direct and indirect evidence that, subjectively, Absolute knew Ms. Piehler's complaints implicated potential discrimination by Absolute, thus satisfying this element of the *prima facie* case.

    1.   The jury was presented with direct evidence that Absolute understood, or could have understood, that Ms. Piehler was engaging in protected activity.

---

[1]    Courts have developed a variety of different ways for a fact finder to impute knowledge to the employer that are not relevant here. *See Kelley v. Sun Microsystems, Inc.,* 520 F. Supp. 2d 388, 403 (D. Conn. 2007) (finding protected activity even where employee did not "use legal terms or buzzwords when opposing discrimination" in making complaints to human resources that did not reference sex or age discrimination); *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112–13 (2d Cir. 2019) (complaint about "peers" enough for protected activity); *Truskoski v. ESPN, Inc*., 823 F. Supp. 1007, 1012 (D. Conn. 1993) (protected activity found even where plaintiff complained about "unfair" treatment and even though all other similarly situated employees were the same sex as plaintiff).

Unlike most cases, the jury was presented with direct evidence during the trial that Absolute understood, or could have understood that Ms. Piehler was engaging in protected activity.

In his testimony, Mr. Berardo testified that employee complaints at Absolute fell into two different buckets: those in which discrimination was not an issue and those which required investigation because of potential discrimination. Ex. H (Berardo Tr.) at 77:2-78:13. As to the first bucket, no further investigation was necessary. *Id*. at 77:19-78:6. As to the second, Mr. Berardo stated Absolute "absolutely" had the responsibility to investigate, substantiate, and remedy (if necessary) those complaints. *Id.* at 76:11-20; 79:5-16.

Mr. Berardo's testimony about this dichotomy made it simple for the jury to understand which complaints involved the protected activity of an employee complaining about what could be discrimination. If Mr. Berardo should have probed the complaint further (and regardless of whether Mr. Berardo did so), that was because complaint was a form of protected activity that implicated potential discriminatory conduct . *Id*. at 77:19-78:13. In doing so, Mr. Berardo was merely carrying out his legal duty under anti-discrimination laws to investigate claims of discrimination, a duty that arose even when the employee did not even mention the word "discrimination." Ferris Decl., Ex. H (Berardo Tr.) at 93:17-94:20 (Mr. Berardo stating that an employee would not need to specifically say that they were being discriminated against on the basis of sex); *see also Torres v. Pisano*, 116 F.3d 625, 638 (2d Cir. 1997) (employers "can be held liable . . . if [they do] not fulfill [their] duty to take reasonable steps to remedy the [violation]."); *Sassaman v. Gamache*, 566 F.3d 307, 314-15 (2d Cir. 2009) ("an employer's response [or lack thereof] to an allegation of discrimination can *itself* constitute evidence of discrimination.") (emphasis in original). Conversely, for more run of

14

the mill "disagreements between managers and employees," Mr. Berardo's policy was not to ask any follow up questions. Ferris Decl., Ex. H (Berardo Tr.) at 77:20-23.

As to the category of complaints that would implicate discrimination and that Absolute knew would require further follow up, Mr. Berardo provided six examples: (1) a female employee complaining that they were not being treated fairly; (2) a female employee stating that they wanted to be treated the same as their male colleagues; (3) a female employee stating that she was being treated differently than her male counterparts, (4) a female employee stating that they wanted to be paid fairly; (5) a female employee stating that a male employee was being paid full value and she wanted to also be paid full value for her work; and (6) an employee telling him that they did not want to be known as a "troublemaker." *Id.* at 63:20-64:15; 76:11-18; 94:21-95:7; 97:21-98:5; 95:9-18; 95:9-97:5; 97:7-19.

As demonstrated below, the complaints made by Ms. Piehler match **each** the circumstances under which Mr. Berardo testified he would conduct a greater investigation and hence the jury was free to believe that Mr. Berardo knew they were complaints about protected activity:

| Words or Acts that Absolute Stated Would Require Additional Follow Up or Investigation Under its Duty to Investigate Complaints of Discrimination | Word or Acts of Ms. Piehler |
|---|---|
| A female employee complaining that they were not being **treated fairly**. *See* Ferris Decl., Ex. H (Berardo Tr.) at 63:20-64:15; 76:11-18) | During her June 30, 2014 call with Mr. Berardo, she told him "I wanted to be **treated equally** to the others." *See* Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 292:24-293:6. |
| A female employee stating that they wanted to **be treated the same** as their male colleagues. (Ex. H (Berardo Tr.) at 94:21-95:7) | Ms. Piehler specifically asked in her July 6, 2014 email to Mr. Berardo to **be "treated the same"** and that Mr. Awtry "treat all regions the same." Trial Exhibit 21. |
| A female employee stating that she was being **treated differently** than her male | Ms. Piehler testified that in her early July 2014 one-on-one meeting with Mr. Olsen in Vancouver, she told him that "I wanted |

| | |
|---|---|
| counterparts. (Ex. H (Berardo Tr.) at 97:21-98:5) | to **be treated like the others**. I wanted the same respect and to be treated like other managers and I did not feel like that was happening." Ex. D (March 7, 2023 Trial Tr.) at 350:2-7. In her August 2014 performance review addendum, Ms. Piehler further noted that "I am not being judged fairly" and provided evidence regarding how "the same standard is not being used" for her region versus other regions. Trial Exhibit 23. |
| A female employee stating that they wanted to be **paid fairly**. (Ex. H (Berardo Tr.) at 95:9-18) | Mr. Piehler's July 6, 2014 email specifically requests that "all I want is . . . to be **paid fairly**." Trial Exhibit 21. |
| A female employee stating that a male employee was being paid full value and she wanted to also be paid full value for her work. (Ex. H (Berardo Tr.) at 95:9-97:5) | In her July 6, 2014 email to Mr. Berardo, Ms. Piehler wrote that while she was subject to an internal investigation, a male employee who committed an infraction was not investigated and was paid at full value. Trial Exhibit 21. |
| An employee stating him they did not want to be known as a "**troublemaker**." (Ex. H (Berardo Tr.) at 97:7-19) | "I don't want to be known as a **troublemaker**." Trial Exhibit 21. Ms. Piehler also testified that "**I didn't want to be known as someone who was just randomly complaining about everything**" and that she believed she would be fired if she was considered a troublemaker. Ex. D (March 7, 2023 Trial Tr.) at at 294:23-295:15. |

The jury was certainly able to infer from matching up this testimony that Absolute knew that Ms. Piehler was making complaints about gender discrimination whether or not Mr. Berardo did what he was supposed to about these complaints. That inference is even stronger given the number and similarity of the complaints which in context further amplifies the discriminatory nature of the complaints that Mr. Berardo himself claimed he would not be deaf to, even if the complaint stood alone. Mr. Berardo admitted that if he viewed her complaints as "disagreements between managers and employees" he would have categorized them into generic complaints about the workplace needing no extra follow-up. Instead, he told the jury the opposite—they needed the

extra follow-up because of the potential for discrimination. (The fact that in reality he may have done nothing to follow up on them when made by Ms. Piehler as he said he was supposed to do only reinforces her claim of retaliation as opposed to diminishing it.)

The fact that Absolute did not actually follow up to further investigate Ms. Piehler's specific complaints is of no moment. Even if Absolute did not actually do so, it was still a complaint of discrimination under the rubric for such complaints established by Mr. Berardo. Likewise, Absolute's ultimate determination as to whether there actually was discrimination is immaterial. *Treglia,* 313 F.3d at 719. All that matters is that Absolute **believed** Ms. Piehler to be making a complaint about discrimination, which the jury found that she did based on Mr. Berardo's testimony that it triggered further questions. In fact, based on the jury's finding against Ms. Piehler on her gender discrimination claims, the jury may have very well found that Ms. Piehler's complaints of gender discrimination were unfounded. But since Ms. Piehler was making a good faith complaint of discrimination that Absolute knew triggered follow up questions, that is all that is required for this element.

In some ways, Ms. Piehler does not disagree with Absolute's underlying argument: if her complaints were too vague, Absolute could not have known that they were protected activity. But that was not the testimony here. Ms. Piehler's words were not vague because they used Absolute's own "magic words" that triggered Absolute's duty to follow up and investigate an instance of potential discrimination.

Furthermore, Mr. Berardo's and Mr. Olsen's testimony that they did not believe Ms. Piehler was making complaints about gender discrimination is of no consequence. The difference in testimony between Ms. Piehler versus Mr. Berardo and Mr. Olsen was black and white, and as

17

a result, the jury was required to make decisions as to whom they believed.[2] Asking the Court therefore to weigh that testimony against the contrary statements of Mssrs. Berardo and Olsen is therefore a witness credibility determination that is inappropriate as a basis of a Rule 50(b) motion. *See Ortiz*, 2023 WL 2058075, at *2 (Wolford, J.).

Accordingly, there was direct evidence that allowed the jury to find that Absolute understood, or should have understood, that Ms. Piehler engaged in protected activity.

> 2. <u>There was also overwhelming circumstantial evidence that allowed the jury to infer that Absolute understood, or could have understood, that Ms. Piehler was engaging in protected activity.</u>

In addition to the direct evidence that the jury heard regarding Absolute's knowledge of Ms. Piehler's protected activity, this prong can independently also be proven through the large amounts of circumstantial evidence that the witness saw and heard. As the chart above makes clear, the testimony of Mr. Berardo and Ms. Piehler, even if not considered direct evidence, would still allow the jury to infer that Absolute had knowledge of her complaints of discrimination. This is no surprise because any reasonable person would interpret the testimony as showing that Absolute was aware that Ms. Piehler was making gender discrimination complaints that Absolute knew it had a duty to investigate and follow up on. As a result, the employer knowledge prong is satisfied through circumstantial evidence as well.

---

[2] There was good reason for the jury to disbelieve Mssrs. Berardo and Olsen. Mr. Olsen not only found that Mr. Kenny's discriminatory comments at the Westin meeting were not problematic, but also testified that swimming naked in front of other employees did not send a negative message to female employees. Ferris Decl., Ex. G (Olsen Tr.) at 34:9-15; 54:25-58:16; 61:23-63:25. Mr. Berardo similarly testified that Absolute did not find Mr. Kenny's comments at the Westin meeting to be discriminatory. Ferris Dec., Ex. H (Berardo Tr.) at 165:23-166:10.[2] From this testimony, a reasonable juror could conclude that Mr. Olsen and Mr. Berardo were not credible.

**B.      Ms. Piehler engaged in protected activity.**

As discussed above, Absolute understood that Ms. Piehler was engaged in protected activity based on Mr. Berardo's admission that her complaints would have triggered follow up questions to further investigate whether there was discrimination. Where, as here, an employer perceives an employee to be engaging in protected activity, the issue and element of whether the employee actually engaged in protected activity is irrelevant. But even if it were, the record more than adequately establishes that the jury reasonably concluded that Ms. Piehler repeatedly engaged in protected activity.

> 1.      <u>The analysis of whether Ms. Piehler actually engaged in protected activity is unnecessary as Absolute perceived her as complaining about gender discrimination.</u>

As an initial matter, the actual protected activity that the employee engaged in is irrelevant if the employer subjectively perceived the employee to be engaging in protected activity. *See Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1418 (2016) (in First Amendment retaliation case, Supreme Court held that perceived protected activity, even in absence of actual protected activity by the employee, establishes protected activity); *see also Grosso v. City University of New York*, 03–cv–2619 (NRB), 2005 WL 627644, *3 (S.D.N.Y. Mar. 16, 2005) (recognizing "perception theory" of retaliation where the a plaintiff can meet elements of a Title VII retaliation claim, even where the employee did not actually engage in protected activity); *Fogelman v. Mercy Hosp.*, 283 F.3d 561 (3d Cir. 2002) ("We have consistently held that an employer's discharge of an employee for discriminatory reasons amounts to illegal retaliation even if it is based on the employer's mistaken belief that the employee engaged in protected activity."); *Brock v. Richardson*, 812 F.2d 121, 125 (3d Cir. 1987) (in retaliation action under the Fair Labor Standards Act, employer's mere belief that the employee engaged in protected activity, even if ultimately

19

wrong, is sufficient to show protected activity). In other words, whether the employee engaged in actual protected activity is not determinative, and what really matters is whether the employer *thought* the employee was engaging in protected activity.

As already established *supra* at III.A through Mr. Berardo's testimony, Absolute *thought* that Ms. Piehler was engaging in protected activity. As a result, the element of whether Ms. Piehler actually engaged in protected activity is irrelevant in the analysis of the prima facie case. Given that Absolute understood Ms. Piehler's complaint to be a complaint of discrimination, this court therefore need not even analyze whether or not her complaints constitute "protected activity."

###### 2.   The jury reasonably found that Ms. Piehler's complaints about gender discrimination were protected activity.

Even if this Court were to engage in the analysis of whether Ms. Piehler actually engaged in protected activity (it need not), the jury reasonably found that Ms. Piehler's complaints of gender discrimination qualified as protected activity and were not based on sheer surmise and conjecture.

To engage in protected activity, simply making informal complaints to management constitutes protected activity. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("[T]he law is clear that opposition to a [] violation need not rise to the level of a formal complaint in order to receive statutory protection,"); *Varno v. Canfield*, 664 Fed. Appx. 63, 65 (2d Cir. 2016) (an employee's testimony that they orally complained to a human resources employee constituted protected activity). As noted above, no "magic words" are necessary. Ramos, 1997 WL 410493, at *3.

Here, both the testimony and documentary presented at trial demonstrates that the jury's verdict was a result of its careful deliberations of the evidence and not a product of conjecture. At trial, Ms. Piehler testified that when she was concerned with how she was being singled out and treated differently, she reached out to Mr. Berardo beginning on June 30, 2014 to complain about

the discrimination she was experiencing. Trial Exhibit 20; Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 291:2-19. In her email to Mr. Berardo, she specifically noted that it was in regards to a "confidential HR issue" and made no reference to the DOE investigation that was coincidentally occurring at the same time. Trial Exhibit 20; Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 291:2-19. In the subsequent phone call with Mr. Berardo that same day, Ms. Piehler testified that "I told him that I was concerned that **I wanted to be treated equally** to the others." *Id.* at 292:24-293:6 (emphasis added). The jury also was presented with Ms. Piehler's notes for that same call, which stated that she wanted to be "treated with more respect" and wanted the note added to both her and Mr. Awtry's personnel files, which the jury was able to infer was because it was a human resources issues. Trial Exhibit 18.

Further, the jury also considered the evidence of the July 6, 2014 email that Ms. Piehler sent Mr. Berardo presenting more "color" to the information that she had provided to him during the June 30, 2014 call. Trial Exhibit 21. In that email, Ms. Piehler stated that she didn't want to be known as a troublemaker, "all I want is the data reflected correctly and **to be paid fairly**." *Id.* (emphasis added). Ms. Piehler noted that while she was subject to an internal investigation, a male employee who committed a violation was not investigated and continued to be paid in full. *Id*. Ms. Piehler further provided several examples in how she and her region were being treated differently, including how her sales records for certain quarters were incorrect and that Mr. Awtry was inconsistently calculating sales growth amongst the various regions. *Id.* Ms. Piehler specifically asks to be "**treated the same**" in terms of how her performance is calculated and that "**we treat all regions the same**." *Id*. (emphasis added).

Ms. Piehler further engaged in protected activity during her one-on-one meeting with Mr. Olsen at Absolute's Global Sales Meeting in early July 2014. Ms. Piehler testified that she "said

that **I wanted to be treated like the others**. I wanted the same respect and to be treated like other managers and I did not feel like that was happening." Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 350:2-7 (emphasis added). Mr. Olsen himself confirmed that the discussion "was just about how she was treated." Ferris Decl., Ex. G (Olsen Tr.) at71:17-20.

Considering all of this collective evidence and the context in which the complaints were made, the jury duly deliberated over the course of two days and determined that Ms. Piehler engaged in protected activity.[3] The jury was instructed that in order to prevail on her retaliation claim, Ms. Piehler needed to make complaints of *gender discrimination*, as opposed to just general complaints. Ferris Decl., Ex. A (March 15, 2023 Trial Tr.) at 1397:102-22. The jury found in favor of Ms. Piehler on this claim, meaning that it found that she met this element was met. As the above evidence demonstrates, it cannot be said that the jury's verdict was sheer surmise and conjecture given the totality of the evidence, including the disparities in treatment that Ms. Piehler identified in how she was treated versus Mike Kenny.

Therefore, Absolute has failed to meet its burden of showing that the jury's determination that Ms. Piehler engaged in protected activity was erroneous as a matter of law.

**C.     The jury determines if the evidence establishes a "but-for" causation.**

Absolute fundamentally misreads the "but-for" requirement in proving retaliatory termination. In fact, the 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Ya-Chen Chen*, 805 F.3d at 78 (Chin, J., concurring) (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 n.5 (2d Cir. 2013)). The Supreme

---

[3]     While Ms. Piehler did not specifically use the term "gender discrimination," the Court itself pointed out in its summary judgment opinion that Ms. Piehler likely had good reason not to do so given Absolute's discriminatory culture. *Van Brunt-Piehler v. Absolute Software, Inc*., 504 F. Supp. 3d 175, 194 (W.D.N.Y. 2020). The jury likely concluded the same.

Court has held that there can be multiple "but for" causes, and that "but for" does not equate to "solely," "because of," or "primarily because of." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020) ("the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision."). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausabilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reason for its action." *Kwan*, 737 F.3d at 846; *accord Jones v. Target Corp.*, 792 F. App'x 54, 56 (2d Cir. 2019) (summary order).

Furthermore, the determination of whether a plaintiff's protected activity was the "but-for" cause of the employee's termination is a factual determination by the jury that is inappropriate for overturning based on Absolute's own views of the evidence. *See Kwan*, 737 F.3d at 846 n. 5 (2d Cir. 2013) ("The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition [as a matter of law], because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact. A jury should [] determine whether [] she would not have been terminated if she had not complained about discrimination.").

Here, the Court instructed the jury (a point echoed by the defendants in their close) that Ms. Piehler would "need to prove that but for her complaints, she would not have been terminated." *See* Ferris Decl., Ex. A (March 15, 2023 Trial Tr.) at 1303:15-16; 1399:12-15. The jury therefore acted within its sole province to decide whether Ms. Piehler met this element of the claim. Absolute may wish the jury had concluded otherwise, but that second guessing merely reflects its deflated

hopes of what it wanted the jury to do, but that wish is not a command the jury to accept Absolute's alternative reading of the facts.

Even factually, Absolute misconstrues the evidence in arguing that the adverse actions that Ms. Piehler suffered were the "same" as before her protected activity. Defs. Br. at 12-13. Certainly, this cannot be true of her termination. But it is also true as to each of the other adverse actions: Mr. Awtry yelling at her in Vancouver was a completely different interaction that was because she had complained about gender discrimination; Absolute did not pay her commissions on the DOE account for over two months; she did not receive a pay raise in Fiscal Year 2015; and she received a new, negative performance review in August 2014. Trial Exhibit 11; Trial Exhibit 252; *See* Ferris Decl., Ex. D (March 7, 2023 Trial Tr.) at 231:2-234:25; 316:15-20. Furthermore, each of the cases that Absolute relies on in making this point are inapposite as they were decided on either a motion to dismiss or for summary judgment, and therefore unlike the instant case, did not already have a jury determination that the plaintiff's protected activity was a "but for" cause of her termination. Defs. Br. at 13-14.

In addition to her termination, the other adverse actions that Plaintiff alleged are legally cognizable. Significantly, courts construe adverse actions in the retaliation context much more broadly than they do in evaluating adverse actions relating to discrimination. *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010); *Zelnik v. Fashion Institute of Tech.*, 464 F. 3d 217, 226 (2d Cir. 2006). Courts hold in the Second Circuit hold that the adverse actions that happened to Ms. Piehler such as receiving a negative performance review, being humiliated before her subordinates (when Mr. Awtry yelled at her in the lobby in Vancouver), the withholding of pay (her DOE commissions), and not receiving a pay increase are adverse actions. *See Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (negative performance review is an adverse action); *Giordano-*

*Forkan v. N.Y.C. Dep't of Educ.,* No. 13 Civ. 6950(GBD), 2014 WL 5369426, at *3 (S.D.N.Y. Oct. 17, 2014) (denial of a pay raise constitutes adverse action); *Smith v. Westchester Cty.*, 769 F. Supp. 448, 471, 471 n.27 (S.D.N.Y. 2011) (withholding of pay constitutes adverse action); *Kirkweg v. NYC Dept. of Educ.*, 633 Fed. Appx. 40, *41 (2d Cir. Feb. 16, 2016) ("Acts that humiliate or undermine an employee's authority with subordinates can constitute adverse action").

Accordingly, the "but-for" standard, and the requirement that it is the jury to determine what evidence meets that standard, furnishes the basis to uphold the verdict not reverse it.

### D. Ms. Piehler Proved a Causal Connection Between Her Complaints of Gender Discrimination and Her Termination.

As discussed extensively above at Point II.A, Ms. Piehler has already shown through direct evidence that Absolute was aware that she engaged in protected activity. The only remaining question therefore is whether there is a causal connection of that protected activity to her termination. Here, the jury could easily find that there was a causal connection based on an abundance of convincing forms of circumstantial evidence.

It is well-settled that a causal connection between the protected activity and the adverse action may be established through a variety of independent forms of circumstantial evidence including: (1) weaknesses, implausabilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reason for its action; (2) that the employer waited for the opportune time to terminate the employee; (3) escalating, negative conduct over a period of time; and (4) temporal proximity. *Kwan*, 737 F.3d at 846; *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013); *Behringer v. Lavelle School for the Blind*, No. 08 CIV 4899 JGK, 2010 WL 5158644, at *11 (S.D.N.Y. Dec. 17, 2010). As discussed below, there was ample circumstantial evidence for the jury to infer a causal connection based on these different possibilities.

1.  <u>The jury could infer a causal connection based on rejecting Absolute's proffered reasons for Ms. Piehler's termination under *Reeves v. Sanderson Plumbing*.</u>

Under binding Supreme Court precedent, whereas like in the present case the jury rejected the employer's supposed legitimate, non-discriminatory reasons for the plaintiff's termination, that alone is sufficient for the plaintiff to show a causal connection.

Absolute has a fundamental misunderstanding of the legal framework surrounding the closely related issues of causal connection and pretext. *See* Defs. Br. at 20-22. Absolute fails to appreciate that under the Supreme Court's holding in *Reeves v. Sanderson Plumbing Products, Inc*. that if a plaintiff offers evidence that disproves the employer's proffered non-discriminatory reasons for plaintiff's termination, that itself is indirect evidence of retaliatory animus and plaintiff need not provide other proof. 530 U.S. 133, 137 (2000). Ms. Piehler does not, as Absolute argues, need to affirmatively prove that Absolute's supposed reasons for Ms. Piehler's termination were pretextual. Instead, the jury was able to infer discrimination based on the falsity of Absolute's explanation for the reasons for her termination alone.

The Supreme Court in *Reeves* addressed "the kind and amount of evidence necessary to sustain a jury's verdict that an employer unlawfully discriminated." 530 U.S. 133, 137, (2000). As the Supreme Court explained regarding the parties' burdens of proof in anti-discrimination lawsuits:

> **Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive**. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." **Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision**. Thus, a plaintiff's

>prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id.* at 146–49 (emphasis added and citations omitted); *see also Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 142 (2d Cir. 1993) ("[A] fact finder's disbelief of a defendant's proffered rationale may allow it to infer the ultimate fact of intentional discrimination in some cases."). Thus, discriminatory intent can be inferred by the jury through simply finding that the jury does not believe the employer's stated reasons for terminating the employee. *Id*.

Additionally, the Second Circuit holds that an employer's changing rationale is evidence of pretext. *Kwan,* 737 F.3d at 846 ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."); *E.E.O. C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (holding that a juror could infer that the shifting and inconsistent explanations given by the employer at trial were pretextual, and developed over time to counter the evidence suggesting discrimination).

*Vera v. Alstom Power Inc.* is instructive and persuasive on this point. 189 F. Supp. 3d 360 (D. Conn. 2016). In very similar circumstances to this case, the defendant in *Vera* made a Rule 50(b) motion where the jury had found in favor of the employee on the employee's retaliation claims, but found in favor of the employer on the employee's sex discrimination claims under Title VII and state law claims. *Id.* at 367-368. In reviewing the evidence, the court noted that "the jury could have found untrustworthy" the defendants' testimony because of inconsistencies and contradictions in the employer's testimony. *Id*. at 370. Citing *Reeves*, the court upheld the jury's verdict on the retaliations claim stating that "[a] finding that [the employer's] explanations were

unworthy of credence may have been quite persuasive on the question of whether [the employer's] true motivation was retaliation." *Id.* at 370-71 (citing *Reeves*, 530 U.S. at 147).

Here, the record shows that there was more than sufficient evidence for a reasonable factfinder to find "weaknesses, implausibilities, inconsistencies, or contradictions" in rejecting Absolute's pretextual reasons for terminating Ms. Piehler and therefore to infer that the real reason for her termination was retaliation. *Kwan*, 737 F.3d at 846. The jury was instructed that it should scrutinize the reasons offered by Absolute, and that if found the reasons were not the real reasons for her termination, it could infer that the pretext was designed to conceal discrimination. Ferris Decl., Ex. A (March 15, 2023 Trial Tr.) at 1391:15-21.

A reasonable juror could have certainly made that inference given the evidence presented. Perhaps most damning, Mr. Awtry indicated that Ms. Piehler was fired for a lack of cybersecurity experience despite freely admitting that he was changing his prior deposition testimony from nearly three years earlier, and that he never even bothered to find out if she had such experience before terminating her. Ferris Decl., Ex. M (March 13, 2023 Trial Tr.) at 1101:5; 1102:12-15. Further, while Absolute argued that Ms. Piehler sales numbers were inconsistent, Mr. Awtry admitted her sales numbers for the several quarters prior to her termination were overperforming her targets. *Id.* at 1080:2-11; 1081:25-1082:3.

The jury also likely found Mr. Awtry's testimony that Ms. Piehler did not support the reorganization to be particularly untruthful when Mr. Awtry cited an email from over two years prior (and thus well before the reorganization even occurred) as such evidence. Trial Exhibit 420; Ferris Decl., Ex. M (March 13, 2023 Trial Tr.) at 953:10-956:14. The jury also likely discredited the rationale that Ms. Piehler's portfolio was not balanced in terms of Absolute Manage and Absolute Service as Absolute, considering that Absolute sold off those products just months later

28

and they were therefore not a sales priority. *Id.* at 1065:12-24. Nor did the jury find compelling the suggestions that Ms. Piehler was difficult to work with, since the employee survey instead pointed to Mr. Kenny and Mr. Awtry as the ones who had significant communications issues. Trial Exhibit 67; Ferris Decl., Ex. S (March 10, 2023 Trial Tr.) at 853:15-854:16; 854:22-861:3; 864:25-866:7; 866:12-867:20. Furthermore, the jury likely thought that Mr. Awtry was likely papering over his retaliatory motives when he had the Jermaine Maldonado email recirculated just days before Ms. Piehler's termination, despite the fact that he had never taken any previous action against Ms. Piehler on it. Trial Exhibit 498.

Mr. Awtry was not even the only live witness who changed their testimony on the witness stand, as Mr. Kenny initially testified that there were three reasons for Ms. Piehler's termination, but then changed his answer to add a fourth reason. Ferris Decl., Ex. S (March 10, 2023 Trial Tr.) at 862:12-863:4. And both Mr. Awtry and Mr. Kenny were contradicted by Mr. Berardo's testimony where he testified that Ms. Piehler was not terminated based on her performance or sales. Ferris Decl., Ex. H (Berardo Tr.) at 279:11-280:20; 282:22-24.

Based on the numerous inconsistencies, weaknesses, and contradictions that existed, the jury was free to discredit Absolute's stated reasons for Ms. Piehler's termination. As a result, it was free to infer retaliatory animus and causal connection, and the jury's verdict should not be overturned as a result.

2. A causal connection exists because Absolute waited for the "opportune time" to fire Ms. Piehler.

The jury was also able to infer a causal connection between Ms. Piehler's protected activity and her termination because it considered evidence that Absolute waited for the opportune time to terminate her.

Where several months have passed between the protected activity and adverse action, the Second Circuit has considered the factual circumstances of the case and whether the employer lied in wait for an "opportune time" to retaliate. *See Summa*, 708 F.3d at 128 (2d Cir. 2013) (seven-month gap "not prohibitively remote" where decisionmaker had personal knowledge of protected activity when she terminated plaintiff's employment and had retaliatory motive); *Bucalo*, 691 F.3d at 131; *Espinal v. Goord*, 558 F.3d at 130 (permitting longer temporal gap because "officers were waiting for opportune time to retaliate").

Here, the jury could have reasonably inferred that Mr. Awtry (and Absolute) lied in wait to terminate Ms. Piehler until early April 2014 because it was its first opportunity to do so. *Summa*, 708 F.3d at 128. Before Ms. Piehler engaged in protected activity, Mr. Awtry was told in late June 2014 that he could not fire Ms. Piehler as a result of the DOE investigation. Trial Exhibit 74. After hearing that Ms. Piehler had engaged in protected activity, he was unable to immediately terminate her due and needed to wait until things would be less "sensitive" as Mr. Berardo had told him just prior. Trial Exhibit 76. Even after the DOE investigation concluded, Mr. Awtry still did not have the opportunity to fire Ms. Piehler for several months because her performance was so stellar and it would not provide a basis for her termination. Trial Exhibit 66. Only in April 2015 and under the guise of the reorganization was Mr. Awtry finally able to execute his retaliatory plan.

Therefore, because the jury could have inferred that because Absolute was waiting for the opportune time to terminate Ms. Piehler that hid its retaliatory animus, a causal connection exists.

3.  <u>A causal connection exists because of the escalating, negative conduct that Ms. Piehler endured.</u>

The jury could also infer a causal connection based on the escalating, negative conduct that Ms. Piehler endured after she engaged in protected activity.

Courts allow for longer gaps in time between the protected activity and ultimate adverse action where a pattern of retaliatory conduct begins soon after the protected activity and escalates over time. *Behringer*, 2010 WL 5158644, at *11 (finding causal connection where employer "engaged in escalating, negative conduct towards her over an eight-month period"); *Marx v. Schnuk Markets, Inc.*, 76 F. 3d 324, 329 (10th Cir. 1996).

Here, Absolute engaged in continuing and escalating forms of retaliation that began immediately after she complained of gender discrimination: she was yelled at by Mr. Awtry; she received a negative performance review, and she did not receive a pay raise. The ultimate punishment she received was termination. As a result, the jury could infer the continuing forms of retaliation provided a causal connection between her protected activity and termination.

4. <u>Ms. Piehler is not relying on temporal scope alone.</u>

Absolute makes a fundamental error in suggesting that the *only* way in which a causal connection can be established is through temporal proximity, and that the outer limit is approximately three months. As the above cases and circumstances demonstrate, that is certainly not the case. To the extent that the outer limit is three months, that is *only* in situations where the employee is relying on the temporal time period to establish causal connection. Absolute ignores that Ms. Piehler is relying on a wealth of other evidence, such as weaknesses, implausabilities, inconsistencies, or contradictions in the Absolute's reasons; that Absolute lied in wait for an opportunity to retaliate; and that Absolute engaged in continuing retaliation as further evidence of the causal connection. Thus, the temporal scope cases on which Absolute relies are miles away from being applicable to the present case.

But even then, the Second Circuit has made clear that "[n]o 'bright line ... define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal

relationship between" a protected activity and an adverse act. *Cioffi v. Averill Park Central School Dist. Board of Ed.*, 444 F.3d 158, 168 (2d Cir. 2006). Courts in the Second Circuit have found that temporal gaps of eight months or far longer can still support temporal proximity. *See e.g., Bucalo v. Shelter Island Union Free Sch. Dist.,* 691 F.3d 119, 131 (2d Cir. 2012) (four-year gap between protected activity and adverse action "did not preclude a causal inference"); *Dupee v. Klaff's, Inc.*, 462 F. Supp. 2d 233, 240 (D. Conn. 2006) (finding that a 13-month gap was "not too temporally disconnected to support an inference of retaliation" in a state-law retaliatory discharge claim); *Baluch v. 300 West 22 Realty, LLC*, 2023 WL 112547, at *6 (S.D.N.Y. Jan. 5, 2023) (10-months between protected activity and termination*); Parrish v. Sollecito*, 258 F.Supp.2d 264 (S.D.N.Y. 2003) (eight month gap); *Bernhardt v. Interbank of New York*, No. 92 CV 4550, 2009 WL 255992, at *6 (E.D.N.Y. Feb. 3, 2009) (11-month span between protected activity and adverse act); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (eight-month gap between complaint and retaliatory act suggested causal relationship); *Lee v. Overseas Shipholding Grp., Inc*., No. 00-9682 (DLC), 2001 WL 849747, at *6 (S.D.N.Y. July 30, 2001) (seventeen-month gap).

Accordingly, because Absolute's argument is based on the entirely flawed premise that Ms. Piehler is solely relying on temporal proximity to establish the causal connection prong, its argument is inapplicable. The jury therefore was able to infer a causal connection based on the multiple forms of evidence establishing the connection.

## III.   Absolute's request for a partial dismissal in unwarranted and the Court should schedule the damages phase of the trial.

Lastly, Absolute makes the strange argument that the Court could potentially partially dismiss Ms. Piehler's retaliation claim to the extent that it is based on her termination, but otherwise preserve a finding on other adverse actions. Defs. Br. at 22. It is unclear how this would

even be permissible, and Absolute cites no case law where a Court has ever done so on a Rule 50(b) motion. Nor could the Court even do so because the jury's verdict did not parcel out each of the adverse actions, and it would be highly inappropriate for the Court to go back and make its own determinations on different adverse actions, especially when the jury's verdict was based on Ms. Piehler's termination. Since Absolute's motion fails, the Court should now move forward with scheduling the damages portion of the trial.

## CONCLUSION

For the foregoing reasons, the Court should deny Absolute's Rule 50(b) motion.


Dated:  May 12, 2023


                                        THOMAS & SOLOMON LLP

                        By:    s/ Jonathan W. Ferris
                               J. Nelson Thomas, Esq.
                               Jonathan W. Ferris, Esq.
                                *Attorneys for Plaintiffs*
                               693 East Avenue
                               Rochester, New York 14607
                               Telephone:  (585) 272-0540
                               nthomas@theemploymentattorneys.com
                               jferris@theemploymentattorneys.com

33